No. 23-6218 *and* No. 24-6043

IN THE

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

SUSAN PARISI,

*Plaintiff-Appellee*,

v.

GREENSKY, LLC
(incorrectly identified as BMO Harris Bank, NA, d/b/a Greensky, LLC),

*and*

OKLAHOMA WINDOWS AND DOORS LLC,
d/b/a Renewal by Andersen of Oklahoma.

*Defendant-Appellants*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
The Honorable David L. Russell
D.C. Case No. 5:23-CV-00115-R

**APPELLANTS' JOINT APPENDIX VOLUME I OF III, PAGES 1 TO 286**

Diane J. Zelmer, Esq.
BERENSON LLP
4495 Military Trail,Suite 203
Jupiter, Florida 33458
(561) 429-4496

*Attorneys for Appellant Oklahoma
Windows and Doors, LLC*

Barry Goheen
PIERSON FERDINAND LLP
100 Mount Paran Ridge
Atlanta, Georgia 30327
(404) 703-3093

Derrick T. DeWitt
Kyle R. Prince
DeWITT PARUOLO & MEEK
P.O. Box 138800
Oklahoma City, Oklahoma 73113
(405) 705-3600

*Attorneys for Appellant GreenSky, LLC*

## TABLE OF CONTENTS

| ECF # | Document | Date | Page |
|---|---|---|---|

### VOLUME I

| ECF # | Document | Date | Page |
|---|---|---|---|
| | Docket Sheet No. 5:23-cv-00115-R from the United States District Court for the Western District of Oklahoma | | A001 |
| 17 | GreenSky's Motion to Compel Arbitration as to All Claims Asserted by Plaintiff and to Dismiss or Stay Claims Pending Arbitration | April 28, 2023 | A013 |
| 18 | GreenSky's Brief in Support of Motion to Compel Arbitration as to All Claims Asserted by Plaintiff and to Dismiss or Stay Claims Pending Arbitration | April 28, 2023 | A016 |
| | Exhibit 1, Plaintiff's Amended Petition and Motion to Certify Class Action | | A042 |
| | Exhibit 2, Loan Agreement | | A068 |
| | Exhibit 3, Declaration of Timothy Kaliban | | A080 |
| | Exhibit 3-1, Loan Application | | A087 |
| | Exhibit 3-2, Loan Decision | | A088 |
| | Exhibit 3-3, Loan Agreement | | A089 |
| | Exhibit 3-4, Loan Account | | A101 |
| 36 | Amended Complaint and Motion to Certify a Class Action | August 21, 2023 | A103 |
| | Exhibit 1, Redacted 12/07/21 letter | | A123 |
| | Exhibit 2, 12/10/21 Email | | A126 |
| | Exhibit 3, 12/14/21 Email | | A127 |
| | Exhibit 4, 12/17/21 Email | | A128 |

| | Exhibit 5, Redacted 12/27/21 Letter | | A129 |
|---|---|---|---|
| | Exhibit 6, Redacted 10/2/22 Past Due Notice | | A130 |
| 39 | Parisi's Response in Opposition to GreenSky's Motion to Compel Arbitration as to All Claims Asserted by Plaintiff and to Dismiss or Stay Claims Pending Arbitration | August 24, 2023 | A132 |
| | Exhibit 1, Declaration of Susan Parisi | | A157 |
| | Exhibit 1-1, Renewal by Anderson Agreement | | A164 |
| | Exhibit 1-2, 11/29/21 Email | | A195 |
| | Exhibit 2, CFPB Consent Order | | A197 |
| | Exhibit 3, Plan 7541 Loan Information | | A255 |
| 42 | GreenSky's Reply in Support of Motion to Compel Arbitration as to All Claims Asserted by Plaintiff and to Dismiss or Stay Claims Pending Arbitration | September 7, 2023 | A272 |
| 46 | GreenSky's Motion to Dismiss All Claims Pursuant to Fed. R. Civ. P. 12(b)(3) | September 25, 2023 | A284 |

## **VOLUME II**

| 47 | GreenSky's Brief in Support of Motion to Dismiss All Claims Pursuant to Fed. R. Civ. P. 12(b)(3) | September 25, 2023 | A287 |
|---|---|---|---|
| | Exhibit 1, GreenSky's Motion to Compel Arbitration | | A297 |
| | Exhibit 2, Plaintiff's Amended Petition and Motion to Certify Class Action | | A323 |
| | Exhibit 3, GreenSky Shopping Pass | | A343 |
| | Exhibit 4, Loan Agreement | | A344 |

|  | Exhibit 5, Declaration of Timothy D. Kaliban |  | A350 |
|--|--|--|--|
|  | Exhibit 5-1, Loan Application |  | A357 |
|  | Exhibit 5-2, Loan Decision |  | A358 |
|  | Exhibit 5-3, Loan Agreement |  | A359 |
|  | Exhibit 5-4, Loan Account |  | A371 |
| 56 | Parisi's Response in Opposition to GreenSky's Motion to Dismiss All Claims Pursuant to Fed. R. Civ. P. 12(b)(3) | October 31, 2023 | A373 |
|  | Exhibit 1, Declaration of Susan Parisi |  | A393 |
|  | Exhibit 1-1, Renewal by Anderson Agreement |  | A401 |
|  | Exhibit 1-2, 11/29/21 Email |  | A432 |
|  | Exhibit 1-3, Emails, various dates |  | A434 |
|  | Exhibit 2, CFPB Consent Order |  | A437 |
| 65 | GreenSky's Reply Brief in Support of Motion to Dismiss All Claims Pursuant to Fed. R. Civ. P. 12(b)(3) | November 7, 2023 | A495 |
| 66 | Order denying GreenSky's Motion to Dismiss and denying GreenSky's Motion to Compel | December 1, 2023 | A505 |

**<u>VOLUME III</u>**

| 68 | Oklahoma Windows' Motion to Dismiss the Amended Class Action Complaint (or Stay) and Compel Arbitration | December 7, 2023 | A521 |
|--|--|--|--|
| 69 | Oklahoma Windows' Memorandum of Law in Support of Motion to Dismiss the Amended Class Action Complaint (or Stay) and Compel Arbitration | December 7, 2023 | A523 |

|  | Exhibit 1, Declaration of Jon Erickson |  | A548 |
|---|---|---|---|
|  | Exhibit 1-1, Renewal by Anderson Agreement |  | A552 |
|  | Exhibit 1-2, 11/23/21 Email |  | A583 |
| 70 | GreenSky's Notice of Joinder, joining Oklahoma Windows' Motion to Dismiss the Amended Class Action Complaint (or Stay) and Compel Arbitration | December 28, 2023 | A585 |
| 71 | Parisi's Response in Opposition to Oklahoma Windows' Motion to Dismiss the Amended Class Action Complaint (or Stay) and Compel Arbitration | December 28, 2023 | A589 |
|  | Exhibit 1, Declaration of Susan Parisi |  | A622 |
|  | Exhibit 1-1, 11/29/21 Email |  | A632 |
|  | Exhibit 1-2, 11/29/21 Emails |  | A634 |
|  | Exhibit 1-3, Emails, various dates |  | A637 |
|  | Exhibit 1-4, 11/23/21 Emails |  | A640 |
| 72 | GreenSky's Motion to Reconsider Order (Doc. 66) and Brief in Support | December 29, 2023 | A647 |
| 73 | GreenSky's Notice of Appeal | December 29, 2023 | A655 |
| 76 | Parisi's Response in Opposition to GreenSky's Notice of Joinder | January 10, 2024 | A658 |
| 79 | GreenSky's Reply in Support of its Notice of Joinder | January 17, 2024 | A666 |
| 81 | Parisi's Opposition to GreenSky's Motion to Reconsider Order | January 19, 2024 | A673 |
| 82 | Order denying Oklahoma Windows' Motion to Compel Arbitration | February 14, 2024 | A685 |

| 83 | Order denying GreenSky's Motion for Reconsideration | February 14, 2024 | A696 |
| 86 | Oklahoma Windows' Notice of Appeal | March 14, 2024 | A699 |

APPEAL,MITCHELL,_RTC

# U.S. District Court
## Western District of Oklahoma[LIVE] (Oklahoma City)
## CIVIL DOCKET FOR CASE #: 5:23-cv-00115-R

Parisi v. C Cashion Windows LLC et al

Assigned to: Judge David L. Russell

Case in other court:  Tenth Circuit, 23-06218

        Tenth Circuit, 24-06043

        Oklahoma County District Court, CJ-22-05727

Cause: 28:1332 Diversity-Petition for Removal

Date Filed: 02/02/2023

Jury Demand: Both

Nature of Suit: 480 Consumer Credit

Jurisdiction: Diversity

**Plaintiff**

**Susan Parisi**

represented by **M Kathi Rawls**
Rawls Law Office PLC
2404 S Broadway
Moore, OK 73160
405-912-3225
Fax: 405-703-2769
Email: mkr@rawlslawoffice.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Minal Gahlot**
Gahlot Law Firm, PLLC
922 SW 107th Street
Suite 200
73170
Oklahoma City, OK 73170
405-331-5811
Email: minal@okconsumerlaw.com
*TERMINATED: 05/22/2024*
*LEAD ATTORNEY*

**Janet R Varnell**
Varnell and Warwick PA
400 N Ashley Drive
Suite 1900
Tampa, FL 33602
352-753-8600
Fax: 352-504-3301
Email: jvarnell@vandwlaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**C Cashion Windows LLC**
*TERMINATED: 08/21/2023*
*doing business as*
Renewal by Anderson of Oklahoma
*TERMINATED: 08/21/2023*

**Defendant**

**BMO Harris Bank NA**              represented by    **Derrick T DeWitt**
*doing business as*                                  DeWitt Paruolo & Meek
Greensky LLC                                         705 NW 4th St
                                                     Oklahoma City, OK 73102
                                                     405-705-3600
                                                     Fax: 405-705-2573
                                                     Email: dewitt@46legal.com
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Kyle R Prince**
                                                     DeWitt Paruolo & Meek
                                                     705 NW 4th St
                                                     Oklahoma City, OK 73102
                                                     405-705-3600
                                                     Fax: 405-705-2573
                                                     Email: kprince@46legal.com
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Sean W. Fleming**
                                                     Spector & Johnson PLLC
                                                     12770 Coit Road
                                                     Suite 1100
                                                     Dallas, TX 75251
                                                     214-744-3300
                                                     Fax: 214-774-0942
                                                     Email: sfleming@macdonalddevin.com
                                                     *ATTORNEY TO BE NOTICED*

**Defendant**

**Oklahoma Windows and Doors LLC**    represented by    **Diane J Zelmer**
*doing business as*                                  Berenson LLP
Renewal by Anderson of Oklahoma                      4495 Military Trail
                                                     Suite 203

Jupiter, FL 33458
202-577-8984
Email: djz@berensonllp.com
*ATTORNEY TO BE NOTICED*

**Sheila D Sayne**
Sayne Law PLLC
PO Box 33309
Tulsa, OK 74153-3309
918-740-3013
Email: sheila.sayne@outlook.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/02/2023 | 1 | NOTICE OF REMOVAL from Oklahoma County District Court, case number CJ-2022-5727 filed by BMO Harris Bank NA. (Attachments: # 1 Exhibit 1 - Petition, # 2 Exhibit 2 - Summons, # 3 Exhibit 3 - Amended Petition, # 4 Exhibit 4 - GreenSky Answer to Amended Petition, # 5 Exhibit 5 - Notice of Filing Notice of Removal, # 6 Exhibit 6 - Declaration, # 7 Exhibit 7 - State Court Civil Docket, # 8 Civil Cover Sheet) (ekw) (Entered: 02/03/2023) |
| 02/03/2023 |  | PAYMENT FOR A CIVIL CASE Filing fee $ 402, receipt number AOKWDC-4083750. (Prince, Kyle) (Entered: 02/03/2023) |
| 02/06/2023 | 2 | ENTRY of Appearance by Derrick T DeWitt on behalf of BMO Harris Bank NA (DeWitt, Derrick) (Entered: 02/06/2023) |
| 02/06/2023 | 3 | ENTRY of Appearance by Kyle R Prince on behalf of BMO Harris Bank NA (Prince, Kyle) (Entered: 02/06/2023) |
| 02/07/2023 | 4 | DISCLOSURE STATEMENT - CORPORATE by BMO Harris Bank NA . (Prince, Kyle) (Entered: 02/07/2023) |
| 02/24/2023 | 5 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number AOKWDC-4098975 by BMO Harris Bank NA. (Attachments: # 1 Exhibit Request for Admission Pro Hac Vice)(Prince, Kyle) (Entered: 02/24/2023) |
| 02/24/2023 | 6 | **ORDER** granting 5 Motion to Appear Pro Hac Vice of Sean Fleming, provided that Mr. Fleming obtains e-filing access to NextGen CM/ECF in this judicial district and files an entry of appearance consistent with LCvR 83.4. Signed by Judge David L. Russell on 02/24/2023. (km) (Entered: 02/24/2023) |
| 03/06/2023 | 7 | ENTRY of Appearance by Sean W. Fleming on behalf of BMO Harris Bank NA (Fleming, Sean) (Entered: 03/06/2023) |
| 03/06/2023 | 8 | MOTION to Remand to State Court by All Plaintiffs. (Attachments: # 1 Exhibit 1 - 1.23.23 Greensky's Answer to P's Amended Petition)(Gahlot, Minal) (Entered: 03/06/2023) |

| | | |
|---|---|---|
| 03/06/2023 | 9 | ENTRY of Appearance by Minal Gahlot on behalf of All Plaintiffs (Gahlot, Minal) Modified on 3/6/2023: document flattened to optimize CM/ECF display; no other changes made (ekw). (Entered: 03/06/2023) |
| 03/06/2023 | 10 | ENTRY of Appearance by M Kathi Rawls on behalf of All Plaintiffs (Rawls, M) Modified on 3/6/2023: document flattened to optimize CM/ECF display; no other changes made (ekw). (Entered: 03/06/2023) |
| 03/24/2023 | 11 | MOTION for Extension of Time to File Response/Reply as to 8 MOTION to Remand to State Court by BMO Harris Bank NA. (Attachments: # 1 Exhibit 1 - 2023-03-24 Email, # 2 Exhibit 2 - Proposed Order)(Prince, Kyle) (Entered: 03/24/2023) |
| 03/27/2023 | 12 | **ORDER** granting 11 Defendant Greensky, LLC's Unopposed Motion for Extension of Time to Respond to Plaintiff's Motion to Remand. The deadline for Defendant to file its Response to Plaintiff's Motion to Remand is hereby extended from March 27, 2023 to April 10, 2023. Signed by Judge David L. Russell on 03/27/2023. (km) (Entered: 03/27/2023) |
| 04/10/2023 | 13 | RESPONSE in Opposition re 8 MOTION to Remand to State Court filed by BMO Harris Bank NA. (Attachments: # 1 Exhibit Exhibit 1 - Plaintiff's Loan Agreement, # 2 Exhibit Exhibit 2 - Oklahoma SOS (C Cashion Windows LLC), # 3 Exhibit Exhibit 3 - Texas SOS, # 4 Exhibit Exhibit 4 - Texas Franchise Tax Public Info. Report)(Prince, Kyle) (Entered: 04/10/2023) |
| 04/17/2023 | 14 | MOTION for Extension of Time to File Response/Reply by All Plaintiffs. (Gahlot, Minal) (Entered: 04/17/2023) |
| 04/17/2023 | 15 | **ORDER** granting 14 Plaintiff's Motion for Extension of Time to Reply in Support of Plaintiff's Motion to Remand. Plaintiff's reply should be filed on or before May 1, 2023. Signed by Judge David L. Russell on 04/17/2023. (km) (Entered: 04/17/2023) |
| 04/28/2023 | 16 | FIRST MOTION to Amend/Correct *Petition to Correct the Named Defendant and the Caption of the Case* by All Plaintiffs. (Attachments: # 1 Exhibit 1- Mailer with Entity Info., # 2 Exhibit 2 - SOS Entity Info., # 3 Exhibit 3 - Proposed Second Amended Petition)(Gahlot, Minal) (Entered: 04/28/2023) |
| 04/28/2023 | 17 | MOTION to Compel *Arbitration as to All Claims Asserted by Pltf and to Dismiss or Stay Claims Pending Arbitration* by BMO Harris Bank NA. (Prince, Kyle) (Entered: 04/28/2023) |
| 04/28/2023 | 18 | BRIEF IN SUPPORT *of Motion to Compel Arbitration as to All Claims Asserted by Pltf and to Dismiss or Stay Claims of Plaintiff Pending Arbitration* by BMO Harris Bank NA. (Attachments: # 1 Exhibit Pltf's Amended Petition and Motion to Motion to Certify Class Action, # 2 Exhibit Loan Agreement, # 3 Exhibit Declaration of Timothy Kaliban)(Prince, Kyle) (Entered: 04/28/2023) |
| 05/01/2023 | 19 | REPLY to Response to Motion re 8 MOTION to Remand to State Court filed by All Plaintiffs. (Attachments: # 1 Exhibit 1 - CFPB Consent Order, # 2 Exhibit 2- Mailer, # 3 Exhibit 3 - SOS Registration, # 4 Exhibit 4- Detailed SOS Entity Info. Oklahoma Windows & Doors, # 5 Exhibit 5 - Reinstatement Form Filed by J. Cashion, # 6 Exhibit 6 - OK SOS entity Details on C Cashion Windows, # 7 Exhibit 7- 9.29.20 Trade Name |

| | | |
|---|---|---|
| | | report)(Gahlot, Minal) (Entered: 05/01/2023) |
| 05/08/2023 | 20 | MOTION for Order *Staying Response Briefing to Defendant's Motion to Compel Arbitration* by Susan Parisi. (Gahlot, Minal) (Entered: 05/08/2023) |
| 05/12/2023 | 21 | **ORDER**: Defendant is ordered to respond to Plaintiff's Motion to Stay Her Deadline to Respond to Defendant's Motion to Compel Arbitration Pending the Court's Ruling on Motion to Remand [Doc. 20 ] by Wednesday, May 17, 2023. Signed by Judge David L. Russell on 05/12/2023. (km) (Entered: 05/12/2023) |
| 05/17/2023 | 22 | RESPONSE re 16 Plaintiff Susan Parisi's Motion to Amend Petition to Correct the Named Defendant and the Caption of the Case filed by BMO Harris Bank NA. (Prince, Kyle) Modified 06/02/2023 to match the docket text with the title of the document. (km) (Entered: 05/17/2023) |
| 05/17/2023 | 23 | RESPONSE to Motion re 20 MOTION for Order *Staying Response Briefing to Defendant's Motion to Compel Arbitration* filed by BMO Harris Bank NA. (Prince, Kyle) (Entered: 05/17/2023) |
| 05/18/2023 | 24 | **ORDER**: Plaintiff has filed a motion to stay her response to Defendant's Motion to Compel Arbitration (Doc. 20 ). The Court grants Plaintiff's motion and stays her response pending the resolution of other motions filed in this matter. Signed by Judge David L. Russell on 05/18/2023. (km) (Entered: 05/18/2023) |
| 06/05/2023 | 25 | **ORDER** denying 8 Motion to Remand to State Court. The Court concludes that Defendant GreenSky has shown that removal is proper. Plaintiff has not demonstrated by a preponderance of the evidence that the case should be remanded pursuant to a Class Action Fairness Act exception. See Order for details. Signed by Judge David L. Russell on 06/05/2023. (km) (Entered: 06/05/2023) |
| 06/05/2023 | 26 | **ORDER**: Before the Court is 16 Plaintiff Susan Parisi's Motion to Amend the Petition to Correct the Named Defendant and the Caption of the Case. Defendant BMO Harris Bank, NA d/b/a Greensky, LLC filed a 22 Response, to which Plaintiff has not replied. The Court is without sufficient briefing to rule on the Motion. Plaintiff is ordered to file a supplemental brief, limited to ten (10) pages in length, on or before June 19, 2023, addressing the arguments raised by Defendant in its Response. Defendant GreenSky is permitted, but not required, to file a response to Plaintiff's supplemental brief, limited to ten (10) pages in length, within seven (7) days of the filing of Plaintiff's supplemental brief. Signed by Judge David L. Russell on 06/05/2023. (km) (Entered: 06/05/2023) |
| 06/20/2023 | 27 | SUPPLEMENTAL Brief in Support of 16 *Motion to Amend* by All Plaintiffs. (Attachments: # 1 Exhibit 1- Declaration of Kathi Rawls, # 2 Exhibit 1.1-Certifed Mail to Cashion-12.29.22, # 3 Exhibit 1.2-1.23.23 Rawls Email to Davidson, # 4 Exhibit 1.3-1.23.23 Davidson Email to Rawls, # 5 Exhibit 2- Declaration of Susan Parisi, # 6 Exhibit 2.1 Russell Kelley Business card, # 7 Exhibit 2.2 Greensky Welcome packet, # 8 Exhibit 2.3-11.29.21 Parisi Email to GreenSky, # 9 Exhibit 2.4-12.1.21 GreenSky Email to Parisi-719, # 10 Exhibit 2.5-12.1.21 GreenSky email to Parisi 821, # 11 Exhibit 2.6-12.2.21 GreenSky Email to Parisi, # 12 Exhibit 2.7-12.2.21 Greensky Letter to Parisi, # 13 Exhibit 2.8-12.10.21 Parisi Email to from GreenSky, # 14 Exhibit 2.8-1-12.10.21 Parisi Email to from GreenSky, # 15 Exhibit 2.10-12.14.21 GreenSky Email to |

A005

| | | |
|---|---|---|
| | | Parisi (2), # 16 Exhibit 2.11-12.14.21 GreenSky Email to Parisi, # 17 Exhibit 2.12-12.27.21 GreenSky Letter Resolving Complaint), # 18 Exhibit 2.13-1.3.22 GreenSky Statement, # 19 Exhibit 2.14-06.2022 GreenSky Offer, # 20 Exhibit 2.15-June GreenSky Statement, # 21 Exhibit 2.16 GreenSky Offer from Jason Cashion, # 22 Exhibit 2.17-25% Off from Jason Cashion, # 23 Exhibit 2.18-8.1.22 GreenSky Statement Past Due, # 24 Exhibit 2.19-10.2.22 GreenSky Statement Past Due, # 25 Exhibit 2.20-Jason Cashion Letter, # 26 Exhibit 2.21-10.2.22 GreenSky Statement Past Due, # 27 Exhibit 2.22-10.2.22 GreenSky Statement Past Due, # 28 Exhibit 2.23-10.13.22 GreenSky Letter to Parisi, # 29 Exhibit 2.24-10.4.22 Jason Cashion Letter to Parisi))(Rawls, M) Docket text modified on 6/21/2023 to reflect title of document. (ekw). (Entered: 06/20/2023) |
| 06/21/2023 | 28 | MOTION for Order *for Oral Arguments on Plaintiff's Motion to Amend* by All Plaintiffs. (Rawls, M) (Entered: 06/21/2023) |
| 06/27/2023 | 29 | RESPONSE to Motion re 22 MOTION to Amend/Correct *the Named Defendant and The Caption of the Case and Brief in Support* filed by BMO Harris Bank NA. (Prince, Kyle) (Entered: 06/27/2023) |
| 07/17/2023 | 30 | **ORDER** granting 28 Plaintiff's Motion for Oral Argument Regarding the Motion to Amend to Add Correct Defendant. This matter will be set for hearing on August 3, 2023 at 10:30 a.m. The parties should be prepared to address whether Oklahoma Windows received sufficient notice of the action within the period provided by Rule 4(m) for serving the summons and complaint so that it will not be prejudiced in defending on the merits. See Order for details. Signed by Judge David L. Russell on 07/17/2023. (km) (Entered: 07/17/2023) |
| 07/25/2023 | 31 | FIRST MOTION for Leave to Appear Pro Hac Vice *Janet Varnell* Filing fee $ 100, receipt number AOKWDC-4213091 by Susan Parisi. (Attachments: # 1 Exhibit Request for Admission Pro Hac Vac)(Rawls, M) (Entered: 07/25/2023) |
| 07/25/2023 | 32 | **ORDER** granting 31 Motion to Appear Pro Hac Vice. Janet Varnell is temporarily admitted to practice before the Court for the limited purpose of appearing in this case as an attorney for Susan Parisi, provided counsel obtains e-filing access to NextGen CM/ECF in this judicial district and files an entry of appearance consistent with LCvR 83.4. Signed by Judge David L. Russell on 07/25/2023. (km) (Entered: 07/25/2023) |
| 07/27/2023 | 33 | ENTRY of Appearance by Janet R Varnell on behalf of Susan Parisi (Varnell, Janet) (Entered: 07/27/2023) |
| 08/03/2023 | 34 | **Minute Entry** for proceedings held before Judge David L. Russell: Motion Hearing held on 8/3/2023. It is the order of the Court that Plaintiff may join their party as requested. If that party objects, these objections will be addressed at the appropriate time. The stay imposed by Doc. No. 24 is lifted. Within 20 days of this date, Plaintiff shall file a response to the Defendant's Motion to Compel Arbitration (Doc. No. 17 ). The parties shall submit a proposed order reflecting the decisions of the Court discussed at this hearing. (Court Reporter Tracy Thompson.) (km) (Entered: 08/03/2023) |
| 08/14/2023 | 35 | **ORDER** granting 16 Plaintiff's Motion to Amend the Petition. Plaintiff shall file her Second Amended Petition on or before August 21, 2023. Additionally, the Court's |

| | | |
|---|---|---|
| | | Order (Doc. No. 24 ) granting Plaintiff's Motion to Stay Her Response to Defendant's Motion to Compel Arbitration is hereby lifted. Consistent with the undersigned's directive at the hearing conducted August 3, 2023, Plaintiff shall file her Response to Defendant Greensky's Motion (Doc. No. 17 ) no later than August 23, 2023. Signed by Judge David L. Russell on 08/14/2023. (km) (Entered: 08/14/2023) |
| 08/21/2023 | 36 | AMENDED COMPLAINT *and Motion to Certify a Class Action* against All Defendants filed by All Plaintiffs. (Attachments: # 1 Exhibit 1- Redacted 12.07.21 ltr re no payment due until project is complete, # 2 Exhibit 2 - 12.10.21 Email from GreenSky to Parisi, # 3 Exhibit 3 - 12.14.21 Email from GreenSky to Parisi, # 4 Exhibit 4 - 12.17.21 Email from GreenSky to Parisi, # 5 Exhibit 5- Redacted 12.27.21 Ltr re resolving issue, # 6 Exhibit 6 - Redacted 10.2.22 Past Due Notice)(Rawls, M) (Entered: 08/21/2023) |
| 08/21/2023 | 37 | Summons Issued Electronically as to Oklahoma Windows and Doors LLC. (ekw) (Entered: 08/21/2023) |
| 08/23/2023 | 38 | STRICKEN: RESPONSE in Opposition re 17 MOTION to Compel *Arbitration as to All Claims Asserted by Pltf and to Dismiss or Stay Claims Pending Arbitration* filed by Susan Parisi. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Varnell, Janet) (Entered: 08/23/2023) |
| 08/24/2023 | | NOTICE from the Court: 38 Response in Opposition to Motion is STRICKEN, due to counsel's failure to comply with this Court's ECF Policies and Procedures Manual, § II.A.4.a. Specifically, exhibits must be numerically titled and must include a description. Counsel to refile. (ekw) (Entered: 08/24/2023) |
| 08/24/2023 | 39 | RESPONSE in Opposition re 17 MOTION to Compel *Arbitration as to All Claims Asserted by Pltf and to Dismiss or Stay Claims Pending Arbitration* filed by Susan Parisi. (Attachments: # 1 Exhibit 1 - Declaration of Susan Parisi, # 2 Exhibit 2 - CFPB Consent Order, # 3 Exhibit 3 - Plan 7541 Loan Information)(Varnell, Janet) (Entered: 08/24/2023) |
| 08/29/2023 | 40 | MOTION for Extension of Time to File Response/Reply as to 17 MOTION to Compel *Arbitration as to All Claims Asserted by Pltf and to Dismiss or Stay Claims Pending Arbitration* by BMO Harris Bank NA. (Prince, Kyle) (Entered: 08/29/2023) |
| 08/30/2023 | 41 | ORDER granting 40 Motion for Extension of Time. Defendant shall have up to and including September 7, 2023 to file its Reply Brief Supporting Defendant's Motion to Compel Arbitration. Signed by Judge David L. Russell on 08/30/2023. (km) (Entered: 08/30/2023) |
| 09/07/2023 | 42 | REPLY by Defendant BMO Harris Bank NA *in Support of Motion to Compel Arbitration as to All Claims Asserted by Plaintiff and to Dismiss or Stay Claims of Plaintiff Pending Arbitration* filed by BMO Harris Bank NA. (Prince, Kyle) (Entered: 09/07/2023) |
| 09/07/2023 | 43 | OBJECTIONS *to Use of Consent Order* filed by BMO Harris Bank NA. (Prince, Kyle) (Entered: 09/07/2023) |
| 09/08/2023 | 44 | UNOPPOSED MOTION for Extension of Time to File Answer by BMO Harris Bank |

|  |  | NA. (Attachments: # 1 Attachment Proposed Order Granting Motion for Extension) (Prince, Kyle) (Entered: 09/08/2023) |
|---|---|---|
| 09/11/2023 | 45 | **ORDER** granting 44 Motion for Extension of Time to File Its Responsive Pleading to Plaintiff's First Amended Complaint. Defendant shall have up to and including September 25, 2023 to file its responsive pleading to Plaintiff's First Amended Complaint. Signed by Judge David L. Russell on 09/11/2023. (km) (Entered: 09/11/2023) |
| 09/25/2023 | 46 | MOTION to Dismiss *All Claims Pursuant to Federal Rule of Civil Procedure 12(b)(3)* by BMO Harris Bank NA. (Prince, Kyle) (Entered: 09/25/2023) |
| 09/25/2023 | 47 | BRIEF IN SUPPORT re 46 MOTION to Dismiss *All Claims Pursuant to Federal Rule of Civil Procedure 12(b)(3)* by BMO Harris Bank NA. (Attachments: # 1 Exhibit Def Greensky's Motion to Compel Arbitration, # 2 Exhibit Pltf's Amended Petition & Motion to Certify Class Action, # 3 Exhibit Greensky Shopping Pass, # 4 Exhibit Loan Agreement`, # 5 Exhibit Declaration of Timothy D. Kaliban)(Prince, Kyle) (Entered: 09/25/2023) |
| 09/28/2023 | 48 | RESPONSE re 43 Objections *to Use of Consent Order* filed by Susan Parisi. (Varnell, Janet) (Entered: 09/28/2023) |
| 10/04/2023 | 49 | FIRST MOTION for Extension of Time to File Response/Reply *to Defendant's Motion to Dismiss All Claims* by Susan Parisi. (Attachments: # 1 Exhibit Proposed Order re. Motion for Extension of Time to Respond)(Rawls, M) (Entered: 10/04/2023) |
| 10/05/2023 | 50 | **ORDER** granting 49 Plaintiff's Unopposed Motion for Extension of Time to Respond to Defendant's Motion to Dismiss. Plaintiff shall file her response to Defendant's Motion to Dismiss All Claims on or before October 30, 2023. Signed by Judge David L. Russell on 10/05/2023. (km) (Entered: 10/05/2023) |
| 10/05/2023 | 51 | MOTION for Order *for Extension of Time and Motion to File Reply Brief Supporting Objection to Use of Consent Order* by BMO Harris Bank NA. (DeWitt, Derrick) (Entered: 10/05/2023) |
| 10/06/2023 | 52 | **ORDER** granting 51 Defendant Greensky, LLC's Motion for Extension of Time and Motion to File Reply Brief Supporting Objection to Use of Consent Order. The deadline for Defendant to file its Reply is October 30, 2023. Signed by Judge David L. Russell on 10/06/2023. (km) (Entered: 10/06/2023) |
| 10/18/2023 | 53 | SUMMONS Returned Executed by Susan Parisi. Oklahoma Windows and Doors LLC served on 10/17/2023. (Varnell, Janet) (Entered: 10/18/2023) |
| 10/30/2023 | 54 | REPLY by Defendant BMO Harris Bank NA re 48 Response *in Opposition to Defendant GreenSky, LLC's Objection to Use of Consent Order* filed by BMO Harris Bank NA. (Prince, Kyle) (Entered: 10/30/2023) |
| 10/30/2023 | 55 | STRICKEN: RESPONSE in Opposition re 46 MOTION to Dismiss *All Claims Pursuant to Federal Rule of Civil Procedure 12(b)(3)* filed by Susan Parisi. (Attachments: # 1 Exhibit A - Declaration of Susan Parisi, # 2 Exhibit B - CFPB Consent Order)(Varnell, Janet) (Entered: 10/30/2023) |

| 10/31/2023 | | NOTICE from the Court: 55 Response in Opposition to Motion is STRICKEN, due to counsel's failure to comply with this Court's ECF Policies & Procedures Manual, § II.A.4.a. Specifically, exhibits must be numerically titled. Counsel to refile. (km) (Entered: 10/31/2023) |
| --- | --- | --- |
| 10/31/2023 | 56 | RESPONSE in Opposition re 46 MOTION to Dismiss *All Claims Pursuant to Federal Rule of Civil Procedure 12(b)(3)* filed by Susan Parisi. (Attachments: # 1 Exhibit 1 - Declaration of Susan Parisi, # 2 Exhibit 2 - CFPB Consent Order)(Varnell, Janet) (Entered: 10/31/2023) |
| 11/01/2023 | 57 | ENTRY of Appearance by Sheila D Sayne on behalf of Oklahoma Windows and Doors LLC (Sayne, Sheila) (Entered: 11/01/2023) |
| 11/01/2023 | 58 | DISCLOSURE STATEMENT - LLC by Oklahoma Windows and Doors LLC . (Sayne, Sheila) (Entered: 11/01/2023) |
| 11/01/2023 | 59 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 100, receipt number AOKWDC-4284984 by Oklahoma Windows and Doors LLC. (Attachments: # 1 Exhibit 1 - Diane J Zelmer Request for Admission)(Sayne, Sheila) (Entered: 11/01/2023) |
| 11/01/2023 | 60 | NOTICE of Change of Address by Sheila D Sayne (Sayne, Sheila) (Entered: 11/01/2023) |
| 11/02/2023 | 61 | ORDER granting 59 Motion for Admission Pro Hac Vice. Diane J. Zelmer shall be admitted pro hac vice to practice before this Court for the purpose of representing Defendant RBA in the above-captioned matter, provided that Ms. Zelmer obtains e-filing access to NextGen CM/ECF in this judicial district and files an entry of appearance consistent with LCvR 83.4. Signed by Judge David L. Russell on 11/02/2023. (km) (Entered: 11/02/2023) |
| 11/02/2023 | 62 | DISCLOSURE STATEMENT - LLC by Oklahoma Windows and Doors LLC *Supplemental*. (Sayne, Sheila) (Entered: 11/02/2023) |
| 11/06/2023 | 63 | FIRST MOTION for Extension of Time to File Response/Reply *to Amended Complaint and Motion to Certify Class Action* by Oklahoma Windows and Doors LLC. (Attachments: # 1 Exhibit 1 - 11/01/23 SDS extension request to opposing counsel, # 2 Exhibit 2- Proposed order granting extension of time)(Sayne, Sheila) (Entered: 11/06/2023) |
| 11/07/2023 | 64 | ORDER granting 63 Opposed Motion for Extension of Time to Respond to Plaintiff's Combined First Amended Complaint and Motion to Certify a Class Action, filed by Defendant Oklahoma Windows and Doors, LLC d/b/a Renewal by Anderson of Oklahoma. Defendant shall file its response to Plaintiff's combined First Amended Complaint and Motion to Certify a Class Action on or before December 7, 2023. Signed by Judge David L. Russell on 11/07/2023. (km) (Entered: 11/07/2023) |
| 11/07/2023 | 65 | REPLY to Response to Motion re 46 MOTION to Dismiss *All Claims Pursuant to Federal Rule of Civil Procedure 12(b)(3)* filed by BMO Harris Bank NA. (Prince, Kyle) (Entered: 11/07/2023) |

| | | |
|---|---|---|
| 12/01/2023 | 66 | **ORDER** denying 46 Motion to Dismiss; denying 17 Motion to Compel Arbitration. See Order for details. Signed by Judge David L. Russell on 12/01/2023. (km) (Entered: 12/01/2023) |
| 12/01/2023 | 67 | ENTRY of Appearance by Diane J Zelmer on behalf of Oklahoma Windows and Doors LLC (Zelmer, Diane) Modified on 12/1/2023: document flattened to optimize CM/ECF display; no other changes made (ekw). (Entered: 12/01/2023) |
| 12/07/2023 | 68 | MOTION to Dismiss *the Amended Class Action Complaint (or Stay) and Compel Arbitration* by Oklahoma Windows and Doors LLC. (Zelmer, Diane) (Entered: 12/07/2023) |
| 12/07/2023 | 69 | MEMORANDUM in Support re 68 MOTION to Dismiss *the Amended Class Action Complaint (or Stay) and Compel Arbitration* filed by Oklahoma Windows and Doors LLC. (Attachments: # 1 Exhibit Declaration of Jon Erickson)(Zelmer, Diane) (Entered: 12/07/2023) |
| 12/28/2023 | 70 | MOTION for Joinder, joining MOTION to Dismiss *the Amended Class Action Complaint (or Stay) and Compel Arbitration* filed by Oklahoma Windows and Doors LLC, by BMO Harris Bank NA. (Prince, Kyle) (Entered: 12/28/2023) |
| 12/28/2023 | 71 | RESPONSE in Opposition re 68 MOTION to Dismiss *the Amended Class Action Complaint (or Stay) and Compel Arbitration* filed by Susan Parisi. (Attachments: # 1 Exhibit 1 - Declaration of Susan Parisi)(Varnell, Janet) (Entered: 12/28/2023) |
| 12/29/2023 | 72 | MOTION for Reconsideration re 66 Order on Motion to Dismiss, Order on Motion to Compel by BMO Harris Bank NA. (DeWitt, Derrick) (Entered: 12/29/2023) |
| 12/29/2023 | 73 | NOTICE OF APPEAL as to 66 Order on Motion to Dismiss, Order on Motion to Compel by BMO Harris Bank NA. (DeWitt, Derrick) (Entered: 12/29/2023) |
| 12/29/2023 | 74 | PRELIMINARY RECORD LETTER - Electronic Transmission of Notice of Appeal with Preliminary Record sent to Tenth Circuit Court of Appeals re 73 Notice of Appeal (Attachments: # 1 Attachment 1 - Preliminary Record on Appeal)(naa) (Entered: 12/29/2023) |
| 12/29/2023 | 75 | Tenth Circuit USCA Case Number 23-6218 for 73 Notice of Appeal filed by BMO Harris Bank NA. Civil case docketed. Preliminary record filed. DATE RECEIVED: 12/29/2023 Fee, docketing statement, transcript order form, notice of appearance and disclosure form are due by 01/12/2024 for GreenSky, LLC. Notice of appearance also due on 01/12/2024 for Susan Parisi. [23-6218] (ekw) (Entered: 01/02/2024) |
| 01/10/2024 | 76 | RESPONSE in Opposition re 70 MOTION for Joinder, joining MOTION to Dismiss *the Amended Class Action Complaint (or Stay) and Compel Arbitration* filed by Oklahoma Windows and Doors LLC, filed by Susan Parisi. (Varnell, Janet) (Entered: 01/10/2024) |
| 01/12/2024 | 77 | TRANSCRIPT Order Form by BMO Harris Bank NA that transcripts are not necessary. See order form for dates and proceedings. (Prince, Kyle) (Entered: 01/12/2024) |
| 01/12/2024 | 78 | ORDER of USCA as to 73 Notice of Appeal filed by BMO Harris Bank NA. Order filed by Clerk of the Court abating case until pending motion to reconsider is resolved. |

| | | |
|---|---|---|
| | | Status report due 02/12/2024 by GreenSky, LLC. Please see Order for additional information. Served on 01/12/2024. [23-6218] (ekw) (Entered: 01/16/2024) |
| 01/17/2024 | 79 | REPLY by Defendant BMO Harris Bank NA *in Support of Its Notice of Joinder in Defendant Oklahoma Windows and Doors, LLC's Motion to Dismiss the Amended Class Action Complaint (or Stay) and Compel Arbitration* filed by BMO Harris Bank NA. (Prince, Kyle) (Entered: 01/17/2024) |
| 01/17/2024 | 80 | USCA Appeal Fee received in the amount of $ 605, receipt number 500005301, re 73 Notice of Appeal filed by BMO Harris Bank NA. Receipt provided over the counter. (ekw) (Entered: 01/17/2024) |
| 01/19/2024 | 81 | RESPONSE in Opposition re 72 MOTION for Reconsideration re 66 Order on Motion to Dismiss, Order on Motion to Compel filed by Susan Parisi. (Varnell, Janet) (Entered: 01/19/2024) |
| 02/14/2024 | 82 | **ORDER** denying 68 Defendant Renewal by Anderson of Oklahoma's Motion to Compel Arbitration. See Order for details. Signed by Judge David L. Russell on 02/14/2024. (km) (Entered: 02/14/2024) |
| 02/14/2024 | 83 | **ORDER** denying 72 Defendant GreenSky, LLC'S Motion for Reconsideration. The Court finds no reason to depart from its prior Order denying GreenSky's motions. Signed by Judge David L. Russell on 02/14/2024. (km) (Entered: 02/14/2024) |
| 02/14/2024 | | Docket Annotation: Minute Order filed - Upon review of the appellants status report filed today, the abatement of this appeal will continue. The appellant shall file another written report on 3/15/2024, to advise this court about the status of its pending motion to reconsider (ECF No. 72) the order being appealed in this case (ECF No. 66), or within five days of entry of an order disposing of the appellants pending motion to reconsider. Served on 02/14/2024. Text only entry - no attachment. [23-6218] (ekw) (Entered: 02/14/2024) |
| 02/21/2024 | 84 | ORDER of USCA as to 73 Notice of Appeal filed by BMO Harris Bank NA. Order filed by Clerk of the Court lifting the abatement of proceedings in this appeal. Briefing on the merits in this appeal is suspended through 03/15/2024. Absent other action by the parties and the court before this date, the appellant in this appeal must file its opening brief and appendix by 04/24/2024. Served on 02/21/2024. [23-6218] (naa) (Entered: 02/21/2024) |
| 02/22/2024 | 85 | TRANSCRIPT LETTER advising no transcripts are necessary re 73 Notice of Appeal filed by BMO Harris Bank NA. The record is ready for appeal purposes. (ekw) (Entered: 02/22/2024) |
| 03/14/2024 | 86 | NOTICE OF APPEAL as to 82 Order on Motion to Dismiss, Order on Motion for Joinder by Oklahoma Windows and Doors LLC. Filing fee $ 605, receipt number AOKWDC-4383267. (Zelmer, Diane) (Entered: 03/14/2024) |
| 03/14/2024 | 87 | PRELIMINARY RECORD LETTER - Electronic Transmission of Notice of Appeal with Preliminary Record sent to Tenth Circuit Court of Appeals re 86 Notice of Appeal (Attachments: # 1 Attachment 1 - Preliminary Record on Appeal)(ekw) (Entered: 03/14/2024) |

| 03/14/2024 | 88 | Tenth Circuit USCA Case Number 24-6043 for 86 Notice of Appeal filed by Oklahoma Windows and Doors LLC. Civil case docketed. Preliminary record filed. DATE RECEIVED: 03/14/2024 Notice of appearance, Docketing statement, Disclosure statement, and Transcript order form due 03/28/2024 for Oklahoma Windows and Doors LLC. Notice of appearance due on 03/28/2024 for Susan Parisi. [24-6043] (ekw) (Entered: 03/15/2024) |
|---|---|---|
| 03/15/2024 | 89 | ORDER of USCA as to 73 Notice of Appeal filed by BMO Harris Bank NA, 86 Notice of Appeal filed by Oklahoma Windows and Doors LLC. Order filed by Clerk of the Court. These matters are before the court on our own motion for case management purposes. These two appeals are procedurally consolidated for preparation of the appendix, briefing, oral argument (if granted), and submission to a panel of judges. All future filings in these appeals shall be captioned for and filed in both appeals, unless good cause exists for filing a document in only one of the appeals. Notwithstanding our consolidation of these appeals, the parties shall complete all outstanding preliminary filing requirements in Case No. 24-6043. The briefing schedule previously set in Case No. 23-6218 is vacated. Please see Order for additional information. Served on 03/15/2024. [23-6218, 24-6043] (ekw) (Entered: 03/15/2024) |
| 03/27/2024 | 90 | TRANSCRIPT Order Form by Oklahoma Windows and Doors LLC re 86 Notice of Appeal that transcripts are not necessary. See order form for dates and proceedings. (Zelmer, Diane) (Entered: 03/27/2024) |
| 03/28/2024 | 91 | TRANSCRIPT LETTER advising no transcripts are necessary re 86 Notice of Appeal filed by Oklahoma Windows and Doors LLC. The record is ready for appeal purposes. (ekw) (Entered: 03/28/2024) |
| 05/22/2024 | 92 | UNOPPOSED MOTION to Withdraw as Attorney by All Plaintiffs. (Gahlot, Minal) (Entered: 05/22/2024) |
| 05/22/2024 | 93 | **ORDER** granting 92 Motion to Withdraw as Counsel of Record. Attorney Minal Gahlot terminated. Signed by Judge David L. Russell on 05/22/2024. (km) (Entered: 05/22/2024) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 05/23/2024 10:02:16 | | |
| **PACER Login:** | DJZelmer | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 5:23-cv-00115-R Start date: 1/1/1974 End date: 5/23/2024 |
| **Billable Pages:** | 9 | **Cost:** | 0.90 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| (1) SUSAN PARISI, | ) | |
| | ) | |
| | ) | |
|      Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-23-115-R |
| | ) | |
| (1) C CASHION WINDOWS, LLC d/b/a | | |
| RENEWAL BY ANDERSON OF | ) | |
| OKLAHOMA, and (2) BMO HARRIS | ) | |
| BANK, NA d/b/a GREENSKY, LLC, | ) | |
| | ) | |
|      Defendants. | ) | |

**DEFENDANT GREENSKY, LLC'S, INCORRECTLY IDENTIFIED AS BMO HARRIS BANK, NA D/B/A GREENSKY, LLC, MOTION TO COMPEL ARBITRATION AS TO ALL CLAIMS ASSERTED BY PLAINTIFF AND TO DISMISS OR STAY CLAIMS OF PLAINTIFF PENDING ARBITRATION**

TO THE HONORABLE JUDGE OF SAID COURT:

     Defendant, GreenSky, LLC, incorrectly identified as BMO Harris Bank, NA d/b/a GreenSky, LLC (hereinafter "GreenSky"), files its Motion to Compel Arbitration as to all claims asserted by Plaintiff Susan Parisi (hereinafter "Plaintiff"). In support of this Motion, GreenSky respectfully shows as follows:

     1.     GreenSky has simultaneously filed a Brief in Support of its Motion to Compel Arbitration as to all claims asserted by Plaintiff outlining the arguments relating thereto.

A013

Respectfully submitted,

Dated: April 28th,  2023           */s/ Sean W. Fleming*

Sean W. Fleming
*Admitted Pro Hac Vice*
Texas State Bar No. 24027250
MACDONALD DEVIN MADDEN
KENEFICK & HARRIS, P.C.
12770 Coit Road, Suite 1100
Dallas, Texas 75251
T: (214) 744-3300
F: (214) 747-0942
SFleming@MacdonaldDevin.com

Derrick T. DeWitt, OBA #18044
Kyle R. Prince, OBA #33040
DeWITT PARUOLO & MEEK
P.O. Box 138800
Oklahoma City, OK 73113
T: (405) 705-3600
F: (405) 705-2573
ddewitt@46legal.com
kprince@46legal.com

***Attorneys for Defendant GreenSky, LLC, incorrectly
identified as BMO Harris Bank, NA d/b/a
GreenSky, LLC***

A014

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th of April, 2023, I electronically transmitted this document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

M. Kathi Rawls, OBA #18814
Minal Gahlot, OBA #22145
kathi@rawlsgahlot.com
minal@rawlsgahlot.com

**_Attorneys for Plaintiffs_**


_/s/ Sean W. Fleming_____

A015

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) SUSAN PARISI, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-23-115-R |
| | ) | |
| (1) C CASHION WINDOWS, LLC d/b/a | | |
| RENEWAL BY ANDERSON OF | ) | |
| OKLAHOMA, and (2) BMO HARRIS | ) | |
| BANK, NA d/b/a GREENSKY, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT GREENSKY, LLC'S, INCORRECTLY IDENTIFIED AS BMO
HARRIS BANK, NA D/B/A GREENSKY, LLC, MOTION TO COMPEL
ARBITRATION AS TO ALL CLAIMS ASSERTED BY PLAINTIFF AND TO
<u>DISMISS OR STAY CLAIMS OF PLAINTIFF PENDING ARBITRATION</u>**

Respectfully submitted,

Dated: April 28th,  2023        */s/ Sean W. Fleming*

Sean W. Fleming
*Admitted Pro Hac Vice*
Texas State Bar No. 24027250
MACDONALD DEVIN MADDEN
KENEFICK & HARRIS, P.C.
12770 Coit Road, Suite 1100
Dallas, Texas 75251
T: (214) 744-3300
F: (214) 747-0942
SFleming@MacdonaldDevin.com

i

A016

Derrick T. DeWitt, OBA #18044
Kyle R. Prince, OBA #33040
DeWITT PARUOLO & MEEK
P.O. Box 138800
Oklahoma City, OK 73113
T: (405) 705-3600
F: (405) 705-2573
ddewitt@46legal.com
kprince@46legal.com

***Attorneys for Defendant GreenSky, LLC, incorrectly
identified as BMO Harris Bank, NA d/b/a
GreenSky, LLC***

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ..............................................................................v

**I.      INTRODUCTION** ...........................................................................1

**II.     UNDISPUTED FACTS** ...................................................................2

**III.    PLAINTIFF'S LOAN AGREEMENT** ...........................................3

         A. ARBITRATION PROVISION...................................................4

         B. AGREEMENT TO PURSUE CLAIMS INDIVIDUALLY ..............6

**IV.     APPLICATION AND APPROVAL OF PLAINTIFF'S LOAN** .......6

         A. APPLICATION AND APPROVAL PROCESS...............................6

         B. GREENSKY'S MAILING TO PLAINTIFF WITH
            THE LOAN AGREEMENT ...................................................7

         C. GREENSKY'S EMAIL TO PLAINTIFF WITH
            THE LOAN AGREEMENT ...................................................8

**V.      PLAINTIFF'S USE OF HER SHOPPING PASS AND LOAN
         AGREEMENT CONTAINING THE ARBITRATION
         PROVISION** ....................................................................................9

**VI.     ARGUMENT AND AUTHORITIES** ...........................................10

         A. THE ARBITRATION CLAUSE IS VALID AND
            ENFORCEABLE UNDER THE FEDERAL ARBITRATION ACT .............11

         B. THE ARBITRATION PROVISION AGREED TO BY PLAINTIFF IS
            EXPRESSLY GOVERNED BY THE FEDERAL ARBITRATION ACT
            AND THE COURT MUST COMPEL ARBITRATION PURSUANT TO
            FEDERAL ARBITRATION LAW ...............................................13

         C. THE ARBITRATION CLAUSE AND CLASS ACTION WAIVER ARE
            ALSO VALID AND ENFORCEABLE UNDER OKLAHOMA LAW.........16

**VII.** **CONCLUSION** ..................................................................................**19**

**CERTIFICATE OF SERVICE** ..................................................................**20**

iv

A019

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992)  .............. **16**

*AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)....................................**11**

*AT&T Techs., Inc. v. Communications Workers of Am.*, 475 U.S. 643,
650 (1986)........................................................................................................................**14**

*Chelsea Family Pharmacy, PLLC v. Medco Health Solutions, Inc.*, 567 F.3d
1191, 1199 (10th Cir. 2009) ...........................................................................................**15**

*Choice Hotels Int'l v. BSR Tropicana Resort, Inc.*, 252 F.3d 707,
709-10 (4th Cir. 2001) .....................................................................................................**16**

*Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 111 (2001). ....................................**11**

*City of Muskogee v. Martin*, 796 P.2d 337, 340 (Okla. 1990)  ....................................**17**

*Cummings v. FedEx Ground Package System, Inc.*, 404 F.3d 1258, 1262
(10th Cir. 2005) ..............................................................................................................**14**

*Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) .............................**11, 16**

*Dolese Bros. v. Tollett*, 19 P.2d 570, 571 (Okla. 1933)  ..............................................**10**

*Freeman v. Prudential Sec., Inc.*, 856 P.2d 592, 594 (Okla. Civ. App. 1993)..............**17**

*Green v. Ameritech Corp.*, 200 F.3d 967, 973 (6th Cir. 2000)  ....................................**16**

*Green v. SuperShuttle Int'l, Inc.*, 653 F.3d 766, 769-70 (8th Cir. 2011)  ....................**16**

*Hancock v. American Tel. and Tel. Co., Inc.*, 2011 WL 3626785, *10 ........................**18**

*Harber v. McKeown*, 157 P.2d 753, 754 (Okla. 1945 ...................................................**10**

*Long v. DeGeer*, 753 P.2d 1327, 1328 (Okla. 1987) ....................................................**17**

*Mid-Continent Pipe Line Co. v. Wilkerson*, 193 P.2d 586, 588 (Okla. 1948) ..............**10**

v

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) ........................................................................................ **12**

*Morris v. Airbnb, Inc.*, 2020 WL 5823542, *4 (W.D. Okla. 2020).............................. **18**

*Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 2 (1983) ...... **12, 14**

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 398 (1967) ............. **15**

*Rogers v. Dell Comp. Corp.*, 138 P.3d 826, 830 (Okla. 2005) .................................... **17**

*Sparling v. Hoffman Const. Co., Inc.*, 864 F.2d 635, 637-38 (9th Cir. 1988).............. **16**

*Thompson v. Bar-S Foods Co.*, 174 P.3d 567, 572 (Okla. 2007) ................................. **17**

*Towe, Hester & Erwin, Inc. v. Kansas City Fire & Marine Ins. Co.*, 947 P.2d 594, 599 (Okla. Civ. App. 1997) ........................................................................ **17**

*Voss v. City of Okla. City*, 618 P.2d 925, 928 (Okla. 1980)........................................ **17**

*Wolverine Exploration Co. v. Natural Gas Pipeline Co. of Amer. Inc.*, 842 P.2d 352, 353 (Okla. Civ. App. 1991) ......................................................... **16**

## Statutes

9 U.S.C. § 2 *et seq.* .................................................................................... **4**

9 U.S.C. § 3 ................................................................................................. **12**

9 U.S.C. § 4 ................................................................................................. **11**

9 U.S.C. §§ 1-16 *et seq.* ............................................................................. **4**

12 O.S. § 1857(A) ....................................................................................... **17**

A021

Defendant, GreenSky, LLC, incorrectly identified as BMO Harris Bank, NA d/b/a GreenSky, LLC (hereinafter "GreenSky"), files this brief in support of its Motion to Compel Arbitration as to all claims asserted by Plaintiff Susan Parisi (hereinafter "Plaintiff") and to dismiss or stay claims of Plaintiff pending arbitration. Plaintiff's loan agreement contains a mandatory arbitration provision directing the parties to resolve and dismiss or stay Plaintiff's claims in this case pending the outcome of arbitration. In support of this Motion, GreenSky respectfully shows as follows:

## I.
## INTRODUCTION

Plaintiff has filed a putative class action against GreenSky and purports to assert claims against GreenSky under the Oklahoma Consumer Credit Code. Plaintiff's claims against GreenSky, which arise from a loan document captioned "Installment Loan Agreement" (hereinafter "Loan Agreement"), should be sent to arbitration. The Loan Agreement contains, among other provisions: (1) an arbitration agreement; (2) an agreement to arbitrate "any claim, dispute or controversy of every kind and nature, whether based in law or equity, between you and us arising from or relating to your Loan Agreement . . . , including the validity, enforceability or scope of this Arbitration Provision or the Agreement"; and (3) an agreement to arbitrate all "Claims" individually.

As discussed below, there is an agreement to arbitrate between Plaintiff and GreenSky, and all other issues should be resolved by the arbitrator pursuant to the Loan Agreement. Therefore, GreenSky respectfully requests that the Court enter an order

compelling arbitration of Plaintiff's individual claims against GreenSky and dismissing or staying all further proceedings against GreenSky.

## II.
## UNDISPUTED FACTS

1.   On November 23, 2021, Plaintiff claims that she met with a representative of Defendant C Cashion Windows, LLC d/b/a Renewal by Andersen of Oklahoma to discuss the purchase and installation of replacement windows for her home. (*See* Exhibit 1, Plaintiff's Amended Petition and Motion to Certify a Class Action, ¶ 60.)[1]

2.   Plaintiff claims that the above representative explained a financing option, serviced through GreenSky, for Plaintiff to purchase the replacement windows. (*See id.*, ¶ 61.)

3.   Plaintiff alleges that said representative told her that she could purchase the replacement windows with zero money down and zero interest on the loan for two years, and that payments would not be due until two years after the installation. (*See id.*)

4.   Further, Plaintiff alleges that she discussed with said representative that she wanted to replace nine windows. (*See id.*, ¶ 63-64.)

---

[1] For the purpose of this Brief, relevant portions of Plaintiff's Amended Petition and Motion to Certify a Class Action will be attached as Exhibit 1. For a complete copy of Plaintiff's Amended Petition and Motion to Certify a Class Action, *see* ECF No. 1, Exhibit 1.

5.  A split plan installation was also discussed whereby five out of the nine windows would be installed first, with the remaining four windows installed later. (*See id.*, ¶ 64.)

6.  Plaintiff claims that she was shown on an iPad that she was approved for the loan terms mentioned above. (*See id.*, ¶ 65.)

7.  Plaintiff claims that based on her conversation with the representative described above, she agreed to purchase the replacement windows. (*See id.*, ¶ 67.)

8.  Further, Plaintiff claims that she was never shown the disclosures or informed of the interest that she would have to pay on the loan. (*See id.*, ¶ 68.)

9.  Because Plaintiff agreed to purchase the replacement windows and was approved for a loan with BMO Harris Bank, NA, serviced by GreenSky, a Loan Agreement was created that established Plaintiff's contractual agreement with GreenSky, as the servicing agent of Plaintiff's loan with BMO Harris Bank, NA. (*See* Exhibit 2, Loan Agreement, ¶ 25.) [2]

### III.
### PLAINTIFF'S LOAN AGREEMENT

Plaintiff's loan was serviced by GreenSky and funded by BMO Harris Bank, NA through the GreenSky® Program. (*See* Exhibit 3, Declaration of Timothy D. Kaliban ("Kaliban Declaration"), ¶¶ 7-8.) [3] That loan was documented by the Loan Agreement

---

[2] A true and correct copy of the Loan Agreement is attached as Exhibit 2, and is fully incorporated by reference herein.

[3] The Kaliban Declaration is attached as Exhibit 3, and is fully incorporated by reference herein.

3

GreenSky emailed to Plaintiff, which set forth the relevant terms and conditions of Plaintiff's loan. (Exhibit 3, Kaliban Declaration, ¶ 23.)

## A. ARBITRATION PROVISION

For purposes of this brief in support of GreenSky's motion, the most relevant provision of the Loan Agreement is in Paragraph 25, which is prominently titled: "**ARBITRATION PROVISION. Agreement to Arbitrate**." (*See* Exhibit 2, ¶ 25.) This provision requires that all "Claims" between the parties be resolved, "upon the election" by any party, through arbitration. (*Id.*) The arbitration agreement reflects that it "is made pursuant to a transaction involving interstate commerce, and will be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16, as it may be amended . . . , and the applicable Code." [4] (*Id.*)

The arbitration agreement mandates that all "Claims" between Plaintiff and GreenSky "will be resolved through binding arbitration." (*Id.*) The term "Claim" is broadly defined to mean:

> any claim, dispute or controversy of every kind and nature, whether based in law or equity, between you and us arising from or relating to your Loan Agreement as well as the relationship resulting from such Agreement . . . including the validity, enforceability or scope of this Arbitration Provision or the Agreement.

---

[4] Aside from the contractual provision designating the applicability of the Federal Arbitration Act, there is no dispute that the arbitration agreement is "a transaction involving interstate commerce," as GreenSky is based in Georgia while Plaintiff lives in Oklahoma. (*See* Exhibit 1, ¶ 1; *see also* Kaliban Declaration, ¶ 5.) The Federal Arbitration Act applies here. 9 U.S.C. § 2 (explaining that the Federal Arbitration Act applies to "[a] written provision in . . . a contract evidencing a transaction involving [interstate] commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . .").

4

(*Id.*) Likewise, the terms "you" and "us" are broadly defined to "include[] any corporate parent, wholly or majority owned subsidiaries, affiliates, any licensees, predecessors, successors, assigns and purchasers of any accounts, all agents, employees, directors and representatives of any of the foregoing and any third party providing any product, service or benefit in connection with the Agreement." (*Id.*)

There was also a clause in the arbitration provision that gave Plaintiff an opportunity to opt out of the arbitration provision.

> You may choose to opt out of and not be subject to this arbitration provision but only by following the process set forth below. If you do not wish to be subject to this Arbitration Provision, then you must notify us in writing within forty-five (45) calendar days of the date of the Agreement at the following address: P.O. Box 29429, Atlanta, GA 30359, Attention: Legal.

(*Id.*) Additionally, Plaintiff was notified in the arbitration agreement, in all capital letters, of the consequences of not opting out of arbitration:

> UNLESS YOU OPT OUT OF THIS ARBITRATION PROVISION AS PROVIDED BELOW OR EXCEPT AS APPLICABLE LAW PROHIBITS US FROM IMPOSING ARBITRATION ON YOU, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO LITIGATE A CLAIM IN COURT OR HAVE A JURY TRIAL ON A CLAIM. OTHER RIGHTS THAT YOU WOULD HAVE IN COURT ALSO MAY NOT BE AVAILABLE OR MAY BE LIMITED IN ARBITRATION, INCLUDING YOUR RIGHT TO APPEAL AND YOUR ABILITY TO PARTICIPATE IN A CLASS ACTION.

(*Id.*) Nevertheless, even if she did not opt out of arbitration, Plaintiff remained able to file and pursue an "individual Claim in a small claims court in [her] state or municipality, so long as that claim is pending only in that court." (*Id.*)

Claims will be referred either to JAMS or to the American Arbitration Association (hereinafter "AAA"). (*Id.*) The arbitration will take place in the federal judicial district

A026

where Plaintiff resides. (*Id.*) Plaintiff will not be required to pay more in arbitration frees than she paid in initiating litigation:

> Regardless of who wins in arbitration, you will only be responsible for paying your share, if any, of the arbitration fees required by the applicable Code, which amount will not exceed the filing fees that you would have in court if the Claim had been brought in the appropriate state or federal court closest to were you live. We will pay the remainder of any arbitration fees.

(*Id.*)

### B. AGREEMENT TO PURSUE CLAIMS INDIVIDUALLY

The Loan Agreement's arbitration provision also contains an agreement that arbitration will be conducted on an individual basis only, and that Plaintiff will not have the right to assert class action claims. The provision states, in relevant part: "Class Action Waiver and Other Restrictions: Arbitration will proceed solely on an individual basis without the right for any Claims to be arbitrated on a class action basis or on bases involving claims brought in a purported representative capacity on behalf of others." (*Id.*) Furthermore, the parties agreed that "[t]he arbitrator's authority to resolve and make written awards is limited to Claims between you and us alone. Claims may not be joined or consolidated unless agreed to in writing by all parties." (*Id.*)

### IV.
### APPLICATION AND APPROVAL OF PLAINTIFF'S LOAN

### A. APPLICATION AND APPROVAL PROCESS

On November 23, 2021, Plaintiff applied and was approved for a loan from BMO Harris Bank, NA through the GreenSky® Program for a home improvement project with Renewal by Andersen of Oklahoma, the company reflected on Plaintiff's Loan Agreement. (Exhibit 3, Kaliban Declaration, ¶ 12.; *see* Exhibit 2, p. 3.)

As part of the application process, applicants provide certain information necessary for GreenSky, as agent for the banks participating in the GreenSky® Program, to reach a decision on the application and to communicate with the borrower regarding the transaction. (Exhibit 3, Kaliban Declaration, ¶ 13.) Therefore, Plaintiff, as part of her loan application, supplied, among other information, her social security number, date of birth, telephone number, mailing address, and email address. (*Id.* ¶ 14.)

Once Plaintiff's information was entered in the application, in order to submit the application to GreenSky, Plaintiff was required to acknowledge reading and accepting: (1) the Loan Application disclosures; (2) the consent to electronic records and communication; and (3) an authorization for GreenSky to pull her credit report on behalf of the participating financial institution. (*Id.* ¶ 15.)

The credit report and credit score are provided to the GreenSky® Program's decisioning software, which applies the various credit policies of the participating financial institutions and renders a credit decision on the application based on these preset credit policies. (*Id.* ¶ 16.) Plaintiff was approved for a loan from BMO Harris Bank, NA with a credit limit in the amount of $17,744.00 (*Id.* ¶ 17.)

## B. GREENSKY'S MAILING TO PLAINTIFF WITH THE LOAN AGREEMENT

GreenSky mailed a printed copy of the Loan Agreement through the United States Postal Service to Ms. Parisi on or about November 23, 2021, to the physical address Ms. Parisi provided as part of the loan application process. (*Id.* ¶ 18.)

A028

GreenSky's vendor, Source Link, mailed the package on behalf of GreenSky containing the Loan Agreement directly to the physical address Ms. Parisi provided as part of her application. (*Id.* ¶ 19.)

GreenSky's action in mailing the printed copy of the Loan Agreement to Plaintiff was, and is, consistent with GreenSky's customary business practices for borrowers whose loans GreenSky services. (*Id.* ¶ 20.)

Specifically, Loan Agreement mailing was properly addressed to Plaintiff, had sufficient postage, and it was deposited in the U.S. Mail. This process is consistent with GreenSky's procedures for preparing and having mailed loan agreements to its customers. (*Id.* ¶ 21.)

This mailing was not returned to GreenSky as undeliverable and GreenSky did not receive any returned notifications that the Loan Agreement or any other mailings associated with Plaintiff's loan account were undeliverable. (*Id.* ¶ 22.)

## C.   GREENSKY'S EMAIL TO PLAINTIFF WITH THE LOAN AGREEMENT

GreenSky emailed Plaintiff the Loan Agreement on November 23, 2021—the same day Plaintiff filled out the loan application and was approved for same. (*Id.* ¶¶ 23, 25.) The Loan Agreement was emailed to sparisi21@yahoo.com, which is the email address she provided on her loan application with GreenSky as part of the loan application process. (*Id.* ¶ 23.)

GreenSky's action in emailing a copy of the Loan Agreement to Plaintiff was, and is, consistent with GreenSky's customary business practices for borrowers whose loans

GreenSky services. (*Id.* ¶ 24.) Specifically, the Loan Agreement was emailed to the proper email address that Plaintiff provided the same day she filled out the GreenSky loan application and was approved for the loan. (*Id.* ¶ 25.)

The email sent to Plaintiff identified GreenSky as the sender, stated that the email was regarding the Installment Loan Agreement, and the email was not returned to GreenSky as undeliverable. (*Id.* ¶ 26.) Additionally, as evidenced by Exhibits 2 and 3 in Plaintiff's Amended Petition and Motion to Certify a Class Action, the sparisi21@yahoo.com email address was used by Plaintiff. (*Id.* ¶ 27; *see* Exhibit 1, Plaintiff's Exhibits 2 and 3.)

## V.
## PLAINTIFF'S USE OF HER SHOPPING PASS AND LOAN AGREEMENT CONTAINING THE ARBITRATION PROVISION

On November 29, 2021, less than one week after receiving approval on her loan application and receiving the Loan Agreement, Plaintiff used the Shopping Pass included with, and part of, her Loan Agreement, and authorized Renewal by Andersen of Oklahoma to charge her account in the amount of $8,871.50. (Exhibit 3, Kaliban Declaration, ¶ 28.)

Plaintiff's use of the Shopping Pass and the loan proceeds to make the charge with Renewal by Andersen of Oklahoma constituted an affirmance and acceptance of the terms of the Loan Agreement; as set forth in the Shopping Pass included with the Loan Agreement, "[u]se of this Shopping Pass or the associated Loan by (any) Borrower (or any authorized user) to make a purchase constitutes acceptance by (all) Borrower(s) of the terms of the accompanying Loan Agreement. The physical or electronic record of any such

purchase will constitute the signature of (all) Borrower(s) on such Loan Agreement." (*Id.* ¶ 29; Exhibit 2, p. 1.)

Attached as Exhibit 4 to the Kaliban Declaration is a true and correct copy of the transaction history for Plaintiff's loan account. This document shows the charges to Plaintiff's account number ending in 2561. (Exhibit 3, Kaliban Declaration, ¶ 30.) The funds ($8,871.50) were settled and disbursed directly to Renewal by Andersen of Oklahoma's designated bank account in order to pay for the services Plaintiff requested from Renewal by Andersen of Oklahoma. (*Id.*)

## VI.
## ARGUMENT AND AUTHORITIES

The question of jurisdiction is primary and fundamental in every case. *Mid-Continent Pipe Line Co. v. Wilkerson*, 193 P.2d 586, 588 (Okla. 1948). Under Oklahoma law, it is the responsibility of the court to inquire and resolve such jurisdictional questions. *Harber v. McKeown*, 157 P.2d 753, 754 (Okla. 1945); *see Dolese Bros. v. Tollett*, 19 P.2d 570, 571 (Okla. 1933) (explaining that "[a] trial court is required to determine the legal question of whether or not it has jurisdiction of the subject-matter of an action presented to it for determination.").

When it appears either from the pleadings or briefs that the subject matter is exclusively within the jurisdiction of another forum, such as arbitration, the Court should decline to proceed further and dismiss the action. *See, e.g.*, *Mid-Continent Pipe Line Co.*, 193 P.2d at 591.

In this case, the proper forum is arbitration based the valid and enforceable arbitration provision in Plaintiff's Loan Agreement. Therefore, this Court should enter an order compelling arbitration of Plaintiff's individual claims against GreenSky and dismissing, or in the alternative, staying all further proceedings against GreenSky.

## A. THE ARBITRATION CLAUSE IS VALID AND ENFORCEABLE UNDER THE FEDERAL ARBITRATION ACT

As quoted above, the arbitration provision in the Loan Agreement states that it is to be governed by the Federal Arbitration Act (hereinafter "FAA"). The FAA codifies a national policy in favor of arbitrating claims when parties contract to settle disputes by arbitration, and compels judicial enforcement of a wide range of written arbitration agreements. *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 111 (2001). Section 4 of the FAA empowers a "party aggrieved by the alleged failure . . . of another to arbitrate under a written agreement for arbitration" to "petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4.

The FAA mandates that district courts "shall" enforce arbitration agreements "in accordance with the terms of the agreement." *Id.*; *see Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). This provision codifies the "liberal federal policy favoring arbitration." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal quotation marks omitted).

The "first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute. The court is to make this determination

11

by applying the 'federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act.'" *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) (quoting *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 2 (1983)). The "parties' intentions control, but those intentions are generously construed as to issues of arbitrability." *Id.* And, any ambiguities in the contract or doubts as to the parties' intentions should be resolved in favor of arbitration. *See id.*

Further, under the FAA, a district court should dismiss or stay a suit involving an arbitration clause under the following circumstances:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.

In this case, there was clearly an agreement to arbitrate between GreenSky and Plaintiff, as reflected in the extensive language quoted above that details the terms and conditions of the arbitration provision in the Loan Agreement. Also, there is no question that Plaintiff understood and agreed to have GreenSky service a loan so she could receive services from Renewal by Andersen of Oklahoma. (*See* Exhibit 3, Kaliban Declaration, ¶¶ 12-17.) Moreover, BMO Harris Bank, NA offered to lend funds to Plaintiff, with GreenSky acting as the servicing agent, as reflected in the terms and conditions of the Loan

Agreement. (*See id.*; *see also* Exhibit 2, p. 1) (stating Plaintiff was "approved" for loan proceeds up to $19,000).

It is undisputed that Plaintiff had the opportunity to review the Loan Agreement, containing the arbitration provision and class action waiver, when the Loan Agreement was sent to a valid email address that Plaintiff herself provided on her loan application with GreenSky, and then later used that same email address to converse with GreenSky. (*See* Exhibit 3, Kaliban Declaration, ¶¶ 23-27.) Plaintiff authorized the loan proceeds to be disbursed to Renewal by Andersen of Oklahoma, under the terms of the Loan Agreement, which contained the arbitration and class action waiver provisions. (*See id*. ¶ 28).

As quoted above, there is an opt-out provision in the Loan Agreement's arbitration provision giving Plaintiff the opportunity to opt-out of the arbitration provision by providing GreenSky with written notice within 45 days after the date of the Loan Agreement. (*See* Exhibit 2, ¶ 25). Plaintiff did not opt out of the arbitration provision by providing written notice to GreenSky within 45 days after the date of the Loan Agreement, further reflecting her assent to the arbitration provision and class action waiver.

Based on the foregoing, the arbitration provision in the Loan Agreement is valid and enforceable against Plaintiff. Therefore, this Court should enter an order compelling arbitration of Plaintiff's individual claims against GreenSky and dismissing, or in the alternative, staying all further proceedings against GreenSky.

**B. THE ARBITRATION PROVISION AGREED TO BY PLAINTIFF IS EXPRESSLY GOVERNED BY THE FEDERAL ARBITRATION ACT AND THE COURT MUST COMPEL ARBITRATION PURSUANT TO FEDERAL ARBITRATION LAW**

Under the FAA, there is a presumption in favor of arbitrating a broad scope of claims, particularly where no type of claim has been specifically excluded in the language of the arbitration agreement. *AT&T Techs., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 650 (1986). "The Arbitration Act establish that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Memorial Hosp.*, 460 U.S. at 24-25.

The arbitration provision in this case broadly states: "NEITHER YOU NOR WE WILL HAVE THE RIGHT TO LITIGATE A CLAIM IN COURT OR HAVE A JURY TRIAL ON A CLAIM."  (Exhibit 2, ¶ 25). As mentioned above, the term "Claim" is defined as "***any*** claim, dispute or controversy *of every kind and nature*, whether based in law or equity, between you and us ***arising from or relating to*** your Loan Agreement as well as the relationship resulting from such Agreement . . . including the validity, enforceability or scope of this Arbitration Provision or the Agreement."  (*Id.*) (emphasis added).

In determining whether a plaintiff's claims fall within the scope of an arbitration agreement, courts determine whether the arbitration agreement is broad or narrow. "When an arbitration clause is narrowly drawn, the policy in favor of arbitration does not have the 'strong effect . . . that it would have if . . .[it] [were] a broad arbitration clause." *Cummings v. FedEx Ground Package System, Inc.*, 404 F.3d 1258, 1262 (10th Cir. 2005). Generally, if an arbitration agreement contains the "language '[a]ny controversy or claim arising out

14

of or relating to this Agreement," then the arbitration agreement is considered broad. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 398 (1967); *see id.* (explaining that a broad arbitration provision "refer[s] all disputes arising out of a contract to arbitration."). Moreover, courts have determined that "the ordinary meaning of the phrase 'relating to' is broad." *Chelsea Family Pharmacy, PLLC v. Medco Health Solutions, Inc.*, 567 F.3d 1191, 1199 (10th Cir. 2009).

Clearly, the language of the arbitration provision in this case is broad as the arbitration provision defines "Claim" as "***any*** claim, dispute or controversy *of every kind and nature*, whether based in law or equity, between you and us ***arising from or relating to*** your Loan Agreement . . . ." (Exhibit 2, ¶ 25) (emphasis added). As such, the broad language in the arbitration provision covers the claims asserted against GreenSky by Plaintiff in her Petition.

Plaintiff's claims against GreenSky are based entirely on Plaintiff entering into a purchase and installation agreement with Renewal by Andersen of Oklahoma and then a subsequent Loan Agreement, with GreenSky as the servicing agent and BMO Harris Bank, NA as the lender, to finance that transaction. GreenSky's sole connection with this case is that GreenSky serviced a loan of approximately $8,871.50 to Renewal by Andersen of Oklahoma on behalf of Plaintiff for the replacement windows she agreed to purchase and have installed. The loan that GreenSky serviced is governed by the Loan Agreement, including the arbitration provision contained in said agreement.

Therefore, all of Plaintiff's claims and allegations in this case against GreenSky "arise from or relate to" the Loan Agreement. Consequently, the arbitration provision in the Loan Agreement covers this lawsuit in its entirety.

If all claims in a lawsuit are subject to arbitration, a court may dismiss such claims rather than staying the action. *See Green v. SuperShuttle Int'l, Inc.*, 653 F.3d 766, 769-70 (8th Cir. 2011); *Choice Hotels Int'l v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709-10 (4th Cir. 2001); *Green v. Ameritech Corp.*, 200 F.3d 967, 973 (6th Cir. 2000); *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992); *Sparling v. Hoffman Const. Co., Inc.*, 864 F.2d 635, 637-38 (9th Cir. 1988). Because this case is subject to arbitration in its entirety, this Court should not only enter an order compelling arbitration of Plaintiff's individual claims against GreenSky, but should also dismiss this case, or in the alternative, stay all further proceedings against GreenSky.

## C. THE ARBITRATION CLAUSE AND CLASS ACTION WAIVER ARE ALSO VALID AND ENFORCEABLE UNDER OKLAHOMA LAW

The arbitration provision in the Loan Agreement expressly provides for arbitration of the claims alleged in Plaintiff's Amended Petition and Motion to Certify a Class Action. The arbitration provision is valid, enforceable, and irrevocable pursuant to Oklahoma law. As such, the contractual agreement between the parties to arbitrate eliminates this Court's jurisdiction over the subject matter of Plaintiff's claims and allegations against GreenSky. Therefore, the Court must compel arbitration of this matter.

Oklahoma law favors arbitration where the parties have agreed. *Wolverine Exploration Co. v. Natural Gas Pipeline Co. of Amer. Inc.*, 842 P.2d 352, 353 (Okla. Civ.

App. 1991); *Freeman v. Prudential Sec., Inc.*, 856 P.2d 592, 594 (Okla. Civ. App. 1993). Oklahoma law also reflects a strong public policy in favor of arbitration. *See Towe, Hester & Erwin, Inc. v. Kansas City Fire & Marine Ins. Co.*, 947 P.2d 594, 599 (Okla. Civ. App. 1997). Section 1857(A) of the Oklahoma Uniform Arbitration Act (OUAA) declares arbitration agreements "valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for the revocation of a contract." 12 O.S. § 1857(A). According to the Oklahoma Supreme Court, where parties enter a contractual agreement to arbitrate disputes, "it constitutes a substantive and mandatory right." *Voss v. City of Okla. City*, 618 P.2d 925, 928 (Okla. 1980). The OUAA reveals "a clear legislative intent that any disputes arising from the interpretation or application" of such agreements "shall have an immediate and speedy resolution by required arbitration." *Id.*

Courts generally view arbitration provisions as "a shortcut to substantial justice with a minimum of court interference." *Long v. DeGeer*, 753 P.2d 1327, 1328 (Okla. 1987). The Oklahoma Supreme Court has held courts should compel arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Thompson v. Bar-S Foods Co.*, 174 P.3d 567, 572 (Okla. 2007) (internal citation omitted). Interpretation of an arbitration agreement is governed by general state-law contract principles, and courts should resolve in favor of covering any doubts concerning the arbitrability of a particular dispute. *Id.*; *City of Muskogee v. Martin*, 796 P.2d 337, 340 (Okla. 1990); *see also Rogers v. Dell Comp. Corp.*, 138 P.3d 826, 830 (Okla. 2005) (holding "ambiguity falls on the side of the existence of an agreement to arbitrate.").

17

The arbitration provision in the Loan Agreement covers all claims between Plaintiff and GreenSky "arising from or relating to [Plaintiff's] Loan Agreement as well as the relationship resulting from such Agreement . . . including the validity, enforceability or scope of th[e] Arbitration Provision or the Agreement." (Exhibit 2, ¶ 25).

Further, the arbitration provision states that Plaintiff agrees to waive any right, that she might otherwise have, to bring or participate in a class action lawsuit. Also, under the arbitration provision, Plaintiff agrees that any arbitration proceeding under the Loan Agreement will be limited to her individual claims rather than those of any class or group.

Courts in Oklahoma have determined that class action waivers are valid and enforceable. *See Morris v. Airbnb, Inc.*, 2020 WL 5823542, *4 (W.D. Okla. 2020) (ruling that Defendant's Motion to Compel Arbitration is granted where the arbitration clause contained a class action waiver); *see also Hancock v. American Tel. and AT&T Co., Inc.*, 2011 WL 3626785, *10 (enforcing arbitration clauses that contained class action waivers and granting a motion to compel arbitration with dismissal of certain claims). Given these Western District of Oklahoma cases holding that arbitration provisions with class actions waivers are enforceable, Plaintiff has waived any right to bring any class action claims against GreenSky, and the class action claims asserted in the Petition should be dismissed as a matter of law, or in the alternative, proceedings should be stayed in favor of arbitration.

18

**VII.**
**<u>CONCLUSION</u>**

WHEREFORE, Defendant respectfully requests that this Court compel arbitration as to all claims asserted by Plaintiff and to dismiss or stay claims of Plaintiff pending the outcome of arbitration.

Respectfully submitted,

Dated: April 28, 2023          */s/ Sean W. Fleming*

Sean W. Fleming
*Admitted Pro Hac Vice*
Texas State Bar No. 24027250
MACDONALD DEVIN MADDEN
KENEFICK & HARRIS, P.C.
12770 Coit Road, Suite 1100
Dallas, Texas 75251
T: (214) 744-3300
F: (214) 747-0942
SFleming@MacdonaldDevin.com

Derrick T. DeWitt, OBA #18044
Kyle R. Prince, OBA #33040
DeWITT PARUOLO & MEEK
P.O. Box 138800
Oklahoma City, OK 73113
T: (405) 705-3600
F: (405) 705-2573
ddewitt@46legal.com
kprince@46legal.com

***Attorneys for Defendant GreenSky, LLC, incorrectly identified as BMO Harris Bank, NA d/b/a GreenSky, LLC***

A040

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 28th of April, 2023, I electronically transmitted this document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

M. Kathi Rawls, OBA #18814
Minal Gahlot, OBA #22145
kathi@rawlsgahlot.com
minal@rawlsgahlot.com

***Attorneys for Plaintiffs***

*/s/ Sean W. Fleming*

20



Appellate Case: 23-6218   Document: 01011062398   Date Filed: 06/07/2024   Page: 48

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

IN THE DISTRICT COURT OF OKLAHOMA COUNTY
STATE OF OKLAHOMA

DEC 22 2022

RICK WARREN
COURT CLERK

108

SUSAN PARISI )
    Plaintiff, )
     )
v. )
     )
C CASHION WINDOWS, LLC )
d/b/a RENEWAL BY ANDERSON OF ) CASE NO.: CJ-22-5727
OKLAHOMA, and BMO HARRIS )
BANK, NA d/b/a GREENSKY, LLC, )
    Defendants. ) *The Honorable Judge Aletia Haynes Timmons*

## AMENDED PETITION AND MOTION TO CERTIFY A CLASS ACTION

COMES NOW the Plaintiff, Susan Parisi ("Ms. Parisi") by and through her counsel of

record, M. Kathi Rawls and Minal Gahlot of Rawls Gahlot, PLLC, and for her Petition and Class

Action claims states as follows:

### PARTIES

1. Plaintiff, Ms. Parisi is currently a resident of Oklahoma County, State of Oklahoma, and has

    been for more than six (6) months prior to the filing of this litigation.

2. The class members are Oklahoma consumers who were not provided adequate consumer

    credit disclosures prior to consummation or liability for the loans originated by Anderson and

    later sold to Harris/GreenSky.

3. Defendant, BMO Harris Bank, NA is a national lender issuing loans in reliance upon home

    solicitation sales of consumer goods as that term is defined by 14A O.S. § 2-501, issuing

    loans in Oklahoma under the name of GreenSky LLC, it may be served through its agents in

    Georgia ( hereafter "Harris/GreenSky").

4. Defendant C Cashion Windows, LLC d/b/a Renewal by Anderson of Oklahoma (Anderson)

    is a domestic entity which utilizes home solicitors in its sale and financing of consumer credit

    sales of goods as defined by 14A O.S. § 2-501.

1

A042

## JURISDICTION AND VENUE
(Plaintiff hereby incorporates ¶¶ 1-4 above)

5. This matter is filed against the Defendants in Oklahoma County as it is the residence county of Ms. Parisi and the location of the home solicitation for the sale of replacement windows.

6. Each Defendant may be served through its registered service agent or head teller and regularly conducts business in the State of Oklahoma.

7. GreenSky is a BMO Harris Bank N.A. is the actual lender identified in the loan sold by Anderson to Harris/GreenSky.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION
(Plaintiff hereby incorporates ¶¶ 1-7 above)

8. This class action seeks injunctive and monetary relief to redress an unlawful and deceptive pattern of wrongdoing followed by Defendant, C Cashion Windows, LLC d/b/a Renewal by Andersen of Oklahoma (Anderson), in concert with its co-defendant, Harris/GreenSky (jointly Defendants), in its credit extension sale of consumer goods and services in the State of Oklahoma.

9. Defendants are regularly engaged in the business of making/issuing "consumer loans" in which:

    (a) the debtor is a person other than an organization;

    (b) the debt is incurred primarily for a personal, family or household purpose;

    (c) either the debt is payable in installments or a loan finance charge is made; and

    (d) either the principal does not exceed Fifty Thousand Dollars ($50,000.00).

10. In violation of 14A O.S. § 5-203, Defendants regularly issue consumer loans for products and services which fail to comply with Oklahoma Consumer Credit Code (OCCC) accurate disclosure requirements, specifically:

    a) Defendants failed to deliver all material disclosures, prior to consummation, in a form the Class Representative or its members may keep in violation of 14A O.S. § 3-306;

    b) Defendants failed to give the Class Representative or its members the identity of the lender's assignee in violation of 14A O.S. § 3-306 2(a);

Appellate Case: 23-6218   Document: 010111062398   Date Filed: 06/07/2024   Page: 49

Appellate Case: 23-6218     Document: 010111062398     Date Filed: 06/07/2024     Page: 50

c) Defendants failed to accurately disclose to the Class Representative or its members "the amount financed" or to disclose the amount of credit to which the debtor has use, or to segregate those amounts from other amounts in violation of 14A O.S. § 3-306.2(b) (i);

d) Defendants failed to disclose the Class Representative or its members a statement of the debtor's right to obtain, upon a written request, a written itemization of the amount financed, and included spaces for a "yes" and "no" indication to be initialed by the debtor to indicate whether the debtor wants a written itemization of the amount financed.

e) Defendants failed to provide or respond to Disclosure Requirement (d) above or provide a written itemization of the amount financed in violation of 14A O.S. § 3-306 2(cc) (ii);

    i.   the amount that is or will be paid directly to the debtor;

    ii.   the amount that is or will be credited to the debtor's account to discharge obligations owed to the lender;

    iii.   each amount that is or will be paid to third persons by the lender on the debtor's behalf, together with an identification of or reference to the third person; and

    iv.   the total amount of any charges described in the division (cc) of subparagraph (i) of this paragraph.

    v.   The sum of the amount financed and the finance charge, which shall be termed the "total of payments".

    vi.   (f) The number, amount, and due dates or period of payments scheduled to repay the total of payments.

    vii.   (g) Descriptive explanations of the terms "amount financed", "finance charge", "annual percentage rate" and "total of payments", as specified by the Administrator.

    viii.   Any dollar charge or percentage amount which may be imposed by a lender solely on account of a late payment, other than a deferral or extension charge.

    ix.   (j) A statement indicating whether or not the debtor is entitled to a rebate of any finance charge upon refinancing or prepayment in full pursuant to acceleration or otherwise, if the obligation involves a precomputed finance charge. A statement indicating whether or not a penalty will be imposed in those same circumstances if the obligation involves a finance charge computed from time to time by application of a rate to the unpaid principal balance.

    x.   (k) A statement that the debtor should refer to the appropriate contract document for any information such document provides about nonpayment,

Appellate Case: 23-6218   Document: 010111062398   Date Filed: 06/07/2024   Page: 51

default, the right to accelerate the maturity of the debt, and prepayment rebates and penalties;

xi.     The preceding list of disclosure violations by Defendants, as it relates to the loans issued to the Class Representative or its members, are prohibited under 14A O.S. § 3-306 2(aa) through (k).

## CLASS REPRESENTATION ALLEGATIONS
### *Statement of Maintainable Class Claims*

(Plaintiff hereby incorporates ¶¶ 1-11 above)

11. Pursuant to 12 O.S. § 2023, this is a case maintainable on a class-wide basis pursuant to 12 O.S. §§ 2023B.2 and 3, and the Class Representative brings this action on behalf of herself and of a class of all other persons similarly situated, to remedy the ongoing unfair, unlawful, and/or deceptive business practices alleged herein, and seeks redress on behalf of all those persons who have been harmed thereby, more specifically as set out below:

12. Anderson is a "Merchant", approved, trained and contractually engaged in the assignment of loans to Harris/GreenSky as more fully described below.

13. Anderson uses deceptive practices to sell its products, door-to-door, to home owners in Oklahoma pursuant to an extension of credit; the terms of which are not timely and accurately disclosed to homeowners prior to consummation or prior to incurring liability thereon.

14. Anderson then immediately assigns its non-compliant, unauthorized credit extensions to BMO Harris Bank N.A. via its GreenSky Loan Program, who ratifies Anderson's actions by reporting negatively to consumer reporting agencies, conducting collection calls, and demanding payments in writing from consumers despite the fraudulent nature of the loan(s) issuance and the objections stated by said consumers.

15. GreenSky LLC is a loan servicing subsidiary of BMO Harris Bank N. A. with its principal place of business at 5565 Glenridge Connector, Suite 700, Atlanta, Georgia 30342.

A045

Appellate Case: 23-6218   Document: 010111062398   Date Filed: 06/07/2024   Page: 52

16. BMO Harris conducts business throughout the United States through GreenSky LLC, its subsidiary administering the GreenSky Program, and engages in accepting assignment of loan from Assignors, origination and servicing activities related to the GreenSky Program.

17. Harris/GreenSky therefore engages in offering or providing a "financial product or service" within the meaning of 12 U.S.C. § 5481(15)(A)(i) and the Oklahoma Consumer Credit Code 14A O.S. § 3-306 and 2-104.

18. Harris/GreenSky engages in origination activities and services loans offered or provided for use by consumers primarily for personal, family, or household purposes within the meaning of 12 U.S.C. § 5481(5)(A) and 14A O.S. § 2-104.

19. Harris/GreenSky are "covered persons" under 12 U.S.C. § 5481(6) and the Oklahoma Consumer Credit Code.

17. <u>**Identification of Common Questions of Law or Fact**</u>

(Plaintiff hereby incorporates ¶¶ 1-19 above)

20. Pursuant to 12 O.S. § 2023A.2, there are questions of law and fact common to the Class, which common issues predominate over any issues involving owing individual class members.

21. The factual questions common to the Class Representative and to each class member is that each class member's loan for Anderson windows in Oklahoma were presented, sold and loan originated as described below.

22. Pursuant to 12 O.S. § 2023A.2, the principal legal question common to the Class Representative and to each class member is whether adequate consumer credit disclosures were provided to class members prior to consummation or liability for the loans originated by Anderson and later sold to Harris/GreenSky.

<u>*Allegations of Typicality*</u>

5

A046

Appellate Case: 23-6218   Document: 01011062398   Date Filed: 06/07/2024   Page: 53

(Plaintiff hereby incorporates ¶¶ 1-22 above)

23. Pursuant to 12 O.S. § 2023A.3, the Class Representatives claims are typical of those of the classes it seeks to represent in that the Class Representative was solicited to purchase replacement windows without providing mandatory disclosures of the consumer credit extension loan and as such, the claim of the Class Representative is identical to that of the class members.

### *Definition of Class*

(Plaintiff hereby incorporates ¶¶ 1-23 above)

24. Pursuant to 12 O.S. § 2023C.3, the class is composed of all Oklahoma consumers who, since one year prior to the filing of this litigation,

    a) Defendants failed to deliver all material disclosures, prior to consummation, in a form the Class Representative or its members may keep in violation of 14A O.S. § 3-306;

    b) Defendants failed to give the Class Representative or its members the identity of the lender's assignee in violation of 14A O.S. § 3-306 2(a);

    c) Defendants failed to accurately disclose to the Class Representative or its members "the amount financed" or to disclose the amount of credit to which the debtor has use, or to segregate those amounts from other amounts in violation of 14A O.S. § 3-306 2(b) (i);

    d) Defendants failed to disclose the Class Representative or its members a statement of the debtor's right to obtain, upon a written request, a written itemization of the amount financed, and included spaces for a "yes" and "no" indication to be initialed by the debtor to indicate whether the debtor wants a written itemization of the amount financed.

    e) Upon receiving an affirmative indication, the lender shall provide, at the time other disclosures are required to be furnished, a written itemization of the amount financed in violation of 14A O.S. § 3-306 2(cc) (ii);

        xii.   the amount that is or will be paid directly to the debtor;

        xiii.   the amount that is or will be credited to the debtor's account to discharge obligations owed to the lender;

A047

Appellate Case: 23-6218     Document: 01011062398     Date Filed: 06/07/2024     Page: 54

xiv.   each amount that is or will be paid to third persons by the lender on the debtor's behalf, together with an identification of or reference to the third person; and

xv.    the total amount of any charges described in the division (cc) of subparagraph (i) of this paragraph.

xvi.   The sum of the amount financed and the finance charge, which shall be termed the "total of payments".

xvii.  (f) The number, amount, and due dates or period of payments scheduled to repay the total of payments.

xviii. (g) Descriptive explanations of the terms "amount financed", "finance charge", "annual percentage rate" and "total of payments", as specified by the Administrator.

xix.   Any dollar charge or percentage amount which may be imposed by a lender solely on account of a late payment, other than a deferral or extension charge.

xx.    (j) A statement indicating whether or not the debtor is entitled to a rebate of any finance charge upon refinancing or prepayment in full pursuant to acceleration or otherwise, if the obligation involves a precomputed finance charge. A statement indicating whether or not a penalty will be imposed in those same circumstances if the obligation involves a finance charge computed from time to time by application of a rate to the unpaid principal balance.

xxi.   (k) A statement that the debtor should refer to the appropriate contract document for any information such document provides about nonpayment, default, the right to accelerate the maturity of the debt, and prepayment rebates and penalties;

xxii.  The preceding list of disclosure violations by Defendants, as it relates to the loans issued to the Class Representative or its members, are prohibited under 14A O.S. § 3-306 2(aa) through (k).

### *Adequacy of Class Representative*

(Plaintiff hereby incorporates ¶¶ 1-24 above)

25. Pursuant to 12 O.S. § 2023A.4, the Class Representative will fairly and adequately protect

and represent the interest of each class member.

26. The Class Representative has retained counsel with substantial experience in handling class

actions in federal and state court. See, e.g., Martinez v. FMS Inc., 2008 WL 4010101 (M.D.

Fla. 2008); Brown v. SCI Funeral Services, 212 F.R.D. 602 (S.D.Fla.2003); Baez v. Wagner

A048

Appellate Case: 23-6218   Document: 010111062398   Date Filed: 06/07/2024   Page: 55

& Hunt, P.A., 442 F.Supp.2d 1273 (S.D. Fla. 2006); Jansen v. West Palm Nissan, Inc., 2006 WL 1582068 (S.D. Fla. 2006); Tyrell v. Robert Kaye & Associates, P.A., 223 F.R.D. 686 (S.D. Fla. 2004). Further, counsel for the Class Representatives has substantial experience in litigating individual and class actions under the Uniform Commercial Code.  See, e.g., Jackson v. Southern Auto Finance Co., 988 So.2d 721 (Fla. 4th DCA 2008); Muro v. Hermano's Auto Wholesalers, Inc., 514 F.Supp. 2d 1343 (S.D. Fla. 2007); Westlake Financial Services v. Ray, 923 So.2d 555 (Fla. 4th DCA 2006).

27. The Class Representative has no conflicts of interest which would interfere with their ability to represent the interests of the class members.

*Appropriateness of Hybrid Class Treatment Under §§ 2023 B.2 and 3*

(Plaintiff hereby incorporates ¶¶ 1-27 above)

28. A class action is superior to other methods for the fair and efficient adjudication of this controversy. Because the damages suffered by the individual class members may be relatively small compared to the expense and burden of litigation, it would be impractical and economically unfeasible for class members to seek redress individually. The prosecution of separate actions by the individual class members, even if possible, would create a risk of inconsistent or varying adjudications with respect to the individual class members against Harris/GreenSky.

29. The Class Representative is represented by counsel competent and experienced in both consumer protection and class action litigation.

30. Members of the proposed class who have an interest in individually controlling the prosecution of separate claims against Anderson and Harris/GreenSky will not be prejudiced by this action.

A049

Appellate Case: 23-6218    Document: 010111062398    Date Filed: 06/07/2024    Page: 56

31. Each member of the proposed class will be identified through discovery from Harris/GreenSky and will be notified and given an opportunity to opt out of their respective class(es).

32. The Class Representative does not presently know the nature and extent of any pending litigation to which a member of the proposed class is a party and in which any question of law or fact controverted in the present action is to be adjudicated. The Class Representative will identify any such pending litigation by

33. This Court is an appropriate forum for the present action in that the Class Representative is, and at all times herein mentioned has been, a resident of this county; the Class Representatives vehicle was purchased and repossessed in this county; and Harris/GreenSky does business in this county, including without limitation providing to residents of this county financing of motor vehicles that are consumer goods.

34. Certification of a class under 12 O.S. § 2023B.2 is appropriate as Harris/GreenSky has acted on grounds generally applicable to the Class with respect to the collection and credit reporting activity by Harris/GreenSky described above, thereby making appropriate equitable relief with respect to the Class as a whole.

35. Unless restrained from such activities, Harris/GreenSky will continue to unlawfully harm the interests of the Class Representative and the class for which no adequate remedy at law exists.

36. Certification of a class under 12 Oklahoma Statutes Annotated § 2023B.3 is also appropriate in that:

37. The questions of law or fact common to the members of the class predominate over any questions affecting an individual class member; and

9

A050

Appellate Case: 23-6218   Document: 01011062398   Date Filed: 06/07/2024   Page: 57

38. A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

39. The Class Representative requests a certification of a "hybrid" class for monetary damages under 12 Oklahoma Statutes Annotated § 2023B.3 and for equitable relief under 12 Oklahoma Statutes Annotated § 2023B.2. See, Penson v. Terminal Transport Co., Inc., 634 F.2d 989, 994 (5th Cir.1981); Agan v. Katzman & Korr, P.A., 222 F.R.D. 692 (S.D.Fla.2004).

40. There are no difficulties likely to be encountered by the Court in the management of this proposed class action.

41. The Class Representatives counsel is entitled to a reasonable fee from the class members or from a common fund for the handling of this action.

### Harris/GreenSky's Business Model
(Plaintiff hereby incorporates ¶¶ 1-41 above)

42. Harris/GreenSky engages in origination and servicing activities on behalf of GreenSky Program banks.

43. Harris/GreenSky uses Merchants to market and intake loan applications from consumers at the point of sale. Most of these Merchants provide home improvement products and services, health care services, or retail products.

44. Anderson is one of those Merchants in the State of Oklahoma.

45. Merchants must apply to participate in the GreenSky Program and if accepted into the GreenSky Program, Harris/GreenSky generally train Merchants, including on how to market and promote the GreenSky Program loans, intake consumers' personal and financial information, submit loan applications to Harris/GreenSky on behalf of consumers or assist consumers in submitting loan applications directly to Harris/GreenSky.

10

A051

Appellate Case: 23-6218     Document: 01011062398     Date Filed: 06/07/2024     Page: 58

46. Harris/GreenSky allows most Merchants to submit consumer loan applications online using Harris/GreenSky 's website or mobile applications, or over the phone if the Merchant indicates it has a signed application information form or a signed application from a consumer.

47. Once Harris/GreenSky receives an application, it makes an on-the-spot financing decision by comparing a consumer's application data with the lending criteria of the GreenSky Program banks, using proprietary technology and algorithms. These loans typically range from a few thousand dollars to tens of thousands of dollars.

48. When a consumer or Merchant submits a loan application through Harris/GreenSky 's website or mobile application, the approved loan terms are displayed on the computer or tablet at the conclusion of the application process.

49. Where a Merchant submits a loan application on a consumer's behalf, however, the consumer may view the approved loan terms on the computer or tablet only if the Merchant shares the screen with the consumer.

50. Until at least April 2019, if Harris/GreenSky determined that an applicant qualified for a loan, the loan application process was complete. Harris/GreenSky mailed or emailed loan documentation to consumers, but consumers were not required to sign and return that loan documentation to consummate the loan.

51. Harris/GreenSky also issues consumers a "shopping pass" number, which functions like a credit card (Shopping Pass). Harris/GreenSky treats use of the Shopping Pass, or associated funds, as acceptance of the loan.

52. Harris/GreenSky does not disburse the loan proceeds to the consumer. Rather, to pay for a product or service, a consumer provides the Shopping Pass number to her Merchant or

A052

Appellate Case: 23-6218   Document: 010111062398   Date Filed: 06/07/2024   Page: 59

otherwise authorizes a transaction and the Merchant, in turn, uses the Shopping Pass number or other authorization to apply for payment from Harris/GreenSky.

53. Harris/GreenSky then disburses loan proceeds directly to the Merchant.

54. Most of Harris/GreenSky's revenue is earned from fees that Merchants pay to Harris/GreenSky every time they receive payment from the proceeds of a consumer's loan.

55. In some instances, Merchants have misused these Shopping Pass numbers.

56. Merchants sometimes applied for a loan without a consumer's knowledge and entered their own email addresses as the consumer's own on the loan application. Because of this, Harris/GreenSky emailed the consumer's loan documents or Shopping Pass number to the Merchant instead of the consumer.

57. In other instances, Merchants applied for a loan without a consumer's knowledge and entered the consumer's correct mailing address on the application, but because the consumer was unaware of the loan, the consumer ignored the loan documents Harris/GreenSky mailed, thinking they were promotional materials.

58. Consumers sometimes received mailed loan documents–which could take weeks to arrive after a loan application–only after the Merchant had already used the Shopping Pass number without the consumer's knowledge.

### The Specific Facts related to the Class Representative Ms. Parisi

59. Here, the proposed class representative, Ms. Parisi was interested in Anderson's advertised replacement windows for her home in Oklahoma City, OK.

60. Ms. Parisi met with Russell Kelley (Russell), of Defendant, C Cashion Windows, LLC d/b/a Renewal by Andersen of Oklahoma (Anderson) on or around 11/23/2021.

12

Appellate Case: 23-6218 Document: 01011062398 Date Filed: 06/07/2024 Page: 60

61. Russell indicated Ms. Parisi could purchase the windows with zero money down, zero interest on the loan for two years and zero payments for 24 months after the installation.

62. Ms. Parisi informed Russell she had recently been diagnosed with multiple myeloma and would need the 24 month option due to her health issues and its costs and time related to treatment.

63. Russell and Ms. Parisi discussed the windows she wanted to replace and made choices regarding those windows.

64. Russell indicated that they would install the nine (9) windows on a "split plan"; planning to install five windows now and the rest at another time.

65. Russell showed Ms. Parisi an IPad to evidence that she had been approved for that type loan but the terms of the credit extension contract were not visible, Russell didn't release the IPad and Ms. Parisi was not provided the opportunity to read it.

66. Russell assured Ms. Parisi that she would be emailed a copy of the contract.

67. Based upon Russell's statements, Ms. Parisi agreed to the purchase but didn't execute any documents; only the IPad.

68. Russell never mailed her a copy of the contract and Ms. Parisi was not provided any accurate disclosures about the interest she would be paying on the credit extension.

69. On or about December 7, 2021, Ms. Parisi was notified by Defendant Harris/GreenSky that Anderson had received an advance payment of $8,871.50 for the sale of its windows to Ms. Parisi and that her payments would start 6 months after installation of the windows.

70. GreenSky' s letter also informed Ms. Parisi that if she didn't authorize the payment to contact Harris/GreenSky immediately, which Ms. Parisi did.(Exhibit 1, Harris/GreenSky Letter to Parisi)

A054

Appellate Case: 23-6218     Document: 01011062398     Date Filed: 06/07/2024     Page: 61

71. Ms. Parisi immediately contacted Russell with Anderson, who falsely told Ms. Parisi this had never happened before and he would follow up to find out what happened.

72. Ms. Parisi never heard from Russel again.

73. Ms. Parisi then contacted Harris/GreenSky to inform them she had not authorized the payments, was unaware of their involvement, had not been informed of the interest rate, and had not agreed for payments to start six months after the installation of windows.

74. Ms. Parisi informed Harris/GreenSky she could not agree to such a loan because of the cancer treatment she was undergoing which would not be completed until the end of 2022.

75. Anderson never installed any windows at Ms. Parisi's home.

76. Ms. Parisi disputed that she owed Harris/GreenSky any money on the contract; a fact acknowledged by Harris/GreenSky in writing to Ms. Parisi shortly thereafter.

77. Harris/GreenSky did not notify the credit bureaus to whom it reported Ms. Parisi's loan, that she disputed the alleged debt.

78. Harris/GreenSky ignored Ms. Parisi's request to delete its tradeline, ignored the fact Anderson defrauded her, and ignored her request to provide her a copy of the alleged signed contract.

79. On December 10, 2021, Ms. Parisi again objected to the new loan being reported under her name and credit history.(Exhibit 2, 12/10/21 Parisi Email to Harris/GreenSky)

80. Harris/GreenSky failed to conduct any written investigation on Ms. Parisi's complaints but instead stated it would "get the plan changed" for her.(Exhibit 3, 12/14/21 email to Ms. Parisi)

81. On 12/17/21, Harris/GreenSky stated, "got the plan changed and to let Harris/GreenSky know when the account was created". (12/17/21 Harris/GreenSky email to Parisi)

14

A055

Appellate Case: 23-6218    Document: 0101111062398    Date Filed: 06/07/2024    Page: 62

82. Remarkably, Harris/GreenSky sent Ms. Parisi a letter stating that she had failed to "participate" in her own complaint and its resolution.(Exhibit 4, Harris/GreenSky letter to Parisi)

83. Harris/GreenSky continued its false reporting on the alleged loan it purchased from Anderson.

84. Ms. Parisi has endured continued stress from Harris/GreenSky's harassment and defamation throughout 2022.

85. Harris/GreenSky's actions herein are a violation of the 7/12/21 CFPB Consent Order entered into by Harris/GreenSky.(Exhibit 5, CFPB Consent Order)

86. On July 18, 2022, Ms. Parisi sent a formal letter to Harris/GreenSky again reiterating the details of Anderson's fraud and Harris/GreenSky's participation, but the communication failed to eliminate Harris/GreenSky's false reporting to others about her.

87. Harris/GreenSky was then notified that Ms. Parisi had retained undersigned counsel as a result of its actions and all future communications should cease with Ms. Parisi.

88. Harris/GreenSky continued to contact Ms. Parisi after receipt of undersigned counsel and continues to defame her in its credit reporting.

89. Harris/GreenSky has previously stipulated to an Agreed Order finding it violated the Consumer Financial Protection Bureaus' rules when accepting assignment of loans from entities such as Anderson.

90. Harris/GreenSky regularly accepts assignment of loans originated by Anderson even though it is aware that Anderson regularly fails to abide by Oklahoma's Consumer Protection Act or Consumer Protection Act.

A056

Appellate Case: 23-6218   Document: 010111062398   Date Filed: 06/07/2024   Page: 63

91. Anderson regularly extends credit to consumers to facilitate the sale of its windows and is subject to the Oklahoma Consumer Credit Code (OCC) and the Oklahoma Consumer protection Act by failing to provide accurate and timely disclosures of loan terms prior to consummation.

92. Anderson violated the Oklahoma Consumer Credit Code disclosure requirements in its door-to-door sales of replacement windows pursuant to the consumer credit extension in the State of Oklahoma.

93. Anderson, in concert with Harris GreenSky, also committed fraud and forgery when its agent

91. falsely indicated the terms of the window sale credit extension were other than previously advertised, as enumerated above.

94. Harris/GreenSky is liable for the actions taken by Anderson in that it accepted Assignment of the loan without ensuring compliance with multiple state laws.

95. Harris/GreenSky committed its own independent acts of fraud by stating that it would resolve the issue of Anderson's fraud and lack of disclosure of the cost of the credit extension to the Class Representative and its members by continuing to defame them by reporting falsely that credit extensions were valid, in default, or both.

96. Harris/GreenSky continued to harass and bill Ms. Parisi, falsely indicating that she was past due; causing Ms. Parisi unnecessary anguish and emotional distress while undergoing cancer treatment.(Exhibit 6, 10/2/22 Past Due Notice from Harris/GreenSky)

97. Harris/GreenSky ratified and benefited from its Assignor's violations of law when it refused to delete the false and defamatory information it published regarding the Class Representative and its members.

16

A057

Appellate Case: 23-6218   Document: 010111062398   Date Filed: 06/07/2024   Page: 64

98. Harris/GreenSky failed to conduct a meaningful investigation of Ms. Parisi's dispute following receipt of Ms. Parisi's statements in its regard

99. Harris/GreenSky has purposefully and intentionally continued to falsely report that Ms. Parisi is in default even after undersigned counsel requested all communications cease.

100.                                             Defendants and its agents are prohibited from destroying, concealing or altering any document, testimony, recording or electronic storage of relevant evidence regarding the claims, defenses or allegations regarding this matter; Defendants are admonished to preserve and protect such evidence.

101.                                          The Class Representative and its members are entitled to their actual, consequential, statutory and exemplary damages as a result of the Defendants actions, along with their reasonable attorney fees and costs.

Sincerely,

M. Kathi Rawls, OBA #18814
Minal Gahlot, OBA#22145
Rawls Gahlot, PLLC
2404 S. Broadway
Moore, Ok 73160
Phone: 405-912-3225
Email: kathi@rawlsgahlot.com
Email: minal@rawlsgahlot.com
ATTORNEYS FOR PLAINTIFF

**JURY TRIAL DEMANDED**
**ATTORNEY LIEN CLAIMED**

17

A058

 

Page: 65   Date Filed: 06/07/2024   Document: 010111062398   Appellate Case: 23-6218

12/07/2021

Account Activity Update

Dear SUSAN K PARISI,

For your records, this is an account activity update.

Please note: **No payment is due and no interest will be charged until your project is complete.***

You can also go to www.greenskyonline.com to access your account online and review your loan documents.

Regards,

BMO HARRIS BANK N.A.
GreenSky® Program

If you did NOT authorize this account or these charges, please contact us at service@greensky.com or **866-936-0602** immediately!

Account Up

Dear SUS

For your serve

Reserved

Regards

BMO HI
GreenSk

Regards

# Dear

* This is what Complete means: The purchase window will close on **05/26/2022** or when your merchant submits a final transaction and confirms the job is complete, whichever comes first.

PLAINTIFF'S
EXHIBIT

1

A059

Appellate Case: 23-6218    Document: 01011062398    Date Filed: 06/07/2024    Page: 66

## Your Billing Rights: What To Do If You Find a Mistake on Your Statement

If you think there is an error on your statement, write to us at:

GreenSky® Program
Attention: Disputes
PO Box 29429
Atlanta, GA 30359
You may also contact us at service@greensky.com.

In your letter, give us the following information:

- Account information: Your name and account number.
- Dollar amount: The dollar amount of the suspected error.
- Description of Problem: If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.

You must contact us within 60 days after the error appeared on your statement. You must notify us of any potential errors in writing. You may call us, but if you do, we are not required to investigate any potential errors and you may have to pay the amount in question.

## While we investigate whether or not there has been an error, the following are true:

- We cannot try to collect the amount in question, or report you as delinquent on that amount.
- The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount.
- While you do not have to pay the amount in question, you are responsible for the remainder of your balance.
- We can apply any unpaid amount against your available loan funds (if any).

## Your Rights If You Are Dissatisfied With Your Payment Card Purchases

If you are dissatisfied with the goods or services that you have purchased with your payment card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the purchase.

To use this right, all of the following must be true:

1. The purchase must have been made in your home state or within 100 miles of your current mailing address, and the purchase price must have been more than $50. (Note: Neither of these is necessary if your purchase was based on an advertisement we mailed to you, or if we own the company that sold you the goods or services.)
2. You must have used your payment card for the purchase.
3. You must not yet have fully paid for the purchase.

If all of the criteria above are met and you are still dissatisfied with the purchase, contact us in writing.

## When Will You Credit My Payment?

As of the business day we receive it, as long as payments are made by 6 p.m. ET.

The Servicemembers Civil Relief Act (SCRA) provides important financial and legal protections to servicemembers, including caps on interest rates and stays of certain legal proceedings. Learn more online at www.militaryonesource.mil (search for "SCRA").

A060

1/4/22, 11:40 AM                                    Yahoo Mail - Re: GreenSky case 04386281 [ ref:_00Dd0dh5w._5003o1VuXKY:ref ]

Re: GreenSky case 04386281 [ ref:_00Dd0dh5w._5003o1VuXKY:ref ]

From: Customer Solutions (cst@greensky.com)

To:      sparisi21@yahoo.com

Date:    Friday, December 10, 2021, 01:43 PM CST

Hi Susan,

I am sorry and understand your frustration. I have reached out to the merchant about your concern. Our records shows you signed agreeing to the loan terms. Loan plan 7541, you will not be billed until the project is fully completed. Once completed, you will have 24 months with interest waived and required minimum payment due. Please call me if you have further questions.

Thank you

--------- Original Message ---------
From: Susan Parisi [sparisi21@yahoo.com]
Sent: 12/10/2021 1:29 AM
To: cst@greensky.com
Subject: Re: GreenSky case 04386281 [ ref:_00Dd0dh5w._5003o1VuXKY:ref ]

You did NOT explain any loan process to me and I do NOT authorize any transaction which I have already stated. I do NOT do well with lies. I have many questions related to this situation. I was told I qualified for a 24 month, NO money down, No Interest, and NO payment situation to begin 24 months after installation, now I am being told I did NOT qualify for that and you have removed that original offer. Well this is to inform you again that I am NOT doing business with you or Renewal by Anderson and IF you sent them money without my consent that is ON you NOT me. I did NOT authorize anything. I will provide you the name of my attorney and they will deal with this. This is a very sketchy situation you have set up here with Renewal by Anderson I suggest this gets straightened out quickly.   Susan Parisi

On Thursday, December 2, 2021, 07:57:40 AM CST, Customer Solutions <cst@greensky.com> wrote:

Good Morning Susan,

After explaining the loan process, do you authorize this transaction? If you have any questions, please give me a call.

--------- Original Message ---------
From: Customer Solutions [cst@greensky.com]
Sent: 12/1/2021 5:02 PM
To: sparisi21@yahoo.com
Subject: Re: GreenSky case 04386281 [ ref:_00Dd0dh5w._5003o1VuXKY:ref ]

The account will be charged because it is part of the loan process but based on your loan plan, we will not bill you until the job is completed or purchase window expiration date-05/26/22. So the account is being charged but you are not going to be billed just yet.

--------- Original Message ---------
From: Susan Parisi [sparisi21@yahoo.com]



1/2

A061

Appellate Case: 23-6218     Document: 01011062398     Date Filed: 06/07/2024     Page: 68

1/4/22, 11:43 AM                                        Yahoo Mail - Re: GreenSky case 04386281 [ ref:_00Dd0dh5w._5003o1VuXKY:ref ]

ReF #

Re: GreenSky case 04386281 [ ref:_00Dd0dh5w._5003o1VuXKY:ref ]

From:  Customer Solutions (cst@greensky.com)

To:     sparisi21@yahoo.com

Date:  Friday, December 17, 2021, 02:55 PM CST

Hi Susan,

I got the plan change approved. I will let you know once the account is created.

——————— Original Message ———————
From: Customer Solutions [cst@greensky.com]
Sent: 12/14/2021 4:21 PM
To: sparisi21@yahoo.com
Subject: Re: GreenSky case 04386281 [ ref:_00Dd0dh5w._5003o1VuXKY:ref ]

Re: Green sky
Hey Susan,

I am going to see if I can get the plan change approved. I will call you with an update.

——————— Original Message ———————
From: Customer Solutions [cst@greensky.com]
Sent: 12/10/2021 2:43 PM
To: sparisi21@yahoo.com
Subject: Re: GreenSky case 04386281 [ ref:_00Dd0dh5w._5003o1VuXKY:ref ]

Hi Susan,

I am sorry and understand your frustration. I have reached out to the merchant about your concern. Our records shows you signed agreeing to the loan terms. Loan plan 7541, you will not be billed until the project is fully completed. Once completed, you will have 24 months with interest waived and required minimum payment due. Please call me if you have further questions.

Thank you

——————— Original Message ———————
From: Susan Parisi [sparisi21@yahoo.com]
Sent: 12/10/2021 1:29 AM
To: cst@greensky.com
Subject: Re: GreenSky case 04386281 [ ref:_00Dd0dh5w._5003o1VuXKY:ref ]

You did NOT explain any loan process to me and I do NOT authorize any transaction which I have already stated. I do NOT do well with lies. I have many questions related to this situation. I was told I qualified for a 24 month, NO money down, No Interest, and NO payment situation to begin 24 months after installation, now I am being told I did NOT qualify for that and you have removed that original offer. Well this is to inform you again that I am NOT doing business with you or Renewal by Anderson and IF you sent them money without my consent that is ON you NOT me. I did NOT authorize anything. I will provide you the name of my attorney and they

PLAINTIFF'S
EXHIBIT
3

1/3

A062



PO Box 29429
Atlanta, GA 30359

12/27/2021

SUSAN K PARISI

Dear SUSAN,

GreenSky® received your complaint. This matter is important to us, and GreenSky is committed to working with you to resolve your complaint.

In order to address your concerns, we need additional information from you. Our Customer Solutions Advocate has made several efforts to reach you for this additional information, but has been unsuccessful in those attempts.

Because we are unable to resolve your complaint without your participation, we have closed this matter at this time. Upon receipt of the needed information, we will happily reopen your case for further investigation. Please note that your loan and obligations under the loan agreement are still in effect. In order to protect your credit, please continue to make your required payments.

Our goal is to provide excellent customer service, and we are eager to address your concern. To provide the information requested, please contact your Customer Advocate at 855-849-0088 and reference this letter. If your concern has already been addressed and resolved, please let us know.

Sincerely,

GreenSky® Loan Services

2111233004



## UNITED STATES OF AMERICA
## CONSUMER FINANCIAL PROTECTION BUREAU

ADMINISTRATIVE PROCEEDING
File No. 2021-CFPB-0004

In the Matter of:

**CONSENT ORDER**

**GREENSKY, LLC**

The Consumer Financial Protection Bureau (Bureau) has reviewed certain origination and servicing activities of GreenSky, LLC (Respondent, as defined below) and has identified the following law violations: (1) Respondent engaged in unfair acts and practices with regard to loans to consumers who did not authorize them in violation of §§ 1031(a) and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B); and (2) Respondent engaged in unfair acts and practices by structuring its loan origination and servicing activities in a manner that enabled unauthorized loans in violation of §§ 1031(a) and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B). Under §§ 1053 and 1055 of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5563, 5565, the Bureau issues this Consent Order (Consent Order).

Appellate Case: 23-6218     Document: 010111062398     Date Filed: 06/07/2024     Page: 70



PLAINTIFF'S EXHIBIT 5

A064

Appellate Case: 23-6218   Document: 01011062398   Date Filed: 06/07/2024   Page: 71

representations, or warranties other than what is contained in this Consent Order and the accompanying Stipulation. This Consent Order and the accompanying Stipulation supersede any prior oral or written communications, discussions, or understandings.

135. Nothing in this Consent Order or the accompanying Stipulation may be construed as allowing Respondent, its Board, officers, or employees to violate any law, rule, or regulation.

**IT IS SO ORDERED**, this 12th day of July 2021.

*David K. Uejio*

David Uejio
Acting Director
Consumer Financial Protection Bureau

A065

 

**GreenSky**
A Goldman Sachs Company
PO Box 2730
Alpharetta, GA 30023

T9 P1 162562-4-3-1 -4849
**SUSAN PARISI**

<u>Past Due Notice</u>

10/02/2022

Account Number Ending
Total Balance: $9,688.50
Past Due Amount: $224.50
Fees: $73.00
Amount Due by 10/20/2022: $449.00
Lender: BMO HARRIS BANK N.A.

Dear SUSAN,

Thank you for being a valued customer. We noticed that you missed your most recent payment on your GreenSky®
Program Loan. As a result, your account is now past due. We ask that you pay the Past Due Amount of $224.50 now. The
Amount Due by 10/20/2022 includes the Past Due Amount and the current month's payment.

You can make a payment online at www.greenskyonline.com/greensky/guest-portal, by calling 833-981-1372, or mailing
your payment to:

Dept.#3025, GreenSky® Program
PO Box 2153, Birmingham AL 35287-3025

Please include your payment slip or coupon with your mailed payment or note your account number on your check.

If you have any questions, or would like to notify us of a payment, please contact us toll-free at 833-981-1372 Monday
through Thursday 8am-11pm, Friday 8am-10pm, and Saturday 8am-5pm - All Eastern Time.

Sincerely,

BMO HARRIS BANK N.A.
GreenSky® Program
833-981-1372

THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT
PURPOSE.

IF YOU HAVE BEEN DISCHARGED FROM LIABILITY ON THIS ACCOUNT BECAUSE OF BANKRUPTCY
PROCEEDINGS, OR IF YOU ARE THE SUBJECT OF A PENDING BANKRUPTCY PROCEEDING, THIS LETTER IS
MEANT FOR INFORMATION PURPOSES ONLY AND IS NOT INTENDED AS AN ATTEMPT FOR PAYMENT OR TO
IMPOSE PERSONAL LIABILITY FOR ANY OBLIGATION.

See Reverse Side for City and State Notices.



PLAINTIFF'S
EXHIBIT
6

A066

**Important Notice for Washington, D.C. Residents:**

You have the right to request any of the following concerning your debt:

1. Documentation of the name of the original creditor as well as the name of the current creditor or owner of your debt;
2. Your last account number with the original creditor;
3. A copy of the signed contract, signed application, or other documents providing evidence of your liability and its terms;
4. The date that your debt was incurred;
5. The date of your last payment, if applicable; and,
6. An itemized accounting of the amount claimed to be owed including the amount of the principal, the amount of any interest, fees, or charges, and whether the charges were imposed by the original creditor, a debt collector, or a subsequent owner of the debt.

You may request the above information by contacting us by phone at 833-981-1372, email at service@greensky.com, or mail at GreenSky® Program, P.O. Box 2730, Alpharetta, GA 30023.

**NY RESIDENTS: YOU MAY REQUEST US TO PROVIDE COLLECTION COMMUNICATIONS IN AN ALTERNATIVE, REASONABLY ACCOMODATABLE FORMAT SELECTED BY US BY CALLING 833-909-4064.**

©2008-2022 GreenSky, LLC | GreenSky® and GreenSky Patient Solutions® are loan program names for certain consumer credit plans extended by participating lenders to borrowers for the purchase of goods and/or services from participating merchants/providers. Participating lenders are federally insured, federal and state chartered financial institutions providing credit without regard to age, race, color, religion, national origin, gender or familial status. GreenSky® and GreenSky Patient Solutions® are registered trademarks of GreenSky. LLC. GreenSky Servicing, LLC services the loans on behalf of participating lenders. NMLS #1416362. GreenSky, LLC and GreenSky Servicing, LLC are subsidiaries of Goldman Sachs Bank USA. All rights reserved. Loans originated by Goldman Sachs are issued by Goldman Sachs Bank USA, Salt Lake City Branch.



**GreenSky**®
Shopping Pass

For Barcode Scanners

| | Exp 11/25 |
|---|---|
| Susan K Parisi | CVV |

Exp 11/25

---

## Congratulations, Susan!
## You have been approved for up to $17,744.00!*

**The purpose of this Shopping Pass is to provide important information about your loan and to make purchases using your GreenSky® loan.†**

**About Your Account:**

1. When you are ready to make your purchase, give your account number and expiration date to your Merchant along with your photo ID. By providing your account number to your Merchant you are authorizing your Lender to send Loan proceeds to your Merchant in payment for the goods or services that you have purchased. Provide your account number to your Merchant only when you are prepared to pay. Only those named on this Shopping Pass are authorized to make purchases. Do not give this Shopping Pass to any person not named on this Shopping Pass. If you do so, you may be held liable for their purchases. If this Shopping Pass is lost or stolen, notify us immediately at (866) 936-0602 to limit your liability. **Please be aware that if you authorize your Lender to make an initial advance under your GreenSky® Installment Loan to pay any initial payment required by the Merchant, payments may become due under your GreenSky® Installment Loan prior to the completion of services by the Merchant.**

2. You have a purchasing window of 6 months to use your credit limit of up to $17,744.00. All purchases must be made by 05/26/2022 (the "Purchase Window Expiration Date"). We may close your purchase window earlier if we determine that your job is substantially complete. See the terms and conditions of your Loan Agreement for details.

3. After your first purchase, you will receive monthly statements to track your transactions. **You have zero liability for transactions that you do not authorize‡**. Please monitor your statements carefully and contact us at (866) 936-0602 to notify us immediately of any unauthorized activity.

4. You will have no Loan unless you authorize a transaction, which is your electronic signature of the Loan Agreement and will have the same legal effect as a physical signature.

**Plan 7541. THIS IS A DIFFERENT PLAN THAN REQUESTED. 84 payments. Up to 6 month purchase window. At the earlier of purchase window expiration date or job completion, a 24 month promotional (promo) period begins with minimum monthly payments required followed by 60 amortized payments based on the balance at the end of promo. Your fixed interest rate is based on creditworthiness and is disclosed in your loan agreement. Interest is billed during the promo period but all interest is waived if the purchase amount is paid in full before the end of the promo period. Making initial minimum monthly payments will not pay off your loan before the end of the promo period.**

**(866) 936-0602**                                                                                                          **www.greensky.com**

### Thank you for choosing GreenSky® Program!
**service@greensky.com**

---

Use of this Shopping Pass or the associated Loan by (any) Borrower (or any authorized user) to make a purchase constitutes acceptance by (all) Borrower(s) of the terms of the accompanying Loan Agreement.

**The physical or electronic record of any such purchase will constitute the signature of (all) Borrower(s) on such Loan Agreement.**

Provide your account number and expiration date to authorize a transaction only after you are satisfied that you have received the goods and/or services that you are purchasing. Your Lender does not monitor the workmanship, quality, or completeness of the goods and/or services that you purchase. Contact your Merchant immediately if not completely satisfied. You will receive monthly statements to help track your transactions and payments.

**FOR PROTECTION AGAINST UNAUTHORIZED PURCHASES, IDENTIFICATION WILL BE REQUIRED FOR ALL PURCHASES.**

Spanish language loan agreements are available upon request. Contact us for a Spanish version of this agreement.

Los acuerdos de préstamo en idioma español están disponibles bajo petición. Contáctenos para obtener una versión en español de este acuerdo.

* Eligible only for purchases with your Merchant. **Your Lender is specified on your Loan Agreement.**

† GreenSky® is the brand name for certain consumer credit plans extended by participating lenders to borrowers for the purchase of goods or services from participating Merchants. Participating lenders are federally insured, federal and state chartered financial institutions providing credit without regard to age, race, color, religion, national origin, sex, or familial status. GreenSky® is a registered trademark of GreenSky, LLC and is used by your Lender under license. GreenSky Servicing, LLC ("Servicer") will service this Loan on behalf of your Lender.

‡ Applicable payment card network rules apply. Any unauthorized transactions must be reported to us within 60 days.

The monthly payments in the payment schedule of your Truth in Lending Disclosure is estimated and based on the Amount Financed for which you have been approved. Examples of required minimum monthly payments for different total purchase amounts appear below.

| Total Amount of Purchases | Monthly Payment Amount |
|---|---|
| $4,000.00 | $101.22 |
| $5,000.00 | $126.52 |
| $10,000.00 | $253.05 |
| $15,000.00 | $379.58 |
| $17,744.00 | $449.01 |
| $19,000.00 | $480.80 |

A068

**GreenSky**®

# UNDERSTANDING YOUR DEFERRED INTEREST LOAN

## What does it mean to have "No Interest if Paid in Full within the Promotional Period?"

We are committed to helping you understand how your GreenSky® Program loan works. While the details of your loan are described throughout this package, the information and frequently asked questions below are designed to provide you with helpful information regarding your loan.

Your loan is a "**deferred interest**" (also referred to as "No Interest if Paid in Full") loan. This means that:

* **INTEREST WILL BE BILLED DURING THE PROMOTIONAL PERIOD.**
* But, if you pay off your entire purchase balance before the end of the promotional period, all billed interest will be waived.
* **If you do not repay your entire purchase balance before the end of the promotional period**, you will be responsible for paying all interest that was billed during the promotional period and any interest that accrues after the expiration of the promotional period.

---

## FREQUENTLY ASKED QUESTIONS

**Q.** How long is the "promotional period" for my loan?

**A.** The promotional period for your loan is identified on the Shopping Pass and in the loan agreement.

**Q.** Do I have to make payments during the "promotional period"?

**A.** Your plan description and Truth in Lending disclosures will tell you whether you have payments due during the promotional period. Even if you don't have to make payments during the promotional period, it is a good idea to make regular payments to minimize any deferred interest you might owe if the purchase balance is not paid in full before the end of the promotional period. If you have payments due during the promotional period, making these payments will NOT pay off your entire purchase balance before the end of the promotional period.

**Q.** How will I know how much to pay and by when in order to satisfy the promotional offer?

**A.** You will receive a statement every month. During the promotional period, your statement will include a section that details your promotional financing offer. This section will identify your entire purchase balance, the purchase balance left to pay before the end of the promotional period, and the date on which your promotional period expires.

**Q.** My merchant is offering refinancing at the end of the "promotional period". How should I evaluate that offer?

**A.** Merchants are not allowed to make refinancing offers (either verbally or in writing) in connection with a Program loan. If your merchant has made any refinancing offers please report to us immediately. A customer's credit situation can change and relying on obtaining refinancing to pay-off the deferred interest loan before the end of the promotional period is not advisable.

**Q.** What if I still have questions?

**A.** You have no obligation on your loan until you authorize a transaction. If you have any questions about your deferred interest loan and your responsibility to repay, please contact us before authorizing a transaction.

**By authorizing a transaction and accepting your loan, you are acknowledging that you understand you are responsible for repaying this loan and agree that your merchant has not promised to issue or arranged to issue a loan with another lender to repay this loan.**

A069

## Installment Loan Agreement | NON-NEGOTIABLE CONSUMER NOTE

**LENDER:** BMO HARRIS BANK N.A.      **Application ID:**     **Date:** 11/23/2021
**Lender Correspondence Address:** GreenSky® Program     **Merchant:** Renewal by Andersen of Oklahoma
Attn: Correspondence P.O. Box 29429, Atlanta, GA 30359     **Borrower:**
**Borrower:**     Susan K Parisi     **Phone Number:**
**Phone Number:**     **Address:**
**Address:**     **City/State/Zip:** ,
**City/State**

The Truth in Lending Act (TILA) disclosures below assume that your first purchase will be made on the last day of your Purchase Window, approximately 6 months from your approval date, in an amount equal to the Amount Financed shown below. The Finance Charge below includes $8,868.00 of interest, which will be waived if you pay off your purchase balance within 24 months of the date your Purchase Window closes. Minimum monthly payments are required during the promotional period but will not pay off your loan before the end of your promotional period. Your actual Annual Percentage Rate, Finance Charges, Amount Financed and scheduled payments may vary from the amounts shown below depending on, among other things, the timing and amount of your purchases and payments. You will not accrue interest or be required to make any payments until your Purchase Window closes. Your Purchase Window closes at the earlier of job completion or approximately 6 months from approval date.

### TRUTH IN LENDING DISCLOSURE

| ANNUAL PERCENTAGE RATE<br>The cost of credit as a yearly rate | FINANCE CHARGE<br>The dollar amount the credit will cost you | Amount Financed<br>The amount of credit provided to you or on your behalf | Total of Payments<br>The amount you will have paid when you have made all payments as scheduled |
|---|---|---|---|
| 24.99% (e) | $19,973.08 (e) | $17,744.00 (e) | $37,717.08 (e) |

Your payment schedule will be:

| Number of Payments | Amount of Payments | When Payments are Due |
|---|---|---|
| 24 | $449.02 (e) | Beginning approximately one month after the close of the Purchase Window and monthly thereafter for a total of 24 Months (NOTE: Purchase Window may be open as long as 6 months following your approval). |
| 59 | $449.01 (e) | Beginning monthly thereafter for a total of 59 months. |
| 1 | $449.01 (e) | Approximately 84 months after Purchase Window closes. |

**Prepayment:** If you pay off early, you will not be entitled to a refund of any interest that was billed to your account for the billing cycle in which you make your last payment. You will not be entitled to a refund of the Activation Fee, if any.
See the rest of this document for any additional information on nonpayment, default, and any required repayment in full before the scheduled date, and prepayment refunds and penalties.
**"(e)" means estimate.**

**Itemization of Amount Financed:** $17,744.00 (e)
Paid to Renewal by Andersen of Oklahoma

### FEES

**Penalty Fees**
| | |
|---|---|
| • Late Payment | The greater of **$39** or **5%** of the amount past due, except **$0** for MA and ME residents and **$30** maximum for Iowa residents. |
| • Returned Payment | Up to **$20** |

**MILITARY LENDING ACT:** The Military Lending Act ("MLA") provides protections for certain members of the Armed Forces and their dependents ("Covered Borrowers"). The provisions of this section apply to Covered Borrowers under the MLA. If you would like more information about whether you are a Covered Borrower and whether this section applies to you, please contact us at 877-266-2945. **Statement of MAPR:** Federal law provides important protections to members of the Armed Forces and their dependents relating to extensions of consumer credit. In general, the cost of consumer credit to a member of the Armed Forces and his or her dependent may not exceed an Annual Percentage Rate of 36%. This rate must include, as applicable to the credit transaction or account: (1) the costs associated with credit insurance premiums; (2) fees for ancillary products sold in connection with the credit transaction; (3) any application fee charged (other than certain application fees for specified credit transactions or accounts); and (4) any participation fee charged (other than certain participation fees for a credit card account). **Oral Disclosures:** In order to hear important MLA disclosures and payment information, please call 877-266-2945. **Covered Military Borrowers:** If you are a Covered Borrower, as defined under the MLA, 10 U.S.C. § 987, as amended from time to time, (i) the provisions of the ARBITRATION PROVISION, (ii) any waiver of your right to legal recourse under any state or federal law and (iii) any other provision in this Loan Agreement that is not enforceable against you under the MLA, does not apply to you.
NOTICE TO THE BUYER: 1. THIS IS A CONSUMER CREDIT TRANSACTION. 2. DO NOT SIGN THIS CREDIT AGREEMENT BEFORE YOU READ IT OR IF IT CONTAINS ANY BLANK SPACE. 3. YOU ARE ENTITLED TO A COMPLETELY FILLED IN COPY OF THIS CREDIT AGREEMENT. **4. YOU MAY PREPAY THE UNPAID BALANCE UNDER THIS AGREEMENT AT ANY TIME SUBJECT TO THE "PREPAYMENT" DISCLOSURE ABOVE. 5. THIS LOAN AGREEMENT CONTAINS AN ARBITRATION PROVISION THAT, UNLESS YOU REJECT IT, MAY LIMIT YOUR RIGHT TO LITIGATE A CLAIM IN COURT OR HAVE A JURY TRIAL ON A CLAIM.**
**ACCEPTANCE OF THIS LOAN AGREEMENT BY ELECTRONIC SIGNATURE:** The first use of the Shopping Pass or the associated loan to make a purchase will constitute acceptance by (all) Borrower(s) of the terms of this Loan Agreement. The dated physical or electronic record of such use will evidence the signature of (all) Borrower(s) on this Loan Agreement and have the same legal effect as a physical signature.

**CAUTION - IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT. NON-NEGOTIABLE CONSUMER NOTE.**
Borrower: _____ Date: _____     Co- Borrower: _____ Date: _____
*Electronic record constitutes acceptance of this Agreement (see above)*     *Electronic record constitutes acceptance of this Agreement (see above)*
**LENDER: /s/** BMO HARRIS BANK N.A.      Date: 11/23/2021
**IN-HOME SALE CUSTOMERS:** ARIZONA, CONNECTICUT, NORTH DAKOTA AND RHODE ISLAND RESIDENTS: THIS INSTRUMENT IS BASED UPON A HOME/PERSONAL SOLICITATION SALE SUBJECT TO THE PROVISIONS OF TITLE 44, CHAPTER 15 OF THE ARIZONA REVISED STATUTES IN ARIZONA; THE HOME SOLICITATION SALES ACT IN CONNECTICUT, THE NORTH DAKOTA CENTURY CODE IN NORTH DAKOTA; AND TITLE 6, CHAPTER 28 OF THE RHODE ISLAND GENERAL LAWS. THIS INSTRUMENT IS NOT NEGOTIABLE.

A070

TERMS AND CONDITIONS CONTINUE ON NEXT PAGE
Lender: BMO HARRIS BANK N.A. 2111233004 PPLD20211011_77_2_W Rev. 10/21

**1. Welcome.** Thank you for opening an installment loan through the GreenSky® Program. By accepting the Shopping Pass, the Truth in Lending Disclosure, the terms and conditions, and the Lender's Privacy Notice (collectively, the "Loan Agreement"), each Borrower ("you") acknowledges that (i) BMO HARRIS BANK N.A. ("Lender", "we", "our" or "us") has approved Borrower(s) for a GreenSky® Program Installment Loan up to the Amount Financed as set forth in the Truth in Lending Disclosure above (the "Loan"), (ii) each Borrower has received and retained a copy of Lender's Privacy Notice, (iii) each Borrower has read this Loan Agreement, including any Addenda, and agrees to be bound by its terms, (iv) if this Agreement resulted from a sale in your home ("In-Home Sale"), the sales person has explained each Borrower's right to cancel and has provided a written Notice of Right to Cancel. Any Notice of Right to Cancel and any additional notice of right to cancel provided in the sales contract for an In-Home Sale, as well as any accompanying addendum provided to Borrower, are incorporated herein by reference, and unless any Borrower exercises the right to cancel, Lender agrees to pay the Amount Financed to Merchant for an In-Home Sale upon receipt of a transaction authorization, (v) either Borrower may direct Lender to make payments to Merchant by using the Shopping Pass or account number, and (vi) neither Borrower is a co-signer. A Certificate of Completion is required unless Borrower directs Lender to make payments to Merchant by using the Shopping Pass or account number. This Loan Agreement, including any changes to it, contains the terms of your agreement with BMO HARRIS BANK N.A..

**2. Installment Loan Program.**

    **a. Using your Loan:** You may make purchases of goods or services from Merchant, in total up to the "Amount Financed" set forth in the Truth in Lending Disclosure of this Loan Agreement, during the purchasing window time period specified on your Shopping Pass, which is incorporated here by reference. We may close the purchasing window time period on the earlier of the Purchase Window Expiration Date or when your job is substantially complete as determined by Lender (such as when your Merchant notifies us that your job is substantially complete). Once the purchasing window time closes, you will no longer be able to make additional purchases. Each time you make a purchase of goods or services from Merchant, you authorize us to extend credit to you and to forward Loan proceeds to your Merchant on your behalf. We may decline any transaction if we experience an operational difficulty (such as a system outage), if you fail to make any payment required under this Agreement or you are in Default (as defined herein), or if we identify suspected fraudulent or unlawful activity involving your Loan.

    **b. Credit Limit:** You agree not to make purchases in excess of the Amount Financed shown above, but if you do, you agree that we may, in our sole discretion, increase the Amount Financed to include such excess amount in a "Summary of Account at Conversion" that reflects such increased Amount Financed and resulting increased anticipated Finance Charge and Total of Payments. The dated electronic record of such excess purchase(s) will evidence your request for and acceptance of any such increased terms.

    **c. Beginning of Amortization Period:** We will total the purchases you made during the purchasing window and provide you with a Summary of Account at Conversion that will show (based on actual total purchases) a final Amount Financed, Finance Charge, Total of Payments and remaining payment schedule for your Loan based on your total purchases.

    **d. For your convenience, we may provide you with certain materials in both the Spanish and English languages. You agree that, to the greatest extent not prohibited by law, the English text will control.**

    **Para su conveniencia, podemos proporcionarle ciertos materiales en los idiomas español e inglés. Usted acepta que, en la mayor medida no prohibida por la ley predominará el texto en Inglés.**

**3. Promise to Pay.** For value received, you agree to pay us: (a) so much as you may actually borrow from time to time by initiating transactions under the Loan Agreement, plus (b) periodic interest at an annual rate of 24.99% on the unpaid Amount Financed outstanding until the loan is paid in full, (c) any applicable taxes or other charges due under this Loan Agreement. We calculate the interest charge on your account by applying a monthly periodic rate to your outstanding principal balance on the first day of your first billing cycle and thereafter to your outstanding principal balance on the first day of each billing cycle. The monthly periodic rate equals the applicable annual rate divided by twelve (12). Payments will be due as scheduled. Any principal balance, interest and other charges remaining unpaid are due in full on the date of the last scheduled payment. The actual amount of interest that you pay may exceed the Finance Charge disclosed in the Truth in Lending Disclosure or Summary of Account at Conversion if you do not make minimum payments due by their due dates as identified in your statements. If you do not make required payments, then, in addition to any other rights and remedies available under this Loan Agreement or applicable law, (i) your purchasing window may close early and (ii) no new purchases may be permitted.

**4. Timing and Application of Payments.** You agree to make payments in accordance with the estimated payment schedule contained in the Truth in Lending Disclosure on the preceding page (or any updated disclosure, including the Summary of Account at Conversion), provided that you will be obligated to make minimum monthly payments in the amounts and on the dates shown on your statements. Any payment made in excess of your minimum monthly payment will be applied to your Principal Balance and will not reduce the amount of your next regularly scheduled payment. You agree that, except for updated amounts, if any, shown on your updated Summary of Account at Conversion, including any adjustments in scheduled payments to reflect your final Amount Financed and Finance Charges due, all other terms and disclosures of this Loan Agreement will remain in full force and effect. Once the initial payment due date is set, the payment due date will be the same day each month. Subject to applicable law, we may apply payments to the amounts you owe under this Loan Agreement in any order we choose. You may not tell us how to apply payments. Any partial prepayment will be applied against the outstanding balance, but will not postpone the due date of any subsequent monthly installments or change the amount of any such installments, unless we otherwise agree in writing. We will apply any refund for a returned purchase when we or Servicer receives notice of the refund from your Merchant. We do not control when your Merchant may notify us or Servicer of a refund. If your Merchant's notice is received after we send your Summary of Account at Conversion, we will apply the refund as a prepayment on your loan to reduce your outstanding balance but this will not reduce your subsequent minimum monthly payments (subject to any necessary adjustments to the number of payments required or your final payment amount).

**5. Payment Method and Address.** Unless automatic payments are authorized in connection with this Loan, you agree to make payments by mailing a check or money order to **Dept# 3025, GreenSky, PO Box 2153, Birmingham AL 35287-3025**, by making a phone payment by dialing **1-855-809-1889** or by making an online payment at www.greenskyonline.com. You agree that payments may not be made in whole or in part by credit card. A payment to our Servicer in accordance with this Loan Agreement is a payment to us. You agree not to send us partial payments marked "paid in full," "without recourse," or similar language. If you send such a payment, we may accept it without losing any of our rights under this Loan Agreement. **All written communications concerning disputed amounts, including any check or other payment instrument that (i) is postdated and accompanied by adequate notice, (ii) indicates that the payment constitutes "payment in full" of the amount owed, (iii) is tendered with other conditions or limitations or (iv) is otherwise tendered as full satisfaction of a disputed amount, must be marked for special handling and mailed or delivered to us at P.O. Box 29429, Atlanta, GA 30359, Attention: Disputes.**

**6. Unpaid Balances.** (a) During your deferred interest promotional period, you will satisfy the terms of your promotion and all interest billed during the promotional period will be waived/credited if you pay the entire purchase balance before the end of the promotional period and you will still be responsible for any outstanding

A071

fees. (b) Notwithstanding the above, if your Deferred Interest Promotional Offer loan will not be regarded as "paid in full" if your loan has an unpaid balance of Amount Financed, Interest, late charges, returned payment charges, or any other fees or charges at the end of the term.

**7. Access Device.** We will provide you with a Shopping Pass which you may use to make purchases of goods or services from Merchant during the purchasing window time period as described in this Loan Agreement. Use of your Shopping Pass or Loan to make a purchase constitutes your acceptance of the terms of this Loan Agreement. You agree to notify us immediately if your Shopping Pass is lost, stolen or otherwise compromised.

**8. Returned Payment Charge.** Subject to applicable law, we may charge you a "Returned Payment Charge" as provided herein. If your lender is located in Connecticut, Georgia, Illinois, Michigan, or Ohio, and your payment is dishonored or returned for any reason, you agree to pay us a Returned Payment Charge of **$20**. If your lender is located in Alabama or Mississippi and your payment is dishonored or returned for any reason, you agree to pay us a Returned Payment Charge of **$15**. If you are a Massachusetts Borrower and your payment is dishonored or returned for any reason, you agree to pay us a Returned Payment Charge of **$10**. In all cases, we may charge this fee the first time any payment is returned even if it is paid upon resubmission.

**9. Late Charge.** If a payment is more than 10 days late, you will be charged the GREATER of $39 or 5% of the amount past due, provided that the late payment fee will not exceed the amount past due ($30 maximum in Iowa). NOTICE: Massachusetts and Maine Borrowers are not charged late charges.

**10. Default.** Subject to applicable law, you will be in default ("Default") if any of the following events occur:

> (a) You have made any false or misleading statement(s) in your application for the Loan subject to this Loan Agreement or any other account that you may have with us;
> (b) You fail to make a payment within 60 days of when it was due under this Loan Agreement or any other account agreement that you may have with us;
> (c) You fail to comply fully with any term or condition of this Loan Agreement or any other account agreement that you may have with us;
> (d) You file or someone else files against you a petition in bankruptcy;
> (e) You die;
> (f) You commit fraud; or
> (g) We believe you are unable or unwilling to pay your debts when due.

MASSACHUSETTS NOTICE: If you are a Massachusetts borrower and this Loan Agreement is secured by a non-possessory interest in consumer goods, this Default provision is enforceable only to the extent that the Default is material and consists of a failure to make one or more payments as required by the Loan Agreement or the occurrence of an event that substantially impairs the value of the collateral.

**11. Remedies on Default.** If you are in Default, we will have all of the rights and remedies available to us at law or in equity, in addition to the specific rights and remedies set forth in this Loan Agreement. We may exercise any, some or all of our rights and remedies, in our sole discretion. If you are in Default, we may, at our option, require you to pay immediately the entire amount you owe us under this Loan Agreement, in full. Subject to the requirements of applicable law, we may do this without giving you any advance notice of presentment, acceleration or our intent to accelerate. Unless prohibited by applicable law, you agree to pay our reasonable costs and attorneys' fees related to the collection of your Loan.

**12. Credit Inquiries and Loan Information.** You authorize us to obtain a credit report on you for any legal purpose in connection with this Loan, including any update, extension of credit, review or collection of this Loan. If you request, we will tell you whether any credit report was requested and, if so, the name and address of the credit bureau furnishing the report.

**13. Inaccurate Information.** If you believe that we have information about you that is inaccurate or that we have reported or may report inaccurate information about you to a credit bureau, please notify us of the specific information that you believe is inaccurate by writing to us at **P.O. Box 29429, Atlanta, GA 30359, Attention: Disputes**. In doing so, please identify the inaccurate information and tell us why you believe it is incorrect. If you have a copy of the credit report that includes the inaccurate information, please send a copy of that report to us as well. The "Your Billing Rights" section below contains special processes required for contacting us in the event of a Billing Error.

**14. Negative Information Reporting.** We may report information about your Loan to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

**15. Severability.** If applicable law is finally interpreted so that charges collected or to be collected in connection with this Loan Agreement exceed the permitted limits, then (i) any such charges will be reduced to the permitted amounts and (ii) any amounts already collected that exceed the permitted amounts will be credited to you by, at our option, applying the credit to any amounts due hereunder or making a direct payment to you. If any provision in this Loan Agreement is invalid under applicable law, the remainder of the provisions in this Loan Agreement will remain in effect and interpreted to give the greatest possible effect to the intent of the parties as originally written.

**16. Assignment; Transfer.** We may sell, assign, transfer or delegate all or any portion of our rights or obligations under this Loan Agreement to any other person without prior notice to you. You may not sell, assign, transfer or delegate any of your rights or obligations under this Loan Agreement.

**17. Governing Law. This Loan Agreement, including the rate of interest and fees, is governed by applicable federal law and, to the extent not preempted by federal law, the laws of IL where the Lender is located as shown in Section 1 (Welcome) of this Loan Agreement (without regard to the State's conflict of laws provisions). If Lender is located in Kansas, the Kansas Consumer Credit Code (Kan. Stat. Ann. §§ 16a-1-101 et seq.) governs this Agreement. If you are a Massachusetts borrower and the Amount Financed is $6,000 or less, this Loan Agreement is also subject to the Massachusetts Small Loan Law.**

**18. Joint and Several Liability.** Each Borrower will be liable individually and together for all obligations under this Loan Agreement, including payment to us of the entire amount owed under this Loan Agreement.

**19. No Waiver by Us.** We will not be deemed to have waived any of our rights by delaying the enforcement of any of our rights. If we waive any of our rights in writing on one occasion, that waiver does not constitute a waiver by us of our rights on any future occasion.

A072

**20. Telephone Monitoring and Recording.** You understand that we may monitor and/or record telephone calls between you and us for reasonable business purposes such as assuring the quality of our service and for training purposes.

**21. Communicating With You; Consent to Contact by Electronic and Other Means.** You agree that, to the greatest extent not prohibited by applicable law, we may contact you for any lawful reason, including for the collection of amounts owed to us. No such contact will be deemed unsolicited. You agree that we (and any other owner or servicer of your account) may contact you for any and all purposes arising out of or relating to your Loan at any physical or electronic addresses or numbers (including wireless cellular telephone numbers, ported landline numbers, VOIP or other services) as you may provide to us from time to time. We may use any means of communication, including, but not limited to, postal mail, electronic mail, telephone, text messaging, or other technology, to reach you. You agree that we may use automatic dialing and announcing devices which may play recorded messages. You may contact us at any time to ask that we not contact you using any one or more methods or technologies. You represent that you are permitted to receive communications at each of the telephone numbers you have provided to us.

**22. Notices; Change of Address, Employment or Telephone Number.** We will send all written notices and statements to your address as it appears on our records. To avoid delays and missed payments that could affect your credit standing, you agree to advise us promptly if you change your mailing address, place of employment, telephone number or other contact information, including, but not limited to, porting a landline telephone number to a cellular phone, VoIP or other services. You represent and agree that for purposes of imposing fees and charges, you are deemed to reside at the current mailing address that we have on record for you. You can update your contact information with us by phone, mail, or online at www.greenskyonline.com.

**23. Entire Agreement.** This Loan Agreement constitutes the final written expression of the credit agreement between you and us relating to your Loan. We are not bound by any oral representations made or implied that are not directly reflected in this Loan Agreement. **A credit agreement must be in writing to be enforceable. Oral agreements or commitments to loan money, extend credit, or forbear from enforcing repayment of a debt, including promises to extend or renew such debt, are not enforceable. To protect you and us from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it.**

**24. NOTICES: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

**Your Merchant pays transaction fees as a result of your use of the Loan. Your Merchant is prohibited from surcharging you to cover the cost of these transaction fees.**

<u>Notice to California Residents:</u> **(AVISO PARA LOS QUE RESIDEN EN CALIFORNIA): SI SU PRÉSTAMO FUÉ NEGOCIADO PRIMERAMENTE EN ESPAÑOL, ESTAMOS OBLIGADOS A PRESENTARLE UNA TRADUCCIÓN EN ESPAÑOL DE LAS DISPOSICIONES REQUERIDAS POR LA REGULACIÓN FEDERAL Z, 12 C.F.R. APARTADO 1026.**

<u>Notice to Iowa Residents:</u> **IMPORTANT: READ BEFORE SIGNING. THE TERMS OF THIS LOAN AGREEMENT SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE. NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THIS WRITTEN CONTRACT MAY BE LEGALLY ENFORCED. BORROWER MAY CHANGE THE TERMS OF THIS AGREEMENT ONLY BY ANOTHER WRITTEN AGREEMENT.**

<u>Notice to New Hampshire Residents:</u> This Loan Agreement provides for reasonable attorneys' fees to be awarded to us in an action against you involving this Loan Agreement. Reasonable attorneys' fees will be awarded to you if you prevail in any action, suit or proceeding brought by us, or an action brought by you. If you successfully assert a partial defense or set-off, recoupment or counterclaim to an action brought by us, the court may withhold from us the entire amount or such portion of the attorneys' fees as the court considers equitable.

<u>Notice to New Jersey Residents:</u> Because certain provisions of this Loan Agreement are subject to applicable laws, they may be void, unenforceable or inapplicable in some jurisdictions. None of these provisions, however, is void, unenforceable or inapplicable in New Jersey.

<u>Notice to New York Residents:</u> NOTICE TO THE BUYER: 1. Do not sign this credit agreement before you read it or if it contains any blank space. 2. You are entitled to a completely filled in copy of this credit agreement.

<u>Notice to Ohio Residents:</u> The Ohio laws against discrimination require that all creditors make credit equally available to all credit worthy customers, and that credit reporting agencies maintain separate credit histories on each individual upon request. The Ohio civil rights commission administers compliance with this law.

<u>Notice to Vermont Residents:</u> Lender is engaged in loan production. **EACH BORROWER SHOULD RETAIN A COPY FOR THEIR RECORDS.**

**25. ARBITRATION PROVISION. Agreement to Arbitrate Disputes:** This Arbitration Provision sets forth the circumstances and procedures under which Claims (defined below) that arise between you and us will be resolved through binding arbitration; provided, however, that this provision does not apply if, on the date this Agreement is issued, you are covered by the federal Military Lending Act as a member of the Armed Forces or a dependent of such a member. UNLESS YOU OPT OUT OF THIS ARBITRATION PROVISION AS PROVIDED BELOW OR EXCEPT AS APPLICABLE LAW PROHIBITS US FROM IMPOSING BINDING ARBITRATION ON YOU, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO LITIGATE A CLAIM IN COURT OR HAVE A JURY TRIAL ON A CLAIM. OTHER RIGHTS THAT YOU WOULD HAVE IN COURT ALSO MAY NOT BE AVAILABLE OR MAY BE LIMITED IN ARBITRATION, INCLUDING YOUR RIGHT TO APPEAL AND YOUR ABILITY TO PARTICIPATE IN A CLASS ACTION. Nothing in this provision precludes you from filing and pursuing your individual Claim in a small claims court in your state or municipality, so long as that claim is pending only in that court. Definitions: As used in this Arbitration Provision, the term "<u>Claim</u>" means and includes any claim, dispute or controversy of every kind and nature, whether based in law or equity, between you and us arising from or relating to your Loan Agreement as well as the relationship resulting from such Agreement ("<u>the Agreement</u>"), including the validity, enforceability or scope of this Arbitration Provision or the Agreement. "Claim" also includes claims by or against any third party providing any product, service or benefit in connection with the Agreement (including, but not limited to, debt collectors and all of their agents, employees, directors and representatives) if and only if, such third party is named as a co-party with you or us (or files a Claim with or against you or us) in connection with a claim asserted by you or us against the other. As used in this Arbitration Provision, "<u>you</u>" and "<u>us</u>" also includes any corporate parent, wholly or majority owned subsidiaries, affiliates, any licensees, predecessors, successors, assigns and purchasers of any accounts, all agents, employees, directors and representatives of any of the foregoing and any third party providing any product, service or benefit in connection with the Agreement. Initiation of Arbitration Proceeding / Selection of Administrator: Any Claim will be resolved, upon the election by you or us,

A073

**TERMS AND CONDITIONS CONTINUE ON NEXT PAGE**

by arbitration pursuant to this Arbitration Provision and the Rule Procedures of the national arbitration organization to which the Claim is referred in effect at the time the Claim is filed (the "Code"), except to the extent the Code conflicts with the Agreement. Claims must be referred to either JAMS or The American Arbitration Association ("AAA"), as selected by the party electing to use arbitration. If a selection by us of either of these organizations is unacceptable to you, you will have the right within 30 days after you receive notice of our election to select the other organization listed to serve as arbitration administrator. For a copy of the procedures, to file a Claim or for other information about these organizations, contact (1) JAMS at 1920 Main Street, Suite 300, Irvine, CA 92614; www.jamsadr.com or (2) AAA at 335 Madison Avenue, New York, NY 10017, www.adr.org. In addition to the arbitration organizations listed above, Claims may be referred to any other arbitration organization that is mutually agreed upon in writing by you and us, or to an arbitration organization or arbitrator(s) appointed pursuant to Section 5 of the Federal Arbitration Act, 9 U.S.C. §§ 1-16, provided that any such arbitration organization and arbitrator(s) will enforce the terms of the restrictions set forth below. Class Action Waiver and Other Restrictions: Arbitration will proceed solely on an individual basis without the right for any Claims to be arbitrated on a class action basis or on bases involving claims brought in a purported representative capacity on behalf of others. The arbitrator's authority to resolve and make written awards is limited to Claims between you and us alone. Claims may not be joined or consolidated unless agreed to in writing by all parties. No arbitration award or decision will have a preclusive effect as to issues or claims in any dispute with anyone who is not a named party to the arbitration. Notwithstanding any other provision in these terms and conditions and without waiving either party's right of appeal, if any portion of this "Class Action Waiver and Other Restrictions" provision is deemed invalid or unenforceable, then the entire Arbitration Provision (other than this sentence) will not apply. Arbitration Procedures: This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and will be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16, as it may be amended (the "FAA"), and the applicable Code. The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations and will honor claims of privilege recognized by law. Federal or state rules of civil procedure or evidence will not apply. Written requests to expand the scope of discovery rest within the arbitrator's sole discretion and will be determined pursuant to the applicable Code. The arbitrator will take reasonable steps to preserve the privacy of individual, and of business matters. Judgment upon the written arbitral award may be entered in any court having jurisdiction. Subject to the right of appeal under the FAA, the arbitrator's written decision will be final and binding unless you or we take an appeal from the award by making a dated, written request to the arbitration organization within 30 days from the date of entry of the written arbitral award. A three-arbitrator panel administered by the same arbitration organization will consider anew any aspect of the award objected to by the appellant, conduct an arbitration pursuant to its Code and issue its decision within 120 days of the date of the appellant's written notice. The panel's majority vote decision will be final and binding. Location of Arbitration / Payment of Fees: The arbitration will take place in the federal judicial district where you live. Regardless of who wins in arbitration, you will only be responsible for paying your share, if any, of the arbitration fees required by the applicable Code, which amount will not exceed the filing fees that you would have incurred if the Claim had been brought in the appropriate state or federal court closest to where you live. We will pay the remainder of any arbitration fees. At your written request, we will consider in good faith making a temporary advance of all or part of your share of the arbitration fees. Waivers also may be available from the JAMS or AAA. Continuation: This Arbitration provision will survive termination of the Agreement, as well as voluntary payment in full of your account, any debt collection proceeding by or between you and us, and any bankruptcy by you or us. If any portion of this Arbitration Provision, except the "Class Action Waiver and Other Restrictions" provision above, is deemed invalid or unenforceable for any reason, it will not invalidate the remaining portions of this Arbitration Provision or the Agreement, each of which will be enforceable regardless of such invalidity. Opt-Out Process: You may choose to opt out of and not be subject to this Arbitration Provision but only by following the process set forth below. If you do not wish to be subject to this Arbitration Provision, then you must notify us in writing within forty-five (45) calendar days of the date of the Agreement at the following address: P.O. Box 29429, Atlanta, GA 30359, Attention: Legal. Your written notice must include your name, address, social security number, the date of the Agreement, and a statement that you wish to opt out of this Arbitration Provision. Your notice to opt out will only apply to this particular Agreement with us and not to subsequent or previous agreements.

## 26. Your Billing Rights: Keep this Document for Future Use

This notice tells you about your rights and our responsibilities under the Fair Credit Billing Act.

### What To Do If You Find a Mistake on Your Statement

If you think there is an error on your statement, write to us at:

GreenSky® Program
Attention: Disputes
PO Box 29429
Atlanta, GA 30359
You may also contact us at service@greensky.com.

In your letter, give us the following information:

- *Account information:* Your name and account number.
- *Dollar amount:* The dollar amount of the suspected error.
- *Description of problem:* If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.

You must contact us:

- Within 60 days after the error appeared on your statement.
- At least 3 business days before an automated payment is scheduled, if you want to stop payment on the amount you think is wrong.

You must notify us of any potential errors in writing. You may call us, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question.

### What Will Happen After We Receive Your Letter

When we receive your letter, we must do two things:

1. Within 30 days of receiving your letter, we must tell you that we received your letter. We will also tell you if we have already corrected the error.
2. Within 90 days of receiving your letter, we must either correct the error or explain to you why we believe the bill is correct.

A074

- We cannot try to collect the amount in question, or report you as delinquent on that amount.
- The charge in question may remain on your statement, and we may continue to charge you interest on that amount.
- While you do not have to pay the amount in question, you are responsible for the remainder of your balance.
- We can apply any unpaid amount against your available loan funds (if any).

After we finish our investigation, one of two things will happen:

- *If we made a mistake:* You will not have to pay the amount in question or any interest or other fees related to that amount.
- *If we do not believe there was a mistake:*

You will have to pay the amount in question, along with applicable interest and fees. We will send you a statement of the amount you owe and the date payment is due. We may then report you as delinquent if you do not pay the amount we think you owe.

If you receive our explanation but still believe your bill is wrong, you must write to us within *10 days* telling us that you still refuse to pay. If you do so, we cannot report you as delinquent without also reporting that you are questioning your bill. We must tell you the name of anyone to whom we reported you as delinquent, and we must let those organizations know when the matter has been settled between us.

If we do not follow all of the rules above, you do not have to pay the first $50 of the amount you question even if your bill is correct.

**Your Rights If You Are Dissatisfied With Your Payment Card Purchases**
If you are dissatisfied with the goods or services that you have purchased with your Loan, and you have tried in good faith to correct the problem with the Merchant, you may have the right not to pay the remaining amount due on the purchase.

To use this right, all of the following must be true:

1. The purchase must have been made in your home state or within 100 miles of your current mailing address, and the purchase price must have been more than $50. (Note: Neither of these are necessary if your purchase was based on an advertisement we mailed to you, or if we own the company that sold you the goods or services.)
2. You must have used your payment card for the purchase.
3. You must not yet have fully paid for the purchase.

If all of the criteria above are met and you are still dissatisfied with the purchase, contact us *in writing* at:

GreenSky® Program
Attention: Disputes
PO Box 29429
Atlanta, GA 30359
You may also contact us at service@greensky.com.

While we investigate, the same rules apply to the disputed amount as discussed above. After we finish our investigation, we will tell you our decision. At that point, if we think you owe an amount and you do not pay, we may report you as delinquent.

A075

| FACTS | WHAT DOES BMO HARRIS BANK N.A. DO WITH YOUR PERSONAL INFORMATION? |
|---|---|
| **Why?** | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| **What?** | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br>• Social Security number and  employment information<br>• account transactions  and transaction history<br>• credit history and investment experience |
| **How?** | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons BMO Harris Bank N.A. chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does BMO Harris Bank N.A. share? | Can you limit this sharing? |
|---|---|---|
| **For our everyday business purposes —** such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | **Yes** | **No** |
| **For our marketing purposes —** to offer our products and services to you | **Yes** | **No** |
| **For joint marketing with other financial companies** | **Yes** | **No** |
| **For our affiliates' everyday business purposes** — information about your transactions and experiences | **Yes** | **No** |
| **For our affiliates' everyday business purposes** — information about your creditworthiness | **Yes** | **Yes** |
| **For our affiliates to market to you** | **Yes** | **Yes** |
| **For nonaffiliates to market to you** | **No** | **We don't share** |

| To limit our sharing | Call toll-free:  1-866-936-0602<br>**Please note:**<br>If you are a *new* customer, we can begin sharing your information 30 days from the date we sent this notice. When you are *no longer* our customer, we continue to share your information as described in this notice. However, you can contact us at any time to limit our sharing. |
|---|---|
| **Questions?** | • Call toll-free:  1-888-654-0063<br>• Talk to a banker at a BMO Harris branch<br>• Talk to your assigned account representative |



**Page 2**

| Who we are | |
|---|---|
| **Who is providing this notice?** | This notice is provided by BMO Harris Bank N.A. for its consumer customers, including all cardholders of Diners Club and Carte Blanche Professional cards issued by us. |

| What we do | |
|---|---|
| **How does BMO Harris Bank N.A. protect my personal information?** | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings. |
| **How does BMO Harris Bank N.A. collect my personal information?** | We collect your personal information, for example, when you: <br> • open an account or deposit money <br> • apply for a loan or use your credit or debit card <br> • seek advice about your investments <br><br> We also collect your personal information from others, such as credit bureaus, affiliates, or other companies. |
| **Why can't I limit all sharing?** | Federal law gives you the right to limit only <br> • sharing for affiliates' everyday business purposes—information about your creditworthiness <br> • affiliates from using your information to market to you <br> • sharing for nonaffiliates to market to you <br><br> State laws and individual companies may give you additional rights to limit sharing.  See below for more information on your rights under state laws. |
| **What happens when I limit sharing for an account I hold jointly with someone else?** | Your choices will apply to you only, unless you tell us otherwise. |

| Definitions | |
|---|---|
| **Affiliates** | Companies related by common ownership or control.  They can be financial or nonfinancial companies. <br> • Our affiliates include companies with a Bank of Montreal or BMO name; and financial companies such as BMO Harris Financial Advisors, Inc. |
| **Nonaffiliates** | Companies not related by common ownership or control. They can be financial and nonfinancial companies. <br> • BMO Harris Bank N.A. does not share with nonaffiliates so they can market to you. |
| **Joint Marketing** | A formal agreement between nonaffiliated financial companies that together market financial products or services to you. <br> • Our joint marketing partners include credit card companies. |

| Other important information |
|---|

**For California Residents:**  We will not share information we collect about you with companies outside of the BMO family of companies except with your authorization or as permitted by California law, such as to service your account. To authorize the sharing of this information, please call us toll-free at 1-888-654-0063.  In addition, we will limit the sharing of information about you within the BMO family of companies to the extent required by California law.

**For Vermont Residents:** We will not disclose information about your creditworthiness to our affiliates and will not disclose your personal information, financial information, credit report, or health information to nonaffiliated third parties to market to you, other than as permitted by Vermont law, unless you authorize us to make those disclosures.  Additional information concerning our privacy policies can be found at www.bmoharris.com/us/about/privacy or call 1-888-654-0063.

**For Nevada Residents:** Notice provided pursuant to state law. To be placed on our internal Do Not Call List, call 1-888-654-0063. For more on this Nevada law, contact Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St., Suite 3900, Las Vegas, NV 89101. Phone number: (702)486-3132; email: BCPINFO@ag.state.nv.us.

**BMO HARRIS BANK N.A.**

### Your Credit Score and the Price You Pay for Credit

| Your Credit Score | |
|---|---|
| **Your credit score:** | 717 |
| | Source: **EXPERIAN**          Date: 11/23/2021 |

| Understanding Your Credit Score | |
|---|---|
| **What you should know about credit scores** | Your credit score is a number that reflects the information in your credit report. Your credit report is a record of your credit history.  It includes information about whether you pay your bills on time and how much you owe to creditors. Your credit score can change, depending on how your credit history changes. |
| **How we use your credit score** | Your credit score can affect whether you can get a loan and how much you will have to pay for that loan. |
| **The range of scores** | Scores range from a low of 300 to a high of 850. Generally, the higher your score, the more likely you are to be offered better credit terms. |
| **How your score compares to the scores of other consumers** |  |

| Checking Your Credit Report | |
|---|---|
| **What if there are mistakes in your credit report?** | You have a right to dispute any inaccurate information in your credit report. If you find mistakes on your credit report, contact the consumer reporting agency.<br><br>It is a good idea to check your credit report to make sure the information it contains is accurate. |
| **How can you obtain a copy of your credit report?** | Under federal law, you have the right to obtain a free copy of your credit report from each of the nationwide consumer reporting agencies once a year.<br><br>To order your free annual credit report—<br><br>*By telephone:*   Call toll-free: 1-877-322-8228<br><br>*On the web:*   Visit www.annualcreditreport.com<br><br>*By mail:*   Mail your completed Annual Credit Report Request Form (which you can obtain from the Federal Trade Commission's website at www.ftc.gov/bcp/conline/include/requestformfinal.pdf) to:<br><br>Annual Credit Report Request Service<br>P.O. Box 105281<br>Atlanta, GA 30348-5281 |
| **How can you get more information about credit reports?** | For more information about credit reports and your rights under Federal law, visit the Consumer Financial Protection Bureau's website at www.consumerfinance.gov/learnmore or visit the Federal Reserve Board's website at www.federalreserve.gov. |

A079

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| SUSAN PARISI, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-23-115-R |
| | ) | |
| C CASHION WINDOWS, LLC d/b/a | ) | |
| RENEWAL BY ANDERSON OF | ) | |
| OKLAHOMA, and BMO HARRIS | ) | |
| BANK, NA d/b/a GREENSKY, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

### DECLARATION OF TIMOTHY D. KALIBAN

I, Timothy D. Kaliban, hereby make this Declaration under penalty of perjury pursuant to 28 U.S.C. § 1746, and declare as follows:

## I.   BACKGROUND

1.     I have personal knowledge of the following facts and would testify to them if called as a witness in a court of law. This Declaration is based upon my personal knowledge.

2.     I am the Chief Strategy Officer for GreenSky, LLC ("GreenSky").

3.     I am familiar with the lawsuit filed against GreenSky, LLC, incorrectly identified as BMO Harris Bank, NA d/b/a GreenSky, LLC by Susan Parisi, and I have read the Amended Petition and Motion to Certify a Class Action filed on Ms. Parisi's behalf against GreenSky, LLC, incorrectly identified as BMO Harris Bank, NA d/b/a GreenSky, LLC.

A080

4.      I make this Declaration in support of the Motion to Compel Arbitration as to all claims asserted by Plaintiff and to Dismiss or Stay Claims of Plaintiff Pending Arbitration to be filed on behalf of GreenSky, LLC, incorrectly identified as BMO Harris Bank, NA d/b/a GreenSky, LLC.

5.      GreenSky, LLC is a Georgia limited liability company with its principal place of business at 5565 Glenridge Connector, Suite 700, Atlanta, Georgia 30342.

6.      I have been asked to explain the process by which Ms. Parisi applied for and obtained a loan that was serviced by GreenSky, and how GreenSky sent documents associated with the loan, including the Installment Loan Agreement ("Loan Agreement"), to Ms. Parisi.

## II.   MS. PARISI'S LOAN AGREEMENT

### A. The GreenSky® Program

7.      BMO Harris Bank, NA is a bank that participates in the GreenSky® Program.

8.      GreenSky serviced Ms. Parisi's loan as an agent on behalf of BMO Harris Bank, NA. As such, BMO Harris Bank, NA considers GreenSky to be its agent for purposes of servicing and generally managing consumer loan transactions made under the GreenSky® Program.

9.      Paragraph 25 of Ms. Parisi's Loan Agreement contains a mandatory arbitration agreement for the resolution of any disputes "between you and us." Paragraph 25 states: "As used in this Arbitration Provision, "you" and "us" also includes any corporate parent, wholly or majority owned subsidiaries, affiliates, any licensees, predecessors, successors, assigns and purchasers of any accounts, all agents, employees,

2

A081

directors and representatives of any of the foregoing and any third party providing any product, service or benefit in connection with the Agreement."

10. Because BMO Harris Bank, NA considers GreenSky to be its agent for purposes of servicing and generally managing consumer loan transactions made under the GreenSky® Program, GreenSky is covered by the definition of "us" for purposes of the Loan Agreement's mandatory arbitration provision.

11. Additionally, GreenSky would be "any third party providing any product, service or benefit in connection with the Agreement."

**B. Application and Approval Process**

12. On November 23, 2021, Ms. Parisi applied for and was approved for a loan from BMO Harris Bank, NA, through the GreenSky® Program for a home improvement project with Renewal by Andersen of Oklahoma, the company reflected on Plaintiff's Loan Agreement. Ms. Parisi's application was submitted through an online application process for her project with Renewal by Andersen of Oklahoma.

13. As part of the application process, applicants provide certain information necessary for GreenSky, as agent for the banks participating in the GreenSky® Program, to reach a decision on the application and to communicate with the borrower regarding the transaction.

14. Thus, Ms. Parisi, as part of her application, supplied, among other information, her social security number, date of birth, telephone number, mailing address, income, and email address. (*See* Exhibit 1.)

15.    Once the information was entered in the application, in order to submit the application to GreenSky, Ms. Parisi was required to acknowledge reading and accepting: (1) the Loan Application disclosures; (2) the consent to electronic records and communication; and (3) an authorization for GreenSky to pull her credit report on behalf of the participating financial institution.

16.    The credit report and credit score are provided to the GreenSky® Program's decisioning software, which applies the various credit policies of the participating financial institutions and renders a credit decision on the application based on these preset credit policies.

17.    A representative of GreenSky contacted Ms. Parisi by telephone on November 23, 2021 at the phone number listed on the consumer statement on her credit report and verified that she was aware of, and authorized, the application.  Ms. Parisi was approved for a loan from BMO Harris Bank, NA with a credit limit in the amount of $19,000.00. (*See* Exhibit 2.)

**C.  GreenSky's Mailing of the Loan Agreement to Ms. Parisi**

18.    A printed copy of the Loan Agreement was mailed by the United States Postal Service to Ms. Parisi on or about November 23, 2021, to the physical address Ms. Poza provided as part of the loan application process. (*See* Exhibit 3.)

19.    GreenSky's vendor, SourceLink, mailed the package on behalf of GreenSky containing the Loan Agreement directly to the physical address the borrower provided as part of her application.

A083

20.     GreenSky's mailing of the printed copy of the Loan Agreement to Ms. Parisi was, and is, consistent with GreenSky's customary business practices for borrowers whose loans GreenSky services.

21.     Specifically, the Loan Agreement mailing was properly addressed to Ms. Parisi and had sufficient postage, and it was deposited in the U.S. Mail.  This process is consistent with GreenSky's procedures for preparing and having mailed loan agreements to its customers.

22.     This mailing was not returned to GreenSky as undeliverable and GreenSky did not receive any returned notifications that the Loan Agreement or any other mailings associated with Ms. Parisi's loan account were undeliverable.

**D. GreenSky's Email to Ms. Parisi with the Loan Agreement**

23.     The Loan Agreement was emailed to Ms. Parisi in a link in which she could access it on November 23, 2021. The link containing the Loan Agreement was emailed to sparisi21@yahoo.com, which is the email address that Ms. Parisi provided on her loan application with GreenSky as part of the loan application process. (*See* Exhibit 1.) (A true and correct copy of the Loan Agreement emailed to Ms. Parisi is attached as Exhibit 3.)

24.     GreenSky's action in emailing a copy of the Loan Agreement to Ms. Parisi was, and is, consistent with GreenSky's customary business practices for borrowers whose loans GreenSky services.

25.     Specifically, the Loan Agreement was emailed to the proper email address that Ms. Parisi provided the same day she filled out the GreenSky loan application and was approved for the loan (November 23, 2021).

26.     The email sent to Ms. Parisi identified GreenSky as the sender, stated that the email was regarding the Installment Loan Agreement, and the email was not returned to GreenSky as undeliverable.

27.     Moreover, Ms. Parisi used the sparisi21@yahoo.com email address as evidenced by Exhibits 2 and 3 of Plaintiff's Amended Petition and Motion to Certify a Class Action where Ms. Parisi communicated with GreenSky through that same email address.

**E.  MS. PARISI'S USE OF THE SHOPPING PASS**

28.     On November 29, 2021, Ms. Parisi used the Shopping Pass included with, and part of, her Loan Agreement, and authorized Renewal by Andersen of Oklahoma to charge her account in the amount of $8,871.50. (*See* Exhibit 4.)

29.     Ms. Parisi's use of the Shopping Pass and the loan proceeds to make the charge with Renewal by Andersen of Oklahoma constituted an affirmation and acceptance of the terms of the Loan Agreement; as set forth in the Shopping Pass included with the Loan Agreement, "[u]se of this Shopping Pass or the associated Loan by (any) Borrower (or any authorized user) to make a purchase constitutes acceptance by (all) Borrower(s) of the terms of the accompanying Loan Agreement. The physical or electronic record of any such purchase will constitute the signature of (all) Borrower(s) on such Loan Agreement." (*See* Exhibit 3.)

30.     Attached as Exhibit 4 is a true and correct copy of the transaction history for

Ms. Parisi's loan account. This document shows the charges to Ms. Parisi's account

number ending in 2561. The funds ($8,871.50) were settled and disbursed directly to

Renewal by Andersen of Oklahoma's designated bank account in order to pay for the

services Ms. Parisi requested from Renewal by Andersen of Oklahoma.


I declare under penalty of perjury under the laws of the United States of America that the
foregoing is true and correct.



TIMOTHY D. KALIBAN                                    Date



7



## Application Details

| | | | |
|---|---|---|---|
| Application ID | ██████ | Channel | JCA-OS |
| Reference Number | Russell Kelley | | |
| Promotion Code | 81002512-3541 | | |
| Application Type | Individual | | |
| Credit Product | Installment | | |
| Credit Limit Requested | $17,743.00 | | |
| Who Are You | Sales Consultant | | |
| Entered by | russellkelley | | |
| Conversion Indicator | No | | |

### Authorized Signatory/Applicant

| | |
|---|---|
| First Name | Susan |
| Last Name | Parsi |
| Date of Birth | ██████ |
| SSN | ██████ |
| Cell | ██████ |
| Physical/Street Address | ██████ |
| Email Address | spansi21@yahoo.com |
| Total Monthly Income | $8,500.00 |

### Co-Applicant

| | |
|---|---|
| Owner Interest in Property | No |

### Company Information

| | |
|---|---|
| Company Full Legal Name | Susan K Parsi |
| Address | |
| Company City | ██████ |
| State | |
| Zip Code | |
| Bad Address | No |
| Program | GreenSky Consumer Projects |
| Merchant ID | 81002512 |
| Merchant Name | Renewal by Andersen of Oklahoma |
| Contract Language | en |

OK



Applicant information

| | | | | | | |
|---|---|---|---|---|---|---|
| Name: | Susan K Parisi | Cell Phone Number: | | Activation Status: | | Telephone Consumer Protection OPT-IN |
| Physical Address: | | Work Phone Number: | | Application Status: | Approved | Act |
| | | SSN: | XXX-XX- | Application Status Date: | 11/29/2021 | |
| Mailing Address: | | Date of Birth: | | Text Fraud/Collections | OPT-OUT | |
| Email Address: | sparisi21@yahoo.com | ECOA Type: | 1 - Individual | Messages: | | |
| Phone Number: | | Intellicheck Status: | Not Completed | Email Notifications: | OPT-IN | |

Loan Information    Transactions    Payments    Documents    **Decision**    Collections    Communications    Other Details

Other Links:    Credit Report    Response    Credit Line Policies

### Decision information

| | | | |
|---|---|---|---|
| Authorized Signatory/Applicant: | Parisi Susan | Primary Verified Annual Income: | |
| Application Type: | Individual | Primary Income Verification | |
| Credit Product: | Installment | Source | |
| Credit Limit Requested: | $17,743.00 | Co-Applicant Verified Annual | |
| Credit Limit Recommended: | $19,000.00 | Income: | |
| Credit Limit Approved: | $19,000.00 | Co-Applicant Income Verification | |
| Credit Limit Maximum: | $32,530.00 | Source: | |
| Credit Line Policy: | Platinum SLAP | Verified DTI: | |
| Strategy ID: | 1061 | Verified Decision Income: | |
| Program: | GreenSky Consumer Projects | Bankruptcy Score: | 228 |
| Product: | 7541 | Co-applicant Bankruptcy Score: | |
| Term: | PLAN-7541-24.99-LP | Decision Bureau: | EXPERIAN |
| FICO Score: | 717 | Decisioned On: | 100 |
| Co-Applicant FICO Score: | | Autodecay: | No |
| DTI: | 20.029529 | Merchant: | Renewal by Andersen of Oklahoma |
| | | Portfolio ID: | BMO |
| | | Decision recommendation: | Approved |

### Installment Information

| | | | |
|---|---|---|---|
| Maximum Monthly Payment amount: | | Promotional monthly payment: | $449.02 |
| | | Total Finance Charges: | $19,973.08 |
| Loan Amount: | $17,744.00 | Total Payments: | $37,717.08 |
| Number of Payments: | 60 | | |
| Monthly Payment: | $449.01 | | |

A088



**GreenSky**®
Shopping Pass

Exp 11/25

Susan K Parisi          CVV

For Barcode Scanners

Exp 11/25

---

# Congratulations, Susan!
## You have been approved for up to $17,744.00!*

**The purpose of this Shopping Pass is to provide important information about your loan and to make purchases using your GreenSky® loan.†**

**About Your Account:**

1. When you are ready to make your purchase, give your account number and expiration date to your Merchant along with your photo ID. By providing your account number to your Merchant you are authorizing your Lender to send Loan proceeds to your Merchant in payment for the goods or services that you have purchased. Provide your account number to your Merchant only when you are prepared to pay. Only those named on this Shopping Pass are authorized to make purchases. Do not give this Shopping Pass to any person not named on this Shopping Pass. If you do so, you may be held liable for their purchases. If this Shopping Pass is lost or stolen, notify us immediately at (866) 936-0602 to limit your liability. **Please be aware that if you authorize your Lender to make an initial advance under your GreenSky® Installment Loan to pay any initial payment required by the Merchant, payments may become due under your GreenSky® Installment Loan prior to the completion of services by the Merchant.**

2. You have a purchasing window of 6 months to use your credit limit of up to $17,744.00. All purchases must be made by 05/26/2022 (the "Purchase Window Expiration Date"). We may close your purchase window earlier if we determine that your job is substantially complete. See the terms and conditions of your Loan Agreement for details.

3. After your first purchase, you will receive monthly statements to track your transactions. **You have zero liability for transactions that you do not authorize‡.** Please monitor your statements carefully and contact us at (866) 936-0602 to notify us immediately of any unauthorized activity.

4. You will have no Loan unless you authorize a transaction, which is your electronic signature of the Loan Agreement and will have the same legal effect as a physical signature.

**Plan 7541. THIS IS A DIFFERENT PLAN THAN REQUESTED. 84 payments. Up to 6 month purchase window. At the earlier of purchase window expiration date or job completion, a 24 month promotional (promo) period begins with minimum monthly payments required followed by 60 amortized payments based on the balance at the end of promo. Your fixed interest rate is based on creditworthiness and is disclosed in your loan agreement. Interest is billed during the promo period but all interest is waived if the purchase amount is paid in full before the end of the promo period. Making initial minimum monthly payments will not pay off your loan before the end of the promo period.**

## (866) 936-0602                                                    www.greensky.com

### Thank you for choosing GreenSky® Program!
service@greensky.com

---

Use of this Shopping Pass or the associated Loan by (any) Borrower (or any authorized user) to make a purchase constitutes acceptance by (all) Borrower(s) of the terms of the accompanying Loan Agreement.

**The physical or electronic record of any such purchase will constitute the signature of (all) Borrower(s) on such Loan Agreement.**

Provide your account number and expiration date to authorize a transaction only after you are satisfied that you have received the goods and/or services that you are purchasing. Your Lender does not monitor the workmanship, quality, or completeness of the goods and/or services that you purchase. Contact your Merchant immediately if not completely satisfied. You will receive monthly statements to help track your transactions and payments.

**FOR PROTECTION AGAINST UNAUTHORIZED PURCHASES, IDENTIFICATION WILL BE REQUIRED FOR ALL PURCHASES.**

Spanish language loan agreements are available upon request. Contact us for a Spanish version of this agreement.

Los acuerdos de préstamo en idioma español están disponibles bajo petición. Contáctenos para obtener una versión en español de este acuerdo.

* Eligible only for purchases with your Merchant. **Your Lender is specified on your Loan Agreement.**

† GreenSky® is the brand name for certain consumer credit plans extended by participating lenders to borrowers for the purchase of goods or services from participating Merchants. Participating lenders are federally insured, federal and state chartered financial institutions providing credit without regard to age, race, color, religion, national origin, sex, or familial status. GreenSky® is a registered trademark of GreenSky, LLC and is used by your Lender under license. GreenSky Servicing, LLC ("Servicer") will service this Loan on behalf of your Lender.

‡ Applicable payment card network rules apply. Any unauthorized transactions must be reported to us within 60 days.

The monthly payments in the payment schedule of your Truth in Lending Disclosure is estimated and based on the Amount Financed for which you have been approved. Examples of required minimum monthly payments for different total purchase amounts appear below:

| Total Amount of Purchases | Monthly Payment Amount |
|---|---|
| $4,000.00 | $101.22 |
| $5,000.00 | $126.52 |
| $10,000.00 | $253.05 |
| $15,000.00 | $379.58 |
| $17,744.00 | $449.01 |
| $19,000.00 | $480.80 |

A089

**GreenSky®**

# UNDERSTANDING YOUR DEFERRED INTEREST LOAN

### What does it mean to have "No Interest if Paid in Full within the Promotional Period?"

We are committed to helping you understand how your GreenSky® Program loan works. While the details of your loan are described throughout this package, the information and frequently asked questions below are designed to provide you with helpful information regarding your loan.

Your loan is a "**deferred interest**" (also referred to as "No Interest if Paid in Full") loan. This means that:

- **INTEREST WILL BE BILLED DURING THE PROMOTIONAL PERIOD.**
- But, if you pay off your entire purchase balance before the end of the promotional period, all billed interest will be waived.
- **If you do not repay your entire purchase balance before the end of the promotional period**, you will be responsible for paying all interest that was billed during the promotional period and any interest that accrues after the expiration of the promotional period.

## FREQUENTLY ASKED QUESTIONS

**Q.** How long is the "promotional period" for my loan?

**A.** The promotional period for your loan is identified on the Shopping Pass and in the loan agreement.

**Q.** Do I have to make payments during the "promotional period"?

**A.** Your plan description and Truth in Lending disclosures will tell you whether you have payments due during the promotional period. Even if you don't have to make payments during the promotional period, it is a good idea to make regular payments to minimize any deferred interest you might owe if the purchase balance is not paid in full before the end of the promotional period. If you have payments due during the promotional period, making these payments will NOT pay off your entire purchase balance before the end of the promotional period.

**Q.** How will I know how much to pay and by when in order to satisfy the promotional offer?

**A.** You will receive a statement every month. During the promotional period, your statement will include a section that details your promotional financing offer. This section will identify your entire purchase balance, the purchase balance left to pay before the end of the promotional period, and the date on which your promotional period expires.

**Q.** My merchant is offering refinancing at the end of the "promotional period". How should I evaluate that offer?

**A.** Merchants are not allowed to make refinancing offers (either verbally or in writing) in connection with a Program loan. If your merchant has made any refinancing offers please report to us immediately. A customer's credit situation can change and relying on obtaining refinancing to pay-off the deferred interest loan before the end of the promotional period is not advisable.

**Q.** What if I still have questions?

**A.** You have no obligation on your loan until you authorize a transaction. If you have any questions about your deferred interest loan and your responsibility to repay, please contact us before authorizing a transaction.

**By authorizing a transaction and accepting your loan, you are acknowledging that you understand you are responsible for repaying this loan and agree that your merchant has not promised to issue or arranged to issue a loan with another lender to repay this loan.**

A090

# Installment Loan Agreement NON-NEGOTIABLE CONSUMER NOTE

| | |
|---|---|
| **LENDER:** BMO HARRIS BANK N.A. | **Application ID:** ___   **Date:** 11/23/2021 |
| **Lender Correspondence Address:** GreenSky® Program | **Merchant:** Renewal by Andersen of Oklahoma |
| Attn: Correspondence P.O. Box 29429, Atlanta, GA 30359 | **Borrower:** |
| **Borrower:**         Susan K Parisi | **Phone Number:** |
| **Phone Number:** | **Address:** |
| **Address:** | **City/State/Zip:** , |
| **City/State** | |

The Truth in Lending Act (TILA) disclosures below assume that your first purchase will be made on the last day of your Purchase Window, approximately 6 months from your approval date, in an amount equal to the Amount Financed shown below. The Finance Charge below includes $8,868.00 of interest, which will be waived if you pay off your purchase balance within 24 months of the date your Purchase Window closes. Minimum monthly payments are required during the promotional period but will not pay off your loan before the end of your promotional period. Your actual Annual Percentage Rate, Finance Charges, Amount Financed and scheduled payments may vary from the amounts shown below depending on, among other things, the timing and amount of your purchases and payments. You will not accrue interest or be required to make any payments until your Purchase Window closes. Your Purchase Window closes at the earlier of job completion or approximately 6 months from approval date.

## T R U T H   I N   L E N D I N G   D I S C L O S U R E

| ANNUAL PERCENTAGE RATE<br>The cost of credit as a yearly rate | FINANCE CHARGE<br>The dollar amount the credit will cost you | Amount Financed<br>The amount of credit provided to you or on your behalf | Total of Payments<br>The amount you will have paid when you have made all payments as scheduled |
|---|---|---|---|
| 24.99% (e) | $19,973.08 (e) | $17,744.00 (e) | $37,717.08 (e) |

Your payment schedule will be:

| Number of Payments | Amount of Payments | When Payments are Due |
|---|---|---|
| 24 | $449.02 (e) | Beginning approximately one month after the close of the Purchase Window and monthly thereafter for a total of 24 Months (NOTE: Purchase Window may be open as long as 6 months following your approval). |
| 59 | $449.01 (e) | Beginning monthly thereafter for a total of 59 months. |
| 1 | $449.01 (e) | Approximately 84 months after Purchase Window closes. |

**Prepayment:** If you pay off early, you will not be entitled to a refund of any interest that was billed to your account for the billing cycle in which you make your last payment. You will not be entitled to a refund of the Activation Fee, if any.
See the rest of this document for any additional information on nonpayment, default, and any required repayment in full before the scheduled date, and prepayment refunds and penalties.
**"(e)" means estimate.**

**Itemization of Amount Financed:** $17,744.00 (e)
Paid to Renewal by Andersen of Oklahoma

## FEES

**Penalty Fees**
| | |
|---|---|
| • Late Payment | The greater of **$39** or **5%** of the amount past due, except **$0** for MA and ME residents and **$30** maximum for Iowa residents. |
| • Returned Payment | Up to **$20** |

**MILITARY LENDING ACT:** The Military Lending Act ("MLA") provides protections for certain members of the Armed Forces and their dependents ("Covered Borrowers"). The provisions of this section apply to Covered Borrowers under the MLA. If you would like more information about whether you are a Covered Borrower and whether this section applies to you, please contact us at 877-266-2945. **Statement of MAPR:** Federal law provides important protections to members of the Armed Forces and their dependents relating to extensions of consumer credit. In general, the cost of consumer credit to a member of the Armed Forces and his or her dependent may not exceed an Annual Percentage Rate of 36%. This rate must include, as applicable to the credit transaction or account: (1) the costs associated with credit insurance premiums; (2) fees for ancillary products sold in connection with the credit transaction; (3) any application fee charged (other than certain application fees for specified credit transactions or accounts); and (4) any participation fee charged (other than certain participation fees for a credit card account). **Oral Disclosures:** In order to hear important MLA disclosures and payment information, please call 877-266-2945. **Covered Military Borrowers:** If you are a Covered Borrower, as defined under the MLA, 10 U.S.C. § 987, as amended from time to time, (i) the provisions of the ARBITRATION PROVISION, (ii) any waiver of your right to legal recourse under any state or federal law and (iii) any other provision in this Loan Agreement that is not enforceable against you under the MLA, does not apply to you.
NOTICE TO THE BUYER: 1. THIS IS A CONSUMER CREDIT TRANSACTION. 2. DO NOT SIGN THIS CREDIT AGREEMENT BEFORE YOU READ IT OR IF IT CONTAINS ANY BLANK SPACE. 3. YOU ARE ENTITLED TO A COMPLETELY FILLED IN COPY OF THIS CREDIT AGREEMENT. **4. YOU MAY PREPAY THE UNPAID BALANCE UNDER THIS AGREEMENT AT ANY TIME SUBJECT TO THE "PREPAYMENT" DISCLOSURE ABOVE. 5. THIS LOAN AGREEMENT CONTAINS AN ARBITRATION PROVISION THAT, UNLESS YOU REJECT IT, MAY LIMIT YOUR RIGHT TO LITIGATE A CLAIM IN COURT OR HAVE A JURY TRIAL ON A CLAIM.**
**ACCEPTANCE OF THIS LOAN AGREEMENT BY ELECTRONIC SIGNATURE:** The first use of the Shopping Pass or the associated loan to make a purchase will constitute acceptance by (all) Borrower(s) of the terms of this Loan Agreement. The dated physical or electronic record of such use will evidence the signature of (all) Borrower(s) on this Loan Agreement and have the same legal effect as a physical signature.

**CAUTION - IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT. NON-NEGOTIABLE CONSUMER NOTE.**

| | |
|---|---|
| Borrower: _____ Date: _____ | Co- Borrower: _____ Date: _____ |
| *Electronic record constitutes acceptance of this Agreement (see above)* | *Electronic record constitutes acceptance of this Agreement (see above)* |

**LENDER: /s/** BMO HARRIS BANK N.A.                       Date: 11/23/2021
**IN-HOME SALE CUSTOMERS:** ARIZONA, CONNECTICUT, NORTH DAKOTA AND RHODE ISLAND RESIDENTS: THIS INSTRUMENT IS BASED UPON A HOME/PERSONAL SOLICITATION SALE SUBJECT TO THE PROVISIONS OF TITLE 44, CHAPTER 15 OF THE ARIZONA REVISED STATUTES IN ARIZONA; THE HOME SOLICITATION SALES ACT IN CONNECTICUT, THE NORTH DAKOTA CENTURY CODE IN NORTH DAKOTA; AND TITLE 6, CHAPTER 28 OF THE RHODE ISLAND GENERAL LAWS. THIS INSTRUMENT IS NOT NEGOTIABLE.

A091

**TERMS AND CONDITIONS CONTINUE ON NEXT PAGE**

**1. Welcome.** Thank you for opening an installment loan through the GreenSky® Program. By accepting the Shopping Pass, the Truth in Lending Disclosure, the terms and conditions, and the Lender's Privacy Notice (collectively, the "Loan Agreement"), each Borrower ("you") acknowledges that (i) BMO HARRIS BANK N.A. ("Lender", "we", "our" or "us") has approved Borrower(s) for a GreenSky® Program Installment Loan up to the Amount Financed as set forth in the Truth in Lending Disclosure above (the "Loan"), (ii) each Borrower has received and retained a copy of Lender's Privacy Notice, (iii) each Borrower has read this Loan Agreement, including any Addenda, and agrees to be bound by its terms, (iv) if this Agreement resulted from a sale in your home ("In-Home Sale"), the sales person has explained each Borrower's right to cancel and has provided a written Notice of Right to Cancel. Any Notice of Right to Cancel and any additional notice of right to cancel provided in the sales contract for an In-Home Sale, as well as any accompanying addendum provided to Borrower, are incorporated herein by reference, and unless any Borrower exercises the right to cancel, Lender agrees to pay the Amount Financed to Merchant for an In-Home Sale upon receipt of a transaction authorization, (v) either Borrower may direct Lender to make payments to Merchant by using the Shopping Pass or account number, and (vi) neither Borrower is a co-signer. A Certificate of Completion is required unless Borrower directs Lender to make payments to Merchant by using the Shopping Pass or account number. This Loan Agreement, including any changes to it, contains the terms of your agreement with BMO HARRIS BANK N.A..

**2. Installment Loan Program.**

    **a. Using your Loan:** You may make purchases of goods or services from Merchant, in total up to the "Amount Financed" set forth in the Truth in Lending Disclosure of this Loan Agreement, during the purchasing window time period specified on your Shopping Pass, which is incorporated here by reference. We may close the purchasing window time period on the earlier of the Purchase Window Expiration Date or when your job is substantially complete as determined by Lender (such as when your Merchant notifies us that your job is substantially complete). Once the purchasing window time closes, you will no longer be able to make additional purchases. Each time you make a purchase of goods or services from Merchant, you authorize us to extend credit to you and to forward Loan proceeds to your Merchant on your behalf. We may decline any transaction if we experience an operational difficulty (such as a system outage), if you fail to make any payment required under this Agreement or you are in Default (as defined herein), or if we identify suspected fraudulent or unlawful activity involving your Loan.

    **b. Credit Limit:** You agree not to make purchases in excess of the Amount Financed shown above, but if you do, you agree that we may, in our sole discretion, increase the Amount Financed to include such excess amount in a "Summary of Account at Conversion" that reflects such increased Amount Financed and resulting increased anticipated Finance Charge and Total of Payments. The dated electronic record of such excess purchase(s) will evidence your request for and acceptance of any such increased terms.

    **c. Beginning of Amortization Period:** We will total the purchases you made during the purchasing window and provide you with a Summary of Account at Conversion that will show (based on actual total purchases) a final Amount Financed, Finance Charge, Total of Payments and remaining payment schedule for your Loan based on your total purchases.

    **d. For your convenience, we may provide you with certain materials in both the Spanish and English languages. You agree that, to the greatest extent not prohibited by law, the English text will control.**

    **Para su conveniencia, podemos proporcionarle ciertos materiales en los idiomas español e inglés. Usted acepta que, en la mayor medida no prohibida por la ley predominará el texto en Inglés.**

**3. Promise to Pay.** For value received, you agree to pay us: (a) so much as you may actually borrow from time to time by initiating transactions under the Loan Agreement, plus (b) periodic interest at an annual rate of 24.99% on the unpaid Amount Financed outstanding until the loan is paid in full, (c) any applicable taxes or other charges due under this Loan Agreement. We calculate the interest charge on your account by applying a monthly periodic rate to your outstanding principal balance on the first day of your first billing cycle and thereafter to your outstanding principal balance on the first day of each billing cycle. The monthly periodic rate equals the applicable annual rate divided by twelve (12). Payments will be due as scheduled. Any principal balance, interest and other charges remaining unpaid are due in full on the date of the last scheduled payment. The actual amount of interest that you pay may exceed the Finance Charge disclosed in the Truth in Lending Disclosure or Summary of Account at Conversion if you do not make minimum payments due by their due dates as identified in your statements. If you do not make required payments, then, in addition to any other rights and remedies available under this Loan Agreement or applicable law, (i) your purchasing window may close early and (ii) no new purchases may be permitted.

**4. Timing and Application of Payments.** You agree to make payments in accordance with the estimated payment schedule contained in the Truth in Lending Disclosure on the preceding page (or any updated disclosure, including the Summary of Account at Conversion), provided that you will be obligated to make minimum monthly payments in the amounts and on the dates shown on your statements. Any payment made in excess of your minimum monthly payment will be applied to your Principal Balance and will not reduce the amount of your next regularly scheduled payment. You agree that, except for updated amounts, if any, shown on your updated Summary of Account at Conversion, including any adjustments in scheduled payments to reflect your final Amount Financed and Finance Charges due, all other terms and disclosures of this Loan Agreement will remain in full force and effect. Once the initial payment due date is set, the payment due date will be the same day each month. Subject to applicable law, we may apply payments to the amounts you owe under this Loan Agreement in any order we choose. You may not tell us how to apply payments. Any partial prepayment will be applied against the outstanding balance, but will not postpone the due date of any subsequent monthly installments or change the amount of any such installments, unless we otherwise agree in writing. We will apply any refund for a returned purchase when we or Servicer receives notice of the refund from your Merchant. We do not control when your Merchant may notify us or Servicer of a refund. If your Merchant's notice is received after we send your Summary of Account at Conversion, we will apply the refund as a prepayment on your loan to reduce your outstanding balance but this will not reduce your subsequent minimum monthly payments (subject to any necessary adjustments to the number of payments required or your final payment amount).

**5. Payment Method and Address.** Unless automatic payments are authorized in connection with this Loan, you agree to make payments by mailing a check or money order to **Dept# 3025, GreenSky, PO Box 2153, Birmingham AL 35287-3025**, by making a phone payment by dialing **1-855-809-1889** or by making an online payment at www.greenskyonline.com. You agree that payments may not be made in whole or in part by credit card. A payment to our Servicer in accordance with this Loan Agreement is a payment to us. You agree not to send us partial payments marked "paid in full," "without recourse," or similar language. If you send such a payment, we may accept it without losing any of our rights under this Loan Agreement. **All written communications concerning disputed amounts, including any check or other payment instrument that (i) is postdated and accompanied by adequate notice, (ii) indicates that the payment constitutes "payment in full" of the amount owed, (iii) is tendered with other conditions or limitations or (iv) is otherwise tendered as full satisfaction of a disputed amount, must be marked for special handling and mailed or delivered to us at P.O. Box 29429, Atlanta, GA 30359, Attention: Disputes.**

**6. Unpaid Balances.** (a) During your deferred interest promotional period, you will satisfy the terms of your promotion and all interest billed during the promotional period will be waived/credited if you pay the entire purchase balance before the end of the promotional period and you will still be responsible for any outstanding

**TERMS AND CONDITIONS CONTINUE ON NEXT PAGE**

Lender: BMO HARRIS BANK N.A. 2111233004 PPLD20211011_77_2_W Rev. 10/21

fees. (b) Notwithstanding the language in Section 6(a) above, if your deferred interest or promotional plan can expire larger than of be regarded as "paid in full" if your loan has an unpaid balance of Amount Financed, interest, late charges, returned payment charges, or any other fees or charges at the end of the term.

**7. Access Device.** We will provide you with a Shopping Pass which you may use to make purchases of goods or services from Merchant during the purchasing window time period as described in this Loan Agreement. Use of your Shopping Pass or Loan to make a purchase constitutes your acceptance of the terms of this Loan Agreement. You agree to notify us immediately if your Shopping Pass is lost, stolen or otherwise compromised.

**8. Returned Payment Charge.** Subject to applicable law, we may charge you a "Returned Payment Charge" as provided herein. If your lender is located in Connecticut, Georgia, Illinois, Michigan, or Ohio, and your payment is dishonored or returned for any reason, you agree to pay us a Returned Payment Charge of **$20**. If your lender is located in Alabama or Mississippi and your payment is dishonored or returned for any reason, you agree to pay us a Returned Payment Charge of **$15**. If you are a Massachusetts Borrower and your payment is dishonored or returned for any reason, you agree to pay us a Returned Payment Charge of **$10**. In all cases, we may charge this fee the first time any payment is returned even if it is paid upon resubmission.

**9. Late Charge.** If a payment is more than 10 days late, you will be charged the GREATER of $39 or 5% of the amount past due, provided that the late payment fee will not exceed the amount past due ($30 maximum in Iowa). NOTICE: Massachusetts and Maine Borrowers are not charged late charges.

**10. Default.** Subject to applicable law, you will be in default ("Default") if any of the following events occur:

(a) You have made any false or misleading statement(s) in your application for the Loan subject to this Loan Agreement or any other account that you may have with us;
(b) You fail to make a payment within 60 days of when it was due under this Loan Agreement or any other account agreement that you may have with us;
(c) You fail to comply fully with any term or condition of this Loan Agreement or any other account agreement that you may have with us;
(d) You file or someone else files against you a petition in bankruptcy;
(e) You die;
(f) You commit fraud; or
(g) We believe you are unable or unwilling to pay your debts when due.

MASSACHUSETTS NOTICE: If you are a Massachusetts borrower and this Loan Agreement is secured by a non-possessory interest in consumer goods, this Default provision is enforceable only to the extent that the Default is material and consists of a failure to make one or more payments as required by the Loan Agreement or the occurrence of an event that substantially impairs the value of the collateral.

**11. Remedies on Default.** If you are in Default, we will have all of the rights and remedies available to us at law or in equity, in addition to the specific rights and remedies set forth in this Loan Agreement. We may exercise any, some or all of our rights and remedies, in our sole discretion. If you are in Default, we may, at our option, require you to pay immediately the entire amount you owe us under this Loan Agreement, in full. Subject to the requirements of applicable law, we may do this without giving you any advance notice of presentment, acceleration or our intent to accelerate. Unless prohibited by applicable law, you agree to pay our reasonable costs and attorneys' fees related to the collection of your Loan.

**12. Credit Inquiries and Loan Information.** You authorize us to obtain a credit report on you for any legal purpose in connection with this Loan, including any update, extension of credit, review or collection of this Loan. If you request, we will tell you whether any credit report was requested and, if so, the name and address of the credit bureau furnishing the report.

**13. Inaccurate Information.** If you believe that we have information about you that is inaccurate or that we have reported or may report inaccurate information about you to a credit bureau, please notify us of the specific information that you believe is inaccurate by writing to us at **P.O. Box 29429, Atlanta, GA 30359, Attention: Disputes**. In doing so, please identify the inaccurate information and tell us why you believe it is incorrect. If you have a copy of the credit report that includes the inaccurate information, please send a copy of that report to us as well. The "Your Billing Rights" section below contains special processes required for contacting us in the event of a Billing Error.

**14. Negative Information Reporting.** We may report information about your Loan to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

**15. Severability.** If applicable law is finally interpreted so that charges collected or to be collected in connection with this Loan Agreement exceed the permitted limits, then (i) any such charges will be reduced to the permitted amounts and (ii) any amounts already collected that exceed the permitted amounts will be credited to you by, at our option, applying the credit to any amounts due hereunder or making a direct payment to you. If any provision in this Loan Agreement is invalid under applicable law, the remainder of the provisions in this Loan Agreement will remain in effect and interpreted to give the greatest possible effect to the intent of the parties as originally written.

**16. Assignment; Transfer.** We may sell, assign, transfer or delegate all or any portion of our rights or obligations under this Loan Agreement to any other person without prior notice to you. You may not sell, assign, transfer or delegate any of your rights or obligations under this Loan Agreement.

**17. Governing Law. This Loan Agreement, including the rate of interest and fees, is governed by applicable federal law and, to the extent not preempted by federal law, the laws of IL where the Lender is located as shown in Section 1 (Welcome) of this Loan Agreement (without regard to the State's conflict of laws provisions). If Lender is located in Kansas, the Kansas Consumer Credit Code (Kan. Stat. Ann. §§ 16a-1-101 et seq.) governs this Agreement. If you are a Massachusetts borrower and the Amount Financed is $6,000 or less, this Loan Agreement is also subject to the Massachusetts Small Loan Law.**

**18. Joint and Several Liability.** Each Borrower will be liable individually and together for all obligations under this Loan Agreement, including payment to us of the entire amount owed under this Loan Agreement.

**19. No Waiver by Us.** We will not be deemed to have waived any of our rights by delaying the enforcement of any of our rights. If we waive any of our rights in writing on one occasion, that waiver does not constitute a waiver by us of our rights on any future occasion.

A093

TERMS AND CONDITIONS CONTINUE ON NEXT PAGE

Appellate Case: 23-6218    Document: 010111062398    Date Filed: 06/07/2024    Page: 100

**21. Communicating With You; Consent to Contact by Electronic and Other Means.** You agree that, to the greatest extent not prohibited by applicable law, we may contact you for any lawful reason, including for the collection of amounts owed to us. No such contact will be deemed unsolicited. You agree that we (and any other owner or servicer of your account) may contact you for any and all purposes arising out of or relating to your Loan at any physical or electronic addresses or numbers (including wireless cellular telephone numbers, ported landline numbers, VOIP or other services) as you may provide to us from time to time. We may use any means of communication, including, but not limited to, postal mail, electronic mail, telephone, text messaging, or other technology, to reach you. You agree that we may use automatic dialing and announcing devices which may play recorded messages. You may contact us at any time to ask that we not contact you using any one or more methods or technologies. You represent that you are permitted to receive communications at each of the telephone numbers you have provided to us.

**22. Notices; Change of Address, Employment or Telephone Number.** We will send all written notices and statements to your address as it appears on our records. To avoid delays and missed payments that could affect your credit standing, you agree to advise us promptly if you change your mailing address, place of employment, telephone number or other contact information, including, but not limited to, porting a landline telephone number to a cellular phone, VoIP or other services. You represent and agree that for purposes of imposing fees and charges, you are deemed to reside at the current mailing address that we have on record for you. You can update your contact information with us by phone, mail, or online at www.greenskyonline.com.

**23. Entire Agreement.** This Loan Agreement constitutes the final written expression of the credit agreement between you and us relating to your Loan. We are not bound by any oral representations made or implied that are not directly reflected in this Loan Agreement. **A credit agreement must be in writing to be enforceable. Oral agreements or commitments to loan money, extend credit, or forbear from enforcing repayment of a debt, including promises to extend or renew such debt, are not enforceable. To protect you and us from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it.**

**24. NOTICES: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

**Your Merchant pays transaction fees as a result of your use of the Loan. Your Merchant is prohibited from surcharging you to cover the cost of these transaction fees.**

**Notice to California Residents: (AVISO PARA LOS QUE RESIDEN EN CALIFORNIA): SI SU PRÉSTAMO FUÉ NEGOCIADO PRIMERAMENTE EN ESPAÑOL, ESTAMOS OBLIGADOS A PRESENTARLE UNA TRADUCCIÓN EN ESPAÑOL DE LAS DISPOSICIONES REQUERIDAS POR LA REGULACIÓN FEDERAL Z, 12 C.F.R. APARTADO 1026.**

**Notice to Iowa Residents: IMPORTANT: READ BEFORE SIGNING. THE TERMS OF THIS LOAN AGREEMENT SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE. NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THIS WRITTEN CONTRACT MAY BE LEGALLY ENFORCED. BORROWER MAY CHANGE THE TERMS OF THIS AGREEMENT ONLY BY ANOTHER WRITTEN AGREEMENT.**

**Notice to New Hampshire Residents:** This Loan Agreement provides for reasonable attorneys' fees to be awarded to us in an action against you involving this Loan Agreement. Reasonable attorneys' fees will be awarded to you if you prevail in any action, suit or proceeding brought by us, or an action brought by you. If you successfully assert a partial defense or set-off, recoupment or counterclaim to an action brought by us, the court may withhold from us the entire amount or such portion of the attorneys' fees as the court considers equitable.

**Notice to New Jersey Residents:** Because certain provisions of this Loan Agreement are subject to applicable laws, they may be void, unenforceable or inapplicable in some jurisdictions. None of these provisions, however, is void, unenforceable or inapplicable in New Jersey.

**Notice to New York Residents:** NOTICE TO THE BUYER: 1. Do not sign this credit agreement before you read it or if it contains any blank space. 2. You are entitled to a completely filled in copy of this credit agreement.

**Notice to Ohio Residents:** The Ohio laws against discrimination require that all creditors make credit equally available to all credit worthy customers, and that credit reporting agencies maintain separate credit histories on each individual upon request. The Ohio civil rights commission administers compliance with this law.

**Notice to Vermont Residents:** Lender is engaged in loan production. **EACH BORROWER SHOULD RETAIN A COPY FOR THEIR RECORDS.**

**25. ARBITRATION PROVISION. Agreement to Arbitrate Disputes:** This Arbitration Provision sets forth the circumstances and procedures under which Claims (defined below) that arise between you and us will be resolved through binding arbitration; provided, however, that this provision does not apply if, on the date this Agreement is issued, you are covered by the federal Military Lending Act as a member of the Armed Forces or a dependent of such a member. UNLESS YOU OPT OUT OF THIS ARBITRATION PROVISION AS PROVIDED BELOW OR EXCEPT AS APPLICABLE LAW PROHIBITS US FROM IMPOSING BINDING ARBITRATION ON YOU, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO LITIGATE A CLAIM IN COURT OR HAVE A JURY TRIAL ON A CLAIM. OTHER RIGHTS THAT YOU WOULD HAVE IN COURT ALSO MAY NOT BE AVAILABLE OR MAY BE LIMITED IN ARBITRATION, INCLUDING YOUR RIGHT TO APPEAL AND YOUR ABILITY TO PARTICIPATE IN A CLASS ACTION. Nothing in this provision precludes you from filing and pursuing your individual Claim in a small claims court in your state or municipality, so long as that claim is pending only in that court. Definitions: As used in this Arbitration Provision, the term "Claim" means and includes any claim, dispute or controversy of every kind and nature, whether based in law or equity, between you and us arising from or relating to your Loan Agreement as well as the relationship resulting from such Agreement ("the Agreement"), including the validity, enforceability or scope of this Arbitration Provision or the Agreement. "Claim" also includes claims by or against any third party providing any product, service or benefit in connection with the Agreement (including, but not limited to, debt collectors and all of their agents, employees, directors and representatives) if and only if, such third party is named as a co-party with you or us (or files a Claim with or against you or us) in connection with a claim asserted by you or us against the other. As used in this Arbitration Provision, "you" and "us" also includes any corporate parent, wholly or majority owned subsidiaries, affiliates, any licensees, predecessors, successors, assigns and purchasers of any accounts, all agents, employees, directors and representatives of any of the foregoing and any third party providing any product, service or benefit in connection with the Agreement. Initiation of Arbitration Proceeding / Selection of Administrator: Any Claim will be resolved, upon the election by you or us,

A094

**TERMS AND CONDITIONS CONTINUE ON NEXT PAGE**

by arbitration pursuant to this Arbitration Provision and the Code of procedures of the national arbitration organization to which the Claim is referred in effect at the time the Claim is filed (the "Code"), except to the extent the Code conflicts with the Agreement. Claims must be referred to either JAMS or The American Arbitration Association ("AAA"), as selected by the party electing to use arbitration. If a selection by us of either of these organizations is unacceptable to you, you will have the right within 30 days after you receive notice of our election to select the other organization listed to serve as arbitration administrator. For a copy of the procedures, to file a Claim or for other information about these organizations, contact (1) JAMS at 1920 Main Street, Suite 300, Irvine, CA 92614; www.jamsadr.com or (2) AAA at 335 Madison Avenue, New York, NY 10017, www.adr.org. In addition to the arbitration organizations listed above, Claims may be referred to any other arbitration organization that is mutually agreed upon in writing by you and us, or to an arbitration organization or arbitrator(s) appointed pursuant to Section 5 of the Federal Arbitration Act, 9 U.S.C. §§ 1-16, provided that any such arbitration organization and arbitrator(s) will enforce the terms of the restrictions set forth below. Class Action Waiver and Other Restrictions: Arbitration will proceed solely on an individual basis without the right for any Claims to be arbitrated on a class action basis or on bases involving claims brought in a purported representative capacity on behalf of others. The arbitrator's authority to resolve and make written awards is limited to Claims between you and us alone. Claims may not be joined or consolidated unless agreed to in writing by all parties. No arbitration award or decision will have a preclusive effect as to issues or claims in any dispute with anyone who is not a named party to the arbitration. Notwithstanding any other provision in these terms and conditions and without waiving either party's right of appeal, if any portion of this "Class Action Waiver and Other Restrictions" provision is deemed invalid or unenforceable, then the entire Arbitration Provision (other than this sentence) will not apply. Arbitration Procedures: This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and will be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16, as it may be amended ("FAA"), and the applicable Code. The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations and will honor claims of privilege recognized by law. Federal or state rules of civil procedure or evidence will not apply. Written requests to expand the scope of discovery rest within the arbitrator's sole discretion and will be determined pursuant to the applicable Code. The arbitrator will take reasonable steps to preserve the privacy of individual, and of business matters. Judgment upon the written arbitral award may be entered in any court having jurisdiction. Subject to the right of appeal under the FAA, the arbitrator's written decision will be final and binding unless you or we take an appeal from the award by making a dated, written request to the arbitration organization within 30 days from the date of entry of the written arbitral award. A three-arbitrator panel administered by the same arbitration organization will consider anew any aspect of the award objected to by the appellant, conduct an arbitration pursuant to its Code and issue its decision within 120 days of the date of the appellant's written notice. The panel's majority vote decision will be final and binding. Location of Arbitration / Payment of Fees: The arbitration will take place in the federal judicial district where you live. Regardless of who wins in arbitration, you will only be responsible for paying your share, if any, of the arbitration fees required by the applicable Code, which amount will not exceed the filing fees that you would have incurred if the Claim had been brought in the appropriate state or federal court closest to where you live. We will pay the remainder of any arbitration fees. At your written request, we will consider in good faith making a temporary advance of all or part of your share of the arbitration fees. Waivers also may be available from the JAMS or AAA. Continuation: This Arbitration provision will survive termination of the Agreement, as well as voluntary payment in full of your account, any debt collection proceeding by or between you and us, and any bankruptcy by you or us. If any portion of this Arbitration Provision, except the "Class Action Waiver and Other Restrictions" provision above, is deemed invalid or unenforceable for any reason, it will not invalidate the remaining portions of this Arbitration Provision or the Agreement, each of which will be enforceable regardless of such invalidity. Opt-Out Process: You may choose to opt out of and not be subject to this Arbitration Provision but only by following the process set forth below. If you do not wish to be subject to this Arbitration Provision, then you must notify us in writing within forty-five (45) calendar days of the date of the Agreement at the following address: P.O. Box 29429, Atlanta, GA 30359, Attention: Legal. Your written notice must include your name, address, social security number, the date of the Agreement, and a statement that you wish to opt out of this Arbitration Provision. Your notice to opt out will only apply to this particular Agreement with us and not to subsequent or previous agreements.

**26. Your Billing Rights: Keep this Document for Future Use**
This notice tells you about your rights and our responsibilities under the Fair Credit Billing Act.

**What To Do If You Find a Mistake on Your Statement**
If you think there is an error on your statement, write to us at:

GreenSky® Program
Attention: Disputes
PO Box 29429
Atlanta, GA 30359
You may also contact us at service@greensky.com.

In your letter, give us the following information:

- *Account information:* Your name and account number.
- *Dollar amount:* The dollar amount of the suspected error.
- *Description of problem:* If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.

You must contact us:

- Within 60 days after the error appeared on your statement.
- At least 3 business days before an automated payment is scheduled, if you want to stop payment on the amount you think is wrong.

You must notify us of any potential errors in writing. You may call us, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question.

**What Will Happen After We Receive Your Letter**
When we receive your letter, we must do two things:

1. Within 30 days of receiving your letter, we must tell you that we received your letter. We will also tell you if we have already corrected the error.
2. Within 90 days of receiving your letter, we must either correct the error or explain to you why we believe the bill is correct.

A095

Lender: BMO HARRIS BANK N.A. 2111233004 PPLD20211011_77_2_W Rev. 10/21

- We cannot try to collect the amount in question, or report you as delinquent on that amount.

- The charge in question may remain on your statement, and we may continue to charge you interest on that amount.

- While you do not have to pay the amount in question, you are responsible for the remainder of your balance.

- We can apply any unpaid amount against your available loan funds (if any).

After we finish our investigation, one of two things will happen:

- *If we made a mistake:* You will not have to pay the amount in question or any interest or other fees related to that amount.

- *If we do not believe there was a mistake:*

You will have to pay the amount in question, along with applicable interest and fees. We will send you a statement of the amount you owe and the date payment is due. We may then report you as delinquent if you do not pay the amount we think you owe.

If you receive our explanation but still believe your bill is wrong, you must write to us within *10 days* telling us that you still refuse to pay. If you do so, we cannot report you as delinquent without also reporting that you are questioning your bill. We must tell you the name of anyone to whom we reported you as delinquent, and we must let those organizations know when the matter has been settled between us.

If we do not follow all of the rules above, you do not have to pay the first $50 of the amount you question even if your bill is correct.

**Your Rights If You Are Dissatisfied With Your Payment Card Purchases**
If you are dissatisfied with the goods or services that you have purchased with your Loan, and you have tried in good faith to correct the problem with the Merchant, you may have the right not to pay the remaining amount due on the purchase.

To use this right, all of the following must be true:

1. The purchase must have been made in your home state or within 100 miles of your current mailing address, and the purchase price must have been more than $50. (Note: Neither of these are necessary if your purchase was based on an advertisement we mailed to you, or if we own the company that sold you the goods or services.)
2. You must have used your payment card for the purchase.
3. You must not yet have fully paid for the purchase.

If all of the criteria above are met and you are still dissatisfied with the purchase, contact us *in writing* at:

GreenSky® Program
Attention: Disputes
PO Box 29429
Atlanta, GA 30359
You may also contact us at service@greensky.com.

While we investigate, the same rules apply to the disputed amount as discussed above. After we finish our investigation, we will tell you our decision. At that point, if we think you owe an amount and you do not pay, we may report you as delinquent.

A096

| FACTS | WHAT DOES BMO HARRIS BANK N.A. DO WITH YOUR PERSONAL INFORMATION? |
|---|---|
| Why? | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| What? | The types of personal information we collect and share depend on the product or service you have with us. This information can include: <br>• Social Security number and  employment information <br>• account transactions  and transaction history <br>• credit history and investment experience |
| How? | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons BMO Harris Bank N.A. chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does BMO Harris Bank N.A. share? | Can you limit this sharing? |
|---|---|---|
| **For our everyday business purposes** — such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | **Yes** | **No** |
| **For our marketing purposes** — to offer our products and services to you | **Yes** | **No** |
| **For joint marketing with other financial companies** | **Yes** | **No** |
| **For our affiliates' everyday business purposes** — information about your transactions and experiences | **Yes** | **No** |
| **For our affiliates' everyday business purposes** — information about your creditworthiness | **Yes** | **Yes** |
| **For our affiliates to market to you** | **Yes** | **Yes** |
| **For nonaffiliates to market to you** | **No** | **We don't share** |

| To limit our sharing | Call toll-free:  1-866-936-0602 <br>**Please note:** <br>If you are a *new* customer, we can begin sharing your information 30 days from the date we sent this notice. When you are *no longer* our customer, we continue to share your information as described in this notice. However, you can contact us at any time to limit our sharing. |
|---|---|

| Questions? | • Call toll-free:  1-888-654-0063 <br>• Talk to a banker at a BMO Harris branch <br>• Talk to your assigned account representative |
|---|---|



A097

**Page 2**

| Who we are | |
|---|---|
| **Who is providing this notice?** | This notice is provided by BMO Harris Bank N.A. for its consumer customers, including all cardholders of Diners Club and Carte Blanche Professional cards issued by us. |

| What we do | |
|---|---|
| **How does BMO Harris Bank N.A. protect my personal information?** | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings. |
| **How does BMO Harris Bank N.A. collect my personal information?** | We collect your personal information, for example, when you:<br>• open an account or deposit money<br>• apply for a loan or use your credit or debit card<br>• seek advice about your investments<br><br>We also collect your personal information from others, such as credit bureaus, affiliates, or other companies. |
| **Why can't I limit all sharing?** | Federal law gives you the right to limit only<br>• sharing for affiliates' everyday business purposes—information about your creditworthiness<br>• affiliates from using your information to market to you<br>• sharing for nonaffiliates to market to you<br><br>State laws and individual companies may give you additional rights to limit sharing.  See below for more information on your rights under state laws. |
| **What happens when I limit sharing for an account I hold jointly with someone else?** | Your choices will apply to you only, unless you tell us otherwise. |

| Definitions | |
|---|---|
| **Affiliates** | Companies related by common ownership or control.  They can be financial or nonfinancial companies.<br>• Our affiliates include companies with a Bank of Montreal or BMO name; and financial companies such as BMO Harris Financial Advisors, Inc. |
| **Nonaffiliates** | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br>• BMO Harris Bank N.A. does not share with nonaffiliates so they can market to you. |
| **Joint Marketing** | A formal agreement between nonaffiliated financial companies that together market financial products or services to you.<br>• Our joint marketing partners include credit card companies. |

## Other important information

**For California Residents:**  We will not share information we collect about you with companies outside of the BMO family of companies except with your authorization or as permitted by California law, such as to service your account. To authorize the sharing of this information, please call us toll-free at 1-888-654-0063.  In addition, we will limit the sharing of information about you within the BMO family of companies to the extent required by California law.

**For Vermont Residents:** We will not disclose information about your creditworthiness to our affiliates and will not disclose your personal information, financial information, credit report, or health information to nonaffiliated third parties to market to you, other than as permitted by Vermont law, unless you authorize us to make those disclosures.  Additional information concerning our privacy policies can be found at www.bmoharris.com/us/about/privacy or call 1-888-654-0063.

**For Nevada Residents:** Notice provided pursuant to state law. To be placed on our internal Do Not Call List, call 1-888-654-0063. For more on this Nevada law, contact Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St., Suite 3900, Las Vegas, NV 89101. Phone number: (702)486-3132; email: BCPINFO@ag.state.nv.us.

**BMO HARRIS BANK N.A.**

## Your Credit Score and the Price You Pay for Credit

| Your Credit Score | |
|---|---|
| **Your credit score:** | 717<br><br>Source: EXPERIAN          Date: 11/23/2021 |

| Understanding Your Credit Score | |
|---|---|
| **What you should know about credit scores** | Your credit score is a number that reflects the information in your credit report.<br><br>Your credit report is a record of your credit history.  It includes information about whether you pay your bills on time and how much you owe to creditors.<br><br>Your credit score can change, depending on how your credit history changes. |
| **How we use your credit score** | Your credit score can affect whether you can get a loan and how much you will have to pay for that loan. |
| **The range of scores** | Scores range from a low of 300 to a high of 850.<br><br>Generally, the higher your score, the more likely you are to be offered better credit terms. |
| **How your score compares to the scores of other consumers** |  |

| **Checking Your Credit Report** | |
|---|---|
| **What if there are mistakes in your credit report?** | You have a right to dispute any inaccurate information in your credit report. If you find mistakes on your credit report, contact the consumer reporting agency.<br><br>It is a good idea to check your credit report to make sure the information it contains is accurate. |
| **How can you obtain a copy of your credit report?** | Under federal law, you have the right to obtain a free copy of your credit report from each of the nationwide consumer reporting agencies once a year.<br><br>To order your free annual credit report—<br><br>*By telephone:*  Call toll-free: 1-877-322-8228<br><br>*On the web:*  Visit www.annualcreditreport.com<br><br>*By mail:*  Mail your completed Annual Credit Report Request Form (which you can obtain from the Federal Trade Commission's website at www.ftc.gov/bcp/conline/include/requestformfinal.pdf) to:<br><br>Annual Credit Report Request Service<br>P.O. Box 105281<br>Atlanta, GA 30348-5281 |
| **How can you get more information about credit reports?** | For more information about credit reports and your rights under Federal law, visit the Consumer Financial Protection Bureau's website at www.consumerfinance.gov/learnmore or visit the Federal Reserve Board's website at www.federalreserve.gov |

A100

| Transaction Date | Post Date | Card # | Transaction Type | Transaction Status | Invoice # | Confirmation # | Transaction Description | Transaction Amount |
|---|---|---|---|---|---|---|---|---|
| 10/25/2022 | 10/25/2022 | **** | Late Payment Fee | | | 20221025-003631 | late payment fee correction | 78.00 |
| 10/11/2022 | 10/11/2022 | **** | Late Payment Fee Credit PCResolution | | | | Fees associated with the dispute amount | 78.00 |
| 10/11/2022 | 10/11/2022 | **** | Finance Charge Credit | | | | Finance Charge Credit | 739.00 |
| 10/11/2022 | 10/11/2022 | **** | Finance Charge Credit | | | 20221011-001825 | 1X Courtesy | 78.00 |
| 10/10/2022 | 10/10/2022 | **** | Credit | | PARISI, SUSAN 80_21_10903 GS REFUND - CXLD SALE | 20221010-003385 | Greensky Direct Transaction - Renewal by Andersen of Oklahoma | 8,871.50 |
| 10/01/2022 | 10/01/2022 | **** | Late Payment Fee | | | | Late Payment Fee | 39.00 |
| 09/25/2022 | 09/25/2022 | **** | Finance Charge | | | | FINANCE CHARGE | 184.75 |
| 08/25/2022 | 08/25/2022 | *** | Finance Charge | | | | FINANCE CHARGE | 184.75 |
| 07/31/2022 | 07/31/2022 | **** | Late Payment Fee | | | | Late Payment Fee | 39.00 |
| 07/25/2022 | 07/25/2022 | **** | Finance Charge | | | | FINANCE CHARGE | 184.75 |
| 06/25/2022 | 06/25/2022 | **** | Finance Charge | | | | FINANCE CHARGE | 184.75 |
| 11/29/2021 | 11/29/2021 | **** | MTC Charge Request | | Parisi, Susan 80_21_10903 | 1649236 | | 8,871.50 |
| 11/29/2021 | 11/29/2021 | **** | Charge | | Parisi, Susan 80_21_10903 | 20211129-001115 | Greensky Direct Transaction - Renewal by | 8,871.50 |

A101

| Transaction Date | Post Date | Card # | Transaction Type | Transaction Status | Invoice # | Confirmation # | Transaction Description | Transaction Amount |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Andersen of Oklahoma | |

A102

## IN THE UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF OKLAHOMA

SUSAN PARISI      )
  Plaintiff,      )
v.          ) Civil Action No.:  CIV-23-115-R
OKLAHOMA WINDOWS  )
AND DOORS, LLC    )
d/b/a RENEWAL BY ANDERSON OF )
OKLAHOMA, and BMO HARRIS ) (Removed from the District Court
BANK, NA d/b/a GREENSKY, LLC, ) of Oklahoma County, State of
  Defendants.    ) Oklahoma, Case No.: CJ-21-1681)

## AMENDED PETITION
## AND MOTION TO CERTIFY A CLASS ACTION

**COMES NOW** the Plaintiff, Susan Parisi ("Ms. Parisi") by and through her counsel of record, M. Kathi Rawls and Minal Gahlot of Rawls Gahlot, PLLC, and for her Petition and Class Action claims states as follows:

## PARTIES

1. Plaintiff, Ms. Parisi is currently a resident of Oklahoma County, State of Oklahoma, and has been for more than six (6) months prior to the filing of this litigation.

2. The class members are Oklahoma consumers who were not provided adequate consumer credit disclosures prior to consummation or liability for the loans originated by Renewal by Anderson of Oklahoma (Andersen) and later sold to Harris/GreenSky.

3. Defendant, BMO Harris Bank, NA is a national lender issuing loans in reliance upon home solicitation sales of consumer goods as that term is defined by 14A O.S. § 2-501, issuing loans in Oklahoma under the name of GreenSky LLC, it may be served through its agents in Georgia.( hereafter "Harris/GreenSky").

4.  Defendant Andersen is a foreign limited liability company and has principal place of business in Oklahoma.  Andersen utilizes home solicitors in its sale and financing of consumer credit sales of goods as defined by 14A O.S. § 2-501.

## JURISDICTION AND VENUE
(Plaintiff hereby incorporates ¶¶ 1-4 above)

5.  This matter is filed against the Defendants in Oklahoma County as it is the residence county of Ms. Parisi and the location of the home solicitation for the sale of replacement windows.

6.  Each Defendant may be served through its registered service agent or head teller and regularly conducts business in the State of Oklahoma.

7.  GreenSky is a BMO Harris Bank N.A. is the actual lender identified in the loan sold by Andersen to Harris/GreenSky.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION
(Plaintiff hereby incorporates ¶¶ 1-7 above)

8.  This class action seeks injunctive and monetary relief to redress an unlawful and deceptive pattern of wrongdoing followed by Defendant, Andersen, in concert with its co-defendant, Harris/GreenSky (jointly Defendants), in its credit extension sale of consumer goods and services in the State of Oklahoma.

9.  Defendants are regularly engaged in the business of making/issuing "consumer loans" in which:

   (a) the debtor is a person other than an organization;

   (b) the debt is incurred primarily for a personal, family or household purpose;

   (c) either the debt is payable in installments or a loan finance charge is made; and

   (d) either the principal does not exceed Fifty Thousand Dollars ($50,000.00).

2

A104

10. In violation of 14A O.S. § 5-203, Defendants regularly issue consumer loans for products and services which fail to comply with Oklahoma Consumer Credit Code (OCCC) accurate disclosure requirements, specifically:

    a) Defendants failed to deliver all material disclosures, prior to consummation, in a form the Class Representative or its members may keep in violation of 14A O.S. § 3-306;

    b) Defendants failed to give the Class Representative or its members the identity of the lender's assignee in violation of 14A O.S. § 3-306 2(a);

    c) Defendants failed to accurately disclose to the Class Representative or its members "the amount financed" or to disclose the amount of credit to which the debtor has use,  or to segregate those amounts from other amounts in violation of 14A O.S. § 3-306 2(b) (i);

    d) Defendants failed to disclose the Class Representative or its members a statement of the debtor's right to obtain, upon a written request, a written itemization of the amount financed, and included spaces for a "yes" and "no" indication to be initialed by the debtor to indicate whether the debtor wants a written itemization of the amount financed.

    e) Defendants failed to provide or respond to Disclosure Requirement (d) above or provide a written itemization of the amount financed in violation of 14A O.S. § 3-306 2(cc) (ii);

        i. the amount that is or will be paid directly to the debtor;

        ii. the amount that is or will be credited to the debtor's account to discharge obligations owed to the lender;

        iii. each amount that is or will be paid to third persons by the lender on the debtor's behalf, together with an identification of or reference to the third person; and

        iv. the total amount of any charges described in the division (cc) of subparagraph (i) of this paragraph.

        v. The sum of the amount financed and the finance charge, which shall be termed the "total of payments".

        vi. (f) The number, amount, and due dates or period of payments scheduled to repay the total of payments.

        vii. (g) Descriptive explanations of the terms "amount financed", "finance charge", "annual percentage rate" and "total of payments", as specified by the Administrator.

A105

    viii.   Any dollar charge or percentage amount which may be imposed by a lender solely on account of a late payment, other than a deferral or extension charge.

    ix.   (j) A statement hereby indicating whether or not the debtor is entitled to a rebate of any finance charge upon refinancing or prepayment in full pursuant to acceleration or otherwise, if the obligation involves a precomputed finance charge. A statement indicating whether or not a penalty will be imposed in those same circumstances if the obligation involves a finance charge computed from time to time by application of a rate to the unpaid principal balance.

    x.   (k) A statement that the debtor should refer to the appropriate contract document for any information such document provides about nonpayment, default, the right to accelerate the maturity of the debt, and prepayment rebates and penalties;

    xi.   The preceding list of disclosure violations by Defendants, as it relates to the loans issued to the Class Representative or its members, are prohibited under 14A O.S. § 3-306 2(aa) through (k).

## CLASS REPRESENTATION ALLEGATIONS
### *Statement of Maintainable Class Claims*

(Plaintiff hereby incorporates ¶¶ 1-11 above)

11. Pursuant to 12 O.S. § 2023, this is a case maintainable on a class-wide basis pursuant to 12 O.S. §§ 2023B.2 and 3, and the Class Representative brings this action on behalf of herself and of a class of all other persons similarly situated, to remedy the ongoing unfair, unlawful, and/or deceptive business practices alleged herein, and seeks redress on behalf of all those persons who have been harmed thereby, more specifically as set out below:

12. Andersen is a "Merchant", approved, trained and contractually engaged in the assignment of loans to Harris/GreenSky as more fully described below.

13. Andersen uses deceptive practices to sell its products, door-to-door, to home owners in Oklahoma pursuant to an extension of credit; the terms of which are not timely and

accurately disclosed to homeowners prior to consummation or prior to incurring

liability thereon.

14. Andersen then immediately assigns its non-compliant, unauthorized credit extensions

to BMO Harris Bank N.A. via its GreenSky Loan Program, who ratifies Andersen's

actions by reporting negatively to consumer reporting agencies, conducting collection

calls, and demanding payments in writing from consumers despite the fraudulent

nature of the loan(s) issuance and the objections stated by said consumers.

15. GreenSky LLC is a loan servicing subsidiary of BMO Harris Bank N. A. with its

principal place of business at 5565 Glenridge Connector, Suite 700, Atlanta, Georgia

30342.

16. BMO Harris conducts business throughout the United States through GreenSky LLC,

its subsidiary administering the GreenSky Program, and engages in accepting

assignment of loan from Assignors, origination and servicing activities related to the

GreenSky Program.

17. Harris/GreenSky therefore engages in offering or providing a "financial product or

service" within the meaning of 12 U.S.C. § 5481(15)(A)(i) and the Oklahoma

Consumer Credit Code 14A O.S. § 3-306 and 2-104.

18. Harris/GreenSky engages in origination activities and services loans offered or

provided for use by consumers primarily for personal, family, or household purposes

within the meaning of 12 U.S.C. § 5481(5)(A) and 14A O.S. § 2-104.

19. Harris/GreenSky are "covered persons" under 12 U.S.C. § 5481(6) and the Oklahoma

Consumer Credit Code.

**<u>Identification of Common Questions of Law or Fact</u>**

(Plaintiff hereby incorporates ¶¶ 1-19 above)

20. Pursuant to 12 O.S. § 2023A.2, there are questions of law and fact common to the Class, which common issues predominate over any issues involving owing individual class members.

21. The factual questions common to the Class Representative and to each class member is that each class member's loan for Andersen windows in Oklahoma were presented, sold and loan originated as described below.

22. Pursuant to 12 O.S. § 2023A.2, the principal legal question common to the Class Representative and to each class member is whether adequate consumer credit disclosures were provided to class members prior to consummation or liability for the loans originated by Andersen and later sold to Harris/GreenSky.

**<u>*Allegations of Typicality*</u>**

(Plaintiff hereby incorporates ¶¶ 1-22 above)

23. Pursuant to 12 O.S. § 2023A.3, the Class Representatives claims are typical of those of the classes it seeks to represent in that the Class Representative was solicited to purchase replacement windows without providing mandatory disclosures of the consumer credit extension loan and as such, the claim of the Class Representative is identical to that of the class members.

**<u>*Definition of Class*</u>**

(Plaintiff hereby incorporates ¶¶ 1-23 above)

24. Pursuant to 12 O.S. § 2023C.3, the class is composed of all Oklahoma consumers who, since one year prior to the filing of this litigation,

a)  Defendants failed to deliver all material disclosures, prior to consummation, in a form the Class Representative or its members may keep in violation of 14A O.S. § 3-306;

b)  Defendants failed to give the Class Representative or its members the identity of the lender's assignee in violation of 14A O.S. § 3-306 2(a);

c)  Defendants failed to accurately disclose to the Class Representative or its members "the amount financed" or to disclose the amount of credit to which the debtor has use,  or to segregate those amounts from other amounts in violation of 14A O.S. § 3-306 2(b) (i);

d)  Defendants failed to disclose the Class Representative or its members a statement of the debtor's right to obtain, upon a written request, a written itemization of the amount financed, and included spaces for a "yes" and "no" indication to be initialed by the debtor to indicate whether the debtor wants a written itemization of the amount financed.

e)  Upon receiving an affirmative indication, the lender shall provide, at the time other disclosures are required to be furnished, a written itemization of the amount financed in violation of 14A O.S. § 3-306 2(cc) (ii);

    xii.  the amount that is or will be paid directly to the debtor;

    xiii.  the amount that is or will be credited to the debtor's account to discharge obligations owed to the lender;

    xiv.  each amount that is or will be paid to third persons by the lender on the debtor's behalf, together with an identification of or reference to the third person; and

    xv.  the total amount of any charges described in the division (cc) of subparagraph (i) of this paragraph.

    xvi.  The sum of the amount financed and the finance charge, which shall be termed the "total of payments".

    xvii.  (f) The number, amount, and due dates or period of payments scheduled to repay the total of payments.

    xviii.  (g) Descriptive explanations of the terms "amount financed", "finance charge", "annual percentage rate" and "total of payments", as specified by the Administrator.

    xix.  Any dollar charge or percentage amount which may be imposed by a lender solely on account of a late payment, other than a deferral or extension charge.

A109

xx.    (j) A statement indicating whether or not the debtor is entitled to a rebate of any finance charge upon refinancing or prepayment in full pursuant to acceleration or otherwise, if the obligation involves a precomputed finance charge. A statement indicating whether or not a penalty will be imposed in those same circumstances if the obligation involves a finance charge computed from time to time by application of a rate to the unpaid principal balance.

xxi.    (k) A statement that the debtor should refer to the appropriate contract document for any information such document provides about nonpayment, default, the right to accelerate the maturity of the debt, and prepayment rebates and penalties;

xxii.    The preceding list of disclosure violations by Defendants, as it relates to the loans issued to the Class Representative or its members, are prohibited under 14A O.S. § 3-306 2(aa) through (k).

### ***Adequacy of Class Representative***

(Plaintiff hereby incorporates ¶¶ 1-24 above)

25. Pursuant to 12 O.S. § 2023A.4, the Class Representative will fairly and adequately protect and represent the interest of each class member.

26. The Class Representative has retained counsel with substantial experience in handling class actions in federal and state court.  See, e.g., Martinez v. FMS Inc., 2008 WL 4010101 (M.D. Fla. 2008); Brown v. SCI Funeral Services, 212 F.R.D. 602 (S.D.Fla.2003); Baez v. Wagner & Hunt, P.A., 442 F.Supp. 2d 1273 (S.D. Fla. 2006); Jansen v. West Palm Nissan, Inc., 2006 WL 1582068 (S.D. Fla. 2006); Tyrell v. Robert Kaye & Associates, P.A., 223 F.R.D. 686 (S.D. Fla. 2004). Further, counsel for the Class Representatives has substantial experience in litigating individual and class actions under the Uniform Commercial Code.  See, e.g., Jackson v. Southern Auto Finance Co., 988 So.2d 721 (Fla. 4th DCA 2008); Muro v. Hermano's Auto

8

Wholesalers, Inc., 514 F.Supp. 2d 1343 (S.D. Fla. 2007); <u>Westlake Financial Services</u>

<u>v. Ray</u>, 923 So.2d 555 (Fla. 4th DCA 2006).

27. The Class Representative has no conflicts of interest which would interfere with their

ability to represent the interests of the class members.

***Appropriateness of Hybrid Class Treatment Under §§ 2023 B.2 and 3***

(Plaintiff hereby incorporates ¶¶ 1-27 above)

28. A class action is superior to other methods for the fair and efficient adjudication of

this controversy. Because the damages suffered by the individual class members may

be relatively small compared to the expense and burden of litigation, it would be

impractical and economically unfeasible for class members to seek redress

individually. The prosecution of separate actions by the individual class members,

even if possible, would create a risk of inconsistent or varying adjudications with

respect to the individual class members against Harris/GreenSky.

29. The Class Representative is represented by counsel competent and experienced in

both consumer protection and class action litigation.

30. Members of the proposed class who have an interest in individually controlling the

prosecution of separate claims against Andersen and Harris/GreenSky will not be

prejudiced by this action.

31. Each member of the proposed class will be identified through discovery from

Harris/GreenSky  and will be notified and given an opportunity to opt out of their

respective class(es).

32. The Class Representative does not presently know the nature and extent of any pending litigation to which a member of the proposed class is a party and in which any question of law or fact controverted in the present action is to be adjudicated. The Class Representative will identify any such pending litigation by

33. This Court is an appropriate forum for the present action in that the Class Representative is, and at all times herein mentioned has been, a resident of this county; the Class Representatives vehicle was purchased and repossessed in this county; and Harris/GreenSky does business in this county, including without limitation providing to residents of this county financing of motor vehicles that are consumer goods.

34. Certification of a class under 12 O.S. § 2023B.2 is appropriate as Harris/GreenSky has acted on grounds generally applicable to the Class with respect to the collection and credit reporting activity by Harris/GreenSky described above, thereby making appropriate equitable relief with respect to the Class as a whole.

35. Unless restrained from such activities, Harris/GreenSky will continue to unlawfully harm the interests of the Class Representative and the class for which no adequate remedy at law exists.

36. Certification of a class under 12 Oklahoma Statutes Annotated § 2023B.3 is also appropriate in that:

37. The questions of law or fact common to the members of the class predominate over any questions affecting an individual class member; and

A112

38. A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

39. The Class Representative requests a certification of a "hybrid" class for monetary damages under 12 Oklahoma Statutes Annotated § 2023B.3 and for equitable relief under 12 Oklahoma Statutes Annotated § 2023B.2. See, Penson v. Terminal Transport Co., Inc., 634 F.2d 989, 994 (5th Cir.1981); Agan v. Katzman & Korr, P.A., 222 F.R.D. 692 (S.D.Fla.2004).

40. There are no difficulties likely to be encountered by the Court in the management of this proposed class action.

41. The Class Representatives counsel is entitled to a reasonable fee from the class members or from a common fund for the handling of this action.

**Harris/GreenSky' s Business Model**
(Plaintiff hereby incorporates ¶¶ 1-41 above)

42. Harris/GreenSky engages in origination and servicing activities on behalf of GreenSky Program banks.

43. Harris/GreenSky uses Merchants to market and intake loan applications from consumers at the point of sale. Most of these Merchants provide home improvement products and services, health care services, or retail products.

44. Andersen is one of those Merchants in the State of Oklahoma.

45. Merchants must apply to participate in the GreenSky Program and if accepted into the GreenSky Program, Harris/GreenSky generally train Merchants, including on how to market and promote the GreenSky Program loans, intake consumers' personal and

financial information, submit loan applications to Harris/GreenSky on behalf of consumers or assist consumers in submitting loan applications directly to Harris/GreenSky.

46. Harris/GreenSky allows most Merchants to submit consumer loan applications online using Harris/GreenSky 's website or mobile applications, or over the phone if the Merchant indicates it has a signed application information form or a signed application from a consumer.

47. Once Harris/GreenSky receives an application, it makes an on-the-spot financing decision by comparing a consumer's application data with the lending criteria of the GreenSky Program banks, using proprietary technology and algorithms. These loans typically range from a few thousand dollars to tens of thousands of dollars.

48. When a consumer or Merchant submits a loan application through Harris/GreenSky 's website or mobile application, the approved loan terms are displayed on the computer or tablet at the conclusion of the application process.

49. Where a Merchant submits a loan application on a consumer's behalf, however, the consumer may view the approved loan terms on the computer or tablet only if the Merchant shares the screen with the consumer.

50. Until at least April 2019, if Harris/GreenSky determined that an applicant qualified for a loan, the loan application process was complete. Harris/GreenSky mailed or emailed loan documentation to consumers, but consumers were not required to sign and return that loan documentation to consummate the loan.

51. Harris/GreenSky also issues consumers a "shopping pass" number, which functions like a credit card (Shopping Pass). Harris/GreenSky treats use of the Shopping Pass, or associated funds, as acceptance of the loan.

52. Harris/GreenSky does not disburse the loan proceeds to the consumer. Rather, to pay for a product or service, a consumer provides the Shopping Pass number to her Merchant or otherwise authorizes a transaction and the Merchant, in turn, uses the Shopping Pass number or other authorization to apply for payment from Harris/GreenSky.

53. Harris/GreenSky then disburses loan proceeds directly to the Merchant.

54. Most of Harris/GreenSky's revenue is earned from fees that Merchants pay to Harris/GreenSky every time they receive payment from the proceeds of a consumer's loan.

55. In some instances, Merchants have misused these Shopping Pass numbers.

56. Merchants sometimes applied for a loan without a consumer's knowledge and entered their own email addresses as the consumer's own on the loan application. Because of this, Harris/GreenSky emailed the consumer's loan documents or Shopping Pass number to the Merchant instead of the consumer.

57. In other instances, Merchants applied for a loan without a consumer's knowledge and entered the consumer's correct mailing address on the application, but because the consumer was unaware of the loan, the consumer ignored the loan documents Harris/GreenSky mailed, thinking they were promotional materials.

58. Consumers sometimes received mailed loan documents–which could take weeks to arrive after a loan application–only after the Merchant had already used the Shopping Pass number without the consumer's knowledge.

**The Specific Facts related to the Class Representative Ms. Parisi**

59. Here, the proposed class representative, Ms. Parisi was interested in Andersen's advertised replacement windows for her home in Oklahoma City, OK.

60. Ms. Parisi met with Russell Kelley (Russell), of Defendant, Andersen, on or around 11/23/2021.

61. Russell indicated Ms. Parisi could purchase the windows with zero money down, zero interest on the loan for two years and zero payments for 24 months after the installation.

62. Ms. Parisi informed Russell she had recently been diagnosed with multiple myeloma and would need the 24 month option due to her health issues and its costs and time related to treatment.

63. Russell and Ms. Parisi discussed the windows she wanted to replace and made choices regarding those windows.

64. Russell indicated that they would install the nine (9) windows on a "split plan"; planning to install five windows now and the rest at another time.

65. Russell showed Ms. Parisi an IPad to evidence that she had been approved for that type loan but the terms of the credit extension contract were not visible, Russell didn't release the IPad and Ms. Parisi was not provided the opportunity to read it.

66. Russell assured Ms. Parisi that she would be emailed a copy of the contract.

14

A116

67. Based upon Russell's statements, Ms. Parisi agreed to the purchase but didn't execute any documents; only the IPad.

68. Russell never mailed her a copy of the contract and Ms. Parisi was not provided any accurate disclosures about the interest she would be paying on the credit extension.

69. On or about December 7, 2021, Ms. Parisi was notified by Defendant Harris/GreenSky that Andersen had received an advance payment of $8,871.50 for the sale of its windows to Ms. Parisi and that her payments would start 6 months after installation of the windows.

70. GreenSky' s letter also informed Ms. Parisi that if she didn't authorize the payment to contact Harris/GreenSky immediately, which Ms. Parisi did.(Exhibit 1, Harris/GreenSky Letter to Parisi)

71. Ms. Parisi immediately contacted Russell with Andersen, who falsely told Ms. Parisi this  had never happened before and he would follow up to find out what happened.

72. Ms. Parisi never heard from Russel again.

73. Ms. Parisi then contacted Harris/GreenSky to inform them she had not authorized the payments, was unaware of their involvement, had not been informed of the interest rate, and had not agreed for payments to start six months after the installation of windows.

74. Ms. Parisi informed Harris/GreenSky she could not agree to such a loan because of the cancer treatment she was undergoing which would not be completed until the end of 2022.

75. Andersen never installed any windows at Ms. Parisi's home.

A117

76. Ms. Parisi disputed that she owed Harris/GreenSky any money on the contract; a fact acknowledged by Harris/GreenSky in writing to Ms. Parisi shortly thereafter.

77. Harris/GreenSky did not notify the credit bureaus to whom it reported Ms. Parisi's loan, that she disputed the alleged debt.

78. Harris/GreenSky ignored Ms. Parisi's request to delete its tradeline, ignored the fact Andersen defrauded her, and ignored her request to provide her a copy of the alleged signed contract.

79. On December 10, 2021, Ms. Parisi again objected to the new loan being reported under her name and credit history.(Exhibit 2, 12/10/21 Parisi  Email to Harris/GreenSky)

80. Harris/GreenSky failed to conduct any written investigation on Ms. Parisi's complaints but instead stated it would "get the plan changed" for her.(Exhibit 3, 12/14/21 email to Ms. Parisi)

81. On 12/17/21, Harris/GreenSky stated, "got the plan changed and to let Harris/GreenSky know when the account was created". (Exhibit 4, 12/17/21 Harris/GreenSky email to Parisi)

82. Remarkably, Harris/GreenSky sent Ms. Parisi a letter stating that she had failed to "participate" in her own complaint and its resolution.(Exhibit 5, Harris/GreenSky letter to Parisi)

83. Harris/GreenSky continued its false reporting on the alleged loan it purchased from Andersen.

A118

84. Ms. Parisi has endured continued stress from Harris/GreenSky's harassment and defamation throughout 2022.

85. Harris/GreenSky's actions herein are a violation of the 7/12/21 CFPB Consent Order entered into by Harris/GreenSky.(CFPB Consent Order)

86. On July 18, 2022, Ms. Parisi sent a formal letter to Harris/GreenSky again reiterating the details of Andersen's fraud and Harris/GreenSky' s participation,  but the communication failed to eliminate Harris/GreenSky' s false reporting to others about her.

87. Harris/GreenSky was then notified that Ms. Parisi had retained undersigned counsel as a result of its actions and all future communications should cease with Ms. Parisi.

88. Harris/GreenSky continued to contact Ms. Parisi after receipt of undersigned counsel and continues to defame her in its credit reporting.

89. Harris/GreenSky has previously stipulated to an Agreed Order finding it violated the Consumer Financial Protection Bureaus' rules when accepting assignment of loans from entities such as Andersen.

90. Harris/GreenSky regularly accepts assignment of loans originated by Andersen even though it is aware that Andersen regularly fails to abide by Oklahoma's Consumer Protection Act or Consumer Protection Act.

91. Andersen regularly extends credit to consumers to facilitate the sale of its windows and is subject to the Oklahoma Consumer Credit Code (OCC) and the Oklahoma Consumer protection Act by failing to provide accurate and timely disclosures of loan terms prior to consummation.

A119

92. Andersen violated the Oklahoma Consumer Credit Code disclosure requirements in its door-to-door sales of replacement windows pursuant to the consumer credit extension in the State of Oklahoma.

93. Andersen, in concert with Harris GreenSky, also committed fraud and forgery when its agent falsely indicated the terms of the window sale credit extension were other than previously advertised, as enumerated above.

94. Harris/GreenSky is liable for the actions taken by Andersen in that it accepted Assignment of the loan without ensuring compliance with multiple state laws.

95. Harris/GreenSky committed its own independent acts of fraud by stating that it would resolve the issue of Andersen's fraud and lack of disclosure of the cost of the credit extension to the Class Representative and its members by continuing to defame them by reporting falsely that credit extensions were valid, in default, or both.

96. Harris/GreenSky continued to harass and bill Ms. Parisi, falsely indicating that she was past due; causing Ms. Parisi unnecessary anguish and emotional distress while undergoing cancer treatment.(Exhibit 6, 10/2/22 Past Due Notice from Harris/GreenSky)

97. Harris/GreenSky ratified and benefited from its Assignor's violations of law when it refused to delete the false and defamatory information it published regarding the Class Representative and its members.

98. Harris/GreenSky failed to conduct a meaningful investigation of Ms. Parisi's dispute following receipt of Ms. Parisi's statements in its regard.

A120

99. Harris/GreenSky has purposefully and intentionally continued to falsely report that Ms. Parisi is in default even after undersigned counsel requested all communications cease.

100. Defendants and its agents are prohibited from destroying, concealing or altering any document, testimony, recording or electronic storage of relevant evidence regarding the claims, defenses or allegations regarding this matter; Defendants are admonished to preserve and protect such evidence.

WHEREFORE, premises stated, Plaintiff, individually and on behalf of all others similarly situated, prays this Court award their actual, consequential, statutory, treble, exemplary and punitive damages, their reasonable attorney fees and costs in this matter, and all other relief that the Court deems just and proper.

Sincerely,

/s/ M. Kathi Rawls
M. Kathi Rawls, OBA #18814
Minal Gahlot, OBA#22145
Rawls Gahlot, PLLC
2404 S. Broadway
Moore, Ok 73160
Phone: 405-912-3225
Email: kathi@rawlsgahlot.com
Email: minal@rawlsgahlot.com

AND

Janet R. Varnell, Admitted Pro Hac Vice
Varnell and Warwick, P.A.
400 N. Ashley Drive, Suite 1900
Tampa, FL 33602
ATTORNEYS FOR PLAINTIFF

**JURY TRIAL DEMANDED**
**ATTORNEY LIEN CLAIMED**

This is to certify that on the August 21, 2023, a true and correct copy of the above and foregoing was submitted electronically through the ECF System to the following:

Derrick T. DeWitt, OBA #18044
Kyle R. Prince, OBA #33040
DEWITT PARUOLO & MEEK
P.O. Box 138800
Oklahoma City, OK  73113
Telephone: (405) 705-3600
Facsimile:  (405) 705-2573
dewitt@46legal.com
kprince@46legal.com

AND

Sean Fleming, Admitted Pro Hac Vice
MACDONALD DEVIN MADDEN KENEFICK & HARRIS, P.C.
12770 Coit Road, Suite 1100
Dallas, TX 75251
(214) 651-3383
sfleming@macdonalddevin.com
***Attorneys for Defendant BMO Harris Bank, d/b/a GreenSky, LLC***

/s/M. Kathi Rawls

A122

**GreenSky**®

000026

12/07/2021

Account Activity Update

Dear SUSAN K PARISI,

For your records, this is an account activity update.

Please note: **No payment is due and no interest will be charged until your project is complete.\***

You can also go to www.greenskyonline.com to access your account online and review your loan documents.

Regards,

BMO HARRIS BANK N.A.
GreenSky® Program

If you did NOT authorize this account or these charges, please contact us at service@greensky.com or **866-936-0602** immediately!

---

\* This is what Complete means: The **purchase window will close on 05/26/2022** or when your merchant submits a final transaction and confirms the job is complete, whichever comes first.

**GreenSky®**

PO BOX 29429 | ATLANTA, GA 30359



T1 P0 **SNGLP 145117-4-7-3 - 26
SUSAN K PARISI

000026
1/2

A124

A125

000026

1/4/22, 11:40 AM
Yahoo Mail - Re: GreenSky case 04386281 [ ref:_00Dd0dh5w._5003o1VuXKY:ref ]
Case 5:23-cv-00115-R Document 36-2 Filed 08/21/23 Page 1 of 1
Appellate Case: 23-6218 Document: 010111062398 Date Filed: 06/07/2024 Page: 132

## Re: GreenSky case 04386281 [ ref:_00Dd0dh5w._5003o1VuXKY:ref ]

From: Customer Solutions (cst@greensky.com)

To: sparisi21@yahoo.com

Date: Friday, December 10, 2021, 01:43 PM CST

Hi Susan,

I am sorry and understand your frustration. I have reached out to the merchant about your concern. Our records shows you signed agreeing to the loan terms. Loan plan 7541, you will not be billed until the project is fully completed. Once completed, you will have 24 months with interest waived and required minimum payment due. Please call me if you have further questions.

Thank you

--------------- Original Message ---------------
**From:** Susan Parisi [sparisi21@yahoo.com]
**Sent:** 12/10/2021 1:29 AM
**To:** cst@greensky.com
**Subject:** Re: GreenSky case 04386281 [ ref:_00Dd0dh5w._5003o1VuXKY:ref ]

You did NOT explain any loan process to me and I do NOT authorize any transaction which I have already stated. I do NOT do well with lies. I have many questions related to this situation. I was told I qualified for a 24 month, NO money down, No Interest, and NO payment situation to begin 24 months after installation, now I am being told I did NOT qualify for that and you have removed that original offer. Well this is to inform you again that I am NOT doing business with you or Renewal by Anderson and IF you sent them money without my consent that is ON you NOT me. I did NOT authorize anything. I will provide you the name of my attorney and they will deal with this. This is a very sketchy situation you have set up with Renewal by Anderson I suggest this gets straightened out quickly. Susan Parisi

On Thursday, December 2, 2021, 07:57:40 AM CST, Customer Solutions <cst@greensky.com> wrote:

Good Morning Susan,

After explaining the loan process, do you authorize this transaction? If you have any questions, please give me a call.

--------------- Original Message ---------------
**From:** Customer Solutions [cst@greensky.com]
**Sent:** 12/1/2021 5:02 PM
**To:** sparisi21@yahoo.com
**Subject:** Re: GreenSky case 04386281 [ ref:_00Dd0dh5w._5003o1VuXKY:ref ]

The account will be charged because it is part of the loan process but based on your loan plan, we will not bill you until the job is completed or purchase window expiration date-05/26/22. So the account is being charged but you are not going to be billed just yet.

--------------- Original Message ---------------
**From:** Susan Parisi [sparisi21@yahoo.com]

A126

1/4/22, 11:42 AM    Yahoo Mail - Re: GreenSky case 04386281 [ ref:_00Dd0dh5w._5003o1VuXKY:ref ]

Case 5:23-cv-00115-R    Document 36-3    Filed 08/21/23    Page 1 of 1
Appellate Case: 23-6218    Document: 010111062398    Date Filed: 06/07/2024    Page: 133

## Re: GreenSky case 04386281 [ ref:_00Dd0dh5w._5003o1VuXKY:ref ]

From:  Customer Solutions (cst@greensky.com)

To:  sparisi21@yahoo.com

Date:  Tuesday, December 14, 2021, 03:21 PM CST

Hey Susan,

I am going to see if I can get the plan change approved. I will call you with an update.

--------------- Original Message ---------------
**From:** Customer Solutions [cst@greensky.com]
**Sent:** 12/10/2021 2:43 PM
**To:** sparisi21@yahoo.com
**Subject:** Re: GreenSky case 04386281 [ ref:_00Dd0dh5w._5003o1VuXKY:ref ]

Hi Susan,

I am sorry and understand your frustration. I have reached out to the merchant about your concern. Our records shows you signed agreeing to the loan terms. Loan plan 7541, you will not be billed until the project is fully completed. Once completed, you will have 24 months with interest waived and required minimum payment due. Please call me if you have further questions.

Thank you

--------------- Original Message ---------------
**From:** Susan Parisi [sparisi21@yahoo.com]
**Sent:** 12/10/2021 1:29 AM
**To:** cst@greensky.com
**Subject:** Re: GreenSky case 04386281 [ ref:_00Dd0dh5w._5003o1VuXKY:ref ]

You did NOT explain any loan process to me and I do NOT authorize any transaction which I have already stated. I do NOT do well with lies. I have many questions related to this situation. I was told I qualified for a 24 month, NO money down, No Interest, and NO payment situation to begin 24 months after installation, now I am being told I did NOT qualify for that and you have removed that original offer. Well this is to inform you again that I am NOT doing business with you or Renewal by Anderson and IF you sent them money without my consent that is ON you NOT me. I did NOT authorize anything.   I will provide you the name of my attorney and they will deal with this. This is a very sketchy situation you have set up with Renewal by Anderson I suggest this gets straightened out quickly.   Susan Parisi

On Thursday, December 2, 2021, 07:57:40 AM CST, Customer Solutions <cst@greensky.com> wrote:

Good Morning Susan,

After explaining the loan process, do you authorize this transaction? If you have any questions, please give me a call.

--------------- Original Message ---------------

A127

## Re: GreenSky case 04386281 [ ref:_00Dd0dh5w._5003o1VuXKY:ref ]

From:  Customer Solutions (cst@greensky.com)

To:    sparisi21@yahoo.com

Date:  Friday, December 17, 2021, 02:55 PM CST

Hi Susan,

I got the plan change approved. I will let you know once the account is created.

--------------- Original Message ---------------
**From:** Customer Solutions [cst@greensky.com]
**Sent:** 12/14/2021 4:21 PM
**To:** sparisi21@yahoo.com
**Subject:** Re: GreenSky case 04386281 [ ref:_00Dd0dh5w._5003o1VuXKY:ref ]

Hey Susan,

I am going to see if I can get the plan change approved. I will call you with an update.

--------------- Original Message ---------------
**From:** Customer Solutions [cst@greensky.com]
**Sent:** 12/10/2021 2:43 PM
**To:** sparisi21@yahoo.com
**Subject:** Re: GreenSky case 04386281 [ ref:_00Dd0dh5w._5003o1VuXKY:ref ]

Hi Susan,

I am sorry and understand your frustration. I have reached out to the merchant about your concern. Our records shows you signed agreeing to the loan terms. Loan plan 7541, you will not be billed until the project is fully completed. Once completed, you will have 24 months with interest waived and required minimum payment due. Please call me if you have further questions.

Thank you

--------------- Original Message ---------------
**From:** Susan Parisi [sparisi21@yahoo.com]
**Sent:** 12/10/2021 1:29 AM
**To:** cst@greensky.com
**Subject:** Re: GreenSky case 04386281 [ ref:_00Dd0dh5w._5003o1VuXKY:ref ]

You did NOT explain any loan process to me and I do NOT authorize any transaction which I have already stated. I do NOT do well with lies. I have many questions related to this situation. I was told I qualified for a 24 month, NO money down, No Interest, and NO payment situation to begin 24 months after installation, now I am being told I did NOT qualify for that and you have removed that original offer. Well this is to inform you again that I am NOT doing business with you or Renewal by Anderson and IF you sent them money without my consent that is ON you NOT me. I did NOT authorize anything.  I will provide you the name of my attorney and they

A128



PO Box 29429
Atlanta, GA 30359

12/27/2021

SUSAN K PARISI

Dear SUSAN,

GreenSky® received your complaint. This matter is important to us, and GreenSky is committed to working with you to resolve your complaint.

In order to address your concerns, we need additional information from you. Our Customer Solutions Advocate has made several efforts to reach you for this additional information, but has been unsuccessful in those attempts.

Because we are unable to resolve your complaint without your participation, we have closed this matter at this time. Upon receipt of the needed information, we will happily reopen your case for further investigation. Please note that your loan and obligations under the loan agreement are still in effect. In order to protect your credit, please continue to make your required payments.

Our goal is to provide excellent customer service, and we are eager to address your concern. To provide the information requested, please contact your Customer Advocate at 855-849-0088 and reference this letter. If your concern has already been addressed and resolved, please let us know.

Sincerely,

GreenSky® Loan Services

2111233004

201802_1_1 Rev

A129

 

**A Goldman Sachs Company**
PO Box 2730
Alpharetta, GA 30023



|ᴵᵐᵘᵗᵉᶥ|ᵗ|||ᵗ|ᵗ||ᵗᵉᵉ|ᵗᵗᵗᵗ|ᵗ|ᵗᵗᵗᵗᵗᵗᵗᵉᵗᵗᵉᵗ||||ᵗᵗᵗᵗ|ᵗᵗ|ᵗᵗ|
T9 P1 162562-4-3-1 - 4849
SUSAN PARISI
004849

Past Due Notice

10/02/2022

Account Number Ending in:
Total Balance: $9,688.50
Past Due Amount: $224.50
Fees: $78.00
Amount Due by 10/20/2022: $449.00
Lender: BMO HARRIS BANK N.A.

Dear SUSAN,

Thank you for being a valued customer. We noticed that you missed your most recent payment on your GreenSky® Program Loan. As a result, your account is now past due. We ask that you pay the Past Due Amount of $224.50 now. The Amount Due by 10/20/2022 includes the Past Due Amount and the current month's payment.

You can make a payment online at www.greenskyonline.com/greensky/guest-portal, by calling 833-981-1372, or mailing your payment to:

Dept #3025, GreenSky® Program
PO Box 2153, Birmingham AL 35287-3025

Please include your payment slip or coupon with your mailed payment or note your account number on your check.

If you have any questions, or would like to notify us of a payment, please contact us toll-free at 833-981-1372 Monday through Thursday 8am-11pm, Friday 8am-10pm, and Saturday 8am-5pm - All Eastern Time.

Sincerely,

BMO HARRIS BANK N.A.
GreenSky® Program
833-981-1372

**THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

**IF YOU HAVE BEEN DISCHARGED FROM LIABILITY ON THIS ACCOUNT BECAUSE OF BANKRUPTCY PROCEEDINGS, OR IF YOU ARE THE SUBJECT OF A PENDING BANKRUPTCY PROCEEDING, THIS LETTER IS MEANT FOR INFORMATION PURPOSES ONLY AND IS NOT INTENDED AS AN ATTEMPT FOR PAYMENT OR TO IMPOSE PERSONAL LIABILITY FOR ANY OBLIGATION.**

**Important Notice for Washington, D.C. Residents:**

**You have the right to request any of the following concerning your debt:**

1. **Documentation of the name of the original creditor as well as the name of the current creditor or owner of your debt;**
2. **Your last account number with the original creditor;**
3. **A copy of the signed contract, signed application, or other documents providing evidence of your liability and its terms;**
4. **The date that your debt was incurred;**
5. **The date of your last payment, if applicable; and,**
6. **An itemized accounting of the amount claimed to be owed including the amount of the principal, the amount of any interest, fees, or charges, and whether the charges were imposed by the original creditor, a debt collector, or a subsequent owner of the debt.**

**You may request the above information by contacting us by phone at 833-981-1372, email at service@greensky.com, or mail at GreenSky® Program, P.O. Box 2730, Alpharetta, GA 30023.**

**NY RESIDENTS:** YOU MAY REQUEST US TO PROVIDE COLLECTION COMMUNICATIONS IN AN ALTERNATIVE, REASONABLY ACCOMODATABLE FORMAT SELECTED BY US BY CALLING 833-909-4064.

©2006-2022 GreenSky, LLC | GreenSky® and GreenSky Patient Solutions® are loan program names for certain consumer credit plans extended by participating lenders to borrowers for the purchase of goods and/or services from participating merchants/providers. Participating lenders are federally insured, federal and state chartered financial institutions providing credit without regard to age, race, color, religion, national origin, gender or familial status. GreenSky® and GreenSky Patient Solutions® are registered trademarks of GreenSky, LLC. GreenSky Servicing, LLC services the loans on behalf of participating lenders. NMLS #1416362. GreenSky, LLC and GreenSky Servicing, LLC are subsidiaries of Goldman Sachs Bank USA. All rights reserved. Loans originated by Goldman Sachs are issued by Goldman Sachs Bank USA, Salt Lake City Branch.

A131

## IN THE UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF OKLAHOMA

**SUSAN PARISI,**

**Plaintiff,**

**v.**

**OKLAHOMA WINDOWS AND DOORS, LLC d/b/a RENEWAL BY ANDERSON OF OKLAHOMA, and BMO HARRIS BANK, NA d/b/a GREENSKY, LLC,**

**Defendant.**

**Case No.: 5:23-cv-00115-R**

---

### PLAINTIFF PARISI'S RESPONSE IN OPPOSITION TO DEFENDANT GREENSKY, LLC'S MOTION TO COMPEL ARBITRATION AS TO ALL CLAIMS ASSERTED BY PLAINTIFF AND TO DISMISS OR STAY CLAIMS OF PLAINTIFF PENDING ARBITRATION

Plaintiff, Lt. Col. Susan Parisi (Ret.) ("Parisi") responds in opposition to Defendant GreenSky, LLC's ("GreenSky") Motion to Compel Arbitration as to All Claims asserted by Plaintiff and to Dismiss or Stay Claims of Plaintiff Pending Arbitration (the "Motion"). [D.E. 17]. Parisi disputes that there is a valid and enforceable arbitration agreement with Defendant GreenSky.

### BACKGROUND AND DISPUTED FACTS

GreenSky failed to prove the existence of an agreement to arbitrate between it and Parisi. Although it is GreenSky's burden to demonstrate mutual assent, GreenSky offers no evidence that Parisi assented to arbitration. If anything, GreenSky's evidence proves the opposite: the purported loan agreement submitted

contains a signature line for the borrower, yet the signature line is blank because it was never presented to Parisi and she never signed it. GreenSky also does not offer any proof of an electronic signature. And while the agreement says it can be accepted through "use" of the loan, Parisi never used the account to purchase windows as evidenced, in part, by the fact that no windows were ever installed on her home. The "use" of the account, if any, was done by GreenSky's merchant, Defendant Oklahoma Windows ("Oklahoma Windows"). GreenSky also does not offer any proof that Parisi received the agreement before the loan's first "use." To the contrary, when Parisi realized that GreenSky was attempting to obligate her on the loan, she objected profusely. [D.E. 36-2].

**A.    CFPB's Consent Order with GreenSky Found that GreenSky Originates Unauthorized Loans**

Parisi did not agree to the contract GreenSky is attempting to enforce against her. *See* Amended Petition, [D.E. 36]; Parisi Declaration (hereafter Parisi Dec.), Ex. 1. That was also the central issue in a Consent Order issued by the Consumer Financial Protection Bureau ("CFPB"), which details GreenSky's scheme to lure consumers into paying on loans they never authorized. [D.E. 19-1, Consent Order, hereafter "CO", attached hereto as Ex. 2, ¶2]. As a result of GreenSky's conduct, the CFPB required the company to refund or cancel up to $9 million in loans for customers harmed by its illegal practices, pay a $2.5 million civil penalty, and implement new procedures to prevent future fraudulent loans. *See* CFPB website, newsroom,         available         at         https://www.consumerfinance.gov/about-

A133

us/newsroom/cfpb-takes-action-against-fintech-company-greensky-for-enabling-merchants-to-secure-loans-for-consumers-without-their-authorization/#:~:text=The%20CFPB%20issued%20a%20consent,to%20prevent%20future%20fraudulent%20loans (last visited August 23, 2023). Specifically, the CFPB found that GreenSky "engaged in origination and servicing activities for loans to consumers that consumers did not authorize." Ex. 2, CO, ¶60. According to the Findings in the Consent Order, GreenSky injured consumers by causing new unauthorized credit lines to appear on their credit profiles; causing some consumers to pay on unauthorized loans to avoid negative credit reporting; and causing consumers to spend time and money attempting to rescind the loans, reverse charges, and remove negative credit reporting. *Id*. The Consent Order states that between 2014 and 2019, GreenSky received over 6,000 complaints from consumers who stated that they did not authorize a loan application submission. *Id*., ¶25.  The Consent Order required GreenSky to rectify its conduct in exchange for resolving its potential liability for violations of the law. *Id*., ¶71. GreenSky's conduct toward Parisi shows that it has not done so.

**B.**     **Parisi Falls Victim to GreenSky's Continuing Scheme**

Parisi fell victim to a sales scam perpetrated by Oklahoma Windows and facilitated by GreenSky. As of today, not a single window has been installed in her home, yet GreenSky insists that she owes money to BMO Harris Bank on loan terms Parisi never accepted. [D.E. 1-3, ¶¶69- 74].  In its Motion, GreenSky essentially argues that Parisi, simply by applying to purchase windows from Oklahoma

A134

Windows under one set of terms (zero money down, zero percent interest, zero payments for 24 months), became obligated under ***any*** loan agreement with any terms that a third-party financial technology company, GreenSky, decided to secretly process on her behalf without her consent.

GreenSky is a financial technology company that allows its merchants – including Oklahoma Windows – to apply, through a proprietary mobile app for point-of-sale loans for consumers. Ex. 2, CO, ¶11. The GreenSky App is used not only to run a formal credit check, but also to apply for a loan and then (without the consumer's knowledge in some cases) use that loan to pay the merchant. Ex. 2, CO, ¶10. GreenSky trains the merchants on how to operate the app and how to originate loans *Id*. Thus, while the consumer is the borrower on the loan, it is the merchant that performs most of the key actions to originate the loan and then to use the loan to pay for the merchant's services. Importantly, the terms of the loan are sent to the borrower at some unspecified future point in time.

GreenSky-serviced loans are typically approved within just minutes of applying through the GreenSky App. Ex. 2, CO, ¶13. So, sometime after the Oklahoma Windows sales person visited Parisi, the app would have generated a "GreenSky Shopping Pass" with a code that is akin to a credit card number. Ex. 2, CO, ¶16; [D.E. 18-3]. According to GreenSky's publicly available training materials for merchants, that shopping pass code and other information are accessible to merchants. Thus, GreenSky controls the entire system that enables merchants to fraudulently create loans and then gives them the ability to begin charging the

consumer's account before ever revealing the terms of the proposed loan. That is precisely what happened here.

### C. Parisi Only Agreed to Apply for the Advertised Loan to Purchase Windows from Oklahoma Windows for Zero Money Down, Zero Interest, Zero Payments for 24 Months

Sometime in late 2021, Parisi received an advertisement from a company offering replacement windows for zero money down, zero interest, and zero payments for 24 months after installation. Parisi Dec., ¶4. A representative from Oklahoma Windows came to her home on November 23, 2021. [D.E. 1-3, ¶60]; Parisi Dec., ¶4. The Oklahoma Windows representative confirmed that just as advertised, Parisi would be able to purchase replacement windows for her home with zero money down, zero interest, and zero payments for 24 months after installation. [D.E. 1-3, ¶¶ 59-61]. Parisi told the salesman that because she had recently been diagnosed with multiple myeloma cancer, she would need the 24-month deferred payment option due to her health issues and the cost and time related to her treatment. [D.E. 1-3, ¶62]. The salesman said that Parisi would need to sign his iPad to authorize a credit review required for her loan application. Parisi Dec., ¶8. Parisi was not informed of her right to review, nor provided with any opportunity to review, a paper copy of the document she was signing; nor was Parisi ever asked to provide consent to conduct transactions by electronic means. Parisi Dec., ¶¶ 11, 12. Parisi was never informed that her signature was to be used to agree to the terms of the loan for which she was applying without any further review. Parisi Dec., ¶13. She was not informed that her signature could mean that she assented to the terms

of any loan with any terms that GreenSky chose to process. *Id.*  Parisi was never provided with any method to learn that that she was agreeing to arbitrate any claims with any party nor that she could be waiving any rights to pursue any claims in a class action. Parisi Dec., ¶ 20.  After she signed the iPad, where she was directed one time, the salesman swiped through several screens.  Parisi Dec., ¶¶15, 16.  Other than a signature line, Parisi was only able to see the box she was asked to check to allow use of her electronic signature.  Parisi Dec., ¶17.  Parisi only intended to apply for a loan that required zero money down, zero interest for 24 months, and zero payments for 24 months after installation, just as she discussed with the Oklahoma Windows representative.  Parisi Dec., ¶21. Thirty minutes after the salesman submitted her application, the Oklahoma Windows representative received a phone call from GreenSky, and placed the call on speakerphone.  Parisi Dec., ¶25. The GreenSky representative congratulated Parisi and told her she was approved for the 2-year loan program with GreenSky.  Parisi Dec., ¶26.  Parisi was not given the opportunity to read the purported contract after the GreenSky representative said that her loan had been approved.  Parisi Dec., ¶28.  Despite a promise from the Oklahoma Windows salesman that he would send a copy of the iPad-signed approved contract via the U.S. Mail, he did not. [D.E. 1-3, ¶¶ 65-68]; Parisi Dec., ¶¶29, 30.

Unbeknownst to Parisi until two weeks ago, the sales representative emailed a copy of the contract to Parisi which went to her spam folder. Parisi Dec., ¶¶31, 32. The emailed document contained a GreenSky Financing Form that identified

Parisi's loan plan as follows: "#3541 – 24-month promotional period. Interest waived if balance paid off before promotional period ends." Parisi Dec., ¶33, Ex. 1. Several pages include Parisi's purported electronic signature but Parisi never consented to such use of her electronic signature. Parisi Dec., ¶34. A page entitled GreenSky financing form was included that was executed with Parisi's purported signature, but upon information and belief, the signature is forged.  Parisi Dec., ¶¶36, 37. Another page includes what appears to be a forged signature as well. Parisi Dec., ¶¶36, 38.

Within a few days of her meeting with the Oklahoma Windows salesman, the salesman called Parisi and told her that he did not know what had happened but she had not qualified for the 2 year no interest no payment loan. Parisi Dec., ¶39.

On or around November 26, 2021, Parisi received a letter from GreenSky notifying her that it had sent a payment for $8,871.50, directly to Oklahoma Windows. Parisi Dec., ¶40; [D.E. 1-3, ¶69].  The GreenSky letter informed Parisi that if she had not authorized the payment to contact them immediately. [D.E. 1-3, ¶70]. Parisi did just that. *Id*.   On November 29, 2021, Parisi emailed GreenSky to state that she was never informed of the $8,871.50 payment that had been issued by GreenSky to Oklahoma Windows and had not authorized it.  Parisi Dec., ¶41. She told GreenSky that she had applied for a two year "nothing down, no interest, no payments" loan and was promised that nothing would be due until two years after the windows were installed. *Id*.

A few days later, Parisi received a mailing from GreenSky. Parisi Dec., ¶42. The mailing indicated that there was a loan agreement identified as loan number of 7541. Parisi Dec., ¶43. The loan agreement attached to GreenSky's Motion to Compel Arbitration is Plan #7541 ("Loan Agreement"). [D.E. 18-3], Ex. 3.[1] The document includes a statement that the loan plan is "a different plan than requested." *Id*. This Loan Agreement required 84 monthly payments that would begin within six months or earlier, terms to which Parisi had never seen and to which she had not agreed:

> Plan 7541. THIS IS A DIFFERENT PLAN THAN REQUESTED. 84 payments. Up to 6 month purchase window. At the earlier of purchase window expiration date or job completion, a 24 month promotional (promo) period begins with minimum monthly payments required followed by 60 amortized payments based on the balance at the end of promo.

A number of calls and emails were exchanged in which Parisi disputed the Loan Agreement and the unauthorized payment to Oklahoma Windows. [D.E. 1-3, ¶¶76-82]. In one such email exchange, a GreenSky representative asked, "[a]fter explaining the loan process, do you authorize this transaction?" [D.E. 1-3, Ex. 2]. Parisi responded,

> You did NOT explain any loan process to me and I do NOT authorize any transaction which I have already stated. I do NOT do well with lies. I have many questions related to this situation. I was told I qualified for a 24 month, NO money down, No Interest, and NO payment situation to begin 24 months after installation, now I am being told I did NOT qualify for that and you have removed that original offer. Well this is to inform you again that I am NOT doing

---

[1] For the Court's convenience, a highlighted copy of Loan Plan 7541, the Loan Agreement attached to GreenSky's Motion, is attached hereto as Ex. 3.

> business with you or Renewal by Anderson and IF you sent them
> money without my consent that is ON you NOT me. I did NOT
> authorize anything. I will provide you the name of my attorney and
> they will deal with this. This is a very sketchy situation you have set
> up with Renewal by Anderson. I suggest this gets straightened out
> quickly.

[D.E. 1-3, Ex. 2].

In response to Parisi's email, the GreenSky representative falsely claimed that "our records shows (sic) you signed agreeing to the loan terms. Loan plan 7541," despite the plain legend on the mailed contract stating that loan plan 7541 was "a different plan than requested" and despite the new terms. [D.E. 1-3, Ex. 2, 3].

No windows were ever installed at Parisi's home. [D.E. 1-3, ¶75]; Parisi Dec., ¶45. Parisi refused to sign the Loan Agreement. Parisi Dec., ¶44. This is why the contract attached to GreenSky's Motion does not include Parisi's signature. Motion, Ex. 2. And despite acknowledging that Parisi disputed authorizing the loan, GreenSky did not inform the credit bureaus of any dispute, ignored her requests for a copy of a signed contract, began billing her for payments and late fees, failed to conduct a written investigation, and then inexplicably closed the matter after stating that she had failed to "participate" in her own complaint and resolution. Parisi Dec., ¶¶45, 46.

## D. GreenSky's Involvement with Oklahoma Windows

GreenSky attempted to obligate Parisi for a loan without her consent by choosing to accept loan applications from Oklahoma Windows and by training

Oklahoma Windows sales representatives on the loan application system. GreenSky did not properly respond to the obvious signs of fraud, Parisi's complaints and objections, nor did it put systems into place that would detect the fraud despite being under a valid Consent Order to do so. To the contrary, it put incentives in place that induced the fraudulent conduct and forgery. First, Parisi's electronic signature from the salesman's IPad was taken without her consent and affixed on several pages of the original loan plan without her review of those pages.  Second, GreenSky created a "Shopping Pass" and allowed that account to be used for an $8,871.00 direct payment to Oklahoma Windows from the unauthorized loan without Parisi's knowledge or consent.

The CFPB Consent Order includes a description of the precise conduct alleged in this complaint on GreenSky's part:

> When a Merchant submits a loan application on a consumer's behalf, [ ] the consumer may view the approved loan terms on the computer or tablet only if the Merchant shares the screen with the consumer.

[Ex. 2, CO ¶14].

> [GreenSky] also issues consumers a "shopping pass" number, which functions like a credit card (Shopping Pass). [GreenSky] treats use of the Shopping Pass, or associated funds, as acceptance of the loan.

[Ex. 2, CO ¶16].

> Consumers sometimes received mailed loan documents [ ] only after the Merchant had already used the Shopping Pass number without the consumer's knowledge.

[Ex. 2, CO ¶ 23].

Parisi never signed the loan plan belatedly offered to her from GreenSky. It is this unsigned Loan Agreement that GreenSky claims is the parties' contract. Now GreenSky seeks to avoid responsibility for its fraudulent, unfair and deceptive conduct, and to avoid her petition to certify a class of consumers who, like Parisi, have been subjected to the very conduct GreenSky agreed to stop when it stipulated to the CFPB Consent Order.

As is clear from the above and Parisi's Complaint, GreenSky's claim that "a Loan Agreement was created that established Plaintiff's contractual agreement with GreenSky" cannot reasonably be considered undisputed.  Whether a loan agreement was created is the central disputed fact of the case.

## STANDARD OF REVIEW

The Supreme Court has consistently emphasized that "arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration*." See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); *Howsam v. Dean Witter Reynolds, Inc*., 537 U.S. 79, 83, 123 S.Ct. 588, 591, 154 L.Ed.2d 491 (2002) (courts will not require a party to submit a controversy to arbitration where it has not been so agreed). "[A]rbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration." *AT&T Techs., Inc. v. Commc'ns Workers of Am*., 475 U.S. 643, 648–49, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (citing *Gateway Coal Co. v. Mine Workers*, 414 U.S. 368, 374, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974)).

When deciding whether the parties have agreed to arbitrate, courts apply ordinary state law principles that govern the formation of contracts. *Kaplan,* 514 U.S at 944; *Walker v. BuildDirect.com Techs., Inc*., 733 F.3d 1001, 1004 (10th Cir. 2013) ("Generally, courts should apply ordinary state-law principles that govern the formation of contracts to determine whether a party has agreed to arbitrate a dispute.") (citation omitted).  Thus, in this case, whether an arbitration agreement exists between Parisi and GreenSky is governed by principles of Oklahoma contract law.

Courts will not impose arbitration upon parties where they have not agreed to arbitrate. See *Morgan v. Sundance, Inc*., ⎯⎯ U.S. ⎯⎯, 142 S. Ct. 1708, 1709, 212 L.Ed.2d 753 (2022) ("The federal policy is about treating arbitration contracts like all others, not about fostering arbitration."); *See also, Okla. Oncology & Hematology P.C. v. U.S. Oncology, Inc*., 2007 OK 12 ¶ 22, 160 P.3d 936 (citing *Volt Info. Sciences Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ*., 489 U.S. 468, 479, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989) (arbitration is a matter of consent, not coercion)).

This Court can decide as a matter of law that Parisi did not consent to the Loan Agreement and therefore never consented to its arbitration clause. *See Quazilbash v. Wells Fargo & Co*., 2010 WL 1643778, *2 (N.D. Ok. April 22, 2010) (denying motion to compel arbitration where defendant failed to meet burden that an agreement to arbitrate existed). See *Harris v. David Stanley Chevrolet, Inc*., 2012 OK 9, ¶ 8, 273 P.3d 877, 878 (holding no evidentiary hearing was required where

arbitration clause did not apply as a matter of law because subsequent contract for insurance was separate contract from car sale contract requiring arbitration). The record is quite clear that Parisi did not agree to the Loan Agreement containing the arbitration clause and thus GreenSky's Motion should be denied.

**ARGUMENT**

### A.      There Is No Presumption in Favor of Arbitration

As the Supreme Court held in *Morgan v. Sundance, supra*, arbitration agreements are contracts just like all other contracts – a court may not devise novel rules to favor arbitration over litigation. *Id*., at 1709. The general presumption in favor of arbitration "disappears when the parties dispute the existence of a valid arbitration agreement." *Dumais v. Am. Golf Corp*., 299 F.3d 1216, 1220 (10th Cir. 2002); *accord Jacks v. CMH Homes, Inc*., 856 F.3d 1301, 1304 (10th Cir. 2017) ("[W]hen the dispute is whether there is a valid and enforceable arbitration agreement in the first place, the presumption of arbitrability falls away.") (Quoting *Riley Mfg. Co. v. Anchor Glass Container Corp*., 157 F.3d 775, 779 (10th Cir. 1998))). "To satisfy itself that such agreement exists, the court must resolve any issue that calls into question the formation ... of the specific arbitration clause that a party seeks to have the court enforce." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297, 130 S.Ct. 2847, 177 L.Ed.2d 567 (2010). "Such issues always include whether the clause was agreed to, and may include when that agreement was formed." *Id*.

In the instant case, there is no presumption that GreenSky should be able to arbitrate Parisi's claim. Parisi and the record before the Court have called into question the very existence of an agreement to arbitrate because Parisi never agreed to the loan agreement. Without a contract, there can be no arbitration agreement.

**B.      Parisi Did Not Agree to the Loan Agreement or its Arbitration Provision, Nor Authorize Use of a Shopping Pass**

Consent to arbitrate is an essential component of an enforceable arbitration agreement. Thus, in order to be sure that the parties have consented to arbitration, the courts will decide whether there is a valid enforceable arbitration agreement, whether the parties are bound by it and whether the parties agreed to submit a particular dispute to arbitration. *Johnson v. Convalescent Ctr. of Grady Cty., LLC*, 341 P.3d 71, 73 (Okla. 2014); *See also* 12 O.S.§1857(B) (If necessary, a court shall decide whether an agreement to arbitrate exists or whether a controversy is subject to an agreement to arbitrate). GreenSky has not proven by a preponderance of the evidence, that Parisi had reasonable notice of an assent to loan terms that include arbitration.

Here, GreenSky employs the very same objectionable conduct that led to a Consent Order from the CFPB – attempting to demonstrate consent to an agreement by Oklahoma Windows' use of a credit account that Parisi did not authorize. The record evidence does not, therefore, establish Parisi's consent to arbitrate. Quite the opposite. GreenSky submits a copy of a loan agreement between a Bank and Parisi that she did not sign. [D.E. 18-3, at p. 12] (listing a signature line and date line for

"Borrower" with no signature or date). This leaves GreenSky to argue that the use of the shopping pass (or loan proceeds) by Oklahoma Windows constitutes assent to the loan terms.[2] GreenSky provides NO evidence that Parisi was on notice of the terms of the loan agreement when that shopping pass was used by Oklahoma Windows. No reasonably prudent consumer could have known that Oklahoma Windows would forge her signature on documents that would trigger acceptance. Parisi should not be compelled into arbitration based on a contract she was never offered, which she never accepted and never signed.

### C.      There Was No Meeting of the Minds

If there is no meeting of the minds there is no contract. *Jacks*, 856 F.3d at 1304 ("To determine whether a party has agreed to arbitrate a dispute, we apply ordinary state-law principles that govern the formation of contracts.") (cleaned up))(Quoting *Walker*, 733 F.3d at 1004. "As every first-year law student knows, 'an agreement or mutual assent is of course essential to a valid contract.'" *Jacks*, 856 F.3d at 1304 (alteration and citation omitted). That mutual consent, "or a meeting of the minds [must be] on all the essential terms of the contract." *South Central Industries v. Kerrtas Marketing, LLC*, 2022 WL 1518935, *2 (W.D. Ok. February 7, 2022) (quoting *Young v. Chappell*, 239 P.3d 476, 479 (Okla. Civ. App. 2010) (cleaned up).

---

[2] GreenSky's only evidence – which is no evidence at all – is an unsourced, unidentifiable ledger listing the shopping pass expenditure. See Motion, Ex. 4. This obviously does not reflect Parisi's authorization of the Shopping Pass's use.

In Oklahoma, mutual assent as an essential element of a valid contract has been a basic rule "even before its admission to the Union." *Jacks*, 856 F. 3d at 1304.") (citing *McCormick v. Bonfils*, 9 Okla. 605, 60 P. 296, 299–300 (1900) ("The gist and meaning of the word 'contract' is that the minds of the parties must meet and agree upon a given proposition.)) A contract is defined by Oklahoma statute as "an agreement to do or not to do a certain thing." *Id*.  (citing Okla. Stat. Ann. tit. 15, § 1.) Simply put, "without an agreement, there is no contract." *Id*.

To form an enforceable contract under Oklahoma law requires an offer, an acceptance, and consideration. *See National Outdoor Adver. Co. v. Kalkhurst*, 418 P.2d 661, 664 (Okla.1966) ("It is an elementary rule of law in this jurisdiction that in order to constitute a contract there must be an offer on the part of one and an acceptance on the part of the other."). Consent must be free, mutual, and communicated. 15 O.S.2001 § 51. Consent is not mutual unless the parties all agree upon the same thing in the same sense. 15 O.S.2001 § 66; *see also, Beck v. Reynolds*, 903 P.2d 317, 319 (Okla. 1995) (cleaned up) ("The consent of the parties must be mutual, and consent is not mutual unless the parties all agree upon the same thing in the same sense.").  Parisi accepted one set of terms and GreenSky tried to provide a contract with another. When Parisi discovered GreenSky's conduct, she immediately objected. Because Parisi and GreenSky did not agree on the same thing in the same sense, there was no mutual consent, and therefore no contract.

An acceptance must be absolute and unqualified; if qualified, it is a new proposal. 15 O.S.2001 § 71. An acceptance will not bind the offeror unless it is

unconditional, identical to the offer, and does not modify, delete or introduce any new terms into the offer. *Ollie v. Rainbolt*, 1983 OK 79, 669 P.2d 275. Thus, a binding contract exists where the parties had a meeting of the minds on all the essential terms. Parisi agreed to an offer for window installation subject to terms of zero money down, zero interest, and zero payments until 24 months after installation. Instead, GreenSky tried to bind her to a contract requiring payments that began within six months of the issuance of a direct payment to Oklahoma Windows that she never authorized. Parisi was offered one set of terms but was provided with an entirely different set of terms which she clearly rejected.

Of course, GreenSky has a documented history of similar efforts to obligate consumers on loans that they never authorized.  The Court need not ignore this very relevant history of the precise conduct at issue in this complaint that is the subject of a federal Consent Order. In any case, GreenSky has the burden of showing that there is a viable contract between the parties, and this it cannot do. *See Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1261 (10th Cir. 2012); *see also Pioneer Supply Co. v. American Meter Co.*, 484 F. Supp. 227, 229 (W.D. Ok 1979) (holding defendant failed to meet burden to stay pending arbitration and proceeding to evidentiary hearing).

The Court must afford Parisi, as the party resisting arbitration, "the benefit of all reasonable doubts and inferences that may arise." *Hancock,* 701 F.3d at 1261. Although GreenSky points to a statement of account allegedly reflecting that the "Shopping Pass" was used, Parisi has denied ever authorizing that use, and when

she learned of it, immediately contested it. Accordingly, there are material questions of fact regarding the formation of the agreement to arbitrate, and more specifically, whether there was ever a meeting of the minds on the essential terms of the agreement. *See Riley Mfg. Co., Inc.*, 157 F. 3d at 780 (citing *First Options*, *supra.*) (Courts will not force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide.).

This Court must resolve the question central to GreenSky's arbitration demand: did Parisi enter into a contract with GreenSky that was "validly formed, is legally enforceable, and is best construed to encompass the dispute." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297, 130 S.Ct. 2847, 2851, 177 L.Ed.2d 567 (2010) (citing *Gibson v. Wal-Mart Stores, Inc.*, 181 F.3d 1163, 1169 (10th Cir.1999) ("Because arbitration is a matter of contract, a party may not be required to arbitrate a dispute unless it has agreed to arbitration of that dispute.") Indeed, Section 4 of the FAA "does not confer a right to compel arbitration of any dispute at any time; it confers only the right to obtain an order directing that *'arbitration proceed in the manner provided for in [the parties'] agreement.'*" *Volt Information Sciences, Inc.*, 489 U.S. at 474-75 (quoting 9 U.S.C. § 4) (emphasis in original).

Here, at a minimum, there are genuine issues of material fact regarding the existence of any agreement. No presumption in favor of arbitration exists. *Dumais v. American Golf Corp.*, 299 F.3d 1216, 1220 (10th Cir.2002) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944–45, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); *Riley Mfg. Co., Inc.*, 157 F.3d at 779 ("[W]hen the dispute is whether there

is a valid and enforceable arbitration agreement in the first place, the presumption of arbitrability falls away.") (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983));

Forcing Parisi to arbitrate her claims would be grossly unjust because she never accepted the terms of the Loan Agreement.  There was no meeting of the minds, and thus no contract formed.  Moreover, given the documented history of the same pattern and practice by GreenSky, it would be unfair to prohibit Parisi from representing a class of others who have had similar experiences with GreenSky attempting to obligate them for loans they did not authorize.

### D.   Oklahoma Windows Failed to Comply with Federal and Oklahoma Electronic Signature Laws

Parisi never assented to the terms of the Loan Agreement.  In addition to the "bait and switch" GreenSky employed to attempt to obligate Parisi to a loan with different terms than the loan for which she applied, there is question of material fact as to whether Parisi ever assented to the terms of the first loan offered by GreenSky. Parisi only provided her electronic signature because she was told it was needed for a check on her creditworthiness as part of an application for a loan – a loan with terms of zero money down, zero interest, zero payments for 24 months. Parisi did not affirmatively consent, as required by law, to having her electronic signature used to agree to loan terms.

The Electronic Signatures in Global and National Commerce Act ("E-Sign Act") requires that where a transaction involves a consumer, like Parisi, the

consumer must affirmatively consent to the use of her electronic signature and have not withdrawn her consent. 15 U.S.C. §7001(c)(1)(A). The E-Sign Act defines an electronic signature as follows: "The term 'electronic signature' means an electronic sound, symbol, or process, attached to or logically associated with a contract or other record and executed or adopted by a person with the ***intent*** to sign the record." (emphasis added). 15 U.S.C. §7006(5). Pursuant to the E-Sign Act, prior to consenting, a consumer must be provided with a clear and conspicuous statement, *inter alia*, of (1) any right or option to have the record provided or made available on paper or in non-electronic form; (2) the right to withdraw the consent to have the record provided in electronic form; and (3) whether the consent applies only to the particular transaction which gave rise to the obligation to provide the electronic signature or to identified categories of records that may be provided or made available during the course of the relationship.  15 U.S.C. §7001(c)(1)(B).

The Uniform Electronic Transactions Act ("UETA") is a model act for adoption by states that encourages the lawful use of electronic documents and records. Oklahoma has adopted its own version of the UETA, the Oklahoma Uniform Electronic Transactions Act ("OUETA"). 12A O.S. § 15-101 *et. seq*. The OUETA includes the same definition of electronic signature as the E-Sign Act: "Electronic signature" means an electronic sound, symbol, or process attached to or logically associated with a record and executed or adopted by a person with the ***intent*** to sign the record. (emphasis added). 12A O.S. §15-102(10). The OUETA requires that electronic signatures are valid "only between parties each of which has

agreed to conduct transactions by electronic means." 12A O.S. §15-105(b).

Whether the parties agree to conduct a transaction by electronic means is determined

from the context and surrounding circumstances, including the parties' conduct." *Id*.

¶ 15-105(b).

Parisi disputes that she was ever asked to provide consent to conduct

transactions by electronic means. She was not provided with a clear and conspicuous

statement that she had the right to receive a copy of what she signed provided on

paper or non-electronic form, the right to withdraw her consent to have the record

provided in electronic form, and most importantly, whether her consent applied to

the credit check and loan application only or whether there were other identified

categories of documents to which her e-signature could be applied. Consequently,

Parisi had no intent to agree to provide her approval to any specific loan terms that

she had yet to review. *See* 15 U.S.C. §7006(5) ("The term 'electronic signature'

means an electronic sound, symbol, or process, attached to or logically associated

with a contract or other record and executed or adopted by a person with the ***intent***

to sign the record.") (emphasis added).  As such, Parisi disputes that she ever validly

assented to the arbitration provision in the first loan plan offered to Parisi.  Certainly,

the same e-signatures used to agree to have credit checked for a loan application

without any notice of further potential use cannot be evidence of an agreement to

arbitrate disputes between the parties.

### E.  Disputed Issues of Fact May Be Resolved After Discovery and a Trial

Under the FAA, if there is a need to resolve material factual disputes as to the formation of an agreement to arbitrate, the court must proceed to a summary trial. *See* 9 U.S.C. § 4. ("If the making of the arbitration agreement ... be in issue, the court shall proceed summarily to the trial thereof.").  The 10th Circuit agrees that "when factual disputes may determine whether the parties agreed to arbitrate, the way to resolve them ... is by proceeding summarily to trial". *See Howard*, 748 F.3d at 984. "When parties dispute the making of an agreement to arbitrate, a jury trial on the existence of the agreement is warranted unless there are no genuine issues of material fact regarding the parties' agreement." *Hardin v. First Cash Fin. Servs., Inc.*, 465 F.3d 470, 475 (10th Cir. 2006) (quoting *Avedon Engineering Inc v. Seatex*, 126 F 3d 1279, 1283 (10th Cir. 1997).

GreenSky cannot meet its burden to show there is an agreement to arbitrate. Parisi denies ever entering into a valid loan agreement with GreenSky. The evidence of an agreement attached to GreenSky's Motion is an unsigned contract and an unidentifiable accounting ledger. Accordingly, this Court can deny GreenSky's Motion as a matter of law. *See Quazilbash*, 2010 WL at *2 (denying motion to compel arbitration where defendant failed to show that there was an agreement to arbitrate and there was genuine issue of fact whether plaintiff entered into account agreement at issue). However, if the Court does not so find, Parisi has the right to demand a jury trial on the disputed facts regarding the existence of a binding agreement. See 9 U.S.C § 4:

> If the making of an arbitration agreement or the failure, neglect or
> refusal to perform the same be an issue, the court shall proceed
> summarily to the trial thereof ... if the jury find that no agreement
> in writing for arbitration was made or that there is no default in
> proceeding thereunder, the proceeding shall be dismissed.

*Id.*

Because Parisi has provided her Declaration supporting the lack of a valid arbitration agreement, and the record reflects that Parisi never accepted the Loan Agreement and never authorized payment to Anderson from the loan, a jury trial on the existence of a valid and enforceable agreement is required if the Court does not deny the Motion.

**F.** **If the Court Finds that Arbitration Is Warranted (It Is Not), The Case Should Be Stayed, Not Dismissed.**

Although arbitration should not be compelled for the reasons set out above, even if this Court were to require arbitration, the matter should be stayed and not dismissed. 9 U.S.C. § 3. This statutory requirement is followed in the Tenth Circuit. *See Fancher v. Westwind Enterprises, Ltd.,* 2018 WL 11411336, *2 (W.D. Ok Aug. 8, 2018) (citing *Williams v. Imhoff*, 203 F.3d 758, 764 (10th Cir. 2000) ("Under the FAA, a court must stay proceedings if satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding.") (quotation marks and citation omitted); *Adair Bus Sales, Inc. v. Blue Bird Corp.*, 25 F.3d 953, 955 (10th Cir. 1994) (indicating, when a district court dismissed a suit and ordered the parties to arbitrate, that "[t]he proper course ... would have been for the district court to grant [the movant's] motion and stay the action pending

A154

arbitration"); *see also, Hill v. Ricoh Ams. Corp., 201*0 U.S. App. LEXIS 7979, *6-7 (10th Cir. Kan. Apr. 19, 2010) ("Section 3 of the Act, 9 U.S.C. § 3, obliges courts to stay litigation on matters that the parties have agreed to arbitrate").

## CONCLUSION

For the reasons stated above, this Court should deny GreenSky's Motion. Parisi never agreed to arbitrate her claims.  The Court should find that, as a matter of law GreenSky has failed to meet its burden to show an agreement to arbitrate.  At a minimum, there is a dispute as to the existence of an agreement to arbitrate between GreenSky and Parisi.  If the Court does not deny GreenSky's Motion as a matter of law, the Court should move summarily to a jury trial as to the existence of a valid and enforceable arbitration agreement.

Respectfully submitted this 24th day of August, 2023.

**Varnell & Warwick, P.A.**

/s/ Janet R. Varnell
Janet R. Varnell, FBN: 0071072
400 N. Ashley Drive, Suite 1900
Tampa, FL  33602
Telephone: (352) 753-8600
jvarnell@vandwlaw.com

/s/ M. Kathi Rawls
M. Kathi Rawls, OBA #18814
Minal Gahlot, OBA # 22145
Rawls Gahlot, PLLC
2404 S. Broadway
Moore, Ok 73160
Phone: 405-912-3225
kathi@rawlsgahlot.com
minal@rawlsgahlot.com

*Attorneys For Plaintiffs*

A155

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on August 24, 2023, I electronically filed the foregoing with the Clerk of the Court through the CM/ECF System, which will send a notice of electronic filing to all counsel of record.

/s/ Janet R. Varnell
Janet R. Varnell

A156

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **SUSAN PARISI** | ) |
| **Plaintiff,** | ) |
| | ) **Civil Action No.: CIV-23-115-R** |
| **v.** | ) |
| **OKLAHOMA WINDOWS** | ) |
| **AND DOORS, LLC d/b/a RENEWAL** | ) **County Case No.: CJ-21-1681** |
| **BY ANDERSEN OF OKLAHOMA,** | ) |
| **and BMO HARRIS  BANK, NA** | ) |
| **d/b/a GREENSKY, LLC,** | ) |
| **Defendants.** | ) |

### Exhibit

### DECLARATION OF SUSAN PARISI

1.  My name is Susan Parisi.  I make this declaration based on my personal knowledge.  I am over the age of 18.

2.  I am a citizen of Oklahoma, County of Oklahoma.

3.  I submit this declaration in support of Plaintiff's Opposition to Defendant BMO Harris Bank, NA d/b/a Greensky, LLC's ("GreenSky") Motion to Compel Arbitration as to All Claims Asserted by Plaintiff.

4.  After receiving advertisements sometime in late 2021 from Oklahoma Windows offering doors and windows upgrades, I met at my home with its agent, Russell Kelley on or about November 23, 2021.

5.  At that time we discussed the number of windows I needed and how long it would take to install them.

6.  I informed Mr. Kelley that I had just received a medical diagnosis of multiple myeloma cancer and that I would be starting chemotherapy soon.

A158

7.      He confirmed that Greensky offered a loan to purchase the windows as advertised - a loan requiring zero money down, zero interest and zero payments for twenty-four months following the installation of the windows.

8.      Mr. Kelley stated I would need to sign a credit application so Oklahoma Windows could review my credit worthiness.

9.      Mr. Kelley came to the kitchen counter in my home and placed an iPad device in front of himself as I stood next to him.

10.     Mr. Kelley informed me that the iPad would be used to secure my signature authorizing a credit review, so I agreed to sign it.

11.     There were no disclosures regarding how the electronic signature would be utilized and no consent was given for its use, other than for the credit review.

12.     I was not informed of a right to review or provided with an opportunity to review a paper copy of the document I signed. I was never asked to provide consent to conduct transactions by electronic means or told that I had the right to withdraw such consent if I had given it.

13.     I was not informed that my signature could be used to agree to the terms of a loan without any further review and I was never informed that my signature could be used on anything other than the credit check and the loan application.

14.     Mr. Kelley seemed like a nice honest man so I had no reason to distrust what he told me.

15.     I signed Mr. Kelley's iPad one time on one signature line.

16.     After I signed it, however, Mr. Kelley then "swiped" the iPad in an upward motion and stated, "he needed some additional signatures to secure the zero interest for two years and no payments for two years" loan program.

17.     When he presented each of the subsequent locations for my signatures on additional screens, I was not able to see what I was signing; the only thing visible on the iPad screen other than a signature line was a box I needed to "check" that permitted my original electronic signature to be affixed on the signature line.

18.     I believe I checked a box to affix my signature approximately twelve (12) times.

19.     I was never presented a hard copy of any contract, or contract terms to review prior to my checking the various "check" boxes appearing on the iPad screen.

20.     I was never told I was agreeing to arbitrate any claims or was waiving any rights. Mr. Kelley never explained that a material term of Oklahoma Window's loan was a restriction on my right to access the court should we have a dispute.

21.     I only ever intended to apply for a loan requiring zero money down, zero interest for 24 months, and zero payments for 24 months after my windows were installed.

22.     Mr. Kelly immediately took the iPad, made a call to someone on his cell phone, and placed that person on speakerphone.

23.     The person on the speakerphone was a woman who identified herself as a representative of Greensky, proceeded to inquire about my personal identification information, and then informed me that she would be calling me back to let me know if I was approved.

24.     After the call was completed, Mr. Kelley went around the exterior of my home with me, indicating which windows could be installed first, and which could wait until later.

25.     Less than 30 minutes later, Mr. Kelley's cell phone rang and it was the Greensky representative, so he placed her on speakerphone again.

26.     Greensky's telephone representative said, "Congratulations!  You have been approved for the 2 year loan program with Greensky!"

27.     After he hung up, Mr. Kelley stated that another team from Oklahoma Windows would be coming to my home to measure the windows again to confirm his measurements.

28.     I was not given any opportunity to read the contract after learning I was approved.

29.     As he began to leave for his automobile, Mr. Kelley stated that he would mail me a copy of the loan contract.

30.     I never received a copy of the contract from Mr. Kelley in the mail.

31.     Unknown to me, Mr. Kelley had emailed a copy of a contract between Oklahoma Windows and myself that went to my "spam" or "junk" folder in my yahoo email account.

32.     I discovered this fact on or about August 14, 2023, when my attorney asked me to review my yahoo email account.

33.     The contract attached to Mr. Kelley's email shows Loan Plan 3541 with a 24-month promotional period and interest waived if the balance is paid off before the promotional period ends.  A true and accurate copy of the Loan Plan 3541 I discovered in my spam email folder is attached hereto as Exhibit 1.

34.     Several of my electronic signatures were affixed without my authorization to pages which I had never seen previously, and which Mr. Kelly never described.

35.     Most of the electronic signatures are the same and show that my "checked" box filled in the electronic signatures on contract pages.

36.     Two of the signatures within the contract are not my electronic signature; I believe those signatures were forged by someone other than myself.

37.     The first forged signature is located on Page 5 of the document emailed to me by Mr. Kelley, identified as the "Greensky Financing Form".

38.     The second forged signature is located on Page 6 of the document emailed to me by Mr. Kelley; identified as the "HOA authorization & Contact Form"

39.     Within a few days of our initial meeting, Mr. Kelley then called me and told me that he didn't know what happened, and that it had never happened before, but that I didn't qualify for the 2 year no interest, no payment loan.

40.     Thereafter, on or around November 26, 2021, I received a letter from GreenSky stating that GreenSky sent a payment for $8,871.50 directly to Oklahoma Windows.

41.     On or around November 29, 2021, I emailed GreenSky at service@greensky.com to tell them that I had never been notified about this payment of $8,871.50 being made and that I had not authorized it. I explained that I applied for a two year "nothing down, no interest, no payments" loan and was promised nothing would be due until two years after windows were installed at my home. A true and correct copy of my email is attached hereto as Exhibit 2.

42.     Within a few days, Greensky mailed me a contract which was the first I had seen of any contract.

43.    Greensky's Contract stated that it was for a loan called Plan 7541, a different loan than I had requested, which required 84 monthly payments that began as soon as the windows were installed but no later than within six months.

44.    I refused to sign the Greensky contract and objected to any release of funds to Oklahoma Windows.

45.    To date, no windows have been installed at my home, but GreenSky continued to bill me for payments and late fees until I filed this lawsuit.

46.    GreenSky ignored my requests for a copy of a signed contract and failed to conduct a written investigation. GreenSky inexplicably closed my complaint after stating that I failed to "participate" in the investigation.

47.    In October of 2022, Greensky informed me that it had cancelled the loan contract.

48.    My credit reports still reflect a balance due to BMO Harris/GreenSky of over $8,000.

FURTHER DECLARENT SAY NOT.

Susan Parisi
Susan Parisi

# EXHIBIT 1



RENEWAL
by ANDERSEN

Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 l Oklahoma City, OK 73149
Phone: 405-608-5000 l Fax: 405-562-7880 l oksales@renewalokiahoma.com



# Thank you for your order

Please find, enclosed for your convenience, the contents of your
agreement with Oklahoma Windows and Doors LLC d/b/a Renewal by
Andersen of Oklahoma

### Table of Contents

Agreement Document and Payment Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Itemized Order Receipt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Notice of Cancellation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Greensky Form Oct 2021.pdf . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Terms and Conditions of Sale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Sales Cost Savings Program (SCSP) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Lead-Safe Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

What to Expect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Disclosure Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Limited Warranty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Lead Safe Work Practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Release Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

Price Presentation Discounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# Agreement Document and Payment Terms



**dba: Renewal by Andersen of Oklahoma**
Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 I Oklahoma City, OK 73149
Phone: 405-608-5000 I Fax: 405-562-7880 I oksales@renewaloklahoma.com

**Susan Parisi**

---

**Susan Parisi**

Buyer(s) Name

**11/23/21**

Contract Date

Buyer(s) Street Address     Primary Telephone Number     Secondary Telephone Number

**sparisi21@yahoo.com**

Primary Email     Secondary Email

Buyer(s) hereby jointly and severally agrees to purchase the products and/or services of Oklahoma Windows and Doors LLC d/b/a Renewal by Andersen of Oklahoma("Contractor"), in accordance with the terms and conditions described in this Agreement Document and Payment Terms, any documents listed in the Table of Contents, and any other document attached to this Agreement Document, the terms of which are all agreed to by the parties and incorporated herein by reference (collectively, this "Agreement"). Buyer(s) hereby agrees to sign a completion certificate after Contractor has completed all work under this Agreement.

---

| | | |
|---|---|---|
| Total Job Amount: | **$17,743** | By signing this Agreement, you acknowledge that the Balance Due, and the Amount Financed must be made by personal check, bank check, credit card, or cash. |
| Deposit Received: | **$0** | |
| Balance Due: | **$17,743** | **Estimated Start:**     **Estimated Completion:** |
| Amount Financed: | **$17,743** | **3-5 months**     **1-2 days** |
| Method of Payment: | **Financing** | We schedule installations based on the date of the signed contract and secondarily on the date in which we complete the technical measurements. The installation date that we are providing at this time is only an estimate. We will communicate an official date and time at a later date. Rain and extreme weather are the most common causes for delay. |

Notes:   **Dates are subject to change due to back orders**

---

Buyer(s) agrees and understands that this Agreement constitutes the entire understandings between the parties and that there are no verbal understandings changing or modifying any of the terms of this Agreement. No alterations to or deviations from this Agreement will be valid without the signed, written consent of both the Buyer(s) and Contractor. Buyer(s) hereby acknowledges that Buyer(s) 1) has read this Agreement, understands the terms of this Agreement, and has received a completed, signed, and dated copy of this Agreement, including the two attached Notices of Cancellation, on the date first written above and 2) was orally informed of Buyer's right to cancel this Agreement.

NOTICE TO BUYER: Do not sign this contract if blank. You are entitled to a copy of the contract at the time you sign.

**YOU, THE BUYER, MAY CANCEL THIS TRANSACTION AT ANY TIME NOT LATER THAN MIDNIGHT OF 11/26/2021 OR THE THIRD BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION, WHICHEVER DATE IS LATER. SEE THE ATTACHED NOTICE OF CANCELLATION FORM FOR AN EXPLANATION OF THIS RIGHT.**

---

| | | |
|---|---|---|
| Signature of Sales Person | Signature | Signature |
| **Russell Kelley** | **Susan Parisi** | |
| Print Name of Sales Person | Print Name | Print Name |

---

# Itemized Order Receipt



**dba: Renewal by Andersen of Oklahoma**
Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 I Oklahoma City, OK 73149
Phone: 405-608-5000 I Fax: 405-562-7880 I oksales@renewaloklahoma.com

**Susan Parisi**



| ID#: | ROOM: | SIZE: | DETAILS: |
|------|-------|-------|----------|
| | | 0 W<br>0 H | **Misc:** Misc, Processing Fee, <Enter Description Here> |
| 107 | dining | 95 W<br>30 H | **Window:** Gliding, Triple, 1:1:1, Base Frame, Exterior Dark Bronze, Interior Dark Bronze, **Glass:** All Sash: High Performance SmartSun Glass, No Pattern, **Hardware:** Dark Bronze, **Screen:** Fiberglass, Full Screen, **Grille Style:** No Grille, **Misc:** None |
| 108 | dining upper | 95 W<br>64 H | **Window:** Picture, Insert Frame, Exterior Dark Bronze, Interior Dark Bronze, **Glass:** All Sash: High Performance SmartSun Glass, No Pattern, Tempered Glass, **Grille Style:** No Grille, **Misc:** None |
| 109 | office lower | 59 W<br>30 H | **Window:** Gliding, Double, 1:1, Active / Passive, Base Frame, Exterior Dark Bronze, Interior Dark Bronze, **Glass:** All Sash: High Performance SmartSun Glass, No Pattern, **Hardware:** Dark Bronze, **Screen:** Fiberglass, Full Screen, **Grille Style:** No Grille, **Misc:** None |
| 110 | office upper | 59 W<br>40 H<br>30 L | **Specialty:** Equal Leg Arch, Base Frame, Exterior Dark Bronze, Interior Dark Bronze, **Glass:** All Sash: High Performance SmartSun Glass, No Pattern, **Grille Style:** No Grille, **Misc:** None |
| 111 | guest room | 35 W<br>59 H | **Window:** Gliding, Double, 1:1, Active / Passive, Base Frame, Exterior Dark Bronze, Interior Dark Bronze, **Glass:** All Sash: High Performance SmartSun Glass, No Pattern, **Hardware:** Dark Bronze, **Screen:** Fiberglass, Full Screen, **Grille Style:** No Grille, **Misc:** None |

**WINDOWS: 4**   **PATIO DOORS: 0**   **SPECIALTY: 1**   **MISC: 1**                 TOTAL **$17,743**



*Renewal by Andersen is committed to our customers' safety by
complying with the rules and lead-safe work practices specified by the EPA.*



# Notice of Cancellation

**dba: Renewal by Andersen of Oklahoma**
Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 I Oklahoma City, OK 73149
Phone: 405-608-5000 I Fax: 405-562-7880 I oksales@renewaloklahoma.com

**Susan Parisi**

---

**You, the buyer(s) may cancel this transaction at any time prior to midnight on 11/26/2021
or the third business day after the date of this transaction, whichever date is later.**

---

NOTICE OF CANCELLATION

Date of Transaction: 11/23/21. You may cancel this
transaction, without any penalty or obligation, before
midnight on 11/26/2021 or the third business day
after the date of this transaction, whichever date is
later. If you cancel, any property traded in, any
payments made by you under the Contract or Sale,
and any negotiable instrument executed by you will be
returned within 10 business days following receipt by
the Seller of your cancellation notice, and any security
interest arising out of the transaction will be canceled.
If you cancel, you must make available to the Seller at
your residence, in substantially as good condition as
when received, any goods delivered to you under this
Contract or Sale; or you may, if you wish, comply with
the instructions of the Seller regarding the return
shipment of the goods at the Sellers expense and risk.
If you do make the goods available to the Seller and
the Seller does not pick them up within 20 days of the
date of your Notice of Cancellation, you may retain or
dispose of the goods without any further obligation. If
you fail to make the goods available to the Seller, or if
you agree to return the goods to the Seller and fail to
do so, then you remain liable for performance of all
obligations under the Contract. To cancel this
transaction, mail or deliver a signed and dated copy of
this cancellation notice or any other written notice, or
send a telegram, to:

**dba: Renewal by Andersen of Oklahoma**

**Legal Name: Oklahoma Windows and Doors LLC**

**9201 Polaris Drive Suite 200**

**Oklahoma City, OK 73149**

**Phone: 405-608-5000**

**Fax: 405-562-7880**

**Email: oksales@renewaloklahoma.com**

NOT LATER THAN MIDNIGHT OF 11/26/2021
OR THE THIRD BUSINESS DAY AFTER THE DATE
OF THIS TRANSACTION, WHICHEVER DATE IS LATER.

I HEREBY CANCEL THIS TRANSACTION

---

Buyer Signature                    Date

---

NOTICE OF CANCELLATION

Date of Transaction: 11/23/21. You may cancel this
transaction, without any penalty or obligation, before
midnight on 11/26/2021 or the third business day
after the date of this transaction, whichever date is
later. If you cancel, any property traded in, any
payments made by you under the Contract or Sale,
and any negotiable instrument executed by you will be
returned within 10 business days following receipt by
the Seller of your cancellation notice, and any security
interest arising out of the transaction will be canceled.
If you cancel, you must make available to the Seller at
your residence, in substantially as good condition as
when received, any goods delivered to you under this
Contract or Sale; or you may, if you wish, comply with
the instructions of the Seller regarding the return
shipment of the goods at the Sellers expense and risk.
If you do make the goods available to the Seller and
the Seller does not pick them up within 20 days of the
date of your Notice of Cancellation, you may retain or
dispose of the goods without any further obligation. If
you fail to make the goods available to the Seller, or if
you agree to return the goods to the Seller and fail to
do so, then you remain liable for performance of all
obligations under the Contract. To cancel this
transaction, mail or deliver a signed and dated copy of
this cancellation notice or any other written notice, or
send a telegram, to:

**dba: Renewal by Andersen of Oklahoma**

**Legal Name: Oklahoma Windows and Doors LLC**

**9201 Polaris Drive Suite 200**

**Oklahoma City, OK 73149**

**Phone: 405-608-5000**

**Fax: 405-562-7880**

**Email: oksales@renewaloklahoma.com**

NOT LATER THAN MIDNIGHT OF 11/26/2021
OR THE THIRD BUSINESS DAY AFTER THE DATE
OF THIS TRANSACTION, WHICHEVER DATE IS LATER.

I HEREBY CANCEL THIS TRANSACTION

---

Buyer Signature                    Date

---





## GreenSky Financing Form

SOLD TO: Susan Parisi                                           DATE: 11/23/2021

CARD HOLDER'S NAME: Susan Parisi                     APPLICATION ID: ███████

Job Address: ████████████████████

PO Box _____            LAST 4 SSN: ███

PLAN #:  3541 - 24 month promotional period. Interest waived if balance paid off before promotional period ends.

Simply visit myloan.greenskycredit.com, enter your Application ID and Access number to download loan agreements.

1.   Total Project Amount   $ 17,743

2.   Deposit (if applicable)   $ 0

3.   Total Greensky Finance Amount   $ 17,743.00

4.   Greensky financed at order (50%)   $ 8,871.50

5.   Greensky financed at completion (50%)   $ 8,871.50

**Name as it appears on card:** Susan Parisi

RbA Rep. Signature: _____        Date: 11/23/2021

Customer Signature: _____Susan Parisi_____        Date: 11/23/2021



**Renewal by Andersen**
WINDOW REPLACEMENT   an Andersen Company

## HOA Authorization & Contact Form

Homeowner Name: _Susan Parisi_

Project Consultant: _Russell Kelley_

Measure Date: _11/23/21_

# of units: _5_

**IS THIS PROJECT LIKE FOR LIKE**
YES: ☑    NO: ☐

| Check only one and sign please |

☑ **NO HOA EXISTS for my project.** Please proceed with placing my order.

Homeowner Signature: _Susan Parisi_        Date: _____

**PROCEED WITH ORDER**
YES: ☑    NO: ☐

---

If project is LIKE FOR LIKE we recommend the following:

☐ **I WILL OBTAIN MY OWN HOA APPROVAL.** I accept all responsibility for my order. Please proceed with placing my order.

Homeowner Signature: _____        Date: _____

---

☐ **Authorization Release for HOA Assistance:** I the undersigned, hereby authorize Renewal by Andersen to act on my behalf in all manners relating to HOA REQUESTS, including signing documents relating to these matters. Any and all acts carried out by Renewal by Andersen on my behalf shall have the same effect as acts of my own. This authorization is valid until further notice. WHEN OPTING FOR ASSISTANCE, PROVIDE CURRENT CONTACT INFORMATION:
You may be contacted if your HOA is one that will not work with us, or has special requirements that are not within our means.

➢ Sub Division HOA (complete name ): _____

➢ Property Management Co: _____

➢ Contact Name (Manager): _____

➢ Telephone: _____

➢ HOA Management Co. Manager's E-mail: _____

**Home Owners Responsibility:** Renewal by Andersen will submit your request; notify RbA when you hear from your HOA with the decision. Your replacements will be ordered at this time. *(Note: Some HOA's will only communicate with the Home Owner.)*

---

Partial Replacement ☐        Entire Home Replacement ☐

**Reps to initial:** *Color same:* ☐    *Style same:* ☐    *Grid pattern same:* ☐

**Notes to HOA for changes needed.**

Please explain all changes not like for like. Please provide a brief description for each side of the home (front, back, left, right). Description for each side of the home to include if L4L, if not L4L what unit # is changing.

Homeowners Signature: _Susan Parisi_        Date: _11/23/21_

A170



# Terms and Conditions of Sale

**dba: Renewal by Andersen of Oklahoma**

Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 I Oklahoma City, OK 73149
Phone: 405-608-5000 | Fax: 405-562-7880 | oksales@renewaloklahoma.com

**Susan Parisi**

"I," "my," and "me" means each person who signs this Agreement as a Buyer. "Contractor" means Oklahoma Windows and Doors, LLC d/b/a Renewal by Andersen of Oklahoma. "We" and "us" mean both the Buyer, or Buyers if more than one, and the Contractor. Oklahoma Windows and Doors, LLC, LLC d/b/a Renewal by Andersen of Oklahoma is an authorized and independent dealer of Renewal by Andersen LLC ("RbA") products. You are entering into a contract with Oklahoma Windows and Doors, LLC, d/b/a Renewal by Andersen of Oklahoma.

Warranties/Intended Use: I understand that in connection with my purchase, RbA is providing me with a written Limited Warranty a copy of which has been furnished to me or is available to me online at www.renewalbyandersen.com and is incorporated by reference. Contractor is providing me with an Extended Limited Lifetime Labor Warranty. I understand that I should carefully read RbA's Limited Warranty and the Contractor's Extended Limited Lifetime Labor Warranty for complete details of my warranty coverages. I understand that neither warranty will be effective or enforced while a balance due remains on this Agreement.

Contractor's Promises: Contractor promises to perform all work in a professional manner and within industry standards. Contractor will remove and transport away from the premises any debris and waste materials that are generated by Contractor. Contractor will obtain all building permits for the work to be performed under this Agreement. Contractor will maintain worker's compensation insurance and liability insurance during the term of this Agreement in amounts not less than those required by applicable law.

My Promises: I promise to Contractor that (a) I will provide Contractor with reasonable access to my property and the area in which the work is to be performed, including access to electrical outlets; (b) I will be responsible for preparation, moving, and reinstalling of any materials, personal property, motor vehicles, or equipment as may be needed for Contractor to perform its work; (c) the walls and surfaces near and upon which the work is to be performed are sound and suitable for the work being performed; (d) when the work is substantially complete, I will pay Contractor the balance due on the Total Job Amount. I understand that "substantially complete" means the work has been materially finished and is functional as intended; (e) in the event that I disagree with Contractor that the work is substantially complete, I agree that I will not withhold more than 10% of the Agreement price; (f) if taxes and/ or permitting fees are necessary to complete the work, I will pay them unless the law requires Contractor to pay them; and (g) Contractor may place an advertising sign of reasonable size in my yard during the installation.

Deposit, Second and Final Payments: Unless otherwise specified in this Agreement, a Deposit of 33% of the Total Job Amount identified on front of this Agreement is required to be made by you upon your acceptance of this Agreement. The second payment is due at the start of installation and final payment is due at the substantial completion of the installation. The checks are made payable to Renewal by Andersen of Oklahoma. You may hand the check to the installer who will then bring the check into the office. If you have financed your project, the instructions provided by the finance institution must be followed. All amounts quoted, exclude all present and future federal, state and local excise, sales/use, privilege, personal property, gross receipts, and similar taxes and charges payable with respect to the products and services under this Agreement.

Measurements: I understand that all dimensions referred to in this Agreement are considered estimated measurements and used only for the purpose of arriving at the Total Job Amount in this Agreement. I understand that the actual measurements will be determined during a follow up visit by a qualified measurement technician employed by Contractor. I understand that if Contractor must make changes to the estimated measurements, I agree to sign an addendum to this Agreement.

| | | |
|---|---|---|
| Signature of Sales Person | Signature | Signature |
| **Russell Kelley** | **Susan Parisi** | |
| Print Name of Sales Person | Print Name | Print Name |

A171



# Terms and Conditions of Sale

**dba: Renewal by Andersen of Oklahoma**
Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 I Oklahoma City, OK 73149
Phone: 405-608-5000 I Fax: 405-562-7880 I oksales@renewalokalahoma.com

**Susan Parisi**

**Late Cancellation:** I understand that I have three business days to cancel this Agreement, as described in the Notice of Cancellation. I understand that if I want to cancel this Agreement after those three business days, Contractor does not have to allow me to do so. I understand that if Contractor does permit me cancel after those three business days, however, I will have to pay to Contractor a late cancellation fee equal to 25% of the Total Job Amount to compensate Contractor for its labor, administrative, and material costs.

**Delay/Unknown Conditions:** I understand that if Contractor determines that it cannot perform the work according to Contractor's normal professional standards, then Contractor can cancel this Agreement, notify me in writing of the cancellation, and return to me all deposits I have paid. I understand that some of the things that could cause Contractor to cancel this Agreement would be incorrect pricing, unforeseen structural defects, or unknown pre-existing conditions to my property. I understand that Contractor is not responsible for structural or other defects in my home , and that Contractor's products do not cure those types of problems. I also understand that the work could be delayed by events that Contractor does not control, and that is acceptable to me. Some of the things that could cause the work to be delayed would be acts of God, pandemics, labor strikes, inclement weather, material shortages, my inability to qualify for or obtain financing, delays by local government authorities in issuing or otherwise approving inspections, permitting, or other required authorizations for the work.  In  no event will Contractor be liable for any damage, consequential or otherwise, arising from  delayed performance.

**Late Payment/Default:** I agree that if I do not pay Contractor all or any portion of the money owed when it is due, I will pay a late fee of 1.5% of the amount owed for each month the money is owed and not paid. I also agree that if I default on my promises under this Agreement, and Contractor hires an attorney to enforce this Agreement, to the extent permitted by law, I will pay Contractor its reasonable legal fees and related costs or expenses. I agree and understand that in the event that I do not pay Contractor all or any portion of the money owed when it is due, Contractor may have a claim against me, which may be enforced against my home in accordance with the applicable lien laws. I also understand that if I finance the work with Contractor or a third party, my separately provided financing documents may include a security interest in my home. I understand that I should read those documents closely.

**Informal Dispute Resolution and Mediation:** Before submitting a claim to mediation and arbitration as described below, the Buyer agrees to present the Contractor with written notice of any construction defects and allow the Contractor within thirty (30) days (1) to inspect any construction defects and (2) present to the Buyer a written response which may include Contractor's offer to repair defects or to compensate Buyer for such defects. Before submitting a claim to mediation and arbitration as described below, the Contractor agrees to present the Buyer with written notice regarding any payment disputes and similarly allow the Buyer to respond in writing within thirty (30) days.

If that process does not resolve the dispute, the complaining party must submit all claims to mediation within 10 days following notice of the claim to the other party. The mediation shall take place at offices of the American Arbitration Association (AAA) in the state where the work is to be performed; if there is no such office, the mediation will take place at a location designated by the mediator within the state where the work is to be performed.  Each party will identify a person with decision-making authority who shall attend the mediation. The mediation will be nonbinding and conducted by the AAA in accordance with its then-current Construction Industry Mediation Procedures. The parties shall equally share the cost of the mediation. The parties agree that any action or claim or request for an injunction shall not be subject to mediation.

**Arbitration:** Buyer and Contractor agree that any dispute between them, or any of their respective affiliates, officers, directors, employees, agents or owners arising under or in connection with this Agreement, or the products and services to be provided by Contractor, that has been not resolved through mediation, will be determined by binding arbitration administered by the AAA pursuant to its then-current

| | | |
|---|---|---|
| _(signature)_ | _Susan Parisi_ | |
| Signature of Sales Person | Signature | Signature |
| **Russell Kelley** | **Susan Parisi** | |
| Print Name of Sales Person | Print Name | Print Name |



**Terms and Conditions of Sale**

**dba: Renewal by Andersen of Oklahoma**
Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 I Oklahoma City, OK 73149
Phone: 405-608-5000 I Fax: 405-562-7880 I oksales@renewaloklahoma.com

Susan Parisi

Construction Industry Fast Track Procedures. The arbitration shall take place at offices of the AAA in the state where the work is to be performed; if there is no such office, the arbitration will take place at a location designated by the arbitrator within the state where the work is to be performed. The arbitration shall be heard by one (1) arbitrator who has at least ten (10) years of experience in the construction industry. The arbitrator must follow the law of the state where the work is being performed and not disregard the terms of this Agreement.

The arbitration must be conducted on an individual basis. Neither of the parties nor the arbitrator will have any authority or power to proceed with any claim as a class action or otherwise to join or consolidate any claim with any other claims or any other proceeding involving third parties. In the event a court determines that this limitation on joinder or class action claims is unenforceable, then this entire commitment to arbitrate will become null and void and the parties must submit all claims to the jurisdiction of the courts. The parties agree that any action or claim or request for an injunction shall not be subject to arbitration.

A judgment may be entered upon the arbitration award by any state or federal court in the state where the Buyer resides. The decision of the arbitrator will be final and binding on all parties to the dispute. However, the arbitrator may not under any circumstances stay the effectiveness of any award, assess punitive, multiple or exemplary damages, or make any award which extends, modifies or suspends any lawful term of this Agreement.

Interpretation of this Agreement: I agree that this Agreement will be interpreted and enforced under the laws of the state where the work is to be performed. If any part of this Agreement is determined to be invalid or illegal, then I agree that the rest of this Agreement will still be valid and enforceable. We both understand that this Agreement and any attachments hereto, make up the entire understanding between us about the work of Contractor. There are no oral or other written agreements, promises, statements, or representations on which either of us is relying. We both agree that any change to this Agreement must be in writing and signed by both of us. The paragraph headings contained in this Agreement are for convenience only and will not affect the meaning or interpretation of this Agreement.

Condensation and Environmental Conditions: Condensation, which can form on or within walls, siding, tiles, or other surfaces results from pre-existing conditions in a home and internal or external temperatures. Reducing the humidity in a home will often remedy any condensation problems. I agree that Contractor is not responsible for condensation or existing or developing spore or mold growth, which can be the result of condensation.

By signing below, Buyer and Contractor hereby agree to the Terms and Conditions of Sale of this Agreement.

| | | |
|---|---|---|
| _Signature of Sales Person_ | _Susan Parisi_ (signature) | |
| Signature of Sales Person | Signature | Signature |
| **Russell Kelley** | **Susan Parisi** | |
| Print Name of Sales Person | Print Name | Print Name |



## Sales Cost Savings Program (SCSP)

**dba: Renewal by Andersen of Oklahoma**
Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 I Oklahoma City, OK 73149
Phone: 405-608-5000 I Fax: 405-562-7880 I oksales@renewaloklahoma.com



Susan Parisi

To: All Sales Personnel

Date: 1/1/2020

From: Matthew Esler, Manager, Renewal by Andersen of Oklahoma

Re: Sales Cost Savings Program (SCSP)

At Renewal by Andersen of Oklahoma, we are always looking for ways to increase value, and we've found a way to lower costs to our customers. The majority of customers that we see love Renewal by Andersen products and are comfortable enough to award us the project on the initial visit. For a variety of reasons, some customers feel they need time to think it over for a day or two before placing the order. This requires a second visit.

We are happy to visit our customers as many times at it takes to earn their business.

However, when the consumer makes a buying decision on the first visit, the sales cost of additional visits is saved and we are happy to pass that savings on to our customers.

Please keep in mind, the savings are only realized during the initial visit.

Best Regards,
Matthew Esler

Manager
Renewal by Andersen of Oklahoma

| | | |
|---|---|---|
| Signature of Sales Person | Signature | Signature |
| **Russell Kelley** | **Susan Parisi** | |
| Print Name of Sales Person | Print Name | Print Name |



## Lead-Safe Form

**dba: Renewal by Andersen of Oklahoma**
Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 I Oklahoma City, OK 73149
Phone: 405-608-5000 I Fax: 405-562-7880 I oksales@renewaloklahoma.com

Susan Parisi

Lead Safe Work Pamphlet Receipt and Lead Testing Permission Form

Pamphlet Receipt

I have received a copy of the EPA The Lead Safe Certified Guide to Renovate Right informing me of the potential risks of lead hazard exposure from renovation activity to be performed in my home. I received this pamphlet before the work began.

Permission to Test

I confirm that if my home was built before 1978, I understand and give permission to have my home tested for lead paint at time the Installation Manager comes to my home to take final measurements. I understand that the if the test does show the presence of lead paint, the firm performing the renovation will be required to use the lead-safe work practices required by EPA's Lead-Based Paint Renovation, Repair, and Painting Rule. I also understand that there is no added charge to me for using these lead safe work practices.

By signing below, Buyer and Contractor hereby agree to the terms and conditions above.

_____
Signature of Sales Person

**Russell Kelley**

Print Name of Sales Person

_Susan Parisi_
_____
Signature

**Susan Parisi**

Print Name

_____
Signature

_____
Print Name

UPDATED: 11/23/21

Page 11 / 30

A175



**What to Expect**

**dba: Renewal by Andersen of Oklahoma**
Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 I Oklahoma City, OK 73149
Phone: 405-608-5000 I Fax: 405-562-7880 I oksales@renewaloklahoma.com

Susan Parisi

## OPENING YOUR HOME FOR SITE INSPECTION

You are required to be present during your Site Inspection in order to open your home and review your contract specifications the Installation Manager we assign to the project. The Installation Manager will measure the opening for each purchased unit and determine the amount of time required for your installation.

## PRE-INSTALLATION

Once your window and/or door units have a scheduled arrival date from the RbA manufacturing facility, we will confirm the tentative installation date with you. Please keep in mind that this installation date may need to change. Variables, such as rain and extreme weather are the most common reasons for a change in installation date. We appreciate your understanding and flexibility in advance. We will give you a reminder call or text message one day prior to the scheduled installation date.

## INSTALLATION DAY

The installation crew will arrive at your home after picking up all the required installation materials from our warehouse. Due to variables in travel distance and possible morning traffic, arrival times will vary, but typically the crew will arrive between 8am and 10am unless you are scheduled for an afternoon installation. At the end of the project the lead installer will perform a final walk-through and issue any applicable final documentation.

## POSSIBLE GLASS LOSS

Buyer has been made aware of the possible glass loss that is inherent with the installation of replacement windows.

## PAINTING AND STAINING

Any painting, staining, or wallpapering which may be needed is not included in this agreement unless specifically noted.

## FURNITURE AND DECORATIONS

We ask that you remove any furniture that may block access to the windows or door openings. We ask that you remove the pictures from the walls being worked on and any decorations that are in the work area before work begins. This will greatly reduce the likelihood of any accidental damage to personal property.

## WINDOW COVERINGS

Please remove all blinds, shades or shutters before we arrive. We also assume no liability for any new blinds or shutters; that includes fit, measuring and installation. All of these processes should be handled by a professional window treatment company.

## AIR CONDITIONING UNITS

Buyer is responsible for the removal and re-installation of any AC units and brackets.

## ALARM SYSTEMS

Buyer is responsible for the removal and reinstallation of existing alarm systems. PLEASE CONTACT YOUR ALARM SYSTEM PROVIDER FOR DETAILS.

| | | |
|---|---|---|
| _(signature)_ | _Susan Parisi (signature)_ | |
| Signature of Sales Person | Signature | Signature |
| **Russell Kelley** | **Susan Parisi** | |
| Print Name of Sales Person | Print Name | Print Name |



## What to Expect

**dba: Renewal by Andersen of Oklahoma**
Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 I Oklahoma City, OK 73149
Phone: 405-608-5000 I Fax: 405-562-7880 I oksales@renewaloklahoma.com

**Susan Parisi**

PETS

Because not all pets react favorably to the excitement of the construction process, we ask that you keep all of your pets confined during the time we are working on your home. This should keep them from becoming stressed, accidentally escaping or possible injury.

WHAT IS INCLUDED

Contractor will insulate, caulk and seal the windows we install with our 3-point system to prevent water and air infiltration.

Contractor will clean up all job debris including the old windows and vacuum on a nightly basis.

The RbA Limited Warranty and the Extended Limited Lifetime Labor Warranty will be in effect upon completion of the project and payment in full.

Building Permit: The fee for any and all required building permits is to be paid by the customer to Contractor). Contractor will secure any and all required building permits. After installation is complete, you are required close out the building permit with the issuing municipality.

| | | |
|---|---|---|
| _Signature of Sales Person_ | _Signature_ | _Signature_ |
| **Russell Kelley** | **Susan Parisi** | |
| Print Name of Sales Person | Print Name | Print Name |



## Disclosure Statement

**RENEWAL by ANDERSEN**
FULL SERVICE WINDOW & DOOR REPLACEMENT

dba: Renewal by Andersen of Oklahoma
Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 I Oklahoma City, OK 73149
Phone: 405-608-5000 | Fax: 405-562-7880 | oksales@renewaloklahoma.com

Susan Parisi

KNOW YOUR RIGHTS AND RESPONSIBILITIES UNDER THE LAW. You are about to enter into a transaction to build a new home or remodel existing property. State law requires your contractor to provide you with this brief overview of some of your rights, responsibilities, and risks in this transaction.

CONVEYANCE TO CONTRACTOR PROHIBITED. Your contractor may not require you to convey your real property to your contractor as a condition to the agreement for the construction of improvements on your property.

KNOW YOUR CONTRACTOR. Before you enter into your agreement for the construction of improvements to your real property, make sure that you have investigated your contractor. Obtain and verify references from other people who have used the contractor for the type and size of construction project on your property.

GET IT IN WRITING. Make sure that you have a written agreement with your contractor that includes: (1) a description of the work the contractor is to preform; (2) the required or estimated time for completion of the work; (3) the cost of the work or how the cost will be determined; and (4) the procedure and method of payment, including provisions for statutory retainage and conditions for final payment. If your contractor made a promise, warranty, or representation to you concerning the work the contractor is to perform, make sure that promise, warranty, or representation is specified in the written agreement. An oral promise that is not included in the agreement may not be enforceable under state law.

READ BEFORE YOU SIGN. Do not sign any document before you have read and understood it. NEVER SIGN A DOCUMENT THAT INCLUDEDS AN UNTRUE STATEMENT. Take your time in reviewing documents. If you borrow money from a lender to pay for the improvements, you are entitled to have the loan closing documents furnished to you for review at least one business day before the closing. Do not waive this requirement unless a bona fide emergency or another good cause exists, and make sure you understand the documents before you sign them. If you fail to comply with the terms of the documents, you could lose your property. You are entitled to have your own attorney review any documents. If you have any question about the meaning of a document, consult an attorney.

GET A LIST OF SUBCONTRACTORS AND SUPPLIERS. Before construction commences, your contractor is required to provide you with a list of the subcontractors and suppliers the contractor intends to use on your project. Your contractor is required to supply updated information on any subcontractors and suppliers added after the list was provided.

MONITOR THE WORK. Lenders and governmental authorities may inspect the work in progress from time to time for their own purposes. These inspections are not intended as quality control inspections. Quality control is a matter for you and your contractor. To ensure that your home is being constructed in accordance with your wished and specifications, you should inspect the work yourself or have your own independent inspector review the work in progress.

MONITOR PAYMENTS. If you use a lender, your lender is required to provide you with a periodic statement showing the money disbursed by the lender form the proceeds of your loan. Your contractor is also required to furnish you with a statement at least once each month of money disbursed to subcontractors and suppliers for this project. Review these statements and make sure that the money is being properly disbursed.

CLAIMS BY SUBCONTRACTORS AND SUPPLIERS. Under state law, if a subcontractor or supplier who furnishes labor or materials

| | | |
|---|---|---|
| _(signature)_ | _Susan Parisi_ | |
| Signature of Sales Person | Signature | Signature |
| **Russell Kelley** | **Susan Parisi** | |
| Print Name of Sales Person | Print Name | Print Name |



## Disclosure Statement

**dba: Renewal by Andersen of Oklahoma**
Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 | Oklahoma City, OK 73149
Phone: 405-608-5000 | Fax: 405-562-7880 | oksales@renewaloklahoma.com

**Susan Parisi**

for the construction of improvements on your property is not paid, you may become liable and your property may be subject to a lien for the unpaid amount, even if you have not contracted directly with the subcontractor or supplier. To avoid liability, you should take the following actions:

(1) If you receive a written notice from a subcontractor or supplier, you should withhold payment from your contractor for the amount of the claim stated in the notice until the dispute between your contractor and the subcontractor or supplier is resolved. If your lender is disbursing money directly to your contractor, you should immediately provide a copy of the notice to your lender and instruct the lender to withhold payment in the amount of the claim stated in the notice. If you continue to pay the contractor after receiving the written notice without withholding the amount of the claim, you may be liable and your property may be subject to a lien for the amount you failed to withhold.

(2) During construction and for 30 days after final completion, termination, or abandonment of the contract by the contractor, you should withhold or cause your lender to withhold 10 percent of the amount of payments made for the work performed by your contractor. This is sometimes referred to as "statutory retainage." If you fail to withhold the 10 percent for at least 30 days after final completion, termination, or abandonment of the contract by the contractor and if a valid claim in timely made by a claimant, you may be personally liable and your property may be subject to a lien up to the amount that you failed to withhold.

If the claim is not paid within a certain time period, the claimant is required to file a mechanic's lien affidavit in the real property records in the county where the property is located. A mechanic's lien affidavit is not a lien on your property, but the filing of the affidavit could result in a court imposing lien on your property if the clamant is successful in litigation to enforce the lien claim.

SOME CLAIMS MAY NOT BE VALID. When you receive a written notice of a claim or when a mechanic's lien affidavit is filed on your property, you should know your legal rights and responsibilities regarding the claim. Not all claims are valid. A notice of a claim by a subcontractor or supplier is required to be sent, and the mechanic's lien affidavit is required to be filed, within strict time periods. The notice and the affidavit must contain certain information. All Claimants may not fully comply with the legal requirements to collect on a claim. If you have paid the contractor in full before receiving a notice of a claim and have fully complied with the law regarding statutory retainage, you may not be liable for that claim. Accordingly, you should consult your attorney when you receive a written notice of a claim to determine the true extent of your liability or potential liability for that claim.

OBTAIN A LIEN RELEASE AND A BILLS-PAID AFFIDAVIT. When you receive a notice of a claim, do not release withheld funds without obtaining a signed and notarized release of lien and claim from the claimant. You can also reduce the risk of having a claim filed by a subcontractor or supplier by requiring as a condition of each payment made by you or your lender that your contractor furnish you with an affidavit stating that all bills have been paid. Under state law, on final completion of the work and before final payment, the contractor is required to furnish you with an affidavit stating that all bills have been paid. If the contractor discloses any unpaid bill in the affidavit, you should withhold payment in the amount of the unpaid bill until you receive a waiver of lien or release from that subcontractor or supplier.

OBTAIN TITLE INSURANCE PROTECTION. You may be able to obtain a title insurance policy to insure that the title to your property and the existing improvements on your property are free from liens claimed by subcontractors and suppliers. If your policy is issued before the improvements are completed and covers the value of the improvements to be completed, you should obtain, on the completion of the improvements and as a condition of your final payment, a "completion of improvements" policy endorsement. This endorsement will

| _____ | _Susan Parisi_ | _____ |
|---|---|---|
| Signature of Sales Person | Signature | Signature |
| **Russell Kelley** | **Susan Parisi** | |
| Print Name of Sales Person | Print Name | Print Name |



## Disclosure Statement

**dba: Renewal by Andersen of Oklahoma**
Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 | Oklahoma City, OK 73149
Phone: 405-608-5000 | Fax: 405-562-7880 | oksales@renewaloklahoma.com

**Susan Parisi**

protect your property from liens claimed by subcontractors and suppliers that may arise from the date the original title policy is issued to the date of the endorsement.

| | | |
|---|---|---|
| *Signature of Sales Person* | *Signature* | *Signature* |
| **Russell Kelley** | **Susan Parisi** | |
| Print Name of Sales Person | Print Name | Print Name |

**Renewal by Andersen® Products and Installation Transferable Limited Warranty**

UNITS INSTALLED AFTER MAY 1, 2016

*Your Renewal by Andersen® products are warranted under a fully transferable limited warranty covering parts, labor and original installation services.*

### Transferable Limited Warranty on Glass

The glass in Renewal by Andersen® factory glazed windows (including high-performance Low-E4® glass, high-performance Low-E4® Sun glass, high-performance Low-E4® SmartSun™ glass, high-performance SmartSun glass with HeatLock® technology, patterned glass [including obscure, fern, reed and cascade designs]), Finelight™ grilles, divided light grilles and tempered versions of these glass options is warranted to be free from defects in manufacturing, materials and workmanship for twenty (20) years from the original installation date. It is also warranted not to develop, under normal conditions, any material change in appearance resulting from manufacturing defects or as a result of premature failure of the glass or organic seal for twenty (20) years from the original installation date. This limited warranty on glass does not apply to special order glazings, art glass, insulated art glass, impact-resistant glass or glass that is not factory installed by Renewal by Andersen.

In the event a glass failure occurs as a result of a defect in manufacturing, materials or workmanship within the limited warranty period, Renewal by Andersen, at its option, will: [1] provide and install the appropriate replacement glass product or [2] provide a factory-authorized repair to the existing glass. Such replacement or repair is warranted for the remainder of the original limited warranty period.

### Transferable Limited Warranty on Fibrex® Material Components

The Fibrex® material components of your Renewal by Andersen windows (including frame, sash, and exterior grilles) are warranted not to flake, rust, blister, peel, crack, pit or corrode and be free from defects in manufacturing, materials and workmanship for a period of twenty (20) years from the original installation date.

In the event a Fibrex material component fails as a result of a defect in manufacturing, materials or workmanship within the limited warranty period, Renewal by Andersen, at its option, will: [1] provide and install the appropriate replacement parts or [2] provide a factory-authorized repair to the existing product. Such replacement or repair is warranted for the remainder of the original limited warranty period.

### Transferable Limited Warranty on Components Other Than Glass

The non-glass portions of your Renewal by Andersen windows (including non-electric operators, locks, lifts, balance systems, hinges, handles, insect screens, weatherstripping, sash and frame members) are warranted to be free from defects in manufacturing, materials and workmanship for a period of ten (10) years from the original installation date.

In the event a component other than glass fails as a result of a defect in manufacturing, materials or workmanship within the limited warranty period, Renewal by Andersen, at its option, will: [1] provide and install the appropriate replacement parts or [2] provide a factory-authorized repair to the existing product. Such replacement or repair is warranted for the remainder of the original limited warranty period.

### Transferable Limited Warranty on Exterior Color Finish

The color finish on the Fibrex® material exterior components (frame, sash, window sills and grilles) on Renewal by Andersen windows is warranted to be free from manufacturing defects resulting in color fade greater than 5 delta-E* measured in accordance with ASTM D2244 for a period of ten (10) years from the original installation date.

What is not covered by this exterior color finish warranty: weatherstripping, accessories and hardware, including insect screen frames, handles, trim sets and lock components, exterior trim profiles and exterior aluminum coil stock.

In the event there is a defect covered by this limited warranty for exterior color finish within the limited warranty period, Renewal by Andersen, at its option, will: [1] refinish the product – labor is included (the finish will be applied with standard commercial refinishing techniques and may not be the same finish as originally applied to the product) or [2] repair or replace the product. Such replacement parts or repairs are warranted for the remainder of the original limited warranty period.

### Transferable Limited Warranty on Installation

Installation of your Renewal by Andersen windows or other Andersen window and/or door products by an authorized Renewal by Andersen contractor is warranted for a period of two (2) years from the date of original installation. During this period, should your Renewal by Andersen window or door fail to perform according to our specifications due to improper original installation, we will bring the workmanship up to our professional standards, at no cost to you.

This limited warranty on installation does not extend to labor/services performed by anyone other than the original authorized installer or other authorized Renewal by Andersen contractor, nor to the installation or repair of any finishing or other materials that have been applied to or adjacent to the product after the initial installation.

### No Other Warranties or Representations

THIS LIMITED WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. ALL WARRANTIES ARE LIMITED TO THE APPLICABLE STATUTE OF LIMITATIONS, BUT IN NO CASE WILL EXTEND BEYOND THE LIMITED WARRANTY PERIODS SPECIFIED ABOVE. RENEWAL BY ANDERSEN EXCLUDES AND WILL NOT BE LIABLE FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES, WHETHER ARISING OUT OF CONTRACT, TORT OR OTHERWISE. THE REMEDY OF REPAIR OR REPLACEMENT OF THE ACTUAL PURCHASE PRICE OF THE PRODUCT PROVIDED BY THIS LIMITED WARRANTY IS THE EXCLUSIVE REMEDY WITH RESPECT TO ANY AND ALL LOSS OR DAMAGE.

### Applicable Law

This Limited Warranty is only applicable in the U.S.A. (i.e. the fifty states and the District of Columbia) and Canada. This Limited Warranty gives you specific legal rights, and you may have other rights which vary from state to state or province. Some states do not allow the exclusion or limitation of incidental or consequential damages or limitation of the duration of an implied warranty, so the above limitations or exclusions may not apply to you. If any specific term of this Limited Warranty is prohibited by any applicable law, it shall be null and void, but the remainder of this Limited Warranty shall remain in full force and effect.

A181

*Technical measurement of color fade.

**What is *Not* covered by this Limited Warranty**

**Specific Additional Exclusions**

In addition to any other limitations or exclusions in this Limited Warranty, Renewal by Andersen shall have no obligation for product failure, damage or costs due to or related to the following:

- Product modifications or glass shading devices (e.g. glass tinting, security systems, improper painting or staining, insulated coverings, etc.)

- Failure due to the application of non Renewal by Andersen hardware (e.g. locksets, trim sets, hinges, panic hardware, closers, etc.)

- Water infiltration other than as a result of a defect in manufacturing, materials or workmanship

- Failure as a result of settling or structural failure of the structure in which the products are installed

- Condensation, other than as a result of a defect in manufacturing, materials or workmanship

- Improper maintenance, such as use of brick wash, razor blades, sealants, sanding or improper washing

- Failing to properly seal and maintain the exposed wood portions and veneer of a product in accordance to Renewal by Andersen painting or staining guidelines

- Fading of furniture, flooring, window coverings or other surrounding materials

- Chemicals or airborne pollutants, such as salt or acid rain

- Accidents

- Acts of God

- Normal wear and tear

Additional items excluded from this limited warranty:

- Products not manufactured by Renewal by Andersen

- Installation services by other than authorized Renewal by Andersen installers

- Removal of Renewal by Andersen windows from the structure in which it was originally installed by anyone other than an authorized Renewal by Andersen installer

- The performance of the low-maintenance exterior glass coating on products with high-performance Low-E4® glass – performance will vary depending on environmental conditions

- Slight glass curvature, minor scratches or other imperfections in the glass that do not impair structural integrity or significantly obscure normal vision

- Rattling of grille bars within an air space

- Insects passing through or around the insect screen

- Tarnish or corrosion to hardware finishes

- Special glazings – contact us concerning the limited warranty on special glazings

- Art glass and decorative insulated art glass, impact-resistant glass

- Renewal by Andersen Series 2 windows and patio doors, Andersen® A-Series windows and doors, 400 Series and 200 Series windows and doors, 400 Series windows with Stormwatch® protection and impact-resistant glass, 100 Series windows and doors, storm doors, E-Series windows and doors, Silver Line® windows and doors, American Craftsman® windows and doors and Weiland® windows and doors have their own limited warranties and are not covered by this Limited Warranty – for information on warranty coverage for these products, please refer to the specific limited warranties for these products – they are available at andersenwindows.com

**Warranty Claim Procedure**

To make a claim under this Limited Warranty, contact the nearest Renewal by Andersen showroom, our Warranty Service Line at 800-441-1109 or visit our website at renewalbyandersen.com. We will contact you to investigate your claim within approximately two weeks after notification and arrange for appropriate action. Warranty services may be provided by Renewal by Andersen and/or an authorized Renewal by Andersen service provider.

You can help us serve you faster by providing the following important information:

- The serial number of the affected product (e.g., located on a label affixed to the top or side of the window frame)

- Description of the product concerns

- Documentation of the purchase date, if available

- Your name, address (with zip code) where product is installed and telephone numbers

**Non-Warranty Repair**

You will be responsible for all costs related to any repair that is not covered by this Limited Warranty or which is outside of the limited warranty period. When warranty coverage is unclear, Renewal by Andersen may charge an inspection fee for any on-site product inspections. If the inspector determines the Renewal by Andersen product has a defect covered by this Limited Warranty, the inspection fee will be waived.



A182

RENEWALBYANDERSEN.COM



# THE LEAD-SAFE CERTIFIED GUIDE TO
# RENOVATE RIGHT

WARNING
LEAD WORK AREA
POISON
NO SMOKING
OR EATING

CAUTION CAUTION CAUTION CAUTION CAUTION CA

1-800-424-LEAD (5323)
epa.gov/getleadsafe
EPA-740-K-10-001
Revised September 2011

Important lead hazard information for families, child care providers and schools.

This document may be purchased through the U.S. Government Printing Office online at bookstore.gpo.gov or by phone (toll-free): 1-866-512-1800.

A183

# IT'S THE LAW!

Federal law requires contractors that disturb painted surfaces in homes, child care facilities and schools built before 1978 to be certified and follow specific work practices to prevent lead contamination. Always ask to see your contractor's certification.

Federal law requires that individuals receive certain information before renovating more than six square feet of painted surfaces in a room for interior projects or more than twenty square feet of painted surfaces for exterior projects or window replacement or demolition in housing, child care facilities and schools built before 1978.

• Homeowners and tenants: renovators must give you this pamphlet before starting work.

• Child care facilities, including preschools and kindergarten classrooms, and the families of children under six years of age that attend those facilities: renovators must provide a copy of this pamphlet to child care facilities and general renovation information to families whose children attend those facilities.

A184

# WHO SHOULD READ THIS PAMPHLET?

### This pamphlet is for you if you:

- Reside in a home built before 1978.
- Own or operate a child care facility, including preschools and kindergarten classrooms, built before 1978, or
- Have a child under six years of age who attends a child care facility built before 1978.

### You will learn:

- Basic facts about lead and your health.
- How to choose a contractor, if you are a property owner.
- What tenants, and parents/guardians of a child in a child care facility or school should consider.
- How to prepare for the renovation or repair job.
- What to look for during the job and after the job is done.
- Where to get more information about lead.

### This pamphlet is not for:

- **Abatement projects.** Abatement is a set of activities aimed specifically at eliminating lead or lead hazards. EPA has regulations for certification and training of abatement professionals. If your goal is to eliminate lead or lead hazards, contact the National Lead Information Center at **1-800-424-LEAD (5323)** for more information.

- **"Do-it-yourself"** projects. If you plan to do renovation work yourself, this document is a good start, but you will need more information to complete the work safely. Call the National Lead Information Center at **1-800-424-LEAD (5323)** and ask for more information on how to work safely in a home with lead-based paint.

- **Contractor education.** Contractors who want information about working safely with lead should contact the National Lead Information Center at **1-800-424-LEAD (5323)** for information about courses and resources on lead-safe work practices.





A185   1

# RENOVATING, REPAIRING, OR PAINTING?



- Is your home, your building, or the child care facility or school your children attend being renovated, repaired, or painted?

- Was your home, your building, or the child care facility or school where your children under six years of age attend built before 1978?

If the answer to these questions is YES, there are a few important things you need to know about lead-based paint.

This pamphlet provides basic facts about lead and information about lead safety when work is being done in your home, your building or the child care facility or school your children attend.

## The Facts About Lead

- Lead can affect children's brains and developing nervous systems, causing reduced IQ, learning disabilities, and behavioral problems. Lead is also harmful to adults.

- Lead in dust is the most common way people are exposed to lead. People can also get lead in their bodies from lead in soil or paint chips. Lead dust is often invisible.

- Lead-based paint was used in more than 38 million homes until it was banned for residential use in 1978.

- Projects that disturb painted surfaces can create dust and endanger you and your family. Don't let this happen to you. Follow the practices described in this pamphlet to protect you and your family.

# LEAD AND YOUR HEALTH

### Lead is especially dangerous to children under six years of age.

Lead can affect children's brains and developing nervous systems, causing:

- Reduced IQ and learning disabilities.
- Behavior problems.



**Even children who appear healthy can have dangerous levels of lead in their bodies.**

Lead is also harmful to adults. In adults, low levels of lead can pose many dangers, including:

- High blood pressure and hypertension.
- Pregnant women exposed to lead can transfer lead to their fetuses. Lead gets into the body when it is swallowed or inhaled.
- People, especially children, can swallow lead dust as they eat, play, and do other normal hand-to-mouth activities.
- People may also breathe in lead dust or fumes if they disturb lead-based paint. People who sand, scrape, burn, brush, blast or otherwise disturb lead-based paint risk unsafe exposure to lead.

### What should I do if I am concerned about my family's exposure to lead?

- A blood test is the only way to find out if you or a family member already has lead poisoning. Call your doctor or local health department to arrange for a blood test.
- Call your local health department for advice on reducing and eliminating exposures to lead inside and outside your home, child care facility or school.
- Always use lead-safe work practices when renovation or repair will disturb painted surfaces.

For more information about the health effects of exposure to lead, visit the EPA lead website at epa.gov/lead/pubs/leadinfo or call **1-800-424-LEAD (5323)**.

### There are other things you can do to protect your family every day.

- Regularly clean floors, window sills, and other surfaces.
- Wash children's hands, bottles, pacifiers, and toys often.
- Make sure children eat a healthy, nutritious diet consistent with the USDA's dietary guidelines, that helps protect children from the effects of lead.
- Wipe off shoes before entering the house.

# WHERE DOES THE LEAD COME FROM?

### Dust is the main problem.

The most common way to get lead in the body is from dust. Lead dust comes from deteriorating lead-based paint and lead-contaminated soil that gets tracked into your home. This dust may accumulate to unsafe levels. Then, normal hand-to-mouth activities, like playing and eating (especially in young children), move that dust from surfaces like floors and window sills into the body.

### Home renovation creates dust.

Common renovation activities like sanding, cutting, and demolition can create hazardous lead dust and chips.

### Proper work practices protect you from the dust.

The key to protecting yourself and your family during a renovation, repair or painting job is to use lead-safe work practices such as containing dust inside the work area, using dust-minimizing work methods, and conducting a careful cleanup, as described in this pamphlet.

### Other sources of lead.

Remember, lead can also come from outside soil, your water, or household items (such as lead-glazed pottery and lead crystal). Contact the National Lead Information Center at **1-800-424-LEAD (5323)** for more information on these sources.



# CHECKING YOUR HOME FOR LEAD-BASED PAINT

Percentage of Homes Likely to Contain Lead



### Older homes, child care facilities, and schools are more likely to contain lead-based paint.

Homes may be single-family homes or apartments. They may be private, government-assisted, or public housing. Schools are preschools and kindergarten classrooms. They may be urban, suburban, or rural.

### You have the following options:

**You may decide to assume your home, child care facility, or school contains lead.** Especially in older homes and buildings, you may simply want to assume lead-based paint is present and follow the lead-safe work practices described in this brochure during the renovation, repair, or painting job.

**You can hire a certified professional to check for lead-based paint.** These professionals are certified risk assessors or inspectors, and can determine if your home has lead or lead hazards.

• A certified inspector or risk assessor can conduct an inspection telling you whether your home, or a portion of your home, has lead-based paint and where it is located. This will tell you the areas in your home where lead-safe work practices are needed.

• A certified risk assessor can conduct a risk assessment telling you if your home currently has any lead hazards from lead in paint, dust, or soil. The risk assessor can also tell you what actions to take to address any hazards.

• For help finding a certified risk assessor or inspector, call the National Lead Information Center at **1-800-424-LEAD (5323)**.

You may also have a certified renovator test the surfaces or components being disturbed for lead by using a lead test kit or by taking paint chip samples and sending them to an EPA-recognized testing laboratory. Test kits must be EPA-recognized and are available at hardware stores. They include detailed instructions for their use.

# FOR PROPERTY OWNERS

## FOR TENANTS AND FAMILIES OF CHILDREN UNDER SIX YEARS OF AGE IN CHILD CARE FACILITIES AND SCHOOLS

### You have the ultimate responsibility for the safety of your family, tenants, or children in your care.

This means properly preparing for the renovation and keeping persons out of the work area (see p. 8). It also means ensuring the contractor uses lead-safe work practices.

Federal law requires that contractors performing renovation, repair and painting projects that disturb painted surfaces in homes, child care facilities, and schools built before 1978 be certified and follow specific work practices to prevent lead contamination.

**Make sure your contractor is certified, and can explain clearly the details of the job and how the contractor will minimize lead hazards during the work.**

• You can verify that a contractor is certified by checking EPA's website at epa.gov/getleadsafe or by calling the National Lead Information Center at **1-800-424-LEAD (5323)**. You can also ask to see a copy of the contractor's firm certification.

• Ask if the contractor is trained to perform lead-safe work practices and to see a copy of their training certificate.

• Ask them what lead-safe methods they will use to set up and perform the job in your home, child care facility or school.

• Ask for references from at least three recent jobs involving homes built before 1978, and speak to each personally.

**Always make sure the contract is clear about how the work will be set up, performed, and cleaned.**

• Share the results of any previous lead tests with the contractor.

• You should specify in the contract that they follow the work practices described on pages 9 and 10 of this brochure.

• The contract should specify which parts of your home are part of the work area and specify which lead-safe work practices will be used in those areas. Remember, your contractor should confine dust and debris to the work area and should minimize spreading that dust to other areas of the home.

• The contract should also specify that the contractor will clean the work area, verify that it was cleaned adequately, and re-clean it if necessary.

### If you think a worker is not doing what he is supposed to do or is doing something that is unsafe, you should:

• Direct the contractor to comply with regulatory and contract requirements.

• Call your local health or building department, or

• Call EPA's hotline **1-800-424-LEAD (5323)**.

If your property receives housing assistance from HUD (or a state or local agency that uses HUD funds), you must follow the requirements of HUD's Lead-Safe Housing Rule and the ones described in this pamphlet.

### You play an important role ensuring the ultimate safety of your family.



This means properly preparing for the renovation and staying out of the work area (see p. 8).

Federal law requires that contractors performing renovation, repair and painting projects that disturb painted surfaces in homes built before 1978 and in child care facilities and schools built before 1978, that a child under six years of age visits regularly, to be certified and follow specific work practices to prevent lead contamination.

The law requires anyone hired to renovate, repair, or do painting preparation work on a property built before 1978 to follow the steps described on pages 9 and 10 unless the area where the work will be done contains no lead-based paint.

### If you think a worker is not doing what he is supposed to do or is doing something that is unsafe, you should:

• Contact your landlord.

• Call your local health or building department, or

• Call EPA's hotline **1-800-424-LEAD (5323)**.

If you are concerned about lead hazards left behind after the job is over, you can check the work yourself (see page 10).



A188

# PREPARING FOR A RENOVATION

**The work areas should not be accessible to occupants while the work occurs.**

The rooms or areas where work is being done may need to be blocked off or sealed with plastic sheeting to contain any dust that is generated. Therefore, the contained area may not be available to you until the work in that room or area is complete, cleaned thoroughly, and the containment has been removed. Because you may not have access to some areas during the renovation, you should plan accordingly.

**You may need:**

• Alternative bedroom, bathroom, and kitchen arrangements if work is occurring in those areas of your home.

• A safe place for pets because they too can be poisoned by lead and can track lead dust into other areas of the home.

• A separate pathway for the contractor from the work area to the outside in order to bring materials in and out of the home. Ideally, it should not be through the same entrance that your family uses.

• A place to store your furniture. All furniture and belongings may have to be moved from the work area while the work is being done. Items that can't be moved, such as cabinets, should be wrapped in plastic.

• To turn off forced-air heating and air conditioning systems while the work is being done. This prevents dust from spreading through vents from the work area to the rest of your home. Consider how this may affect your living arrangements.

**You may even want to move out of your home temporarily while all or part of the work is being done.**

**Child care facilities and schools may want to consider alternative accommodations for children and access to necessary facilities.**



# DURING THE WORK

Federal law requires contractors that are hired to perform renovation, repair and painting projects in homes, child care facilities, and schools built before 1978 that disturb painted surfaces to be certified and follow specific work practices to prevent lead contamination.

The work practices the contractor must follow include these three simple procedures, described below:

**1. Contain the work area.** The area must be contained so that dust and debris do not escape from that area. Warning signs must be put up and plastic or other impermeable material and tape must be used as appropriate to:

• Cover the floors and any furniture that cannot be moved.

• Seal off doors and heating and cooling system vents.

• For exterior renovations, cover the ground and, in some instances, erect vertical containment or equivalent extra precautions in containing the work area.

These work practices will help prevent dust or debris from getting outside the work area.

**2. Avoid renovation methods that generate large amounts of lead-contaminated dust.** Some methods generate so much lead-contaminated dust that their use is prohibited. They are:



• Open flame burning or torching.

• Sanding, grinding, planing, needle gunning, or blasting with power tools and equipment not equipped with a shroud and HEPA vacuum attachment.

• Using a heat gun at temperatures greater than 1100°F.

There is no way to eliminate dust, but some renovation methods make less dust than others. Contractors may choose to use various methods to minimize dust generation, including using water to mist areas before sanding or scraping; scoring paint before separating components; and prying and pulling apart components instead of breaking them.

**3. Clean up thoroughly.** The work area should be cleaned up daily to keep it as clean as possible. When all the work is done, the area must be cleaned up using special cleaning methods before taking down any plastic that isolates the work area from the rest of the home. The special cleaning methods should include:

• Using a HEPA vacuum to clean up dust and debris on all surfaces, followed by

• Wet wiping and wet mopping with plenty of rinse water.

When the final cleaning is done, look around. There should be no dust, paint chips, or debris in the work area. If you see any dust, paint chips, or debris, the area must be re-cleaned.



# FOR PROPERTY OWNERS: AFTER THE WORK IS DONE

When all the work is finished, you will want to know if your home, child care facility, or school where children under six attend has been cleaned up properly.

## EPA Requires Cleaning Verification.

In addition to using allowable work practices and working in a lead-safe manner, EPA's RRP rule requires contractors to follow a specific cleaning protocol. The protocol requires the contractor to use disposable cleaning cloths to wipe the floor and other surfaces of the work area and compare these cloths to an EPA-provided cleaning verification card to determine if the work area was adequately cleaned. EPA research has shown that following the use of lead-safe work practices with the cleaning verification protocol will effectively reduce lead-dust hazards.

## Lead-Dust Testing.

EPA believes that if you use a certified and trained renovation contractor who follows the LRRP rule by using lead-safe work practices and the cleaning protocol after the job is finished, lead-dust hazards will be effectively reduced. If, however, you are interested in having lead-dust testing done at the completion of your job, outlined below is some helpful information.

### What is a lead-dust test?
• Lead-dust tests are wipe samples sent to a laboratory for analysis. You will get a report specifying the levels of lead found after your specific job.

### How and when should I ask my contractor about lead-dust testing?
• Contractors are not required by EPA to conduct lead-dust testing. However, if you want testing, EPA recommends testing be conducted by a lead professional. To locate a lead professional who will perform an evaluation near you, visit EPA's website at epa.gov/lead/pubs/locate or contact the National Lead Information Center at **1-800-424-LEAD (5323).**

• If you decide that you want lead-dust testing, it is a good idea to specify in your contract, before the start of the job, that a lead-dust test is to be done for your job and who will do the testing, as well as whether re-cleaning will be required based on the results of the test.

• You may do the testing yourself. If you choose to do the testing, some EPA-recognized lead laboratories will send you a kit that allows you to collect samples and send them back to the laboratory for analysis. Contact the National Lead Information Center for lists of EPA-recognized testing laboratories.



# FOR ADDITIONAL INFORMATION

You may need additional information on how to protect yourself and your children while a job is going on in your home, your building, or child care facility.

The National Lead Information Center at **1-800-424-LEAD (5323)** or epa.gov/lead/nlic can tell you how to contact your state, local, and/or tribal programs or get general information about lead poisoning prevention.

• State and tribal lead poisoning prevention or environmental protection programs can provide information about lead regulations and potential sources of financial aid for reducing lead hazards. If your state or local government has requirements more stringent than those described in this pamphlet, you must follow those requirements.



• Local building code officials can tell you the regulations that apply to the renovation work that you are planning.

• State, county, and local health departments can provide information about local programs, including assistance for lead-poisoned children and advice on ways to get your home checked for lead.

The National Lead Information Center can also provide a variety of resource materials, including the following guides to lead-safe work practices. Many of these materials are also available at epa.gov/lead/pubs/brochure



• Steps to Lead Safe Renovation, Repair and Painting.

• Protect Your Family from Lead in Your Home

• Lead in Your Home: A Parent's Reference Guide

For the hearing impaired, call the Federal Information Relay Service at 1-800-877-8339 to access any of the phone numbers in this brochure.

A190

# EPA CONTACTS

## EPA Regional Offices

EPA addresses residential lead hazards through several different regulations. EPA requires training and certification for conducting abatement and renovations, education about hazards associated with renovations, disclosure about known lead paint and lead hazards in housing, and sets lead-paint hazard standards.

Your Regional EPA Office can provide further information regarding lead safety and lead protection programs at epa.gov/lead.

**Region 1**
(Connecticut, Massachusetts, Maine, New Hampshire, Rhode Island, Vermont)
Regional Lead Contact
U.S. EPA Region 1
Suite 1100
One Congress Street
Boston, MA 02114-2023
(888) 372-7341

**Region 2**
(New Jersey, New York, Puerto Rico, Virgin Islands)
Regional Lead Contact
U.S. EPA Region 2
2890 Woodbridge Avenue
Building 205, Mail Stop 225
Edison, NJ 08837-3679
(732) 321-6671

**Region 3**
(Delaware, Maryland, Pennsylvania, Virginia, Washington, DC, West Virginia)
Regional Lead Contact
U.S. EPA Region 3
1650 Arch Street
Philadelphia, PA 19103-2029
(215) 814-5000

**Region 4**
(Alabama, Florida, Georgia, Kentucky, Mississippi, North Carolina, South Carolina, Tennessee)
Regional Lead Contact
U.S. EPA Region 4
61 Forsyth Street, SW
Atlanta, GA 30303-8960
(404) 562-9900

**Region 5**
(Illinois, Indiana, Michigan, Minnesota, Ohio, Wisconsin)
Regional Lead Contact
U.S. EPA Region 5
77 West Jackson Boulevard
Chicago, IL 60604-3507
(312) 886-6003

**Region 6**
(Arkansas, Louisiana, New Mexico, Oklahoma, Texas)
Regional Lead Contact
U.S. EPA Region 6
1445 Ross Avenue,
12th Floor
Dallas, TX 75202-2733
(214) 665-7577

**Region 7**
(Iowa, Kansas, Missouri, Nebraska)
Regional Lead Contact
U.S. EPA Region 7
901 N. 5th Street
Kansas City, KS 66101
(913) 551-7003

**Region 8**
(Colorado, Montana, North Dakota, South Dakota, Utah, Wyoming)
Regional Lead Contact
U.S. EPA Region 8
1595 Wynkoop Street
Denver, CO 80202
(303) 312-6312

**Region 9**
(Arizona, California, Hawaii, Nevada)
Regional Lead Contact
U.S. Region 9
75 Hawthorne Street
San Francisco, CA 94105
(415) 947-8021

**Region 10**
(Alaska, Idaho, Oregon, Washington)
Regional Lead Contact
U.S. EPA Region 10
1200 Sixth Avenue
Seattle, WA 98101-1128
(206) 553-1200

# OTHER FEDERAL AGENCIES

## CPSC

The Consumer Product Safety Commission (CPSC) protects the public from the unreasonable risk of injury or death from 15,000 types of consumer products under the agency's jurisdiction. CPSC warns the public and private sectors to reduce exposure to lead and increase consumer awareness. Contact CPSC for further information regarding regulations and consumer product safety.

**CPSC**
4330 East West Highway
Bethesda, MD 20814
Hotline 1-(800) 638-2772
cpsc.gov

## CDC Childhood Lead Poisoning Prevention Branch

The Centers for Disease Control and Prevention (CDC) assists state and local childhood lead poisoning prevention programs to provide a scientific basis for policy decisions, and to ensure that health issues are addressed in decisions about housing and the environment. Contact CDC Childhood Lead Poisoning Prevention Program for additional materials and links on the topic of lead.

**CDC Childhood Lead Poisoning Prevention Branch**
4770 Buford Highway, MS F-40
Atlanta, GA 30341
(770) 488-3300
cdc.gov/nceh/lead

## HUD Office of Healthy Homes and Lead Hazard Control

The Department of Housing and Urban Development (HUD) provides funds to state and local governments to develop cost-effective ways to reduce lead-based paint hazards in America's privately-owned low-income housing. In addition, the office enforces the rule on disclosure of known lead paint and lead hazards in housing, and HUD's lead safety regulations in HUD-assisted housing, provides public outreach and technical assistance, and conducts technical studies to help protect children and their families from health and safety hazards in the home. Contact the HUD Office of Healthy Homes and Lead Hazard Control for information on lead regulations, outreach efforts, and lead hazard control research and outreach grant programs.

**U.S. Department of Housing and Urban Development**
Office of Healthy Homes and Lead Hazard Control
451 Seventh Street, SW, Room 8236
Washington, DC 20410-3000
HUD's Lead Regulations Hotline
(202) 402-7698
hud.gov/offices/lead/

# SAMPLE PRE-RENOVATION FORM

This sample form may be used by renovation firms to document compliance with the Federal pre-renovation education and renovation, repair, and painting regulations.

## Occupant Confirmation

Pamphlet Receipt

☐ I have received a copy of the lead hazard information pamphlet informing me of the potential risk of the lead hazard exposure from renovation activity to be performed in my dwelling unit. I received this pamphlet before the work began.

_____

Printed Name of Owner-occupant

_____   _____

Signature of Owner-occupant                    Signature Date

## Renovator's Self Certification Option (for tenant-occupied dwellings only)

Instructions to Renovator: If the lead hazard information pamphlet was delivered but a tenant signature was not obtainable, you may check the appropriate box below.

☐ **Declined** – I certify that I have made a good faith effort to deliver the lead hazard information pamphlet to the rental dwelling unit listed below at the date and time indicated and that the occupant declined to sign the confirmation of receipt. I further certify that I have left a copy of the pamphlet at the unit with the occupant.

☐ **Unavailable for signature** – I certify that I have made a good faith effort to deliver the lead hazard information pamphlet to the rental dwelling unit listed below and that the occupant was unavailable to sign the confirmation of receipt. I further certify that I have left a copy of the pamphlet at the unit by sliding it under the door or by (fill in how pamphlet was left).

_____   _____

Printed Name of Person Certifying Delivery     Attempted Delivery Date

_____

Signature of Person Certifying Lead Pamphlet Delivery

_____

_____

Unit Address

## Note Regarding Mailing Option

— As an alternative to delivery in person, you may mail the lead hazard information pamphlet to the owner and/or tenant. Pamphlet must be mailed at least seven days before renovation. Mailing must be documented by a certificate of mailing from the post office.

A192



**Release Agreement**

**dba: Renewal by Andersen of Oklahoma**
Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 l Oklahoma City, OK 73149
Phone: 405-608-5000 l Fax: 405-562-7880 l oksales@renewaloklahoma.com

Susan Parisi

I UNDERSTAND that my name, my company name, voice, picture, likeness, biographical materials, photo images of my home and/or person, and statements and/or opinions made by me, in whole or in part, edited or unedited, in any and all media (hereinafter "Information"), without limitation for any and all purposes (including but not limited to incorporating the material into commercials, advertisements, promotions, coupons, in-store displays, on-line programs, free standing inserts and/or publicity or other materials of Renewal by Andersen's products or services). I agree that Renewal by Andersen LLC will have the right to attribute this Information to me and that the Information is accurate to the best of my knowledge. No benefit has been given or promised to me in consideration of expressing my beliefs about Renewal by Andersen® products.

I hereby consent to the use of the Information to Renewal by Andersen LLC, their successors and assigns, for use without restriction as to frequency, scope or duration of usage.

In connection herewith, I hereby release and agree to hold harmless Renewal by Andersen LLC, its successors and assigns, each of them from any and all claims of any kind which I, my heirs, executors or assigns, may have on account of such use including what might be deemed to be misrepresentations of me, my character or my person due to distortion, optical illusion or faulty reproduction which may occur in the finished product.

I hereby agree to waive any compensation rights and/or benefits other than the publicity my business will receive from this advertisement for my participation in this project.

Renewal by Andersen LLC, its successors and assigns, shall be the absolute owner of any and all advertising materials (and all rights therein, including the copyright) produced pursuant to this Agreement.

No promise or representation which is not expressed herein has been made to me, and I have read this release, understand it and am signing it voluntarily.

**Buyer(s)**

*Susan Parisi*

Witness

Signature | Signature | Signature

**Susan Parisi** | | **Russell Kelley**

Print Name | Print Name | Print Name

| | **11/23/21**

Address | Address | Date

City / State / Zip | City / State / Zip

# Price Presentation Discounts

**dba: Renewal by Andersen of Oklahoma**
Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 | Oklahoma City, OK 73149
Phone: 405-608-5000 | Fax: 405-562-7880 | oksales@renewaloklahoma.com

Susan Parisi



| PROJECT PRICE BEFORE DISCOUNTS | $23,344 |

**INDIVIDUAL SAVINGS BASED ON 5 UNITS**

**Advertised Offer**                                                   Savings:

    20% Off Project                                          **$4,668**

**Sales Cost Savings Program (5%)**                        Savings:
                                                                           **$933**

**TOTAL PRICE: $17,743**

### $5,601
SAVINGS

# EXHIBIT 2

A195

1/4/22, 11:24 AM
Yahoo Mail - Charge to my account
Case 5:23-cv-00115-R   Document 39-1   Filed 08/24/23   Page 40 of 40
Appellate Case: 23-6218   Document: 010111062398   Date Filed: 06/07/2024   Page: 202

Charge to my account

From:   Susan Parisi (sparisi21@yahoo.com)

To:      service@greensky.com

Date:   Monday, November 29, 2021, 12:02 PM CST

OK, I was never informed/told that an $8000 + dollar charge was going to take place! ☹ I chose the two-year nothing down, no interest, no payment option. And was informed the clock started ticking when the windows were installed. So what else is going to be done without my knowledge? This little trick makes me think twice about proceeding. Someone best be taking to me about this. I am under treatment for bone marrow cancer and I don't need any more surprises! It is not right defined this out after the fact.
Susan Parisi

Sent from Yahoo Mail for iPhone

A196

# EXHIBIT 2

# UNITED STATES OF AMERICA
## CONSUMER FINANCIAL PROTECTION BUREAU

ADMINISTRATIVE PROCEEDING
File No. 2021-CFPB-0004

In the Matter of:

**CONSENT ORDER**

**GREENSKY, LLC**

The Consumer Financial Protection Bureau (Bureau) has reviewed certain

origination and servicing activities of GreenSky, LLC (Respondent, as defined

below) and has identified the following law violations: (1) Respondent engaged in

unfair acts and practices with regard to loans to consumers who did not authorize

them in violation of §§ 1031(a) and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§

5531(a) and 5536(a)(1)(B); and (2) Respondent engaged in unfair acts and

practices by structuring its loan origination and servicing activities in a manner that

enabled unauthorized loans in violation of §§ 1031(a) and 1036(a)(1)(B) of the

CFPA, 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B). Under §§ 1053 and 1055 of the

Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5563, 5565, the

Bureau issues this Consent Order (Consent Order).

## I.

### Jurisdiction

1.  The Bureau has jurisdiction over this matter under §§ 1053 and 1055 of the

    CFPA, 12 U.S.C. §§ 5563 and 5565.

## II.

### Stipulation

2.  Respondent has executed a "Stipulation and Consent to the Issuance of a

    Consent Order," dated June 29, 2021 (Stipulation), which is incorporated by

    reference and is accepted by the Bureau. By this Stipulation, Respondent has

    consented to the issuance of this Consent Order by the Bureau under §§

    1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565, without admitting or

    denying any of the findings of fact or conclusions of law, except that

    Respondent admits the facts necessary to establish the Bureau's jurisdiction

    over Respondent and the subject matter of this action.

## III.

### Definitions

3.  The following definitions apply to this Consent Order:

    a.  "Affected Consumers" means any consumer who received an

        unauthorized loan through the GreenSky Program between March 1,

2014, and the Effective Date of this Consent Order, as determined by the Settlement Administrator, and further described in Section VIII.

b.  "Board" means the duly elected and acting Board of Directors of GreenSky, Inc., the ultimate parent of Respondent.

c.  "Clearly and Prominently" means:

    i.  In textual communications (e.g., printed publications or words displayed on the screen of an electronic device), the disclosure must be of a type size and location sufficiently noticeable for an ordinary consumer to read and comprehend it, in print that contrasts with the background on which it appears;

    ii.  In communications disseminated orally or through audible means (e.g., radio or streaming audio), the disclosure must be delivered in a volume and cadence sufficient for an ordinary consumer to hear and comprehend it;

    iii.  In communications disseminated through video means (e.g., television or streaming video), the disclosure must be in writing in a form consistent with subsection (i), and must appear on the screen for a duration sufficient for an ordinary consumer to read and comprehend it;

3

      iv.    In communications made through interactive media such as the internet, online services, and software, the disclosure must be unavoidable and presented in a form consistent with subsection (i);

      v.    In communications that contain both audio and visual portions, the disclosure must be presented simultaneously in both the audio and visual portions of the communication; and

      vi.    In all instances, the disclosure must be presented before the consumer incurs any financial obligation, in an understandable language and syntax, and with nothing contrary to, inconsistent with, or in mitigation of the disclosures used in any communication with the consumer.

d.   "Effective Date" means the date on which the Consent Order is entered on the administrative docket.

e.   "Enforcement Director" means the Assistant Director of the Office of Enforcement for the Consumer Financial Protection Bureau, or his or her delegate.

f.   "GreenSky Program" means a consumer financing and payments program created and administered by Respondent for certain federally insured banks ("GreenSky Program banks") where Respondent provides

4

point-of-sale financing technology and payments technology, and
engages in origination and servicing activities.

g.  "Identified Consumer Account Information" means the loan files,
complaints, call recordings, and related documentation of Potential
Affected Consumers to be reviewed by the Settlement Administrator
pursuant to Section VIII.

h.  "Merchant" means any third-party provider of services or seller of retail
products to consumers that intakes, submits, or facilitates submission of
consumer loan applications to Respondent for the purpose of financing
consumer purchases from such provider or seller through the GreenSky
Program. This definition shall not include any third-party provider or
seller that, as of January 1, 2014, required consumers to contact
Respondent directly to activate a loan.

i.  "Potential Affected Consumers" consists of the following groups of
consumers:

   i.  Consumers who filed complaints about unauthorized loans or
   unauthorized transactions between March 1, 2014 and the
   Effective Date of this Consent Order; and

   ii.  Consumers who both (1) completed loan applications between
   March 1, 2014 and the Effective Date of this Consent Order and

5

meet any one of the criteria described in subparagraphs (a) – (d)

below; and (2) respond to a communication from the Settlement

Administrator indicating they did not authorize a GreenSky

Program loan. The criteria consist of the following:

> (a)  Consumers whose loan application listed a Merchant's
>
> physical address as the consumer's own;
>
> (b)  Consumers whose loans were identified by Respondent as
>
> part of a customer-authorization audit for fraud as loans for
>
> which Respondent did not possess or obtain evidence of
>
> authorization;
>
> (c)  Consumers who submitted disputes directly to Respondent
>
> claiming information on their consumer report related to
>
> unauthorized loans or associated unauthorized
>
> transactions; and
>
> (d)  Consumers who submitted disputes to consumer reporting
>
> agencies claiming information on their consumer report
>
> related to unauthorized loans or associated unauthorized
>
> transactions.

j.   "Related Consumer Action" means a private action by or on behalf of

one or more consumers or an enforcement action by another

governmental agency brought against Respondent based on substantially the same facts as described in Section IV of this Consent Order.

k.  "Relevant Period" includes from March 1, 2014 to the Effective Date of this Consent Order.

l.  "Respondent" means GreenSky, LLC, and its subsidiaries, successors and assigns.

## IV.

## Bureau Findings and Conclusions

The Bureau finds the following:

4.  Respondent is a limited liability company with its principal place of business at 5565 Glenridge Connector, Suite 700, Atlanta, Georgia 30342.

5.  Respondent transacts business throughout the United States.

6.  Respondent administers the GreenSky Program and engages in origination and servicing activities related to the GreenSky Program, and therefore engages in offering or providing a "financial product or service" within the meaning of 12 U.S.C. § 5481(15)(A)(i).

7.  Respondent engages in origination activities and services loans offered or provided for use by consumers primarily for personal, family, or household purposes within the meaning of 12 U.S.C. § 5481(5)(A).

8.  Respondent is therefore a "covered person" under 12 U.S.C. § 5481(6).

7

<u>Respondent's Business Model</u>

9.   Respondent engages in origination and servicing activities on behalf of
GreenSky Program banks. Respondent uses Merchants to market and intake
loan applications from consumers at the point of sale. Most of these
Merchants provide home improvement products and services, health care
services, or retail products.

10.   Merchants must apply to participate in the GreenSky Program. If accepted
into the GreenSky Program, Respondent generally trains Merchants,
including on how to market and promote the GreenSky Program loans,
intake consumers' personal and financial information, submit loan
applications to Respondent on behalf of consumers or assist consumers in
submitting loan applications directly to Respondent, as well as on GreenSky
Program rules regarding consumers.

11.   Respondent allows most Merchants to submit consumer loan applications
online using Respondent's website or mobile applications, or over the phone
if the Merchant indicates it has a signed application information form or a
signed application from a consumer.

12.   Respondent's Patient Solutions Program, which provides financing for
elective medical procedures, requires consumers to apply for loans directly
through Respondent.

13.　Once Respondent receives an application, it makes an on-the-spot financing decision by comparing a consumer's application data with the lending criteria of the GreenSky Program banks, using proprietary technology and algorithms. These loans typically range from a few thousand dollars to tens of thousands of dollars.

14.　When a consumer or Merchant submits a loan application through Respondent's website or mobile application, the approved loan terms are displayed on the computer or tablet at the conclusion of the application process. Where a Merchant submits a loan application on a consumer's behalf, however, the consumer may view the approved loan terms on the computer or tablet only if the Merchant shares the screen with the consumer.

15.　Until at least April 2019, if Respondent determined that an applicant qualified for a loan, the loan application process was complete. Respondent mailed or emailed loan documentation to consumers, but consumers were not required to sign and return that loan documentation to consummate the loan.

16.　Respondent also issues consumers a "shopping pass" number, which functions like a credit card (Shopping Pass). Respondent treats use of the Shopping Pass, or associated funds, as acceptance of the loan.

9

17.   Respondent does not disburse the loan proceeds to the consumer. Rather, to

pay for a product or service, a consumer provides the Shopping Pass number

to her Merchant or otherwise authorizes a transaction and the Merchant, in

turn, uses the Shopping Pass number or other authorization to apply for

payment from Respondent.

18.   Respondent then disburses loan proceeds directly to the Merchant.

19.   Most of Respondent's revenue is earned from fees that Merchants pay to

Respondent every time they receive payment from the proceeds of a

consumer's loan.

20.   In some instances, Merchants misused these Shopping Pass numbers.

21.   Merchants sometimes applied for a loan without a consumer's knowledge

and entered their own email addresses as the consumer's own on the loan

application. Because of this, Respondent emailed the consumer's loan

documents or Shopping Pass number to the Merchant instead of the

consumer.

22.   In other instances, Merchants applied for a loan without a consumer's

knowledge and entered the consumer's correct mailing address on the

application, but because the consumer was unaware of the loan, the

consumer ignored the loan documents Respondent mailed, thinking they

were promotional materials.

23.   Consumers sometimes received mailed loan documents–which could take

weeks to arrive after a loan application–only after the Merchant had already

used the Shopping Pass number without the consumer's knowledge.

### Respondent Engaged in Origination Activity on Loans That Consumers Did Not Authorize

24.   During the Relevant Period, some Merchants submitted loan applications to

Respondent without consumers' consent. Respondent performed origination

and servicing activities with regard to these loans and, in some instances,

disbursed loan proceeds directly to the Merchant, without consumers'

knowledge or consent.

25.   Between 2014 and 2019, Respondent received at least 6,000 complaints

from consumers who stated they did not authorize submission of a loan

application. Respondent's complaint investigation found that in at least

1,600 instances the Merchant was at fault.

26.   Some consumers became aware of the loan for the first time when they

noticed Respondent's name on their credit report, or received billing

statements, collection letters, and calls from Respondent.

27.   After receiving a complaint about an unauthorized loan, Respondent

sometimes cancelled the loan, refunded consumers' money, wrote off the

unauthorized loan, or convinced the relevant Merchants to return money to consumers.

28.     At least 2,800 consumers who complained about unauthorized loans however, received neither refunds nor write-offs from Respondent or its Merchants.

<u>Respondent's Loan Application and Funding Process Created Opportunities for the Origination of Unauthorized Loans</u>

29.     Respondent uses a completely paperless application process for both its mobile and web-based application platforms.

30.     Until at least 2019, if a Merchant had certain personal information about a consumer, Respondent's systems and application process enabled Merchants to submit an entire loan application online without the consumer's knowledge or consent.

31.     While Respondent's program agreement with Merchants requires Merchants to obtain a written authorization from consumers to submit a loan application, Respondent does not request or review such documentation prior to loan application approval and disbursement of the loan proceeds.

32.     Instead, Respondent generally requires Merchants to provide proof of consumer authorization only after a consumer files a complaint. In some

instances, however, Merchants are unable to provide evidence that a
consumer ever authorized submission of a loan application.

### Respondent's Merchant Training Program was Inadequate and Inconsistent

33.   Respondent's Merchant training practices exacerbated the circumstances that
led to unauthorized loans.

34.   During the Relevant Period, Respondent permitted Merchants to intake and
submit loan applications for up to two months before completing any loan
application training.

35.   Further, until at least October 2019, the training Respondent provided to
Merchants was inadequate and inconsistent.

36.   Merchants who generated more loans for Respondent received a dedicated
"Client Growth Manager," who was supposed to conduct one-on-one
trainings with the Merchant and provide the Merchant opportunities to ask
questions about the loan application process.

37.   Merchants who did not meet the required business threshold received online
training on the GreenSky Program rules, how to market loans, intake loan
applications, submit applications to Respondent, and apply for payment.

38.   Even when Respondent did provide individualized training, the training
often did not adequately teach Merchants how to comply with consumer
protection laws.

39.   For example, some Client Growth Managers failed to teach Merchants that consumer authorization is required before submitting a loan application and some even instructed Merchants on how to directly access and use consumers' Shopping Pass numbers.

40.   Further, Respondent only required that one representative from each Merchant attend a training session; this representative was then responsible for training all other Merchant employees intaking and submitting loan applications.

41.   Respondent also did not require Merchants to verify that each employee intaking and submitting loan applications had been trained. And Respondent did not always take action when it learned Merchant employees had not received training.

42.   Until at least January 2020, Respondent also sometimes failed to notify and train Merchants when it made changes to the GreenSky Program and did not require Merchants to attend annual compliance training.

Respondent's Merchant Oversight Program was Ineffective

43.   In some instances, Respondent did not discipline or terminate Merchants known to have submitted unauthorized loan applications.

14

44.     Respondent's Merchant Risk department is tasked with investigating

        Merchant activity to root out fraud and discipline or terminate Merchants

        who engage in practices that violate Respondent's policies and procedures.

45.     But employees in the Merchant Risk department are not consistently trained

        and do not follow written investigation guidelines. In some cases, they were

        instructed to apply different, more lenient investigative standards to high-

        volume Merchants and to change their recommendations regarding

        Merchant suspensions and terminations based on the volume of business a

        Merchant generates.

46.     As a result, the Merchant Risk department's investigations are not governed

        by a consistent set of principles or standards and its disciplinary action

        recommendations differ depending on the Merchant and the volume of

        business the Merchant generates.

Respondent's Complaint Resolution Practices were Deficient

47.     In 2014, Respondent created a department to respond to and resolve

        consumer complaints.

48.     In many instances, because of understaffing and frequent staff turnover,

        Respondent took over 75 days to investigate and resolve complaints, even

        though Respondent's stated policy is to strive to investigate and resolve

        complaints within 15 days. In over 100 cases where consumers complained

15

about an unauthorized loan, Respondent took six or more months to resolve the complaint.

49.    Further, in some instances, Respondent closed complaints in its system without ever resolving the case or informing consumers of the result of the investigation.

50.    As a result, some consumers had to call or contact Respondent multiple times over several months to receive a response from Respondent or any resolution to their complaints.

51.    Frequently, Respondent told consumers they must attempt to resolve their unauthorized loan complaint with the Merchant first before Respondent would open an investigation.

52.    When Respondent did open an investigation, Respondent requested evidence of the consumer's authorization of submission of the loan application from the Merchant.

53.    If a Merchant could not provide evidence of consumer authorization, Respondent asked the Merchant to refund the consumer's account. Merchants, however, did not always agree to provide a refund and Respondent did not always require them to do so.

54.    If a Merchant refused to provide a refund, Respondent required the consumer in question to seek a "chargeback" of the amounts charged to the

A213

Shopping Pass. If the consumer did not do so within four to fifteen months, this remedy was unavailable because of the transaction processor's chargeback rules. Due to the length of time Respondent took to resolve some unauthorized loan complaints, some consumers lost out on the opportunity to pursue this remedy because Respondent could not pursue chargeback rights for the consumer until the complaint was resolved.

55. In these circumstances, the consumer had no other recourse, except for taking legal action.

56. Respondent, however, had the discretion to cancel and write off the loan, and absolve the consumer from liability, if it determined a Merchant submitted a loan application without consumer authorization.

57. Respondent did, in some instances, determine that Merchants had submitted loans without authorization and canceled and wrote off loans for some consumers.

58. But, until at least May 2018, Respondent lacked any policies or procedures governing these practices. As a result, Respondent granted loan write-offs inconsistently with regard to complaints about unauthorized loans.

Findings and Conclusions as to Respondent's
Origination and Servicing Activities on Unauthorized Loans (Unfair Acts and Practices)

59.    Section 1036(a)(1)(B) of the CFPA prohibits "unfair, deceptive, or abusive" acts or practices. 12 U.S.C. § 5536(a)(1)(B). An act or practice is unfair if it causes or is likely to cause consumers substantial injury that is not reasonably avoidable and that is not outweighed by countervailing benefits to consumers or to competition.

60.    Respondent engaged in origination and servicing activities for loans to consumers that consumers did not authorize. Respondent's actions caused or were likely to cause substantial injury to consumers by causing: (1) new unauthorized credit lines to appear on consumers' consumer reports, potentially adversely affecting their credit profiles; (2) some consumers to make payments on unauthorized loans in order to avoid negative impact to their credit profiles from nonpayment; and (3) consumers to spend time and money attempting to rescind the loans, reverse charges, and remove Respondent's tradeline from their credit reports.

61.    Some consumers did not learn of the loans until well after they were funded.

62.    The substantial injuries consumers suffered were therefore not reasonably avoidable.

63.     Nor were they outweighed by any countervailing benefit to consumers or to

        competition.

64.     Thus, Respondent engaged in unfair acts and practices in violation of

        Sections 1031(a) and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531(a),

        5536(a)(1)(B).

Findings and Conclusions as to Respondent's Structuring of Loan Origination and
Servicing Practices in a Manner that Enabled Unauthorized Loans (Unfair Acts and
Practices)

65.     Respondent's lack of appropriate and effective: (i) controls during the loan

        application, approval, and funding processes; (ii) merchant training and

        oversight; and (iii) complaint management, resulted in Respondent's

        engaging in origination and servicing activities on loans that consumers did

        not authorize.

66.     Respondent's practices caused or were likely to cause substantial injury to

        consumers by causing: (1) new unauthorized credit lines to appear on

        consumers' credit reports, potentially adversely affecting their credit

        profiles; (2) some consumers to make payments on unauthorized loans in

        order to avoid negative impact to their credit profiles from nonpayment; and

        (3) consumers to spend time and money attempting to rescind the loans,

        reverse charges, and remove Respondent's tradeline from their credit

        reports.

67.     Some consumers did not learn of the loans until well after they were funded.

68.     The substantial injuries consumers suffered were therefore not reasonably
        avoidable.

69.     Nor were they outweighed by any countervailing benefit to consumers or to
        competition.

70.     Thus, Respondent engaged in unfair acts and practices in violation of
        Sections 1031(a) and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531(a),
        5536(a)(1)(B).

## CONDUCT PROVISIONS

## V.

### Required Conduct

**IT IS ORDERED**, under §§ 1053 and 1055 of the CFPA, that:

71.     Respondent and its officers, agents, servants, employees, and attorneys who
        have actual notice of this Consent Order, whether acting directly or
        indirectly, in connection with consumer loan authorizations, must take the
        following affirmative actions:

        a.  Obtain and retain evidence of a consumer's authorization of a loan in one
            of the following forms prior to asserting or reporting to a credit reporting
            agency any obligation on the part of the consumer and prior to the loan
            being activated:

      i.   A signed written authorization from the consumer;

      ii.   An audio recording of a phone call with the consumer containing the consumer's verbal authorization; or

      iii.   Other documentary evidence evidencing consumer authorization of the loan obtained during loan activation procedures using email, the internet, or mobile messaging technology (such as SMS).

b.   To the extent that a consumer complains about authorization of a loan application, Respondent must delete any credit inquiry unless it has or obtains evidence of consumer authorization of the loan application.

c.   This paragraph shall not apply to Respondent's Patient Solutions Program, which requires consumers to apply for loans directly through Respondent.

72.   Respondent, whether acting directly or indirectly, must take the following affirmative actions with respect to Respondent's consumer complaint management program:

a.   Develop, implement, and monitor a consumer complaint management program designed to efficiently and accurately intake, investigate, document, resolve, and track consumer complaints regarding unauthorized loans and related unauthorized transactions;

b.  Acquire and allocate the systems and staff necessary to administer the complaint management program in a manner consistent with the requirements of subparagraph (a);

c.  Develop and implement written policies, practices, and procedures, including specific standards of investigation, to govern the consumer complaint management program described in subparagraph (a);

d.  Develop and implement a training program on the requirements of subparagraphs (a) and (c) for Respondent's employees or agents responsible for any aspect of the complaint management program;

e.  Review and analyze complaints in the consumer complaint management program on a routine basis for the purpose of identifying trends, emerging issues, and Merchants potentially involved in unauthorized loans and related unauthorized transactions; and

f.  Based on the analyses conducted pursuant to subparagraph (e), periodically revise policies and procedures, and implement updated practices or solutions designed to prevent unauthorized loans.

73.  Respondent and its officers, agents, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, in connection with receiving consumer complaints, must take the following affirmative actions following receipt of a complaint regarding an

unauthorized loan for which Respondent cannot obtain or produce evidence
of consumer authorization as set forth in paragraph 71(a):

a.  Issue the consumer a provisional account credit within 5 business days of
    receiving the complaint, provided such complaint remains unresolved;

b.  Cancel the loan within 7 business days following resolution of a
    complaint of an unauthorized loan in the consumer's favor because
    Respondent does not possess or cannot obtain evidence of consumer
    authorization as required by paragraph 71(a);

c.  Issue a permanent account credit within 7 business days following
    resolution of a complaint of an unauthorized loan in the consumer's favor
    because Respondent does not possess or cannot obtain evidence of
    consumer authorization as required by paragraph 71(a);

d.  Refund the consumer for any amounts paid on the unauthorized loan
    within 10 business days following resolution of a complaint of an
    unauthorized loan in the consumer's favor because Respondent does not
    possess or cannot obtain evidence of consumer authorization as required
    by paragraph 71(a); and

e.  Submit a request to update or correct any incorrect or inaccurate
    information furnished to a consumer reporting agency in the subsequent
    reporting cycle following resolution of a consumer complaint of an

A220

unauthorized loan in the consumer's favor because Respondent does not possess or cannot obtain evidence of consumer authorization as required by paragraph 71(a).

74.  Respondent and its officers, agents, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, in connection with loan application, verification, activation, and transaction procedures, must take the following affirmative actions:

a.  Develop and implement policies, practices, procedures, and training materials regarding:

    i.  Obtaining and retaining evidence of consumers' loan authorizations consistent with paragraph 71(a).

    ii.  Attempting to verify consumers' email addresses and mobile telephone numbers before sending loan activation messages to a consumer's email address or mobile telephone number.

    iii.  Using knowledge-based authentication procedures or other comparably effective authentication procedures before activating a loan or disbursing loan proceeds, if Respondent cannot verify a consumer's email address or mobile telephone number;

    iv.  Establishing affirmative loan activation steps a consumer must take after a loan application is submitted and before Respondent may

disburse a consumer's loan proceeds or furnish information to a

consumer reporting agency; and

    v.  Obtaining and retaining evidence of consumers' approval of

transactions before Respondent may disburse loan proceeds to a

Merchant.

b.  Provide Clear and Prominent disclosures to consumers describing the

steps the consumer is taking, including their effect. Such disclosures shall

be provided, as applicable, before: (1) submission of a loan application;

(2) activation of a loan; and (3) a consumer approves the initial loan

transaction.

75.  Respondent, whether acting directly or indirectly, must take the following

affirmative actions regarding Merchant training and oversight:

a.  Develop and implement policies, procedures, and training materials

designed to prevent and prohibit Merchants from applying for loans

without consumers' knowledge or authorization, or using Shopping Pass

numbers without consumers' consent;

b.  Require any Merchant employee who intakes, facilitates, or submits

consumer loan applications to: (1) attend both an initial and subsequent

annual internet-based training on loan application submission procedures;

25

and (2) pass a knowledge test on loan application submission procedures

following the initial internet-based training before the employee may

begin intaking, facilitating, or submitting loan applications;

    i.   This provision shall not prevent a Merchant employee who has not

received such training from assisting consumers in contacting

Respondent, and then having the consumer directly communicate

with Respondent to apply for a GreenSky Program loan.

c.   Develop and implement a process to verify the attendance of all

Merchant employees required to receive training pursuant to

subparagraph (b) at all required initial and annual trainings;

d.   Discipline, including through suspension and termination, any Merchant

who violates Respondent's loan application, activation, or transaction

approval policies or procedures as outlined in paragraph 71, as set forth

in the approved Compliance Plan; and

e.   Develop and implement policies, practices, procedures, and training

materials for effective oversight, risk management and audit of

Merchants.

76.   Respondent, whether acting directly or indirectly, must:

a.   Develop, implement, and consistently apply policies, practices, and

procedures governing Respondent's write-off practices, including clear

26

and detailed guidelines to govern write-off decisions, which must be set

forth in the approved Compliance Plan; and

b.  Develop and implement training materials and a training program on

Respondent's write-off policies, practices, and procedures.

## VI.

### Compliance Committee and Compliance Plan

**IT IS FURTHER ORDERED that:**

77.  The Board must establish a Compliance Committee of at least 3 directors, of

which at least 2 are not officers or employees of Respondent or any of its

affiliates. Within 14 days of the Effective Date, the Board must provide in

writing to the Enforcement Director the name of each member of the

Compliance Committee. If there is a change of membership to the

Compliance Committee, the Board must submit the name of any new

member in writing to the Enforcement Director.

78.  For 5 years from the Effective Date, the Compliance Committee will be

responsible for monitoring and coordinating Respondent's adherence to the

provisions of this Consent Order. The Compliance Committee must meet at

least quarterly and must maintain minutes of its meetings.

79.  Within 50 days of the Effective Date, the Compliance Committee must

submit to the Board a comprehensive compliance plan designed to ensure

that Respondent's loan origination and servicing activities comply with all applicable Federal consumer financial laws and the terms of this Consent Order (Compliance Plan). The Compliance Plan must include, at a minimum:

    a.  Detailed steps Respondent will take to effectuate each of the Conduct Provisions required by this Consent Order;

    b.  A mechanism to ensure that the Board is kept apprised of the status of compliance actions;

    c.  Specific steps, timeframes, and deadlines for implementation of the requirements described above; and

    d.  A proposal for who the Respondent will retain as the Assessor to complete the initial Assessment set forth in Section XI.

80.   Within 60 days of the Effective Date, the Board must submit a copy of the Compliance Plan, with any additional comments by the Board, to the Enforcement Director for review and determination of non-objection.

81.   The Enforcement Director will have the discretion to make a determination of non-objection to the Compliance Plan or direct Respondent to revise it. If the Enforcement Director directs Respondent to revise the Compliance Plan, Respondent must revise and resubmit the Compliance Plan to the Enforcement Director within 30 days.

A225

82. After receiving notification that the Enforcement Director has made a determination of non-objection to the Compliance Plan, Respondent must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Compliance Plan.

## VII.

## Role of the Board

**IT IS FURTHER ORDERED** that:

83. The Board or a relevant committee thereof must review all submissions (including plans, reports, programs, policies, and procedures) required by this Consent Order prior to submission to the Bureau.

84. Although this Consent Order requires Respondent to submit certain documents for review or non-objection by the Enforcement Director, the Board will have the ultimate responsibility for proper and sound management of Respondent and for ensuring that Respondent complies with the laws that the Bureau enforces, including Federal consumer financial laws and this Consent Order.

85. In each instance that this Consent Order requires the Board to ensure adherence to, or perform certain obligations of Respondent, the Board or a relevant committee thereof must:

a.  Authorize whatever actions are necessary for Respondent to fully comply
with the Consent Order;

b.  Require timely reporting by management to the Board or a relevant
committee thereof on the status of compliance obligations; and

c.  Require timely and appropriate corrective action to remedy any material
non-compliance with any failures to comply with Board directives related
to this Section.

## MONETARY PROVISIONS

## VIII.

### Order to Pay Redress

**IT IS FURTHER ORDERED** that:

86.  Respondent shall pay redress to Affected Consumers as follows:

a.  Cash redress totaling between $750,000 and $3,000,000 in the form of
checks mailed to consumers (Cash Redress); and

b.  Loan cancellations in an amount no more than $6,000,000 (Credit
Redress).

87.  Within 10 days of the Effective Date, Respondent shall reserve or deposit
into a segregated deposit account an amount not less than $750,000 for the
purpose of providing Cash Redress to Affected Consumers as required by
this Section.

a.  If, at any time during the administration of this Consent Order, the Settlement Administrator, as defined in paragraph 88, determines that Cash Redress owed to Affected Consumers exceeds $750,000, Respondent shall reserve or deposit into a segregated deposit account, such additional amounts, not to exceed $3,000,000 in aggregate, for purposes of paying Cash Redress.

b.  If, at any time during the administration of this Consent Order, the Settlement Administrator determines that Cash Redress owed to Affected Consumers is less than $750,000, Respondent may use the remainder of the funds in the segregated deposit account to pay the Settlement Administrator as required by this Section. If funds remain in the segregated deposit account after paying Cash Redress and the Settlement Administrator, within 30 days of the completion of the Redress Plan, Respondent must pay the remainder to the Bureau, by wire transfer to the Bureau or to the Bureau's agent, and according to the Bureau's wiring instructions. The Bureau will deposit any remaining funds in the U.S. Treasury as disgorgement. Respondent will have no right to challenge any actions that the Bureau or its representatives may take under this Section.

88.    Within 30 days of the Effective Date, Respondent must submit to the Enforcement Director for review and non-objection a proposal for retaining an independent third-party settlement administrator (Settlement Administrator) for the purpose of: (1) communicating with Potential Affected Consumers as set forth in subparagraph 3(i)(ii)(a-d); (2) conducting a review of Identified Consumer Account Information of Potential Affected Consumers to identify all Affected Consumers; (3) determining the amount of redress due to each Affected Consumer; and (4) administering redress pursuant to this Consent Order (Settlement Administrator Proposal).

89.    The Settlement Administrator Proposal shall identify the Settlement Administrator that Respondent proposes to retain and must include:

    a.   The proposed Settlement Administrator's qualifications and specialized expertise; and

    b.   A description of all work the proposed Settlement Administrator has performed for Respondent in the five years preceding the Effective Date (if any), including the amount Respondent paid the Settlement Administrator for each engagement.

90.    If the Enforcement Director directs Respondent to revise the Settlement Administrator Proposal or select a different Settlement Administrator,

Respondent must make such revisions or selection and resubmit the proposal within 10 days of the Enforcement Director's request.

91.    Within 15 days of the Enforcement Director's determination of non-objection, Respondent shall engage the Settlement Administrator for the purposes described in paragraph 88.

92.    Within 30 days of retaining the Settlement Administrator, Respondent must submit to the Enforcement Director for review and non-objection a comprehensive written plan for providing redress consistent with this Consent Order (Redress Plan). The Enforcement Director will have the discretion to make a determination of non-objection to the Redress Plan or direct Respondent to revise it. If the Enforcement Director directs Respondent to revise the Redress Plan, Respondent must revise and resubmit the Redress Plan to the Enforcement Director within 15 days. After receiving notification that the Enforcement Director has made a determination of non-objection to the Redress Plan, Respondent must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the approved Redress Plan.

93.    The Redress Plan must:

    a.  Describe the methodology the Settlement Administrator will use to identify Potential Affected Consumers;

b.  Describe the steps the Settlement Administrator must take to communicate with the Potential Affected Consumers described subparagraphs 3(i)(ii)(a-d) and as required by subparagraphs 93 (e)- (f) including, without limitation: (1) how the Settlement Administrator will locate Potential Affected Consumers, (2) the form and method the Settlement Administrator will use to contact Potential Affected Consumers (e.g. mail, phone, email), (3) a representative exemplar of each form of communication, (4) how Potential Affected Consumers may respond to the Settlement Administrator's communication(s), and (5) the number of times and methods by which the Settlement Administrator must attempt to contact non-responsive Potential Affected Consumers.

c.  Describe the steps the Settlement Administrator will employ to conduct a review of the Identified Consumer Account Information of Potential Affected Consumers to identify all Affected Consumers, including the Settlement Administrator's discretion to take all reasonable steps where appropriate to verify the authenticity of Identified Consumer Account Information obtained from Merchants;

d.  Identify the parameters that the Settlement Administrator will use to determine which of the Potential Affected Consumers are Affected Consumers. At a minimum, Affected Consumers must include Potential

34

Affected Consumers for whom Respondent does not possess or obtain at least one the following forms of evidence of authorization:

i. Respondent's loan application or loan application information form with the consumer's signature;

ii. An audio recording of a phone call with the consumer in which the consumer acknowledges that he or she submitted a loan application to Respondent for financing, authorized submission of a loan application by a Merchant, or confirmed that he or she wished to keep the GreenSky Program loan;

iii. An email or other written communication from the consumer in which the consumer acknowledges that he or she submitted a loan application for financing to Respondent, authorized submission of a loan application by a Merchant, or confirmed he or she wished to keep the GreenSky Program loan;

iv. Respondent's "Borrower Payment Certificate," signed by the consumer, indicating he or she agrees to the GreenSky Program loan;

v. Respondent's "Limited Transaction Authorization Form," signed by the consumer, indicating he or she authorizes payments from the GreenSky Program loan to a Merchant; or

vi. A consumer's written or text response to an email or mobile

messaging technology (such as SMS) alert from Respondent

authorizing or acknowledging a loan transaction.

e. The requirement in paragraph 93(d) that Affected Consumers must

include, at minimum, Potential Affected Consumers for whom

Respondent does not possess or obtain one of the listed forms of evidence

may not apply if the Identified Consumer Account Information contains

evidence that the consumer: (i) signed an agreement with the Merchant

for goods and services, and (ii) also applied for financing as a part of that

agreement. In such instances, the Settlement Administrator must take the

steps outlined in the approved Redress Plan to contact the Potential

Affected Consumer to: (i) determine whether the Merchant provided the

goods or services, (ii) determine how the Potential Affected Consumer

paid for such goods or services, and, (iii) if applicable, invite the

Potential Affected Consumer to submit any relevant evidence for the

Settlement Administrator's consideration.

(a) For purposes of the Redress Plan, "evidence that the consumer

(i) signed an agreement with the Merchant for goods and

services, and (ii) also applied for financing as a part of that

agreement," shall not include:

36

(1) Respondent's customer representative notes stating the consumer has authorized the loan;

(2) A writing from a Merchant or Respondent's own notes regarding communications with a Merchant where the Merchant states the consumer authorized the loan or transaction; or

(3) A transaction ledger or payment history for Respondent's loan.

f.  Specify the methodology the Settlement Administrator will use to:

   i.  Cancel loans for Affected Consumers;

  ii.  Calculate Cash Redress and Credit Redress, including any setoff pursuant to subparagraphs (iii)(a) to (c) below, for each Affected Consumer;

 iii.  For purposes of calculating redress pursuant to this Order, the Redress Plan shall provide that the Settlement Administrator may consider from Respondent a request for a setoff of Cash Redress or Credit Redress for goods and services actually provided, as follows:

  (a) Respondent shall bear the burden of proving that set off is appropriate.

37

    (b)  If Respondent provides evidence to the Settlement Administrator that setoff may be appropriate, the Settlement Administrator must take the steps outlined in the approved Redress Plan to contact the Potential Affected Consumer to determine whether the Merchant provided goods or services to the Potential Affected Consumer, how the consumer paid for such goods or services, and, if applicable, invite the Potential Affected Consumer to submit any evidence for the Settlement Administrator's consideration.

    (c)  If Respondent and the Potential Affected Consumer present conflicting evidence, the Settlement Administrator may take any steps she or he deems necessary to determine whether setoff is appropriate, as will be further described in the Redress Plan.

  iii.  Delete Respondent's tradeline information with consumer reporting agencies; and

  iv.  Administer Cash Redress and Credit Redress to Affected Consumers.

g.  Provide that the Cash Redress or Credit Redress due to any Affected Consumer shall be paid pursuant to this Consent Order;

h.  Describe the Settlement Administrator's procedures for issuing and tracking Cash Redress and Credit Redress to each Affected Consumer;

i.  Provide that the Settlement Administrator shall mail each Affected Consumer owed redress under this Order an explanatory letter (Redress Notification Letter) that: (i) includes a statement that redress is being provided in accordance with the terms of this Consent Order; (ii) states why the Affected Consumer is receiving the letter; and (iii) states, if applicable, that the Affected Consumer's loan is being canceled and that the relevant tradeline will be deleted from their consumer report;

j.  Provide that neither the Settlement Administrator nor Respondent shall include in an envelope containing a Redress Notification Letter any materials other than the letter and a redress check, as applicable;

k.  Attach, as exhibits, an exemplar of each Redress Notification Letter envelope and letter template and any other scripts or correspondence used to communicate with Potential Affected Consumers;

l.  Specify timeframes and deadlines for implementing the Redress Plan;

m. Allow Respondent to review the work conducted by the Settlement Administrator required by this Section to assure compliance with this Consent Order and the Redress Plan, provided however that: (i) the Settlement Administrator retains full and final decision-making rights as

39

A236

to the class of Affected Consumers and the amounts of Cash Redress or

Credit Redress due to Affected Consumers under this Consent Order; and

(ii) a detailed accounting of any changes or modifications to the class of

Affected Consumers or amounts of redress due to Affected Consumers as

a result of Respondent's review under this provision shall be documented

and provided to the Bureau prior to completion of redress administration;

and

n. Provide that Respondent will pay all costs of administering redress as

required by this Consent Order, subject to paragraph 87.

94. After the Settlement Administrator has completed redress administration

under the Redress Plan, Respondent must submit a report to the Enforcement

Director, and identify: (i) the number of Potential Affected Consumers; (ii)

the number of Affected Consumers; (iii) the amount of Cash Redress

distributed and Credit Redress applied to Affected Consumers; (iv) the

number and amount of setoffs granted; (v) the amount of the Cash Redress

checks deposited by Affected Consumers; and (vi) the number of tradelines

deleted to correct inaccurate consumer reports.

95. Respondent may not condition the payment of any redress to any Affected

Consumer under this Consent Order on that Affected Consumer waiving any

right.

# IX.

## Order to Pay Civil Money Penalty

**IT IS FURTHER ORDERED** that:

96. Under § 1055(c) of the CFPA, 12 U.S.C. § 5565(c), by reason of the violations of law described in Section IV of this Consent Order, and taking into account the factors in 12 U.S.C. § 5565(c)(3), Respondent must pay a civil money penalty of $2,500,000 to the Bureau.

97. Within 10 days of the Effective Date, Respondent must pay the civil money penalty by wire transfer to the Bureau or to the Bureau's agent in compliance with the Bureau's wiring instructions.

98. The civil money penalty paid under this Consent Order will be deposited in the Civil Penalty Fund of the Bureau as required by § 1017(d) of the CFPA, 12 U.S.C. § 5497(d).

99. Respondent, for all purposes, must treat the civil money penalty paid under this Consent Order as a penalty paid to the government. Regardless of how the Bureau ultimately uses those funds, Respondent may not:

   a. Claim, assert, or apply for a tax deduction, tax credit, or any other tax benefit for any civil money penalty paid under this Consent Order; or

   b. Seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made under any

insurance policy, with regard to any civil money penalty paid under this Consent Order.

100.    To preserve the deterrent effect of the civil money penalty in any Related Consumer Action, Respondent may not argue that Respondent is entitled to, nor may Respondent benefit by, any offset or reduction of any compensatory monetary remedies imposed in the Related Consumer Action because of the civil money penalty paid in this action or because of any payment that the Bureau makes from the Civil Penalty Fund. If the court in any Related Consumer Action offsets or otherwise reduces the amount of compensatory monetary remedies imposed against Respondent based on the civil money penalty paid in this action or based on any payment that the Bureau makes from the Civil Penalty Fund, Respondent must, within 30 days after entry of a final order granting such offset or reduction, notify the Bureau, and pay the amount of the offset or reduction to the U.S. Treasury. Such a payment will not be considered an additional civil money penalty and will not change the amount of the civil money penalty imposed in this action.

## X.

## Additional Monetary Provisions

**IT IS FURTHER ORDERED** that:

101. In the event of any default on Respondent's obligations to make payment under this Consent Order, interest, computed under 28 U.S.C. § 1961, as amended, will accrue on any outstanding amounts not paid from the date of default to the date of payment, and will immediately become due and payable.

102. Respondent must relinquish all dominion, control, and title to the funds paid to the fullest extent permitted by law and no part of the funds may be returned to Respondent.

103. Under 31 U.S.C. § 7701, Respondent, unless it already has done so, must furnish to the Bureau its taxpayer-identification numbers, which may be used for purposes of collecting and reporting on any delinquent amount arising out of this Consent Order.

104. Within 30 days of the entry of a final judgment, consent order, or settlement in a Related Consumer Action, Respondent must notify the Enforcement Director of the final judgment, consent order, or settlement in writing. That notification must indicate the amount of redress, if any, that Respondent paid

43

or is required to pay to consumers and describe the consumers or classes of consumers to whom that redress has been or will be paid.

## COMPLIANCE PROVISIONS

## XI.

## Reporting Requirements

**IT IS FURTHER ORDERED** that:

105.   Respondent must notify the Bureau of any development that may affect compliance obligations arising under this Consent Order, including but not limited to a dissolution, assignment, sale, merger, or other action that would result in the emergence of a successor company; the creation or dissolution of a subsidiary, parent, or affiliate that engages in any acts or practices subject to this Consent Order; the filing of any bankruptcy or insolvency proceeding by or against Respondent; or a change in Respondent's name or address. Respondent must provide this notice, if practicable, at least 30 days before the development, but in any case, no later than 14 days after the development.

106.   Within 7 days of the Effective Date, Respondent must:

a.   designate at least one telephone number and email, physical, and postal addresses as points of contact that the Bureau may use to communicate with Respondent;

b.  identify all businesses for which Respondent is the majority owner, or that Respondent directly or indirectly controls, by all of their names, telephone numbers, and physical, postal, email, and Internet addresses; and

c.  describe the activities of each such business, including the products and services offered, and the means of advertising, marketing, and sales.

107.  Respondent must report any change in the information required to be submitted under paragraph 106 above at least 30 days before the change or as soon as practicable after the learning about the change, whichever is sooner.

108.  Within 90 days of the Effective Date, and again one year after the Effective Date, Respondent must submit to the Enforcement Director an accurate written compliance progress report (Compliance Report) that has been approved by the Board, sworn to under penalty of perjury, which, at a minimum:

a.  Lists each applicable paragraph and subparagraph of the Order and describes in detail the manner and form in which Respondent has complied with each such paragraph and subparagraph;

b.  Describes in detail the manner and form in which Respondent has complied with the Redress Plan and Compliance Plan;

45

   c.  Includes a report on Respondent's consumer complaint management

      program, including, at a minimum:

       i.  The number of complaints received relating to allegedly

          unauthorized loans and related unauthorized transactions;

      ii.  The number of complaints of allegedly unauthorized loans resolved

          with evidence of authorization as specified in the Consent Order;

     iii.  The number of unauthorized loan complaints resolved by cancelling

          the loan because Respondent did not have proof of authorization or

          the consumer provided evidence indicating that the authorization

          was fraudulent;

     iv.  The number of unauthorized loan complaints where Respondent

          determined the consumer was liable but resolved the complaint with

          a goodwill gesture of cancelling the loan;

      v.  The mean and median number of days to resolve unauthorized loan

          complaints;

     vi.  The number of unauthorized loan complaints resulting in

          chargebacks for consumers because Respondent did not have proof

          of authorization or the consumer provided evidence indicating that

          the authorization was fraudulent;

     vii.  The aggregate amount of such chargebacks;

    viii.  The number of unauthorized loan complaints resulting in refunds to consumers because Respondent did not have proof of authorization or the consumer provided information indicating that the authorization was fraudulent;

    ix.  The number of unauthorized loan complaints where Respondent determined the consumer was liable but resolved the complaint with a goodwill gesture of refunding the consumer;

    x.  The aggregate amount of refunds to consumers relating to unauthorized loan complaints because Respondent did not have proof of authorization or the consumer provided information that authorization was fraudulent;

    xi.  The aggregate amount of refunds to consumers where Respondent determined the consumer was liable but resolved the complaint with a goodwill gesture of refunding the consumer;

    xii.  The number of unauthorized loan complaints resulting in write-offs because Respondent did not have proof of authorization or the consumer provided information indicating that the authorization was fraudulent; and

    xiii.  The aggregate amount of the write-offs on loans with unauthorized loan complaints because Respondent did not have proof of

47

authorization or the consumer provided information indicating that

the authorization was fraudulent.

d.  Describe in detail the manner and form in which Respondent has

complied with the Redress Plan and Compliance Plan; and

e.  Attaches a copy of each Order Acknowledgment obtained under Section

XII unless previously submitted to the Bureau.

109.  In connection with Section V of this Consent Order, Respondent must obtain

an initial and annual assessments (Assessments) from an independent third-

party professional (Assessor) as set forth in the approved Compliance Plan.

The reporting period for the Assessments must cover: (1) the period from the

Effective Date to 180 days after the Bureau non-objects to the Compliance

Plan; and (2) each 1-year period thereafter until termination of this Consent

Order for the annual Assessment.  Respondent must submit each Assessment

to the Bureau within ten days after the Assessment has been completed.

110.  Each Assessment must evaluate whether Respondent has effectively

implemented and maintained the requirements set forth in paragraphs 71-76,

and make recommendations to remediate or cure any ineffective

implementation or maintenance of the requirements set forth in paragraphs

71-76.

111.   No finding of any Assessment shall rely solely on assertions or attestations by Respondent's management. The Assessment shall be signed by the Assessor and shall state that the Assessor conducted an independent review and did not rely solely on assertions or attestations by Respondent's management.

## XII.

## Order Distribution and Acknowledgment

**IT IS FURTHER ORDERED** that:

112.   Within 7 days of the Effective Date, Respondent must submit to the Enforcement Director an acknowledgment of receipt of this Consent Order, sworn under penalty of perjury.

113.   Within 30 days of the Effective Date, Respondent must deliver a copy of this Consent Order to each of its board members and executive officers, as well as to any managers, employees, service providers, or other agents and representatives who have responsibilities related to the subject matter of the Consent Order.

114.   For 5 years from the Effective Date, Respondent must deliver a copy of this Consent Order to any business entity resulting from any change in structure referred to in Section XI, any future board members and executive officers, as well as to any managers, employees, service providers, or other agents

and representatives who will have responsibilities related to the subject matter of the Consent Order before they assume their responsibilities.

115.  Respondent must secure a signed and dated statement acknowledging receipt of a copy of this Consent Order, ensuring that any electronic signatures comply with the requirements of the E-Sign Act, 15 U.S.C. § 7001 *et seq.*, within 30 days of delivery, from all persons receiving a copy of this Consent Order under this Section.

116.  Within 90 days of the Effective Date, Respondent must provide the Bureau with a list of all persons and their titles to whom this Consent Order was delivered through that date under paragraphs 113-114 and a copy of all signed and dated statements acknowledging receipt of this Consent Order under paragraph 115.

## XIII.

## Recordkeeping

**IT IS FURTHER ORDERED** that:

117.  Respondent must create and retain the following business records:

a.  all documents and records necessary to demonstrate full compliance with each provision of this Consent Order, including all submissions to the Bureau;

b.  all documents and records pertaining to the Redress Plan, described in

Section VIII above;

c. copies of all sales scripts, training materials, advertisements, websites, and other marketing materials, including any such materials used by a third party on Respondent's behalf;

d. all consumer complaints and refund requests (whether received directly or indirectly, such as through a third party), and any responses to those complaints or requests;

e. records showing, for each employee providing services related to Respondent's loans, that person's name, telephone number, email, physical, and postal address, job title or position, dates of service, and, if applicable, the reason for termination; and

f. records showing, for each Merchant and any other service provider providing services related to the GreenSky Program loans, the name of a point of contact, and that person's telephone number, email, physical, and postal address, job title or position, dates of service, and, if applicable, the reason for termination.

118. Respondent must make the documents identified in paragraph 117 available to the Bureau upon the Bureau's request.

# XIV.

## Notices

**IT IS FURTHER ORDERED** that:

119. Unless otherwise directed in writing by the Bureau, Respondent must

provide all submissions, requests, communications, or other documents

relating to this Consent Order in writing, with the subject line, "*In re*

GreenSky, LLC, File No. 2021-CFPB-0004," and send them by

overnight courier or first-class mail to the below address and

contemporaneously by email to Enforcement_Compliance@cfpb.gov:

> Assistant Director for Enforcement
> Consumer Financial Protection Bureau
> ATTENTION: Office of Enforcement
> 1700 G Street, N.W.
> Washington D.C. 20552

# XV.

## Cooperation with the Bureau

**IT IS FURTHER ORDERED** that:

120. Respondent must cooperate fully to help the Bureau determine the identity

and location of, and the amount of injury sustained by, each Affected

Consumer. Respondent must provide such information in its or its agents'

possession or control within 14 days of receiving a written request from the

Bureau.

A249

# XVI.

## Compliance Monitoring

**IT IS FURTHER ORDERED** that:

121.  Within 14 days of receipt of a written request from the Bureau, Respondent must submit additional Compliance Reports or other requested information, which must be made under penalty of perjury; provide sworn testimony; or produce documents.

122.  For purposes of this Section, the Bureau may communicate directly with Respondent, unless Respondent retains counsel related to these communications.

123.  Respondent must permit Bureau representatives to interview any employee or other person affiliated with Respondent who has agreed to such an interview regarding: (a) this matter; (b) anything related to or associated with the conduct described in Section IV; or (c) compliance with the Consent Order. The person interviewed may have counsel present.

124.  Nothing in this Consent Order will limit the Bureau's lawful use of civil investigative demands under 12 C.F.R. § 1080.6 or other compulsory process.

# XVII.

## Modifications to Non-Material Requirements

**IT IS FURTHER ORDERED** that:

125.   Respondent may seek a modification to non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) by submitting a written request to the Enforcement Director.

126.   The Enforcement Director may, in his or her discretion, modify any non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) if he or she determines good cause justifies the modification. Any such modification by the Enforcement Director must be in writing.

## ADMINISTRATIVE PROVISIONS

## XVIII.

**IT IS FURTHER ORDERED** that:

127.   The provisions of this Consent Order do not bar, estop, or otherwise prevent the Bureau from taking any other action against Respondent, except as described in paragraph 128. Further, for the avoidance of doubt, the provisions of this Consent Order do not bar, estop, or otherwise prevent any other person or governmental agency from taking any action against Respondent.

54

128.   The Bureau releases and discharges Respondent from all potential liability

for law violations that the Bureau has or might have asserted based on the

practices described in Section IV of this Consent Order, to the extent such

practices occurred before the Effective Date and the Bureau knows about

them as of the Effective Date. The Bureau may use the practices described in

this Consent Order in future enforcement actions against Respondent and its

affiliates, including, without limitation, to establish a pattern or practice of

violations or the continuation of a pattern or practice of violations or to

calculate the amount of any penalty. This release does not preclude or affect

any right of the Bureau to determine and ensure compliance with the

Consent Order, or to seek penalties for any violations of the Consent Order.

129.   This Consent Order is intended to be, and will be construed as, a final

Consent Order issued under § 1053 of the CFPA, 12 U.S.C. § 5563, and

expressly does not form, and may not be construed to form, a contract

binding the Bureau or the United States.

130.   This Consent Order will terminate 5 years from the Effective Date or 5 years

from the most recent date that the Bureau initiates an action alleging any

violation of the Consent Order by Respondent. If such action is dismissed or

the relevant adjudicative body rules that Respondent did not violate any

provision of the Consent Order, and the dismissal or ruling is either not

appealed or upheld on appeal, then the Consent Order will terminate as though the action had never been filed. The Consent Order will remain effective and enforceable until such time, except to the extent that any provisions of this Consent Order have been amended, suspended, waived, or terminated in writing by the Bureau or its designated agent.

131. Calculation of time limitations will run from the Effective Date and be based on calendar days, unless otherwise noted.

132. Should Respondent seek to transfer or assign all or part of its operations that are subject to this Consent Order, Respondent must, as a condition of sale, obtain the written agreement of the transferee or assignee to comply with all applicable provisions of this Consent Order.

133. The provisions of this Consent Order will be enforceable by the Bureau. For any violation of this Consent Order, the Bureau may impose the maximum amount of civil money penalties allowed under § 1055(c) of the CFPA, 12 U.S.C. § 5565(c). In connection with any attempt by the Bureau to enforce this Consent Order in federal district court, the Bureau may serve Respondent wherever Respondent may be found, and Respondent may not contest that court's personal jurisdiction over Respondent.

134. This Consent Order and the accompanying Stipulation contain the complete agreement between the parties. The parties have made no promises,

representations, or warranties other than what is contained in this Consent Order and the accompanying Stipulation. This Consent Order and the accompanying Stipulation supersede any prior oral or written communications, discussions, or understandings.

135.    Nothing in this Consent Order or the accompanying Stipulation may be construed as allowing Respondent, its Board, officers, or employees to violate any law, rule, or regulation.


**IT IS SO ORDERED**, this 12th day of July 2021.


*David K. Uejio*
David Uejio
Acting Director
Consumer Financial Protection Bureau

# EXHIBIT 3

# GreenSky®

P.O. Box 29429, Atlanta, GA 30359

---

Important Home Improvement
Loan Information Enclosed

**Congratulations on your project
with Renewal by Andersen of Oklahoma[1]**


T7 P1 144534-9-20-1 - 1279
SUSAN K PARISI
001279

---

**Credit Limit[2]**
## $17,744.00

**Complete Purchases By**
## 05/26/2022

**Application ID**

*You should monitor your statements and notify us of any unauthorized transactions by calling (866) 936-0602. You have zero liability for transactions you did not authorize[4].*

*Hablantes de Español - Los acuerdos de préstamo en idioma Español están disponibles previa solicitud. Contáctenos para obtener una versión en Español de presente acuerdo.*

Welcome Susan,

Thank you for financing your project through the GreenSky® Loan Program[3]. This Welcome Packet includes important information about your account.

Please review the following enclosed documents to ensure you know what to expect next about your loan.

▸ **Upcoming Milestones for Your Loan**

▸ **Shopping Pass and Loan Agreement**

We are committed to providing you with the best service. Please contact us if you have any questions.

We appreciate you choosing the GreenSky® Loan Program for your financing needs.

Sincerely,



Tim Kaliban, GreenSky® Program

---

**Contact Us:** www.greenskyonline.com | service@greensky.com

1. Renewal by Andersen of Oklahoma may pay a transaction fee as a result of your use of the loan. They are prohibited from charging you (either by direct surcharge or other means) to cover the cost of the transaction fee. 2. Although approved for a Greensky® Program loan, you have no obligation until you authorize a transaction on your account. 3. Greensky loans are bank installment loans. Your lender is BMO HARRIS BANK N.A. and is identified on the Loan Agreement. 4. Applicable payment card network rules apply.



A256



# Bill of Rights

Consumers are the foundation of the GreenSky® family.  We care about everything associated with your GreenSky® experience. This includes assisting you with any concerns, questions or issues you experience with a loan and/or your contractor/provider.

At GreenSky, our Core Values – Advocacy, Integrity, Service, Enthusiasm and Impact – drive our mission.

1. **Advocacy** – We are here to be your advocate in resolving disputes related to your GreenSky® experience.  This includes, but is not limited to:

    a. If you encounter concerns, questions or issues related to your contractor/provider and/or your loan, please tell us. **We are here to help.**

    b. Ensuring you are not responsible for transactions that are fraudulent or that you did not authorize or for products or services that you did not receive.

2. **Integrity** – We strive to administer the GreenSky® Program in a manner that is transparent and that allows you to understand your GreenSky® Program loan, including any promotional financing terms and the interest rate, monthly payment, and total dollar cost of your loan.

3. **Service** – We strive to protect your information from theft, loss, or misuse.

4. **Enthusiasm** – We strive to provide excellent customer service, which includes treating you with respect, honesty, and fairness.

5. **Impact** – Through this Consumer Bill of Rights, we strive to enable customers to access loan products that meet their financial needs and help them achieve their dreams.

# Upcoming Milestones for Your Loan



*Learn what to expect next by reviewing key milestones for your loan below.*

**1**   **Activate Your Account: You Are Here!**
  ▸ Activate your loan within 30 days at www.greensky.com/activate.

**2**   **Register on the Customer Portal**
  ▸ Register at www.greenskyonline.com to manage payments, set up autopay/paperless billing, and view statements/loan documents.
  ▸ Set up your profile using your Application ID and a valid email address.

**3**   **Transact on Your Account**
  ▸ Make purchases with your merchant through your Purchase Window Expiration Date, which will close no later than **05/26/2022.** Simply provide your Merchant with your Shopping Pass[1] and a valid photo ID.
  ▸ You will be notified when a purchase is made on your account. The notification will inform you of any action required.
  ▸ You will only be responsible for the total amount purchased on your account. The approved Credit Limit is not reported to credit bureaus unless that limit is the amount you spend.

**4**   **First Statement Available**
  ▸ Receive your first statement in 15-25 days after your first transaction, depending on your plan. You will receive monthly statements for the life of your loan.
  ▸ Use your bank account to make payments. Credit cards and debit cards are not valid payment methods.
  ▸ There are multiple, easy ways to make a payment:

| ☐ Online | ✉ Mail | ☎ Phone |
|---|---|---|
| Log into the Customer Portal to make a payment or pay as a guest. You can also use your bank's online bill pay method. | Dept. #3025 GreenSky P.O. Box 2153 Birmingham, AL 35287-3025 | (866) 936-0602 Make payments 24/7 by using our automated system. |

**5**   **Purchase Window Closes**
  ▸ After the Purchase Window closes, which will be no later than **05/26/2022**, you will no longer have access to the approved Credit Limit.

**6**   **Repay Your Loan**

---

1 Your Shopping Pass is used to access your loan proceeds. Please protect it like any other financial device. Use of the Shopping Pass or the funds from your loan to make a purchase constitutes your electronic signature on the Loan Agreement which has the same legal effect as your physical signature.



A258

This page is intentionally blank.



**GreenSky**
Shopping Pass

For Barcode Scanners

Exp 11/25

Susan K Parisi          CVV

Exp 11/25

---

# Congratulations, Susan!
## You have been approved for up to $17,744.00!*

**The purpose of this Shopping Pass is to provide important information about your loan and to make purchases using your GreenSky® loan.†**

**About Your Account:**

1. When you are ready to make your purchase, give your account number and expiration date to your Merchant along with your photo ID. By providing your account number to your Merchant you are authorizing your Lender to send Loan proceeds to your Merchant in payment for the goods or services that you have purchased. Provide your account number to your Merchant only when you are prepared to pay. Only those named on this Shopping Pass are authorized to make purchases. Do not give this Shopping Pass to any person not named on this Shopping Pass. If you do so, you may be held liable for their purchases. If this Shopping Pass is lost or stolen, notify us immediately at (866) 936-0602 to limit your liability. **Please be aware that if you authorize your Lender to make an initial advance under your GreenSky® Installment Loan to pay any initial payment required by the Merchant, payments may become due under your GreenSky® Installment Loan prior to the completion of services by the Merchant.**

2. You have a purchasing window of 6 months to use your credit limit of up to $17,744.00. All purchases must be made by 05/26/2022 (the "Purchase Window Expiration Date"). We may close your purchase window earlier if we determine that your job is substantially complete. See the terms and conditions of your Loan Agreement for details.

3. After your first purchase, you will receive monthly statements to track your transactions. **You have zero liability for transactions that you do not authorize‡**. Please monitor your statements carefully and contact us at (866) 936-0602 to notify us immediately of any unauthorized activity.

4. You will have no Loan unless you authorize a transaction, which is your electronic signature of the Loan Agreement and will have the same legal effect as a physical signature.

**Plan 7541, THIS IS A DIFFERENT PLAN THAN REQUESTED. 84 payments. Up to 6 month purchase window. At the earlier of purchase window expiration date or job completion, a 24 month promotional (promo) period begins with minimum monthly payments required followed by 60 amortized payments based on the balance at the end of promo. Your fixed interest rate is based on creditworthiness and is disclosed in your loan agreement. Interest is billed during the promo period but all interest is waived if the purchase amount is paid in full before the end of the promo period. Making initial minimum monthly payments will not pay off your loan before the end of the promo period.**

**(866) 936-0602**                                                                      **www.greensky.com**

### Thank you for choosing GreenSky® Program!
service@greensky.com

---

Use of this Shopping Pass or the associated Loan by (any) Borrower (or any authorized user) to make a purchase constitutes acceptance by (all) Borrower(s) of the terms of the accompanying Loan Agreement.

**The physical or electronic record of any such purchase will constitute the signature of (all) Borrower(s) on such Loan Agreement.**

Provide your account number and expiration date to authorize a transaction only after you are satisfied that you have received the goods and/or services that you are purchasing. Your Lender does not monitor the workmanship, quality, or completeness of the goods and/or services that you purchase. Contact your Merchant immediately if not completely satisfied. You will receive monthly statements to help track your transactions and payments.

**FOR PROTECTION AGAINST UNAUTHORIZED PURCHASES, IDENTIFICATION WILL BE REQUIRED FOR ALL PURCHASES.**

Spanish language loan agreements are available upon request. Contact us for a Spanish version of this agreement.

Los acuerdos de préstamo en idioma español están disponibles bajo petición. Contáctenos para obtener una versión en español de este acuerdo.

* Eligible only for purchases with your Merchant. **Your Lender is specified on your Loan Agreement.**

† GreenSky® is the brand name for certain consumer credit plans extended by participating lenders to borrowers for the purchase of goods or services from participating Merchants. Participating lenders are federally insured, federal and state chartered financial institutions providing credit without regard to age, race, color, religion, national origin, sex, or familial status. GreenSky® is a registered trademark of GreenSky, LLC and is used by your Lender under license. GreenSky Servicing, LLC ("Servicer") will service this Loan on behalf of your Lender.

‡ Applicable payment card network rules apply. Any unauthorized transactions must be reported to us within 60 days.

The monthly payments in the payment schedule of your Truth in Lending Disclosure is estimated and based on the Amount Financed for which you have been approved. Examples of required minimum monthly payments for different total purchase amounts appear below.

| Total Amount of Purchases | Monthly Payment Amount |
|---|---|
| $4,000.00 | $101.22 |
| $5,000.00 | $126.52 |
| $10,000.00 | $253.05 |
| $15,000.00 | $379.58 |
| $17,744.00 | $449.01 |
| $19,000.00 | $480.80 |



A260

**GreenSky**

# UNDERSTANDING YOUR DEFERRED INTEREST LOAN

## What does it mean to have "No Interest if Paid in Full within the Promotional Period?"

We are committed to helping you understand how your GreenSky® Program loan works. While the details of your loan are described throughout this package, the information and frequently asked questions below are designed to provide you with helpful information regarding your loan.

Your loan is a "**deferred interest**" (also referred to as "No Interest if Paid in Full") loan. This means that:

- **INTEREST WILL BE BILLED DURING THE PROMOTIONAL PERIOD.**
- But, if you pay off your entire purchase balance before the end of the promotional period, all billed interest will be waived.
- **If you do not repay your entire purchase balance before the end of the promotional period**, you will be responsible for paying all interest that was billed during the promotional period and any interest that accrues after the expiration of the promotional period.

## FREQUENTLY ASKED QUESTIONS

**Q.** How long is the "promotional period" for my loan?

**A.** The promotional period for your loan is identified on the Shopping Pass and in the loan agreement.

**Q.** Do I have to make payments during the "promotional period"?

**A.** Your plan description and Truth in Lending disclosures will tell you whether you have payments due during the promotional period. Even if you don't have to make payments during the promotional period, it is a good idea to make regular payments to minimize any deferred interest you might owe if the purchase balance is not paid in full before the end of the promotional period. If you have payments due during the promotional period, making these payments will NOT pay off your entire purchase balance before the end of the promotional period.

**Q.** How will I know how much to pay and by when in order to satisfy the promotional offer?

**A.** You will receive a statement every month. During the promotional period, your statement will include a section that details your promotional financing offer. This section will identify your entire purchase balance, the purchase balance left to pay before the end of the promotional period, and the date on which your promotional period expires.

**Q.** My merchant is offering refinancing at the end of the "promotional period". How should I evaluate that offer?

**A.** Merchants are not allowed to make refinancing offers (either verbally or in writing) in connection with a Program loan. If your merchant has made any refinancing offers please report to us immediately. A customer's credit situation can change and relying on obtaining refinancing to pay-off the deferred interest loan before the end of the promotional period is not advisable.

**Q.** What if I still have questions?

**A.** You have no obligation on your loan until you authorize a transaction. If you have any questions about your deferred interest loan and your responsibility to repay, please contact us before authorizing a transaction.

**By authorizing a transaction and accepting your loan, you are acknowledging that you understand you are responsible for repaying this loan and agree that your merchant has not promised to issue or arranged to issue a loan with another lender to repay this loan.**

A261

**LENDER:** BMO HARRIS BANK N.A.

**Lender Correspondence Address:** GreenSky® Program
Attn: Correspondence P.O. Box 29429, Atlanta, GA 30359
**Borrower:** Susan K Parisi
**Phone Number:**

**City/State/Zip:**

**Application ID:** **Date:** 11/23/2021
**Merchant:** Renewal by Andersen of Oklahoma
**Borrower:**
**Phone Number:**
**Address:**
**City/State/Zip:**

The Truth in Lending Act (TILA) disclosures below assume that your first purchase will be made on the last day of your Purchase Window, approximately 6 months from your approval date, in an amount equal to the Amount Financed shown below. The Finance Charge below includes $8,868.00 of interest, which will be waived if you pay off your purchase balance within 24 months of the date your Purchase Window closes. Minimum monthly payments are required during the promotional period but will not pay off your loan before the end of your promotional period. Your actual Annual Percentage Rate, Finance Charges, Amount Financed and scheduled payments may vary from the amounts shown below depending on, among other things, the timing and amount of your purchases and payments. You will not accrue interest or be required to make any payments until your Purchase Window closes. Your Purchase Window closes at the earlier of job completion or approximately 6 months from approval date.

## T R U T H   I N   L E N D I N G   D I S C L O S U R E

| ANNUAL PERCENTAGE RATE The cost of credit as a yearly rate | FINANCE CHARGE The dollar amount the credit will cost you | Amount Financed The amount of credit provided to you or on your behalf | Total of Payments The amount you will have paid when you have made all payments as scheduled |
|---|---|---|---|
| 24.99% (e) | $19,973.08 (e) | $17,744.00 (e) | $37,717.08 (e) |

| Your payment schedule will be: | | |
|---|---|---|
| **Number of Payments** | **Amount of Payments** | **When Payments are Due** |
| 24 | $449.02 (e) | Beginning approximately one month after the close of the Purchase Window and monthly thereafter for a total of 24 Months (NOTE: Purchase Window may be open as long as 6 months following your approval). |
| 59 | $449.01 (e) | Beginning monthly thereafter for a total of 59 months. |
| 1 | $449.01 (e) | Approximately 84 months after Purchase Window closes. |

**Prepayment:** If you pay off early, you will not be entitled to a refund of any interest that was billed to your account for the billing cycle in which you make your last payment. You will not be entitled to a refund of the Activation Fee, if any.
See the rest of this document for any additional information on nonpayment, default, and any required repayment in full before the scheduled date, and prepayment refunds and penalties.
**"(e)" means estimate.**

**Itemization of Amount Financed:** $17,744.00 (e)
Paid to Renewal by Andersen of Oklahoma

## FEES
**Penalty Fees**
• Late Payment    The greater of $39 or 5% of the amount past due, except $0 for MA and ME residents and $30 maximum for Iowa residents.
• Returned Payment    Up to $20

**MILITARY LENDING ACT:** The Military Lending Act ("MLA") provides protections for certain members of the Armed Forces and their dependents ("Covered Borrowers"). The provisions of this section apply to Covered Borrowers under the MLA. If you would like more information about whether you are a Covered Borrower and whether this section applies to you, please contact us at 877-266-2945. **Statement of MAPR:** Federal law provides important protections to members of the Armed Forces and their dependents relating to extensions of consumer credit. In general, the cost of consumer credit to a member of the Armed Forces and his or her dependent may not exceed an Annual Percentage Rate of 36%. This rate must include, as applicable to the credit transaction or account: (1) the costs associated with credit insurance premiums; (2) fees for ancillary products sold in connection with the credit transaction; (3) any application fee charged (other than certain application fees for specified credit transactions or accounts); and (4) any participation fee charged (other than certain participation fees for a credit card account). **Oral Disclosures:** In order to hear important MLA disclosures and payment information, please call 877-266-2945. **Covered Military Borrowers:** If you are a Covered Borrower, as defined under the MLA, 10 U.S.C. § 987, as amended from time to time, (i) the provisions of the ARBITRATION PROVISION, (ii) any waiver of your right to legal recourse under any state or federal law and (ii) any other provision in this Loan Agreement that is not enforceable against you under the MLA, does not apply to you.
**NOTICE TO THE BUYER:** 1. THIS IS A CONSUMER CREDIT TRANSACTION. 2. DO NOT SIGN THIS CREDIT AGREEMENT BEFORE YOU READ IT OR IF IT CONTAINS ANY BLANK SPACE. 3. YOU ARE ENTITLED TO A COMPLETELY FILLED IN COPY OF THIS CREDIT AGREEMENT. 4. YOU MAY PREPAY THE UNPAID BALANCE UNDER THIS AGREEMENT AT ANY TIME SUBJECT TO THE "PREPAYMENT" DISCLOSURE ABOVE. 5. THIS LOAN AGREEMENT CONTAINS AN ARBITRATION PROVISION THAT, UNLESS YOU REJECT IT, MAY LIMIT YOUR RIGHT TO LITIGATE A CLAIM IN COURT OR HAVE A JURY TRIAL ON A CLAIM.
**ACCEPTANCE OF THIS LOAN AGREEMENT BY ELECTRONIC SIGNATURE:** The first use of the Shopping Pass or the associated loan to make a purchase will constitute acceptance by (all) Borrower(s) of the terms of this Loan Agreement. The dated physical or electronic record of such use will evidence the signature of (all) Borrower(s) on this Loan Agreement and have the same legal effect as a physical signature.

**CAUTION - IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT. NON-NEGOTIABLE CONSUMER NOTE.**

Borrower: _____ Date: _____    Co-Borrower: _____ Date: _____
*Electronic record constitutes acceptance of this Agreement (see above)*    *Electronic record constitutes acceptance of this Agreement (see above)*

**LENDER:** /s/ BMO HARRIS BANK N.A.      Date: 11/23/2021
**IN-HOME SALE CUSTOMERS:** ARIZONA, CONNECTICUT, NORTH DAKOTA AND RHODE ISLAND RESIDENTS: THIS INSTRUMENT IS BASED UPON A HOME/PERSONAL SOLICITATION SALE SUBJECT TO THE PROVISIONS OF TITLE 44, CHAPTER 15 OF THE ARIZONA REVISED STATUTES IN ARIZONA; THE HOME SOLICITATION SALES ACT IN CONNECTICUT, THE NORTH DAKOTA CENTURY CODE IN NORTH DAKOTA; AND TITLE 6, CHAPTER 28 OF THE RHODE ISLAND GENERAL LAWS. THIS INSTRUMENT IS NOT NEGOTIABLE.



A262

**TERMS AND CONDITIONS CONTINUE ON NEXT PAGE**
Lender: BMO HARRIS BANK N.A. 2111233004 PPLD20211011_77_2_W Rev 10/21

**1. Welcome.** Thank you for opening an installment loan through the GreenSky® Program. By accepting the Shopping Pass, the Truth in Lending Disclosure, the terms and conditions, and the Lender's Privacy Notice (collectively, the "Loan Agreement"), each Borrower ("you") acknowledges that (i) BMO HARRIS BANK N.A. ("Lender", "we", "our " or "us") has approved Borrower(s) for a GreenSky® Program Installment Loan up to the Amount Financed as set forth in the Truth in Lending Disclosure above (the "Loan"), (ii) each Borrower has received and retained a copy of Lender's Privacy Notice, (iii) each Borrower has read this Loan Agreement, including any Addenda, and agrees to be bound by its terms, (iv) if this Agreement resulted from a sale in your home ("In-Home Sale"), the sales person has explained each Borrower's right to cancel and has provided a filled-in written Notice of Right to Cancel. Any Notice of Right to Cancel and any additional notice of right to cancel provided in the sales contract for an In-Home Sale, as well as any accompanying addendum provided to Borrower, are incorporated herein by reference, and unless any Borrower exercises the right to cancel, Lender agrees to pay the Amount Financed to Merchant for an In-Home Sale upon receipt of a transaction authorization, (v) either Borrower may direct Lender to make payments to Merchant by using the Shopping Pass or account number, and (vi) neither Borrower is a co-signer. A Certificate of Completion is required unless Borrower directs Lender to make payments to Merchant by using the Shopping Pass or account number. This Loan Agreement, including any changes to it, contains the terms of your agreement with BMO HARRIS BANK N.A..

**2. Installment Loan Program.**

**a. Using your Loan:** You may make purchases of goods or services from Merchant, in total up to the "Amount Financed" set forth in the Truth in Lending Disclosure of this Loan Agreement, during the purchasing window time period specified on your Shopping Pass, which is incorporated here by reference. We may close the purchasing window time period on the earlier of the Purchase Window Expiration Date or when your job is substantially complete as determined by Lender (such as when your Merchant notifies us that your job is substantially complete). Once the purchasing window time period closes, you will no longer be able to make additional purchases. Each time you make a purchase of goods or services from Merchant, you authorize us to extend credit to you and to forward Loan proceeds to your Merchant on your behalf. We may decline any transaction if we experience an operational difficulty (such as a system outage), if you fail to make any payment required under this Agreement or you are in Default (as defined herein), or if we identify suspected fraudulent or unlawful activity involving your Loan.

**b. Credit Limit:** You agree not to make purchases in excess of the Amount Financed shown above, but if you do, you agree that we may, in our sole discretion, increase the Amount Financed to include such excess amount in a "Summary of Account at Conversion" that reflects such increased Amount Financed and resulting increased anticipated Finance Charge and Total of Payments. The dated electronic record of such excess purchase(s) will evidence your request for and acceptance of any such increased terms.

**c. Beginning of Amortization Period:** We will total the purchases you made during the purchasing window and provide you with a Summary of Account at Conversion that will show (based on actual total purchases) a final Amount Financed, Finance Charge, Total of Payments and remaining payment schedule for your Loan based on your total purchases.

**d. For your convenience, we may provide you with certain materials in both the Spanish and English languages. You agree that, to the greatest extent not prohibited by law, the English text will control.**

**Para su conveniencia, podemos proporcionarle ciertos materiales en los idiomas español e inglés. Usted acepta que, en la mayor medida no prohibida por la ley predominará el texto en inglés.**

**3. Promise to Pay.** For value received, you agree to pay us: (a) so much as you may actually borrow from time to time by initiating transactions under the Loan Agreement, plus (b) periodic interest at an annual rate of 24.99% on the unpaid Amount Financed outstanding until the loan is paid in full, (c) any applicable taxes or other charges due under this Loan Agreement. We calculate the interest charge on your account by applying a monthly periodic rate to your outstanding principal balance on the first day of your first billing cycle and thereafter to your outstanding principal balance on the first day of each billing cycle. The monthly periodic rate equals the applicable annual rate divided by twelve (12). Payments will be due as scheduled. Any principal balance, interest and other charges remaining unpaid are due in full on the date of the last scheduled payment. The actual amount of interest that you may pay may exceed the Finance Charge disclosed in the Truth in Lending Disclosure or Summary of Account at Conversion if you do not make minimum payments due by their due dates as identified in your statements. If you do not make required payments, then, in addition to any other rights and remedies available under this Loan Agreement or applicable law, (i) your purchasing window may close early and (ii) no new purchases may be permitted.

**4. Timing and Application of Payments.** You agree to make payments in accordance with the estimated payment schedule contained in the Truth in Lending Disclosure on the preceding page (or any updated disclosure, including the Summary of Account at Conversion), provided that you will be obligated to make minimum monthly payments in the amounts and on the dates shown on your statements. Any payment made in excess of your minimum monthly payment will be applied to your Principal Balance and will not reduce the amount of your next regularly scheduled payment. You agree that, except for updated amounts, if any, shown on your updated Summary of Account at Conversion, including any adjustments in scheduled payments to reflect your final Amount Financed and Finance Charges due, all other terms and disclosures of this Loan Agreement will remain in full force and effect. Once the initial payment due date is set, the payment due date will be the same day each month. Subject to applicable law, we may apply payments to the amounts you owe under this Loan Agreement in any order we choose. You may not tell us how to apply payments. Any partial prepayment will be applied against the outstanding balance, but will not postpone the due date of any subsequent monthly installments or change the amount of any such installments, unless we otherwise agree in writing. We will apply any refund for a returned purchase when we or Servicer receives notice of the refund from your Merchant. We do not control when your Merchant may notify us or Servicer of a refund. If your Merchant's notice is received after we send your Summary of Account at Conversion, we will apply the refund as a prepayment on your loan to reduce your outstanding balance but this will not reduce your subsequent minimum monthly payments (subject to any necessary adjustments to the number of payments required or your final payment amount).

**5. Payment Method and Address.** Unless automatic payments are authorized in connection with this Loan, you agree to make payments by mailing a check or money order to Dept# 3025, GreenSky, PO Box 2153, Birmingham AL 35287-3025, by making a phone payment by dialing 1-855-809-1889 or by making an online payment at www.greenskyonline.com. You agree that payments may not be made in whole or in part by credit card. A payment to our Servicer in accordance with this Loan Agreement is a payment to us. You agree not to send us partial payments marked "paid in full," "without recourse," or similar language. If you send such a payment, we may accept it without losing any of our rights under this Loan Agreement. **All written communications concerning disputed amounts, including any check or other payment instrument that (i) is postdated and accompanied by adequate notice, (ii) indicates that the payment constitutes "payment in full" of the amount owed, (iii) is tendered with other conditions or limitations or (iv) is otherwise tendered as full satisfaction of a disputed amount, must be marked for special handling and mailed or delivered to us at P.O. Box 29429, Atlanta, GA 30359, Attention: Disputes.**

**6. Unpaid Balances.** (a) During your deferred interest promotional period, you will satisfy the terms of your promotion and all interest billed during the promotional period will be waived/credited if you pay the entire purchase balance before the end of the promotional period and you will still be responsible for any outstanding

fees. (b) Notwithstanding the language in Section 6(a) above, if your deferred interest promotional period has expired, your Loan will not be regarded as "paid in full" if your loan has an unpaid balance of Amount Financed, interest, late charges, returned payment charges, or any other fees or charges at the end of the term.

**7. Access Device.** We will provide you with a Shopping Pass which you may use to make purchases of goods or services from Merchant during the purchasing window time period as described in this Loan Agreement. Use of your Shopping Pass or Loan to make a purchase constitutes your acceptance of the terms of this Loan Agreement. You agree to notify us immediately if your Shopping Pass is lost, stolen or otherwise compromised.

**8. Returned Payment Charge.** Subject to applicable law, we may charge you a "Returned Payment Charge" as provided herein. If your lender is located in Connecticut, Georgia, Illinois, Michigan, or Ohio, and your payment is dishonored or returned for any reason, you agree to pay us a Returned Payment Charge of $20. If your lender is located in Alabama or Mississippi and your payment is dishonored or returned for any reason, you agree to pay us a Returned Payment Charge of $15. If you are a Massachusetts Borrower and your payment is dishonored or returned for any reason, you agree to pay us a Returned Payment Charge of $10. In all cases, we may charge this fee the first time any payment is returned even if it is paid upon resubmission.

**9. Late Charge.** If a payment is more than 10 days late, you will be charged the GREATER of $39 or 5% of the amount past due, provided that the late payment fee will not exceed the amount past due ($30 maximum in Iowa). NOTICE: Massachusetts and Maine Borrowers are not charged late charges.

**10. Default.** Subject to applicable law, you will be in default ("Default") if any of the following events occur:

    (a) You have made any false or misleading statement(s) in your application for the Loan subject to this Loan Agreement or any other account that you may have with us;
    (b) You fail to make a payment within 60 days of when it was due under this Loan Agreement or any other account agreement that you may have with us;
    (c) You fail to comply fully with any term or condition of this Loan Agreement or any other account agreement that you may have with us;
    (d) You file or someone else files against you a petition in bankruptcy;
    (e) You die;
    (f) You commit fraud; or
    (g) We believe you are unable or unwilling to pay your debts when due.

MASSACHUSETTS NOTICE: If you are a Massachusetts borrower and this Loan Agreement is secured by a non-possessory interest in consumer goods, this Default provision is enforceable only to the extent that the Default is material and consists of a failure to make one or more payments as required by the Loan Agreement or the occurrence of an event that substantially impairs the value of the collateral.

**11. Remedies on Default.** If you are in Default, we will have all of the rights and remedies available to us at law or in equity, in addition to the specific rights and remedies set forth in this Loan Agreement. We may exercise any, some or all of our rights and remedies, in our sole discretion. If you are in Default, we may, at our option, require you to pay immediately the entire amount you owe us under this Loan Agreement, in full. Subject to the requirements of applicable law, we may do this without giving you any advance notice of presentment, acceleration or our intent to accelerate. Unless prohibited by applicable law, you agree to pay our reasonable costs and attorneys' fees related to the collection of your Loan.

**12. Credit Inquiries and Loan Information.** You authorize us to obtain a credit report on you for any legal purpose in connection with this Loan, including any update, extension of credit, review or collection of this Loan. If you request, we will tell you whether any credit report was requested and, if so, the name and address of the credit bureau furnishing the report.

**13. Inaccurate Information.** If you believe that we have information about you that is inaccurate or that we have reported or may report inaccurate information about you to a credit bureau, please notify us of the specific information that you believe is inaccurate by writing to us at **P.O. Box 29429, Atlanta, GA 30359, Attention: Disputes.** In doing so, please identify the inaccurate information and tell us why you believe it is incorrect. If you have a copy of the credit report that includes the inaccurate information, please send a copy of that report to us as well. The "Your Billing Rights" section below contains special processes required for contacting us in the event of a Billing Error.

**14. Negative Information Reporting.** We may report information about your Loan to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

**15. Severability.** If applicable law is finally interpreted so that charges collected or to be collected in connection with this Loan Agreement exceed the permitted limits, then (i) any such charges will be reduced to the permitted amounts and (ii) any amounts already collected that exceed the permitted amounts will be credited to you by, at our option, applying the credit to any amounts due hereunder or making a direct payment to you. If any provision in this Loan Agreement is invalid under applicable law, the remainder of the provisions in this Loan Agreement will remain in effect and interpreted to give the greatest possible effect to the intent of the parties as originally written.

**16. Assignment; Transfer.** We may sell, assign, transfer or delegate all or any portion of our rights or obligations under this Loan Agreement to any other person without prior notice to you. You may not sell, assign, transfer or delegate any of your rights or obligations under this Loan Agreement.

**17. Governing Law. This Loan Agreement, including the rate of interest and fees, is governed by applicable federal law and, to the extent not preempted by federal law, the laws of IL where the Lender is located as shown in Section 1 (Welcome) of this Loan Agreement (without regard to the State's conflict of laws provisions). If Lender is located in Kansas, the Kansas Consumer Credit Code (Kan. Stat. Ann. §§ 16a-1-101 et seq.) governs this Agreement. If you are a Massachusetts borrower and the Amount Financed is $6,000 or less, this Loan Agreement is also subject to the Massachusetts Small Loan Law.**

**18. Joint and Several Liability.** Each Borrower will be liable individually and together for all obligations under this Loan Agreement, including payment to us of the entire amount owed under this Loan Agreement.

**19. No Waiver by Us.** We will not be deemed to have waived any of our rights by delaying the enforcement of any of our rights. If we waive any of our rights in writing on one occasion, that waiver does not constitute a waiver by us of our rights on any future occasion.



A-264

Lender: BMO HARRIS BANK N.A. 2111233004 PPLD20211011_77_2_W Rev. 10/21

**20. Telephone Monitoring and Recording.** We may monitor and/or record any of your communications with us and you consent to such monitoring and recording. We may monitor and record telephone calls regarding your account to assure the quality of our service and for training purposes.

**21. Communicating With You; Consent to Contact by Electronic and Other Means.** You agree that, to the greatest extent not prohibited by applicable law, we may contact you for any lawful reason, including for the collection of amounts owed to us. No such contact will be deemed unsolicited. You agree that we (and any other owner or servicer of your account) may contact you for any and all purposes arising out of or relating to your Loan at any physical or electronic addresses or numbers (including wireless cellular telephone numbers, ported landline numbers, VOIP or other services) as you may provide to us from time to time. We may use any means of communication, including, but not limited to, postal mail, electronic mail, telephone, text messaging, or other technology, to reach you. You agree that we may use automatic dialing and announcing devices which may play recorded messages. You may contact us at any time to ask that we not contact you using any one or more methods or technologies. You represent that you are permitted to receive communications at each of the telephone numbers you have provided to us.

**22. Notices; Change of Address, Employment or Telephone Number.** We will send all written notices and statements to your address as it appears on our records. To avoid delays and missed payments that could affect your credit standing, you agree to advise us promptly if you change your mailing address, place of employment, telephone number or other contact information, including, but not limited to, porting a landline telephone number to a cellular phone, VoIP or other services. You represent and agree that for purposes of imposing fees and charges, you are deemed to reside at the current mailing address that we have on record for you. You can update your contact information with us by phone, mail, or online at www.greenskyonline.com.

**23. Entire Agreement.** This Loan Agreement constitutes the final written expression of the credit agreement between you and us relating to your Loan. We are not bound by any oral representations made or implied that are not directly reflected in this Loan Agreement. **A credit agreement must be in writing to be enforceable. Oral agreements or commitments to loan money, extend credit, or forbear from enforcing repayment of a debt, including promises to extend or renew such debt, are not enforceable. To protect you and us from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it.**

**24. NOTICES: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

**Your Merchant pays transaction fees as a result of your use of the Loan. Your Merchant is prohibited from surcharging you to cover the cost of these transaction fees.**

**Notice to California Residents: (AVISO PARA LOS QUE RESIDEN EN CALIFORNIA): SI SU PRÉSTAMO FUÉ NEGOCIADO PRIMERAMENTE EN ESPAÑOL, ESTAMOS OBLIGADOS A PRESENTARLE UNA TRADUCCIÓN EN ESPAÑOL DE LAS DISPOSICIONES REQUERIDAS POR LA REGULACIÓN FEDERAL Z, 12 C.F.R. APARTADO 1026.**

**Notice to Iowa Residents:** IMPORTANT: READ BEFORE SIGNING. THE TERMS OF THIS LOAN AGREEMENT SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE. NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THIS WRITTEN CONTRACT MAY BE LEGALLY ENFORCED. BORROWER MAY CHANGE THE TERMS OF THIS AGREEMENT ONLY BY ANOTHER WRITTEN AGREEMENT.

**Notice to New Hampshire Residents:** This Loan Agreement provides for reasonable attorneys' fees to be awarded to us in an action against you involving this Loan Agreement. Reasonable attorneys' fees will be awarded to you if you prevail in any action, suit or proceeding brought by us, or an action brought by you. If you successfully assert a partial defense or set-off, recoupment or counterclaim to an action brought by us, the court may withhold from us the entire amount or such portion of the attorneys' fees as the court considers equitable.

**Notice to New Jersey Residents:** Because certain provisions of this Loan Agreement are subject to applicable laws, they may be void, unenforceable or inapplicable in some jurisdictions. None of these provisions, however, is void, unenforceable or inapplicable in New Jersey.

**Notice to New York Residents:** NOTICE TO THE BUYER: 1. Do not sign this credit agreement before you read it or if it contains any blank space. 2. You are entitled to a completely filled in copy of this credit agreement.

**Notice to Ohio Residents:** The Ohio laws against discrimination require that all creditors make credit equally available to all credit worthy customers, and that credit reporting agencies maintain separate credit histories on each individual upon request. The Ohio civil rights commission administers compliance with this law.

**Notice to Vermont Residents:** Lender is engaged in loan production. **EACH BORROWER SHOULD RETAIN A COPY FOR THEIR RECORDS.**

**25. ARBITRATION PROVISION. Agreement to Arbitrate Disputes:** This Arbitration Provision sets forth the circumstances and procedures under which Claims (defined below) that arise between you and us will be resolved through binding arbitration; provided, however, that this provision does not apply if, on the date this Agreement is issued, you are covered by the federal Military Lending Act as a member of the Armed Forces or a dependent of such a member. UNLESS YOU OPT OUT OF THIS ARBITRATION PROVISION AS PROVIDED BELOW OR EXCEPT AS APPLICABLE LAW PROHIBITS US FROM IMPOSING BINDING ARBITRATION ON YOU, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO LITIGATE A CLAIM IN COURT OR HAVE A JURY TRIAL ON A CLAIM. OTHER RIGHTS THAT YOU WOULD HAVE IN COURT ALSO MAY NOT BE AVAILABLE OR MAY BE LIMITED IN ARBITRATION, INCLUDING YOUR RIGHT TO APPEAL AND YOUR ABILITY TO PARTICIPATE IN A CLASS ACTION. Nothing in this provision precludes you from filing and pursuing your individual Claim in a small claims court in your state or municipality, so long as that claim is pending only in that court. Definitions: As used in this Arbitration Provision, the term "Claim" means and includes any claim, dispute or controversy of every kind and nature, whether based in law or equity, between you and us arising from or relating to your Loan Agreement as well as the relationship resulting from such Agreement ("the Agreement"), including the validity, enforceability or scope of this Arbitration Provision or the Agreement. "Claim" also includes claims by or against any third party providing any product, service or benefit in connection with the Agreement (including, but not limited to, debt collectors and all of their agents, employees, directors and representatives) if and only if, such third party is named as a co-party with you or us (or files a Claim with or against you or us) in connection with a claim asserted by you or us against the other. As used in this Arbitration Provision, "you" and "us" also includes any corporate parent, wholly or majority owned subsidiaries, affiliates, any licensees, predecessors, successors, assigns and purchasers of any accounts, all agents, employees, directors and representatives of any of the foregoing and any third party providing any product, service or benefit in connection with the Agreement. Initiation of Arbitration Proceeding / Selection of Administrator: Any Claim will be resolved, upon the election by you or us,

A265

**TERMS AND CONDITIONS CONTINUE ON NEXT PAGE**

by arbitration pursuant to the arbitration provision in the credit documents or the national arbitration organization which the Claim is referred in effect at the time the Claim is filed (the "Code"), except to the extent the Code conflicts with the Agreement. Claims must be referred to either JAMS or The American Arbitration Association ("AAA"), as selected by the party electing to use arbitration. If a selection by us of either of these organizations is unacceptable to you, you will have the right within 30 days after you receive notice of our election to select the other organization listed to serve as arbitration administrator. For a copy of the procedures, to file a Claim or for other information about these organizations, contact (1) JAMS at 1920 Main Street, Suite 300, Irvine, CA 92614; www.jamsadr.com or (2) AAA at 335 Madison Avenue, New York, NY 10017, www.adr.org. In addition to the arbitration organizations listed above, Claims may be referred to any other arbitration organization that is mutually agreed upon in writing by you and us, or to an arbitration organization or arbitrator(s) appointed pursuant to Section 5 of the Federal Arbitration Act, 9 U.S.C. §§ 1-16, provided that any such arbitration organization and arbitrator(s) will enforce the terms of the restrictions set forth below. Class Action Waiver and Other Restrictions: Arbitration will proceed solely on an individual basis without the right for any Claims to be arbitrated on a class action basis or on bases involving claims brought in a purported representative capacity on behalf of others. The arbitrator's authority to resolve and make written awards is limited to Claims between you and us alone. Claims may not be joined or consolidated unless agreed to in writing by all parties. No arbitration award or decision will have a preclusive effect as to issues or claims in any dispute with anyone who is not a named party to the arbitration. Notwithstanding any other provision in these terms and conditions and without waiving either party's right of appeal, if any portion of this "Class Action Waiver and Other Restrictions" provision is deemed invalid or unenforceable, then the entire Arbitration Provision (other than this sentence) will not apply. Arbitration Procedures: This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and will be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16, as it may be amended ("FAA"), and the applicable Code. The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations and will honor claims of privilege recognized by law. Federal or state rules of civil procedure or evidence will not apply. Written requests to expand the scope of discovery rest within the arbitrator's sole discretion and will be determined pursuant to the applicable Code. The arbitrator will take reasonable steps to preserve the privacy of individual, and of business matters. Judgment upon the written arbitral award may be entered in any court having jurisdiction. Subject to the right of appeal under the FAA, the arbitrator's written decision will be final and binding unless you or we take an appeal from the award by making a dated, written request to the arbitration organization within 30 days from the date of entry of the written arbitral award. A three-arbitrator panel administered by the same arbitration organization will consider anew any aspect of the award objected to by the appellant, conduct an arbitration pursuant to its Code and issue its decision within 120 days of the date of the appellant's written notice. The panel's majority vote decision will be final and binding. Location of Arbitration / Payment of Fees: The arbitration will take place in the federal judicial district where you live. Regardless of who wins in arbitration, you will only be responsible for paying your share, if any, of the arbitration fees required by the applicable Code, which amount will not exceed the filing fees that you would have incurred if the Claim had been brought in the appropriate state or federal court closest to where you live. We will pay the remainder of any arbitration fees. At your written request, we will consider in good faith making a temporary advance of all or part of your share of the arbitration fees. Waivers also may be available from the JAMS or AAA. Continuation: This Arbitration provision will survive termination of the Agreement, as well as voluntary payment in full of your account, any debt collection proceeding by or between you and us, and any bankruptcy by you or us. If any portion of this Arbitration Provision, except the "Class Action Waiver and Other Restrictions" provision above, is deemed invalid or unenforceable for any reason, it will not invalidate the remaining portions of this Arbitration Provision or the Agreement, each of which will be enforceable regardless of such invalidity. Opt-Out Process: You may choose to opt out of and not be subject to this Arbitration Provision but only by following the process set forth below. If you do not wish to be subject to this Arbitration Provision, then you must notify us in writing within forty-five (45) calendar days of the date of the Agreement at the following address: P.O. Box 29429, Atlanta, GA 30359, Attention: Legal. Your written notice must include your name, address, social security number, the date of the Agreement, and a statement that you wish to opt out of the Arbitration Provision. Your notice to opt out will only apply to this particular Agreement with us and not to subsequent or previous agreements.

## 26. Your Billing Rights: Keep this Document for Future Use
This notice tells you about your rights and our responsibilities under the Fair Credit Billing Act.

### What To Do If You Find a Mistake on Your Statement
If you think there is an error on your statement, write to us at:

GreenSky® Program
Attention: Disputes
PO Box 29429
Atlanta, GA 30359
You may also contact us at service@greensky.com.

In your letter, give us the following information:

- *Account information:* Your name and account number.

- *Dollar amount:* The dollar amount of the suspected error.

- *Description of problem:* If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.

You must contact us:

- Within 60 days after the error appeared on your statement.

- At least 3 business days before an automated payment is scheduled, if you want to stop payment on the amount you think is wrong.

You must notify us of any potential errors in writing. You may call us, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question.

### What Will Happen After We Receive Your Letter
When we receive your letter, we must do two things:

1. Within 30 days of receiving your letter, we must tell you that we received your letter. We will also tell you if we have already corrected the error.
2. Within 90 days of receiving your letter, we must either correct the error or explain to you why we believe the bill is correct.



- We cannot try to collect the amount in question, or report you as delinquent on that amount.
- The charge in question may remain on your statement, and we may continue to charge you interest on that amount.
- While you do not have to pay the amount in question, you are responsible for the remainder of your balance.
- We can apply any unpaid amount against your available loan funds (if any).

After we finish our investigation, one of two things will happen:

- *If we made a mistake:* You will not have to pay the amount in question or any interest or other fees related to that amount.
- *If we do not believe there was a mistake:*

You will have to pay the amount in question, along with applicable interest and fees. We will send you a statement of the amount you owe and the date payment is due. We may then report you as delinquent if you do not pay the amount we think you owe.

If you receive our explanation but still believe your bill is wrong, you must write to us within *10 days* telling us that you still refuse to pay. If you do so, we cannot report you as delinquent without also reporting that you are questioning your bill. We must tell you the name of anyone to whom we reported you as delinquent, and we must let those organizations know when the matter has been settled between us.

If we do not follow all of the rules above, you do not have to pay the first $50 of the amount you question even if your bill is correct.

**Your Rights If You Are Dissatisfied With Your Payment Card Purchases**
If you are dissatisfied with the goods or services that you have purchased with your Loan, and you have tried in good faith to correct the problem with the Merchant, you may have the right not to pay the remaining amount due on the purchase.

To use this right, all of the following must be true:

    1. The purchase must have been made in your home state or within 100 miles of your current mailing address, and the purchase price must have been more than $50. (Note: Neither of these are necessary if your purchase was based on an advertisement we mailed to you, or if we own the company that sold you the goods or services.)
    2. You must have used your payment card for the purchase.
    3. You must not yet have fully paid for the purchase.

If all of the criteria above are met and you are still dissatisfied with the purchase, contact us *in writing* at:

GreenSky® Program
Attention: Disputes
PO Box 29429
Atlanta, GA 30359
You may also contact us at service@greensky.com.

While we investigate, the same rules apply to the disputed amount as discussed above. After we finish our investigation, we will tell you our decision. At that point, if we think you owe an amount and you do not pay, we may report you as delinquent.

**TERMS AND CONDITIONS CONTINUE ON NEXT PAGE**

A267

| FACTS | **WHAT DOES BMO HARRIS BANK N.A. DO WITH YOUR PERSONAL INFORMATION?** |
|---|---|
| Why? | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| What? | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br>• Social Security number and  employment information<br>• account transactions  and transaction history<br>• credit history and investment experience |
| How? | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons BMO Harris Bank N.A. chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does BMO Harris Bank N.A. share? | Can you limit this sharing? |
|---|---|---|
| **For our everyday business purposes** — such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| **For our marketing purposes** — to offer our products and services to you | Yes | No |
| **For joint marketing with other financial companies** | Yes | No |
| **For our affiliates' everyday business purposes** — information about your transactions and experiences | Yes | No |
| **For our affiliates' everyday business purposes** — information about your creditworthiness | Yes | Yes |
| **For our affiliates to market to you** | Yes | Yes |
| **For nonaffiliates to market to you** | No | We don't share |

| To limit our sharing | Call toll-free:  1-866-936-0602<br>**Please note:**<br>If you are a *new* customer, we can begin sharing your information 30 days from the date we sent this notice. When you are *no longer* our customer, we continue to share your information as described in this notice. However, you can contact us at any time to limit our sharing. |
|---|---|

| Questions? | • Call toll-free:  1-888-654-0063<br>• Talk to a banker at a BMO Harris branch<br>• Talk to your assigned account representative |
|---|---|





A268

## Page 2

### Who we are

| Who is providing this notice? | This notice is provided by BMO Harris Bank N.A. for its consumer customers, including all cardholders of Diners Club and Carte Blanche Professional cards issued by us. |
|---|---|

### What we do

| How does BMO Harris Bank N.A. protect my personal information? | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings. |
|---|---|
| How does BMO Harris Bank N.A. collect my personal information? | We collect your personal information, for example, when you: <br>• open an account or deposit money <br>• apply for a loan or use your credit or debit card <br>• seek advice about your investments <br><br>We also collect your personal information from others, such as credit bureaus, affiliates, or other companies. |
| Why can't I limit all sharing? | Federal law gives you the right to limit only <br>• sharing for affiliates' everyday business purposes—information about your creditworthiness <br>• affiliates from using your information to market to you <br>• sharing for nonaffiliates to market to you <br><br>State laws and individual companies may give you additional rights to limit sharing. See below for more information on your rights under state laws. |
| What happens when I limit sharing for an account I hold jointly with someone else? | Your choices will apply to you only, unless you tell us otherwise. |

### Definitions

| Affiliates | Companies related by common ownership or control. They can be financial or nonfinancial companies. <br>• Our affiliates include companies with a Bank of Montreal or BMO name; and financial companies such as BMO Harris Financial Advisors, Inc. |
|---|---|
| Nonaffiliates | Companies not related by common ownership or control. They can be financial and nonfinancial companies. <br>• BMO Harris Bank N.A. does not share with nonaffiliates so they can market to you. |
| Joint Marketing | A formal agreement between nonaffiliated financial companies that together market financial products or services to you. <br>• Our joint marketing partners include credit card companies. |

### Other important information

**For California Residents:** We will not share information we collect about you with companies outside of the BMO family of companies except with your authorization or as permitted by California law, such as to service your account. To authorize the sharing of this information, please call us toll-free at 1-888-654-0063. In addition, we will limit the sharing of information about you within the BMO family of companies to the extent required by California law.

**For Vermont Residents:** We will not disclose information about your creditworthiness to our affiliates and will not disclose your personal information, financial information, credit report, or health information to nonaffiliated third parties to market to you, other than as permitted by Vermont law, unless you authorize us to make those disclosures. Additional information concerning our privacy policies can be found at www.bmoharris.com/us/about/privacy or call 1-888-654-0063.

**For Nevada Residents:** Notice provided pursuant to state law. To be placed on our internal Do Not Call List, call 1-888-654-0063. For more on this Nevada law, contact Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St., Suite 3900, Las Vegas, NV 89101. Phone number: (702)486-3132; email: BCPINFO@ag.state.nv.us.

**BMO HARRIS BANK N.A.**

### Your Credit Score and the Price You Pay for Credit

| Your Credit Score | | |
|---|---|---|
| **Your credit score:** | 717 | |
| | Source: EXPERIAN | Date: 11/23/2021 |

| Understanding Your Credit Score | |
|---|---|
| **What you should know about credit scores** | Your credit score is a number that reflects the information in your credit report.<br><br>Your credit report is a record of your credit history.  It includes information about whether you pay your bills on time and how much you owe to creditors.<br><br>Your credit score can change, depending on how your credit history changes. |
| **How we use your credit score** | Your credit score can affect whether you can get a loan and how much you will have to pay for that loan. |
| **The range of scores** | Scores range from a low of 300 to a high of 850.<br><br>Generally, the higher your score, the more likely you are to be offered better credit terms. |
| **How your score compares to the scores of other consumers** | FICO                                                                    experian.<br><br>% of consumers with scores in particular range<br>25%<br>20%<br>17%   18%<br>15%   13%<br>10%<br>9%<br>7%   7%<br>5%<br>5%<br>0%<br>300-499   500-549   550-599   600-649   650-699   700-749   750-799   800-850<br>© 2018 FICO; © 2019 Experian. All rights reserved.        FICO® Score 9        EXPSG-J |



A270

| Checking Your Credit Report | |
|---|---|
| **What if there are mistakes in your credit report?** | You have a right to dispute any inaccurate information in your credit report. If you find mistakes on your credit report, contact the consumer reporting agency.<br><br>It is a good idea to check your credit report to make sure the information it contains is accurate. |
| **How can you obtain a copy of your credit report?** | Under federal law, you have the right to obtain a free copy of your credit report from each of the nationwide consumer reporting agencies once a year.<br><br>To order your free annual credit report—<br><br>*By telephone:*   Call toll-free: 1-877-322-8228<br><br>*On the web:*   Visit www.annualcreditreport.com<br><br>*By mail:*   Mail your completed Annual Credit Report Request Form (which you can obtain from the Federal Trade Commission's website at www.ftc.gov/bcp/conline/include/requestformfinal.pdf) to:<br><br>Annual Credit Report Request Service<br>P.O. Box 105281<br>Atlanta, GA 30348-5281 |
| **How can you get more information about credit reports?** | For more information about credit reports and your rights under Federal law, visit the Consumer Financial Protection Bureau's website at www.consumerfinance.gov/learnmore or visit the Federal Reserve Board's website at www.federalreserve.gov. |

A271

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) SUSAN PARISI,                ) | |
|                                  ) | |
|                                  ) | |
|     Plaintiff,   ) | |
|                                  ) | |
| v.                               ) | Case No. CIV-23-115-R |
|                                  ) | |
| (1) C CASHION WINDOWS, LLC d/b/a ) | |
| RENEWAL BY ANDERSON OF           ) | |
| OKLAHOMA, and (2) BMO HARRIS     ) | |
| BANK, NA d/b/a GREENSKY, LLC,    ) | |
|                                  ) | |
|     Defendants.   ) | |

**DEFENDANT GREENSKY, LLC'S, INCORRECTLY IDENTIFIED AS BMO HARRIS BANK, NA D/B/A GREENSKY, LLC, REPLY BRIEF IN SUPPORT OF MOTION TO COMPEL ARBITRATION AS TO ALL CLAIMS ASSERTED BY PLAINTIFF AND TO DISMISS OR STAY CLAIMS OF PLAINTIFF PENDING ARBITRATION**

TO THE HONORABLE JUDGE OF SAID COURT:

    Defendant GreenSky, LLC, incorrectly identified as BMO Harris Bank, NA d/b/a GreenSky, LLC (hereinafter "GreenSky"), files this reply brief in support of its Motion to Compel Arbitration (the "Arbitration Motion") as to all claims asserted by Plaintiff Susan Parisi (hereinafter "Plaintiff") and to dismiss or stay claims of Plaintiff pending arbitration. In further support of its Arbitration Motion, GreenSky respectfully shows as follows:

### I.
### PLAINTIFF CANNOT PROPERLY CONTEST THE ARBITRATION AGREEMENT AFTER ACTIVATING THE LOAN AGREEMENT

    In the Loan Agreement, there is a reference to the arbitration agreement in capital and bolded letters that states: "**THIS LOAN AGREEEMENT CONTAINS AN**

A272

**ARBITRATION PROVISION THAT, UNLESS YOU REJECT IT, MAY LIMIT YOUR RIGHT TO LITIGATE A CLAIM IN COURT OR HAVE A JURY TRIAL ON A CLAIM.**" The Loan Agreement is not signed, but it states as follows:

> **ACCEPTANCE OF THIS LOAN AGREEMENT BY ELECTRONIC SIGNATURE:** The first use of the Shopping Pass or the associated loan to make a purchase will constitute acceptance by (all) Borrower(s) of the Terms of this Loan Agreement. The dated physical or electronic record of such use will evidence the signature of (all) Borrower(s) on this Loan Agreement and have the same legal effect as a physical signature.

Arbitration Motion, Doc. 18-3, p. 12. The Loan Agreement need not be physically or even electronically signed to be legally binding and enforceable, as assent can be manifested in other ways. *See Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 767 (10th Cir. 2019); *International Union, United Mine Workers of Am. v. Big Horn Coal Co.*, 916 F.2d 1499, 1502 (10th Cir. 1990).

There is no basis for Plaintiff's apparent argument that she is somehow only bound to certain terms in the Loan Agreement that she specifically reviewed and approved.[1] As a party to a contract, Plaintiff is presumed to have read and understood the terms of the contract, including any arbitration provision. *Johnson v. Lynn Hickey Dodge Inc.*, 166 F.3d 347, 1998 WL 826829, at *2 (10th Cir. 1998) (table); *Schooley v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 867 F. Supp. 989, *aff'd*, 107 F.3d 21 (10th Cir. 1997) (table). It is disingenuous for her to assert after the fact that she is not bound to contractual provisions

---

[1]      In her Response, Plaintiff makes numerous references to a Consent Order GreenSky agreed to in a separate proceeding. The Consent order is not relevant to Plaintiff's claims or any issues involving the arbitration agreement in this case.

she claims she did not review.  If that were the standard, it would be impossible to ever enforce any arbitration provision, as the party seeking to avoid arbitration could defeat any motion to arbitrate simply by denying that he or she reviewed and approved the specific arbitration provision.  *See Jones v. Sallie Mae, Inc.*, 2013 WL 6283483, *5 (M.D. Fla. Dec. 4, 2013) ("Plaintiff's signature on the Loan Application [acknowledging receipt of Promissory Note containing arbitration provision] is evidence that he received the Promissory Note and read it. His failure to recall receipt, without more, is not sufficient to create a jury issue [on arbitration].").

Significantly, there have been other cases in which parties in Plaintiff's position have attempted to avoid arbitration provisions in loan agreements involving GreenSky by stating they did not specifically agree to such provisions.  The courts in those cases have had no problem in holding that the arbitration agreements in those loan agreements were nevertheless valid and enforceable.  *See, e.g., Terlizzi v. Altitude Marketing, Inc.*, 2018 WL 2196090, *7 (D. Colo. May 14, 2018) (granting GreenSky's motion to compel arbitration where "*before* drawing on the loan, the Terlizzis received the full text of the contract with GreenSky") (emphasis in original); *Alfortish v. GreenSky, LLC*, 2017 WL 699830 (E.D. La. Feb. 22, 2017) (enforcing arbitration agreement in loan documents even though plaintiffs claim they did not sign the documents, did not agree to arbitration and did not have access to the loan documents containing the arbitration provisions).[2]

---

[2]     Even though the arbitration agreement in this case was not signed, the FAA does not require a signature. *See Seawright v. American General Financial Services, Inc.* 507 F.3d 967, 978 (6th Cir. 2007).

On November 29, 2021 – after GreenSky had both mailed and emailed the Loan Agreement to her – GreenSky's records show that Plaintiff used the Shopping Pass included with, and made a part of, her Loan Agreement, and authorized Renewal by Andersen of Oklahoma ("Andersen of Oklahoma") to charge her account in the amount of $8,871.50.  Arbitration Motion, Kaliban Declaration, ¶ 28 (Doc. 18-3, p. 6).  As set forth in the quoted passage above, Plaintiff's use of the Shopping Pass after GreenSky had sent her the Loan Agreement was a manifestation of her assent to the terms of the Loan Agreement, which included the arbitration agreement.[3]  *See, e.g., Vernon v. Qwest Communications Int'l, Inc*., 857 F. Supp.2d 1135, 1150-51 (D. Colo. 2012) (holding subscribers to internet service manifested their assent to providers terms and conditions, including arbitration agreement, by becoming subscribers); *Bischoff v. DirecTV, Inc*., 180 F. Supp.2d 1097, 1105 (C.D. Cal. 2002) (holding that arbitration agreement was enforceable even though customer received contract after purchasing necessary equipment and after satellite programming had been activated).

The same standards apply in this case.  Plaintiff cannot ignore contract provisions in the Loan Agreement, activate the Loan Agreement by using the Shopping Pass, and then assert that she is not bound to terms such as the arbitration agreement because she allegedly did not "assent" to it.  Because she activated the Shopping Pass, she manifested her assent to the arbitration agreement, and she is legally bound to the arbitration agreement as much as any other terms in the Loan Agreement. *See Wilmore v. Charter Communications LLC,*

---

[3]      Curiously, Plaintiff states in her Response that she received a letter from GreenSky "on or about November 26, 2021" stating that "it had sent a payment for $8,871.50, directly to Oklahoma Windows."  Response, p. 7.  That would not have been possible, as Plaintiff did not use the Shopping Pass until November 29, 2021.

No. 3:21-cv-01271 (JAM), 2023 WL 2503306, at *5 (D. Conn. Mar. 14, 2023) (holding plaintiff's statement that she did not review arbitration provision did not preclude enforcement of arbitration provision) (applying Alabama law); *Hulwick v. CBOCS East, Inc.,* No. 1:17-CV-468-TLS, 2018 WL 2933684, at *4 (N.D. Ind. Jun. 11, 2018) (holding plaintiff failed to raise fact issue regarding formation of arbitration agreement where she provided no evidence other than her own statement that she did not review arbitration agreement).

## II.
## PLAINTIFF'S EFFORT TO NULLIFY THE LOAN AGREEMENT AS A WHOLE IS UNAVAILING

Perhaps recognizing that she cannot be successful in challenging the arbitration agreement in particular, Plaintiff's second "plan of attack" to attempt to avoid arbitration is to assert that the Loan Agreement as a whole is somehow invalid and unenforceable. There is no basis for Plaintiff's assertion. Moreover, this assertion, if accepted, effectively destroys Plaintiff's claim that she should be recognized as representative of a "class" she seeks to certify.

### A.   THE LOAN AGREEMENT WAS PROVIDED TO PLAINTIFF, AND PLAINTIFF ASSENTED TO ITS TERMS BY USING THE SHOPPING PASS

It is undisputed that Plaintiff applied for a loan under GreenSky's program on or about November 23, 2021, so she cannot assert that she did not seek to enter into a loan agreement in the first place. The basis of Plaintiff's current attack on the Loan Agreement as a whole is that she allegedly never assented to the payment terms of the final Loan Agreement. According to Plaintiff, she thought she was taking out a loan under one set of

A276

payment terms while the final Loan Agreement stated a different set of payment terms. As set forth above, Plaintiff also claims she never saw the Loan Agreement at all until after she was allegedly bound to its terms.

Consistent with its business practices in consummating agreements such as the Loan Agreement in this case, GreenSky mailed a hard copy of the Loan Agreement to Plaintiff, at her stated address, on November 23, 2021. Arbitration Motion, Kaliban Declaration, ¶¶ 18-21 (Doc. 18-3, pp. 4-5). This mailing was not returned to GreenSky as undeliverable and GreenSky did not receive any return notifications that the Loan Agreement or any other mailings associated with Plaintiff's loan account were undeliverable. *Id.*, ¶ 22 (Doc. 18-3, p. 5). Plaintiff has not disputed the fact that the Loan Agreement was mailed to her at her proper address.

In addition to the fact that GreenSky immediately sent the Loan Agreement to Plaintiff by U.S. mail, GreenSky also emailed the Loan Agreement to Plaintiff on November 23, 2021 at the email address Plaintiff provided in her loan application. *Id.*, ¶¶ 23-24 (Doc. 18-3, p. 5). This email was not returned as undeliverable, and Plaintiff has not disputed that GreenSky emailed the Loan Agreement to her at her proper email address. *Id.*, ¶¶ 25-27 (Doc. 18-3, p. 6). Significantly, Plaintiff admits in her Response that she did, in fact, receive an electronic copy of the Loan Agreement, although she claims it ended up in her spam folder. *See* Response, pp. 6-7.

At the time the copies of the Loan Agreement were sent by U.S. mail and by electronic delivery to Plaintiff, she was not yet bound to the Loan Agreement. As stated above, Plaintiff was required to engage in the affirmative act of using the Shopping Pass

before the Loan Agreement would be binding on her.  Plaintiff manifested her assent to the payment terms of the Loan Agreement—and became bound to the terms of the Loan Agreement—by using the Shopping Pass on November 29, 2021.  *Id.*, ¶¶ 29-30 (Doc. 18-3, pp. 6-7).  At that point, GreenSky then relied on Plaintiff's assent to the Loan Agreement to provide funding for the purchase of windows.  The fact that the merchant, Andersen of Oklahoma, allegedly did not properly install windows at Plaintiff's house after receiving loan proceeds through GreenSky does not affect Plaintiff's previous assent to the Loan Agreement.  GreenSky ultimately arranged for the funding to be provided in reliance on Plaintiff's use of the Shopping Pass.  Plaintiff cannot properly withdraw that assent after the funding has already been provided based on her post-funding dissatisfaction with Andersen of Oklahoma.[4]

## B.   PLAINTIFF'S EFFORT TO NULLIFY THE LOAN AGREEMENT SHOULD ALSO PRECLUDE HER FROM ASSERTING CLASS ACTION CLAIMS

In her efforts to avoid the arbitration agreement, Plaintiff makes assertions and provides declaration testimony that are inconsistent with her pleading allegations, and that would effectively prevent her from having standing to assert the class action claims that appear to be the focus of this case.[5]  Plaintiff's declaration is filled with allegations that she

---

[4]    Moreover, Plaintiff admits in the Petition and in her Response that she was in agreement with financing her purchase of windows through the GreenSky program, and that her complaint with the terms of the final Loan Agreement relates to the *financing terms*.  Regardless of the financing terms, any loan agreement through the GreenSky program would have the same arbitration agreement contained in the final Loan Agreement, as all GreenSky loan agreements contain the same arbitration agreement.  Thus, the alleged change in the financing terms to which Plaintiff allegedly agreed would not have affected the existence or terms of the arbitration agreement.

[5]    This is consistent with Plaintiff's previous approach to amending her Petition to substitute Andersen of Oklahoma for Cashion Windows as a defendant.  Plaintiff's Petition says nothing about trying to set aside the Loan Agreement as a whole, or even the arbitration agreement.  Now, however, since GreenSky has moved to enforce the arbitration agreement, Plaintiff seeks to throw out not only the arbitration agreement, but also the Loan Agreement as a whole.

never assented to the terms of the Loan Agreement, and that there was never any agreement because there was allegedly no meeting of the minds between the parties with respect to the terms of the Loan Agreement.  In her Response, Plaintiff seeks a jury trial on the issue of whether she actually entered into the Loan Agreement.  In other words, Plaintiff claims there is no valid arbitration agreement because there was never any Loan Agreement in the first place.  These allegations are inconsistent with Plaintiff's class action pleading allegations.

In Plaintiff's Amended Petition and Motion to Certify a Class Action (the "Petition"), Plaintiff asserts "the principal legal question common to [Plaintiff] and to each class member is whether adequate consumer credit disclosures were provided to class members *prior to consummation or liability for the loans originated by Andersen and later sold to [GreenSky]*."  Petition, ¶ 22 (emphasis added).  If there is no Loan Agreement, as Plaintiff is asserting in her Response, it necessarily follows that there would have been *no* "consummation or liability" on any loan with respect to Plaintiff.  This destroys the commonality of Plaintiff's alleged circumstances with the other members of the proposed class, who would have consummated loans and incurred legal liability as set forth in loan agreements.  *See Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 216 (1974) ("To have standing to sue as a class representative it is essential that a plaintiff ... be a part of that class, that is, he [or she] must possess the same interest and suffer the same injury shared by all members of the class he [or she] represents."); *see also Rector v. City of Denver,* 348 F.3d 935, 949 (10th Cir. 2003).

Further, the proposed "class" claims are based on GreenSky's alleged failures to provide certain disclosures set forth in OKLA. STAT. ANN. tit. 14A, § 3-306 (the "Consumer Disclosure Requirements"). In reviewing the Consumer Disclosure Requirements, it is apparent that the required disclosures are to be provided to the "debtor." *See id.* §3-306(2) (stating "[t]he lender shall give to the *debtor* the following information") (emphasis added). There does not appear to be a statutory definition of "debtor" that specifically applies to the Consumer Disclosure Requirements. However, the term "debtor" is generally defined as a person who owes an obligation or is subject to some form of liability. *See, e.g., Racher v. Lusk*, No. CIV-13-665-M, 2013 WL 6037122, at *9 (W.D. Okla. Nov. 14, 2013) ("'Debtor' means a person who is liable on a claim."); *State ex rel. State Ins. Fund v. Houston*, No. 97,553, 2003 WL 25284639, at *2 (Okla. Civ. App. Aug. 12, 2003) (stating the term "account debtor" means a person "obligated on an account") (citing 12A O.S.2001 § 1–9–102(a)(3)).

In her Response, Plaintiff alleges she has never had any obligation or liability for a loan because there was never any loan agreement. In that event, she would not be within the class of persons to whom any disclosures would have been due under the Consumer Disclosure Requirements, and she would not have standing to complain about any alleged violation of the Consumer Disclosure Requirements because she cannot qualify as a member of the "class" she purports to represent. *See Schlesinger,* 418 U.S. at 216; *Rector,* 348 F.3d at 949.

Moreover, Plaintiff's very request for a jury trial to determine whether she entered into the Loan Agreement should preclude her class claims in this case. Class membership

A280

must be clearly ascertainable, and it must be administratively feasible to determine whether a particular person is a class member.  *See DeBremaecker v. Short,* 433 F.2d 733, 734 (5th Cir.1970); *Davoll v. Webb,* 160 F.R.D. 142, 144 (D. Colo. 1995).  "An identifiable class exists if its members can be ascertained by reference to objective criteria, but not if membership is contingent on a prospective member's state of mind."  *Schwartz v. Upper Deck Co.,* 183 F.R.D. 672, 679–80 (S.D.Cal.1999)).  Plaintiff has placed her individual intent at issue, and she has requested a jury trial on the issue of whether she intended to enter into the Loan Agreement.  As such, she has made it impossible to administratively ascertain that she is a member of the alleged class she purports to represent, and her class claims should fail.

Because these claims would require testimony and evidence unique to each plaintiff's individual claim, there could be no commonality and typicality to support the certification of a class with respect to such claims.  *See Daniel v. Navient Solutions, LLC*, No. 8:17-cv-2503-T-24JSS, 2019 WL 4671169, at *7-8 (M.D. Fla. Apr. 26, 2019); *Levell v. Monsanto Research Corp.*, No. 3:95cv312, 2005 WL 81619926, at *7 (S.D. Ohio Sept. 28, 2005).

### III.
### CONCLUSION

WHEREFORE, GreenSky respectfully requests that this Court compel arbitration as to all claims asserted by Plaintiff and to dismiss or stay claims of Plaintiff pending the outcome of arbitration.

A281

Respectfully submitted,

Dated: September 7, 2023

*s/ Kyle R. Prince*
Derrick T. DeWitt, OBA #18044
Kyle R. Prince, OBA #33040
DeWITT PARUOLO & MEEK
P.O. Box 138800
Oklahoma City, OK 73113
T: (405) 705-3600
F: (405) 705-2573
ddewitt@46legal.com
kprince@46legal.com

-and-

Sean W. Fleming
*Admitted Pro Hac Vice*
Texas State Bar No. 24027250
MACDONALD DEVIN MADDEN
KENEFICK & HARRIS, P.C.
12770 Coit Road, Suite 1100
Dallas, Texas 75251
T: (214) 744-3300
F: (214) 747-0942
SFleming@MacdonaldDevin.com
**Attorneys for Defendant GreenSky, LLC, incorrectly identified as BMO Harris Bank, NA d/b/a GreenSky, LLC**

A282

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 7th day of September, 2023, I electronically transmitted

this document to the Clerk of Court using the ECF System for filing and transmittal of a

Notice of Electronic Filing to the following ECF registrants:


M. Kathi Rawls, OBA #18814
Minal Gahlot, OBA #22145
kathi@rawlsgahlot.com
minal@rawlsgahlot.com

Janet R. Varnell, FBN #0071072
jvarnell@vandwlaw.com

***Attorneys for Plaintiffs***


                                                    *s/ Kyle R. Prince*

A283

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) SUSAN PARISI, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-23-115-R |
| | ) | |
| (1) C CASHION WINDOWS, LLC d/b/a | | |
| RENEWAL BY ANDERSON OF | ) | |
| OKLAHOMA, and (2) BMO HARRIS | ) | |
| BANK, NA d/b/a GREENSKY, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT GREENSKY, LLC'S, INCORRECTLY IDENTIFIED AS BMO HARRIS BANK, NA D/B/A GREENSKY, LLC, MOTION TO DISMISS ALL CLAIMS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(3)

Defendant, GreenSky, LLC (hereinafter "GreenSky"), incorrectly identified as BMO Harris Bank, NA d/b/a GreenSky, LLC (hereinafter "GreenSky"), subject to and without waiving its motion to compel arbitration, files this Motion to Dismiss All Claims asserted by Plaintiff Susan Parisi pursuant to Federal Rule of Civil Procedure 12(b)(3). In support of this Motion, GreenSky respectfully shows as follows:

1.      GreenSky has simultaneously filed a Brief in Support of Defendant GreenSky, LLC's, Incorrectly Identified as BMO Harris Bank, N.A. d/b/a GreenSky, LLC, Motion to Dismiss All Claims Pursuant to Federal Rule of Civil Procedure 12(b)(3), outlining the arguments relating thereto.

1

Respectfully submitted,

Dated: September 25, 2023

*s/ Kyle R. Prince*
Derrick T. DeWitt, OBA #18044
Kyle R. Prince, OBA #33040
DeWITT PARUOLO & MEEK
P.O. Box 138800
Oklahoma City, OK 73113
T: (405) 705-3600
F: (405) 705-2573
ddewitt@46legal.com
kprince@46legal.com

-and-

Sean W. Fleming
*Admitted Pro Hac Vice*
Texas State Bar No. 24027250
MACDONALD DEVIN MADDEN
KENEFICK & HARRIS, P.C.
12770 Coit Road, Suite 1100
Dallas, Texas 75251
T: (214) 744-3300
F: (214) 747-0942
SFleming@MacdonaldDevin.com
**Attorneys for Defendant GreenSky, LLC, incorrectly
identified as BMO Harris Bank, NA d/b/a
GreenSky, LLC**

2

A285

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 25th day of September, 2023, I electronically transmitted

this document to the Clerk of Court using the ECF System for filing and transmittal of a

Notice of Electronic Filing to the following ECF registrants:

M. Kathi Rawls, OBA #18814
Minal Gahlot, OBA #22145
kathi@rawlsgahlot.com
minal@rawlsgahlot.com

Janet R. Varnell, FBN #0071072
jvarnell@vandwlaw.com

***Attorneys for Plaintiffs***

*s/ Kyle R. Prince*

A286