No. 23-6218 *and* No. 24-6043

IN THE

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

SUSAN PARISI,

*Plaintiff-Appellee*,

v.

GREENSKY, LLC
(incorrectly identified as BMO Harris Bank, NA, d/b/a Greensky, LLC),

*and*

OKLAHOMA WINDOWS AND DOORS LLC,
d/b/a Renewal by Andersen of Oklahoma.

*Defendant-Appellants*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
The Honorable David L. Russell
D.C. Case No. 5:23-CV-00115-R

**APPELLANTS' JOINT APPENDIX VOLUME II OF III, PAGES 287 TO 520**

Diane J. Zelmer, Esq.
BERENSON LLP
4495 Military Trail,Suite 203
Jupiter, Florida 33458
(561) 429-4496

*Attorneys for Appellant Oklahoma
Windows and Doors, LLC*

Barry Goheen
PIERSON FERDINAND LLP
100 Mount Paran Ridge
Atlanta, Georgia 30327
(404) 703-3093

Derrick T. DeWitt
Kyle R. Prince
DeWITT PARUOLO & MEEK
P.O. Box 138800
Oklahoma City, Oklahoma 73113
(405) 705-3600

*Attorneys for Appellant GreenSky, LLC*

# TABLE OF CONTENTS

| ECF # | Document | Date | Page |
|---|---|---|---|
| | **VOLUME I** | | |
| | Docket Sheet No. 5:23-cv-00115-R from the United States District Court for the Western District of Oklahoma | | A001 |
| 17 | GreenSky's Motion to Compel Arbitration as to All Claims Asserted by Plaintiff and to Dismiss or Stay Claims Pending Arbitration | April 28, 2023 | A013 |
| 18 | GreenSky's Brief in Support of Motion to Compel Arbitration as to All Claims Asserted by Plaintiff and to Dismiss or Stay Claims Pending Arbitration | April 28, 2023 | A016 |
| | Exhibit 1, Plaintiff's Amended Petition and Motion to Certify Class Action | | A042 |
| | Exhibit 2, Loan Agreement | | A068 |
| | Exhibit 3, Declaration of Timothy Kaliban | | A080 |
| | Exhibit 3-1, Loan Application | | A087 |
| | Exhibit 3-2, Loan Decision | | A088 |
| | Exhibit 3-3, Loan Agreement | | A089 |
| | Exhibit 3-4, Loan Account | | A101 |
| 36 | Amended Complaint and Motion to Certify a Class Action | August 21, 2023 | A103 |
| | Exhibit 1, Redacted 12/07/21 letter | | A123 |
| | Exhibit 2, 12/10/21 Email | | A126 |
| | Exhibit 3, 12/14/21 Email | | A127 |
| | Exhibit 4, 12/17/21 Email | | A128 |

| | Exhibit 5, Redacted 12/27/21 Letter | | A129 |
|---|---|---|---|
| | Exhibit 6, Redacted 10/2/22 Past Due Notice | | A130 |
| 39 | Parisi's Response in Opposition to GreenSky's Motion to Compel Arbitration as to All Claims Asserted by Plaintiff and to Dismiss or Stay Claims Pending Arbitration | August 24, 2023 | A132 |
| | Exhibit 1, Declaration of Susan Parisi | | A157 |
| | Exhibit 1-1, Renewal by Anderson Agreement | | A164 |
| | Exhibit 1-2, 11/29/21 Email | | A195 |
| | Exhibit 2, CFPB Consent Order | | A197 |
| | Exhibit 3, Plan 7541 Loan Information | | A255 |
| 42 | GreenSky's Reply in Support of Motion to Compel Arbitration as to All Claims Asserted by Plaintiff and to Dismiss or Stay Claims Pending Arbitration | September 7, 2023 | A272 |
| 46 | GreenSky's Motion to Dismiss All Claims Pursuant to Fed. R. Civ. P. 12(b)(3) | September 25, 2023 | A284 |

## VOLUME II

| 47 | GreenSky's Brief in Support of Motion to Dismiss All Claims Pursuant to Fed. R. Civ. P. 12(b)(3) | September 25, 2023 | A287 |
|---|---|---|---|
| | Exhibit 1, GreenSky's Motion to Compel Arbitration | | A297 |
| | Exhibit 2, Plaintiff's Amended Petition and Motion to Certify Class Action | | A323 |
| | Exhibit 3, GreenSky Shopping Pass | | A343 |
| | Exhibit 4, Loan Agreement | | A344 |

|    | Exhibit 5, Declaration of Timothy D. Kaliban |    | A350 |
|----|----------------------------------------------|----|------|
|    | Exhibit 5-1, Loan Application |    | A357 |
|    | Exhibit 5-2, Loan Decision |    | A358 |
|    | Exhibit 5-3, Loan Agreement |    | A359 |
|    | Exhibit 5-4, Loan Account |    | A371 |
| 56 | Parisi's Response in Opposition to GreenSky's Motion to Dismiss All Claims Pursuant to Fed. R. Civ. P. 12(b)(3) | October 31, 2023 | A373 |
|    | Exhibit 1, Declaration of Susan Parisi |    | A393 |
|    | Exhibit 1-1, Renewal by Anderson Agreement |    | A401 |
|    | Exhibit 1-2, 11/29/21 Email |    | A432 |
|    | Exhibit 1-3, Emails, various dates |    | A434 |
|    | Exhibit 2, CFPB Consent Order |    | A437 |
| 65 | GreenSky's Reply Brief in Support of Motion to Dismiss All Claims Pursuant to Fed. R. Civ. P. 12(b)(3) | November 7, 2023 | A495 |
| 66 | Order denying GreenSky's Motion to Dismiss and denying GreenSky's Motion to Compel | December 1, 2023 | A505 |

## VOLUME III

| 68 | Oklahoma Windows' Motion to Dismiss the Amended Class Action Complaint (or Stay) and Compel Arbitration | December 7, 2023 | A521 |
| 69 | Oklahoma Windows' Memorandum of Law in Support of Motion to Dismiss the Amended Class Action Complaint (or Stay) and Compel Arbitration | December 7, 2023 | A523 |

| | Exhibit 1, Declaration of Jon Erickson | | A548 |
|---|---|---|---|
| | Exhibit 1-1, Renewal by Anderson Agreement | | A552 |
| | Exhibit 1-2, 11/23/21 Email | | A583 |
| 70 | GreenSky's Notice of Joinder, joining Oklahoma Windows' Motion to Dismiss the Amended Class Action Complaint (or Stay) and Compel Arbitration | December 28, 2023 | A585 |
| 71 | Parisi's Response in Opposition to Oklahoma Windows' Motion to Dismiss the Amended Class Action Complaint (or Stay) and Compel Arbitration | December 28, 2023 | A589 |
| | Exhibit 1, Declaration of Susan Parisi | | A622 |
| | Exhibit 1-1, 11/29/21 Email | | A632 |
| | Exhibit 1-2, 11/29/21 Emails | | A634 |
| | Exhibit 1-3, Emails, various dates | | A637 |
| | Exhibit 1-4, 11/23/21 Emails | | A640 |
| 72 | GreenSky's Motion to Reconsider Order (Doc. 66) and Brief in Support | December 29, 2023 | A647 |
| 73 | GreenSky's Notice of Appeal | December 29, 2023 | A655 |
| 76 | Parisi's Response in Opposition to GreenSky's Notice of Joinder | January 10, 2024 | A658 |
| 79 | GreenSky's Reply in Support of its Notice of Joinder | January 17, 2024 | A666 |
| 81 | Parisi's Opposition to GreenSky's Motion to Reconsider Order | January 19, 2024 | A673 |
| 82 | Order denying Oklahoma Windows' Motion to Compel Arbitration | February 14, 2024 | A685 |

| 83 | Order denying GreenSky's Motion for Reconsideration | February 14, 2024 | A696 |
| 86 | Oklahoma Windows' Notice of Appeal | March 14, 2024 | A699 |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) SUSAN PARISI, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-23-115-R |
| | ) | |
| (1) C CASHION WINDOWS, LLC d/b/a | ) | |
| RENEWAL BY ANDERSON OF | ) | |
| OKLAHOMA, and (2) BMO HARRIS | ) | |
| BANK, NA d/b/a GREENSKY, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT GREENSKY, LLC'S, INCORRECTLY IDENTIFIED AS BMO HARRIS BANK, NA D/B/A GREENSKY, LLC, BRIEF IN SUPPORT OF MOTION TO DISMISS ALL CLAIMS PURSUANT TO FEDERAL RULE OF <u>CIVIL PROCEDURE 12(b)(3)</u>

Defendant, GreenSky, LLC (hereinafter "GreenSky"), incorrectly identified as BMO Harris Bank, NA d/b/a GreenSky, LLC (hereinafter "GreenSky"), subject to and without waiving its motion to compel arbitration, files this Brief in Support of Motion to Dismiss All Claims asserted by Plaintiff Susan Parisi ("Plaintiff") pursuant to Federal Rule of Civil Procedure 12(b)(3).  This case is based on a loan agreement involving Plaintiff, which contains a mandatory arbitration provision directing the parties to resolve and dismiss or stay Plaintiff's claims in this case pending the outcome of arbitration. In support of the Motion, GreenSky respectfully shows as follows:

A287

# I.
## INTRODUCTION

In her Amended Petition and Motion to Certify a Class Action (the "Petition"), Plaintiff has filed a putative class action against GreenSky and purports to assert claims against GreenSky under the Oklahoma Consumer Credit Code. Plaintiff's claims against GreenSky, which arise from a loan document captioned "Installment Loan Agreement" (hereinafter "Loan Agreement"), should be resolved through arbitration. The Loan Agreement contains, among other provisions: (1) an arbitration agreement; (2) an agreement to arbitrate "any claim, dispute or controversy of every kind and nature, whether based in law or equity, between you and us arising from or relating to your Loan Agreement . . . , including the validity, enforceability or scope of this Arbitration Provision or the Agreement"; and (3) an agreement to arbitrate all "Claims" individually.

Based on the arbitration provision contained in the Loan Agreement, this Court is not the proper forum to decide the claims and issues raised in the Petition. Accordingly, GreenSky seeks dismissal of this case under Rule 12(b)(3) of the Federal Rules of Civil Procedure.

# II.
## RULE 12(b)(3) APPLICABILITY AND STANDARDS

Federal Rule of Civil Procedure 12(b)(3) provides that a claim for improper venue may be raised in the form of a motion instead of a responsive pleading. FED. R. CIV. P. 12(b)(3). A Rule 12(b)(3) motion may raise issues relating to arbitration. *See Rock Roofing, LLC v. Travelers Cas. And Sur. Co. of Am.*, 413 F. Supp.3d 1122, 1128-32

A288

(D.N.M. 2019); *Samson Offshore Co. v. Chevron U.S.A., Inc*., No. 11-CV-0109-CVE-TLW, 2011 WL 1238435, at *3 n.7 (N.D. Okla. Mar. 30, 2011).

The Court may properly consider evidence in connection with a Rule 12(b)(3) motion without converting the motion into a motion for summary judgment. *See Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1260 (10th Cir. 2012) (noting that motions claiming improper venue based on an arbitration clause are reviewed as motions to dismiss for improper venue under Rule 12(b)(3) and that in reviewing such motions, the Court may "consider[ ] evidence outside the complaint such as ... affidavits"). Once challenged, Plaintiff bears the burden of proving proper venue. *See Pierce v. Shorty Small's of Branson, Inc.*, 137 F.3d 1190, 1192 (10th Cir. 1998). To that end, the facts alleged in the Petition are taken as true, but only "to the extent that such facts are uncontroverted by [GreenSky's evidence]." *Stevens Trucking Co. v. Amazon.com Servs., LLC*, No. CIV-22-64-J, 2022 WL 19403833, at *2 (W.D. Okla. Apr. 26, 2022) (quoting *Pierce*, 137 F.3d at 1192).

## III.
## EVIDENCE

GreenSky offers the following evidence in support of this Motion to Dismiss:

1.     Defendant GreenSky, LLC's, Incorrectly Identified as BMO Harris Bank, NA d/b/a GreenSky, LLC, Motion to Compel Arbitration as to All Claims Asserted by Plaintiff and to Dismiss or Stay Claims of Plaintiff Pending Arbitration filed in this case on April 28, 2023 [Doc. 18] without exhibits, which is attached as Exhibit 1 (hereinafter referred to as the "Motion to Compel Arbitration").

2.     Plaintiff's Petition filed on August 21, 2023 [Doc. 36] without exhibits, which is attached as Exhibit 2.

3.     GreenSky Shopping Pass, which is attached as Exhibit 3.

4.     Installment Loan Agreement/Non-Negotiable Consumer Note (the "Loan Agreement"), which is attached as Exhibit 4.

5.      Declaration of Timothy D. Kaliban dated April 27, 2023 ("Kaliban Declaration"), with Exhibits 1-4 attached thereto, which is attached as Exhibit 5.

### IV.
### FACTS AND ALLEGATIONS RELATED TO PLAINTIFF'S CLAIMS

1.   On November 23, 2021, Plaintiff claims that she met with a representative of Defendant Oklahoma Windows and Doors, LLC d/b/a Renewal by Andersen of Oklahoma ("Andersen") to discuss the purchase and installation of replacement windows for her home.  *See* Petition, ¶ 60.

2.   Plaintiff claims that the above representative explained a financing option, serviced through GreenSky, for Plaintiff to purchase the replacement windows.  *See id.*, ¶ 61.

3.   Plaintiff alleges that said representative told her that she could purchase the replacement windows with zero money down and zero interest on the loan for two years, and that payments would not be due until two years after the installation.  *See id.*

4.   Further, Plaintiff alleges that she discussed with said representative that she wanted to replace nine windows.  *See id.*, ¶ 63-64.

5.   A split plan installation was also discussed whereby five out of the nine windows would be installed first, with the remaining four windows installed later.  *See id.*, ¶ 64.

6.   Plaintiff claims that she was shown on an iPad that she was approved for the loan terms mentioned above.  *See id.*, ¶ 65.

7.   Plaintiff claims that based on her conversation with the representative described above, she agreed to purchase the replacement windows.  *See id.*, ¶ 67.

8.   Further, Plaintiff claims that she was never shown the disclosures or informed of the interest that she would have to pay on the loan.  *See id.*, ¶ 68.

9.   Because Plaintiff agreed to purchase the replacement windows and was approved for a loan with BMO Harris Bank, NA, serviced by GreenSky, a Loan Agreement was created that established Plaintiff's contractual agreement with GreenSky, as the servicing agent of Plaintiff's loan with BMO Harris Bank, NA.  *See* Exhibit 4, Loan Agreement, ¶ 25.

10.   The Loan Agreement contains an arbitration agreement mandating that all claims between Plaintiff and GreenSky "will be resolved through binding arbitration" conducted pursuant to the Federal Arbitration Act (the "FAA").  *Id.*

11.   The terms and provisions of in the arbitration agreement are set forth in Paragraph 25 of the Loan Agreement attached as Exhibit 4.  Such terms and provisions are also more fully described on pages 4-6 of the Motion to Compel Arbitration, which is attached as Exhibit 1.

12.     The facts and circumstances surrounding Plaintiff's approval and use of the Loan Agreement are set forth in Paragraphs 7-30 of the Kaliban Declaration, which is attached as Exhibit 5.  Such facts and circumstances are also more fully described on pages 6-10 of the Motion to Compel Arbitration, which is attached as Exhibit 1.

**V.**
**ARGUMENTS AND AUTHORITIES**

The FAA codifies a national policy in favor of arbitrating claims when parties contract to settle disputes by arbitration, and compels judicial enforcement of a wide range of written arbitration agreements. *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 111 (2001). Section 4 of the FAA empowers a "party aggrieved by the alleged failure . . . of another to arbitrate under a written agreement for arbitration" to "petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4.

The FAA mandates that district courts "shall" enforce arbitration agreements "in accordance with the terms of the agreement." *Id.*; *see Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). This provision codifies the "liberal federal policy favoring arbitration." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal quotation marks omitted).

The "first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute. The court is to make this determination by applying the 'federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act.'" *Mitsubishi Motors Corp. v. Soler Chrysler-*

*Plymouth, Inc.*, 473 U.S. 614, 626 (1985) (quoting *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 2 (1983)). The "parties' intentions control, but those intentions are generously construed as to issues of arbitrability." *Id.* And, any ambiguities in the contract or doubts as to the parties' intentions should be resolved in favor of arbitration. *See id.*

Further, under the FAA, a district court should dismiss or stay a suit involving an arbitration clause under the following circumstances:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.

In this case, there was clearly an agreement to arbitrate between GreenSky and Plaintiff, as reflected in the extensive language set forth in the Loan Agreement.  See Exhibit 4, ¶ 25. Also, there is no question that Plaintiff understood and agreed to have GreenSky service a loan so she could receive services from Andersen.  *See* Exhibit 5, Kaliban Declaration, ¶¶ 12-17.  Moreover, BMO Harris Bank, NA offered to lend funds to Plaintiff, with GreenSky acting as the servicing agent, as reflected in the terms and conditions of the Loan Agreement.  *See id.*; *see also* Exhibit 3, GreenSky Shopping Pass, p. 1 (stating Plaintiff was "approved" for loan proceeds up to $17,744.00).

It is undisputed that Plaintiff had the opportunity to review the Loan Agreement, containing the arbitration provision and class action waiver, when the Loan Agreement was sent to a valid email address that Plaintiff herself provided on her loan application with GreenSky, and then later used that same email address to communicate with GreenSky. *See* Exhibit 5, Kaliban Declaration, ¶¶ 23-27.  Plaintiff authorized the loan proceeds to be disbursed to Andersen, under the terms of the Loan Agreement, which contained the arbitration and class action waiver provisions.  *See id.* ¶ 28.

GreenSky's right to arbitration is further supported by the arguments and legal authorities set forth on pages 10-18 of the Motion to Compel Arbitration, which is attached as Exhibit 1 and fully incorporated by reference herein.   Additionally, GreenSky incorporates all of the briefing, arguments and authorities set forth in Defendant Greensky, LLC's, Incorrectly Identified as BMO Harris Bank, NA d/b/a Greensky, LLC, Reply Brief in Support of Motion to Compel Arbitration as to All Claims Asserted by Plaintiff and to Dismiss or Stay Claims of Plaintiff Pending Arbitration [Doc. 42] filed in this case.

## VI.
## CONCLUSION

WHEREFORE, GreenSky respectfully requests that this Court grant this Motion pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure and dismiss all of Plaintiff's claims against GreenSky in this case so such claims can be decided in arbitration.

A294

Respectfully submitted,

Dated: September 25, 2023          *s/ Kyle R. Prince*
                                  Derrick T. DeWitt, OBA #18044
                                  Kyle R. Prince, OBA #33040
                                  DeWITT PARUOLO & MEEK
                                  P.O. Box 138800
                                  Oklahoma City, OK 73113
                                  T: (405) 705-3600
                                  F: (405) 705-2573
                                  ddewitt@46legal.com
                                  kprince@46legal.com

                                       -and-

                                  Sean W. Fleming
                                  *Admitted Pro Hac Vice*
                                  Texas State Bar No. 24027250
                                  MACDONALD DEVIN MADDEN
                                  KENEFICK & HARRIS, P.C.
                                  12770 Coit Road, Suite 1100
                                  Dallas, Texas 75251
                                  T: (214) 744-3300
                                  F: (214) 747-0942
                                  SFleming@MacdonaldDevin.com
                                  **Attorneys for Defendant GreenSky, LLC, incorrectly
                                  identified as BMO Harris Bank, NA d/b/a
                                  GreenSky, LLC**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 25th day of September, 2023, I electronically transmitted

this document to the Clerk of Court using the ECF System for filing and transmittal of a

Notice of Electronic Filing to the following ECF registrants:

M. Kathi Rawls, OBA #18814
Minal Gahlot, OBA #22145
kathi@rawlsgahlot.com
minal@rawlsgahlot.com

Janet R. Varnell, FBN #0071072
jvarnell@vandwlaw.com

***Attorneys for Plaintiffs***

*s/ Kyle R. Prince*

10

A296

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) SUSAN PARISI, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-23-115-R |
| | ) | |
| (1) C CASHION WINDOWS, LLC d/b/a | ) | |
| RENEWAL BY ANDERSON OF | ) | |
| OKLAHOMA, and (2) BMO HARRIS | ) | |
| BANK, NA d/b/a GREENSKY, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT GREENSKY, LLC'S, INCORRECTLY IDENTIFIED AS BMO HARRIS BANK, NA D/B/A GREENSKY, LLC, MOTION TO COMPEL ARBITRATION AS TO ALL CLAIMS ASSERTED BY PLAINTIFF AND TO <u>DISMISS OR STAY CLAIMS OF PLAINTIFF PENDING ARBITRATION</u>**

Respectfully submitted,

Dated: April 28th,  2023

/s/ Sean W. Fleming

Sean W. Fleming
*Admitted Pro Hac Vice*
Texas State Bar No. 24027250
MACDONALD DEVIN MADDEN
KENEFICK & HARRIS, P.C.
12770 Coit Road, Suite 1100
Dallas, Texas 75251
T: (214) 744-3300
F: (214) 747-0942
SFleming@MacdonaldDevin.com

i

Exhibit 1

Derrick T. DeWitt, OBA #18044
Kyle R. Prince, OBA #33040
DeWITT PARUOLO & MEEK
P.O. Box 138800
Oklahoma City, OK 73113
T: (405) 705-3600
F: (405) 705-2573
ddewitt@46legal.com
kprince@46legal.com

*Attorneys for Defendant GreenSky, LLC, incorrectly
identified as BMO Harris Bank, NA d/b/a
GreenSky, LLC*

ii

Date Filed: 06/07/2024     Page: 19

Document: 010111062399

Appellate Case: 23-6218

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** .................................................................... v

**I.    INTRODUCTION** ............................................................ 1

**II.   UNDISPUTED FACTS** .................................................. 2

**III.  PLAINTIFF'S LOAN AGREEMENT** ............................ 3

A. ARBITRATION PROVISION .................................... 4

B. AGREEMENT TO PURSUE CLAIMS INDIVIDUALLY .............................. 6

**IV.   APPLICATION AND APPROVAL OF PLAINTIFF'S LOAN** ...................... 6

A. APPLICATION AND APPROVAL PROCESS ................................ 6

B. GREENSKY'S MAILING TO PLAINTIFF WITH
   THE LOAN AGREEMENT ........................................ 7

C. GREENSKY'S EMAIL TO PLAINTIFF WITH
   THE LOAN AGREEMENT ........................................ 8

**V.    PLAINTIFF'S USE OF HER SHOPPING PASS AND LOAN
       AGREEMENT CONTAINING THE ARBITRATION
       PROVISION** .................................................. 9

**VI.   ARGUMENT AND AUTHORITIES** .................................. 10

A. THE ARBITRATION CLAUSE IS VALID AND
   ENFORCEABLE UNDER THE FEDERAL ARBITRATION ACT ............ 11

B. THE ARBITRATION PROVISION AGREED TO BY PLAINTIFF IS
   EXPRESSLY GOVERNED BY THE FEDERAL ARBITRATION ACT
   AND THE COURT MUST COMPEL ARBITRATION PURSUANT TO
   FEDERAL ARBITRATION LAW ................................ 13

C. THE ARBITRATION CLAUSE AND CLASS ACTION WAIVER ARE
   ALSO VALID AND ENFORCEABLE UNDER OKLAHOMA LAW ........ 16

A299

Appellate Case: 23-6218     Document: 010111062399     Date Filed: 06/07/2024     Page: 20

**VII.**    **<u>CONCLUSION</u>** ............................................................................**19**

**<u>CERTIFICATE OF SERVICE</u>** ...................................................................**20**

iv

A300

Appellate Case: 23-6218     Document: 01011062399     Date Filed: 06/07/2024     Page: 21

## TABLE OF AUTHORITIES

### Cases

*Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992) ............... **16**

*AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).................................... **11**

*AT&T Techs., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 650 (1986)...................................................................................................... **14**

*Chelsea Family Pharmacy, PLLC v. Medco Health Solutions, Inc.*, 567 F.3d 1191, 1199 (10th Cir. 2009) ...................................................................... **15**

*Choice Hotels Int'l v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709-10 (4th Cir. 2001) ................................................................................... **16**

*Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 111 (2001). .................................... **11**

*City of Muskogee v. Martin*, 796 P.2d 337, 340 (Okla. 1990) .................................... **17**

*Cummings v. FedEx Ground Package System, Inc.*, 404 F.3d 1258, 1262 (10th Cir. 2005) ...................................................................................... **14**

*Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) .............................. **11, 16**

*Dolese Bros. v. Tollett*, 19 P.2d 570, 571 (Okla. 1933) ............................................... **10**

*Freeman v. Prudential Sec., Inc.*, 856 P.2d 592, 594 (Okla. Civ. App. 1993).............. **17**

*Green v. Ameritech Corp.*, 200 F.3d 967, 973 (6th Cir. 2000) .................................... **16**

*Green v. SuperShuttle Int'l, Inc.*, 653 F.3d 766, 769-70 (8th Cir. 2011) .................... **16**

*Hancock v. American Tel. and Tel. Co., Inc.*, 2011 WL 3626785, *10 ........................ **18**

*Harber v. McKeown*, 157 P.2d 753, 754 (Okla. 1945 ................................................... **10**

*Long v. DeGeer*, 753 P.2d 1327, 1328 (Okla. 1987) .................................................... **17**

*Mid-Continent Pipe Line Co. v. Wilkerson*, 193 P.2d 586, 588 (Okla. 1948) ............. **10**

A301

Appellate Case: 23-6218      Document: 010111062399      Date Filed: 06/07/2024      Page: 22

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) ...................................................................................... **12**

*Morris v. Airbnb, Inc.*, 2020 WL 5823542, \*4 (W.D. Okla. 2020).............................. **18**

*Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 2 (1983) ...... **12, 14**

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 398 (1967) .............. **15**

*Rogers v. Dell Comp. Corp.*, 138 P.3d 826, 830 (Okla. 2005) ..................................... **17**

*Sparling v. Hoffman Const. Co., Inc.*, 864 F.2d 635, 637-38 (9th Cir. 1988).............. **16**

*Thompson v. Bar-S Foods Co.*, 174 P.3d 567, 572 (Okla. 2007) ................................. **17**

*Towe, Hester & Erwin, Inc. v. Kansas City Fire & Marine Ins. Co.*, 947 P.2d 594, 599 (Okla. Civ. App. 1997) ................................................................................................. **17**

*Voss v. City of Okla. City*, 618 P.2d 925, 928 (Okla. 1980)......................................... **17**

*Wolverine Exploration Co. v. Natural Gas Pipeline Co. of Amer. Inc.*, 842 P.2d 352, 353 (Okla. Civ. App. 1991) ....................................................................... **16**

## Statutes

9 U.S.C. § 2 *et seq.* ................................................................................................. **4**

9 U.S.C. § 3 ........................................................................................................... **12**

9 U.S.C. § 4 ........................................................................................................... **11**

9 U.S.C. §§ 1-16 *et seq.* ......................................................................................... **4**

12 O.S. § 1857(A) ................................................................................................. **17**

A302

Defendant, GreenSky, LLC, incorrectly identified as BMO Harris Bank, NA d/b/a GreenSky, LLC (hereinafter "GreenSky"), files this brief in support of its Motion to Compel Arbitration as to all claims asserted by Plaintiff Susan Parisi (hereinafter "Plaintiff") and to dismiss or stay claims of Plaintiff pending arbitration. Plaintiff's loan agreement contains a mandatory arbitration provision directing the parties to resolve and dismiss or stay Plaintiff's claims in this case pending the outcome of arbitration. In support of this Motion, GreenSky respectfully shows as follows:

## I.
## INTRODUCTION

Plaintiff has filed a putative class action against GreenSky and purports to assert claims against GreenSky under the Oklahoma Consumer Credit Code. Plaintiff's claims against GreenSky, which arise from a loan document captioned "Installment Loan Agreement" (hereinafter "Loan Agreement"), should be sent to arbitration. The Loan Agreement contains, among other provisions: (1) an arbitration agreement; (2) an agreement to arbitrate "any claim, dispute or controversy of every kind and nature, whether based in law or equity, between you and us arising from or relating to your Loan Agreement . . . , including the validity, enforceability or scope of this Arbitration Provision or the Agreement"; and (3) an agreement to arbitrate all "Claims" individually.

As discussed below, there is an agreement to arbitrate between Plaintiff and GreenSky, and all other issues should be resolved by the arbitrator pursuant to the Loan Agreement. Therefore, GreenSky respectfully requests that the Court enter an order

Appellate Case: 23-6218     Document: 010111062399     Date Filed: 06/07/2024     Page: 24

compelling arbitration of Plaintiff's individual claims against GreenSky and dismissing or staying all further proceedings against GreenSky.

## II.
## UNDISPUTED FACTS

1.  On November 23, 2021, Plaintiff claims that she met with a representative of Defendant C Cashion Windows, LLC d/b/a Renewal by Andersen of Oklahoma to discuss the purchase and installation of replacement windows for her home. (*See* Exhibit 1, Plaintiff's Amended Petition and Motion to Certify a Class Action, ¶ 60.)[1]

2.  Plaintiff claims that the above representative explained a financing option, serviced through GreenSky, for Plaintiff to purchase the replacement windows. (*See id.*, ¶ 61.)

3.  Plaintiff alleges that said representative told her that she could purchase the replacement windows with zero money down and zero interest on the loan for two years, and that payments would not be due until two years after the installation. (*See id.*)

4.  Further, Plaintiff alleges that she discussed with said representative that she wanted to replace nine windows. (*See id.*, ¶ 63-64.)

---

[1] For the purpose of this Brief, relevant portions of Plaintiff's Amended Petition and Motion to Certify a Class Action will be attached as Exhibit 1. For a complete copy of Plaintiff's Amended Petition and Motion to Certify a Class Action, *see* ECF No. 1, Exhibit 1.

Appellate Case: 23-6218     Document: 01011062399     Date Filed: 06/07/2024     Page: 25

5.  A split plan installation was also discussed whereby five out of the nine windows would be installed first, with the remaining four windows installed later. (*See id.*, ¶ 64.)

6.  Plaintiff claims that she was shown on an iPad that she was approved for the loan terms mentioned above. (*See id.*, ¶ 65.)

7.  Plaintiff claims that based on her conversation with the representative described above, she agreed to purchase the replacement windows. (*See id.*, ¶ 67.)

8.  Further, Plaintiff claims that she was never shown the disclosures or informed of the interest that she would have to pay on the loan. (*See id.*, ¶ 68.)

9.  Because Plaintiff agreed to purchase the replacement windows and was approved for a loan with BMO Harris Bank, NA, serviced by GreenSky, a Loan Agreement was created that established Plaintiff's contractual agreement with GreenSky, as the servicing agent of Plaintiff's loan with BMO Harris Bank, NA. (*See* Exhibit 2, Loan Agreement, ¶ 25.) [2]

### III.
### PLAINTIFF'S LOAN AGREEMENT

Plaintiff's loan was serviced by GreenSky and funded by BMO Harris Bank, NA through the GreenSky® Program. (*See* Exhibit 3, Declaration of Timothy D. Kaliban ("Kaliban Declaration"), ¶¶ 7-8.)[3] That loan was documented by the Loan Agreement

---

[2] A true and correct copy of the Loan Agreement is attached as Exhibit 2, and is fully incorporated by reference herein.

[3] The Kaliban Declaration is attached as Exhibit 3, and is fully incorporated by reference herein.

GreenSky emailed to Plaintiff, which set forth the relevant terms and conditions of Plaintiff's loan. (Exhibit 3, Kaliban Declaration, ¶ 23.)

**A. ARBITRATION PROVISION**

For purposes of this brief in support of GreenSky's motion, the most relevant provision of the Loan Agreement is in Paragraph 25, which is prominently titled: "**ARBITRATION PROVISION. Agreement to Arbitrate**." (*See* Exhibit 2, ¶ 25.) This provision requires that all "Claims" between the parties be resolved, "upon the election" by any party, through arbitration. (*Id.*) The arbitration agreement reflects that it "is made pursuant to a transaction involving interstate commerce, and will be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16, as it may be amended . . . , and the applicable Code." [4] (*Id.*)

The arbitration agreement mandates that all "Claims" between Plaintiff and GreenSky "will be resolved through binding arbitration." (*Id.*) The term "Claim" is broadly defined to mean:

> any claim, dispute or controversy of every kind and nature, whether based in law or equity, between you and us arising from or relating to your Loan Agreement as well as the relationship resulting from such Agreement . . . including the validity, enforceability or scope of this Arbitration Provision or the Agreement.

---

[4] Aside from the contractual provision designating the applicability of the Federal Arbitration Act, there is no dispute that the arbitration agreement is "a transaction involving interstate commerce," as GreenSky is based in Georgia while Plaintiff lives in Oklahoma. (*See* Exhibit 1, ¶ 1; *see also* Kaliban Declaration, ¶ 5.) The Federal Arbitration Act applies here. 9 U.S.C. § 2 (explaining that the Federal Arbitration Act applies to "[a] written provision in . . . a contract evidencing a transaction involving [interstate] commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . .").

4

A306

Appellate Case: 23-6218    Document: 01011062399    Date Filed: 06/07/2024    Page: 27

(*Id.*) Likewise, the terms "you" and "us" are broadly defined to "include[] any corporate parent, wholly or majority owned subsidiaries, affiliates, any licensees, predecessors, successors, assigns and purchasers of any accounts, all agents, employees, directors and representatives of any of the foregoing and any third party providing any product, service or benefit in connection with the Agreement." (*Id.*)

There was also a clause in the arbitration provision that gave Plaintiff an opportunity to opt out of the arbitration provision.

> You may choose to opt out of and not be subject to this arbitration provision but only by following the process set forth below. If you do not wish to be subject to this Arbitration Provision, then you must notify us in writing within forty-five (45) calendar days of the date of the Agreement at the following address: P.O. Box 29429, Atlanta, GA 30359, Attention: Legal.

(*Id.*) Additionally, Plaintiff was notified in the arbitration agreement, in all capital letters, of the consequences of not opting out of arbitration:

> UNLESS YOU OPT OUT OF THIS ARBITRATION PROVISION AS PROVIDED BELOW OR EXCEPT AS APPLICABLE LAW PROHIBITS US FROM IMPOSING ARBITRATION ON YOU, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO LITIGATE A CLAIM IN COURT OR HAVE A JURY TRIAL ON A CLAIM. OTHER RIGHTS THAT YOU WOULD HAVE IN COURT ALSO MAY NOT BE AVAILABLE OR MAY BE LIMITED IN ARBITRATION, INCLUDING YOUR RIGHT TO APPEAL AND YOUR ABILITY TO PARTICIPATE IN A CLASS ACTION.

(*Id.*) Nevertheless, even if she did not opt out of arbitration, Plaintiff remained able to file and pursue an "individual Claim in a small claims court in [her] state or municipality, so long as that claim is pending only in that court." (*Id.*)

Claims will be referred either to JAMS or to the American Arbitration Association (hereinafter "AAA"). (*Id.*) The arbitration will take place in the federal judicial district

where Plaintiff resides. (*Id.*) Plaintiff will not be required to pay more in arbitration frees than she paid in initiating litigation:

> Regardless of who wins in arbitration, you will only be responsible for paying your share, if any, of the arbitration fees required by the applicable Code, which amount will not exceed the filing fees that you would have in court if the Claim had been brought in the appropriate state or federal court closest to were you live. We will pay the remainder of any arbitration fees.

(*Id.*)

## B. AGREEMENT TO PURSUE CLAIMS INDIVIDUALLY

The Loan Agreement's arbitration provision also contains an agreement that arbitration will be conducted on an individual basis only, and that Plaintiff will not have the right to assert class action claims. The provision states, in relevant part: "Class Action Waiver and Other Restrictions: Arbitration will proceed solely on an individual basis without the right for any Claims to be arbitrated on a class action basis or on bases involving claims brought in a purported representative capacity on behalf of others." (*Id.*) Furthermore, the parties agreed that "[t]he arbitrator's authority to resolve and make written awards is limited to Claims between you and us alone. Claims may not be joined or consolidated unless agreed to in writing by all parties." (*Id.*)

### IV.
### APPLICATION AND APPROVAL OF PLAINTIFF'S LOAN

#### A. APPLICATION AND APPROVAL PROCESS

On November 23, 2021, Plaintiff applied and was approved for a loan from BMO Harris Bank, NA through the GreenSky® Program for a home improvement project with Renewal by Andersen of Oklahoma, the company reflected on Plaintiff's Loan Agreement. (Exhibit 3, Kaliban Declaration, ¶ 12.; *see* Exhibit 2, p. 3.)

Appellate Case: 23-6218     Document: 010111062399     Date Filed: 06/07/2024     Page: 29

As part of the application process, applicants provide certain information necessary for GreenSky, as agent for the banks participating in the GreenSky® Program, to reach a decision on the application and to communicate with the borrower regarding the transaction. (Exhibit 3, Kaliban Declaration, ¶ 13.) Therefore, Plaintiff, as part of her loan application, supplied, among other information, her social security number, date of birth, telephone number, mailing address, and email address. (*Id.* ¶ 14.)

Once Plaintiff's information was entered in the application, in order to submit the application to GreenSky, Plaintiff was required to acknowledge reading and accepting: (1) the Loan Application disclosures; (2) the consent to electronic records and communication; and (3) an authorization for GreenSky to pull her credit report on behalf of the participating financial institution. (*Id.* ¶ 15.)

The credit report and credit score are provided to the GreenSky® Program's decisioning software, which applies the various credit policies of the participating financial institutions and renders a credit decision on the application based on these preset credit policies. (*Id.* ¶ 16.) Plaintiff was approved for a loan from BMO Harris Bank, NA with a credit limit in the amount of $17,744.00 (*Id.* ¶ 17.)

## B. GREENSKY'S MAILING TO PLAINTIFF WITH THE LOAN AGREEMENT

GreenSky mailed a printed copy of the Loan Agreement through the United States Postal Service to Ms. Parisi on or about November 23, 2021, to the physical address Ms. Parisi provided as part of the loan application process. (*Id.* ¶ 18.)

Appellate Case: 23-6218    Document: 010111062399    Date Filed: 06/07/2024    Page: 30

GreenSky's vendor, Source Link, mailed the package on behalf of GreenSky containing the Loan Agreement directly to the physical address Ms. Parisi provided as part of her application. (*Id.* ¶ 19.)

GreenSky's action in mailing the printed copy of the Loan Agreement to Plaintiff was, and is, consistent with GreenSky's customary business practices for borrowers whose loans GreenSky services. (*Id.* ¶ 20.)

Specifically, Loan Agreement mailing was properly addressed to Plaintiff, had sufficient postage, and it was deposited in the U.S. Mail. This process is consistent with GreenSky's procedures for preparing and having mailed loan agreements to its customers. (*Id.* ¶ 21.)

This mailing was not returned to GreenSky as undeliverable and GreenSky did not receive any returned notifications that the Loan Agreement or any other mailings associated with Plaintiff's loan account were undeliverable. (*Id.* ¶ 22.)

## C. GREENSKY'S EMAIL TO PLAINTIFF WITH THE LOAN AGREEMENT

GreenSky emailed Plaintiff the Loan Agreement on November 23, 2021—the same day Plaintiff filled out the loan application and was approved for same. (*Id.* ¶¶ 23, 25.) The Loan Agreement was emailed to sparisi21@yahoo.com, which is the email address she provided on her loan application with GreenSky as part of the loan application process. (*Id.* ¶ 23.)

GreenSky's action in emailing a copy of the Loan Agreement to Plaintiff was, and is, consistent with GreenSky's customary business practices for borrowers whose loans

8

A310

Appellate Case: 23-6218     Document: 010111062399     Date Filed: 06/07/2024     Page: 31

GreenSky services. (*Id.* ¶ 24.) Specifically, the Loan Agreement was emailed to the proper email address that Plaintiff provided the same day she filled out the GreenSky loan application and was approved for the loan. (*Id.* ¶ 25.)

The email sent to Plaintiff identified GreenSky as the sender, stated that the email was regarding the Installment Loan Agreement, and the email was not returned to GreenSky as undeliverable. (*Id.* ¶ 26.) Additionally, as evidenced by Exhibits 2 and 3 in Plaintiff's Amended Petition and Motion to Certify a Class Action, the sparisi21@yahoo.com email address was used by Plaintiff. (*Id.* ¶ 27; *see* Exhibit 1, Plaintiff's Exhibits 2 and 3.)

**V.**
**PLAINTIFF'S USE OF HER SHOPPING PASS AND LOAN AGREEMENT CONTAINING THE ARBITRATION PROVISION**

On November 29, 2021, less than one week after receiving approval on her loan application and receiving the Loan Agreement, Plaintiff used the Shopping Pass included with, and part of, her Loan Agreement, and authorized Renewal by Andersen of Oklahoma to charge her account in the amount of $8,871.50. (Exhibit 3, Kaliban Declaration, ¶ 28.)

Plaintiff's use of the Shopping Pass and the loan proceeds to make the charge with Renewal by Andersen of Oklahoma constituted an affirmance and acceptance of the terms of the Loan Agreement; as set forth in the Shopping Pass included with the Loan Agreement, "[u]se of this Shopping Pass or the associated Loan by (any) Borrower (or any authorized user) to make a purchase constitutes acceptance by (all) Borrower(s) of the terms of the accompanying Loan Agreement. The physical or electronic record of any such

9

A311

purchase will constitute the signature of (all) Borrower(s) on such Loan Agreement." (*Id.* ¶ 29; Exhibit 2, p. 1.)

Attached as Exhibit 4 to the Kaliban Declaration is a true and correct copy of the transaction history for Plaintiff's loan account. This document shows the charges to Plaintiff's account number ending in 2561. (Exhibit 3, Kaliban Declaration, ¶ 30.) The funds ($8,871.50) were settled and disbursed directly to Renewal by Andersen of Oklahoma's designated bank account in order to pay for the services Plaintiff requested from Renewal by Andersen of Oklahoma. (*Id.*)

## VI.
## ARGUMENT AND AUTHORITIES

The question of jurisdiction is primary and fundamental in every case. *Mid-Continent Pipe Line Co. v. Wilkerson*, 193 P.2d 586, 588 (Okla. 1948). Under Oklahoma law, it is the responsibility of the court to inquire and resolve such jurisdictional questions. *Harber v. McKeown*, 157 P.2d 753, 754 (Okla. 1945); *see Dolese Bros. v. Tollett*, 19 P.2d 570, 571 (Okla. 1933) (explaining that "[a] trial court is required to determine the legal question of whether or not it has jurisdiction of the subject-matter of an action presented to it for determination.").

When it appears either from the pleadings or briefs that the subject matter is exclusively within the jurisdiction of another forum, such as arbitration, the Court should decline to proceed further and dismiss the action. *See, e.g., Mid-Continent Pipe Line Co.*, 193 P.2d at 591.

A312

In this case, the proper forum is arbitration based the valid and enforceable arbitration provision in Plaintiff's Loan Agreement. Therefore, this Court should enter an order compelling arbitration of Plaintiff's individual claims against GreenSky and dismissing, or in the alternative, staying all further proceedings against GreenSky.

### A. THE ARBITRATION CLAUSE IS VALID AND ENFORCEABLE UNDER THE FEDERAL ARBITRATION ACT

As quoted above, the arbitration provision in the Loan Agreement states that it is to be governed by the Federal Arbitration Act (hereinafter "FAA"). The FAA codifies a national policy in favor of arbitrating claims when parties contract to settle disputes by arbitration, and compels judicial enforcement of a wide range of written arbitration agreements. *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 111 (2001). Section 4 of the FAA empowers a "party aggrieved by the alleged failure . . . of another to arbitrate under a written agreement for arbitration" to "petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4.

The FAA mandates that district courts "shall" enforce arbitration agreements "in accordance with the terms of the agreement." *Id.*; *see Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). This provision codifies the "liberal federal policy favoring arbitration." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal quotation marks omitted).

The "first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute. The court is to make this determination

Appellate Case: 23-6218     Document: 01011062399     Date Filed: 06/07/2024     Page: 33

by applying the 'federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act.'" *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) (quoting *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 2 (1983)). The "parties' intentions control, but those intentions are generously construed as to issues of arbitrability." *Id.* And, any ambiguities in the contract or doubts as to the parties' intentions should be resolved in favor of arbitration. *See id.*

Further, under the FAA, a district court should dismiss or stay a suit involving an arbitration clause under the following circumstances:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.

In this case, there was clearly an agreement to arbitrate between GreenSky and Plaintiff, as reflected in the extensive language quoted above that details the terms and conditions of the arbitration provision in the Loan Agreement. Also, there is no question that Plaintiff understood and agreed to have GreenSky service a loan so she could receive services from Renewal by Andersen of Oklahoma. (*See* Exhibit 3, Kaliban Declaration, ¶¶ 12-17.) Moreover, BMO Harris Bank, NA offered to lend funds to Plaintiff, with GreenSky acting as the servicing agent, as reflected in the terms and conditions of the Loan

12

A314

Appellate Case: 23-6218     Document: 01011062399     Date Filed: 06/07/2024     Page: 35

Agreement. (*See id.*; *see also* Exhibit 2, p. 1) (stating Plaintiff was "approved" for loan proceeds up to $19,000).

It is undisputed that Plaintiff had the opportunity to review the Loan Agreement, containing the arbitration provision and class action waiver, when the Loan Agreement was sent to a valid email address that Plaintiff herself provided on her loan application with GreenSky, and then later used that same email address to converse with GreenSky. (*See* Exhibit 3, Kaliban Declaration, ¶¶ 23-27.) Plaintiff authorized the loan proceeds to be disbursed to Renewal by Andersen of Oklahoma, under the terms of the Loan Agreement, which contained the arbitration and class action waiver provisions. (*See id.* ¶ 28).

As quoted above, there is an opt-out provision in the Loan Agreement's arbitration provision giving Plaintiff the opportunity to opt-out of the arbitration provision by providing GreenSky with written notice within 45 days after the date of the Loan Agreement. (*See* Exhibit 2, ¶ 25). Plaintiff did not opt out of the arbitration provision by providing written notice to GreenSky within 45 days after the date of the Loan Agreement, further reflecting her assent to the arbitration provision and class action waiver.

Based on the foregoing, the arbitration provision in the Loan Agreement is valid and enforceable against Plaintiff. Therefore, this Court should enter an order compelling arbitration of Plaintiff's individual claims against GreenSky and dismissing, or in the alternative, staying all further proceedings against GreenSky.

**B. THE ARBITRATION PROVISION AGREED TO BY PLAINTIFF IS EXPRESSLY GOVERNED BY THE FEDERAL ARBITRATION ACT AND THE COURT MUST COMPEL ARBITRATION PURSUANT TO FEDERAL ARBITRATION LAW**

Under the FAA, there is a presumption in favor of arbitrating a broad scope of claims, particularly where no type of claim has been specifically excluded in the language of the arbitration agreement. *AT&T Techs., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 650 (1986). "The Arbitration Act establish that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Memorial Hosp.*, 460 U.S. at 24-25.

The arbitration provision in this case broadly states: "NEITHER YOU NOR WE WILL HAVE THE RIGHT TO LITIGATE A CLAIM IN COURT OR HAVE A JURY TRIAL ON A CLAIM." (Exhibit 2, ¶ 25). As mentioned above, the term "Claim" is defined as "*any* claim, dispute or controversy *of every kind and nature*, whether based in law or equity, between you and us *arising from or relating to* your Loan Agreement as well as the relationship resulting from such Agreement . . . including the validity, enforceability or scope of this Arbitration Provision or the Agreement." (*Id.*) (emphasis added).

In determining whether a plaintiff's claims fall within the scope of an arbitration agreement, courts determine whether the arbitration agreement is broad or narrow. "When an arbitration clause is narrowly drawn, the policy in favor of arbitration does not have the 'strong effect . . . that it would have if . . .[it] [were] a broad arbitration clause." *Cummings v. FedEx Ground Package System, Inc.*, 404 F.3d 1258, 1262 (10th Cir. 2005). Generally, if an arbitration agreement contains the "language '[a]ny controversy or claim arising out

14

A316

Appellate Case: 23-6218      Document: 010111062399      Date Filed: 06/07/2024      Page: 37

of or relating to this Agreement," then the arbitration agreement is considered broad. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 398 (1967); *see id.* (explaining that a broad arbitration provision "refer[s] all disputes arising out of a contract to arbitration."). Moreover, courts have determined that "the ordinary meaning of the phrase 'relating to' is broad." *Chelsea Family Pharmacy, PLLC v. Medco Health Solutions, Inc.*, 567 F.3d 1191, 1199 (10th Cir. 2009).

Clearly, the language of the arbitration provision in this case is broad as the arbitration provision defines "Claim" as "***any*** claim, dispute or controversy *of every kind and nature*, whether based in law or equity, between you and us ***arising from or relating to*** your Loan Agreement . . . ." (Exhibit 2, ¶ 25) (emphasis added). As such, the broad language in the arbitration provision covers the claims asserted against GreenSky by Plaintiff in her Petition.

Plaintiff's claims against GreenSky are based entirely on Plaintiff entering into a purchase and installation agreement with Renewal by Andersen of Oklahoma and then a subsequent Loan Agreement, with GreenSky as the servicing agent and BMO Harris Bank, NA as the lender, to finance that transaction. GreenSky's sole connection with this case is that GreenSky serviced a loan of approximately $8,871.50 to Renewal by Andersen of Oklahoma on behalf of Plaintiff for the replacement windows she agreed to purchase and have installed. The loan that GreenSky serviced is governed by the Loan Agreement, including the arbitration provision contained in said agreement.

Appellate Case: 23-6218     Document: 01011062399     Date Filed: 06/07/2024     Page: 38

Therefore, all of Plaintiff's claims and allegations in this case against GreenSky "arise from or relate to" the Loan Agreement. Consequently, the arbitration provision in the Loan Agreement covers this lawsuit in its entirety.

If all claims in a lawsuit are subject to arbitration, a court may dismiss such claims rather than staying the action. *See Green v. SuperShuttle Int'l, Inc.*, 653 F.3d 766, 769-70 (8th Cir. 2011); *Choice Hotels Int'l v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709-10 (4th Cir. 2001); *Green v. Ameritech Corp.*, 200 F.3d 967, 973 (6th Cir. 2000); *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992); *Sparling v. Hoffman Const. Co., Inc.*, 864 F.2d 635, 637-38 (9th Cir. 1988). Because this case is subject to arbitration in its entirety, this Court should not only enter an order compelling arbitration of Plaintiff's individual claims against GreenSky, but should also dismiss this case, or in the alternative, stay all further proceedings against GreenSky.

## C. THE ARBITRATION CLAUSE AND CLASS ACTION WAIVER ARE ALSO VALID AND ENFORCEABLE UNDER OKLAHOMA LAW

The arbitration provision in the Loan Agreement expressly provides for arbitration of the claims alleged in Plaintiff's Amended Petition and Motion to Certify a Class Action. The arbitration provision is valid, enforceable, and irrevocable pursuant to Oklahoma law. As such, the contractual agreement between the parties to arbitrate eliminates this Court's jurisdiction over the subject matter of Plaintiff's claims and allegations against GreenSky. Therefore, the Court must compel arbitration of this matter.

Oklahoma law favors arbitration where the parties have agreed. *Wolverine Exploration Co. v. Natural Gas Pipeline Co. of Amer. Inc.*, 842 P.2d 352, 353 (Okla. Civ.

16

A318

App. 1991); *Freeman v. Prudential Sec., Inc.*, 856 P.2d 592, 594 (Okla. Civ. App. 1993). Oklahoma law also reflects a strong public policy in favor of arbitration. *See Towe, Hester & Erwin, Inc. v. Kansas City Fire & Marine Ins. Co.*, 947 P.2d 594, 599 (Okla. Civ. App. 1997). Section 1857(A) of the Oklahoma Uniform Arbitration Act (OUAA) declares arbitration agreements "valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for the revocation of a contract." 12 O.S. § 1857(A). According to the Oklahoma Supreme Court, where parties enter a contractual agreement to arbitrate disputes, "it constitutes a substantive and mandatory right." *Voss v. City of Okla. City*, 618 P.2d 925, 928 (Okla. 1980). The OUAA reveals "a clear legislative intent that any disputes arising from the interpretation or application" of such agreements "shall have an immediate and speedy resolution by required arbitration." *Id.*

Courts generally view arbitration provisions as "a shortcut to substantial justice with a minimum of court interference." *Long v. DeGeer*, 753 P.2d 1327, 1328 (Okla. 1987). The Oklahoma Supreme Court has held courts should compel arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Thompson v. Bar-S Foods Co.*, 174 P.3d 567, 572 (Okla. 2007) (internal citation omitted). Interpretation of an arbitration agreement is governed by general state-law contract principles, and courts should resolve in favor of covering any doubts concerning the arbitrability of a particular dispute. *Id.*; *City of Muskogee v. Martin*, 796 P.2d 337, 340 (Okla. 1990); *see also Rogers v. Dell Comp. Corp.*, 138 P.3d 826, 830 (Okla. 2005) (holding "ambiguity falls on the side of the existence of an agreement to arbitrate.").

17

A319

Appellate Case: 23-6218        Document: 010111062399        Date Filed: 06/07/2024        Page: 40

The arbitration provision in the Loan Agreement covers all claims between Plaintiff and GreenSky "arising from or relating to [Plaintiff's] Loan Agreement as well as the relationship resulting from such Agreement . . . including the validity, enforceability or scope of th[e] Arbitration Provision or the Agreement." (Exhibit 2, ¶ 25).

Further, the arbitration provision states that Plaintiff agrees to waive any right, that she might otherwise have, to bring or participate in a class action lawsuit. Also, under the arbitration provision, Plaintiff agrees that any arbitration proceeding under the Loan Agreement will be limited to her individual claims rather than those of any class or group.

Courts in Oklahoma have determined that class action waivers are valid and enforceable. *See Morris v. Airbnb, Inc.*, 2020 WL 5823542, *4 (W.D. Okla. 2020) (ruling that Defendant's Motion to Compel Arbitration is granted where the arbitration clause contained a class action waiver); *see also Hancock v. American Tel. and Tel. Co., Inc.*, 2011 WL 3626785, *10 (enforcing arbitration clauses that contained class action waivers and granting a motion to compel arbitration with dismissal of certain claims). Given these Western District of Oklahoma cases holding that arbitration provisions with class actions waivers are enforceable, Plaintiff has waived any right to bring any class action claims against GreenSky, and the class action claims asserted in the Petition should be dismissed as a matter of law, or in the alternative, proceedings should be stayed in favor of arbitration.

Page: 41        Date Filed: 06/07/2024        Document: 010111062399        Appellate Case: 23-6218

# VII.
## <u>CONCLUSION</u>

WHEREFORE, Defendant respectfully requests that this Court compel arbitration as to all claims asserted by Plaintiff and to dismiss or stay claims of Plaintiff pending the outcome of arbitration.

<div style="margin-left: 40%;">

Respectfully submitted,

</div>

Dated: April 28, 2023                          */s/ Sean W. Fleming*

<div style="margin-left: 40%;">

Sean W. Fleming
*Admitted Pro Hac Vice*
Texas State Bar No. 24027250
MACDONALD DEVIN MADDEN
KENEFICK & HARRIS, P.C.
12770 Coit Road, Suite 1100
Dallas, Texas 75251
T: (214) 744-3300
F: (214) 747-0942
SFleming@MacdonaldDevin.com

Derrick T. DeWitt, OBA #18044
Kyle R. Prince, OBA #33040
DeWITT PARUOLO & MEEK
P.O. Box 138800
Oklahoma City, OK 73113
T: (405) 705-3600
F: (405) 705-2573
ddewitt@46legal.com
kprince@46legal.com

***Attorneys for Defendant GreenSky, LLC, incorrectly identified as BMO Harris Bank, NA d/b/a GreenSky, LLC***

</div>

A321

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th of April, 2023, I electronically transmitted this document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

M. Kathi Rawls, OBA #18814
Minal Gahlot, OBA #22145
kathi@rawlsgahlot.com
minal@rawlsgahlot.com

***Attorneys for Plaintiffs***

*/s/ Sean W. Fleming*

A322

Appellate Case: 23-6218     Document: 01011062399     Date Filed: 06/07/2024     Page: 43

# IN THE UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| SUSAN PARISI | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.:  CIV-23-115-R |
| OKLAHOMA WINDOWS | ) | |
| AND DOORS, LLC | ) | |
| d/b/a RENEWAL BY ANDERSON OF | ) | |
| OKLAHOMA, and BMO HARRIS | ) | (Removed from the District Court |
| BANK, NA d/b/a GREENSKY, LLC, | ) | of Oklahoma County, State of |
| Defendants. | ) | Oklahoma, Case No.: CJ-21-1681) |

## AMENDED PETITION
## AND MOTION TO CERTIFY A CLASS ACTION

**COMES NOW** the Plaintiff, Susan Parisi ("Ms. Parisi") by and through her

counsel of record, M. Kathi Rawls and Minal Gahlot of Rawls Gahlot, PLLC, and for her

Petition and Class Action claims states as follows:

### PARTIES

1. Plaintiff, Ms. Parisi is currently a resident of Oklahoma County, State of Oklahoma,

   and has been for more than six (6) months prior to the filing of this litigation.

2. The class members are Oklahoma consumers who were not provided adequate

   consumer credit disclosures prior to consummation or liability for the loans originated

   by Renewal by Anderson of Oklahoma (Andersen) and later sold to Harris/GreenSky.

3. Defendant, BMO Harris Bank, NA is a national lender issuing loans in reliance upon

   home solicitation sales of consumer goods as that term is defined by 14A O.S. § 2-

   501, issuing loans in Oklahoma under the name of GreenSky LLC, it may be served

   through its agents in Georgia.( hereafter "Harris/GreenSky").

1

Exhibit 2

A323

Appellate Case: 23-6218     Document: 010111062399     Date Filed: 06/07/2024     Page: 44

4. Defendant Andersen is a foreign limited liability company and has principal place of business in Oklahoma. Andersen utilizes home solicitors in its sale and financing of consumer credit sales of goods as defined by 14A O.S. § 2-501.

## JURISDICTION AND VENUE
(Plaintiff hereby incorporates ¶¶ 1-4 above)

5. This matter is filed against the Defendants in Oklahoma County as it is the residence county of Ms. Parisi and the location of the home solicitation for the sale of replacement windows.

6. Each Defendant may be served through its registered service agent or head teller and regularly conducts business in the State of Oklahoma.

7. GreenSky is a BMO Harris Bank N.A. is the actual lender identified in the loan sold by Andersen to Harris/GreenSky.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION
(Plaintiff hereby incorporates ¶¶ 1-7 above)

8. This class action seeks injunctive and monetary relief to redress an unlawful and deceptive pattern of wrongdoing followed by Defendant, Andersen, in concert with its co-defendant, Harris/GreenSky (jointly Defendants), in its credit extension sale of consumer goods and services in the State of Oklahoma.

9. Defendants are regularly engaged in the business of making/issuing "consumer loans" in which:

   (a) the debtor is a person other than an organization;

   (b) the debt is incurred primarily for a personal, family or household purpose;

   (c) either the debt is payable in installments or a loan finance charge is made; and

   (d) either the principal does not exceed Fifty Thousand Dollars ($50,000.00).

A324

Appellate Case: 23-6218     Document: 010111062399     Date Filed: 06/07/2024     Page: 45

10. In violation of 14A O.S. § 5-203, Defendants regularly issue consumer loans for products and services which fail to comply with Oklahoma Consumer Credit Code (OCCC) accurate disclosure requirements, specifically:

    a) Defendants failed to deliver all material disclosures, prior to consummation, in a form the Class Representative or its members may keep in violation of 14A O.S. § 3-306;

    b) Defendants failed to give the Class Representative or its members the identity of the lender's assignee in violation of 14A O.S. § 3-306 2(a);

    c) Defendants failed to accurately disclose to the Class Representative or its members "the amount financed" or to disclose the amount of credit to which the debtor has use,  or to segregate those amounts from other amounts in violation of 14A O.S. § 3-306 2(b) (i);

    d) Defendants failed to disclose the Class Representative or its members a statement of the debtor's right to obtain, upon a written request, a written itemization of the amount financed, and included spaces for a "yes" and "no" indication to be initialed by the debtor to indicate whether the debtor wants a written itemization of the amount financed.

    e) Defendants failed to provide or respond to Disclosure Requirement (d) above or provide a written itemization of the amount financed in violation of 14A O.S. § 3-306 2(cc) (ii);

        i. the amount that is or will be paid directly to the debtor;

        ii. the amount that is or will be credited to the debtor's account to discharge obligations owed to the lender;

        iii. each amount that is or will be paid to third persons by the lender on the debtor's behalf, together with an identification of or reference to the third person; and

        iv. the total amount of any charges described in the division (cc) of subparagraph (i) of this paragraph.

        v. The sum of the amount financed and the finance charge, which shall be termed the "total of payments".

        vi. (f) The number, amount, and due dates or period of payments scheduled to repay the total of payments.

        vii. (g) Descriptive explanations of the terms "amount financed", "finance charge", "annual percentage rate" and "total of payments", as specified by the Administrator.

A325

Appellate Case: 23-6218     Document: 01011106299     Date Filed: 06/07/2024     Page: 46

viii.   Any dollar charge or percentage amount which may be imposed by a lender solely on account of a late payment, other than a deferral or extension charge.

ix.   (j) A statement indicating whether or not the debtor is entitled to a rebate of any finance charge upon refinancing or prepayment in full pursuant to acceleration or otherwise, if the obligation involves a precomputed finance charge. A statement indicating whether or not a penalty will be imposed in those same circumstances if the obligation involves a finance charge computed from time to time by application of a rate to the unpaid principal balance.

x.   (k) A statement that the debtor should refer to the appropriate contract document for any information such document provides about nonpayment, default, the right to accelerate the maturity of the debt, and prepayment rebates and penalties;

xi.   The preceding list of disclosure violations by Defendants, as it relates to the loans issued to the Class Representative or its members, are prohibited under 14A O.S. § 3-306 2(aa) through (k).

## CLASS REPRESENTATION ALLEGATIONS
### *Statement of Maintainable Class Claims*

(Plaintiff hereby incorporates ¶¶ 1-11 above)

11. Pursuant to 12 O.S. § 2023, this is a case maintainable on a class-wide basis pursuant to 12 O.S. §§ 2023B.2 and 3, and the Class Representative brings this action on behalf of herself and of a class of all other persons similarly situated, to remedy the ongoing unfair, unlawful, and/or deceptive business practices alleged herein, and seeks redress on behalf of all those persons who have been harmed thereby, more specifically as set out below:

12. Andersen is a "Merchant", approved, trained and contractually engaged in the assignment of loans to Harris/GreenSky as more fully described below.

13. Andersen uses deceptive practices to sell its products, door-to-door, to home owners in Oklahoma pursuant to an extension of credit; the terms of which are not timely and

4

Appellate Case: 23-6218     Document: 01011062399     Date Filed: 06/07/2024     Page: 47

accurately disclosed to homeowners prior to consummation or prior to incurring liability thereon.

14. Andersen then immediately assigns its non-compliant, unauthorized credit extensions to BMO Harris Bank N.A. via its GreenSky Loan Program, who ratifies Andersen's actions by reporting negatively to consumer reporting agencies, conducting collection calls, and demanding payments in writing from consumers despite the fraudulent nature of the loan(s) issuance and the objections stated by said consumers.

15. GreenSky LLC is a loan servicing subsidiary of BMO Harris Bank N. A. with its principal place of business at 5565 Glenridge Connector, Suite 700, Atlanta, Georgia 30342.

16. BMO Harris conducts business throughout the United States through GreenSky LLC, its subsidiary administering the GreenSky Program, and engages in accepting assignment of loan from Assignors, origination and servicing activities related to the GreenSky Program.

17. Harris/GreenSky therefore engages in offering or providing a "financial product or service" within the meaning of 12 U.S.C. § 5481(15)(A)(i) and the Oklahoma Consumer Credit Code 14A O.S. § 3-306 and 2-104.

18. Harris/GreenSky engages in origination activities and services loans offered or provided for use by consumers primarily for personal, family, or household purposes within the meaning of 12 U.S.C. § 5481(5)(A) and 14A O.S. § 2-104.

19. Harris/GreenSky are "covered persons" under 12 U.S.C. § 5481(6) and the Oklahoma Consumer Credit Code.

Appellate Case: 23-6218     Document: 010111062399     Date Filed: 06/07/2024     Page: 48

## Identification of Common Questions of Law or Fact

(Plaintiff hereby incorporates ¶¶ 1-19 above)

20. Pursuant to 12 O.S. § 2023A.2, there are questions of law and fact common to the Class, which common issues predominate over any issues involving owing individual class members.

21. The factual questions common to the Class Representative and to each class member is that each class member's loan for Andersen windows in Oklahoma were presented, sold and loan originated as described below.

22. Pursuant to 12 O.S. § 2023A.2, the principal legal question common to the Class Representative and to each class member is whether adequate consumer credit disclosures were provided to class members prior to consummation or liability for the loans originated by Andersen and later sold to Harris/GreenSky.

### *Allegations of Typicality*

(Plaintiff hereby incorporates ¶¶ 1-22 above)

23. Pursuant to 12 O.S. § 2023A.3, the Class Representatives claims are typical of those of the classes it seeks to represent in that the Class Representative was solicited to purchase replacement windows without providing mandatory disclosures of the consumer credit extension loan and as such, the claim of the Class Representative is identical to that of the class members.

### *Definition of Class*

(Plaintiff hereby incorporates ¶¶ 1-23 above)

24. Pursuant to 12 O.S. § 2023C.3, the class is composed of all Oklahoma consumers who, since one year prior to the filing of this litigation,

A328

a) Defendants failed to deliver all material disclosures, prior to consummation, in a form the Class Representative or its members may keep in violation of 14A O.S. § 3-306;

b) Defendants failed to give the Class Representative or its members the identity of the lender's assignee in violation of 14A O.S. § 3-306 2(a);

c) Defendants failed to accurately disclose to the Class Representative or its members "the amount financed" or to disclose the amount of credit to which the debtor has use, or to segregate those amounts from other amounts in violation of 14A O.S. § 3-306 2(b) (i);

d) Defendants failed to disclose the Class Representative or its members a statement of the debtor's right to obtain, upon a written request, a written itemization of the amount financed, and included spaces for a "yes" and "no" indication to be initialed by the debtor to indicate whether the debtor wants a written itemization of the amount financed.

e) Upon receiving an affirmative indication, the lender shall provide, at the time other disclosures are required to be furnished, a written itemization of the amount financed in violation of 14A O.S. § 3-306 2(cc) (ii);

   xii.   the amount that is or will be paid directly to the debtor;

   xiii.   the amount that is or will be credited to the debtor's account to discharge obligations owed to the lender;

   xiv.   each amount that is or will be paid to third persons by the lender on the debtor's behalf, together with an identification of or reference to the third person; and

   xv.   the total amount of any charges described in the division (cc) of subparagraph (i) of this paragraph.

   xvi.   The sum of the amount financed and the finance charge, which shall be termed the "total of payments".

   xvii.   (f) The number, amount, and due dates or period of payments scheduled to repay the total of payments.

   xviii.   (g) Descriptive explanations of the terms "amount financed", "finance charge", "annual percentage rate" and "total of payments", as specified by the Administrator.

   xix.   Any dollar charge or percentage amount which may be imposed by a lender solely on account of a late payment, other than a deferral or extension charge.

A329

Appellate Case: 23-6218     Document: 01011062399     Date Filed: 06/07/2024     Page: 50

xx.    (j) A statement indicating whether or not the debtor is entitled to a rebate of any finance charge upon refinancing or prepayment in full pursuant to acceleration or otherwise, if the obligation involves a precomputed finance charge. A statement indicating whether or not a penalty will be imposed in those same circumstances if the obligation involves a finance charge computed from time to time by application of a rate to the unpaid principal balance.

xxi.    (k) A statement that the debtor should refer to the appropriate contract document for any information such document provides about nonpayment, default, the right to accelerate the maturity of the debt, and prepayment rebates and penalties;

xxii.    The preceding list of disclosure violations by Defendants, as it relates to the loans issued to the Class Representative or its members, are prohibited under 14A O.S. § 3-306 2(aa) through (k).

### ***Adequacy of Class Representative***

(Plaintiff hereby incorporates ¶¶ 1-24 above)

25. Pursuant to 12 O.S. § 2023A.4, the Class Representative will fairly and adequately protect and represent the interest of each class member.

26. The Class Representative has retained counsel with substantial experience in handling class actions in federal and state court.  See, e.g., Martinez v. FMS Inc., 2008 WL 4010101 (M.D. Fla. 2008); Brown v. SCI Funeral Services, 212 F.R.D. 602 (S.D.Fla.2003); Baez v. Wagner & Hunt, P.A., 442 F.Supp. 2d 1273 (S.D. Fla. 2006); Jansen v. West Palm Nissan, Inc., 2006 WL 1582068 (S.D. Fla. 2006); Tyrell v. Robert Kaye & Associates, P.A., 223 F.R.D. 686 (S.D. Fla. 2004). Further, counsel for the Class Representatives has substantial experience in litigating individual and class actions under the Uniform Commercial Code.  See, e.g., Jackson v. Southern Auto Finance Co., 988 So.2d 721 (Fla. 4th DCA 2008); Muro v. Hermano's Auto

A330

Appellate Case: 23-6218     Document: 01011062399     Date Filed: 06/07/2024     Page: 51

Wholesalers, Inc., 514 F.Supp. 2d 1343 (S.D. Fla. 2007); <u>Westlake Financial Services v. Ray</u>, 923 So.2d 555 (Fla. 4th DCA 2006).

27. The Class Representative has no conflicts of interest which would interfere with their ability to represent the interests of the class members.

***Appropriateness of Hybrid Class Treatment Under §§ 2023 B.2 and 3***
(Plaintiff hereby incorporates ¶¶ 1-27 above)

28. A class action is superior to other methods for the fair and efficient adjudication of this controversy. Because the damages suffered by the individual class members may be relatively small compared to the expense and burden of litigation, it would be impractical and economically unfeasible for class members to seek redress individually. The prosecution of separate actions by the individual class members, even if possible, would create a risk of inconsistent or varying adjudications with respect to the individual class members against Harris/GreenSky.

29. The Class Representative is represented by counsel competent and experienced in both consumer protection and class action litigation.

30. Members of the proposed class who have an interest in individually controlling the prosecution of separate claims against Andersen and Harris/GreenSky will not be prejudiced by this action.

31. Each member of the proposed class will be identified through discovery from Harris/GreenSky  and will be notified and given an opportunity to opt out of their respective class(es).

A331

Appellate Case: 23-6218     Document: 010111062399     Date Filed: 06/07/2024     Page: 52

32. The Class Representative does not presently know the nature and extent of any pending litigation to which a member of the proposed class is a party and in which any question of law or fact controverted in the present action is to be adjudicated. The Class Representative will identify any such pending litigation by

33. This Court is an appropriate forum for the present action in that the Class Representative is, and at all times herein mentioned has been, a resident of this county; the Class Representatives vehicle was purchased and repossessed in this county; and Harris/GreenSky does business in this county, including without limitation providing to residents of this county financing of motor vehicles that are consumer goods.

34. Certification of a class under 12 O.S. § 2023B.2 is appropriate as Harris/GreenSky has acted on grounds generally applicable to the Class with respect to the collection and credit reporting activity by Harris/GreenSky  described above, thereby making appropriate equitable relief with respect to the Class as a whole.

35. Unless restrained from such activities, Harris/GreenSky will continue to unlawfully harm the interests of the Class Representative and the class for which no adequate remedy at law exists.

36. Certification of a class under 12 Oklahoma Statutes Annotated § 2023B.3 is also appropriate in that:

37. The questions of law or fact common to the members of the class predominate over any questions affecting an individual class member; and

A332

Appellate Case: 23-6218      Document: 010111062399      Date Filed: 06/07/2024      Page: 53

38. A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

39. The Class Representative requests a certification of a "hybrid" class for monetary damages under 12 Oklahoma Statutes Annotated § 2023B.3 and for equitable relief under 12 Oklahoma Statutes Annotated § 2023B.2. See, Penson v. Terminal Transport Co., Inc., 634 F.2d 989, 994 (5th Cir.1981); Agan v. Katzman & Korr, P.A., 222 F.R.D. 692 (S.D.Fla.2004).

40. There are no difficulties likely to be encountered by the Court in the management of this proposed class action.

41. The Class Representatives counsel is entitled to a reasonable fee from the class members or from a common fund for the handling of this action.

### Harris/GreenSky's Business Model
(Plaintiff hereby incorporates ¶¶ 1-41 above)

42. Harris/GreenSky engages in origination and servicing activities on behalf of GreenSky Program banks.

43. Harris/GreenSky uses Merchants to market and intake loan applications from consumers at the point of sale. Most of these Merchants provide home improvement products and services, health care services, or retail products.

44. Andersen is one of those Merchants in the State of Oklahoma.

45. Merchants must apply to participate in the GreenSky Program and if accepted into the GreenSky Program, Harris/GreenSky generally train Merchants, including on how to market and promote the GreenSky Program loans, intake consumers' personal and

A333

Appellate Case: 23-6218     Document: 010111062399     Date Filed: 06/07/2024     Page: 54

financial information, submit loan applications to Harris/GreenSky on behalf of consumers or assist consumers in submitting loan applications directly to Harris/GreenSky.

46. Harris/GreenSky allows most Merchants to submit consumer loan applications online using Harris/GreenSky 's website or mobile applications, or over the phone if the Merchant indicates it has a signed application information form or a signed application from a consumer.

47. Once Harris/GreenSky receives an application, it makes an on-the-spot financing decision by comparing a consumer's application data with the lending criteria of the GreenSky Program banks, using proprietary technology and algorithms. These loans typically range from a few thousand dollars to tens of thousands of dollars.

48. When a consumer or Merchant submits a loan application through Harris/GreenSky 's website or mobile application, the approved loan terms are displayed on the computer or tablet at the conclusion of the application process.

49. Where a Merchant submits a loan application on a consumer's behalf, however, the consumer may view the approved loan terms on the computer or tablet only if the Merchant shares the screen with the consumer.

50. Until at least April 2019, if Harris/GreenSky determined that an applicant qualified for a loan, the loan application process was complete. Harris/GreenSky mailed or emailed loan documentation to consumers, but consumers were not required to sign and return that loan documentation to consummate the loan.

Appellate Case: 23-6218    Document: 010111062399    Date Filed: 06/07/2024    Page: 55

51. Harris/GreenSky also issues consumers a "shopping pass" number, which functions like a credit card (Shopping Pass). Harris/GreenSky treats use of the Shopping Pass, or associated funds, as acceptance of the loan.

52. Harris/GreenSky does not disburse the loan proceeds to the consumer. Rather, to pay for a product or service, a consumer provides the Shopping Pass number to her Merchant or otherwise authorizes a transaction and the Merchant, in turn, uses the Shopping Pass number or other authorization to apply for payment from Harris/GreenSky.

53. Harris/GreenSky then disburses loan proceeds directly to the Merchant.

54. Most of Harris/GreenSky's revenue is earned from fees that Merchants pay to Harris/GreenSky every time they receive payment from the proceeds of a consumer's loan.

55. In some instances, Merchants have misused these Shopping Pass numbers.

56. Merchants sometimes applied for a loan without a consumer's knowledge and entered their own email addresses as the consumer's own on the loan application. Because of this, Harris/GreenSky emailed the consumer's loan documents or Shopping Pass number to the Merchant instead of the consumer.

57. In other instances, Merchants applied for a loan without a consumer's knowledge and entered the consumer's correct mailing address on the application, but because the consumer was unaware of the loan, the consumer ignored the loan documents Harris/GreenSky mailed, thinking they were promotional materials.

A335

58. Consumers sometimes received mailed loan documents–which could take weeks to arrive after a loan application–only after the Merchant had already used the Shopping Pass number without the consumer's knowledge.

**<u>The Specific Facts related to the Class Representative Ms. Parisi</u>**

59. Here, the proposed class representative, Ms. Parisi was interested in Andersen's advertised replacement windows for her home in Oklahoma City, OK.

60. Ms. Parisi met with Russell Kelley (Russell), of Defendant, Andersen, on or around 11/23/2021.

61. Russell indicated Ms. Parisi could purchase the windows with zero money down, zero interest on the loan for two years and zero payments for 24 months after the installation.

62. Ms. Parisi informed Russell she had recently been diagnosed with multiple myeloma and would need the 24 month option due to her health issues and its costs and time related to treatment.

63. Russell and Ms. Parisi discussed the windows she wanted to replace and made choices regarding those windows.

64. Russell indicated that they would install the nine (9) windows on a "split plan"; planning to install five windows now and the rest at another time.

65. Russell showed Ms. Parisi an IPad to evidence that she had been approved for that type loan but the terms of the credit extension contract were not visible, Russell didn't release the IPad and Ms. Parisi was not provided the opportunity to read it.

66. Russell assured Ms. Parisi that she would be emailed a copy of the contract.

14

A336

Appellate Case: 23-6218   Document: 010111062399   Date Filed: 06/07/2024   Page: 57

67. Based upon Russell's statements, Ms. Parisi agreed to the purchase but didn't execute any documents; only the IPad.

68. Russell never mailed her a copy of the contract and Ms. Parisi was not provided any accurate disclosures about the interest she would be paying on the credit extension.

69. On or about December 7, 2021, Ms. Parisi was notified by Defendant Harris/GreenSky that Andersen had received an advance payment of $8,871.50 for the sale of its windows to Ms. Parisi and that her payments would start 6 months after installation of the windows.

70. GreenSky' s letter also informed Ms. Parisi that if she didn't authorize the payment to contact Harris/GreenSky immediately, which Ms. Parisi did.(Exhibit 1, Harris/GreenSky Letter to Parisi)

71. Ms. Parisi immediately contacted Russell with Andersen, who falsely told Ms. Parisi this  had never happened before and he would follow up to find out what happened.

72. Ms. Parisi never heard from Russel again.

73. Ms. Parisi then contacted Harris/GreenSky to inform them she had not authorized the payments, was unaware of their involvement, had not been informed of the interest rate, and had not agreed for payments to start six months after the installation of windows.

74. Ms. Parisi informed Harris/GreenSky she could not agree to such a loan because of the cancer treatment she was undergoing which would not be completed until the end of 2022.

75. Andersen never installed any windows at Ms. Parisi's home.

Appellate Case: 23-6218    Document: 010111062399    Date Filed: 06/07/2024    Page: 58

76. Ms. Parisi disputed that she owed Harris/GreenSky any money on the contract; a fact acknowledged by Harris/GreenSky in writing to Ms. Parisi shortly thereafter.

77. Harris/GreenSky did not notify the credit bureaus to whom it reported Ms. Parisi's loan, that she disputed the alleged debt.

78. Harris/GreenSky ignored Ms. Parisi's request to delete its tradeline, ignored the fact Andersen defrauded her, and ignored her request to provide her a copy of the alleged signed contract.

79. On December 10, 2021, Ms. Parisi again objected to the new loan being reported under her name and credit history.(Exhibit 2, 12/10/21 Parisi  Email to Harris/GreenSky)

80. Harris/GreenSky failed to conduct any written investigation on Ms. Parisi's complaints but instead stated it would "get the plan changed" for her.(Exhibit 3, 12/14/21 email to Ms. Parisi)

81. On 12/17/21, Harris/GreenSky stated, "got the plan changed and to let Harris/GreenSky know when the account was created". (Exhibit 4, 12/17/21 Harris/GreenSky email to Parisi)

82. Remarkably, Harris/GreenSky sent Ms. Parisi a letter stating that she had failed to "participate" in her own complaint and its resolution.(Exhibit 5, Harris/GreenSky letter to Parisi)

83. Harris/GreenSky continued its false reporting on the alleged loan it purchased from Andersen.

A338

84. Ms. Parisi has endured continued stress from Harris/GreenSky's harassment and defamation throughout 2022.

85. Harris/GreenSky's actions herein are a violation of the 7/12/21 CFPB Consent Order entered into by Harris/GreenSky.(CFPB Consent Order)

86. On July 18, 2022, Ms. Parisi sent a formal letter to Harris/GreenSky again reiterating the details of Andersen's fraud and Harris/GreenSky' s participation, but the communication failed to eliminate Harris/GreenSky' s false reporting to others about her.

87. Harris/GreenSky was then notified that Ms. Parisi had retained undersigned counsel as a result of its actions and all future communications should cease with Ms. Parisi.

88. Harris/GreenSky continued to contact Ms. Parisi after receipt of undersigned counsel and continues to defame her in its credit reporting.

89. Harris/GreenSky has previously stipulated to an Agreed Order finding it violated the Consumer Financial Protection Bureaus' rules when accepting assignment of loans from entities such as Andersen.

90. Harris/GreenSky regularly accepts assignment of loans originated by Andersen even though it is aware that Andersen regularly fails to abide by Oklahoma's Consumer Protection Act or Consumer Protection Act.

91. Andersen regularly extends credit to consumers to facilitate the sale of its windows and is subject to the Oklahoma Consumer Credit Code (OCC) and the Oklahoma Consumer protection Act by failing to provide accurate and timely disclosures of loan terms prior to consummation.

Appellate Case: 23-6218   Document: 010111062399   Date Filed: 06/07/2024   Page: 59

A339

Appellate Case: 23-6218      Document: 01011062399      Date Filed: 06/07/2024      Page: 60

92. Andersen violated the Oklahoma Consumer Credit Code disclosure requirements in its door-to-door sales of replacement windows pursuant to the consumer credit extension in the State of Oklahoma.

93. Andersen, in concert with Harris GreenSky, also committed fraud and forgery when its agent falsely indicated the terms of the window sale credit extension were other than previously advertised, as enumerated above.

94. Harris/GreenSky is liable for the actions taken by Andersen in that it accepted Assignment of the loan without ensuring compliance with multiple state laws.

95. Harris/GreenSky committed its own independent acts of fraud by stating that it would resolve the issue of Andersen's fraud and lack of disclosure of the cost of the credit extension to the Class Representative and its members by continuing to defame them by reporting falsely that credit extensions were valid, in default, or both.

96. Harris/GreenSky continued to harass and bill Ms. Parisi, falsely indicating that she was past due; causing Ms. Parisi unnecessary anguish and emotional distress while undergoing cancer treatment.(Exhibit 6, 10/2/22 Past Due Notice from Harris/GreenSky)

97. Harris/GreenSky ratified and benefited from its Assignor's violations of law when it refused to delete the false and defamatory information it published regarding the Class Representative and its members.

98. Harris/GreenSky failed to conduct a meaningful investigation of Ms. Parisi's dispute following receipt of Ms. Parisi's statements in its regard.

A340

Appellate Case: 23-6218     Document: 01011062399     Date Filed: 06/07/2024     Page: 61

99. Harris/GreenSky has purposefully and intentionally continued to falsely report that Ms. Parisi is in default even after undersigned counsel requested all communications cease.

100.    Defendants and its agents are prohibited from destroying, concealing or altering any document, testimony, recording or electronic storage of relevant evidence regarding the claims, defenses or allegations regarding this matter; Defendants are admonished to preserve and protect such evidence.

    WHEREFORE, premises stated, Plaintiff, individually and on behalf of all others similarly situated, prays this Court award their actual, consequential, statutory, treble, exemplary and punitive damages, their reasonable attorney fees and costs in this matter, and all other relief that the Court deems just and proper.

<div style="margin-left:40%">

Sincerely,

/s/ M. Kathi Rawls
M. Kathi Rawls, OBA #18814
Minal Gahlot, OBA#22145
Rawls Gahlot, PLLC
2404 S. Broadway
Moore, Ok 73160
Phone: 405-912-3225
Email: kathi@rawlsgahlot.com
Email: minal@rawlsgahlot.com

AND

Janet R. Varnell, Admitted Pro Hac Vice
Varnell and Warwick, P.A.
400 N. Ashley Drive, Suite 1900
Tampa, FL 33602
ATTORNEYS FOR PLAINTIFF

</div>

**JURY TRIAL DEMANDED**
**ATTORNEY LIEN CLAIMED**

A341

Appellate Case: 23-6218     Document: 010111062399     Date Filed: 06/07/2024     Page: 62

This is to certify that on the August 21, 2023, a true and correct copy of the above and foregoing was submitted electronically through the ECF System to the following:

Derrick T. DeWitt, OBA #18044
Kyle R. Prince, OBA #33040
DEWITT PARUOLO & MEEK
P.O. Box 138800
Oklahoma City, OK  73113
Telephone: (405) 705-3600
Facsimile:  (405) 705-2573
dewitt@46legal.com
kprince@46legal.com

AND

Sean Fleming, Admitted Pro Hac Vice
MACDONALD DEVIN MADDEN KENEFICK & HARRIS, P.C.
12770 Coit Road, Suite 1100
Dallas, TX 75251
(214) 651-3383
sfleming@macdonalddevin.com
***Attorneys for Defendant BMO Harris Bank, d/b/a GreenSky, LLC***

/s/M. Kathi Rawls

A342

**GreenSky®**
Shopping Pass

Shopping Pass

For Barcode Scanners

Exp 11/25

Susan K Parisi                    CVV

Exp 11/25

## Congratulations, Susan!
## You have been approved for up to $17,744.00!*

The purpose of this Shopping Pass is to provide important information about your loan and to make purchases using your GreenSky® loan.†

**About Your Account:**

1. When you are ready to make your purchase, give your account number and expiration date to your Merchant along with your photo ID. By providing your account number to your Merchant you are authorizing your Lender to send Loan proceeds to your Merchant in payment for the goods or services that you have purchased. Provide your account number to your Merchant only when you are prepared to pay. Only those named on this Shopping Pass are authorized to make purchases. Do not give this Shopping Pass to any person not named on this Shopping Pass. If you do so, you may be held liable for their purchases. If this Shopping Pass is lost or stolen, notify us immediately at (866) 936-0602 to limit your liability. **Please be aware that if you authorize your Lender to make an initial advance under your GreenSky® Installment Loan to pay any initial payment required by the Merchant, payments may become due under your GreenSky® Installment Loan prior to the completion of services by the Merchant.**

2. You have a purchasing window of 6 months to use your credit limit of up to $17,744.00. All purchases must be made by 05/26/2022 (the "Purchase Window Expiration Date"). We may close your purchase window earlier if we determine that your job is substantially complete. See the terms and conditions of your Loan Agreement for details.

3. After your first purchase, you will receive monthly statements to track your transactions. **You have zero liability for transactions that you do not authorize‡.** Please monitor your statements carefully and contact us at (866) 936-0602 to notify us immediately of any unauthorized activity.

4. You will have no Loan unless you authorize a transaction, which is your electronic signature of the Loan Agreement and will have the same legal effect as a physical signature.

**Plan 7541. THIS IS A DIFFERENT PLAN THAN REQUESTED. 84 payments. Up to 6 month purchase window. At the earlier of purchase window expiration date or job completion, a 24 month promotional (promo) period begins with minimum monthly payments required followed by 60 amortized payments based on the balance at the end of promo. Your fixed interest rate is based on creditworthiness and is disclosed in your loan agreement. Interest is billed during the promo period but all interest is waived if the purchase amount is paid in full before the end of the promo period. Making initial minimum monthly payments will not pay off your loan before the end of the promo period.**

**(866) 936-0602**                                                                                     **www.greensky.com**

**Thank you for choosing GreenSky® Program!**
**service@greensky.com**

Use of this Shopping Pass or the associated Loan by (any) Borrower (or any authorized user) to make a purchase constitutes acceptance by (all) Borrower(s) of the terms of the accompanying Loan Agreement.

**The physical or electronic record of any such purchase will constitute the signature of (all) Borrower(s) on such Loan Agreement.**

Provide your account number and expiration date to authorize a transaction only after you are satisfied that you have received the goods and/or services that you are purchasing. Your Lender does not monitor the workmanship, quality, or completeness of the goods and/or services that you purchase. Contact your Merchant immediately if not completely satisfied. You will receive monthly statements to help track your transactions and payments.

**FOR PROTECTION AGAINST UNAUTHORIZED PURCHASES, IDENTIFICATION WILL BE REQUIRED FOR ALL PURCHASES.**

Spanish language loan agreements are available upon request. Contact us for a Spanish version of this agreement.

Los acuerdos de préstamo en idioma español están disponibles bajo petición. Contáctenos para obtener una versión en español de este acuerdo.

\* Eligible only for purchases with your Merchant. **Your Lender is specified on your Loan Agreement.**

† GreenSky® is the brand name for certain consumer credit plans extended by participating lenders to borrowers for the purchase of goods or services from participating Merchants. Participating lenders are federally insured, federal and state chartered financial institutions providing credit without regard to age, race, color, religion, national origin, sex, or familial status. GreenSky® is a registered trademark of GreenSky, LLC and is used by your Lender under license. GreenSky Servicing, LLC ("Servicer") will service this Loan on behalf of your Lender.

‡ Applicable payment card network rules apply. Any unauthorized transactions must be reported to us within 60 days.

Application ID

The monthly payments in the payment schedule of your Truth in Lending Disclosure is estimated and based on the Amount Financed for which you have been approved. Examples of required minimum monthly payments for different total purchase amounts appear below:

| Total Amount of Purchases | Monthly Payment Amount |
|---|---|
| $4,000.00 | $101.22 |
| $5,000.00 | $126.52 |
| $10,000.00 | $253.05 |
| $15,000.00 | $379.58 |
| $17,744.00 | $449.01 |
| $19,000.00 | $480.80 |

Exhibit 3

**Installment Loan Agreement | NON-NEGOTIABLE CONSUMER NOTE**

| | |
|---|---|
| LENDER: BMO HARRIS BANK N.A. | Application ID: ▮▮▮▮  Date: 11/23/2021 |
| **Lender Correspondence Address:** GreenSky® Program | **Merchant:** Renewal by Andersen of Oklahoma |
| Attn: Correspondence P.O. Box 29429, Atlanta, GA 30359 | **Borrower:** |
| **Borrower:**      Susan K Parisi | **Phone Number:** |
| **Phone Number:** | **Address:** |
| **Address:** | **City/State/Zip:** , |
| **City/State/Zip:** | |

Exhibit 4

The Truth in Lending Act (TILA) disclosures below assume that your first purchase will be made on the last day of your Purchase Window (approximately 6 months from your approval date, in an amount equal to the Amount Financed shown below. The Finance Charge below includes $8,868.00 of interest, which will be waived if you pay off your purchase balance within 24 months of the date your Purchase Window closes. Minimum monthly payments are required during the promotional period but will not pay off your loan before the end of your promotional period. Your actual Annual Percentage Rate, Finance Charges, Amount Financed and scheduled payments may vary from the amounts shown below depending on, among other things, the timing and amount of your purchases and payments. You will not accrue interest or be required to make any payments until your Purchase Window closes. Your Purchase Window closes at the earlier of job completion or approximately 6 months from approval date.

### TRUTH IN LENDING DISCLOSURE

| ANNUAL PERCENTAGE RATE The cost of credit as a yearly rate | FINANCE CHARGE The dollar amount the credit will cost you | Amount Financed The amount of credit provided to you or on your behalf | Total of Payments The amount you will have paid when you have made all payments as scheduled |
|---|---|---|---|
| 24.99% (e) | $19,973.08 (e) | $17,744.00 (e) | $37,717.08 (e) |

Your payment schedule will be:

| Number of Payments | Amount of Payments | When Payments are Due |
|---|---|---|
| 24 | $449.02 (e) | Beginning approximately one month after the close of the Purchase Window and monthly thereafter for a total of 24 Months (NOTE: Purchase Window may be open as long as 6 months following your approval). |
| 59 | $449.01 (e) | Beginning monthly thereafter for a total of 59 months. |
| 1 | $449.01 (e) | Approximately 84 months after Purchase Window closes. |

**Prepayment:** If you pay off early, you will not be entitled to a refund of any interest that was billed to your account for the billing cycle in which you make your last payment. You will not be entitled to a refund of the Activation Fee, if any.
See the rest of this document for any additional information on nonpayment, default, and any required repayment in full before the scheduled date, and prepayment refunds and penalties.
**"(e)" means estimate.**

Itemization of Amount Financed: $17,744.00 (e)
Paid to Renewal by Andersen of Oklahoma

### FEES

| **Penalty Fees** | |
|---|---|
| • Late Payment | The greater of $39 or 5% of the amount past due, except $0 for MA and ME residents and $30 maximum for Iowa residents. |
| • Returned Payment | Up to $20 |

**MILITARY LENDING ACT:** The Military Lending Act ("MLA") provides protections for certain members of the Armed Forces and their dependents ("Covered Borrowers"). The provisions of this section apply to Covered Borrowers under the MLA. If you would like more information about whether you are a Covered Borrower and whether this section applies to you, please contact us at 877-266-2945. **Statement of MAPR:** Federal law provides important protections to members of the Armed Forces and their dependents relating to extensions of consumer credit. In general, the cost of consumer credit to a member of the Armed Forces and his or her dependent may not exceed an Annual Percentage Rate of 36%. This rate must include, as applicable to the credit transaction or account: (1) the costs associated with credit insurance premiums; (2) fees for ancillary products sold in connection with the credit transaction; (3) any application fee charged (other than certain application fees for specified credit transactions or accounts); and (4) any participation fee charged (other than certain participation fees for a credit card account). **Oral Disclosures:** In order to hear important MLA disclosures and payment information, please call 877-266-2945. **Covered Military Borrowers:** If you are a Covered Borrower, as defined under the MLA, 10 U.S.C. § 987, as amended from time to time, (i) the provisions of the ARBITRATION PROVISION, (ii) any waiver of your right to legal recourse under any state or federal law and (iii) any other provision in this Loan Agreement that is not enforceable against you under the MLA, does not apply to you.
NOTICE TO THE BUYER: 1. THIS IS A CONSUMER CREDIT TRANSACTION. 2. DO NOT SIGN THIS CREDIT AGREEMENT BEFORE YOU READ IT OR IF IT CONTAINS ANY BLANK SPACE. 3. YOU ARE ENTITLED TO A COMPLETELY FILLED IN COPY OF THIS CREDIT AGREEMENT. 4. YOU MAY PREPAY THE UNPAID BALANCE UNDER THIS AGREEMENT AT ANY TIME SUBJECT TO THE "PREPAYMENT" DISCLOSURE ABOVE. 5. THIS LOAN AGREEMENT CONTAINS AN ARBITRATION PROVISION THAT, UNLESS YOU REJECT IT, MAY LIMIT YOUR RIGHT TO LITIGATE A CLAIM IN COURT OR HAVE A JURY TRIAL ON A CLAIM.
ACCEPTANCE OF THIS LOAN AGREEMENT BY ELECTRONIC SIGNATURE: The first use of the Shopping Pass or the associated loan to make a purchase will constitute acceptance by (all) Borrower(s) of the terms of this Loan Agreement. The dated physical or electronic record of such use will evidence the signature of (all) Borrower(s) on this Loan Agreement and have the same legal effect as a physical signature.

**CAUTION - IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT. NON-NEGOTIABLE CONSUMER NOTE.**

| Borrower: | Date: | Co- Borrower: | Date: |
|---|---|---|---|
| *Electronic record constitutes acceptance of this Agreement (see above)* | | *Electronic record constitutes acceptance of this Agreement (see above)* | |

**LENDER: /s/** BMO HARRIS BANK N.A.      Date: 11/23/2021

**IN-HOME SALE CUSTOMERS:** ARIZONA, CONNECTICUT, NORTH DAKOTA AND RHODE ISLAND RESIDENTS: THIS INSTRUMENT IS BASED UPON A HOME/PERSONAL SOLICITATION SALE SUBJECT TO THE PROVISIONS OF TITLE 44, CHAPTER 15 OF THE ARIZONA REVISED STATUTES IN ARIZONA; THE HOME SOLICITATION SALES ACT IN CONNECTICUT; THE NORTH DAKOTA CENTURY CODE IN NORTH DAKOTA; AND TITLE 6, CHAPTER 28 OF THE RHODE ISLAND GENERAL LAWS. THIS INSTRUMENT IS NOT NEGOTIABLE.

**TERMS AND CONDITIONS CONTINUE ON NEXT PAGE**

Page: 64     Date Filed: 06/07/2024     Document: 01011062399     Appellate Case: 23-6218

**1. Welcome.** Thank you for opening an installment loan through the GreenSky® Program. By accepting the Shopping Pass, the Truth in Lending Disclosure, the terms and conditions, and the Lender's Privacy Notice (collectively, the "<u>Loan Agreement</u>"), each Borrower ("<u>you</u>") acknowledges that (i) BMO HARRIS BANK N.A. ("<u>Lender</u>", "<u>we</u>", "<u>our</u>" or "<u>us</u>") has approved Borrower(s) for a GreenSky® Program Installment Loan up to the Amount Financed as set forth in the Truth in Lending Disclosure above (the "<u>Loan</u>"), (ii) each Borrower has received and retained a copy of Lender's Privacy Notice, (iii) each Borrower has read this Loan Agreement, including any Addenda, and agrees to be bound by its terms, (iv) if this Agreement resulted from a sale in your home ("<u>In-Home Sale</u>"), the sales person has explained each Borrower's right to cancel and has provided a filled-in written Notice of Right to Cancel. Any Notice of Right to Cancel and any additional notice of right to cancel provided in the sales contract for an In-Home Sale, as well as any accompanying addendum provided to Borrower, are incorporated herein by reference, and unless any Borrower exercises the right to cancel, Lender agrees to pay the Amount Financed to Merchant for an In-Home Sale upon receipt of a transaction authorization, (v) either Borrower may direct Lender to make payments to Merchant by using the Shopping Pass or account number, and (vi) neither Borrower is a co-signer. A Certificate of Completion is required unless Borrower directs Lender to make payments to Merchant by using the Shopping Pass or account number. This Loan Agreement, including any changes to it, contains the terms of your agreement with BMO HARRIS BANK N.A..

**2. Installment Loan Program.**

**a. Using your Loan:** You may make purchases of goods or services from Merchant, in total up to the "<u>Amount Financed</u>" set forth in the Truth in Lending Disclosure of this Loan Agreement, during the purchasing window time period specified on your Shopping Pass, which is incorporated here by reference. We may close the purchasing window time period on the earlier of the Purchase Window Expiration Date or when your job is substantially complete as determined by Lender (such as when your Merchant notifies us that your job is substantially complete). Once the purchasing window time period closes, you will no longer be able to make additional purchases. Each time you make a purchase of goods or services from Merchant, you authorize us to extend credit to you and to forward Loan proceeds to your Merchant on your behalf. We may decline any transaction if we experience an operational difficulty (such as a system outage), if you fail to make any payment required under this Agreement or you are in Default (as defined herein), or if we identify suspected fraudulent or unlawful activity involving your Loan.

**b. Credit Limit:** You agree not to make purchases in excess of the Amount Financed shown above, but if you do, you agree that we may, in our sole discretion, increase the Amount Financed to include such excess amount in a "<u>Summary of Account at Conversion</u>" that reflects such increased Amount Financed and resulting increased anticipated Finance Charge and Total of Payments. The dated electronic record of such excess purchase(s) will evidence your request for and acceptance of any such increased terms.

**c. Beginning of Amortization Period:** We will total the purchases you made during the purchasing window and provide you with a Summary of Account at Conversion that will show (based on actual total purchases) a final Amount Financed, Finance Charge, Total of Payments and remaining payment schedule for your Loan based on your total purchases.

**d. For your convenience, we may provide you with certain materials in both the Spanish and English languages. You agree that, to the greatest extent not prohibited by law, the English text will control.**

Para su conveniencia, podemos proporcionarle ciertos materiales en los idiomas español e inglés. Usted acepta que, en la mayor medida no prohibida por la ley predominará el texto en Inglés.

**3. Promise to Pay.** For value received, you agree to pay us: (a) so much as you may actually borrow from time to time by initiating transactions under the Loan Agreement, plus (b) periodic interest at an annual rate of 24.99% on the unpaid Amount Financed outstanding until the loan is paid in full, (c) any applicable taxes or other charges due under this Loan Agreement. We calculate the interest charge on your account by applying a monthly periodic rate to your outstanding principal balance on the first day of your first billing cycle and thereafter to your outstanding principal balance on the first day of each billing cycle. The monthly periodic rate equals the applicable annual rate divided by twelve (12). Payments will be due as scheduled. Any principal balance, interest and other charges remaining unpaid are due in full on the date of the last scheduled payment. The actual amount of interest that you pay may exceed the Finance Charge disclosed in the Truth in Lending Disclosure or Summary of Account at Conversion if you do not make minimum payments due by their due dates as identified in your statements. If you do not make required payments, then, in addition to any other rights and remedies available under this Loan Agreement or applicable law, (i) your purchasing window may close early and (ii) no new purchases may be permitted.

**4. Timing and Application of Payments.** You agree to make payments in accordance with the estimated payment schedule contained in the Truth in Lending Disclosure on the preceding page (or any updated disclosure, including the Summary of Account at Conversion), provided that you will be obligated to make minimum monthly payments in the amounts and on the dates shown on your statements. Any payment made in excess of your minimum monthly payment will be applied to your Principal Balance and will not reduce the amount of your next regularly scheduled payment. You agree that, except for updated amounts, if any, shown on your updated Summary of Account at Conversion, including any adjustments in scheduled payments to reflect your final Amount Financed and Finance Charges due, all other terms and disclosures of this Loan Agreement will remain in full force and effect. Once the initial payment due date is set, the payment due date will be the same day each month. Subject to applicable law, we may apply payments to the amounts you owe under this Loan Agreement in any order we choose. You may not tell us how to apply payments. Any partial prepayment will be applied against the outstanding balance, but will not postpone the due date of any subsequent monthly installments or change the amount of any such installments, unless we otherwise agree in writing. We will apply any refund for a returned purchase when we or Servicer receives notice of the refund from your Merchant. We do not control when your Merchant may notify us or Servicer of a refund. If your Merchant's notice is received after we send your Summary of Account at Conversion, we will apply the refund as a prepayment on your loan to reduce your outstanding balance but this will not reduce your subsequent minimum monthly payments (subject to any necessary adjustments to the number of payments required or your final payment amount).

**5. Payment Method and Address.** Unless automatic payments are authorized in connection with this Loan, you agree to make payments by mailing a check or money order to Dept# 3025, GreenSky, PO Box 2153, Birmingham AL 35287-3025, by making a phone payment by dialing 1-855-809-1889 or by making an online payment at www.greenskyonline.com. You agree that payments may not be made in whole or in part by credit card. A payment to our Servicer in accordance with this Loan Agreement is a payment to us. You agree not to send us partial payments marked "paid in full," "without recourse," or similar language. If you send such a payment, we may accept it without losing any of our rights under this Loan Agreement. All written communications concerning disputed amounts, including any check or other payment instrument that (i) is postdated and accompanied by adequate notice, (ii) indicates that the payment constitutes "payment in full" of the amount owed, (iii) is tendered with other conditions or limitations or (iv) is otherwise tendered as full satisfaction of a disputed amount, must be marked for special handling and mailed or delivered to us at P.O. Box 29429, Atlanta, GA 30359, Attention: Disputes.

**6. Unpaid Balances.** (a) During your deferred interest promotional period, you will satisfy the terms of your promotion and all interest billed during the promotional period will be waived/credited if you pay the entire purchase balance before the end of the promotional period and you will still be responsible for any outstanding

fees. (b) Notwithstanding the language in Section 7 of the Loan Agreement, if you determine to prepay in full prior to the expiration date, you will not be regarded as "paid in full" if your loan has an unpaid balance of Amount Financed, interest, late charges, returned payment charges, or any other fees or charges at the end of the term.

**7. Access Device.** We will provide you with a Shopping Pass which you may use to make purchases of goods or services from Merchant during the purchasing window time period as described in this Loan Agreement. Use of your Shopping Pass or Loan to make a purchase constitutes your acceptance of the terms of this Loan Agreement. You agree to notify us immediately if your Shopping Pass is lost, stolen or otherwise compromised.

**8. Returned Payment Charge.** Subject to applicable law, we may charge you a "Returned Payment Charge" as provided herein. If your lender is located in Connecticut, Georgia, Illinois, Michigan, or Ohio, and your payment is dishonored or returned for any reason, you agree to pay us a Returned Payment Charge of $20. If your lender is located in Alabama or Mississippi and your payment is dishonored or returned for any reason, you agree to pay us a Returned Payment Charge of $15. If you are a Massachusetts Borrower and your payment is dishonored or returned for any reason, you agree to pay us a Returned Payment Charge of $10. In all cases, we may charge this fee the first time any payment is returned even if it is paid upon resubmission.

**9. Late Charge.** If a payment is more than 10 days late, you will be charged the GREATER of $39 or 5% of the amount past due, provided that the late payment fee will not exceed the amount past due ($30 maximum in Iowa). NOTICE: Massachusetts and Maine Borrowers are not charged late charges.

**10. Default.** Subject to applicable law, you will be in default ("Default") if any of the following events occur:

(a) You have made any false or misleading statement(s) in your application for a Loan subject to this Loan Agreement or any other account that you may have with us;
(b) You fail to make a payment within 60 days of when it was due under this Loan Agreement or any other account agreement that you may have with us;
(c) You fail to comply fully with any term or condition of this Loan Agreement or any other account agreement that you may have with us;
(d) You file or someone else files against you a petition in bankruptcy;
(e) You die;
(f) You commit fraud; or
(g) We believe you are unable or unwilling to pay your debts when due.

MASSACHUSETTS NOTICE: If you are a Massachusetts borrower and this Loan Agreement is secured by a non-possessory interest in consumer goods, this Default provision is enforceable only to the extent that the Default is material and consists of a failure to make one or more payments as required by the Loan Agreement or the occurrence of an event that substantially impairs the value of the collateral.

**11. Remedies on Default.** If you are in Default, we will have all of the rights and remedies available to us at law or in equity, in addition to the specific rights and remedies set forth in this Loan Agreement. We may exercise any, some or all of our rights and remedies, in our sole discretion. If you are in Default, we may, at our option, require you to pay immediately the entire amount you owe us under this Loan Agreement, in full. Subject to the requirements of applicable law, we may do this without giving you any advance notice of presentment, acceleration or our intent to accelerate. Unless prohibited by applicable law, you agree to pay our reasonable costs and attorneys' fees related to the collection of your Loan.

**12. Credit Inquiries and Loan Information.** You authorize us to obtain a credit report on you for any legal purpose in connection with this Loan, including any update, extension of credit, review or collection of this Loan. If you request, we will tell you whether any credit report was requested and, if so, the name and address of the credit bureau furnishing the report.

**13. Inaccurate Information.** If you believe that we have information about you that is inaccurate or that we have reported or may report inaccurate information about you to a credit bureau, please notify us of the specific information that you believe is inaccurate by writing to us at **P.O. Box 29429, Atlanta, GA 30359, Attention: Disputes**. In doing so, please identify the inaccurate information and tell us why you believe it is incorrect. If you have a copy of the credit report that includes the inaccurate information, please send a copy of that report to us as well. The "Your Billing Rights" section below contains special processes required for contacting us in the event of a Billing Error.

**14. Negative Information Reporting.** We may report information about your Loan to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

**15. Severability.** If applicable law is finally interpreted so that charges collected or to be collected in connection with this Loan Agreement exceed the permitted limits, then (i) any such charges will be reduced to the permitted amounts and (ii) any amounts already collected that exceed the permitted amounts will be credited to you by, at our option, applying the credit to any amounts due hereunder or making a direct payment to you. If any provision in this Loan Agreement is invalid under applicable law, the remainder of the provisions in this Loan Agreement will remain in effect and interpreted to give the greatest possible effect to the intent of the parties as originally written.

**16. Assignment; Transfer.** We may sell, assign, transfer or delegate all or any portion of our rights or obligations under this Loan Agreement to any other person without prior notice to you. You may not sell, assign, transfer or delegate any of your rights or obligations under this Loan Agreement.

**17. Governing Law. This Loan Agreement, including the rate of interest and fees, is governed by applicable federal law and, to the extent not preempted by federal law, the laws of IL where the Lender is located as shown in Section 1 (Welcome) of this Loan Agreement (without regard to the State's conflict of laws provisions). If Lender is located in Kansas, the Kansas Consumer Credit Code (Kan. Stat. Ann. §§ 16a-1-101 et seq.) governs this Agreement. If you are a Massachusetts borrower and the Amount Financed is $6,000 or less, this Loan Agreement is also subject to the Massachusetts Small Loan Law.**

**18. Joint and Several Liability.** Each Borrower will be liable individually and together for all obligations under this Loan Agreement, including payment to us of the entire amount owed under this Loan Agreement.

**19. No Waiver by Us.** We will not be deemed to have waived any of our rights by delaying the enforcement of any of our rights. If we waive any of our rights in writing on one occasion, that waiver does not constitute a waiver by us of our rights on any future occasion.

Case 5:23-cv-00115-R   Document 18-2   Filed 04/28/23   Page 15 of 112
PlainSite 8600fc7 0000000 Dated: 06/07/2024 Page 66

A 346

Lender: BMO HARRIS BANK N.A. 2111233004 PPLD20211011_77_2_W Rev. 10/21

**20. Telephone Monitoring and Recording.** You understand that we may monitor and record telephone calls to assure the quality of our service and for training purposes.

**21. Communicating With You; Consent to Contact by Electronic and Other Means.** You agree that, to the greatest extent not prohibited by applicable law, we may contact you for any lawful reason, including for the collection of amounts owed to us. No such contact will be deemed unsolicited. You agree that we (and any other owner or servicer of your account) may contact you for any and all purposes arising out of or relating to your Loan at any physical or electronic addresses or numbers (including wireless cellular telephone numbers, ported landline numbers, VOIP or other services) as you may provide to us from time to time. We may use any means of communication, including, but not limited to, postal mail, electronic mail, telephone, text messaging, or other technology, to reach you. You agree that we may use automatic dialing and announcing devices which may play recorded messages. You may contact us at any time to ask that we not contact you using any one or more methods or technologies. You represent that you are permitted to receive communications at each of the telephone numbers you have provided to us.

**22. Notices; Change of Address, Employment or Telephone Number.** We will send all written notices and statements to your address as it appears on our records. To avoid delays and missed payments that could affect your credit standing, you agree to advise us promptly if you change your mailing address, place of employment, telephone number or other contact information, including, but not limited to, porting a landline telephone number to a cellular phone, VoIP or other services. You represent and agree that for purposes of imposing fees and charges, you are deemed to reside at the current mailing address that we have on record for you. You can update your contact information with us by phone, mail, or online at www.greenskyonline.com.

**23. Entire Agreement.** This Loan Agreement constitutes the final written expression of the credit agreement between you and us relating to your Loan. We are not bound by any oral representations made or implied that are not directly reflected in this Loan Agreement. **A credit agreement must be in writing to be enforceable. Oral agreements or commitments to loan money, extend credit, or forbear from enforcing repayment of a debt, including promises to extend or renew such debt, are not enforceable. To protect you and us from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it.**

**24. NOTICES: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

Your Merchant pays transaction fees as a result of your use of the Loan. Your Merchant is prohibited from surcharging you to cover the cost of these transaction fees.

Notice to California Residents: (AVISO PARA LOS QUE RESIDEN EN CALIFORNIA): SI SU PRÉSTAMO FUÉ NEGOCIADO PRIMERAMENTE EN ESPAÑOL, ESTAMOS OBLIGADOS A PRESENTARLE UNA TRADUCCIÓN EN ESPAÑOL DE LAS DISPOSICIONES REQUERIDAS POR LA REGULACIÓN FEDERAL Z, 12 C.F.R. APARTADO 1026.

Notice to Iowa Residents: IMPORTANT: READ BEFORE SIGNING. THE TERMS OF THIS LOAN AGREEMENT SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE. NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THIS WRITTEN CONTRACT MAY BE LEGALLY ENFORCED. BORROWER MAY CHANGE THE TERMS OF THIS AGREEMENT ONLY BY ANOTHER WRITTEN AGREEMENT.

Notice to New Hampshire Residents: This Loan Agreement provides for reasonable attorneys' fees to be awarded to us in an action against you involving this Loan Agreement. Reasonable attorneys' fees will be awarded to you if you prevail in any action, suit or proceeding brought by us, or an action brought by you. If you successfully assert a partial defense or set-off, recoupment or counterclaim in an action brought by us, the court may withhold from us the entire amount or such portion of the attorneys' fees as the court considers equitable.

Notice to New Jersey Residents: Because certain provisions of this Loan Agreement are subject to applicable laws, they may be void, unenforceable or inapplicable in some jurisdictions. None of these provisions, however, is void, unenforceable or inapplicable in New Jersey.

Notice to New York Residents: NOTICE TO THE BUYER: 1. Do not sign this credit agreement before you read it or if it contains any blank space. 2. You are entitled to a completely filled in copy of this credit agreement.

Notice to Ohio Residents: The Ohio laws against discrimination require that all creditors make credit equally available to all credit worthy customers, and that credit reporting agencies maintain separate credit histories on each individual upon request. The Ohio civil rights commission administers compliance with this law.

Notice to Vermont Residents: Lender is engaged in loan production. **EACH BORROWER SHOULD RETAIN A COPY FOR THEIR RECORDS.**

**25. ARBITRATION PROVISION. Agreement to Arbitrate Disputes:** This Arbitration Provision sets forth the circumstances and procedures under which Claims (defined below) that arise between you and us will be resolved through binding arbitration; provided, however, that this provision does not apply if, on the date this Agreement is issued, you are covered by the federal Military Lending Act as a member of the Armed Forces or a dependent of such a member. UNLESS YOU OPT OUT OF THIS ARBITRATION PROVISION AS PROVIDED BELOW OR EXCEPT AS APPLICABLE LAW PROHIBITS US FROM IMPOSING BINDING ARBITRATION ON YOU, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO LITIGATE A CLAIM IN COURT OR HAVE A JURY TRIAL ON A CLAIM. OTHER RIGHTS THAT YOU WOULD HAVE IN COURT ALSO MAY NOT BE AVAILABLE OR MAY BE LIMITED IN ARBITRATION, INCLUDING YOUR RIGHT TO APPEAL AND YOUR ABILITY TO PARTICIPATE IN A CLASS ACTION. Nothing in this Arbitration Provision precludes you from filing and pursuing your individual Claim in a small claims court in your state or municipality, so long as that claim is pending only in that court. Definitions: As used in this Arbitration Provision, the term "Claim" means and includes any claim, dispute or controversy of every kind and nature, whether based in law or equity, between you and us arising from or relating to your Loan Agreement as well as the relationship resulting from such Agreement ("the Agreement"), including the validity, enforceability or scope of this Arbitration Provision or the Agreement. "Claim" also includes claims by or against any third party providing any product, service or benefit in connection with the Agreement (including, but not limited to, debt collectors and all of their agents, employees, directors and representatives) if and only if, such third party is named as a co-party with you or us (or files a Claim with or against you or us) in connection with a claim asserted by you or us against the other. As used in this Arbitration Provision, "you" and "us" also includes any corporate parent, wholly or majority owned subsidiaries, affiliates, any licensees, predecessors, successors, assigns and purchasers of any accounts, all agents, employees, directors and representatives of any of the foregoing and any third party providing any product, service or benefit in connection with the Agreement. Initiation of Arbitration Proceeding / Selection of Administrator: Any Claim will be resolved, upon the election by you or us,

TERMS AND CONDITIONS CONTINUE ON NEXT PAGE

Lender: BMO HARRIS BANK N.A. 2111233004 PPLD20211011_77_2_W Rev. 10/21

Appellate Case: 23-6188   Document: 010110262810   Date Filed: 04/28/23   Page 7 of 12

by arbitration pursuant to this Section 26's provision by its rules and procedures of the arbitration organization to which Claim is referred in effect at the time the Claim is filed (the "Code"), except to the extent the Code conflicts with the Agreement. Claims must be referred to either JAMS or The American Arbitration Association ("AAA"), as selected by the party electing to use arbitration. If a selection by us of either of these organizations is unacceptable to you, you will have the right within 30 days after you receive notice of our election to select the other organization listed to serve as arbitration administrator. For a copy of the procedures, to file a Claim or for other information about these organizations, contact (1) JAMS at 1920 Main Street, Suite 300, Irvine, CA 92614; www.jamsadr.com or (2) AAA at 335 Madison Avenue, New York, NY 10017, www.adr.org. In addition to the arbitration organizations listed above, Claims may be referred to any other arbitration organization that is mutually agreed upon in writing by you and us, or to an arbitration organization or arbitrator(s) appointed pursuant to Section 5 of the Federal Arbitration Act, 9 U.S.C. §§ 1-16, provided that any such arbitration organization and arbitrator(s) will enforce the terms of the restrictions set forth below. Class Action Waiver and Other Restrictions: Arbitration will proceed solely on an individual basis without the right for any Claims to be arbitrated on a class action basis or on bases involving claims brought in a purported representative capacity on behalf of others. The arbitrator's authority to resolve and make written awards is limited to Claims between you and us alone. Claims may not be joined or consolidated unless agreed to in writing by all parties. No arbitration award or decision will have a preclusive effect as to issues or claims in any dispute with anyone who is not a named party to the arbitration. Notwithstanding any other provision in these terms and conditions and without waiving either party's right of appeal, if any portion of this "Class Action Waiver and Other Restrictions" provision is deemed invalid or unenforceable, then the entire Arbitration Provision (other than this sentence) will not apply. Arbitration Procedures: This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and will be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16, as it may be amended ("FAA"), and the applicable Code. The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations and will honor claims of privilege recognized by law. Federal or state rules of civil procedure or evidence will not apply. Written requests to expand the scope of discovery rest within the arbitrator's sole discretion and will be determined pursuant to the applicable Code. The arbitrator will take reasonable steps to preserve the privacy of individual, and of business matters. Judgment upon the written arbitral award may be entered in any court having jurisdiction. Subject to the right of appeal under the FAA, the arbitrator's written decision will be final and binding unless you or we take an appeal from the award by making a dated, written request to the arbitration organization within 30 days from the date of entry of the written arbitral award. A three-arbitrator panel administered by the same arbitration organization will consider anew any aspect of the award objected to by the appellant, conduct an arbitration pursuant to its Code and issue its decision within 120 days of the date of the appellant's written notice. The panel's majority vote decision will be final and binding. Location of Arbitration / Payment of Fees: The arbitration will take place in the federal judicial district where you live. Regardless of who wins in arbitration, you will only be responsible for paying your share, if any, of the arbitration fees required by the applicable Code, which amount will not exceed the filing fees that you would have incurred if the Claim had been brought in the appropriate state or federal court closest to where you live. We will pay the remainder of any arbitration fees. At your written request, we will consider in good faith making a temporary advance of all or part of your share of the arbitration fees. Waivers also may be available from the JAMS or AAA. Continuation: This Arbitration provision will survive termination of the Agreement, as well as voluntary payment in full of your account, any debt collection proceeding by or between you and us, and any bankruptcy by you or us. If any portion of this Arbitration Provision, except the "Class Action Waiver and Other Restrictions" provision above, is deemed invalid or unenforceable for any reason, it will not invalidate the remaining portions of this Arbitration Provision or the Agreement, each of which will be enforceable regardless of such invalidity. Opt-Out Process: You may choose to opt out of and not be subject to this Arbitration Provision but only by following the process set forth below. If you do not wish to be subject to this Arbitration Provision, then you must notify us in writing within forty-five (45) calendar days of the date of the Agreement at the following address: P.O. Box 29429, Atlanta, GA 30359, Attention: Legal. Your written notice must include your name, account number, social security number, the date of the Agreement, and a statement that you wish to opt out of this Arbitration Provision. Your notice to opt out will only apply to this particular Agreement with us and not to subsequent or previous agreements.

**26. Your Billing Rights: Keep this Document for Future Use**
This notice tells you about your rights and our responsibilities under the Fair Credit Billing Act.

**What To Do If You Find a Mistake on Your Statement**
If you think there is an error on your statement, write to us at:

GreenSky® Program
Attention: Disputes
PO Box 29429
Atlanta, GA 30359
You may also contact us at service@greensky.com.

In your letter, give us the following information:

- *Account information:* Your name and account number.
- *Dollar amount:* The dollar amount of the suspected error.
- *Description of problem:* If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.

You must contact us:

- Within 60 days after the error appeared on your statement.
- At least 3 business days before an automated payment is scheduled, if you want to stop payment on the amount you think is wrong.

You must notify us of any potential errors in writing. You may call us, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question.

**What Will Happen After We Receive Your Letter**
When we receive your letter, we must do two things:

1. Within 30 days of receiving your letter, we must tell you that we received your letter. We will also tell you if we have already corrected the error.
2. Within 90 days of receiving your letter, we must either correct the error or explain to you why we believe the bill is correct.

**TERMS AND CONDITIONS CONTINUE ON NEXT PAGE**

While we investigate whether you owe the amount in question:

- We cannot try to collect the amount in question, or report you as delinquent on that amount.
- The charge in question may remain on your statement, and we may continue to charge you interest on that amount.
- While you do not have to pay the amount in question, you are responsible for the remainder of your balance.
- We can apply any unpaid amount against your available loan funds (if any).

After we finish our investigation, one of two things will happen:

- *If we made a mistake:* You will not have to pay the amount in question or any interest or other fees related to that amount.
- *If we do not believe there was a mistake:*

You will have to pay the amount in question, along with applicable interest and fees. We will send you a statement of the amount you owe and the date payment is due. We may then report you as delinquent if you do not pay the amount we think you owe.

If you receive our explanation but still believe your bill is wrong, you must write to us within *10 days* telling us that you still refuse to pay. If you do so, we cannot report you as delinquent without also reporting that you are questioning your bill. We must tell you the name of anyone to whom we reported you as delinquent, and we must let those organizations know when the matter has been settled between us.

If we do not follow all of the rules above, you do not have to pay the first $50 of the amount you question even if your bill is correct.

### Your Rights If You Are Dissatisfied With Your Payment Card Purchases

If you are dissatisfied with the goods or services that you have purchased with your Loan, and you have tried in good faith to correct the problem with the Merchant, you may have the right not to pay the remaining amount due on the purchase.

To use this right, all of the following must be true:

1. The purchase must have been made in your home state or within 100 miles of your current mailing address, and the purchase price must have been more than $50. (Note: Neither of these are necessary if your purchase was based on an advertisement we mailed to you, or if we own the company that sold you the goods or services.)
2. You must have used your payment card for the purchase.
3. You must not yet have fully paid for the purchase.

If all of the criteria above are met and you are still dissatisfied with the purchase, contact us *in writing* at:

GreenSky® Program
Attention: Disputes
PO Box 29429
Atlanta, GA 30359
You may also contact us at service@greensky.com.

While we investigate, the same rules apply to the disputed amount as discussed above. After we finish our investigation, we will tell you our decision. At that point, if we think you owe an amount and you do not pay, we may report you as delinquent.

Date: 01/07/2022, ID: 12392399 DktEntry: 69.3, Page: 69 of 240

Appellate Case: 23-6226

TERMS AND CONDITIONS CONTINUE ON NEXT PAGE

A-349

Appellate Case: 23-6218     Document: 010111062399     Date Filed: 06/07/2024     Page: 70

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| SUSAN PARISI, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. CIV-23-115-R |
| | ) |
| C CASHION WINDOWS, LLC d/b/a | ) |
| RENEWAL BY ANDERSON OF | ) |
| OKLAHOMA, and BMO HARRIS | ) |
| BANK, NA d/b/a GREENSKY, LLC, | ) |
| | ) |
| Defendants. | ) |

**DECLARATION OF TIMOTHY D. KALIBAN**

I, Timothy D. Kaliban, hereby make this Declaration under penalty of perjury

pursuant to 28 U.S.C. § 1746, and declare as follows:

**I.       BACKGROUND**

1.       I have personal knowledge of the following facts and would testify to them

if called as a witness in a court of law. This Declaration is based upon my personal

knowledge.

2.       I am the Chief Strategy Officer for GreenSky, LLC ("GreenSky").

3.       I am familiar with the lawsuit filed against GreenSky, LLC, incorrectly

identified as BMO Harris Bank, NA d/b/a GreenSky, LLC by Susan Parisi, and I have read

the Amended Petition and Motion to Certify a Class Action filed on Ms. Parisi's behalf

against GreenSky, LLC, incorrectly identified as BMO Harris Bank, NA d/b/a GreenSky,

LLC.

Exhibit 5

A350

Appellate Case: 23-6218     Document: 01011062399     Date Filed: 06/07/2024     Page: 71

4.      I make this Declaration in support of the Motion to Compel Arbitration as to all claims asserted by Plaintiff and to Dismiss or Stay Claims of Plaintiff Pending Arbitration to be filed on behalf of GreenSky, LLC, incorrectly identified as BMO Harris Bank, NA d/b/a GreenSky, LLC.

5.      GreenSky, LLC is a Georgia limited liability company with its principal place of business at 5565 Glenridge Connector, Suite 700, Atlanta, Georgia 30342.

6.      I have been asked to explain the process by which Ms. Parisi applied for and obtained a loan that was serviced by GreenSky, and how GreenSky sent documents associated with the loan, including the Installment Loan Agreement ("Loan Agreement"), to Ms. Parisi.

## II.      MS. PARISI'S LOAN AGREEMENT

### A. The GreenSky® Program

7.      BMO Harris Bank, NA is a bank that participates in the GreenSky® Program.

8.      GreenSky serviced Ms. Parisi's loan as an agent on behalf of BMO Harris Bank, NA. As such, BMO Harris Bank, NA considers GreenSky to be its agent for purposes of servicing and generally managing consumer loan transactions made under the GreenSky® Program.

9.      Paragraph 25 of Ms. Parisi's Loan Agreement contains a mandatory arbitration agreement for the resolution of any disputes "between you and us." Paragraph 25 states: "As used in this Arbitration Provision, "you" and "us" also includes any corporate parent, wholly or majority owned subsidiaries, affiliates, any licensees, predecessors, successors, assigns and purchasers of any accounts, all agents, employees,

A351

directors and representatives of any of the foregoing and any third party providing any product, service or benefit in connection with the Agreement."

10.     Because BMO Harris Bank, NA considers GreenSky to be its agent for purposes of servicing and generally managing consumer loan transactions made under the GreenSky® Program, GreenSky is covered by the definition of "us" for purposes of the Loan Agreement's mandatory arbitration provision.

11.     Additionally, GreenSky would be "any third party providing any product, service or benefit in connection with the Agreement."

**B. Application and Approval Process**

12.     On November 23, 2021, Ms. Parisi applied for and was approved for a loan from BMO Harris Bank, NA, through the GreenSky® Program for a home improvement project with Renewal by Andersen of Oklahoma, the company reflected on Plaintiff's Loan Agreement. Ms. Parisi's application was submitted through an online application process for her project with Renewal by Andersen of Oklahoma.

13.     As part of the application process, applicants provide certain information necessary for GreenSky, as agent for the banks participating in the GreenSky® Program, to reach a decision on the application and to communicate with the borrower regarding the transaction.

14.     Thus, Ms. Parisi, as part of her application, supplied, among other information, her social security number, date of birth, telephone number, mailing address, income, and email address. (*See* Exhibit 1.)

A352

Appellate Case: 23-6218     Document: 01011062399     Date Filed: 06/07/2024     Page: 73

15.     Once the information was entered in the application, in order to submit the application to GreenSky, Ms. Parisi was required to acknowledge reading and accepting: (1) the Loan Application disclosures; (2) the consent to electronic records and communication; and (3) an authorization for GreenSky to pull her credit report on behalf of the participating financial institution.

16.     The credit report and credit score are provided to the GreenSky® Program's decisioning software, which applies the various credit policies of the participating financial institutions and renders a credit decision on the application based on these preset credit policies.

17.     A representative of GreenSky contacted Ms. Parisi by telephone on November 23, 2021 at the phone number listed on the consumer statement on her credit report and verified that she was aware of, and authorized, the application. Ms. Parisi was approved for a loan from BMO Harris Bank, NA with a credit limit in the amount of $19,000.00. (*See* Exhibit 2.)

**C. GreenSky's Mailing of the Loan Agreement to Ms. Parisi**

18.     A printed copy of the Loan Agreement was mailed by the United States Postal Service to Ms. Parisi on or about November 23, 2021, to the physical address Ms. Poza provided as part of the loan application process. (*See* Exhibit 3.)

19.     GreenSky's vendor, SourceLink, mailed the package on behalf of GreenSky containing the Loan Agreement directly to the physical address the borrower provided as part of her application.

A353

Appellate Case: 23-6218     Document: 0101111062399     Date Filed: 06/07/2024     Page: 74

20.     GreenSky's mailing of the printed copy of the Loan Agreement to Ms. Parisi was, and is, consistent with GreenSky's customary business practices for borrowers whose loans GreenSky services.

21.     Specifically, the Loan Agreement mailing was properly addressed to Ms. Parisi and had sufficient postage, and it was deposited in the U.S. Mail. This process is consistent with GreenSky's procedures for preparing and having mailed loan agreements to its customers.

22.     This mailing was not returned to GreenSky as undeliverable and GreenSky did not receive any returned notifications that the Loan Agreement or any other mailings associated with Ms. Parisi's loan account were undeliverable.

**D. GreenSky's Email to Ms. Parisi with the Loan Agreement**

23.     The Loan Agreement was emailed to Ms. Parisi in a link in which she could access it on November 23, 2021. The link containing the Loan Agreement was emailed to sparisi21@yahoo.com, which is the email address that Ms. Parisi provided on her loan application with GreenSky as part of the loan application process. (*See* Exhibit 1.) (A true and correct copy of the Loan Agreement emailed to Ms. Parisi is attached as Exhibit 3.)

24.     GreenSky's action in emailing a copy of the Loan Agreement to Ms. Parisi was, and is, consistent with GreenSky's customary business practices for borrowers whose loans GreenSky services.

A354

Appellate Case: 23-6218     Document: 010111062399     Date Filed: 06/07/2024     Page: 75

25.     Specifically, the Loan Agreement was emailed to the proper email address that Ms. Parisi provided the same day she filled out the GreenSky loan application and was approved for the loan (November 23, 2021).

26.     The email sent to Ms. Parisi identified GreenSky as the sender, stated that the email was regarding the Installment Loan Agreement, and the email was not returned to GreenSky as undeliverable.

27.     Moreover, Ms. Parisi used the sparisi21@yahoo.com email address as evidenced by Exhibits 2 and 3 of Plaintiff's Amended Petition and Motion to Certify a Class Action where Ms. Parisi communicated with GreenSky through that same email address.

### E.  MS. PARISI'S USE OF THE SHOPPING PASS

28.     On November 29, 2021, Ms. Parisi used the Shopping Pass included with, and part of, her Loan Agreement, and authorized Renewal by Andersen of Oklahoma to charge her account in the amount of $8,871.50. (*See* Exhibit 4.)

29.     Ms. Parisi's use of the Shopping Pass and the loan proceeds to make the charge with Renewal by Andersen of Oklahoma constituted an affirmance and acceptance of the terms of the Loan Agreement; as set forth in the Shopping Pass included with the Loan Agreement, "[u]se of this Shopping Pass or the associated Loan by (any) Borrower (or any authorized user) to make a purchase constitutes acceptance by (all) Borrower(s) of the terms of the accompanying Loan Agreement. The physical or electronic record of any such purchase will constitute the signature of (all) Borrower(s) on such Loan Agreement." (*See* Exhibit 3.)

A355

Appellate Case: 23-6218     Document: 010111062399     Date Filed: 06/07/2024     Page: 76

30.     Attached as Exhibit 4 is a true and correct copy of the transaction history for Ms. Parisi's loan account. This document shows the charges to Ms. Parisi's account number ending in 2561. The funds ($8,871.50) were settled and disbursed directly to Renewal by Andersen of Oklahoma's designated bank account in order to pay for the services Ms. Parisi requested from Renewal by Andersen of Oklahoma.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
TIMOTHY D. KALIBAN

APRIL 27, 2023
_____
Date

_____          _____

7

A356

Page: 77

Date Filed: 06/07/2024

Document: 010111062399

Appellate Case: 23-6218

## Application Details ✖

| | | | |
|---|---|---|---|
| Application ID: | ▇▇▇▇ | Channel: | JCA-iOS |
| Reference Number: | Russell Kelley | | |
| Promotion Code: | 81002512-3541 | | |
| Application Type: | Individual | | |
| Credit Product: | Installment | | |
| Credit Limit Requested: | $17,743.00 | | |
| Who Are You: | Sales Consultant | | |
| Entered by: | russellkelley | | |
| Conversion Indicator: | No | | |

## Authorized Signatory/Applicant          Co-Applicant

| | | | |
|---|---|---|---|
| First Name: | Susan | Owner Interest in Property: | No |
| Last Name: | Parisi | | |
| Date of Birth: | | | |
| SSN: | | | |
| Cell: | | | |
| Physical Street Address: | | | |
| | 7 | | |
| Email Address: | | | |
| Total Monthly Income: | | | |

## Company Information

| | |
|---|---|
| Company Full Legal Name: | Susan K Parisi |
| Address: | |
| Company City: | Oklahoma City |
| State: | OK |
| Zip Code: | 73127 |
| Bad Address: | No |
| Program: | GreenSky Consumer Projects |
| Merchant ID: | 81002512 |
| Merchant Name: | Renewal by Andersen of Oklahoma |
| Contract Language: | en |

**OK**

┌─────────────┐
│   EXHIBIT   │
│      1      │
└─────────────┘

A357



Applicant Information

| | | | | | |
|---|---|---|---|---|---|
| Name: | Susan K Parisi | | Cell Phone Number: | Activation Status: | | Telephone Consumer Protection OPT-IN Act. |
| Physical Address: | | | Work Phone Number: | Application Status: | Approved |
| | | | SSN: | Application Status Date: | 11/23/2021 |
| Mailing Address: | | | Date of Birth: | Text Fraud/Collections | OPT-OUT |
| Email Address: | | | ECOA Type: | 1 - Individual | Messages: |
| Phone Number: | | | Intellicheck Status: | Not Completed | Email Notifications: | OPT-IN |

Loan Information    Transactions    Payments    Documents    **Decision**    Collections    Communications    Other Details

**Other Links:**    Credit Report    Response    Credit Line Policies

Decision Information

| | | | |
|---|---|---|---|
| Authorized Signatory/Applicant: | Parisi Susan | Primary Verified Annual Income: | |
| Application Type: | Individual | Primary Income Verification Source: | |
| Credit Product: | Installment | Co-Applicant Verified Annual Income: | |
| Credit Limit Requested: | $17,743.00 | | |
| Credit Limit Recommended: | $19,000.00 | Co-Applicant Income Verification Source: | |
| Credit Limit Approved: | $19,000.00 | Verified DTI: | |
| Credit Limit Maximum: | $32,530.00 | Verified Decision Income: | |
| Credit Line Policy: | Platinum SLAP | Bankruptcy Score: | 228 |
| Strategy ID: | 1061 | Co-applicant Bankruptcy Score: | |
| Program: | GreenSky Consumer Projects | Decision Bureau: | EXPERIAN |
| Product: | 7541 | Decisioned On: | 100 |
| Term: | PLAN-7541-24.99-LP | Autopay: | No |
| FICO Score: | 717 | Merchant: | Renewal by Andersen of Oklahoma |
| Co-Applicant FICO Score: | | Portfolio ID: | BMO |
| DTI: | 20.023529 | Decision recommendation: | Approved |

Installment Information

| | | | |
|---|---|---|---|
| Maximum Monthly Payment amount: | | Promotional monthly payment: | $449.02 |
| Loan Amount: | $17,744.00 | Total Finance Charges: | $19,973.08 |
| Number of Payments: | 60 | Total Payments: | $37,717.08 |
| Monthly Payment: | $449.01 | | |

EXHIBIT

2



# GreenSky®
Shopping Pass

Exp 11/25

Susan K Parisi

CVV

Shopping Pass

For Barcode Scanners

Exp 11/25

Date Filed: 06/07/2024

Appellate Case: 24-6216   Document: 010111062399

## Congratulations, Susan!
## You have been approved for up to $17,744.00!*
The purpose of this Shopping Pass is to provide important information about your loan and to make purchases using your GreenSky® loan.†

**About Your Account:**

1. When you are ready to make your purchase, give your account number and expiration date to your Merchant along with your photo ID. By providing your account number to your Merchant you are authorizing your Lender to send Loan proceeds to your Merchant in payment for the goods or services that you have purchased. Provide your account number to your Merchant only when you are prepared to pay. Only those named on this Shopping Pass are authorized to make purchases. Do not give this Shopping Pass to any person not named on this Shopping Pass. If you do so, you may be held liable for their purchases. If this Shopping Pass is lost or stolen, notify us immediately at (866) 936-0602 to limit your liability. **Please be aware that if you authorize your Lender to make an initial advance under your GreenSky® Installment Loan to pay any initial payment required by the Merchant, payments may become due under your GreenSky® Installment Loan prior to the completion of services by the Merchant.**

2. You have a purchasing window of 6 months to use your credit limit of up to $17,744.00. All purchases must be made by 05/26/2022 (the "Purchase Window Expiration Date"). We may close your purchase window earlier if we determine that your job is substantially complete. See the terms and conditions of your Loan Agreement for details.

3. After your first purchase, you will receive monthly statements to track your transactions. **You have zero liability for transactions that you do not authorize‡.** Please monitor your statements carefully and contact us at (866) 936-0602 to notify us immediately of any unauthorized activity.

4. You will have no Loan unless you authorize a transaction, which is your electronic signature of the Loan Agreement and will have the same legal effect as a physical signature.

**Plan 7541. THIS IS A DIFFERENT PLAN THAN REQUESTED. 84 payments. Up to 6 month purchase window. At the earlier of purchase window expiration date or job completion, a 24 month promotional (promo) period begins with minimum monthly payments required followed by 60 amortized payments based on the balance at the end of promo. Your fixed interest rate is based on creditworthiness and is disclosed in your loan agreement. Interest is billed during the promo period but all interest is waived if the purchase amount is paid in full before the end of the promo period. Making initial minimum monthly payments will not pay off your loan before the end of the promo period.**

**(866) 936-0602**                                                                 **www.greensky.com**

### Thank you for choosing GreenSky® Program!
service@greensky.com

Use of this Shopping Pass or the associated Loan by (any) Borrower (or any authorized user) to make a purchase constitutes acceptance by (all) Borrower(s) of the terms of the accompanying Loan Agreement.

**The physical or electronic record of any such purchase will constitute the signature of (all) Borrower(s) on such Loan Agreement.**

Provide your account number and expiration date to authorize a transaction only after you are satisfied that you have received the goods and/or services that you are purchasing. Your Lender does not monitor the workmanship, quality, or completeness of the goods and/or services that you purchase. Contact your Merchant immediately if not completely satisfied. You will receive monthly statements to help track your transactions and payments.

**FOR PROTECTION AGAINST UNAUTHORIZED PURCHASES, IDENTIFICATION WILL BE REQUIRED FOR ALL PURCHASES.**

Spanish language loan agreements are available upon request. Contact us for a Spanish version of this agreement.

Los acuerdos de préstamo en idioma español están disponibles bajo petición. Contáctenos para obtener una versión en español de este acuerdo.

* Eligible only for purchases with your Merchant. **Your Lender is specified on your Loan Agreement.**

† GreenSky® is the brand name for certain consumer credit plans extended by participating lenders to borrowers for the purchase of goods or services from participating Merchants. Participating lenders are federally insured, federal and state chartered financial institutions providing credit without regard to age, race, color, religion, national origin, sex, or familial status. GreenSky® is a registered trademark of GreenSky, LLC and is used by your Lender under license. GreenSky Servicing, LLC ("Servicer") will service this Loan on behalf of your Lender.

‡ Applicable payment card network rules apply. Any unauthorized transactions must be reported to us within 60 days.

Application ID: 

The monthly payments in the payment schedule of your Truth in Lending Disclosure is estimated and based on the Amount Financed for which you have been approved. Examples of required minimum monthly payments for different total purchase amounts appear below:

| Total Amount of Purchases | Monthly Payment Amount |
|---|---|
| $4,000.00 | $101.22 |
| $5,000.00 | $126.52 |
| $10,000.00 | $253.05 |
| $15,000.00 | $379.58 |
| $17,744.00 | $449.01 |
| $19,000.00 | $480.80 |

EXHIBIT
**3**

A359

**GreenSky®**

# UNDERSTANDING YOUR DEFERRED INTEREST LOAN

## What does it mean to have "No Interest if Paid in Full within the Promotional Period?"

We are committed to helping you understand how your GreenSky® Program loan works. While the details of your loan are described throughout this package, the information and frequently asked questions below are designed to provide you with helpful information regarding your loan.

Your loan is a "**deferred interest**" (also referred to as "No Interest if Paid in Full") loan. This means that:

- **INTEREST WILL BE BILLED DURING THE PROMOTIONAL PERIOD.**
- But, if you pay off your entire purchase balance before the end of the promotional period, all billed interest will be waived.
- <u>**If you do not repay your entire purchase balance before the end of the promotional period**</u>, you will be responsible for paying all interest that was billed during the promotional period and any interest that accrues after the expiration of the promotional period.

---

## FREQUENTLY ASKED QUESTIONS

**Q.** How long is the "promotional period" for my loan?

**A.** The promotional period for your loan is identified on the Shopping Pass and in the loan agreement.

**Q.** Do I have to make payments during the "promotional period"?

**A.** Your plan description and Truth in Lending disclosures will tell you whether you have payments due during the promotional period. Even if you don't have to make payments during the promotional period, it is a good idea to make regular payments to minimize any deferred interest you might owe if the purchase balance is not paid in full before the end of the promotional period. If you have payments due during the promotional period, making these payments will <u>NOT</u> pay off your entire purchase balance before the end of the promotional period.

**Q.** How will I know how much to pay and by when in order to satisfy the promotional offer?

**A.** You will receive a statement every month. During the promotional period, your statement will include a section that details your promotional financing offer. This section will identify your entire purchase balance, the purchase balance left to pay before the end of the promotional period, and the date on which your promotional period expires.

**Q.** My merchant is offering refinancing at the end of the "promotional period". How should I evaluate that offer?

**A.** Merchants are not allowed to make refinancing offers (either verbally or in writing) in connection with a Program loan. If your merchant has made any refinancing offers please report to us immediately. A customer's credit situation can change and relying on obtaining refinancing to pay-off the deferred interest loan before the end of the promotional period is not advisable.

**Q.** What if I still have questions?

**A.** You have no obligation on your loan until you authorize a transaction. If you have any questions about your deferred interest loan and your responsibility to repay, please contact us before authorizing a transaction.

**By authorizing a transaction and accepting your loan, you are acknowledging that you understand you are responsible for repaying this loan and agree that your merchant has not promised to issue or arranged to issue a loan with another lender to repay this loan.**

A360

Page: 80

Date Filed: 06/07/2024

Document: 01011062399

Appellate Case: 23-6218

## Installment Loan Agreement | NON-NEGOTIABLE CONSUMER NOTE

**LENDER:** BMO HARRIS BANK N.A.                                      **Application ID** ▓▓▓▓▓▓   **Date:** 11/23/2021
Lender Correspondence Address: GreenSky® Program                      **Merchant:** Renewal by Andersen of Oklahoma
Attn: Correspondence P.O. Box 29429, Atlanta, GA 30359                 **Borrower:**
**Borrower:**          Susan K Parisi                                  **Phone Number:**
**Phone Number:**                                                      **Address:**
**Address:**                                                           **City/State/Zip:** ,
**City/State/Zip:**

The Truth in Lending Act (TILA) disclosures below assume that your first purchase will be made on the last day of your Purchase Window, approximately 6 months from your approval date, in an amount equal to the Amount Financed shown below. The Finance Charge below includes $8,868.00 of interest, which will be waived if you pay off your purchase balance within 24 months of the date your Purchase Window closes. Minimum monthly payments are required during the promotional period but will not pay off your loan before the end of your promotional period. Your actual Annual Percentage Rate, Finance Charges, Amount Financed and scheduled payments may vary from the amounts shown below depending on, among other things, the timing and amount of your purchases and payments. You will not accrue interest or be required to make any payments until your Purchase Window closes. Your Purchase Window closes at the earlier of job completion or approximately 6 months from approval date.

### T R U T H   I N   L E N D I N G   D I S C L O S U R E

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| The cost of credit as a yearly rate | The dollar amount the credit will cost you | The amount of credit provided to you or on your behalf | The amount you will have paid when you have made all payments as scheduled |
| 24.99% (e) | $19,973.08 (e) | $17,744.00 (e) | $37,717.08 (e) |

Your payment schedule will be:

| Number of Payments | Amount of Payments | When Payments are Due |
|---|---|---|
| 24 | $449.02 (e) | Beginning approximately one month after the close of the Purchase Window and monthly thereafter for a total of 24 Months (NOTE: Purchase Window may be open as long as 6 months following your approval). |
| 59 | $449.01 (e) | Beginning monthly thereafter for a total of 59 months. |
| 1 | $449.01 (e) | Approximately 84 months after Purchase Window closes. |

**Prepayment:** If you pay off early, you will not be entitled to a refund of any interest that was billed to your account for the billing cycle in which you make your last payment. You will not be entitled to a refund of the Activation Fee, if any.
See the rest of this document for any additional information on nonpayment, default, and any required repayment in full before the scheduled date, and prepayment refunds and penalties.
**"(e)" means estimate.**

Itemization of Amount Financed: $17,744.00 (e)
Paid to Renewal by Andersen of Oklahoma

### FEES

| Penalty Fees | |
|---|---|
| Late Payment | The greater of $39 or 5% of the amount past due, except $0 for MA and ME residents and $30 maximum for Iowa residents. |
| Returned Payment | Up to $20 |

**MILITARY LENDING ACT:** The Military Lending Act ("MLA") provides protections for certain members of the Armed Forces and their dependents ("Covered Borrowers"). The provisions of this section apply to Covered Borrowers under the MLA. If you would like more information about whether you are a Covered Borrower and whether this section applies to you, please contact us at 877-266-2945. **Statement of MAPR:** Federal law provides important protections to members of the Armed Forces and their dependents relating to extensions of consumer credit. In general, the cost of consumer credit to a member of the Armed Forces and his or her dependent may not exceed an Annual Percentage Rate of 36%. This rate must include, as applicable to the credit transaction or account: (1) the costs associated with credit insurance premiums; (2) fees for ancillary products sold in connection with the credit transaction; (3) any application fee charged (other than certain application fees for specified credit transactions or accounts); and (4) any participation fee charged (other than certain participation fees for a credit card account). **Oral Disclosures:** In order to hear important MLA disclosures and payment information, please call 877-266-2945. **Covered Military Borrowers:** If you are a Covered Borrower, as defined under the MLA, 10 U.S.C. § 987, as amended from time to time, (i) the provisions of the ARBITRATION PROVISION, (ii) any waiver of your right to legal recourse under any state or federal law and (iii) any other provision in this Loan Agreement that is not enforceable against you under the MLA, does not apply to you.
NOTICE TO THE BUYER: 1. THIS IS A CONSUMER CREDIT TRANSACTION. 2. DO NOT SIGN THIS CREDIT AGREEMENT BEFORE YOU READ IT OR IF IT CONTAINS ANY BLANK SPACE. 3. YOU ARE ENTITLED TO A COMPLETELY FILLED IN COPY OF THIS CREDIT AGREEMENT. **4. YOU MAY PREPAY THE UNPAID BALANCE UNDER THIS AGREEMENT AT ANY TIME SUBJECT TO THE "PREPAYMENT" DISCLOSURE ABOVE. 5. THIS LOAN AGREEMENT CONTAINS AN ARBITRATION PROVISION THAT, UNLESS YOU REJECT IT, MAY LIMIT YOUR RIGHT TO LITIGATE A CLAIM IN COURT OR HAVE A JURY TRIAL ON A CLAIM.**
**ACCEPTANCE OF THIS LOAN AGREEMENT BY ELECTRONIC SIGNATURE:** The first use of the Shopping Pass or the associated loan to make a purchase will constitute acceptance by (all) Borrower(s) of the terms of this Loan Agreement. The dated physical or electronic record of such use will evidence the signature of (all) Borrower(s) on this Loan Agreement and have the same legal effect as a physical signature.

**CAUTION - IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT. NON-NEGOTIABLE CONSUMER NOTE.**
Borrower: _____ Date:_____   Co- Borrower: _____ Date:_____
*Electronic record constitutes acceptance of this Agreement (see above)*        *Electronic record constitutes acceptance of this Agreement (see above)*
**LENDER:** /s/   BMO HARRIS BANK N.A.                                                    Date: 11/23/2021
**IN-HOME SALE CUSTOMERS:** ARIZONA, CONNECTICUT, NORTH DAKOTA AND RHODE ISLAND RESIDENTS: THIS INSTRUMENT IS BASED UPON A HOME/PERSONAL SOLICITATION SALE SUBJECT TO THE PROVISIONS OF TITLE 44, CHAPTER 15 OF THE ARIZONA REVISED STATUTES IN ARIZONA; THE HOME SOLICITATION SALES ACT IN CONNECTICUT; THE NORTH DAKOTA CENTURY CODE IN NORTH DAKOTA; AND TITLE 6, CHAPTER 28 OF THE RHODE ISLAND GENERAL LAWS. THIS INSTRUMENT IS NOT NEGOTIABLE.

TERMS AND CONDITIONS CONTINUE ON NEXT PAGE

Lender: BMO HARRIS BANK N.A. 2111233004 PPLD20211011_77_2_W Rev. 10/21

**1. Welcome.** Thank you for opening an installment loan through the GreenSky® Program. By accepting the Shopping Pass, the Truth in Lending Disclosure, the terms and conditions, and the Lender's Privacy Notice (collectively, the "Loan Agreement"), each Borrower ("you") acknowledges that (i) BMO HARRIS BANK N.A. ("Lender", "we", "our " or "us") has approved Borrower(s) for a GreenSky® Program Installment Loan up to the Amount Financed as set forth in the Truth in Lending Disclosure above the "Loan"), (ii) each Borrower has received and retained a copy of Lender's Privacy Notice, (iii) each Borrower has read this Loan Agreement, including any Addenda, and agrees to be bound by its terms, (iv) if this Agreement resulted from a sale in your home ("In-Home Sale"), the sales person has explained each Borrower's right to cancel and has provided a filled-in written Notice of Right to Cancel. Any Notice of Right to Cancel and any additional notice of right to cancel provided in the sales contract for an In-Home Sale, as well as any accompanying addendum provided to Borrower, are incorporated herein by reference, and unless any Borrower exercises the right to cancel, Lender agrees to pay the Amount Financed to Merchant for an In-Home Sale upon receipt of a transaction authorization, (v) either Borrower may direct Lender to make payments to Merchant by using the Shopping Pass or account number, and (vi) neither Borrower is a co-signer. A Certificate of Completion is required unless Borrower directs Lender to make payments to Merchant by using the Shopping Pass or account number. This Loan Agreement, including any changes to it, contains the terms of your agreement with BMO HARRIS BANK N.A..

**2. Installment Loan Program.**

    **a. Using your Loan:** You may make purchases of goods or services from Merchant, in total up to the "Amount Financed" set forth in the Truth in Lending Disclosure of this Loan Agreement, during the purchasing window time period specified on your Shopping Pass, which is incorporated here by reference. We may close the purchasing window time period on the earlier of the Purchase Window Expiration Date or when your job is substantially complete as determined by Lender (such as when your Merchant notifies us that your job is substantially complete). Once the purchasing window time period closes, you will no longer be able to make additional purchases. Each time you make a purchase of goods or services from Merchant, you authorize us to extend credit to you and to forward Loan proceeds to your Merchant on your behalf. We may decline any transaction if we experience an operational difficulty (such as a system outage), if you fail to make any payment required under this Agreement or you are in Default (as defined herein), or if we identify suspected fraudulent or unlawful activity involving your Loan.

    **b. Credit Limit:** You agree not to make purchases in excess of the Amount Financed shown above, but if you do, you agree that we may, in our sole discretion, increase the Amount Financed to include such excess amount in a "Summary of Account at Conversion" that reflects such increased Amount Financed and resulting increased anticipated Finance Charge and Total of Payments. The dated electronic record of such excess purchase(s) will evidence your request for and acceptance of any such increased terms.

    **c. Beginning of Amortization Period:** We will total the purchases you made during the purchasing window and provide you with a Summary of Account at Conversion that will show (based on actual total purchases) a final Amount Financed, Finance Charge, Total of Payments and remaining payment schedule for your Loan based on your total purchases.

    **d. For your convenience, we may provide you with certain materials in both the Spanish and English languages. You agree that, to the greatest extent not prohibited by law, the English text will control.**

    Para su conveniencia, podemos proporcionarle ciertos materiales en los idiomas español e inglés. Usted acepta que, en la mayor medida no prohibida por la ley predominará el texto en Inglés.

**3. Promise to Pay.** For value received, you agree to pay us: (a) so much as you may actually borrow from time to time by initiating transactions under the Loan Agreement, plus (b) periodic interest at an annual rate of 24.99% on the unpaid Amount Financed outstanding until the loan is paid in full, (c) any applicable taxes or other charges due under this Loan Agreement. We calculate the interest charge on your account by applying a monthly periodic rate to your outstanding principal balance on the first day of your first billing cycle and thereafter to your outstanding principal balance on the first day of each billing cycle. The monthly periodic rate equals the applicable annual rate divided by twelve (12). Payments will be due as scheduled. Any principal balance, interest and other charges remaining unpaid are due in full on the date of the last scheduled payment. The actual amount of interest that you pay may exceed the Finance Charge disclosed in the Truth in Lending Disclosure or Summary of Account at Conversion if you do not make minimum payments due by their due dates as identified in your statements. If you do not make required payments, then, in addition to any other rights and remedies available under this Loan Agreement or applicable law, (i) your purchasing window may close early and (ii) no new purchases may be permitted.

**4. Timing and Application of Payments.** You agree to make payments in accordance with the estimated payment schedule contained in the Truth in Lending Disclosure on the preceding page (or any updated disclosure, including the Summary of Account at Conversion), provided that you will be obligated to make minimum monthly payments in the amounts and on the dates shown on your statements. Any payment made in excess of your minimum monthly payment will be applied to your Principal Balance and will not reduce the amount of your next regularly scheduled payment. You agree that, except for updated amounts, if any, shown on your updated Summary of Account at Conversion, including any adjustments in scheduled payments to reflect your final Amount Financed and Finance Charges due, all other terms and disclosures of this Loan Agreement will remain in full force and effect. Once the initial payment due date is set, the payment due date will be the same day each month. Subject to applicable law, we may apply payments to the amounts you owe under this Loan Agreement in any order we choose. You may not tell us how to apply payments. Any partial prepayment will be applied against the outstanding balance, but will not postpone the due date of any subsequent monthly installments or change the amount of any such installments, unless we otherwise agree in writing. We will apply any refund for a returned purchase when we or Servicer receives notice of the refund from your Merchant. We do not control when your Merchant may notify us or Servicer of a refund. If your Merchant's notice is received after we send your Summary of Account at Conversion, we will apply the refund as a prepayment on your loan to reduce your outstanding balance but this will not reduce your subsequent minimum monthly payments (subject to any necessary adjustments to the number of payments required or your final payment amount).

**5. Payment Method and Address.** Unless automatic payments are authorized in connection with this Loan, you agree to make payments by mailing a check or money order to **Dept# 3025, GreenSky, PO Box 2153, Birmingham AL 35287-3025**, by making a phone payment by dialing **1-855-809-1889** or by making an online payment at www.greenskyonline.com. You agree that payments may not be made in whole or in part by credit card. A payment to our Servicer in accordance with this Loan Agreement is a payment to us. You agree not to send us partial payments marked "paid in full," "without recourse," or similar language. If you send such a payment, we may accept it without losing any of our rights under this Loan Agreement. **All written communications concerning disputed amounts, including any check or other payment instrument that (i) is postdated and accompanied by adequate notice, (ii) indicates that the payment constitutes "payment in full" of the amount owed, (iii) is tendered with other conditions or limitations or (iv) is otherwise tendered as full satisfaction of a disputed amount, must be marked for special handling and mailed or delivered to us at** P.O. Box 29429, Atlanta, GA 30359, Attention: Disputes.

**6. Unpaid Balances.** (a) During your deferred interest promotional period, you will satisfy the terms of your promotion and all interest billed during the promotional period will be waived/credited if you pay the entire purchase balance before the end of the promotional period and you will still be responsible for any outstanding

fees. (b) Notwithstanding the language in Section 3 of this Loan Agreement, if you have not paid the Amount Financed, interest, late charges, returned payment charges, or any other fees or charges at the end of the term.

**7. Access Device.** We will provide you with a Shopping Pass which you may use to make purchases of goods or services from Merchant during the purchasing window time period as described in this Loan Agreement. Use of your Shopping Pass or Loan to make a purchase constitutes your acceptance of the terms of this Loan Agreement. You agree to notify us immediately if your Shopping Pass is lost, stolen or otherwise compromised.

**8. Returned Payment Charge.** Subject to applicable law, we may charge you a "Returned Payment Charge" as provided herein. If your lender is located in Connecticut, Georgia, Illinois, Michigan, or Ohio, and your payment is dishonored or returned for any reason, you agree to pay us a Returned Payment Charge of $20. If your lender is located in Alabama or Mississippi and your payment is dishonored or returned for any reason, you agree to pay us a Returned Payment Charge of $15. If you are a Massachusetts Borrower and your payment is dishonored or returned for any reason, you agree to pay us a Returned Payment Charge of $10. In all cases, we may charge this fee the first time any payment is returned even if it is paid upon resubmission.

**9. Late Charge.** If a payment is more than 10 days late, you will be charged the GREATER of $39 or 5% of the amount past due, provided that the late payment fee will not exceed the amount past due ($30 maximum in Iowa). NOTICE: Massachusetts and Maine Borrowers are not charged late charges.

**10. Default.** Subject to applicable law, you will be in default ("Default") if any of the following events occur:

(a) You have made any false or misleading statement(s) in your application for the Loan subject to this Loan Agreement or any other account that you may have with us;
(b) You fail to make a payment within 60 days of when it was due under this Loan Agreement or any other account agreement that you may have with us;
(c) You fail to comply fully with any term or condition of this Loan Agreement or any other account agreement that you may have with us;
(d) You file or someone else files against you a petition in bankruptcy;
(e) You die;
(f) You commit fraud; or
(g) We believe you are unable or unwilling to pay your debts when due.

MASSACHUSETTS NOTICE: If you are a Massachusetts borrower and this Loan Agreement is secured by a non-possessory interest in consumer goods, this Default provision is enforceable only to the extent that the Default is material and consists of a failure to make one or more payments as required by the Loan Agreement or the occurrence of an event that substantially impairs the value of the collateral.

**11. Remedies on Default.** If you are in Default, we will have all of the rights and remedies available to us at law or in equity, in addition to the specific rights and remedies set forth in this Loan Agreement. We may exercise any, some or all of our rights and remedies, in our sole discretion. If you are in Default, we may, at our option, require you to pay immediately the entire amount you owe us under this Loan Agreement, in full. Subject to the requirements of applicable law, we may do this without giving you any advance notice of presentment, acceleration or our intent to accelerate. Unless prohibited by applicable law, you agree to pay our reasonable costs and attorneys' fees related to the collection of your Loan.

**12. Credit Inquiries and Loan Information.** You authorize us to obtain a credit report on you for any legal purpose in connection with this Loan, including any update, extension of credit, review or collection of this Loan. If you request, we will tell you whether any credit report was requested and, if so, the name and address of the credit bureau furnishing the report.

**13. Inaccurate Information.** If you believe that we have information about you that is inaccurate or that we have reported or may report inaccurate information about you to a credit bureau, please notify us of the specific information that you believe is inaccurate by writing to us at **P.O. Box 29429, Atlanta, GA 30359, Attention: Disputes**. In doing so, please identify the inaccurate information and tell us why you believe it is incorrect. If you have a copy of the credit report that includes the inaccurate information, please send a copy of that report to us as well. The "Your Billing Rights" section below contains special processes required for contacting us in the event of a Billing Error.

**14. Negative Information Reporting.** We may report information about your Loan to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

**15. Severability.** If applicable law is finally interpreted so that charges collected or to be collected in connection with this Loan Agreement exceed the permitted limits, then (i) any such charges will be reduced to the permitted amounts and (ii) any amounts already collected that exceed the permitted amounts will be credited to you by, at our option, applying the credit to any amounts due hereunder or making a direct payment to you. If any provision in this Loan Agreement is invalid under applicable law, the remainder of the provisions in this Loan Agreement will remain in effect and interpreted to give the greatest possible effect to the intent of the parties as originally written.

**16. Assignment; Transfer.** We may sell, assign, transfer or delegate all or any portion of our rights or obligations under this Loan Agreement to any other person without prior notice to you. You may not sell, assign, transfer or delegate any of your rights or obligations under this Loan Agreement.

**17. Governing Law.** This Loan Agreement, including the rate of interest and fees, is governed by applicable federal law and, to the extent not preempted by federal law, the laws of IL where the Lender is located as shown in Section 1 (Welcome) of this Loan Agreement (without regard to the State's conflict of laws provisions). If Lender is located in Kansas, the Kansas Consumer Credit Code (Kan. Stat. Ann. §§ 16a-1-101 et seq.) governs this Agreement. If you are a Massachusetts borrower and the Amount Financed is $6,000 or less, this Loan Agreement is also subject to the Massachusetts Small Loan Law.

**18. Joint and Several Liability.** Each Borrower will be liable individually and together for all obligations under this Loan Agreement, including payment to us of the entire amount owed under this Loan Agreement.

**19. No Waiver by Us.** We will not be deemed to have waived any of our rights by delaying the enforcement of any of our rights. If we waive any of our rights in writing on one occasion, that waiver does not constitute a waiver by us of our rights on any future occasion.

TERMS AND CONDITIONS CONTINUE ON NEXT PAGE

Lender: BMO HARRIS BANK N.A. 2111233004 PPLD20211011_77_2_W Rev. 10/21

**20. Telephone Monitoring and Recording.** You agree that we or our agent or a 3rd party may monitor or record calls to give you quality service and for training purposes.

**21. Communicating With You; Consent to Contact by Electronic and Other Means.** You agree that, to the greatest extent not prohibited by applicable law, we may contact you for any lawful reason, including for the collection of amounts owed to us. No such contact will be deemed unsolicited. You agree that we (and any other owner or servicer of your account) may contact you for any and all purposes arising out of or relating to your Loan at any physical or electronic addresses or numbers (including wireless cellular telephone numbers, ported landline numbers, VOIP or other services) as you may provide to us from time to time. We may use any means of communication, including, but not limited to, postal mail, electronic mail, telephone, text messaging, or other technology, to reach you. You agree that we may use automatic dialing and announcing devices which may play recorded messages. You may contact us at any time to ask that we not contact you using any one or more methods or technologies. You represent that you are permitted to receive communications at each of the telephone numbers you have provided to us.

**22. Notices; Change of Address, Employment or Telephone Number.** We will send all written notices and statements to your address as it appears on our records. To avoid delays and missed payments that could affect your credit standing, you agree to advise us promptly if you change your mailing address, place of employment, telephone number or other contact information, including, but not limited to, porting a landline telephone number to a cellular phone, VoIP or other services. You represent and agree that for purposes of imposing fees and charges, you are deemed to reside at the current mailing address that we have on record for you. You can update your contact information with us by phone, mail, or online at www.greenskyonline.com.

**23. Entire Agreement.** This Loan Agreement constitutes the final written expression of the credit agreement between you and us relating to your Loan. We are not bound by any oral representations made or implied that are not directly reflected in this Loan Agreement. **A credit agreement must be in writing to be enforceable. Oral agreements or commitments to loan money, extend credit, or forbear from enforcing repayment of a debt, including promises to extend or renew such debt, are not enforceable. To protect you and us from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it.**

**24. NOTICES: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

Your Merchant pays transaction fees as a result of your use of the Loan. Your Merchant is prohibited from surcharging you to cover the cost of these transaction fees.

**Notice to California Residents:** (AVISO PARA LOS QUE RESIDEN EN CALIFORNIA): SI SU PRÉSTAMO FUÉ NEGOCIADO PRIMERAMENTE EN ESPAÑOL, ESTAMOS OBLIGADOS A PRESENTARLE UNA TRADUCCIÓN EN ESPAÑOL DE LAS DISPOSICIONES REQUERIDAS POR LA REGULACIÓN FEDERAL Z, 12 C.F.R. APARTADO 1026.

**Notice to Iowa Residents:** IMPORTANT: READ BEFORE SIGNING. THE TERMS OF THIS LOAN AGREEMENT SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE. NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THIS WRITTEN CONTRACT MAY BE LEGALLY ENFORCED. BORROWER MAY CHANGE THE TERMS OF THIS AGREEMENT ONLY BY ANOTHER WRITTEN AGREEMENT.

**Notice to New Hampshire Residents:** This Loan Agreement provides for reasonable attorneys' fees to be awarded to us in an action against you involving this Loan Agreement. Reasonable attorneys' fees will be awarded to you if you prevail in any action, suit or proceeding brought by us, or an action brought by you. If you successfully assert a partial defense or set-off, recoupment or counterclaim to an action brought by us, the court may withhold from us the entire amount or such portion of the attorneys' fees as the court considers equitable.

**Notice to New Jersey Residents:** Because certain provisions of this Loan Agreement are subject to applicable laws, they may be void, unenforceable or inapplicable in some jurisdictions. None of these provisions, however, is void, unenforceable or inapplicable in New Jersey.

**Notice to New York Residents:** NOTICE TO THE BUYER: 1. Do not sign this credit agreement before you read it or if it contains any blank space. 2. You are entitled to a completely filled in copy of this credit agreement.

**Notice to Ohio Residents:** The Ohio laws against discrimination require that all creditors make credit equally available to all credit worthy customers, and that credit reporting agencies maintain separate credit histories on each individual upon request. The Ohio civil rights commission administers compliance with this law.

**Notice to Vermont Residents:** Lender is engaged in loan production. **EACH BORROWER SHOULD RETAIN A COPY FOR THEIR RECORDS.**

**25. ARBITRATION PROVISION. Agreement to Arbitrate Disputes:** This Arbitration Provision sets forth the circumstances and procedures under which Claims (defined below) that arise between you and us will be resolved through binding arbitration; provided, however, that this provision does not apply if, on the date this Agreement is issued, you are covered by the federal Military Lending Act as a member of the Armed Forces or a dependent of such a member. UNLESS YOU OPT OUT OF THIS ARBITRATION PROVISION AS PROVIDED BELOW OR EXCEPT AS APPLICABLE LAW PROHIBITS US FROM IMPOSING BINDING ARBITRATION ON YOU, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO LITIGATE A CLAIM IN COURT OR HAVE A JURY TRIAL ON A CLAIM. OTHER RIGHTS THAT YOU WOULD HAVE IN COURT ALSO MAY NOT BE AVAILABLE OR MAY BE LIMITED IN ARBITRATION, INCLUDING YOUR RIGHT TO APPEAL AND YOUR ABILITY TO PARTICIPATE IN A CLASS ACTION. Nothing in this provision precludes you from filing and pursuing your individual Claim in a small claims court in your state or municipality, so long as that claim is pending only in that court. Definitions: As used in this Arbitration Provision, the term "Claim" means and includes any claim, dispute or controversy of every kind and nature, whether based in law or equity, between you and us arising from or relating to your Loan Agreement as well as the relationship resulting from such Agreement ("the Agreement"), including the validity, enforceability or scope of this Arbitration Provision or the Agreement. "Claim" also includes claims by or against any third party providing any product, service or benefit in connection with the Agreement (including, but not limited to, debt collectors and all of their agents, employees, directors and representatives) if and only if, such third party is named as a co-party with you or us (or files a Claim with or against you or us) in connection with a claim asserted by you or us against the other. As used in this Arbitration Provision, "you" and "us" also includes any corporate parent, wholly or majority owned subsidiaries, affiliates, any licensees, predecessors, successors, assigns and purchasers of any accounts, all agents, employees, directors and representatives of any of the foregoing and any third party providing any product, service or benefit in connection with the Agreement. Initiation of Arbitration Proceeding / Selection of Administrator: Any Claim will be resolved, upon the election by you or us,

**TERMS AND CONDITIONS CONTINUE ON NEXT PAGE**

A 364

Appellate Case: 23-6118   Document: 010110162649   Date Filed: 04/23/2024   Page: 85

by arbitration pursuant to this Arbitration Provision, the rules of the national arbitration organization to which the Claim is referred in effect at the time the Claim is filed (the "Code"), except to the extent the Code conflicts with the Agreement. Claims must be referred to either JAMS or The American Arbitration Association ("AAA"), as selected by the party electing to use arbitration. If a selection by us of either of these organizations is unacceptable to you, you will have the right within 30 days after you receive notice of our election to select the other organization listed to serve as arbitration administrator. For a copy of the procedures, to file a Claim or for other information about these organizations, contact (1) JAMS at 1920 Main Street, Suite 300, Irvine, CA 92614; www.jamsadr.com or (2) AAA at 335 Madison Avenue, New York, NY 10017, www.adr.org. In addition to the arbitration organizations listed above, Claims may be referred to any other arbitration organization that is mutually agreed upon in writing by you and us, or to an arbitration organization or arbitrator(s) appointed pursuant to Section 5 of the Federal Arbitration Act, 9 U.S.C. §§ 1-16, provided that any such arbitration organization and arbitrator(s) will enforce the terms of the restrictions set forth below. Class Action Waiver and Other Restrictions: Arbitration will proceed solely on an individual basis without the right for any Claims to be arbitrated on a class action basis or on bases involving claims brought in a purported representative capacity on behalf of others. The arbitrator's authority to resolve and make written awards is limited to Claims between you and us alone. Claims may not be joined or consolidated unless agreed to in writing by all parties. No arbitration award or decision will have a preclusive effect as to issues or claims in any dispute with anyone who is not a named party to the arbitration. Notwithstanding any other provision in these terms and conditions and without waiving either party's right of appeal, if any portion of this "Class Action Waiver and Other Restrictions" provision is deemed invalid or unenforceable, then the entire Arbitration Provision (other than this sentence) will not apply. Arbitration Procedures: This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and will be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16, as it may be amended ("FAA"), and the applicable Code. The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations and will honor claims of privilege recognized by law. Federal or state rules of civil procedure or evidence will not apply. Written requests to expand the scope of discovery rest within the arbitrator's sole discretion and will be determined pursuant to the applicable Code. The arbitrator will take reasonable steps to preserve the privacy of individual, and of business matters. Judgment upon the written arbitral award may be entered in any court having jurisdiction. Subject to the right of appeal under the FAA, the arbitrator's written decision will be final and binding unless you or we take an appeal from the award by making a dated, written request to the arbitration organization within 30 days from the date of entry of the written arbitral award. A three-arbitrator panel administered by the same arbitration organization will consider anew any aspect of the award objected to by the appellant, conduct an arbitration pursuant to its Code and issue its decision within 120 days of the date of the appellant's written notice. The panel's majority vote decision will be final and binding. Location of Arbitration / Payment of Fees: The arbitration will take place in the federal judicial district where you live. Regardless of who wins in arbitration, you will only be responsible for paying your share, if any, of the arbitration fees required by the applicable Code, which amount will not exceed the filing fees that you would have incurred if the Claim had been brought in the appropriate state or federal court closest to where you live. We will pay the remainder of any arbitration fees. At your written request, we will consider in good faith making a temporary advance of all or part of your share of the arbitration fees. Waivers also may be available from the JAMS or AAA. Continuation: This Arbitration provision will survive termination of the Agreement, as well as voluntary payment in full of your account, any debt collection proceeding by or between you and us, and any bankruptcy by you or us. If any portion of this Arbitration Provision, except the "Class Action Waiver and Other Restrictions" provision above, is deemed invalid or unenforceable for any reason, it will not invalidate the remaining portions of this Arbitration Provision or the Agreement, each of which will be enforceable regardless of such invalidity. Opt-Out Process: You may choose to opt out of and not be subject to this Arbitration Provision but only by following the process set forth below. If you do not wish to be subject to this Arbitration Provision, then you must notify us in writing within forty-five (45) calendar days of the date of the Agreement at the following address: P.O. Box 29429, Atlanta, GA 30359, Attention: Legal. Your written notice must include your name, address, social security number, the date of the Agreement, and a statement that you wish to opt out of this Arbitration Provision. Your notice to opt out will only apply to this particular Agreement with us and not to subsequent or previous agreements.

## 26. Your Billing Rights: Keep this Document for Future Use

This notice tells you about your rights and our responsibilities under the Fair Credit Billing Act.

### What To Do If You Find a Mistake on Your Statement

If you think there is an error on your statement, write to us at:

GreenSky® Program
Attention: Disputes
PO Box 29429
Atlanta, GA 30359
You may also contact us at service@greensky.com.

In your letter, give us the following information:

- *Account information:* Your name and account number.
- *Dollar amount:* The dollar amount of the suspected error.
- *Description of problem:* If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.

You must contact us:

- Within 60 days after the error appeared on your statement.
- At least 3 business days before an automated payment is scheduled, if you want to stop payment on the amount you think is wrong.

You must notify us of any potential errors in writing. You may call us, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question.

### What Will Happen After We Receive Your Letter

When we receive your letter, we must do two things:

1. Within 30 days of receiving your letter, we must tell you that we received your letter. We will also tell you if we have already corrected the error.
2. Within 90 days of receiving your letter, we must either correct the error or explain to you why we believe the bill is correct.

TERMS AND CONDITIONS CONTINUE ON NEXT PAGE

Lender: BMO HARRIS BANK N.A. 2111233004 PPLD20211011_77_2_W Rev. 10/21

While we investigate whether

- We cannot try to collect the amount in question, or report you as delinquent on that amount.
- The charge in question may remain on your statement, and we may continue to charge you interest on that amount.
- While you do not have to pay the amount in question, you are responsible for the remainder of your balance.
- We can apply any unpaid amount against your available loan funds (if any).

After we finish our investigation, one of two things will happen:

- *If we made a mistake:* You will not have to pay the amount in question or any interest or other fees related to that amount.
- *If we do not believe there was a mistake:*

You will have to pay the amount in question, along with applicable interest and fees. We will send you a statement of the amount you owe and the date payment is due. We may then report you as delinquent if you do not pay the amount we think you owe.

If you receive our explanation but still believe your bill is wrong, you must write to us within *10 days* telling us that you still refuse to pay. If you do so, we cannot report you as delinquent without also reporting that you are questioning your bill. We must tell you the name of anyone to whom we reported you as delinquent, and we must let those organizations know when the matter has been settled between us.

If we do not follow all of the rules above, you do not have to pay the first $50 of the amount you question even if your bill is correct.

**Your Rights If You Are Dissatisfied With Your Payment Card Purchases**
If you are dissatisfied with the goods or services that you have purchased with your Loan, and you have tried in good faith to correct the problem with the Merchant, you may have the right not to pay the remaining amount due on the purchase.

To use this right, all of the following must be true:

1. The purchase must have been made in your home state or within 100 miles of your current mailing address, and the purchase price must have been more than $50. (Note: Neither of these are necessary if your purchase was based on an advertisement we mailed to you, or if we own the company that sold you the goods or services.)
2. You must have used your payment card for the purchase.
3. You must not yet have fully paid for the purchase.

If all of the criteria above are met and you are still dissatisfied with the purchase, contact us *in writing* at:

GreenSky® Program
Attention: Disputes
PO Box 29429
Atlanta, GA 30359
You may also contact us at service@greensky.com.

While we investigate, the same rules apply to the disputed amount as discussed above. After we finish our investigation, we will tell you our decision. At that point, if we think you owe an amount and you do not pay, we may report you as delinquent.

Appellate Case: 23-6218    Document: 010111062399    Date Filed: 07/07/2023    Page: 86

TERMS AND CONDITIONS CONTINUE ON NEXT PAGE

A-366

Lender: BMO HARRIS BANK N.A. 2111233004 PPLD20211011_77_2_W Rev. 10/21

Date Filed: 06/07/2024       Page: 87

Document: 01011062399

Appellate Case: 23-6218

| FACTS | WHAT DOES BMO HARRIS BANK N.A. DO WITH YOUR PERSONAL INFORMATION? |
|---|---|
| Why? | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| What? | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br>• Social Security number and  employment information<br>• account transactions  and transaction history<br>• credit history and investment experience |
| How? | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons BMO Harris Bank N.A. chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does BMO Harris Bank N.A. share? | Can you limit this sharing? |
|---|---|---|
| **For our everyday business purposes** — such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| **For our marketing purposes** — to offer our products and services to you | Yes | No |
| **For joint marketing with other financial companies** | Yes | No |
| **For our affiliates' everyday business purposes** — information about your transactions and experiences | Yes | No |
| **For our affiliates' everyday business purposes** — information about your creditworthiness | Yes | Yes |
| **For our affiliates to market to you** | Yes | Yes |
| **For nonaffiliates to market to you** | No | We don't share |

| To limit our sharing | Call toll-free:  1-866-936-0602<br>**Please note:**<br>If you are a *new* customer, we can begin sharing your information 30 days from the date we sent this notice. When you are *no longer* our customer, we continue to share your information as described in this notice. However, you can contact us at any time to limit our sharing. |
|---|---|

| Questions? | • Call toll-free:  1-888-654-0063<br>• Talk to a banker at a BMO Harris branch<br>• Talk to your assigned account representative |
|---|---|



A367

Date Filed: 06/07/2024      Page: 88

Document: 01011062399

Appellate Case: 23-6218

## Page 2

| Who we are | |
|---|---|
| Who is providing this notice? | This notice is provided by BMO Harris Bank N.A. for its consumer customers, including all cardholders of Diners Club and Carte Blanche Professional cards issued by us. |

| What we do | |
|---|---|
| How does BMO Harris Bank N.A. protect my personal information? | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings. |
| How does BMO Harris Bank N.A. collect my personal information? | We collect your personal information, for example, when you:<br>• open an account or deposit money<br>• apply for a loan or use your credit or debit card<br>• seek advice about your investments<br><br>We also collect your personal information from others, such as credit bureaus, affiliates, or other companies. |
| Why can't I limit all sharing? | Federal law gives you the right to limit only<br>• sharing for affiliates' everyday business purposes—information about your creditworthiness<br>• affiliates from using your information to market to you<br>• sharing for nonaffiliates to market to you<br><br>State laws and individual companies may give you additional rights to limit sharing. See below for more information on your rights under state laws. |
| What happens when I limit sharing for an account I hold jointly with someone else? | Your choices will apply to you only, unless you tell us otherwise. |

| Definitions | |
|---|---|
| Affiliates | Companies related by common ownership or control. They can be financial or nonfinancial companies.<br>• Our affiliates include companies with a Bank of Montreal or BMO name; and financial companies such as BMO Harris Financial Advisors, Inc. |
| Nonaffiliates | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br>• BMO Harris Bank N.A. does not share with nonaffiliates so they can market to you. |
| Joint Marketing | A formal agreement between nonaffiliated financial companies that together market financial products or services to you.<br>• Our joint marketing partners include credit card companies. |

### Other important information

**For California Residents:** We will not share information we collect about you with companies outside of the BMO family of companies except with your authorization or as permitted by California law, such as to service your account. To authorize the sharing of this information, please call us toll-free at 1-888-654-0063. In addition, we will limit the sharing of information about you within the BMO family of companies to the extent required by California law.

**For Vermont Residents:** We will not disclose information about your creditworthiness to our affiliates and will not disclose your personal information, financial information, credit report, or health information to nonaffiliated third parties to market to you, other than as permitted by Vermont law, unless you authorize us to make those disclosures. Additional information concerning our privacy policies can be found at www.bmoharris.com/us/about/privacy or call 1-888-654-0063.

**For Nevada Residents:** Notice provided pursuant to state law. To be placed on our internal Do Not Call List, call 1-888-654-0063. For more on this Nevada law, contact Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St., Suite 3900, Las Vegas, NV 89101. Phone number: (702)486-3132; email: BCPINFO@ag.state.nv.us.

A368

**BMO HARRIS BANK N.A.**

**Your Credit Score and the Price You Pay for Credit**

| Your Credit Score | |
|---|---|
| **Your credit score:** | 717<br><br>Source: EXPERIAN          Date: 11/23/2021 |

| Understanding Your Credit Score | |
|---|---|
| **What you should know about credit scores** | Your credit score is a number that reflects the information in your credit report.<br><br>Your credit report is a record of your credit history.  It includes information about whether you pay your bills on time and how much you owe to creditors.<br><br>Your credit score can change, depending on how your credit history changes. |
| **How we use your credit score** | Your credit score can affect whether you can get a loan and how much you will have to pay for that loan. |
| **The range of scores** | Scores range from a low of 300 to a high of 850.<br><br>Generally, the higher your score, the more likely you are to be offered better credit terms. |
| **How your score compares to the scores of other consumers** |  |

**Borrower:** Susan K Parisi

A369

Appellate Case: 23-6218     Document: 01011062399     Date Filed: 06/07/2024     Page: 89

| **Checking Your Credit Report** | |
|---|---|
| **What if there are mistakes in your credit report?** | You have a right to dispute any inaccurate information in your credit report. If you find mistakes on your credit report, contact the consumer reporting agency.<br><br>It is a good idea to check your credit report to make sure the information it contains is accurate. |
| **How can you obtain a copy of your credit report?** | Under federal law, you have the right to obtain a free copy of your credit report from each of the nationwide consumer reporting agencies once a year.<br><br>To order your free annual credit report—<br><br>*By telephone:*   Call toll-free: 1-877-322-8228<br><br>*On the web:*   Visit www.annualcreditreport.com<br><br>*By mail:*   Mail your completed Annual Credit Report Request Form (which you can obtain from the Federal Trade Commission's website at www.ftc.gov/bcp/conline/include/requestformfinal.pdf) to:<br><br>Annual Credit Report Request Service<br>P.O. Box 105281<br>Atlanta, GA 30348-5281 |
| **How can you get more information about credit reports?** | For more information about credit reports and your rights under Federal law, visit the Consumer Financial Protection Bureau's website at www.consumerfinance.gov/learnmore or visit the Federal Reserve Board's website at www.federalreserve.gov. |

A370

Case 5:23-cv-00115-R   Document 47-5   Filed 09/25/23   Page 22 of 23
Appellate Case: 23-6218   Document: 010111062399   Date Filed: 06/07/2024   Page: 91

Case 5:23-cv-00115-R   Document 18-3   Filed 04/28/23   Page 22 of 23

| Transaction Date | Post Date | Card # | | Transaction Type | Transaction Status | Invoice # | Confirmation # | Transaction Description | Transaction Amount |
|---|---|---|---|---|---|---|---|---|---|
| 10/25/2022 | 10/25/2022 | | I | Late Payment Fee | | | 20221025-003631 | late payment fee correction | 78.00 |
| 10/11/2022 | 10/11/2022 | * | I | Late Payment Fee Credit PCResolution | | | | Fees associated with the dispute amount | 78.00 |
| 10/11/2022 | 10/11/2022 | | I | Finance Charge Credit | | | | Finance Charge Credit | 739.00 |
| 10/11/2022 | 10/11/2022 | | I | Finance Charge Credit | | | 20221011-001825 | 1X Courtesy | 78.00 |
| 10/10/2022 | 10/10/2022 | | I | Credit | | PARISI, SUSAN 80_21_10903 GS REFUND - CXLD SALE | 20221010-003385 | Greensky Direct Transaction - Renewal by Andersen of Oklahoma | 8,871.50 |
| 10/01/2022 | 10/01/2022 | | I | Late Payment Fee | | | | Late Payment Fee | 39.00 |
| 09/25/2022 | 09/25/2022 | | I | Finance Charge | | | | FINANCE CHARGE | 184.75 |
| 08/25/2022 | 08/25/2022 | | I | Finance Charge | | | | FINANCE CHARGE | 184.75 |
| 07/31/2022 | 07/31/2022 | | I | Late Payment Fee | | | | Late Payment Fee | 39.00 |
| 07/25/2022 | 07/25/2022 | * | I | Finance Charge | | | | FINANCE CHARGE | 184.75 |
| 06/25/2022 | 06/25/2022 | | I | Finance Charge | | | | FINANCE CHARGE | 184.75 |
| 11/29/2021 | 11/29/2021 | **\* | I | MTC Charge Request | | Parisi, Susan 80_21_10903 | 1649236 | | 8,871.50 |
| 11/29/2021 | 11/29/2021 | **\* | I | Charge | | Parisi, Susan 80_21_10903 | 20211129-001115 | Greensky Direct Transaction - Renewal by | 8,871.50 |

EXHIBIT
4

A371

Case 5:23-cv-00115-R   Document 47-5   Filed 09/25/23   Page 23 of 23
Appellate Case: 23-6218   Document: 010111062399   Date Filed: 06/07/2024   Page: 92

Case 5:23-cv-00115-R   Document 18-3   Filed 04/28/23   Page 23 of 23

| Transaction Date | Post Date | Card # | Transaction Type | Transaction Status | Invoice # | Confirmation # | Transaction Description | Transaction Amount |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Andersen of Oklahoma | |

A372

## IN THE UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF OKLAHOMA

**SUSAN PARISI,**

                       **Plaintiff,**

    **v.**

**OKLAHOMA WINDOWS AND
DOORS, LLC d/b/a RENEWAL BY
ANDERSON OF OKLAHOMA, and
BMO HARRIS BANK, NA d/b/a
GREENSKY, LLC,**

                      **Defendants.**

**Case No.: 5:23-cv-00115-R**

## PLAINTIFF'S RESPONSE IN OPPOSITION TO GREENSKY'S
## SECOND AND REDUNDANT MOTION TO DISMISS

      Defendant BMO Harris Bank, NA, d/b/a GreenSky, LLC ("GreenSky") takes a second bite at the apple in this redundant attempt to compel Plaintiff Susan Parisi ("Parisi") to arbitration despite having no evidence that she agreed to GreenSky's contract, let alone the arbitration agreement in it.  Although this is GreenSky's second Motion to Dismiss (the "Motion"), it is based on virtually identical arguments as its first, the Motion to Compel Arbitration as to All Claims Asserted by Plaintiff and to Dismiss or Stay Claims of Plaintiff Pending Arbitration ("Motion to Compel Arbitration and Dismiss") (Doc. No. 18).  Filing this second Motion does little to change the facts or the law, and, like GreenSky's previously filed Motion to Compel Arbitration and Dismiss, it is due to be denied.  No arbitration agreement exists because no loan agreement exists.

A373

## I.   BACKGROUND AND DISPUTED FACTS[1]

GreenSky tried a bait and switch, but Parisi rejected it.  Parisi never agreed to the loan contract GreenSky is attempting to enforce (the "Loan Agreement"), nor did she provide "assent" in any other way as GreenSky claims without evidence. Having never agreed or assented to the Loan Agreement, Parisi could never have agreed to the arbitration clause within the agreement.

### A.   There Was No Meeting of the Minds

In this current Motion, GreenSky argues that because Parisi "agreed to purchase" the Andersen replacement windows with zero money down and zero interest with no payments due until two years after the installation, the Loan Agreement was created that established Parisi's contractual agreement with GreenSky. (Doc. No. 47, at p. 4-5, ¶¶3, 6, 9). GreenSky ignores and hopes this Court will ignore the fact that GreenSky, after receiving Parisi's application, did not offer Parisi a loan with zero down and zero interest, with no payments for two years after installation.  Instead of the no down payment, no interest, no payments for two years loan for which Parisi applied, GreenSky sent Parisi the Loan Agreement, which had different material terms. *See* Declaration of Susan Parisi, hereafter Parisi Dec., ¶¶42, 43, attached hereto as **Exhibit 1**. As set forth in Parisi's Opposition to GreenSky's Motion to Compel Arbitration and Dismiss, the Loan Agreement

---

[1] Much of the background and disputed facts are more fully set forth in Parisi's Opposition to GreenSky's Motion to Compel Arbitration and Dismiss (Doc. No. 39). Because GreenSky incorporated its Motion to Compel Arbitration and Dismiss and its Reply Brief in Support into its Motion, Parisi will refer to those documents as necessary.

A374

had a different identification number and required payments within six months, not two years after window installation. Parisi Dec., ¶43; (Doc. No. 39, at p. 8).  It specified, "THIS IS A DIFFERENT PLAN THAN REQUESTED." *Id*.

GreenSky now admits there was no meeting of the minds for the formation of GreenSky's proposed Loan Agreement when GreenSky sent Parisi this "DIFFERENT PLAN." (Doc. No. 42, at p. 6).  Nor did Parisi "assent" later through the alleged use of the Shopping Pass by its vendor, Renewal by Anderson, because Parisi did not authorize its use.  Parisi Dec., ¶¶41, 44, 45.  Nevertheless, GreenSky claims that "[b]ecause she activated the Shopping Pass, she manifested her assent to the arbitration agreement, and she is legally bound to the arbitration agreement as much as other terms in the Loan Agreement". (Doc. No. 42, at p. 4).  Parisi, however, provides clear evidence that she did not activate the Shopping Pass, nor authorize its use. Parisi Dec., ¶¶41, 44, 45.

## B.    GreenSky Admits Parisi Was Not Bound to its Loan Agreement Simply Because GreenSky Mailed and Emailed it to Parisi

In this Motion, GreenSky argues that Parisi is bound to its Loan Agreement because she "agreed to purchase the replacement windows and was approved for a loan with BMO Harris Bank, NA [ ]". (Doc. No. 47, at p. 5, ¶9. In GreenSky's Reply in Support of its Motion to Compel Arbitration and Dismiss however, GreenSky admitted that "[a]t the time the copies of the Loan Agreement were sent by U.S. Mail and by electronic delivery to [Parisi] she was not yet bound to the Loan Agreement." (Doc. No. 42, at p. 6).  With this admission, GreenSky hangs its entire argument on its claim that Parisi manifested her "assent to the payment terms of the Loan Agreement – and became bound to the terms of

3

the Loan Agreement – by using the Shopping Pass on November 29, 2021." *Id*., at p. 7.

The problem with GreenSky's reliance on the Shopping Pass is that Parisi did not activate

it or authorize its use, and GreenSky's "evidence" that she did fails to pass the laugh test.

Moreover, on the very same day GreenSky claims Parisi authorized use of the Shopping

Pass (November 29, 2021), Parisi denied – in writing – that she did so. Parisi Dec., ¶41;

*See also*, Doc. No. 39-1. p.40.

　　　GreenSky tries to skirt around this inconvenient set of facts when it states that the

"facts and circumstances surrounding [Parisi's] approval and use of the Loan Agreement

are set forth in Paragraphs 7 – 30 of the Kaliban Declaration [ ]."  (Doc. No. 47, at ¶12).

The Kaliban Declaration, however, contains a number of misleading and disputed "facts,"

few of which even address the Shopping Pass use.  For example, in paragraph 12, Kaliban

states that "[o]n November 23, 2021, Ms. Parisi applied for and was approved for a loan

from BMO Harris Bank, NA, through the GreenSky Program for a home improvement

project with Renewal by Andersen of Oklahoma, the company reflected on Plaintiff's Loan

Agreement." *Id*.  This is misleading, because Parisi applied for one loan with one set of

terms but was approved for and offered a different loan with entirely different terms, to

which she never agreed.  Parisi Dec., ¶¶39, 43, 44.  Similarly, in paragraph 17, Kaliban

states that "[a] representative of GreenSky contacted Ms. Parisi by telephone on November

23, 2021. . . and verified that she was aware of, and authorized, the application. Ms. Parisi

was approved for a loan from BMO Harris Bank, NA with a credit limit in the amount of

$19,000.00."  (Doc. No. 47-5, ¶17).  Again, this is misleading.  Parisi was aware of and

authorized an *application* for a loan with specific terms, *i.e*., zero money down and zero

interest with no payments due until two years after the installation of her windows. Parisi Dec., ¶¶7, 21.  The fact that GreenSky approved Parisi for a loan with entirely different terms did not bind her to that approved loan.  No evidence exists that Parisi ever accepted GreenSky's offer of a loan with entirely different terms than the loan for which Parisi applied.  No meeting of the minds occurred.

GreenSky cannot show this Court a Loan Agreement signed by Parisi because Parisi refused to sign the newly offered Loan Agreement. Parisi Dec., ¶44.  Kaliban's declaration states that GreenSky mailed and emailed the Loan Agreement to Parisi. (Doc. No. 47-5, ¶¶18 – 27.)  GreenSky admits, however, this did not bind Parisi to the Loan Agreement. (Doc. No. 42, at p. 6) ("At the time the copies of the Loan Agreement were sent by U.S. mail and by electronic delivery to [Parisi], she was not yet bound to the Loan Agreement."). Instead, GreenSky claims Parisi's "use" of the Loan Agreement Shopping Pass was the way in which Parisi became bound and assented to the Loan Agreement.  (Doc. No. 42, at p. 4) ("[Parisi] manifested her assent to the payment terms of the Loan Agreement—and became bound to the terms of the Loan Agreement—by using the Shopping Pass on November 29, 2021."). But Parisi never used or authorized use of the Shopping Pass.

### C.   Parisi Did Not Use or Authorize Use of Shopping Pass and GreenSky Offers No Contrary Evidence She Did

Kaliban states that "[o]n November 29, 2021, Ms. Parisi used the Shopping Pass included with, and part of, her Loan Agreement, and authorized Renewal by Andersen of Oklahoma to charge her account in the amount of $8,871.50.  (Doc. No. 47-5, ¶28). Kaliban declares that this "use" constituted an affirmation and acceptance of the terms of the Loan

A377

Agreement.[2]  *Id.*, ¶29.   Yet, just as with GreenSky's Motion to Compel Arbitration and Dismiss filed previously, the sum total of GreenSky's purported evidence of Parisi's authorization for use of the Shopping Pass is a document Kaliban refers to as a "transaction history" for Parisi's "loan account."  *Id.*, ¶30.  Kaliban declares, "[t]his document shows the charges to Ms. Parisi's account number ending in 2561.  The funds were settled and disbursed directly to Renewal by Andersen of Oklahoma's designated bank account in order to pay for the services Ms. Parisi requested from Renewal by Andersen of Oklahoma."  *Id.*  Of course, an unsigned document that "shows" charges as a line item on what is purported to be a GreenSky internal "transaction history" that an unidentified individual may or may not have created at a relevant time, does not evidence, in any way, Parisi's approval, assent, or authorization of the Shopping Pass's use.

Parisi expressly disputes that she ever approved, assented to, or authorized the use of the Shopping Pass.  Parisi Dec., ¶¶41, 44, 45.  GreenSky's only "proof" of her authorization is a self-serving accounting ledger printout (if even that) showing the charge as a line item.  GreenSky cannot point to any evidence that Parisi signed a document approving of the Shopping Pass's use.  Nor does GreenSky point to any correspondence in an email or a text message evidencing that Parisi authorized the Shopping Pass use.  Nor does GreenSky point to an audio recording of Parisi's authorization.  To the contrary, evidence that Parisi did **not** know of, approve, or authorize use of the Shopping Pass is evident from Parisi's declaration, and correspondence Parisi sent to GreenSky on the very

---

[2] Of course, what constitutes an affirmance and acceptance is not a fact to be declared but a legal conclusion.

day GreenSky claims she used the Shopping Pass and in the days that immediately

followed.  Parisi Dec., ¶¶41, 44, 45.  In written communication, dated the same day as the

alleged use of the Shopping Pass – November 29, 2021 – Parisi stated that that she was

never informed about the Shopping Pass use:

> OK, I was never informed/told that an $8,000 + dollar charge was going
> to take place! I chose the two-year nothing down, no interest, no payment
> option.  And I was informed the clock started ticking when the windows
> were installed.  So what else is going to be done **without my knowledge**?
> This little trick makes me think twice about proceeding.  Someone best
> be ta[l]king to me about this.  I am under treatment for bone marrow
> cancer and I don't need any more surprises! **It is not right [to find] this
> out after the fact.**

Parisi Dec., ¶41; (Doc. No. 27-8) (Emphasis added).

On December 1, 2021, a GreenSky representative told Parisi that there was a

payment transaction for $8,871.50 because the "merchant charges a percentage upfront on

the loan" account. (Doc. No. 27-11).  Parisi responded:

> Well it certainly would help to know this information up front which I
> wasn't told that there would be a "payment transaction" for $8,871.50
> which I am NOT comfortable with.  I was told there would NOT be a
> payment, NO interest, and etc. for two years. . . **I am NOT authorizing
> any payment at this time to Renewal by Anderson.**

Parisi Dec., ¶44; (Doc. No. 27-11) (Emphasis added).

On December 1, 2021, a GreenSky representative responded, stating that the charge

to Parisi's account was "part of the loan process":

> The account will be charged because it is part of the loan process but
> based on your loan plan, we will not bill you until the job is completed or
> purchase window expiration date 05/26/22.  So the account is being
> charged but you are not going to be billed just yet.

Parisi Dec., ¶44; (Doc. No. 1-1, p. 9); (Doc. No. 27-11)

On December 2, 2021, the GreenSky representative followed up:

> After explaining the loan process, do you authorize this transaction? If you have any questions, please give me a call.

Parisi Dec., ¶44; (Doc. No. 1-1, p. 9); (Doc. No. 27-11)

On December 10, 2021, Parisi responded that she unequivocally did not authorize the use of the Shopping Pass:

> You did NOT explain any loan process to me **and I do NOT authorize any transaction which I have already stated.** I do NOT do well with lies. I have many questions related to this situation. I was told I qualified for a 24 month, NO money down, No Interest, and NO payment situation to begin 24 months after installation, now I am being told I did NOT qualify for that and you have removed that original offer. Well this is to inform you again that I am NOT doing business with you or Renewal by Anderson **and IF you sent them money without my consent that is ON you NOT me. I did NOT authorize anything.** I will provide you the name of my attorney and they will deal with this. This is a very sketchy situation you have set up with Renewal by Anderson. I suggest this gets straightened out quickly.

Parisi Dec., ¶44; (Doc 1-1, p. 9); (Doc. No. 27-13) (Emphasis added).

In each of these written communications, Parisi told GreenSky that she did not use the Shopping Pass and did not authorize its use.  Yet GreenSky deceptively claims Parisi, not the merchant, used the Shopping Pass, even after its representative acknowledged that the use of the Shopping Pass was accomplished without Parisi's involvement.

### D.   GreenSky Agreed It Would Cease Attempts to Bind Consumers with Unauthorized Use of Shopping Passes

GreenSky's attempt to bind Parisi to a Loan Agreement with entirely different terms than those for which she applied through unauthorized use of her Shopping Pass is precisely the type of conduct GreenSky agreed to stop when it entered into a Consent Order

with the Consumer Financial Protection Bureau ("CFPB") in 2021.  A copy of the Consent

Order is attached hereto as **Exhibit 2**; (*See also*, Doc. No. 19-1).  The CFPB found that:

- GreenSky trains the merchants with whom it works. CO, ¶10.

- Where merchants submit loan applications on a consumer's behalf, the consumer is not able to view the approved loan terms unless the merchant shares the screen with the consumer.  CO, ¶14.

- GreenSky issues a Shopping Pass, which functions like a credit card, and treats use of the Shopping Pass as acceptance of the loan.  CO, ¶16.

- Merchants misused the Shopping Pass numbers, using the Shopping Pass numbers to apply for payment.  CO, ¶¶20 – 23.

- Between 2014 and 2019, GreenSky received at least 6,000 complaints from consumers who stated they did not authorize submission of a loan application or became aware of the loan for the first time when they noticed GreenSky's name on their credit report or received billing statements. CO, ¶25-26.

- Merchants who generated more loans for GreenSky received a dedicated "Client Growth Manager," some of whom instructed merchants on how to directly access and use consumers' Shopping Pass numbers.  CO, ¶¶36, 39.

- GreenSky engaged in origination and servicing activities for loans consumers did not authorize. CO, ¶59.

- Some consumers did not learn about the loans until well after they were funded. CO, ¶61.

GreenSky was required to take affirmative action to correct the problems highlighted

by the CFPB in the Consent Order, including:

- Obtaining and retaining evidence of a consumer's authorization of a loan in one of the following forms prior to asserting or reporting to a credit reporting agency any obligation on the consumer's part and *prior to the loan being activated* (emphasis added):

    (1) a signed written authorization from the consumer;

9

(2) an audio recording of a phone call with the consumer containing the consumer's verbal authorization; or

(3) other documentary evidence evidencing consumer authorization of the loan obtained during loan activation procedures using email, the internet, or mobile messaging technology (such as SMS). CO, ¶ 71.

- GreenSky was required to develop and implement policies, practices, procedures, and training materials regarding obtaining and retaining evidence of consumers' loan authorizations consistent with the methods set forth above *before disbursing loan proceeds to a Merchant* (emphasis added). CO, ¶74. (Emphasis added).

- GreenSky was specifically required to develop policies, procedures, and training materials designed to prevent and prohibit Merchants *from using Shopping Pass numbers without consumers' consent* (emphasis added). CO, ¶75. (Emphasis added).

Instead of ensuring the conduct above ceased as it agreed to do, GreenSky doubles down, insisting that Parisi, by *applying* for a loan with one set of terms, agreed to a Loan Agreement containing an arbitration agreement and entirely different terms. After admitting it could not bind Parisi to a new Loan Agreement simply by sending it to her, GreenSky claims she assented to the new Loan Agreement by using the Shopping Pass. The only evidence GreenSky submits of her "use" is an internal purported accounting printout showing GreenSky disbursed funds to its own merchant. GreenSky has no evidence Parisi agreed, authorized, or assented to use of GreenSky's Shopping Pass, despite the CFPB requirement to obtain and retain such evidence "before disbursing loan proceeds to a Merchant." Rather than offering the evidence the CFPB required GreenSky to obtain and retain, *i.e.*, signed written authorization, audio recording of a verbal authorization, or an email or text message evidencing authorization, GreenSky submits an

internal self-serving printout and ignores Parisi's unequivocal written rejection of any authorization of the Shopping Pass use.

## II.    STANDARD OF REVIEW

The existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked. *Avedon Engineering, Inc. v. Seatex*, 126 F. 3d 1279, 1287 (10th Cir. 1997) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995) ("[A]rbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration."). GreenSky argues incorrectly that Rule 12(b)(3) provides for dismissal of this case for improper venue because of an arbitration clause in its Loan Agreement. Because GreenSky has challenged this Court's jurisdiction, Parisi bears the burden of proving proper venue. *See Castle Rock Hef, LLC v. Corba*, 2020 WL 5015261, at *1 (W.D. Ok. March 3, 2020) (citation omitted). In bearing that burden, however, the facts Parisi alleges in her Complaint are taken as true. *Id*. In addition, the Court must draw "all reasonable inferences and resolves all factual conflicts" in Parisi's favor. *Id*. (quoting *Hancock v. Am. Tel. & Tel. Co*., 701 F.3d 1248, 1260 (10th Cir. 2012).

Under the FAA, if there is a need to resolve material factual disputes as to the formation of an agreement to arbitrate, the court must proceed to a summary trial. *See* 9 U.S.C. § 4. ("If the making of the arbitration agreement ... be in issue, the court shall proceed summarily to the trial thereof."). The 10th Circuit agrees that "when factual disputes may determine whether the parties agreed to arbitrate, the way to resolve them ...

11

is by proceeding summarily to trial." *Howard v. Ferrellgas Partners, L.P.*, 748 F. 3d 975, 984. (10th Cir. 2014). "When parties dispute the making of an agreement to arbitrate, a jury trial on the existence of the agreement is warranted unless there are no genuine issues of material fact regarding the parties' agreement." *Hardin v. First Cash Fin. Servs., Inc.*, 465 F.3d 470, 475 (10th Cir. 2006) (quoting *Avedon Engineering Inc v. Seatex*, 126 F 3d at 1283. However, a court can determine that there are no material issues of fact in dispute and decide there is no arbitration agreement as a matter of law. *See Ragan v. Howard*, 841 F. 3d 1134, 1139 (10th Cir. 2016) (When parties do not dispute the material facts surrounding an arbitration provision, then a district court, while viewing the facts most favorable to the non-moving party, can decide as a matter of law whether the parties actually agreed to arbitrate.)

## III.   ARGUMENT

GreenSky claims there was an agreement to arbitrate Parisi's claims "as reflected in the extensive language set forth in the Loan Agreement."  (Doc. No. 47, at p. 7). The problem for GreenSky is that Parisi never agreed to the Loan Agreement.  Because there is no agreement, there is no valid arbitration agreement.

 "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Spahr v. Secco*, 330 F.3d 1266, 1269 (10th Cir.2003) (quoting *AT & T Techs.*, 475 U.S. at 648, 106 S.Ct. 1415) (internal quotation marks omitted). "[T]o determine whether a party has agreed to arbitrate a dispute," the Court applies "ordinary state-law principles that govern the formation of contracts." *Walker v. BuildDirect.com Techs., Inc.*, 733 F.3d 1001, 1004 (10th Cir. 2013).

Agreement or mutual assent is essential to a contract. *Jacks v. CMH Homes, Inc.*, 856 F.3d 1301, 1304 (10th Cir. 2017) ("In present-day Oklahoma, a contract is defined by statute as "an agreement to do or not to do a certain thing." Okla. Stat. Ann. tit. 15, § 1. In short, without an agreement, there is no contract."). Although the presence of an arbitration clause generally creates a presumption in favor of arbitration, "this presumption disappears when the parties dispute the existence of a valid arbitration agreement." *Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1220 (10th Cir.2002); *see also, Riley Mfg. Co. v. Anchor Glass Container Corp.*, 157 F.3d 775, 779 (10th Cir. 1998) ("[W]hen the dispute is whether there is a valid and enforceable arbitration agreement in the first place, the presumption of arbitrability falls away.").  Here, there is no presumption in favor of arbitration, because Parisi disputes the existence of a valid arbitration agreement.  There is no valid arbitration agreement because there is no valid Loan Agreement.

GreenSky argues that the FAA mandates that district courts "shall" enforce arbitration agreements "in accordance with the terms of the agreement," and that this comports with the national policy in favor of arbitration "when parties contract to settle disputes by arbitration." (Doc. No. 47, at p. 6).  All of that falls away when there is a dispute about the existence of a valid agreement.  *Howard v. Ferrellgas Partners, L.P.*, 748 F. 3d at 977 ("[B]efore the [FAA]'s heavy hand in favor of arbitration swings into play, the parties themselves must agree to have their disputes arbitrated."). Here, because there is no agreement, the parties did not "contract to settle disputes by arbitration."  GreenSky attempts to persuade this Court otherwise by using phrases like, "there was clearly an agreement to arbitrate," "there is no question that [Parisi] understood and agreed to have

13

GreenSky service a loan," and "BMO Harris Bank, NA offered to lend funds to [Parisi]. *Id.*, at p.7. Yet none of these are evidence of a valid agreement between the parties. Because the arbitration agreement is contained in the agreement GreenSky attempts to enforce, to which Parisi is not bound, there is no agreement to arbitrate.

In order to have a valid contract, there must be mutual consent or, in other words, a meeting of the minds between the parties. *Oklahoma Gas and Elec. Co. v. Toshiba Int'l Corp.*, 2016 WL 3659941, at *4 (W.D. Ok. July 1, 2016) (citing *Beck v. Reynolds*, 903 P.2d 317, 319 (Okla. 1995) (citing 15 Okla. Stat. § 2)). Consent is mutual if all parties agree on the same thing in the same sense. *Id.* (citing *Beck, supra*; 15 Okla. Stat. § 66.) To achieve mutual consent, there must be an offer by one party and an acceptance of that offer by the other party. *Id.* (citing *Redwine Resources, Inc. v. Predator Technologies, L.L.C.*, 171 P.3d 330, 334 (Okla. Civ. App. 2007)). An acceptance "must be absolute and unqualified," or else it operates as a new proposal or counter-offer. *Id.* (quoting 15 Okla. Stat. § 71.). "In order that an offer and acceptance may result in a binding contract, the acceptance must be absolute, unconditional, and identical with the terms of the offer, and must in every respect meet and correspond with the offer; and any qualification of or departure from those terms invalidates and rejects the offer." *Maddox v. Northern Natural Gas Co.*, 259 F. Spp. 781, 783 (W.D. Ok. 1966) (citing *Hartzell v. Choctaw Lumber Co. of Delaware et al.*, 163 Okl. 240, 22 P.2d 387 (1933) (binding contract requires acceptance to be absolute, unconditional, and identical with terms of offer and must in every respect meet and correspond with offer; any qualification of or departure from those terms invalidates offer); *Nabob Oil Co. v. Bay State Oil and Gas Co.*, 208 Okl. 296, 255 P.2d

513 (1953) (where new proposals are made, the making of which in itself constitutes a rejection of the original offer.)).

In the instant action, Parisi and GreenSky did not agree on the same thing in the same sense. There was no meeting of the minds. If there is no meeting of the minds, there is no contract. *Jacks v. CMH Homes, Inc.*, 856 F.3d at 1304. Parisi and GreenSky were not in agreement on the most essential terms. *South Central Industries v. Kerrtas Marketing, LLC*, 2022 WL1518935, *2 (W.D. Ok. February 7, 2022) ("[A] meeting of the minds [must be] on all essential terms of the contract."). Interest and payment terms are material terms of a contract, to which, in the case of the bait and switch offered by GreenSky, Parisi never agreed. *See Homestead Golf Club, Inc. v. Pride Stables*, 224 F. 3d 1195, 1200 (10th Cir. 2000) (contract unenforceable because "[i]mportant material terms such as the funding date, interest rate, and payment schedule" had not been agreed upon).

Here, GreenSky sent Parisi a new loan offer, which in itself constituted a rejection of the original offer. In fact, as mentioned by Parisi in her communication to GreenSky, GreenSky told her it had removed its original offer. Parisi Dec., ¶44; (Doc. No. 27-13) ("[N]ow I am being told I did NOT qualify for that and you have removed that original offer.")

GreenSky tries an end-run around these basic contract principles. GreenSky admits that Parisi was not bound to its new terms when it sent its loan package by mail and email, but claims Parisi affirmed and accepted the terms in the new loan package by her use of the Shopping Pass. (Doc. No. 18, at p. 9; Doc. No. 42, at p. 6-7; Doc. No. 47, at p. 8). She did not. GreenSky's evidence of Parisi's affirmance and acceptance via use of the

15

Shopping Pass is not really evidence at all.  It is insufficient to meet the standard of evidence that CFPB required GreenSky to obtain and retain, and GreenSky agreed to obtain and retain, in the Consent Order, *i.e.,* a signed written authorization from Parisi, an audio recording of a phone call with Parisi containing her verbal authorization, or any other email or text with Parisi evidencing authorization. Instead, GreenSky submits an internal printout of uncertain origin and date with a line item showing, according to GreenSky, that it disbursed funds to its own merchant. It is questionable whether this can even be considered evidence that GreenSky disbursed funds to a merchant, but it most certainly is not evidence of Parisi's authorization of any such disbursement.

Moreover, GreenSky ignores entirely that Parisi rejected, in writing, that she ever authorized use of the Shopping Pass. Parisi's evidence shows that she did so on the very day GreenSky claims the Shopping Pass was used and on subsequent days thereafter.  *See* I., Background and Disputed Facts, *supra*, at pp. 6-7.  GreenSky further ignores its representative's acknowledgement that her account was "charged because it is part of the loan process," and that there was a payment transaction for $8,871.50 because the "merchant charges a percentage upfront on the loan." *Id*. Only after the funds were disbursed (if GreenSky is to be believed that they were disbursed), the representative asked Parisi, "do you authorize this transaction?" *Id*. Parisi, of course, unequivocally responded that she did not.  *Id*.

This would all be egregious enough, but it is even more so given that GreenSky has already garnered the attention of the CFPB for these very practices, and agreed to cease the very conduct it now relies upon here.  GreenSky was required to refund or cancel up to $9

16

A388

million in loans and pay a $2.5 million civil penalty due to the harm consumers endured with its illegal practices. (Doc. No. 39, at p. 2).

## IV.   SUMMARY TRIAL ON MAKING OF AGREEMENT TO ARBITRATE

Parisi will address at the class certification stage GreenSky's specious contentions in its Reply in Support about Parisi's ability to represent a class, with one exception, addressed here, *i.e*., that Parisi's request for a jury trial on the making of the loan agreement "should preclude her class claims." (Doc. No. 42, at p. 9).  Litigation is best accomplished with all relevant facts and law before the Court at the proper time. GreenSky invites this Court to error requesting it to prematurely determine whether Plaintiff can proffer class wide evidence of common questions for similarly situated customers. *See Francis v. Apex U.S.A.*, 406 F.Supp.3d 1206, 1212-13 (W.D. Ok. 2019)("Rule 23(d)(1)(D) imposes a 'high standard' and a motion to strike class allegations is a 'drastic remedy.'" (citing *Tullie v. Quick Cash, Inc*., No. 14-cv-0491 SMV/SCY, 2014 WL 12782961 at *2 (D. N.M. Dec. 2, 2014) (unpublished op.) (citations omitted)). Thus, "courts in this circuit and elsewhere have ... viewed motions to strike or dismiss class allegations at the pleading stage with particular disfavor" as they "seek to preemptively terminate the class aspects solely on the basis of what is alleged in the complaint, and before the plaintiff has had any meaningful chance to conduct discovery." *Id*. (citing *Hockenbury v. Hanover Ins. Co*., No. CIV-15-1003-D, 2016 WL 552967 at *3 (W.D. Okla. Feb. 10, 2016) (unpublished op.) (citing cases); *cf. Wilson v. Landers McLarty Olathe KS, LLC*, No. 18-2051-JAR-GEB, 2018 WL 5617832, at *7 (D. Kan. Oct. 29, 2018) (unpublished op.) (finding "the better course is to allow discovery to proceed on class certification and consider these issues in the context of

17

a motion to certify the class" rather than dismiss at the pleading stage being "mindful of the court's obligation to conduct a 'rigorous analysis' into whether the prerequisites of Rule 23 are met") (cleaned up); *Wornicki v. Brokerpriceopinion.com, Inc*., No. 13-cv-03258-PAB-KMT, 2015 WL 1403814 at *4 (D. Colo. March 23, 2015) (unpublished op.) (recognizing that courts within district "have held motions to strike class allegations to a high standard of proof").This case is not yet in the proper procedural posture for a determination of whether a class should be certified.

Under the FAA, if the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.  9 U.S.C. § 4.  Parisi, has a right and hereby requests, a jury trial on the making of the agreement if this Court does not simply deny GreenSky's Motion and its Motion to Compel Arbitration and Dismiss as a matter of law.  Given that GreenSky has failed to put forth any evidence that Parisi agreed to its Loan Agreement, this Court can certainly decide that there is no arbitration agreement as a matter of law.

## V.  CONCLUSION

GreenSky has already asserted that venue is proper in this District and Division when it removed this action from State Court.  (Doc. No. 1, ¶6).  Accordingly, with all reasonable inferences and resolving all factual conflicts in Parisi's favor, Parisi has met her burden of proving proper venue because she has submitted evidence that she was never bound to the Loan Agreement containing the arbitration agreement and expressly rejected any authorization of the Shopping Pass upon which GreenSky attempts to rely. Accordingly, for all the reasons above and in Parisi's Opposition to GreenSky's Motion to

A390

Compel Arbitration and Dismiss (Doc. No. 39), GreenSky's instant Motion to Dismiss and

its Motion to Compel Arbitration and Dismiss, should be denied.

Respectfully submitted this 31st day of October, 2023.

**Varnell & Warwick, P.A.**

/s/ Janet R. Varnell
Janet R. Varnell, FBN: 0071072
400 N. Ashley Drive, Suite 1900
Tampa, FL  33602
Telephone: (352) 753-8600
jvarnell@vandwlaw.com

**Rawls Gahlot, PLLC**

/s/ M. Kathi Rawls
M. Kathi Rawls, OBA #18814
Minal Gahlot, OBA # 22145
2404 S. Broadway
Moore, Ok 73160
Phone: 405-912-3225
kathi@rawlsgahlot.com
minal@rawlsgahlot.com

***Attorneys For Plaintiffs***

A391

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 31, 2023, I electronically filed the foregoing with the Clerk of the Court through the CM/ECF System, which will send a notice of electronic filing to all counsel of record.

/s/ Janet R. Varnell
Janet R. Varnell

A392

# EXHIBIT 1

# Declaration of Susan Parisi

## IN THE UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF OKLAHOMA

**SUSAN PARISI,**

                    **Plaintiff,**

**v.**

**OKLAHOMA WINDOWS AND DOORS, LLC d/b/a RENEWAL BY ANDERSON OF OKLAHOMA, and BMO HARRIS BANK, NA d/b/a GREENSKY, LLC,**

                    **Defendant.**

**Case No.: 5:23-cv-00115-R**

## <u>DECLARATION OF SUSAN PARISI</u>

1.     My name is Susan Parisi.  I make this declaration based on my personal knowledge.  I am over the age of 18.

2.     I am a citizen of Oklahoma, County of Oklahoma.

3.     I submit this declaration in support of Plaintiff's Opposition to Defendant BMO Harris Bank, NA d/b/a Greensky, LLC's ("GreenSky") Motion to Dismiss.

4.     After receiving advertisements sometime in late 2021 from Oklahoma Windows offering doors and windows upgrades, I met at my home with its agent, Russell Kelley on or about November 23, 2021.

5.     At that time, we discussed the number of windows I needed and how long it would take to install them.

6.     I informed Mr. Kelley that I had just received a medical diagnosis of multiple myeloma cancer and that I would be starting chemotherapy soon.

A394

7.      He confirmed that Greensky offered a loan to purchase the windows as advertised - a loan requiring zero money down, zero interest and zero payments for twenty-four months following the installation of the windows.

8.      Mr. Kelley stated I would need to sign a credit application so Oklahoma Windows could review my credit worthiness.

9.      Mr. Kelley came to the kitchen counter in my home and placed an iPad device in front of himself as I stood next to him.

10.     Mr. Kelley informed me that the iPad would be used to secure my signature authorizing a credit review, so I agreed to sign it.

11.     There were no disclosures regarding how the electronic signature would be utilized and no consent was given for its use, other than for the credit review.

12.     I was not informed of a right to review or provided with an opportunity to review a paper copy of the document I signed. I was never asked to provide consent to conduct transactions by electronic means or told that I had the right to withdraw such consent if I had given it.

13.     I was not informed that my signature could be used to agree to the terms of a loan without any further review and I was never informed that my signature could be used on anything other than the credit check and the loan application.

14.     Mr. Kelley seemed like a nice honest man so I had no reason to distrust what he told me.

15.     I signed Mr. Kelley's iPad one time on one signature line.

16.     After I signed it, however, Mr. Kelley then "swiped" the iPad in an upward motion and stated, "he needed some additional signatures to secure the zero interest for two years and no payments for two years" loan program.

17.     When he presented each of the subsequent locations for my signatures on additional screens, I was not able to see what I was signing; the only thing visible on the iPad screen other than a signature line was a box I needed to "check" that permitted my original electronic signature to be affixed on the signature line.

18.     I believe I checked a box to affix my signature approximately twelve (12) times.

19.     I was never presented a hard copy of any contract, or contract terms to review prior to my checking the various "check" boxes appearing on the iPad screen.

20.     I was never told I was agreeing to arbitrate any claims or was waiving any rights. Mr. Kelley never explained that a material term of Oklahoma Window's loan was a restriction on my right to access the court should we have a dispute.

21.     I only ever intended to apply for a loan requiring zero money down, zero interest for 24 months, and zero payments for 24 months after my windows were installed.

22.     Mr. Kelly immediately took the iPad, made a call to someone on his cell phone, and placed that person on speakerphone.

23.     The person on the speakerphone was a woman who identified herself as a representative of Greensky, proceeded to inquire about my personal identification

3

information, and then informed me that she would be calling me back to let me know if I was approved.

24.     After the call was completed, Mr. Kelley went around the exterior of my home with me, indicating which windows could be installed first, and which could wait until later.

25.     Less than 30 minutes later, Mr. Kelley's cell phone rang and it was the Greensky representative, so he placed her on speakerphone again.

26.     Greensky's telephone representative said, "Congratulations!  You have been approved for the 2-year loan program with Greensky!"

27.     After he hung up, Mr. Kelley stated that another team from Oklahoma Windows would be coming to my home to measure the windows again to confirm his measurements.

28.     I was not given any opportunity to read the contract after learning I was approved.

29.     As he began to leave for his automobile, Mr. Kelley stated that he would mail me a copy of the loan contract.

30.     I never received a copy of the contract from Mr. Kelley in the mail.

31.     Unknown to me, Mr. Kelley had emailed a copy of a contract between Oklahoma Windows and myself that went to my "spam" or "junk" folder in my yahoo email account.

32.     I discovered this fact on or about August 14, 2023, when my attorney asked me to review my yahoo email account.

33.     The contract attached to Mr. Kelley's email shows Loan Plan 3541 with a 24-month promotional period and interest waived if the balance is paid off before the promotional period ends.  A true and accurate copy of the Loan Plan 3541 I discovered in my spam email folder is attached hereto as Exhibit 1.

34.     Several of my electronic signatures were affixed without my authorization to pages which I had never seen previously, and which Mr. Kelly never described.

35.     Most of the electronic signatures are the same and show that my "checked" box filled in the electronic signatures on contract pages.

36.     Two of the signatures within the contract are not my electronic signature; I believe those signatures were forged by someone other than myself.

37.     The first forged signature is located on Page 5 of the document emailed to me by Mr. Kelley, identified as the "Greensky Financing Form".

38.     The second forged signature is located on Page 6 of the document emailed to me by Mr. Kelley; identified as the "HOA authorization & Contact Form"

39.     Within a few days of our initial meeting, Mr. Kelley then called me and told me that he didn't know what happened, and that it had never happened before, but that I didn't qualify for the 2 year no interest, no payment loan.

40.     Thereafter, on or around November 26, 2021 to November 29, 2021, I received a letter from GreenSky stating that GreenSky sent a payment for $8,871.50 directly to Oklahoma Windows.

41.    On or around November 29, 2021, I emailed GreenSky at
service@greensky.com to tell them that I had never been notified about this
payment of $8,871.50 being made and that I had not authorized it. I explained that
I applied for a two year "nothing down, no interest, no payments" loan and was
promised nothing would be due until two years after windows were installed at my
home. A true and correct copy of my email is attached hereto as Exhibit 2.

42.    Within a few days, Greensky mailed me a contract which was the first I
had seen of any contract.

43.    Greensky's Contract stated that it was for a loan called Plan 7541, and
stated in capital letters that it was a different plan than I had requested, which
required 84 monthly payments that began as soon as the windows were installed but
no later than within six months.

44.    I refused to sign the Greensky contract and objected to any release of
funds to Oklahoma Windows.  My emails objecting to any release of funds and
GreenSky's responses are attached hereto as Composite Exhibit 3.

45.    I never used or authorized use of the GreenSky Shopping Pass and
specifically and expressly told GreenSky that I did not authorize its use.

46.    To date, no windows have been installed at my home, but GreenSky
continued to bill me for payments and late fees until I filed this lawsuit.

47.    GreenSky ignored my requests for a copy of a signed contract and failed
to conduct a written investigation.  GreenSky inexplicably closed my complaint
after stating that I failed to "participate" in the investigation.

A399

FURTHER DECLARENT SAY NOT.

.

Susan Parisi

A400

# EXHIBIT 1

A401



Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 I Oklahoma City, OK 73149
Phone: 405-608-5000 I Fax: 405-562-7880 I oksales@renewaloklahoma.com



# Thank you for your order

Please find, enclosed for your convenience, the contents of your agreement with Oklahoma Windows and Doors LLC d/b/a Renewal by Andersen of Oklahoma

*Table of Contents*

Agreement Document and Payment Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Itemized Order Receipt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Notice of Cancellation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

Greensky Form Oct 2021.pdf . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

Terms and Conditions of Sale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

Sales Cost Savings Program (SCSP) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Lead-Safe Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

What to Expect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Disclosure Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Limited Warranty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Lead Safe Work Practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Release Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

Price Presentation Discounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

A402

# Agreement Document and Payment Terms



**dba: Renewal by Andersen of Oklahoma**

Legal Name: Oklahoma Windows and Doors LLC

9201 Polaris Drive Suite 200 | Oklahoma City, OK 73149

Phone: 405-608-5000 | Fax: 405-562-7880 | oksales@renewaloklahoma.com

**Susan Parisi**

---

**Susan Parisi**

Buyer(s) Name

**11/23/21**

Contract Date

Buyer(s) Street Address

Primary Telephone Number

Secondary Telephone Number

**sparisi21@yahoo.com**

Primary Email

Secondary Email

Buyer(s) hereby jointly and severally agrees to purchase the products and/or services of Oklahoma Windows and Doors LLC d/b/a Renewal by Andersen of Oklahoma("Contractor"), in accordance with the terms and conditions described in this Agreement Document and Payment Terms, any documents listed in the Table of Contents, and any other document attached to this Agreement Document, the terms of which are all agreed to by the parties and incorporated herein by reference (collectively, this "Agreement"). Buyer(s) hereby agrees to sign a completion certificate after Contractor has completed all work under this Agreement.

| | | |
|---|---|---|
| Total Job Amount: | **$17,743** | By signing this Agreement, you acknowledge that the Balance Due, and the Amount Financed must be made by personal check, bank check, credit card, or cash. |
| Deposit Received: | **$0** | |
| Balance Due: | **$17,743** | Estimated Start: Estimated Completion: |
| Amount Financed: | **$17,743** | **3-5 months** **1-2 days** |
| Method of Payment: | **Financing** | We schedule installations based on the date of the signed contract and secondarily on the date in which we complete the technical measurements. The installation date that we are providing at this time is only an estimate. We will communicate an official date and time at a later date. Rain and extreme weather are the most common causes for delay. |

Notes: **Dates are subject to change due to back orders**

Buyer(s) agrees and understands that this Agreement constitutes the entire understandings between the parties and that there are no verbal understandings changing or modifying any of the terms of this Agreement. No alterations to or deviations from this Agreement will be valid without the signed, written consent of both the Buyer(s) and Contractor. Buyer(s) hereby acknowledges that Buyer(s) 1) has read this Agreement, understands the terms of this Agreement, and has received a completed, signed, and dated copy of this Agreement, including the two attached Notices of Cancellation, on the date first written above and 2) was orally informed of Buyer's right to cancel this Agreement.

NOTICE TO BUYER: Do not sign this contract if blank. You are entitled to a copy of the contract at the time you sign.

**YOU, THE BUYER, MAY CANCEL THIS TRANSACTION AT ANY TIME NOT LATER THAN MIDNIGHT OF 11/26/2021 OR THE THIRD BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION, WHICHEVER DATE IS LATER. SEE THE ATTACHED NOTICE OF CANCELLATION FORM FOR AN EXPLANATION OF THIS RIGHT.**

Signature of Sales Person

Signature

Signature

**Russell Kelley**

**Susan Parisi**

Print Name of Sales Person

Print Name

Print Name

# Itemized Order Receipt



**dba: Renewal by Andersen of Oklahoma**
Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 l Oklahoma City, OK 73149
Phone: 405-608-5000 l Fax: 405-562-7880 l oksales@renewaloklahoma.com

**Susan Parisi**



| ID#: | ROOM: | SIZE: | DETAILS: |
|---|---|---|---|
| | | 0 W 0 H | **Misc:** Misc, Processing Fee, <Enter Description Here> |
| **107** | dining | 95 W 30 H | **Window:** Gliding, Triple, 1:1:1, Base Frame, Exterior Dark Bronze, Interior Dark Bronze, **Glass:** All Sash: High Performance SmartSun Glass, No Pattern, **Hardware:** Dark Bronze, **Screen:** Fiberglass, Full Screen, **Grille Style:** No Grille, **Misc:** None |
| **108** | dining upper | 95 W 64 H | **Window:** Picture, Insert Frame, Exterior Dark Bronze, Interior Dark Bronze, **Glass:** All Sash: High Performance SmartSun Glass, No Pattern, Tempered Glass, **Grille Style:** No Grille, **Misc:** None |
| **109** | office lower | 59 W 30 H | **Window:** Gliding, Double, 1:1, Active / Passive, Base Frame, Exterior Dark Bronze, Interior Dark Bronze, **Glass:** All Sash: High Performance SmartSun Glass, No Pattern, **Hardware:** Dark Bronze, **Screen:** Fiberglass, Full Screen, **Grille Style:** No Grille, **Misc:** None |
| **110** | office upper | 59 W 40 H 30 L | **Specialty:** Equal Leg Arch, Base Frame, Exterior Dark Bronze, Interior Dark Bronze, **Glass:** All Sash: High Performance SmartSun Glass, No Pattern, **Grille Style:** No Grille, **Misc:** None |
| **111** | guest room | 35 W 59 H | **Window:** Gliding, Double, 1:1, Active / Passive, Base Frame, Exterior Dark Bronze, Interior Dark Bronze, **Glass:** All Sash: High Performance SmartSun Glass, No Pattern, **Hardware:** Dark Bronze, **Screen:** Fiberglass, Full Screen, **Grille Style:** No Grille, **Misc:** None |

**WINDOWS: 4    PATIO DOORS: 0    SPECIALTY: 1    MISC: 1**                    TOTAL  **$17,743**



*Renewal by Andersen is committed to our customers' safety by complying with the rules and lead-safe work practices specified by the EPA.*

A404

 

# Notice of Cancellation

**dba: Renewal by Andersen of Oklahoma**
Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 | Oklahoma City, OK 73149
Phone: 405-608-5000 | Fax: 405-562-7880 | oksales@renewaloklahoma.com

**Susan Parisi**
[redacted]

**You, the buyer(s) may cancel this transaction at any time prior to midnight on 11/26/2021 or the third business day after the date of this transaction, whichever date is later.**

**NOTICE OF CANCELLATION**

**Date of Transaction: 11/23/21. You may cancel this transaction, without any penalty or obligation, before midnight on 11/26/2021 or the third business day after the date of this transaction, whichever date is later. If you cancel, any property traded in, any payments made by you under the Contract or Sale, and any negotiable instrument executed by you will be returned within 10 business days following receipt by the Seller of your cancellation notice, and any security interest arising out of the transaction will be canceled. If you cancel, you must make available to the Seller at your residence, in substantially as good condition as when received, any goods delivered to you under this Contract or Sale; or you may, if you wish, comply with the instructions of the Seller regarding the return shipment of the goods at the Sellers expense and risk. If you do make the goods available to the Seller and the Seller does not pick them up within 20 days of the date of your Notice of Cancellation, you may retain or dispose of the goods without any further obligation. If you fail to make the goods available to the Seller, or if you agree to return the goods to the Seller and fail to do so, then you remain liable for performance of all obligations under the Contract. To cancel this transaction, mail or deliver a signed and dated copy of this cancellation notice or any other written notice, or send a telegram, to:**

**dba: Renewal by Andersen of Oklahoma**

**Legal Name: Oklahoma Windows and Doors LLC**

**9201 Polaris Drive Suite 200**

**Oklahoma City, OK 73149**

**Phone: 405-608-5000**

**Fax: 405-562-7880**

**Email: oksales@renewaloklahoma.com**

**NOT LATER THAN MIDNIGHT OF 11/26/2021 OR THE THIRD BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION, WHICHEVER DATE IS LATER.**

**I HEREBY CANCEL THIS TRANSACTION**

____________________ __________
Buyer Signature Date

**NOTICE OF CANCELLATION**

**Date of Transaction: 11/23/21. You may cancel this transaction, without any penalty or obligation, before midnight on 11/26/2021 or the third business day after the date of this transaction, whichever date is later. If you cancel, any property traded in, any payments made by you under the Contract or Sale, and any negotiable instrument executed by you will be returned within 10 business days following receipt by the Seller of your cancellation notice, and any security interest arising out of the transaction will be canceled. If you cancel, you must make available to the Seller at your residence, in substantially as good condition as when received, any goods delivered to you under this Contract or Sale; or you may, if you wish, comply with the instructions of the Seller regarding the return shipment of the goods at the Sellers expense and risk. If you do make the goods available to the Seller and the Seller does not pick them up within 20 days of the date of your Notice of Cancellation, you may retain or dispose of the goods without any further obligation. If you fail to make the goods available to the Seller, or if you agree to return the goods to the Seller and fail to do so, then you remain liable for performance of all obligations under the Contract. To cancel this transaction, mail or deliver a signed and dated copy of this cancellation notice or any other written notice, or send a telegram, to:**

**dba: Renewal by Andersen of Oklahoma**

**Legal Name: Oklahoma Windows and Doors LLC**

**9201 Polaris Drive Suite 200**

**Oklahoma City, OK 73149**

**Phone: 405-608-5000**

**Fax: 405-562-7880**

**Email: oksales@renewaloklahoma.com**

**NOT LATER THAN MIDNIGHT OF 11/26/2021 OR THE THIRD BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION, WHICHEVER DATE IS LATER.**

**I HEREBY CANCEL THIS TRANSACTION**

____________________ __________
Buyer Signature Date

# GreenSky Financing Form

SOLD TO: Susan Parisi                                      DATE: 11/23/2021

CARD HOLDER'S NAME: Susan Parisi                APPLICATION ID ██████████

Job Address: ████████████████████         LAST 4 SSN: ████

PO Box _____

PLAN #: 3541 - 24 month promotional period. Interest waived if balance paid off before promotional period ends.

Simply visit myloan.greenskycredit.com, enter your Application ID and Access number to download loan agreements.

1. Total Project Amount        $ 17,743

2. Deposit (if applicable)     $ 0

3. Total Greensky Finance Amount   $ 17,743.00

4. Greensky financed at order (50%)   $ 8,871.50

5. Greensky financed at completion (50%)   $ 8,871.50

**Name as it appears on card:** Susan Parisi

RbA Rep. Signature: _____   Date: 11/23/2021

Customer Signature: _____   Date: 11/23/2021

A406



**Renewal by Andersen**
WINDOW REPLACEMENT   an Andersen Company

# HOA Authorization & Contact Form

Homeowner Name: Susan Parisi

Project Consultant: Russell Kelley

Measure Date: 11/23/21

# of units: 5

**IS THIS PROJECT LIKE FOR LIKE**
YES: ✔   NO: ☐

**PROCEED WITH ORDER**
YES: ✔   NO: ☐

---

**Check only one and sign please**

✔ NO HOA EXISTS for my project. Please proceed with placing my order.

Homeowner Signature: _Susan Parisi_                      Date: _____

---

If project is LIKE FOR LIKE we recommend the following:

☐ I WILL OBTAIN MY OWN HOA APPROVAL. I accept all responsibility for my order. Please proceed with placing my order.

Homeowner Signature: _____         Date: _____

---

☐ Authorization Release for HOA Assistance:   I the undersigned, hereby authorize Renewal by Andersen to act on my behalf in all manners relating to HOA REQUESTS, including signing documents relating to these matters. Any and all acts carried out by Renewal by Andersen on my behalf shall have the same effect as acts of my own. This authorization is valid until further notice. WHEN OPTING FOR ASSISTANCE, PROVIDE CURRENT CONTACT INFORMATION:
You may be contacted if your HOA is one that will not work with us, or has special requirements that are not within our means.

➤ Sub Division HOA (complete name ): _____

➤ Property Management Co:_____

➤ Contact Name (Manager):_____

➤ Telephone:_____

➤ HOA Management Co. Manager's E-mail:_____

**Home Owners Responsibility:** Renewal by Andersen will submit your request; notify RbA when you hear from your HOA with the decision. Your replacements will be ordered at this time. *(Note: Some HOA's will only communicate with the Home Owner.)*

---

Partial Replacement ☐        Entire Home Replacement ☐

**Reps to initial:** *Color same:* ☐   *Style same:* ☐   *Grid pattern same:* ☐

Notes to HOA for changes needed.

Please explain all changes not like for like. Please provide a brief description for each side of the home (front, back, left, right). Description for each side of the home to include if L4L, if not L4L what unit # is changing.

Homeowners Signature: _Susan Parisi_                      Date: 11/23/21

A407



# Terms and Conditions of Sale

**dba: Renewal by Andersen of Oklahoma**
Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 l Oklahoma City, OK 73149
Phone: 405-608-5000 l Fax: 405-562-7880 l oksales@renewaloklahoma.com

**Susan Parisi**

"I," "my," and "me" means each person who signs this Agreement as a Buyer. "Contractor" means Oklahoma Windows and Doors, LLC d/ b/a Renewal by Andersen of Oklahoma. "We" and "'us" mean both the Buyer, or Buyers if more than one, and the Contractor. Oklahoma Windows and Doors, LLC, LLC d/b/a Renewal by Andersen of Oklahoma is an authorized and independent dealer of Renewal by Andersen LLC ("RbA") products. You are entering into a contract with Oklahoma Windows and Doors, LLC,  d/b/a Renewal by Andersen of Oklahoma.

Warranties/Intended Use: I understand that in connection with my purchase, RbA is providing me with a written Limited Warranty  a copy of which has been furnished to me or is available to me online at www.renewalbyandersen.com and is incorporated by reference. Contractor is providing me with an Extended Limited Lifetime Labor Warranty. I understand that I should carefully read RbA's Limited Warranty and the Contractor's Extended Limited Lifetime Labor Warranty for complete details of my warranty coverages. I understand that neither warranty will be effective or enforced while a balance due remains on this Agreement.

Contractor's Promises: Contractor promises to perform all work in a professional manner and within industry standards. Contractor will remove and transport away from the premises any debris and waste materials that are generated by Contractor. Contractor will obtain all building permits for the work to be performed under this Agreement. Contractor will maintain worker's compensation insurance and liability insurance during the term of this Agreement in amounts not less than those required by applicable law.

My Promises: I  promise to Contractor that (a) I will provide Contractor with reasonable access to my property and the area in which the work is to be performed, including access to electrical outlets; (b) I will be responsible for preparation, moving, and reinstalling of any materials, personal property, motor vehicles, or equipment as may be needed for Contractor to perform its work; (c) the walls and surfaces near and upon which the work is to be performed are sound and suitable for the work being performed; (d) when the work is substantially complete, I will pay Contractor the balance due on the Total Job Amount. I understand that "substantially complete" means the work has been materially finished and is functional as intended; (e) in the event that I disagree with Contractor that the work is substantially complete, I agree that I will not withhold more than 10% of the Agreement price; (f) if taxes and/ or permitting fees are necessary to complete the work, I will pay them unless the law requires Contractor to pay them; and (g) Contractor may place an advertising sign of reasonable size in my yard during the installation.

Deposit, Second and Final Payments:  Unless otherwise specified in this Agreement, a Deposit of 33%  of the Total Job Amount identified on front of this Agreement is required to be made by you upon your acceptance of this Agreement. The second payment is due at the start of installation and final payment is due at the substantial completion of the installation. The checks are made payable to Renewal by Andersen of Oklahoma. You may hand the check to the installer who will then bring the check into the office. If you have financed your project, the instructions provided by the finance institution must be followed.   All amounts quoted, exclude all present and future federal, state and local excise, sales/use, privilege, personal property, gross receipts, and similar taxes and charges payable with respect to the products and services under this Agreement.

Measurements: I understand that all dimensions referred to in this Agreement are considered estimated measurements and used only for the purpose of arriving at the Total Job Amount in this Agreement. I understand that the actual measurements will be determined during a follow up visit by a qualified measurement technician employed by Contractor. I understand that if Contractor must make changes to the estimated measurements, I agree to sign an addendum to this Agreement.

_____     _____     _____
Signature of Sales Person                          Signature                                            Signature
**Russell Kelley**                                        **Susan Parisi**

_____     _____     _____
Print Name of Sales Person                        Print Name                                          Print Name



# Terms and Conditions of Sale

dba: Renewal by Andersen of Oklahoma

Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 l Oklahoma City, OK 73149
Phone: 405-608-5000 l Fax: 405-562-7880 l oksales@renewalokoklahoma.com

**Susan Parisi**

Late Cancellation: I understand that I have three business days to cancel this Agreement, as described in the Notice of Cancellation. I understand that if I want to cancel this Agreement after those three business days, Contractor does not have to allow me to do so. I understand that if Contractor does permit me cancel after those three business days, however, I will have to pay to Contractor a late cancellation fee equal to 25% of the Total Job Amount to compensate Contractor for its labor, administrative, and material costs.

Delay/Unknown Conditions: I understand that if Contractor determines that it cannot perform the work according to Contractor's normal professional standards, then Contractor can cancel this Agreement, notify me in writing of the cancellation, and return to me all deposits I have paid. I understand that some of the things that could cause Contractor to cancel this Agreement would be incorrect pricing, unforeseen structural defects, or unknown pre-existing conditions to my property. I understand that Contractor is not responsible for structural or other defects in my home , and that Contractor's products do not cure those types of problems. I also understand that the work could be delayed by events that Contractor does not control, and that is acceptable to me. Some of the things that could cause the work to be delayed would be acts of God, pandemics, labor strikes, inclement weather, material shortages, my inability to qualify for or obtain financing, delays by local government authorities in issuing or otherwise approving inspections, permitting, or other required authorizations for the work.  In  no event will Contractor be liable for any damage, consequential or otherwise, arising from  delayed performance.

Late Payment/Default: I agree that if I do not pay Contractor all or any portion of the money owed when it is due, I will pay a late fee of 1.5% of the amount owed for each month the money is owed and not paid. I also agree that if I default on my promises under this Agreement, and Contractor hires an attorney to enforce this Agreement, to the extent permitted by law, I will pay Contractor its reasonable legal fees and related costs or expenses. I agree and understand that in the event that I do not pay Contractor all or any portion of the money owed when it is due, Contractor may have a claim against me, which may be enforced against my home in accordance with the applicable lien laws. I also understand that if I finance the work with Contractor or a third party, my separately provided financing documents may include a security interest in my home. I understand that I should read those documents closely.

Informal Dispute Resolution and Mediation: Before submitting a claim to mediation and arbitration as described below, the Buyer agrees to present the Contractor with written notice of any construction defects and allow the Contractor within thirty (30) days (1) to inspect any construction defects and (2) present to the Buyer a written response which may include Contractor's offer to repair defects or to compensate Buyer for such defects. Before submitting a claim to mediation and arbitration as described below, the Contractor agrees to present the Buyer with written notice regarding any payment disputes and similarly allow the Buyer to respond in writing within thirty (30) days.

If that process does not resolve the dispute, the complaining party must submit all claims to mediation within 10 days following notice of the claim to the other party. The mediation shall take place at offices of the American Arbitration Association (AAA) in the state where the work is to be performed; if there is no such office, the mediation will take place at a location designated by the mediator within the state where the work is to be performed.  Each party will identify a person with decision-making authority who shall attend the mediation. The mediation will be nonbinding and conducted by the AAA in accordance with its then-current Construction Industry Mediation Procedures. The parties shall equally share the cost of the mediation. The parties agree that any action or claim or request for an injunction shall not be subject to mediation.

Arbitration: Buyer and Contractor agree that any dispute between them, or any of their respective affiliates, officers, directors, employees, agents or owners arising under or in connection with this Agreement, or the products and services to be provided by Contractor, that has been not resolved through mediation, will be determined by binding arbitration administered by the AAA pursuant to its then-current

| | | |
|---|---|---|
| _(signature)_ | _Susan Parisi_ | |
| Signature of Sales Person | Signature | Signature |
| **Russell Kelley** | **Susan Parisi** | |
| Print Name of Sales Person | Print Name | Print Name |

A409

# Terms and Conditions of Sale

**dba: Renewal by Andersen of Oklahoma**
Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 l Oklahoma City, OK 73149
Phone: 405-608-5000 l Fax: 405-562-7880 l oksales@renewaloklahoma.com

**Susan Parisi**



Construction Industry Fast Track Procedures. The arbitration shall take place at offices of the AAA in the state where the work is to be performed; if there is no such office, the arbitration will take place at a location designated by the arbitrator within the state where the work is to be performed. The arbitration shall be heard by one (1) arbitrator who has at least ten (10) years of experience in the construction industry. The arbitrator must follow the law of the state where the work is being performed and not disregard the terms of this Agreement.

The arbitration must be conducted on an individual basis. Neither of the parties nor the arbitrator will have any authority or power to proceed with any claim as a class action or otherwise to join or consolidate any claim with any other claims or any other proceeding involving third parties. In the event a court determines that this limitation on joinder or class action claims is unenforceable, then this entire commitment to arbitrate will become null and void and the parties must submit all claims to the jurisdiction of the courts. The parties agree that any action or claim or request for an injunction shall not be subject to arbitration.

A judgment may be entered upon the arbitration award by any state or federal court in the state where the Buyer resides. The decision of the arbitrator will be final and binding on all parties to the dispute. However, the arbitrator may not under any circumstances stay the effectiveness of any award, assess punitive, multiple or exemplary damages, or make any award which extends, modifies or suspends any lawful term of this Agreement.

Interpretation of this Agreement: I agree that this Agreement will be interpreted and enforced under the laws of the state where the work is to be performed. If any part of this Agreement is determined to be invalid or illegal, then I agree that the rest of this Agreement will still be valid and enforceable. We both understand that this Agreement and any attachments hereto, make up the entire understanding between us about the work of Contractor. There are no oral or other written agreements, promises, statements, or representations on which either of us is relying. We both agree that any change to this Agreement must be in writing and signed by both of us. The paragraph headings contained in this Agreement are for convenience only and will not affect the meaning or interpretation of this Agreement.

Condensation and Environmental Conditions: Condensation, which can form on or within walls, siding, tiles, or other surfaces results from pre-existing conditions in a home and internal or external temperatures. Reducing the humidity in a home will often remedy any condensation problems. I agree that Contractor is not responsible for condensation or existing or developing spore or mold growth, which can be the result of condensation.

By signing below, Buyer and Contractor hereby agree to the Terms and Conditions of Sale of this Agreement.

| | | |
|---|---|---|
| _____ | _Susan Parisi_ | _____ |
| Signature of Sales Person | Signature | Signature |
| **Russell Kelley** | **Susan Parisi** | |
| Print Name of Sales Person | Print Name | Print Name |

A410

# Sales Cost Savings Program (SCSP)

**dba: Renewal by Andersen of Oklahoma**

Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 l Oklahoma City, OK 73149
Phone: 405-608-5000 l Fax: 405-562-7880 l oksales@renewaloklahoma.com

**Susan Parisi**



To: All Sales Personnel

Date: 1/1/2020

From: Matthew Esler, Manager, Renewal by Andersen of Oklahoma

Re: Sales Cost Savings Program (SCSP)


At Renewal by Andersen of Oklahoma, we are always looking for ways to increase value, and we've found a way to lower costs to our customers. The majority of customers that we see love Renewal by Andersen products and are comfortable enough to award us the project on the initial visit. For a variety of reasons, some customers feel they need time to think it over for a day or two before placing the order. This requires a second visit.


We are happy to visit our customers as many times at it takes to earn their business.


However, when the consumer makes a buying decision on the first visit, the sales cost of additional visits is saved and we are happy to pass that savings on to our customers.


Please keep in mind, the savings are only realized during the initial visit.


Best Regards,
Matthew Esler


Manager
Renewal by Andersen of Oklahoma

| | | |
|---|---|---|
| Signature of Sales Person | Signature | Signature |
| **Russell Kelley** | **Susan Parisi** | |
| Print Name of Sales Person | Print Name | Print Name |

A411



**Lead-Safe Form**

**dba: Renewal by Andersen of Oklahoma**

Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 | Oklahoma City, OK 73149
Phone: 405-608-5000 | Fax: 405-562-7880 | oksales@renewaloklahoma.com

**Susan Parisi**

Lead Safe Work Pamphlet Receipt and Lead Testing Permission Form

Pamphlet Receipt

I have received a copy of the EPA The Lead Safe Certified Guide to Renovate Right informing me of the potential risks of lead hazard exposure from renovation activity to be performed in my home.  I received this pamphlet before the work began.

Permission to Test

I confirm that if my home was built before 1978, I understand and give permission to have my home tested for lead paint at time the Installation Manager comes to my home to take final measurements.  I understand that the if the test does show the presence of lead paint, the firm performing the renovation will be required to use the lead-safe work practices required by EPA's Lead-Based Paint Renovation, Repair, and Painting Rule.  I also understand that there is no added charge to me for using these lead safe work practices.

By signing below, Buyer and Contractor hereby agree to the terms and conditions above.

| | | |
|---|---|---|
| _Russell Kelley (signature)_ | _Susan Parisi (signature)_ | |
| Signature of Sales Person | Signature | Signature |
| **Russell Kelley** | **Susan Parisi** | |
| Print Name of Sales Person | Print Name | Print Name |

A412



## What to Expect

**dba: Renewal by Andersen of Oklahoma**

Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 l Oklahoma City, OK 73149
Phone: 405-608-5000 l Fax: 405-562-7880 l oksales@renewaloklahoma.com

**Susan Parisi**

### OPENING YOUR HOME FOR SITE INSPECTION
You are required to be present during your Site Inspection in order to open your home and review your contract specifications the Installation Manager we assign to the project. The Installation Manager will measure the opening for each purchased unit and determine the amount of time required for your installation.

### PRE-INSTALLATION
Once your window and/or door units have a scheduled arrival date from the RbA manufacturing facility, we will confirm the tentative installation date with you. Please keep in mind that this installation date may need to change. Variables, such as rain and extreme weather are the most common reasons for a change in installation date. We appreciate your understanding and flexibility in advance. We will give you a reminder call or text message one day prior to the scheduled installation date.

### INSTALLATION DAY
The installation crew will arrive at your home after picking up all the required installation materials from our warehouse. Due to variables in travel distance and possible morning traffic, arrival times will vary, but typically the crew will arrive between 8am and10am unless you are scheduled for an afternoon installation. At the end of the project the lead installer will perform a final walk-through and issue any applicable final documentation.

### POSSIBLE GLASS LOSS
Buyer has been made aware of the possible glass loss that is inherent with the installation of replacement windows.

### PAINTING AND STAINING
Any painting, staining, or wallpapering which may be needed is not included in this agreement unless specifically noted.

### FURNITURE AND DECORATIONS
We ask that you remove any furniture that may block access to the windows or door openings. We ask that you remove the pictures from the walls being worked on and any decorations that are in the work area before work begins. This will greatly reduce the likelihood of any accidental damage to personal property.

### WINDOW COVERINGS
Please remove all blinds, shades or shutters before we arrive. We also assume no liability for any new blinds or shutters; that includes fit, measuring and installation. All of these processes should be handled by a professional window treatment company.

### AIR CONDITIONING UNITS
Buyer is responsible for the removal and re-installation of any AC units and brackets.

### ALARM SYSTEMS
Buyer is responsible for the removal and reinstallation of existing alarm systems. PLEASE CONTACT YOUR ALARM SYSTEM PROVIDER FOR DETAILS.

| Signature of Sales Person | Signature | Signature |
|---|---|---|
| **Russell Kelley** | **Susan Parisi** | |
| Print Name of Sales Person | Print Name | Print Name |

A413



**What to Expect**

**dba: Renewal by Andersen of Oklahoma**

Legal Name: Oklahoma Windows and Doors LLC

9201 Polaris Drive Suite 200 I Oklahoma City, OK 73149

Phone: 405-608-5000 I Fax: 405-562-7880 I oksales@renewaloklahoma.com

**Susan Parisi**

PETS

Because not all pets react favorably to the excitement of the construction process, we ask that you keep all of your pets confined during the time we are working on your home.  This should keep them from becoming stressed, accidentally escaping or possible injury.

WHAT IS INCLUDED

Contractor will insulate, caulk and seal the windows we install with our 3-point system to prevent water and air infiltration.

Contractor will clean up all job debris including the old windows and vacuum on a nightly basis.

The RbA Limited Warranty and the Extended Limited Lifetime Labor Warranty will be in effect upon completion of the project and payment in full.

Building Permit: The fee for any and all required building permits is to be paid by the customer to Contractor). Contractor will secure any and all required building permits. After installation is complete, you are required close out the building permit with the issuing municipality.

| | | |
|---|---|---|
| Signature of Sales Person | Signature | Signature |
| **Russell Kelley** | **Susan Parisi** | |
| Print Name of Sales Person | Print Name | Print Name |

A414



## Disclosure Statement

dba: Renewal by Andersen of Oklahoma

Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 l Oklahoma City, OK 73149
Phone: 405-608-5000 l Fax: 405-562-7880 l oksales@renewaloklahoma.com

**Susan Parisi**

KNOW YOUR RIGHTS AND RESPONSIBILITIES UNDER THE LAW. You are about to enter into a transaction to build a new home or remodel existing property. State law requires your contractor to provide you with this brief overview of some of your rights, responsibilities, and risks in this transaction.

CONVEYANCE TO CONTRACTOR PROHIBITED. Your contractor may not require you to convey your real property to your contractor as a condition to the agreement for the construction of improvements on your property.

KNOW YOUR CONTRACTOR. Before you enter into your agreement for the construction of improvements to your real property, make sure that you have investigated your contractor. Obtain and verify references from other people who have used the contractor for the type and size of construction project on your property.

GET IT IN WRITING. Make sure that you have a written agreement with your contractor that includes: (1) a description of the work the contractor is to preform; (2) the required or estimated time for completion of the work; (3) the cost of the work or how the cost will be determined; and (4) the procedure and method of payment, including provisions for statutory retainage and conditions for final payment. If your contractor made a promise, warranty, or representation to you concerning the work the contractor is to perform, make sure that promise, warranty, or representation is specified in the written agreement. An oral promise that is not included in the agreement may not be enforceable under state law.

READ BEFORE YOU SIGN. Do not sign any document before you have read and understood it. NEVER SIGN A DOCUMENT THAT INCLUDEDS AN UNTRUE STATEMENT. Take your time in reviewing documents. If you borrow money from a lender to pay for the improvements, you are entitled to have the loan closing documents furnished to you for review at least one business day before the closing. Do not waive this requirement unless a bona fide emergency or another good cause exists, and make sure you understand the documents before you sign them. If you fail to comply with the terms of the documents, you could lose your property. You are entitled to have your own attorney review any documents. If you have any question about the meaning of a document, consult an attorney.

GET A LIST OF SUBCONTRACTORS AND SUPPLIERS. Before construction commences, your contractor is required to provide you with a list of the subcontractors and suppliers the contractor intends to use on your project. Your contractor is required to supply updated information on any subcontractors and suppliers added after the list was provided.

MONITOR THE WORK. Lenders and governmental authorities may inspect the work in progress from time to time for their own purposes. These inspections are not intended as quality control inspections. Quality control is a matter for you and your contractor. To ensure that your home is being constructed in accordance with your wished and specifications, you should inspect the work yourself or have your own independent inspector review the work in progress.

MONITOR PAYMENTS. If you use a lender, your lender is required to provide you with a periodic statement showing the money disbursed by the lender form the proceeds of your loan. Your contractor is also required to furnish you with a statement at least once each month of money disbursed to subcontractors and suppliers for this project. Review these statements and make sure that the money is being properly disbursed.

CLAIMS BY SUBCONTRACTORS AND SUPPLIERS. Under state law, if a subcontractor or supplier who furnishes labor or materials

| | | |
|---|---|---|
| _(signature)_ | _Susan Parisi_ | |
| Signature of Sales Person | Signature | Signature |
| **Russell Kelley** | **Susan Parisi** | |
| Print Name of Sales Person | Print Name | Print Name |



# Disclosure Statement

**dba: Renewal by Andersen of Oklahoma**

Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 l Oklahoma City, OK 73149
Phone: 405-608-5000 l Fax: 405-562-7880 l oksales@renewaloklahoma.com

**Susan Parisi**

for the construction of improvements on your property is not paid, you may become liable and your property may be subject to a lien for the unpaid amount, even if you have not contracted directly with the subcontractor or supplier. To avoid liability, you should take the following actions:

(1) If you receive a written notice from a subcontractor or supplier, you should withhold payment from your contractor for the amount of the claim stated in the notice until the dispute between your contractor and the subcontractor or supplier is resolved. If your lender is disbursing money directly to your contractor, you should immediately provide a copy of the notice to your lender and instruct the lender to withhold payment in the amount of the claim stated in the notice. If you continue to pay the contractor after receiving the written notice without withholding the amount of the claim, you may be liable and your property may be subject to a lien for the amount you failed to withhold.

(2) During construction and for 30 days after final completion, termination, or abandonment of the contract by the contractor, you should withhold or cause your lender to withhold 10 percent of the amount of payments made for the work performed by your contractor. This is sometimes referred to as "statutory retainage." If you fail to withhold the 10 percent for at least 30 days after final completion, termination, or abandonment of the contract by the contractor and if a valid claim in timely made by a claimant, you may be personally liable and your property may be subject to a lien up to the amount that you failed to withhold.

If the claim is not paid within a certain time period, the claimant is required to file a mechanic's lien affidavit in the real property records in the county where the property is located. A mechanic's lien affidavit is not a lien on your property, but the filing of the affidavit could result in a court imposing lien on your property if the clamant is successful in litigation to enforce the lien claim.

SOME CLAIMS MAY NOT BE VALID. When you receive a written notice of a claim or when a mechanic's lien affidavit is filed on your property, you should know your legal rights and responsibilities regarding the claim. Not all claims are valid. A notice of a claim by a subcontractor or supplier is required to be sent, and the mechanic's lien affidavit is required to be filed, within strict time periods. The notice and the affidavit must contain certain information. All Claimants may not fully comply with the legal requirements to collect on a claim. If you have paid the contractor in full before receiving a notice of a claim and have fully complied with the law regarding statutory retainage, you may not be liable for that claim. Accordingly, you should consult your attorney when you receive a written notice of a claim to determine the true extent of your liability or potential liability for that claim.

OBTAIN A LIEN RELEASE AND A BILLS-PAID AFFIDAVIT. When you receive a notice of a claim, do not release withheld funds without obtaining a signed and notarized release of lien and claim from the claimant. You can also reduce the risk of having a claim filed by a subcontractor or supplier by requiring as a condition of each payment made by you or your lender that your contractor furnish you with an affidavit stating that all bills have been paid. Under state law, on final completion of the work and before final payment, the contractor is required to furnish you with an affidavit stating that all bills have been paid. If the contractor discloses any unpaid bill in the affidavit, you should withhold payment in the amount of the unpaid bill until you receive a waiver of lien or release from that subcontractor or supplier.

OBTAIN TITLE INSURANCE PROTECTION. You may be able to obtain a title insurance policy to insure that the title to your property and the existing improvements on your property are free from liens claimed by subcontractors and suppliers. If your policy is issued before the improvements are completed and covers the value of the improvements to be completed, you should obtain, on the completion of the improvements and as a condition of your final payment, a "completion of improvements" policy endorsement. This endorsement will

| | | |
|---|---|---|
| _____ | _____ | _____ |
| Signature of Sales Person | Signature | Signature |
| **Russell Kelley** | **Susan Parisi** | |
| _____ | _____ | _____ |
| Print Name of Sales Person | Print Name | Print Name |



# Disclosure Statement

**dba: Renewal by Andersen of Oklahoma**

Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 l Oklahoma City, OK 73149
Phone: 405-608-5000 l Fax: 405-562-7880 l oksales@renewaloklahoma.com

**Susan Parisi**

protect your property from liens claimed by subcontractors and suppliers that may arise from the date the original title policy is issued to the date of the endorsement.

| | | |
|---|---|---|
| Signature of Sales Person | Signature | Signature |
| **Russell Kelley** | **Susan Parisi** | |
| Print Name of Sales Person | Print Name | Print Name |

**WINDOW  REPLACEMENT**    an Andersen Company

## Renewal by Andersen® Products and Installation Transferable Limited Warranty

UNITS INSTALLED AFTER MAY 1, 2016

*Your Renewal by Andersen® products are warranted under a fully transferable limited warranty covering parts, labor and original installation services.*

### Transferable Limited Warranty on Glass

The glass in Renewal by Andersen® factory glazed windows (including high-performance Low-E4® glass, high-performance Low-E4® Sun glass, high-performance Low-E4® SmartSun™ glass, high-performance SmartSun glass with HeatLock™ technology, patterned glass [including obscure, fern, reed and cascade designs]), Finelight™ grilles, divided light grilles and tempered versions of these glass options is warranted to be free from defects in manufacturing, materials and workmanship for twenty (20) years from the original installation date. It is also warranted not to develop, under normal conditions, any material change in appearance resulting from manufacturing defects or as a result of premature failure of the glass or organic seal for twenty (20) years from the original installation date. This limited warranty on glass does not apply to special order glazings, art glass, insulated art glass, impact-resistant glass or glass that is not factory installed by Renewal by Andersen.

In the event a glass failure occurs as a result of a defect in manufacturing, materials or workmanship within the limited warranty period, Renewal by Andersen, at its option, will: [1] provide and install the appropriate replacement glass product or [2] provide a factory-authorized repair to the existing glass. Such replacement or repair is warranted for the remainder of the original limited warranty period.

### Transferable Limited Warranty on Fibrex® Material Components

The Fibrex® material components of your Renewal by Andersen windows (including frame, sash, and exterior grilles) are warranted not to flake, rust, blister, peel, crack, pit or corrode and be free from defects in manufacturing, materials and workmanship for a period of twenty (20) years from the original installation date.

In the event a Fibrex material component fails as a result of a defect in manufacturing, materials or workmanship within the limited warranty period, Renewal by Andersen, at its option, will: [1] provide and install the appropriate replacement parts or [2] provide a factory-authorized repair to the existing product. Such replacement or repair is warranted for the remainder of the original limited warranty period.

### Transferable Limited Warranty on Components Other Than Glass

The non-glass portions of your Renewal by Andersen windows (including non-electric operators, locks, lifts, balance systems, hinges, handles, insect screens, weatherstripping, sash and frame members) are warranted to be free from defects in manufacturing, materials and workmanship for a period of ten (10) years from the original installation date.

In the event a component other than glass fails as a result of a defect in manufacturing, materials or workmanship within the limited warranty period, Renewal by Andersen, at its option, will: [1] provide and install the appropriate replacement parts or [2] provide a factory-authorized repair to the existing product. Such replacement or repair is warranted for the remainder of the original limited warranty period.

### Transferable Limited Warranty on Exterior Color Finish

The color finish on the Fibrex® material exterior components (frame, sash, window sills and grilles) on Renewal by Andersen windows is warranted to be free from manufacturing defects resulting in color fade greater than 5 delta-e* measured in accordance with ASTM D2244 for a period of ten (10) years from the original installation date.

What is not covered by this exterior color finish warranty: weatherstripping, accessories and hardware, including insect screen frames, handles, trim sets and lock components, exterior trim profiles and exterior aluminum coil stock.

In the event there is a defect covered by this limited warranty for exterior color finish within the limited warranty period, Renewal by Andersen, at its option, will: [1] refinish the product – labor is included (the finish will be applied with standard commercial refinishing techniques and may not be the same finish as originally applied to the product) or [2] repair or replace the product. Such replacement parts or repairs are warranted for the remainder of the original limited warranty period.

### Transferable Limited Warranty on Installation

Installation of your Renewal by Andersen windows or other Andersen window and/or door products by an authorized Renewal by Andersen contractor is warranted for a period of two (2) years from the date of original installation. During this period, should your Renewal by Andersen window or door fail to perform according to our specifications due to improper original installation, we will bring the workmanship up to our professional standards, at no cost to you.

This limited warranty on installation does not extend to labor/services performed by anyone other than the original authorized installer or other authorized Renewal by Andersen contractor, nor to the installation or repair of any finishing or other materials that have been applied to or adjacent to the product after the initial installation.

### No Other Warranties or Representations

THIS LIMITED WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. ALL WARRANTIES ARE LIMITED TO THE APPLICABLE STATUTE OF LIMITATIONS, BUT IN NO CASE WILL EXTEND BEYOND THE LIMITED WARRANTY PERIODS SPECIFIED ABOVE. RENEWAL BY ANDERSEN EXCLUDES AND WILL NOT BE LIABLE FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES, WHETHER ARISING OUT OF CONTRACT, TORT OR OTHERWISE. THE REMEDY OF REPAIR OR REPLACEMENT OF THE ACTUAL PURCHASE PRICE OF THE PRODUCT PROVIDED BY THIS LIMITED WARRANTY IS THE EXCLUSIVE REMEDY WITH RESPECT TO ANY AND ALL LOSS OR DAMAGE.

### Applicable Law

This Limited Warranty is only applicable in the U.S.A. (i.e. the fifty states and the District of Columbia) and Canada. This Limited Warranty gives you specific legal rights, and you may have other rights which vary from state to state or province. Some states do not allow the exclusion or limitation of incidental or consequential damages or limitation of the duration of an implied warranty, so the above limitations or exclusions may not apply to you. If any specific term of this Limited Warranty is prohibited by any applicable law, it shall be null and void, but the remainder of this Limited Warranty shall remain in full force and effect.

A418

*Technical measurement of color fade.

**What is Not covered by this Limited Warranty**

## Specific Additional Exclusions

In addition to any other limitations or exclusions in this Limited Warranty, Renewal by Andersen shall have no obligation for product failure, damage or costs due to or related to the following:

- Product modifications or glass shading devices (e.g. glass tinting, security systems, improper painting or staining, insulated coverings, etc.)

- Failure due to the application of non Renewal by Andersen hardware (e.g. locksets, trim sets, hinges, panic hardware, closers, etc.)

- Water infiltration other than as a result of a defect in manufacturing, materials or workmanship

- Failure as a result of settling or structural failure of the structure in which the products are installed

- Condensation, other than as a result of a defect in manufacturing, materials or workmanship

- Improper maintenance, such as use of brick wash, razor blades, sealants, sanding or improper washing

- Failing to properly seal and maintain the exposed wood portions and veneer of a product in accordance to Renewal by Andersen painting or staining guidelines

- Fading of furniture, flooring, window coverings or other surrounding materials

- Chemicals or airborne pollutants, such as salt or acid rain

- Accidents

- Acts of God

- Normal wear and tear

Additional items excluded from this limited warranty:

- Products not manufactured by Renewal by Andersen

- Installation services by other than authorized Renewal by Andersen installers

- Removal of Renewal by Andersen windows from the structure in which it was originally installed by anyone other than an authorized Renewal by Andersen installer

- The performance of the low-maintenance exterior glass coating on products with high-performance Low-E4® glass – performance will vary depending on environmental conditions

- Slight glass curvature, minor scratches or other imperfections in the glass that do not impair structural integrity or significantly obscure normal vision

- Rattling of grille bars within an air space

- Insects passing through or around the insect screen

- Tarnish or corrosion to hardware finishes

- Special glazings – contact us concerning the limited warranty on special glazings

- Art glass and decorative insulated art glass, impact-resistant glass

- Renewal by Andersen Series 2 windows and patio doors, Andersen® A-Series windows and doors, 400 Series and 200 Series windows and doors, 400 Series windows with Stormwatch® protection and impact-resistant glass, 100 Series windows and doors, storm doors, E-Series windows and doors, Silver Line® windows and doors, American Craftsman® windows and doors and Weiland® windows and doors have their own limited warranties and are not covered by this Limited Warranty – for information on warranty coverage for these products, please refer to the specific limited warranties for these products – they are available at andersenwindows.com

## Warranty Claim Procedure

To make a claim under this Limited Warranty, contact the nearest Renewal by Andersen® show-room, our Warranty Service Line at 800-441-1109 or visit our website at renewalbyandersen.com. We will contact you to investigate your claim within approximately two weeks after notification and arrange for appropriate action. Warranty services may be provided by Renewal by Andersen and/or an authorized Renewal by Andersen service provider.

You can help us serve you faster by providing the following important information:

- The serial number of the affected product (e.g., located on a label affixed to the top or side of the window frame)

- Description of the product concerns

- Documentation of the purchase date, if available

- Your name, address (with zip code) where product is installed and telephone numbers

## Non-Warranty Repair

You will be responsible for all costs related to any repair that is not covered by this Limited Warranty or which is outside of the limited warranty period. When warranty coverage is unclear, Renewal by Andersen may charge an inspection fee for any on-site product inspections. If the inspector determines the Renewal by Andersen product has a defect covered by this Limited Warranty, the inspection fee will be waived.



A419

"Renewal by Andersen" and other marks where denoted are trademarks of Andersen Corporation.
© 2016 Andersen Corporation. All rights reserved. Revised April 4, 2016. RBA10909

RENEWALBYANDERSEN.COM



# THE LEAD-SAFE CERTIFIED GUIDE TO
# RENOVATE
# RIGHT

**WARNING**
LEAD WORK AR
POISON
NO SMOKING
OR EATING

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**EPA**

1-800-424-LEAD (5323)
epa.gov/getleadsafe
EPA-740-K-10-001
Revised September 2011

Important lead hazard information for
families, child care providers and schools.

**EPA**

LEAD-SAFE
EPA
CERTIFIED FIRM

This document may be purchased through the **U.S. Government Printing Office** online at
bookstore.gpo.gov or by phone (toll-free): **1-866-512-1800**.

A420

# IT'S THE LAW!

Federal law requires contractors that disturb painted surfaces in homes, child care facilities and schools built before 1978 to be certified and follow specific work practices to prevent lead contamination. Always ask to see your contractor's certification.

Federal law requires that individuals receive certain information before renovating more than six square feet of painted surfaces in a room for interior projects or more than twenty square feet of painted surfaces for exterior projects or window replacement or demolition in housing, child care facilities and schools built before 1978.

• Homeowners and tenants: renovators must give you this pamphlet before starting work.

• Child care facilities, including preschools and kindergarten classrooms, and the families of children under six years of age that attend those facilities: renovators must provide a copy of this pamphlet to child care facilities and general renovation information to families whose children attend those facilities.

A421

# WHO SHOULD READ THIS PAMPHLET?

### This pamphlet is for you if you:

• Reside in a home built before 1978.

• Own or operate a child care facility, including preschools and kindergarten classrooms, built before 1978, or

• Have a child under six years of age who attends a child care facility built before 1978.

### You will learn:

• Basic facts about lead and your health.

• How to choose a contractor, if you are a property owner.

• What tenants, and parents/guardians of a child in a child care facility or school should consider.

• How to prepare for the renovation or repair job.

• What to look for during the job and after the job is done.

• Where to get more information about lead.

### This pamphlet is not for:

• **Abatement projects.** Abatement is a set of activities aimed specifically at eliminating lead or lead hazards. EPA has regulations for certification and training of abatement professionals. If your goal is to eliminate lead or lead hazards, contact the National Lead Information Center at **1-800-424-LEAD (5323)** for more information.

• **"Do-it-yourself"** projects. If you plan to do renovation work yourself, this document is a good start, but you will need more information to complete the work safely. Call the National Lead Information Center at **1-800-424-LEAD (5323)** and ask for more information on how to work safely in a home with lead-based paint.

• **Contractor education.** Contractors who want information about working safely with lead should contact the National Lead Information Center at **1-800-424-LEAD (5323)** for information about courses and resources on lead-safe work practices.



A422

## RENOVATING, REPAIRING, OR PAINTING?



- Is your home, your building, or the child care facility or school your children attend being renovated, repaired, or painted?

- Was your home, your building, or the child care facility or school where your children under six years of age attend built before 1978?

If the answer to these questions is YES, there are a few important things you need to know about lead-based paint.

This pamphlet provides basic facts about lead and information about lead safety when work is being done in your home, your building or the child care facility or school your children attend.

### The Facts About Lead

- Lead can affect children's brains and developing nervous systems, causing reduced IQ, learning disabilities, and behavioral problems. Lead is also harmful to adults.

- Lead in dust is the most common way people are exposed to lead. People can also get lead in their bodies from lead in soil or paint chips. Lead dust is often invisible.

- Lead-based paint was used in more than 38 million homes until it was banned for residential use in 1978.

- Projects that disturb painted surfaces can create dust and endanger you and your family. Don't let this happen to you. Follow the practices described in this pamphlet to protect you and your family.

## LEAD AND YOUR HEALTH

### Lead is especially dangerous to children under six years of age.

Lead can affect children's brains and developing nervous systems, causing:

- Reduced IQ and learning disabilities.
- Behavior problems.



**Even children who appear healthy can have dangerous levels of lead in their bodies.**

Lead is also harmful to adults. In adults, low levels of lead can pose many dangers, including:

- High blood pressure and hypertension.
- Pregnant women exposed to lead can transfer lead to their fetuses. Lead gets into the body when it is swallowed or inhaled.
- People, especially children, can swallow lead dust as they eat, play, and do other normal hand-to-mouth activities.
- People may also breathe in lead dust or fumes if they disturb lead-based paint. People who sand, scrape, burn, brush, blast or otherwise disturb lead-based paint risk unsafe exposure to lead.

### What should I do if I am concerned about my family's exposure to lead?

- A blood test is the only way to find out if you or a family member already has lead poisoning. Call your doctor or local health department to arrange for a blood test.
- Call your local health department for advice on reducing and eliminating exposures to lead inside and outside your home, child care facility or school.
- Always use lead-safe work practices when renovation or repair will disturb painted surfaces.

For more information about the health effects of exposure to lead, visit the EPA lead website at epa.gov/lead/pubs/leadinfo or call **1-800-424-LEAD (5323)**.

### There are other things you can do to protect your family every day.

- Regularly clean floors, window sills, and other surfaces.
- Wash children's hands, bottles, pacifiers, and toys often.
- Make sure children eat a healthy, nutritious diet consistent with the USDA's dietary guidelines, that helps protect children from the effects of lead.
- Wipe off shoes before entering the house.

## WHERE DOES THE LEAD COME FROM?

### Dust is the main problem.

The most common way to get lead in the body is from dust. Lead dust comes from deteriorating lead-based paint and lead-contaminated soil that gets tracked into your home. This dust may accumulate to unsafe levels. Then, normal hand to-mouth activities, like playing and eating (especially in young children), move that dust from surfaces like floors and window sills into the body.

### Home renovation creates dust.

Common renovation activities like sanding, cutting, and demolition can create hazardous lead dust and chips.

### Proper work practices protect you from the dust.

The key to protecting yourself and your family during a renovation, repair or painting job is to use lead-safe work practices such as containing dust inside the work area, using dust-minimizing work methods, and conducting a careful cleanup, as described in this pamphlet.

### Other sources of lead.

Remember, lead can also come from outside soil, your water, or household items (such as lead-glazed pottery and lead crystal). Contact the National Lead Information Center at **1-800-424-LEAD (5323)** for more information on these sources.



## CHECKING YOUR HOME FOR LEAD-BASED PAINT

Percentage of Homes Likely to Contain Lead



### Older homes, child care facilities, and schools are more likely to contain lead-based paint.

Homes may be single-family homes or apartments. They may be private, government-assisted, or public housing. Schools are preschools and kindergarten classrooms. They may be urban, suburban, or rural.

### You have the following options:

**You may decide to assume your home, child care facility, or school contains lead.** Especially in older homes and buildings, you may simply want to assume lead-based paint is present and follow the lead-safe work practices described in this brochure during the renovation, repair, or painting job.

**You can hire a certified professional to check for lead-based paint.** These professionals are certified risk assessors or inspectors, and can determine if your home has lead or lead hazards.

• A certified inspector or risk assessor can conduct an inspection telling you whether your home, or a portion of your home, has lead-based paint and where it is located. This will tell you the areas in your home where lead-safe work practices are needed.

• A certified risk assessor can conduct a risk assessment telling you if your home currently has any lead hazards from lead in paint, dust, or soil. The risk assessor can also tell you what actions to take to address any hazards.

• For help finding a certified risk assessor or inspector, call the National Lead Information Center at **1-800-424-LEAD (5323)**.

You may also have a certified renovator test the surfaces or components being disturbed for lead by using a lead test kit or by taking paint chip samples and sending them to an EPA-recognized testing laboratory. Test kits must be EPA-recognized and are available at hardware stores. They include detailed instructions for their use.

# FOR PROPERTY OWNERS

## FOR TENANTS AND FAMILIES OF CHILDREN UNDER SIX YEARS OF AGE IN CHILD CARE FACILITIES AND SCHOOLS

**You have the ultimate responsibility for the safety of your family, tenants, or children in your care.**

This means properly preparing for the renovation and keeping persons out of the work area (see p. 8). It also means ensuring the contractor uses lead-safe work practices.

Federal law requires that contractors performing renovation, repair and painting projects that disturb painted surfaces in homes, child care facilities, and schools built before 1978 be certified and follow specific work practices to prevent lead contamination.

**Make sure your contractor is certified, and can explain clearly the details of the job and how the contractor will minimize lead hazards during the work.**

• You can verify that a contractor is certified by checking EPA's website at epa.gov/getleadsafe or by calling the National Lead Information Center at **1-800-424-LEAD (5323)**. You can also ask to see a copy of the contractor's firm certification.

• Ask if the contractor is trained to perform lead-safe work practices and to see a copy of their training certificate.

• Ask them what lead-safe methods they will use to set up and perform the job in your home, child care facility or school.

• Ask for references from at least three recent jobs involving homes built before 1978, and speak to each personally.

**Always make sure the contract is clear about how the work will be set up, performed, and cleaned.**

• Share the results of any previous lead tests with the contractor.

• You should specify in the contract that they follow the work practices described on pages 9 and 10 of this brochure.

• The contract should specify which parts of your home are part of the work area and specify which lead-safe work practices will be used in those areas. Remember, your contractor should confine dust and debris to the work area and should minimize spreading that dust to other areas of the home.

• The contract should also specify that the contractor will clean the work area, verify that it was cleaned adequately, and re-clean it if necessary.

## If you think a worker is not doing what he is supposed to do or is doing something that is unsafe, you should:

• Direct the contractor to comply with regulatory and contract requirements.

• Call your local health or building department, or

• Call EPA's hotline **1-800-424-LEAD (5323)**.

If your property receives housing assistance from HUD (or a state or local agency that uses HUD funds), you must follow the requirements of HUD's Lead-Safe Housing Rule and the ones described in this pamphlet.

**You play an important role ensuring the ultimate safety of your family.**



This means properly preparing for the renovation and staying out of the work area (see p. 8).

Federal law requires that contractors performing renovation, repair and painting projects that disturb painted surfaces in homes built before 1978 and in child care facilities and schools built before 1978, that a child under six years of age visits regularly, to be certified and follow specific work practices to prevent lead contamination.

The law requires anyone hired to renovate, repair, or do painting preparation work on a property built before 1978 to follow the steps described on pages 9 and 10 unless the area where the work will be done contains no lead-based paint.

## If you think a worker is not doing what he is supposed to do or is doing something that is unsafe, you should:

• Contact your landlord.

• Call your local health or building department, or

• Call EPA's hotline **1-800-424-LEAD (5323)**.

If you are concerned about lead hazards left behind after the job is over, you can check the work yourself (see page 10).



A425

## PREPARING FOR A RENOVATION

**The work areas should not be accessible to occupants while the work occurs.**

The rooms or areas where work is being done may need to be blocked off or sealed with plastic sheeting to contain any dust that is generated. Therefore, the contained area may not be available to you until the work in that room or area is complete, cleaned thoroughly, and the containment has been removed. Because you may not have access to some areas during the renovation, you should plan accordingly.

**You may need:**

• Alternative bedroom, bathroom, and kitchen arrangements if work is occurring in those areas of your home.

• A safe place for pets because they too can be poisoned by lead and can track lead dust into other areas of the home.

• A separate pathway for the contractor from the work area to the outside in order to bring materials in and out of the home. Ideally, it should not be through the same entrance that your family uses.

• A place to store your furniture. All furniture and belongings may have to be moved from the work area while the work is being done. Items that can't be moved, such as cabinets, should be wrapped in plastic.

• To turn off forced-air heating and air conditioning systems while the work is being done. This prevents dust from spreading through vents from the work area to the rest of your home. Consider how this may affect your living arrangements.

**You may even want to move out of your home temporarily while all or part of the work is being done.**

**Child care facilities and schools may want to consider alternative accommodations for children and access to necessary facilities.**



## DURING THE WORK

Federal law requires contractors that are hired to perform renovation, repair and painting projects in homes, child care facilities, and schools built before 1978 that disturb painted surfaces to be certified and follow specific work practices to prevent lead contamination.

The work practices the contractor must follow include these three simple procedures, described below:

**1. Contain the work area.** The area must be contained so that dust and debris do not escape from that area. Warning signs must be put up and plastic or other impermeable material and tape must be used as appropriate to:

• Cover the floors and any furniture that cannot be moved.

• Seal off doors and heating and cooling system vents.

• For exterior renovations, cover the ground and, in some instances, erect vertical containment or equivalent extra precautions in containing the work area.

These work practices will help prevent dust or debris from getting outside the work area.

**2. Avoid renovation methods that generate large amounts of lead-contaminated dust.** Some methods generate so much lead-contaminated dust that their use is prohibited. They are:



• Open flame burning or torching.

• Sanding, grinding, planing, needle gunning, or blasting with power tools and equipment not equipped with a shroud and HEPA vacuum attachment.

• Using a heat gun at temperatures greater than 1100°F.

There is no way to eliminate dust, but some renovation methods make less dust than others. Contractors may choose to use various methods to minimize dust generation, including using water to mist areas before sanding or scraping; scoring paint before separating components; and prying and pulling apart components instead of breaking them.

**3. Clean up thoroughly.** The work area should be cleaned up daily to keep it as clean as possible. When all the work is done, the area must be cleaned up using special cleaning methods before taking down any plastic that isolates the work area from the rest of the home. The special cleaning methods should include:

• Using a HEPA vacuum to clean up dust and debris on all surfaces, followed by

• Wet wiping and wet mopping with plenty of rinse water.

When the final cleaning is done, look around. There should be no dust, paint chips, or debris in the work area. If you see any dust, paint chips, or debris, the area must be re-cleaned.

A426

# FOR PROPERTY OWNERS: AFTER THE WORK IS DONE

When all the work is finished, you will want to know if your home, child care facility, or school where children under six attend has been cleaned up properly.

## EPA Requires Cleaning Verification.

In addition to using allowable work practices and working in a lead-safe manner, EPA's RRP rule requires contractors to follow a specific cleaning protocol. The protocol requires the contractor to use disposable cleaning cloths to wipe the floor and other surfaces of the work area and compare these cloths to an EPA-provided cleaning verification card to determine if the work area was adequately cleaned. EPA research has shown that following the use of lead-safe work practices with the cleaning verification protocol will effectively reduce lead-dust hazards.

## Lead-Dust Testing.

EPA believes that if you use a certified and trained renovation contractor who follows the LRRP rule by using lead-safe work practices and the cleaning protocol after the job is finished, lead-dust hazards will be effectively reduced. If, however, you are interested in having lead-dust testing done at the completion of your job, outlined below is some helpful information.

### What is a lead-dust test?
• Lead-dust tests are wipe samples sent to a laboratory for analysis. You will get a report specifying the levels of lead found after your specific job.

### How and when should I ask my contractor about lead-dust testing?
• Contractors are not required by EPA to conduct lead-dust testing. However, if you want testing, EPA recommends testing be conducted by a lead professional.  To locate a lead professional who will perform an evaluation near you, visit EPA's website at epa.gov/lead/pubs/locate or contact the National Lead Information Center at **1-800-424-LEAD (5323).**

• If you decide that you want lead-dust testing, it is a good idea to specify in your contract, before the start of the job, that a lead-dust test is to be done for your job and who will do the testing, as well as whether re-cleaning will be required based on the results of the test.

• You may do the testing yourself. If you choose to do the testing, some EPA-recognized lead laboratories will send you a kit that allows you to collect samples and send them back to the laboratory for analysis.  Contact the National Lead Information Center for lists of EPA-recognized testing laboratories.



# FOR ADDITIONAL INFORMATION

You may need additional information on how to protect yourself and your children while a job is going on in your home, your building, or child care facility.

The National Lead Information Center at **1-800-424-LEAD (5323)** or epa.gov/lead/nlic can tell you how to contact your state, local, and/or tribal programs or get general information about lead poisoning prevention.

• State and tribal lead poisoning prevention or environmental protection programs can provide information about lead regulations and potential sources of financial aid for reducing lead hazards. If your state or local government has requirements more stringent than those described in this pamphlet, you must follow those requirements.



• Local building code officials can tell you the regulations that apply to the renovation work that you are planning.

• State, county, and local health departments can provide information about local programs, including assistance for lead-poisoned children and advice on ways to get your home checked for lead.



The National Lead Information Center can also provide a variety of resource materials, including the following guides to lead-safe work practices. Many of these materials are also available at epa.gov/lead/pubs/brochure

• Steps to Lead Safe Renovation, Repair and Painting.

• Protect Your Family from Lead in Your Home

• Lead in Your Home: A Parent's Reference Guide

For the hearing impaired, call the Federal Information Relay Service at 1-800-877-8339 to access any of the phone numbers in this brochure.

# EPA CONTACTS

# OTHER FEDERAL AGENCIES

## EPA Regional Offices

EPA addresses residential lead hazards through several different regulations. EPA requires training and certification for conducting abatement and renovations, education about hazards associated with renovations, disclosure about known lead paint and lead hazards in housing, and sets lead-paint hazard standards.

Your Regional EPA Office can provide further information regarding lead safety and lead protection programs at epa.gov/lead.

**Region 1**
(Connecticut, Massachusetts, Maine, New Hampshire, Rhode Island, Vermont)
Regional Lead Contact
U.S. EPA Region 1
Suite 1100
One Congress Street
Boston, MA 02114-2023
(888) 372-7341

**Region 2**
(New Jersey, New York, Puerto Rico, Virgin Islands)
Regional Lead Contact
U.S. EPA Region 2
2890 Woodbridge Avenue
Building 205, Mail Stop 225
Edison, NJ 08837-3679
(732) 321-6671

**Region 3**
(Delaware, Maryland, Pennsylvania, Virginia, Washington, DC, West Virginia)
Regional Lead Contact
U.S. EPA Region 3
1650 Arch Street
Philadelphia, PA
19103-2029
(215) 814-5000

**Region 4**
(Alabama, Florida, Georgia, Kentucky, Mississippi, North Carolina, South Carolina, Tennessee)
Regional Lead Contact
U.S. EPA Region 4
61 Forsyth Street, SW
Atlanta, GA 30303-8960
(404) 562-9900

**Region 5**
(Illinois, Indiana, Michigan, Minnesota, Ohio, Wisconsin)
Regional Lead Contact
U.S. EPA Region 5
77 West Jackson Boulevard
Chicago, IL 60604-3507
(312) 886-6003

**Region 6**
(Arkansas, Louisiana, New Mexico, Oklahoma, Texas)
Regional Lead Contact
U.S. EPA Region 6
1445 Ross Avenue,
12th Floor
Dallas, TX 75202-2733
(214) 665-7577

**Region 7**
(Iowa, Kansas, Missouri, Nebraska)
Regional Lead Contact
U.S. EPA Region 7
901 N. 5th Street
Kansas City, KS 66101
(913) 551-7003

**Region 8**
(Colorado, Montana, North Dakota, South Dakota, Utah, Wyoming)
Regional Lead Contact
U.S. EPA Region 8
1595 Wynkoop Street
Denver, CO 80202
(303) 312-6312

**Region 9**
(Arizona, California, Hawaii, Nevada)
Regional Lead Contact
U.S. Region 9
75 Hawthorne Street
San Francisco, CA 94105
(415) 947-8021

**Region 10**
(Alaska, Idaho, Oregon, Washington)
Regional Lead Contact
U.S. EPA Region 10
1200 Sixth Avenue
Seattle, WA 98101-1128
(206) 553-1200

## CPSC

The Consumer Product Safety Commission (CPSC) protects the public from the unreasonable risk of injury or death from 15,000 types of consumer products under the agency's jurisdiction. CPSC warns the public and private sectors to reduce exposure to lead and increase consumer awareness. Contact CPSC for further information regarding regulations and consumer product safety.

**CPSC**
4330 East West Highway
Bethesda, MD 20814
Hotline 1-(800) 638-2772
cpsc.gov

## CDC Childhood Lead Poisoning Prevention Branch

The Centers for Disease Control and Prevention (CDC) assists state and local childhood lead poisoning prevention programs to provide a scientific basis for policy decisions, and to ensure that health issues are addressed in decisions about housing and the environment. Contact CDC Childhood Lead Poisoning Prevention Program for additional materials and links on the topic of lead.

**CDC Childhood Lead Poisoning Prevention Branch**
4770 Buford Highway, MS F-40
Atlanta, GA 30341
(770) 488-3300
cdc.gov/nceh/lead

## HUD Office of Healthy Homes and Lead Hazard Control

The Department of Housing and Urban Development (HUD) provides funds to state and local governments to develop cost-effective ways to reduce lead-based paint hazards in America's privately-owned low-income housing. In addition, the office enforces the rule on disclosure of known lead paint and lead hazards in housing, and HUD's lead safety regulations in HUD-assisted housing, provides public outreach and technical assistance, and conducts technical studies to help protect children and their families from health and safety hazards in the home. Contact the HUD Office of Healthy Homes and Lead Hazard Control for information on lead regulations, outreach efforts, and lead hazard control research and outreach grant programs.

**U.S. Department of Housing and Urban Development**
Office of Healthy Homes and Lead Hazard Control
451 Seventh Street, SW, Room 8236
Washington, DC 20410-3000
HUD's Lead Regulations Hotline
(202) 402-7698
hud.gov/offices/lead/

A428

# SAMPLE PRE-RENOVATION FORM

This sample form may be used by renovation firms to document compliance with the Federal pre-renovation education and renovation, repair, and painting regulations.

## Occupant Confirmation

Pamphlet Receipt

❏ I have received a copy of the lead hazard information pamphlet informing me of the potential risk of the lead hazard exposure from renovation activity to be performed in my dwelling unit. I received this pamphlet before the work began.

_____
Printed Name of Owner-occupant

_____   _____
Signature of Owner-occupant               Signature Date

## Renovator's Self Certification Option (for tenant-occupied dwellings only)

Instructions to Renovator: If the lead hazard information pamphlet was delivered but a tenant signature was not obtainable, you may check the appropriate box below.

❏ **Declined** – I certify that I have made a good faith effort to deliver the lead hazard information pamphlet to the rental dwelling unit listed below at the date and time indicated and that the occupant declined to sign the confirmation of receipt. I further certify that I have left a copy of the pamphlet at the unit with the occupant.

❏ **Unavailable for signature** – I certify that I have made a good faith effort to deliver the lead hazard information pamphlet to the rental dwelling unit listed below and that the occupant was unavailable to sign the confirmation of receipt. I further certify that I have left a copy of the pamphlet at the unit by sliding it under the door or by (fill in how pamphlet was left).

_____   _____
Printed Name of Person Certifying Delivery    Attempted Delivery Date

_____
Signature of Person Certifying Lead Pamphlet Delivery

_____

_____
Unit Address

## Note Regarding Mailing Option

— As an alternative to delivery in person, you may mail the lead hazard information pamphlet to the owner and/or tenant. Pamphlet must be mailed at least seven days before renovation. Mailing must be documented by a certificate of mailing from the post office.



A429



**Release Agreement**

**dba: Renewal by Andersen of Oklahoma**

Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 l Oklahoma City, OK 73149
Phone: 405-608-5000 l Fax: 405-562-7880 l oksales@renewaloklahoma.com

**Susan Parisi**

I UNDERSTAND that my name, my company name, voice, picture, likeness, biographical materials, photo images of my home and/or person, and statements and/or opinions made by me, in whole or in part, edited or unedited, in any and all media (hereinafter "Information"), without limitation for any and all purposes (including but not limited to incorporating the material into commercials, advertisements, promotions, coupons, in-store displays, on-line programs, free standing inserts and/or publicity or other materials of Renewal by Andersen's products or services).  I agree that Renewal by Andersen LLC will have the right to attribute this Information to me and that the Information is accurate to the best of my knowledge.  No benefit has been given or promised to me in consideration of expressing my beliefs about Renewal by Andersen® products.

I hereby consent to the use of the Information to Renewal by Andersen LLC, their successors and assigns, for use without restriction as to frequency, scope or duration of usage.

In connection herewith, I hereby release and agree to hold harmless Renewal by Andersen LLC, its successors and assigns, each of them from any and all claims of any kind which I, my heirs, executors or assigns, may have on account of such use including what might be deemed to be misrepresentations of me, my character or my person due to distortion, optical illusion or faulty reproduction which may occur in the finished product.

I hereby agree to waive any compensation rights and/or benefits other than the publicity my business will receive from this advertisement for my participation in this project.

Renewal by Andersen LLC, its successors and assigns, shall be the absolute owner of any and all advertising materials (and all rights therein, including the copyright) produced pursuant to this Agreement.

No promise or representation which is not expressed herein has been made to me, and I have read this release, understand it and am signing it voluntarily.

**Buyer(s)**

_Susan Parisi_
Signature

**Susan Parisi**
Print Name

**1613 N Markwell Ave**
Address

**Oklahoma City , OK 73127**
City / State / Zip

Signature

**1613 N Markwell Ave**
Print Name

**Oklahoma City , OK 73127**
Address

City / State / Zip

**Witness**

Signature

**Russell Kelley**
Print Name

**11/23/21**
Date

# Price Presentation Discounts

**dba: Renewal by Andersen of Oklahoma**

Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 | Oklahoma City, OK 73149
Phone: 405-608-5000 | Fax: 405-562-7880 | oksales@renewaloklahoma.com

**Susan Parisi**



| PROJECT PRICE BEFORE DISCOUNTS | $23,344 |
|---|---|

**INDIVIDUAL SAVINGS BASED ON 5 UNITS**

| Advertised Offer | Savings: |
|---|---|
| 20% Off Project | **$4,668** |

| Sales Cost Savings Program (5%) | Savings: |
|---|---|
| | **$933** |

**$5,601 SAVINGS**

| TOTAL PRICE: $17,743 | |
|---|---|

# EXHIBIT 2

1/4/22, 11:24 AM          Yahoo Mail - Charge to my account

Case 5:23-cv-00115-R   Document 56-1   Filed 10/31/23   Page 41 of 44
Appellate Case: 23-6218   Document: 010111062399   Date Filed: 06/07/2024   Page: 153

## Charge to my account

From:   Susan Parisi (sparisi21@yahoo.com)

To:     service@greensky.com

Date:   Monday, November 29, 2021, 12:02 PM CST

OK, I was never informed/told that an $8000 + dollar charge was going to take place! 🙁 I chose the two-year nothing down, no interest, no payment option. And was informed the clock started ticking when the windows were installed. So what else is going to be done without my knowledge? This little trick makes me think twice about proceeding. Someone best be taking to me about this. I am under treatment for bone marrow cancer and I don't need any more surprises! It is not right defined this out after the fact.
Susan Parisi

Sent from Yahoo Mail for iPhone

A433

# EXHIBIT 3

## Re: GreenSky case 04386281 [ ref:_00Dd0dh5w._5003o1VuXKY:ref ]

From: Customer Solutions (cst@greensky.com)

To: sparisi21@yahoo.com

Date: Thursday, December 2, 2021, 07:57 AM CST

Good Morning Susan,

After explaining the loan process, do you authorize this transaction? If you have any questions, please give me a call.

--------------- Original Message ---------------
**From:** Customer Solutions [cst@greensky.com]
**Sent:** 12/1/2021 5:02 PM
**To:** sparisi21@yahoo.com
**Subject:** Re: GreenSky case 04386281 [ ref:_00Dd0dh5w._5003o1VuXKY:ref ]

The account will be charged because it is part of the loan process but based on your loan plan, we will not bill you until the job is completed or purchase window expiration date-05/26/22. So the account is being charged but you are not going to be billed just yet.

--------------- Original Message ---------------
**From:** Susan Parisi [sparisi21@yahoo.com]
**Sent:** 12/1/2021 4:55 PM
**To:** cst@greensky.com
**Subject:** Re: GreenSky case 04386281 [ ref:_00Dd0dh5w._5003o1VuXKY:ref ]

Well it certainly would help to know this information up front which I wasn't told that there would be a "payment transaction" for $8,871.50 which I am NOT comfortable with. I was told there would NOT be any payment, NO interest, and etc. for two years. Renewal by Anderson wasn't "completely up front about the "FINE" print. I may have to re-think this whole thing. I do NOT have a date of installation, and I want to know do you place a lean on my home? And I am under treatment for a cancer diagnosis with a scheduled Transplant Date of February 2022. I am NOT authorizing any payment at this time to Renewal by Anderson. Respectfully Susan K. Parisi. You may call me or email me back.

On Wednesday, December 1, 2021, 08:21:05 AM CST, Customer Solutions <cst@greensky.com> wrote:

Good Morning,

Hope your day is going well. My name is Erika and I am reaching out to you regarding your GreenSky account. There was a payment transaction for $8871.50, was there any reason why the payment was rejected? The merchant charges a percentage upfront on the loan account. I wanted you to be aware of the loan process. Please let me know if you have any questions.

Thank you,

Erika
Customer Solutions Account Manager
Office: 855-849-0088 Ext. 401

A435

1/4/22, 11:40 AM    Yahoo Mail - Re: GreenSky case 04386281 [ ref:_00Dd0dh5w._5003o1VuXKY:ref ]

Case 5:23-cv-00115-R   Document 56-1   Filed 10/31/23   Page 44 of 44
Appellate Case: 23-6218    Document: 010111062399    Date Filed: 06/07/2024    Page: 156

## Re: GreenSky case 04386281 [ ref:_00Dd0dh5w._5003o1VuXKY:ref ]

From:  Customer Solutions (cst@greensky.com)

To:    sparisi21@yahoo.com

Date:  Friday, December 10, 2021, 01:43 PM CST

Hi Susan,

I am sorry and understand your frustration. I have reached out to the merchant about your concern. Our records shows you signed agreeing to the loan terms. Loan plan 7541, you will not be billed until the project is fully completed. Once completed, you will have 24 months with interest waived and required minimum payment due. Please call me if you have further questions.

Thank you

--------------- Original Message ---------------
**From:** Susan Parisi [sparisi21@yahoo.com]
**Sent:** 12/10/2021 1:29 AM
**To:** cst@greensky.com
**Subject:** Re: GreenSky case 04386281 [ ref:_00Dd0dh5w._5003o1VuXKY:ref ]

You did NOT explain any loan process to me and I do NOT authorize any transaction which I have already stated. I do NOT do well with lies. I have many questions related to this situation. I was told I qualified for a 24 month, NO money down, No Interest, and NO payment situation to begin 24 months after installation, now I am being told I did NOT qualify for that and you have removed that original offer. Well this is to inform you again that I am NOT doing business with you or Renewal by Anderson and IF you sent them money without my consent that is ON you NOT me. I did NOT authorize anything.   I will provide you the name of my attorney and they will deal with this. This is a very sketchy situation you have set up with Renewal by Anderson I suggest this gets straightened out quickly.   Susan Parisi

On Thursday, December 2, 2021, 07:57:40 AM CST, Customer Solutions <cst@greensky.com> wrote:

Good Morning Susan,

After explaining the loan process, do you authorize this transaction? If you have any questions, please give me a call.

--------------- Original Message ---------------
**From:** Customer Solutions [cst@greensky.com]
**Sent:** 12/1/2021 5:02 PM
**To:** sparisi21@yahoo.com
**Subject:** Re: GreenSky case 04386281 [ ref:_00Dd0dh5w._5003o1VuXKY:ref ]

The account will be charged because it is part of the loan process but based on your loan plan, we will not bill you until the job is completed or purchase window expiration date-05/26/22. So the account is being charged but you are not going to be billed just yet.

--------------- Original Message ---------------
**From:** Susan Parisi [sparisi21@yahoo.com]

A436

# EXHIBIT 2

# CFPB Consent Order

# UNITED STATES OF AMERICA
# CONSUMER FINANCIAL PROTECTION BUREAU

ADMINISTRATIVE PROCEEDING
File No. 2021-CFPB-0004

In the Matter of:

**CONSENT ORDER**

**GREENSKY, LLC**

The Consumer Financial Protection Bureau (Bureau) has reviewed certain

origination and servicing activities of GreenSky, LLC (Respondent, as defined

below) and has identified the following law violations: (1) Respondent engaged in

unfair acts and practices with regard to loans to consumers who did not authorize

them in violation of §§ 1031(a) and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§

5531(a) and 5536(a)(1)(B); and (2) Respondent engaged in unfair acts and

practices by structuring its loan origination and servicing activities in a manner that

enabled unauthorized loans in violation of §§ 1031(a) and 1036(a)(1)(B) of the

CFPA, 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B). Under §§ 1053 and 1055 of the

Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5563, 5565, the

Bureau issues this Consent Order (Consent Order).

# I.

## Jurisdiction

1.    The Bureau has jurisdiction over this matter under §§ 1053 and 1055 of the

CFPA, 12 U.S.C. §§ 5563 and 5565.

# II.

## Stipulation

2.    Respondent has executed a "Stipulation and Consent to the Issuance of a

Consent Order," dated June 29, 2021 (Stipulation), which is incorporated by

reference and is accepted by the Bureau. By this Stipulation, Respondent has

consented to the issuance of this Consent Order by the Bureau under §§

1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565, without admitting or

denying any of the findings of fact or conclusions of law, except that

Respondent admits the facts necessary to establish the Bureau's jurisdiction

over Respondent and the subject matter of this action.

# III.

## Definitions

3.    The following definitions apply to this Consent Order:

a.  "Affected Consumers" means any consumer who received an

unauthorized loan through the GreenSky Program between March 1,

2

2014, and the Effective Date of this Consent Order, as determined by the Settlement Administrator, and further described in Section VIII.

b.  "Board" means the duly elected and acting Board of Directors of GreenSky, Inc., the ultimate parent of Respondent.

c.  "Clearly and Prominently" means:

    i.   In textual communications (e.g., printed publications or words displayed on the screen of an electronic device), the disclosure must be of a type size and location sufficiently noticeable for an ordinary consumer to read and comprehend it, in print that contrasts with the background on which it appears;

    ii.   In communications disseminated orally or through audible means (e.g., radio or streaming audio), the disclosure must be delivered in a volume and cadence sufficient for an ordinary consumer to hear and comprehend it;

    iii.   In communications disseminated through video means (e.g., television or streaming video), the disclosure must be in writing in a form consistent with subsection (i), and must appear on the screen for a duration sufficient for an ordinary consumer to read and comprehend it;

    iv.    In communications made through interactive media such as the internet, online services, and software, the disclosure must be unavoidable and presented in a form consistent with subsection (i);

    v.    In communications that contain both audio and visual portions, the disclosure must be presented simultaneously in both the audio and visual portions of the communication; and

    vi.    In all instances, the disclosure must be presented before the consumer incurs any financial obligation, in an understandable language and syntax, and with nothing contrary to, inconsistent with, or in mitigation of the disclosures used in any communication with the consumer.

d.  "Effective Date" means the date on which the Consent Order is entered on the administrative docket.

e.  "Enforcement Director" means the Assistant Director of the Office of Enforcement for the Consumer Financial Protection Bureau, or his or her delegate.

f.  "GreenSky Program" means a consumer financing and payments program created and administered by Respondent for certain federally insured banks ("GreenSky Program banks") where Respondent provides

point-of-sale financing technology and payments technology, and
engages in origination and servicing activities.

g.  "Identified Consumer Account Information" means the loan files,
complaints, call recordings, and related documentation of Potential
Affected Consumers to be reviewed by the Settlement Administrator
pursuant to Section VIII.

h.  "Merchant" means any third-party provider of services or seller of retail
products to consumers that intakes, submits, or facilitates submission of
consumer loan applications to Respondent for the purpose of financing
consumer purchases from such provider or seller through the GreenSky
Program. This definition shall not include any third-party provider or
seller that, as of January 1, 2014, required consumers to contact
Respondent directly to activate a loan.

i.  "Potential Affected Consumers" consists of the following groups of
consumers:

  i.  Consumers who filed complaints about unauthorized loans or
  unauthorized transactions between March 1, 2014 and the
  Effective Date of this Consent Order; and

  ii.  Consumers who both (1) completed loan applications between
  March 1, 2014 and the Effective Date of this Consent Order and

5

meet any one of the criteria described in subparagraphs (a) – (d)

below; and (2) respond to a communication from the Settlement

Administrator indicating they did not authorize a GreenSky

Program loan. The criteria consist of the following:

    (a)  Consumers whose loan application listed a Merchant's

        physical address as the consumer's own;

    (b)  Consumers whose loans were identified by Respondent as

        part of a customer-authorization audit for fraud as loans for

        which Respondent did not possess or obtain evidence of

        authorization;

    (c)  Consumers who submitted disputes directly to Respondent

        claiming information on their consumer report related to

        unauthorized loans or associated unauthorized

        transactions; and

    (d)  Consumers who submitted disputes to consumer reporting

        agencies claiming information on their consumer report

        related to unauthorized loans or associated unauthorized

        transactions.

j.   "Related Consumer Action" means a private action by or on behalf of

    one or more consumers or an enforcement action by another

governmental agency brought against Respondent based on substantially the same facts as described in Section IV of this Consent Order.

k.  "Relevant Period" includes from March 1, 2014 to the Effective Date of this Consent Order.

l.  "Respondent" means GreenSky, LLC, and its subsidiaries, successors and assigns.

## IV.

### Bureau Findings and Conclusions

The Bureau finds the following:

4.  Respondent is a limited liability company with its principal place of business at 5565 Glenridge Connector, Suite 700, Atlanta, Georgia 30342.

5.  Respondent transacts business throughout the United States.

6.  Respondent administers the GreenSky Program and engages in origination and servicing activities related to the GreenSky Program, and therefore engages in offering or providing a "financial product or service" within the meaning of 12 U.S.C. § 5481(15)(A)(i).

7.  Respondent engages in origination activities and services loans offered or provided for use by consumers primarily for personal, family, or household purposes within the meaning of 12 U.S.C. § 5481(5)(A).

8.  Respondent is therefore a "covered person" under 12 U.S.C. § 5481(6).

7

Respondent's Business Model

9.  Respondent engages in origination and servicing activities on behalf of
    GreenSky Program banks. Respondent uses Merchants to market and intake
    loan applications from consumers at the point of sale. Most of these
    Merchants provide home improvement products and services, health care
    services, or retail products.

10. Merchants must apply to participate in the GreenSky Program. If accepted
    into the GreenSky Program, Respondent generally trains Merchants,
    including on how to market and promote the GreenSky Program loans,
    intake consumers' personal and financial information, submit loan
    applications to Respondent on behalf of consumers or assist consumers in
    submitting loan applications directly to Respondent, as well as on GreenSky
    Program rules regarding consumers.

11. Respondent allows most Merchants to submit consumer loan applications
    online using Respondent's website or mobile applications, or over the phone
    if the Merchant indicates it has a signed application information form or a
    signed application from a consumer.

12. Respondent's Patient Solutions Program, which provides financing for
    elective medical procedures, requires consumers to apply for loans directly
    through Respondent.

8

A445

13.   Once Respondent receives an application, it makes an on-the-spot financing decision by comparing a consumer's application data with the lending criteria of the GreenSky Program banks, using proprietary technology and algorithms. These loans typically range from a few thousand dollars to tens of thousands of dollars.

14.   When a consumer or Merchant submits a loan application through Respondent's website or mobile application, the approved loan terms are displayed on the computer or tablet at the conclusion of the application process. Where a Merchant submits a loan application on a consumer's behalf, however, the consumer may view the approved loan terms on the computer or tablet only if the Merchant shares the screen with the consumer.

15.   Until at least April 2019, if Respondent determined that an applicant qualified for a loan, the loan application process was complete. Respondent mailed or emailed loan documentation to consumers, but consumers were not required to sign and return that loan documentation to consummate the loan.

16.   Respondent also issues consumers a "shopping pass" number, which functions like a credit card (Shopping Pass). Respondent treats use of the Shopping Pass, or associated funds, as acceptance of the loan.

9

17.   Respondent does not disburse the loan proceeds to the consumer. Rather, to

pay for a product or service, a consumer provides the Shopping Pass number

to her Merchant or otherwise authorizes a transaction and the Merchant, in

turn, uses the Shopping Pass number or other authorization to apply for

payment from Respondent.

18.   Respondent then disburses loan proceeds directly to the Merchant.

19.   Most of Respondent's revenue is earned from fees that Merchants pay to

Respondent every time they receive payment from the proceeds of a

consumer's loan.

20.   In some instances, Merchants misused these Shopping Pass numbers.

21.   Merchants sometimes applied for a loan without a consumer's knowledge

and entered their own email addresses as the consumer's own on the loan

application. Because of this, Respondent emailed the consumer's loan

documents or Shopping Pass number to the Merchant instead of the

consumer.

22.   In other instances, Merchants applied for a loan without a consumer's

knowledge and entered the consumer's correct mailing address on the

application, but because the consumer was unaware of the loan, the

consumer ignored the loan documents Respondent mailed, thinking they

were promotional materials.

10

23.   Consumers sometimes received mailed loan documents–which could take

weeks to arrive after a loan application–only after the Merchant had already

used the Shopping Pass number without the consumer's knowledge.

<u>Respondent Engaged in Origination Activity on Loans That Consumers Did Not
Authorize</u>

24.   During the Relevant Period, some Merchants submitted loan applications to

Respondent without consumers' consent. Respondent performed origination

and servicing activities with regard to these loans and, in some instances,

disbursed loan proceeds directly to the Merchant, without consumers'

knowledge or consent.

25.   Between 2014 and 2019, Respondent received at least 6,000 complaints

from consumers who stated they did not authorize submission of a loan

application. Respondent's complaint investigation found that in at least

1,600 instances the Merchant was at fault.

26.   Some consumers became aware of the loan for the first time when they

noticed Respondent's name on their credit report, or received billing

statements, collection letters, and calls from Respondent.

27.   After receiving a complaint about an unauthorized loan, Respondent

sometimes cancelled the loan, refunded consumers' money, wrote off the

unauthorized loan, or convinced the relevant Merchants to return money to consumers.

28.    At least 2,800 consumers who complained about unauthorized loans however, received neither refunds nor write-offs from Respondent or its Merchants.

<u>Respondent's Loan Application and Funding Process Created Opportunities for the Origination of Unauthorized Loans</u>

29.    Respondent uses a completely paperless application process for both its mobile and web-based application platforms.

30.    Until at least 2019, if a Merchant had certain personal information about a consumer, Respondent's systems and application process enabled Merchants to submit an entire loan application online without the consumer's knowledge or consent.

31.    While Respondent's program agreement with Merchants requires Merchants to obtain a written authorization from consumers to submit a loan application, Respondent does not request or review such documentation prior to loan application approval and disbursement of the loan proceeds.

32.    Instead, Respondent generally requires Merchants to provide proof of consumer authorization only after a consumer files a complaint. In some

instances, however, Merchants are unable to provide evidence that a consumer ever authorized submission of a loan application.

<u>Respondent's Merchant Training Program was Inadequate and Inconsistent</u>

33.   Respondent's Merchant training practices exacerbated the circumstances that led to unauthorized loans.

34.   During the Relevant Period, Respondent permitted Merchants to intake and submit loan applications for up to two months before completing any loan application training.

35.   Further, until at least October 2019, the training Respondent provided to Merchants was inadequate and inconsistent.

36.   Merchants who generated more loans for Respondent received a dedicated "Client Growth Manager," who was supposed to conduct one-on-one trainings with the Merchant and provide the Merchant opportunities to ask questions about the loan application process.

37.   Merchants who did not meet the required business threshold received online training on the GreenSky Program rules, how to market loans, intake loan applications, submit applications to Respondent, and apply for payment.

38.   Even when Respondent did provide individualized training, the training often did not adequately teach Merchants how to comply with consumer protection laws.

39.     For example, some Client Growth Managers failed to teach Merchants that consumer authorization is required before submitting a loan application and some even instructed Merchants on how to directly access and use consumers' Shopping Pass numbers.

40.     Further, Respondent only required that one representative from each Merchant attend a training session; this representative was then responsible for training all other Merchant employees intaking and submitting loan applications.

41.     Respondent also did not require Merchants to verify that each employee intaking and submitting loan applications had been trained. And Respondent did not always take action when it learned Merchant employees had not received training.

42.     Until at least January 2020, Respondent also sometimes failed to notify and train Merchants when it made changes to the GreenSky Program and did not require Merchants to attend annual compliance training.

Respondent's Merchant Oversight Program was Ineffective

43.     In some instances, Respondent did not discipline or terminate Merchants known to have submitted unauthorized loan applications.

14

44.   Respondent's Merchant Risk department is tasked with investigating

Merchant activity to root out fraud and discipline or terminate Merchants

who engage in practices that violate Respondent's policies and procedures.

45.   But employees in the Merchant Risk department are not consistently trained

and do not follow written investigation guidelines. In some cases, they were

instructed to apply different, more lenient investigative standards to high-

volume Merchants and to change their recommendations regarding

Merchant suspensions and terminations based on the volume of business a

Merchant generates.

46.   As a result, the Merchant Risk department's investigations are not governed

by a consistent set of principles or standards and its disciplinary action

recommendations differ depending on the Merchant and the volume of

business the Merchant generates.

Respondent's Complaint Resolution Practices were Deficient

47.   In 2014, Respondent created a department to respond to and resolve

consumer complaints.

48.   In many instances, because of understaffing and frequent staff turnover,

Respondent took over 75 days to investigate and resolve complaints, even

though Respondent's stated policy is to strive to investigate and resolve

complaints within 15 days. In over 100 cases where consumers complained

15

about an unauthorized loan, Respondent took six or more months to resolve the complaint.

49.    Further, in some instances, Respondent closed complaints in its system without ever resolving the case or informing consumers of the result of the investigation.

50.    As a result, some consumers had to call or contact Respondent multiple times over several months to receive a response from Respondent or any resolution to their complaints.

51.    Frequently, Respondent told consumers they must attempt to resolve their unauthorized loan complaint with the Merchant first before Respondent would open an investigation.

52.    When Respondent did open an investigation, Respondent requested evidence of the consumer's authorization of submission of the loan application from the Merchant.

53.    If a Merchant could not provide evidence of consumer authorization, Respondent asked the Merchant to refund the consumer's account. Merchants, however, did not always agree to provide a refund and Respondent did not always require them to do so.

54.    If a Merchant refused to provide a refund, Respondent required the consumer in question to seek a "chargeback" of the amounts charged to the

16

Shopping Pass. If the consumer did not do so within four to fifteen months, this remedy was unavailable because of the transaction processor's chargeback rules. Due to the length of time Respondent took to resolve some unauthorized loan complaints, some consumers lost out on the opportunity to pursue this remedy because Respondent could not pursue chargeback rights for the consumer until the complaint was resolved.

55.   In these circumstances, the consumer had no other recourse, except for taking legal action.

56.   Respondent, however, had the discretion to cancel and write off the loan, and absolve the consumer from liability, if it determined a Merchant submitted a loan application without consumer authorization.

57.   Respondent did, in some instances, determine that Merchants had submitted loans without authorization and canceled and wrote off loans for some consumers.

58.   But, until at least May 2018, Respondent lacked any policies or procedures governing these practices. As a result, Respondent granted loan write-offs inconsistently with regard to complaints about unauthorized loans.

Findings and Conclusions as to Respondent's
Origination and Servicing Activities on Unauthorized Loans (Unfair Acts and
Practices)

59.    Section 1036(a)(1)(B) of the CFPA prohibits "unfair, deceptive, or abusive"

acts or practices. 12 U.S.C. § 5536(a)(1)(B). An act or practice is unfair if it

causes or is likely to cause consumers substantial injury that is not

reasonably avoidable and that is not outweighed by countervailing benefits

to consumers or to competition.

60.    Respondent engaged in origination and servicing activities for loans to

consumers that consumers did not authorize. Respondent's actions caused or

were likely to cause substantial injury to consumers by causing: (1) new

unauthorized credit lines to appear on consumers' consumer reports,

potentially adversely affecting their credit profiles; (2) some consumers to

make payments on unauthorized loans in order to avoid negative impact to

their credit profiles from nonpayment; and (3) consumers to spend time and

money attempting to rescind the loans, reverse charges, and remove

Respondent's tradeline from their credit reports.

61.    Some consumers did not learn of the loans until well after they were funded.

62.    The substantial injuries consumers suffered were therefore not reasonably

avoidable.

63.     Nor were they outweighed by any countervailing benefit to consumers or to

         competition.

64.     Thus, Respondent engaged in unfair acts and practices in violation of

         Sections 1031(a) and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531(a),

         5536(a)(1)(B).

Findings and Conclusions as to Respondent's Structuring of Loan Origination and
Servicing Practices in a Manner that Enabled Unauthorized Loans (Unfair Acts and
Practices)

65.     Respondent's lack of appropriate and effective: (i) controls during the loan

         application, approval, and funding processes; (ii) merchant training and

         oversight; and (iii) complaint management, resulted in Respondent's

         engaging in origination and servicing activities on loans that consumers did

         not authorize.

66.     Respondent's practices caused or were likely to cause substantial injury to

         consumers by causing: (1) new unauthorized credit lines to appear on

         consumers' credit reports, potentially adversely affecting their credit

         profiles; (2) some consumers to make payments on unauthorized loans in

         order to avoid negative impact to their credit profiles from nonpayment; and

         (3) consumers to spend time and money attempting to rescind the loans,

         reverse charges, and remove Respondent's tradeline from their credit

         reports.

19

A456

67.   Some consumers did not learn of the loans until well after they were funded.

68.   The substantial injuries consumers suffered were therefore not reasonably
      avoidable.

69.   Nor were they outweighed by any countervailing benefit to consumers or to
      competition.

70.   Thus, Respondent engaged in unfair acts and practices in violation of
      Sections 1031(a) and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531(a),
      5536(a)(1)(B).

## CONDUCT PROVISIONS

## V.

### Required Conduct

**IT IS ORDERED**, under §§ 1053 and 1055 of the CFPA, that:

71.   Respondent and its officers, agents, servants, employees, and attorneys who
      have actual notice of this Consent Order, whether acting directly or
      indirectly, in connection with consumer loan authorizations, must take the
      following affirmative actions:

      a.   Obtain and retain evidence of a consumer's authorization of a loan in one
           of the following forms prior to asserting or reporting to a credit reporting
           agency any obligation on the part of the consumer and prior to the loan
           being activated:

20

A457

      i.   A signed written authorization from the consumer;

      ii.   An audio recording of a phone call with the consumer containing the consumer's verbal authorization; or

     iii.   Other documentary evidence evidencing consumer authorization of the loan obtained during loan activation procedures using email, the internet, or mobile messaging technology (such as SMS).

b.  To the extent that a consumer complains about authorization of a loan application, Respondent must delete any credit inquiry unless it has or obtains evidence of consumer authorization of the loan application.

c.  This paragraph shall not apply to Respondent's Patient Solutions Program, which requires consumers to apply for loans directly through Respondent.

72.    Respondent, whether acting directly or indirectly, must take the following affirmative actions with respect to Respondent's consumer complaint management program:

a.  Develop, implement, and monitor a consumer complaint management program designed to efficiently and accurately intake, investigate, document, resolve, and track consumer complaints regarding unauthorized loans and related unauthorized transactions;

b.   Acquire and allocate the systems and staff necessary to administer the

complaint management program in a manner consistent with the

requirements of subparagraph (a);

c.   Develop and implement written policies, practices, and procedures,

including specific standards of investigation, to govern the consumer

complaint management program described in subparagraph (a);

d.   Develop and implement a training program on the requirements of

subparagraphs (a) and (c) for Respondent's employees or agents

responsible for any aspect of the complaint management program;

e.   Review and analyze complaints in the consumer complaint management

program on a routine basis for the purpose of identifying trends,

emerging issues, and Merchants potentially involved in unauthorized

loans and related unauthorized transactions; and

f.   Based on the analyses conducted pursuant to subparagraph (e),

periodically revise policies and procedures, and implement updated

practices or solutions designed to prevent unauthorized loans.

73.   Respondent and its officers, agents, servants, employees, and attorneys who

have actual notice of this Consent Order, whether acting directly or

indirectly, in connection with receiving consumer complaints, must take the

following affirmative actions following receipt of a complaint regarding an

unauthorized loan for which Respondent cannot obtain or produce evidence
of consumer authorization as set forth in paragraph 71(a):

a.  Issue the consumer a provisional account credit within 5 business days of
    receiving the complaint, provided such complaint remains unresolved;

b.  Cancel the loan within 7 business days following resolution of a
    complaint of an unauthorized loan in the consumer's favor because
    Respondent does not possess or cannot obtain evidence of consumer
    authorization as required by paragraph 71(a);

c.  Issue a permanent account credit within 7 business days following
    resolution of a complaint of an unauthorized loan in the consumer's favor
    because Respondent does not possess or cannot obtain evidence of
    consumer authorization as required by paragraph 71(a);

d.  Refund the consumer for any amounts paid on the unauthorized loan
    within 10 business days following resolution of a complaint of an
    unauthorized loan in the consumer's favor because Respondent does not
    possess or cannot obtain evidence of consumer authorization as required
    by paragraph 71(a); and

e.  Submit a request to update or correct any incorrect or inaccurate
    information furnished to a consumer reporting agency in the subsequent
    reporting cycle following resolution of a consumer complaint of an

A460

unauthorized loan in the consumer's favor because Respondent does not
possess or cannot obtain evidence of consumer authorization as required
by paragraph 71(a).

74.    Respondent and its officers, agents, servants, employees, and attorneys who
have actual notice of this Consent Order, whether acting directly or
indirectly, in connection with loan application, verification, activation, and
transaction procedures, must take the following affirmative actions:

a.    Develop and implement policies, practices, procedures, and training
materials regarding:

i.    Obtaining and retaining evidence of consumers' loan authorizations
consistent with paragraph 71(a).

ii.    Attempting to verify consumers' email addresses and mobile
telephone numbers before sending loan activation messages to a
consumer's email address or mobile telephone number.

iii.    Using knowledge-based authentication procedures or other
comparably effective authentication procedures before activating a
loan or disbursing loan proceeds, if Respondent cannot verify a
consumer's email address or mobile telephone number;

iv.    Establishing affirmative loan activation steps a consumer must take
after a loan application is submitted and before Respondent may

24

disburse a consumer's loan proceeds or furnish information to a

consumer reporting agency; and

    v.  Obtaining and retaining evidence of consumers' approval of

transactions before Respondent may disburse loan proceeds to a

Merchant.

b.  Provide Clear and Prominent disclosures to consumers describing the

steps the consumer is taking, including their effect. Such disclosures shall

be provided, as applicable, before: (1) submission of a loan application;

(2) activation of a loan; and (3) a consumer approves the initial loan

transaction.

75.  Respondent, whether acting directly or indirectly, must take the following

affirmative actions regarding Merchant training and oversight:

a.  Develop and implement policies, procedures, and training materials

designed to prevent and prohibit Merchants from applying for loans

without consumers' knowledge or authorization, or using Shopping Pass

numbers without consumers' consent;

b.  Require any Merchant employee who intakes, facilitates, or submits

consumer loan applications to: (1) attend both an initial and subsequent

annual internet-based training on loan application submission procedures;

and (2) pass a knowledge test on loan application submission procedures following the initial internet-based training before the employee may begin intaking, facilitating, or submitting loan applications;

    i. This provision shall not prevent a Merchant employee who has not received such training from assisting consumers in contacting Respondent, and then having the consumer directly communicate with Respondent to apply for a GreenSky Program loan.

c. Develop and implement a process to verify the attendance of all Merchant employees required to receive training pursuant to subparagraph (b) at all required initial and annual trainings;

d. Discipline, including through suspension and termination, any Merchant who violates Respondent's loan application, activation, or transaction approval policies or procedures as outlined in paragraph 71, as set forth in the approved Compliance Plan; and

e. Develop and implement policies, practices, procedures, and training materials for effective oversight, risk management and audit of Merchants.

76. Respondent, whether acting directly or indirectly, must:

a. Develop, implement, and consistently apply policies, practices, and procedures governing Respondent's write-off practices, including clear

and detailed guidelines to govern write-off decisions, which must be set

forth in the approved Compliance Plan; and

b.  Develop and implement training materials and a training program on

Respondent's write-off policies, practices, and procedures.

## VI.

### Compliance Committee and Compliance Plan

**IT IS FURTHER ORDERED that:**

77.   The Board must establish a Compliance Committee of at least 3 directors, of

which at least 2 are not officers or employees of Respondent or any of its

affiliates. Within 14 days of the Effective Date, the Board must provide in

writing to the Enforcement Director the name of each member of the

Compliance Committee. If there is a change of membership to the

Compliance Committee, the Board must submit the name of any new

member in writing to the Enforcement Director.

78.   For 5 years from the Effective Date, the Compliance Committee will be

responsible for monitoring and coordinating Respondent's adherence to the

provisions of this Consent Order. The Compliance Committee must meet at

least quarterly and must maintain minutes of its meetings.

79.   Within 50 days of the Effective Date, the Compliance Committee must

submit to the Board a comprehensive compliance plan designed to ensure

that Respondent's loan origination and servicing activities comply with all applicable Federal consumer financial laws and the terms of this Consent Order (Compliance Plan). The Compliance Plan must include, at a minimum:

    a.  Detailed steps Respondent will take to effectuate each of the Conduct Provisions required by this Consent Order;

    b.  A mechanism to ensure that the Board is kept apprised of the status of compliance actions;

    c.  Specific steps, timeframes, and deadlines for implementation of the requirements described above; and

    d.  A proposal for who the Respondent will retain as the Assessor to complete the initial Assessment set forth in Section XI.

80.    Within 60 days of the Effective Date, the Board must submit a copy of the Compliance Plan, with any additional comments by the Board, to the Enforcement Director for review and determination of non-objection.

81.    The Enforcement Director will have the discretion to make a determination of non-objection to the Compliance Plan or direct Respondent to revise it. If the Enforcement Director directs Respondent to revise the Compliance Plan, Respondent must revise and resubmit the Compliance Plan to the Enforcement Director within 30 days.

82.     After receiving notification that the Enforcement Director has made a

        determination of non-objection to the Compliance Plan, Respondent must

        implement and adhere to the steps, recommendations, deadlines, and

        timeframes outlined in the Compliance Plan.

## VII.

### Role of the Board

**IT IS FURTHER ORDERED** that:

83.     The Board or a relevant committee thereof must review all submissions

        (including plans, reports, programs, policies, and procedures) required by

        this Consent Order prior to submission to the Bureau.

84.     Although this Consent Order requires Respondent to submit certain

        documents for review or non-objection by the Enforcement Director, the

        Board will have the ultimate responsibility for proper and sound

        management of Respondent and for ensuring that Respondent complies with

        the laws that the Bureau enforces, including Federal consumer financial laws

        and this Consent Order.

85.     In each instance that this Consent Order requires the Board to ensure

        adherence to, or perform certain obligations of Respondent, the Board or a

        relevant committee thereof must:

a. Authorize whatever actions are necessary for Respondent to fully comply with the Consent Order;

b. Require timely reporting by management to the Board or a relevant committee thereof on the status of compliance obligations; and

c. Require timely and appropriate corrective action to remedy any material non-compliance with any failures to comply with Board directives related to this Section.

## MONETARY PROVISIONS

## VIII.

## Order to Pay Redress

**IT IS FURTHER ORDERED** that:

86. Respondent shall pay redress to Affected Consumers as follows:

a. Cash redress totaling between $750,000 and $3,000,000 in the form of checks mailed to consumers (Cash Redress); and

b. Loan cancellations in an amount no more than $6,000,000 (Credit Redress).

87. Within 10 days of the Effective Date, Respondent shall reserve or deposit into a segregated deposit account an amount not less than $750,000 for the purpose of providing Cash Redress to Affected Consumers as required by this Section.

30

a.  If, at any time during the administration of this Consent Order, the Settlement Administrator, as defined in paragraph 88, determines that Cash Redress owed to Affected Consumers exceeds $750,000, Respondent shall reserve or deposit into a segregated deposit account, such additional amounts, not to exceed $3,000,000 in aggregate, for purposes of paying Cash Redress.

b.  If, at any time during the administration of this Consent Order, the Settlement Administrator determines that Cash Redress owed to Affected Consumers is less than $750,000, Respondent may use the remainder of the funds in the segregated deposit account to pay the Settlement Administrator as required by this Section. If funds remain in the segregated deposit account after paying Cash Redress and the Settlement Administrator, within 30 days of the completion of the Redress Plan, Respondent must pay the remainder to the Bureau, by wire transfer to the Bureau or to the Bureau's agent, and according to the Bureau's wiring instructions. The Bureau will deposit any remaining funds in the U.S. Treasury as disgorgement. Respondent will have no right to challenge any actions that the Bureau or its representatives may take under this Section.

A468

88.    Within 30 days of the Effective Date, Respondent must submit to the
       Enforcement Director for review and non-objection a proposal for retaining
       an independent third-party settlement administrator (Settlement
       Administrator) for the purpose of: (1) communicating with Potential
       Affected Consumers as set forth in subparagraph 3(i)(ii)(a-d); (2) conducting
       a review of Identified Consumer Account Information of Potential Affected
       Consumers to identify all Affected Consumers; (3) determining the amount
       of redress due to each Affected Consumer; and (4) administering redress
       pursuant to this Consent Order (Settlement Administrator Proposal).

89.    The Settlement Administrator Proposal shall identify the Settlement
       Administrator that Respondent proposes to retain and must include:

       a.    The proposed Settlement Administrator's qualifications and specialized
             expertise; and

       b.    A description of all work the proposed Settlement Administrator has
             performed for Respondent in the five years preceding the Effective Date
             (if any), including the amount Respondent paid the Settlement
             Administrator for each engagement.

90.    If the Enforcement Director directs Respondent to revise the Settlement
       Administrator Proposal or select a different Settlement Administrator,

Respondent must make such revisions or selection and resubmit the proposal within 10 days of the Enforcement Director's request.

91.   Within 15 days of the Enforcement Director's determination of non-objection, Respondent shall engage the Settlement Administrator for the purposes described in paragraph 88.

92.   Within 30 days of retaining the Settlement Administrator, Respondent must submit to the Enforcement Director for review and non-objection a comprehensive written plan for providing redress consistent with this Consent Order (Redress Plan). The Enforcement Director will have the discretion to make a determination of non-objection to the Redress Plan or direct Respondent to revise it. If the Enforcement Director directs Respondent to revise the Redress Plan, Respondent must revise and resubmit the Redress Plan to the Enforcement Director within 15 days. After receiving notification that the Enforcement Director has made a determination of non-objection to the Redress Plan, Respondent must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the approved Redress Plan.

93.   The Redress Plan must:

a.   Describe the methodology the Settlement Administrator will use to identify Potential Affected Consumers;

33

b.  Describe the steps the Settlement Administrator must take to communicate with the Potential Affected Consumers described subparagraphs 3(i)(ii)(a-d) and as required by subparagraphs 93 (e)- (f) including, without limitation: (1) how the Settlement Administrator will locate Potential Affected Consumers, (2) the form and method the Settlement Administrator will use to contact Potential Affected Consumers (e.g. mail, phone, email), (3) a representative exemplar of each form of communication, (4) how Potential Affected Consumers may respond to the Settlement Administrator's communication(s), and (5) the number of times and methods by which the Settlement Administrator must attempt to contact non-responsive Potential Affected Consumers.

c.  Describe the steps the Settlement Administrator will employ to conduct a review of the Identified Consumer Account Information of Potential Affected Consumers to identify all Affected Consumers, including the Settlement Administrator's discretion to take all reasonable steps where appropriate to verify the authenticity of Identified Consumer Account Information obtained from Merchants;

d.  Identify the parameters that the Settlement Administrator will use to determine which of the Potential Affected Consumers are Affected Consumers. At a minimum, Affected Consumers must include Potential

A471

Affected Consumers for whom Respondent does not possess or obtain at least one the following forms of evidence of authorization:

i.  Respondent's loan application or loan application information form with the consumer's signature;

ii.  An audio recording of a phone call with the consumer in which the consumer acknowledges that he or she submitted a loan application to Respondent for financing, authorized submission of a loan application by a Merchant, or confirmed that he or she wished to keep the GreenSky Program loan;

iii. An email or other written communication from the consumer in which the consumer acknowledges that he or she submitted a loan application for financing to Respondent, authorized submission of a loan application by a Merchant, or confirmed he or she wished to keep the GreenSky Program loan;

iv. Respondent's "Borrower Payment Certificate," signed by the consumer, indicating he or she agrees to the GreenSky Program loan;

v.  Respondent's "Limited Transaction Authorization Form," signed by the consumer, indicating he or she authorizes payments from the GreenSky Program loan to a Merchant; or

vi. A consumer's written or text response to an email or mobile messaging technology (such as SMS) alert from Respondent authorizing or acknowledging a loan transaction.

e. The requirement in paragraph 93(d) that Affected Consumers must include, at minimum, Potential Affected Consumers for whom Respondent does not possess or obtain one of the listed forms of evidence may not apply if the Identified Consumer Account Information contains evidence that the consumer: (i) signed an agreement with the Merchant for goods and services, and (ii) also applied for financing as a part of that agreement. In such instances, the Settlement Administrator must take the steps outlined in the approved Redress Plan to contact the Potential Affected Consumer to: (i) determine whether the Merchant provided the goods or services, (ii) determine how the Potential Affected Consumer paid for such goods or services, and, (iii) if applicable, invite the Potential Affected Consumer to submit any relevant evidence for the Settlement Administrator's consideration.

(a) For purposes of the Redress Plan, "evidence that the consumer (i) signed an agreement with the Merchant for goods and services, and (ii) also applied for financing as a part of that agreement," shall not include:

36

(1) Respondent's customer representative notes stating the

consumer has authorized the loan;

(2) A writing from a Merchant or Respondent's own notes

regarding communications with a Merchant where the

Merchant states the consumer authorized the loan or

transaction; or

(3) A transaction ledger or payment history for

Respondent's loan.

f.  Specify the methodology the Settlement Administrator will use to:

i.  Cancel loans for Affected Consumers;

ii.  Calculate Cash Redress and Credit Redress, including any setoff

pursuant to subparagraphs (iii)(a) to (c) below, for each Affected

Consumer;

iii.  For purposes of calculating redress pursuant to this Order, the

Redress Plan shall provide that the Settlement Administrator may

consider from Respondent a request for a setoff of Cash Redress or

Credit Redress for goods and services actually provided, as follows:

(a) Respondent shall bear the burden of proving that set off is

appropriate.

37

    (b)  If Respondent provides evidence to the Settlement Administrator that setoff may be appropriate, the Settlement Administrator must take the steps outlined in the approved Redress Plan to contact the Potential Affected Consumer to determine whether the Merchant provided goods or services to the Potential Affected Consumer, how the consumer paid for such goods or services, and, if applicable, invite the Potential Affected Consumer to submit any evidence for the Settlement Administrator's consideration.

    (c)  If Respondent and the Potential Affected Consumer present conflicting evidence, the Settlement Administrator may take any steps she or he deems necessary to determine whether setoff is appropriate, as will be further described in the Redress Plan.

  iii.  Delete Respondent's tradeline information with consumer reporting agencies; and

  iv.  Administer Cash Redress and Credit Redress to Affected Consumers.

g.  Provide that the Cash Redress or Credit Redress due to any Affected Consumer shall be paid pursuant to this Consent Order;

h.  Describe the Settlement Administrator's procedures for issuing and tracking Cash Redress and Credit Redress to each Affected Consumer;

i.  Provide that the Settlement Administrator shall mail each Affected Consumer owed redress under this Order an explanatory letter (Redress Notification Letter) that: (i) includes a statement that redress is being provided in accordance with the terms of this Consent Order; (ii) states why the Affected Consumer is receiving the letter; and (iii) states, if applicable, that the Affected Consumer's loan is being canceled and that the relevant tradeline will be deleted from their consumer report;

j.  Provide that neither the Settlement Administrator nor Respondent shall include in an envelope containing a Redress Notification Letter any materials other than the letter and a redress check, as applicable;

k.  Attach, as exhibits, an exemplar of each Redress Notification Letter envelope and letter template and any other scripts or correspondence used to communicate with Potential Affected Consumers;

l.  Specify timeframes and deadlines for implementing the Redress Plan;

m.  Allow Respondent to review the work conducted by the Settlement Administrator required by this Section to assure compliance with this Consent Order and the Redress Plan, provided however that: (i) the Settlement Administrator retains full and final decision-making rights as

39

to the class of Affected Consumers and the amounts of Cash Redress or

Credit Redress due to Affected Consumers under this Consent Order; and

(ii) a detailed accounting of any changes or modifications to the class of

Affected Consumers or amounts of redress due to Affected Consumers as

a result of Respondent's review under this provision shall be documented

and provided to the Bureau prior to completion of redress administration;

and

n.  Provide that Respondent will pay all costs of administering redress as

required by this Consent Order, subject to paragraph 87.

94.  After the Settlement Administrator has completed redress administration

under the Redress Plan, Respondent must submit a report to the Enforcement

Director, and identify: (i) the number of Potential Affected Consumers; (ii)

the number of Affected Consumers; (iii) the amount of Cash Redress

distributed and Credit Redress applied to Affected Consumers; (iv) the

number and amount of setoffs granted; (v) the amount of the Cash Redress

checks deposited by Affected Consumers; and (vi) the number of tradelines

deleted to correct inaccurate consumer reports.

95.  Respondent may not condition the payment of any redress to any Affected

Consumer under this Consent Order on that Affected Consumer waiving any

right.

**IX.**

**Order to Pay Civil Money Penalty**

**IT IS FURTHER ORDERED** that:

96.  Under § 1055(c) of the CFPA, 12 U.S.C. § 5565(c), by reason of the violations of law described in Section IV of this Consent Order, and taking into account the factors in 12 U.S.C. § 5565(c)(3), Respondent must pay a civil money penalty of $2,500,000 to the Bureau.

97.  Within 10 days of the Effective Date, Respondent must pay the civil money penalty by wire transfer to the Bureau or to the Bureau's agent in compliance with the Bureau's wiring instructions.

98.  The civil money penalty paid under this Consent Order will be deposited in the Civil Penalty Fund of the Bureau as required by § 1017(d) of the CFPA, 12 U.S.C. § 5497(d).

99.  Respondent, for all purposes, must treat the civil money penalty paid under this Consent Order as a penalty paid to the government. Regardless of how the Bureau ultimately uses those funds, Respondent may not:

  a.  Claim, assert, or apply for a tax deduction, tax credit, or any other tax benefit for any civil money penalty paid under this Consent Order; or

  b.  Seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made under any

41

insurance policy, with regard to any civil money penalty paid under this Consent Order.

100.   To preserve the deterrent effect of the civil money penalty in any Related Consumer Action, Respondent may not argue that Respondent is entitled to, nor may Respondent benefit by, any offset or reduction of any compensatory monetary remedies imposed in the Related Consumer Action because of the civil money penalty paid in this action or because of any payment that the Bureau makes from the Civil Penalty Fund. If the court in any Related Consumer Action offsets or otherwise reduces the amount of compensatory monetary remedies imposed against Respondent based on the civil money penalty paid in this action or based on any payment that the Bureau makes from the Civil Penalty Fund, Respondent must, within 30 days after entry of a final order granting such offset or reduction, notify the Bureau, and pay the amount of the offset or reduction to the U.S. Treasury. Such a payment will not be considered an additional civil money penalty and will not change the amount of the civil money penalty imposed in this action.

# X.

## Additional Monetary Provisions

**IT IS FURTHER ORDERED** that:

101.  In the event of any default on Respondent's obligations to make payment
      under this Consent Order, interest, computed under 28 U.S.C. § 1961, as
      amended, will accrue on any outstanding amounts not paid from the date of
      default to the date of payment, and will immediately become due and
      payable.

102.  Respondent must relinquish all dominion, control, and title to the funds paid
      to the fullest extent permitted by law and no part of the funds may be
      returned to Respondent.

103.  Under 31 U.S.C. § 7701, Respondent, unless it already has done so, must
      furnish to the Bureau its taxpayer-identification numbers, which may be
      used for purposes of collecting and reporting on any delinquent amount
      arising out of this Consent Order.

104.  Within 30 days of the entry of a final judgment, consent order, or settlement
      in a Related Consumer Action, Respondent must notify the Enforcement
      Director of the final judgment, consent order, or settlement in writing. That
      notification must indicate the amount of redress, if any, that Respondent paid

43

or is required to pay to consumers and describe the consumers or classes of consumers to whom that redress has been or will be paid.

## COMPLIANCE PROVISIONS

## XI.

### Reporting Requirements

**IT IS FURTHER ORDERED** that:

105.   Respondent must notify the Bureau of any development that may affect compliance obligations arising under this Consent Order, including but not limited to a dissolution, assignment, sale, merger, or other action that would result in the emergence of a successor company; the creation or dissolution of a subsidiary, parent, or affiliate that engages in any acts or practices subject to this Consent Order; the filing of any bankruptcy or insolvency proceeding by or against Respondent; or a change in Respondent's name or address. Respondent must provide this notice, if practicable, at least 30 days before the development, but in any case, no later than 14 days after the development.

106.   Within 7 days of the Effective Date, Respondent must:

a.   designate at least one telephone number and email, physical, and postal addresses as points of contact that the Bureau may use to communicate with Respondent;

44

b. identify all businesses for which Respondent is the majority owner, or that Respondent directly or indirectly controls, by all of their names, telephone numbers, and physical, postal, email, and Internet addresses; and

c. describe the activities of each such business, including the products and services offered, and the means of advertising, marketing, and sales.

107. Respondent must report any change in the information required to be submitted under paragraph 106 above at least 30 days before the change or as soon as practicable after the learning about the change, whichever is sooner.

108. Within 90 days of the Effective Date, and again one year after the Effective Date, Respondent must submit to the Enforcement Director an accurate written compliance progress report (Compliance Report) that has been approved by the Board, sworn to under penalty of perjury, which, at a minimum:

a. Lists each applicable paragraph and subparagraph of the Order and describes in detail the manner and form in which Respondent has complied with each such paragraph and subparagraph;

b. Describes in detail the manner and form in which Respondent has complied with the Redress Plan and Compliance Plan;

45

c.  Includes a report on Respondent's consumer complaint management

program, including, at a minimum:

   i.  The number of complaints received relating to allegedly

       unauthorized loans and related unauthorized transactions;

  ii.  The number of complaints of allegedly unauthorized loans resolved

       with evidence of authorization as specified in the Consent Order;

 iii.  The number of unauthorized loan complaints resolved by cancelling

       the loan because Respondent did not have proof of authorization or

       the consumer provided evidence indicating that the authorization

       was fraudulent;

  iv.  The number of unauthorized loan complaints where Respondent

       determined the consumer was liable but resolved the complaint with

       a goodwill gesture of cancelling the loan;

   v.  The mean and median number of days to resolve unauthorized loan

       complaints;

  vi.  The number of unauthorized loan complaints resulting in

       chargebacks for consumers because Respondent did not have proof

       of authorization or the consumer provided evidence indicating that

       the authorization was fraudulent;

 vii.  The aggregate amount of such chargebacks;

46

viii.   The number of unauthorized loan complaints resulting in refunds to
consumers because Respondent did not have proof of authorization
or the consumer provided information indicating that the
authorization was fraudulent;

ix.   The number of unauthorized loan complaints where Respondent
determined the consumer was liable but resolved the complaint with
a goodwill gesture of refunding the consumer;

x.   The aggregate amount of refunds to consumers relating to
unauthorized loan complaints because Respondent did not have
proof of authorization or the consumer provided information that
authorization was fraudulent;

xi.   The aggregate amount of refunds to consumers where Respondent
determined the consumer was liable but resolved the complaint with
a goodwill gesture of refunding the consumer;

xii.   The number of unauthorized loan complaints resulting in write-offs
because Respondent did not have proof of authorization or the
consumer provided information indicating that the authorization was
fraudulent; and

xiii.   The aggregate amount of the write-offs on loans with unauthorized
loan complaints because Respondent did not have proof of

authorization or the consumer provided information indicating that

the authorization was fraudulent.

   d.  Describe in detail the manner and form in which Respondent has

      complied with the Redress Plan and Compliance Plan; and

   e.  Attaches a copy of each Order Acknowledgment obtained under Section

      XII unless previously submitted to the Bureau.

109.  In connection with Section V of this Consent Order, Respondent must obtain

an initial and annual assessments (Assessments) from an independent third-

party professional (Assessor) as set forth in the approved Compliance Plan.

The reporting period for the Assessments must cover: (1) the period from the

Effective Date to 180 days after the Bureau non-objects to the Compliance

Plan; and (2) each 1-year period thereafter until termination of this Consent

Order for the annual Assessment.  Respondent must submit each Assessment

to the Bureau within ten days after the Assessment has been completed.

110.  Each Assessment must evaluate whether Respondent has effectively

implemented and maintained the requirements set forth in paragraphs 71-76,

and make recommendations to remediate or cure any ineffective

implementation or maintenance of the requirements set forth in paragraphs

71-76.

111.  No finding of any Assessment shall rely solely on assertions or attestations by Respondent's management. The Assessment shall be signed by the Assessor and shall state that the Assessor conducted an independent review and did not rely solely on assertions or attestations by Respondent's management.

## XII.

## Order Distribution and Acknowledgment

**IT IS FURTHER ORDERED** that:

112.  Within 7 days of the Effective Date, Respondent must submit to the Enforcement Director an acknowledgment of receipt of this Consent Order, sworn under penalty of perjury.

113.  Within 30 days of the Effective Date, Respondent must deliver a copy of this Consent Order to each of its board members and executive officers, as well as to any managers, employees, service providers, or other agents and representatives who have responsibilities related to the subject matter of the Consent Order.

114.  For 5 years from the Effective Date, Respondent must deliver a copy of this Consent Order to any business entity resulting from any change in structure referred to in Section XI, any future board members and executive officers, as well as to any managers, employees, service providers, or other agents

and representatives who will have responsibilities related to the subject

matter of the Consent Order before they assume their responsibilities.

115.  Respondent must secure a signed and dated statement acknowledging receipt

of a copy of this Consent Order, ensuring that any electronic signatures

comply with the requirements of the E-Sign Act, 15 U.S.C. § 7001 *et seq.*,

within 30 days of delivery, from all persons receiving a copy of this Consent

Order under this Section.

116.  Within 90 days of the Effective Date, Respondent must provide the Bureau

with a list of all persons and their titles to whom this Consent Order was

delivered through that date under paragraphs 113-114 and a copy of all

signed and dated statements acknowledging receipt of this Consent Order

under paragraph 115.

## XIII.

### Recordkeeping

**IT IS FURTHER ORDERED** that:

117.  Respondent must create and retain the following business records:

a.  all documents and records necessary to demonstrate full compliance with

each provision of this Consent Order, including all submissions to the

Bureau;

b.  all documents and records pertaining to the Redress Plan, described in

Section VIII above;

c.   copies of all sales scripts, training materials, advertisements, websites, and other marketing materials, including any such materials used by a third party on Respondent's behalf;

d.   all consumer complaints and refund requests (whether received directly or indirectly, such as through a third party), and any responses to those complaints or requests;

e.   records showing, for each employee providing services related to Respondent's loans, that person's name, telephone number, email, physical, and postal address, job title or position, dates of service, and, if applicable, the reason for termination; and

f.   records showing, for each Merchant and any other service provider providing services related to the GreenSky Program loans, the name of a point of contact, and that person's telephone number, email, physical, and postal address, job title or position, dates of service, and, if applicable, the reason for termination.

118.   Respondent must make the documents identified in paragraph 117 available to the Bureau upon the Bureau's request.

# XIV.

## Notices

**IT IS FURTHER ORDERED** that:

119.   Unless otherwise directed in writing by the Bureau, Respondent must

provide all submissions, requests, communications, or other documents

relating to this Consent Order in writing, with the subject line, "*In re*

GreenSky, LLC, File No. 2021-CFPB- 0004," and send them by

overnight courier or first-class mail to the below address and

contemporaneously by email to Enforcement_Compliance@cfpb.gov:

> Assistant Director for Enforcement
> Consumer Financial Protection Bureau
> ATTENTION: Office of Enforcement
> 1700 G Street, N.W.
> Washington D.C. 20552

# XV.

## Cooperation with the Bureau

**IT IS FURTHER ORDERED** that:

120.   Respondent must cooperate fully to help the Bureau determine the identity

and location of, and the amount of injury sustained by, each Affected

Consumer. Respondent must provide such information in its or its agents'

possession or control within 14 days of receiving a written request from the

Bureau.

52

# XVI.

## Compliance Monitoring

**IT IS FURTHER ORDERED** that:

121.   Within 14 days of receipt of a written request from the Bureau, Respondent

must submit additional Compliance Reports or other requested information,

which must be made under penalty of perjury; provide sworn testimony; or

produce documents.

122.   For purposes of this Section, the Bureau may communicate directly with

Respondent, unless Respondent retains counsel related to these

communications.

123.   Respondent must permit Bureau representatives to interview any employee

or other person affiliated with Respondent who has agreed to such an

interview regarding: (a) this matter; (b) anything related to or associated

with the conduct described in Section IV; or (c) compliance with the

Consent Order. The person interviewed may have counsel present.

124.   Nothing in this Consent Order will limit the Bureau's lawful use of civil

investigative demands under 12 C.F.R. § 1080.6 or other compulsory

process.

A490

## XVII.

### Modifications to Non-Material Requirements

**IT IS FURTHER ORDERED** that:

125.   Respondent may seek a modification to non-material requirements of this
       Consent Order (*e.g.*, reasonable extensions of time and changes to reporting
       requirements) by submitting a written request to the Enforcement Director.

126.   The Enforcement Director may, in his or her discretion, modify any non-
       material requirements of this Consent Order (*e.g.*, reasonable extensions of
       time and changes to reporting requirements) if he or she determines good
       cause justifies the modification. Any such modification by the Enforcement
       Director must be in writing.

### ADMINISTRATIVE PROVISIONS

### XVIII.

**IT IS FURTHER ORDERED** that:

127.   The provisions of this Consent Order do not bar, estop, or otherwise prevent
       the Bureau from taking any other action against Respondent, except as
       described in paragraph 128. Further, for the avoidance of doubt, the
       provisions of this Consent Order do not bar, estop, or otherwise prevent any
       other person or governmental agency from taking any action against
       Respondent.

128.   The Bureau releases and discharges Respondent from all potential liability for law violations that the Bureau has or might have asserted based on the practices described in Section IV of this Consent Order, to the extent such practices occurred before the Effective Date and the Bureau knows about them as of the Effective Date. The Bureau may use the practices described in this Consent Order in future enforcement actions against Respondent and its affiliates, including, without limitation, to establish a pattern or practice of violations or the continuation of a pattern or practice of violations or to calculate the amount of any penalty. This release does not preclude or affect any right of the Bureau to determine and ensure compliance with the Consent Order, or to seek penalties for any violations of the Consent Order.

129.   This Consent Order is intended to be, and will be construed as, a final Consent Order issued under § 1053 of the CFPA, 12 U.S.C. § 5563, and expressly does not form, and may not be construed to form, a contract binding the Bureau or the United States.

130.   This Consent Order will terminate 5 years from the Effective Date or 5 years from the most recent date that the Bureau initiates an action alleging any violation of the Consent Order by Respondent. If such action is dismissed or the relevant adjudicative body rules that Respondent did not violate any provision of the Consent Order, and the dismissal or ruling is either not

appealed or upheld on appeal, then the Consent Order will terminate as

though the action had never been filed. The Consent Order will remain

effective and enforceable until such time, except to the extent that any

provisions of this Consent Order have been amended, suspended, waived, or

terminated in writing by the Bureau or its designated agent.

131.   Calculation of time limitations will run from the Effective Date and be based

on calendar days, unless otherwise noted.

132.   Should Respondent seek to transfer or assign all or part of its operations that

are subject to this Consent Order, Respondent must, as a condition of sale,

obtain the written agreement of the transferee or assignee to comply with all

applicable provisions of this Consent Order.

133.   The provisions of this Consent Order will be enforceable by the Bureau. For

any violation of this Consent Order, the Bureau may impose the maximum

amount of civil money penalties allowed under § 1055(c) of the CFPA, 12

U.S.C. § 5565(c). In connection with any attempt by the Bureau to enforce

this Consent Order in federal district court, the Bureau may serve

Respondent wherever Respondent may be found, and Respondent may not

contest that court's personal jurisdiction over Respondent.

134.   This Consent Order and the accompanying Stipulation contain the complete

agreement between the parties. The parties have made no promises,

representations, or warranties other than what is contained in this Consent Order and the accompanying Stipulation. This Consent Order and the accompanying Stipulation supersede any prior oral or written communications, discussions, or understandings.

135.   Nothing in this Consent Order or the accompanying Stipulation may be construed as allowing Respondent, its Board, officers, or employees to violate any law, rule, or regulation.

**IT IS SO ORDERED**, this 12th day of July 2021.

*David K. Uejio*
David Uejio
Acting Director
Consumer Financial Protection Bureau

A494

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) SUSAN PARISI,        ) | |
|       ) | |
|       ) | |
|     Plaintiff,      ) | |
|       ) | |
| v.       ) | Case No. CIV-23-115-R |
|       ) | |
| (1) C CASHION WINDOWS, LLC d/b/a | |
| RENEWAL BY ANDERSON OF    ) | |
| OKLAHOMA, and (2) BMO HARRIS  ) | |
| BANK, NA d/b/a GREENSKY, LLC,  ) | |
|       ) | |
|     Defendants.    ) | |

## DEFENDANT GREENSKY, LLC'S, INCORRECTLY IDENTIFIED AS BMO HARRIS BANK, NA D/B/A GREENSKY, LLC, REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS ALL CLAIMS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(3)

Defendant, GreenSky, LLC (hereinafter "GreenSky"), incorrectly identified as BMO Harris Bank, NA d/b/a GreenSky, LLC, subject to and without waiving its motion to compel arbitration, files this Reply Brief in Support of its Motion to Dismiss All Claims asserted by Plaintiff Susan Parisi ("Plaintiff") pursuant to Federal Rule of Civil Procedure 12(b)(3) (the "Motion"). Dkt.#46; Dkt.#47. This Reply Brief is in reply to Plaintiff's Response in Opposition to GreenSky's Second and Redundant Motion to Dismiss (the "Response"). Dkt.#56. This case is based on a loan agreement involving Plaintiff, which contains a mandatory arbitration provision directing the parties to resolve and dismiss or stay Plaintiff's claims in this case pending the outcome of arbitration. In the Motion, GreenSky seeks dismissal of this case based on the mandatory arbitration provision. In

1

further support of the Motion, and in reply to the Response, GreenSky respectfully shows as follows:

## I.
## PLAINTIFF'S CLASS ACTION CLAIMS ARE PREDICATED ON HER ALLEGED STATUS AS A "DEBTOR" UNDER OKLAHOMA CONSUMER DISCLOSURE STATUTES

In her Response, Plaintiff asserts she is not bound to the arbitration provision in her Installment Loan Agreement/Non-Negotiable Consumer Note dated November 23, 2021 (the "Loan Agreement")[1] because there was no meeting of minds as to the terms of the loan agreement, and therefore no loan agreement in the first place.  Plaintiff has pleaded this case as a class action case.  The problem with Plaintiff's assertion in the Response that there was no contract between Plaintiff and GreenSky is that it is fatally inconsistent with the class action relief she is seeking in her Complaint.

In Plaintiff's Amended Petition and Motion to Certify a Class Action (the "Petition"), Plaintiff asserts "the principal legal question common to [Plaintiff] and to each class member is whether adequate consumer credit disclosures were provided to class members *prior to consummation or liability for the loans originated by Andersen and later sold to [GreenSky]*."  Petition, ¶ 22 (emphasis added).  If there is no agreement at all with respect to any loan, as Plaintiff is asserting in her Response, it necessarily follows that there would have been *no* "consummation or liability" on any loan with respect to Plaintiff.

---

[1] The Loan Agreement is attached as Exhibit 4 to Defendant GreenSky, LLC's, Incorrectly Identified as BMO Harris Bank, NA d/b/a GreenSky, LLC, Brief in Support of Motion to Dismiss All Claims Pursuant to Federal Rule of Civil Procedure 12(b)(3) (hereinafter referred to as the "Brief").

As set forth in the Petition, Plaintiff's proposed "class" claims are based on GreenSky's alleged failures to provide certain disclosures applicable to consumer loans that are set forth in OKLA. STAT. ANN. tit. 14A, § 3-306 (the "Consumer Disclosure Requirements"). The Consumer Disclosure Requirements state that the required disclosures are to be provided to the "debtor," which, of course, means that Plaintiff must qualify as a "debtor" to have standing to assert claims based on the Consumer Disclosure Requirements. *See id*. §3-306(2) (stating "[t]he lender shall give to the *debtor* the following information") (emphasis added).

There does not appear to be a statutory definition of "debtor" that specifically applies to the Consumer Disclosure Requirements. However, the term "debtor" is generally defined as a person who owes an obligation or is subject to some form of liability. *See, e.g., Racher v. Lusk*, No. CIV-13-665-M, 2013 WL 6037122, at *9 (W.D. Okla. Nov. 14, 2013) ("'Debtor' means a person who is liable on a claim."); *State ex rel. State Ins. Fund v. Houston*, No. 97,553, 2003 WL 25284639, at *2 (Okla. Civ. App. Aug. 12, 2003) (stating the term "account debtor" means a person "obligated on an account") (citing 12A O.S.2001 § 1–9–102(a)(3)). By asserting class claims based on the Consumer Disclosure Requirements, Plaintiff is necessarily asserting she is a "debtor" who is liable on a claim.

Consistent with the assertion she is a "debtor," Plaintiff states in the Petition that "the principal legal question common to [Plaintiff] and to each class member is whether adequate consumer credit disclosures were provided to class members *prior to consummation or liability for the loans originated by Andersen and later sold to [GreenSky]*." Petition, ¶ 22 (emphasis added). In other words, Plaintiff's class action

3

A497

claims are necessarily predicated upon Plaintiff having consummated and/or otherwise become subject to liability under a loan agreement.  This is especially true because Plaintiff cannot represent a class in which she is not a member.  *See Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 216 (1974) ("To have standing to sue as a class representative it is essential that a plaintiff ... be a part of that class, that is, he [or she] must possess the same interest and suffer the same injury shared by all members of the class he [or she] represents."); *see also Rector v. City of Denver,* 348 F.3d 935, 949 (10th Cir. 2003). Plaintiff does *not* identify any agreement or any terms *other that those set forth in the Loan Agreement* under which she could have become liable and thus become a "debtor" under the Consumer Disclosure Requirements.  Accordingly, if Plaintiff is a "debtor" with alleged rights under the Consumer Disclosure Requirements, then the basis for her obligations under the loan would necessarily be the terms of the Loan Agreement.

## II.
## IF PLAINTIFF IS A DEBTOR WITH STANDING UNDER THE CONSUMER DISCLOSURE REQUIREMENTS, SHE WOULD BE SUBJECT TO THE ARBITRATION PROVISIONS IN THE LOAN AGREEMENT

It is undisputed the Loan Agreement was sent to Plaintiff, both electronically and through the U.S. mail at the email and physical addresses she provided on November 23, 2021, prior to the advancement of funds under the Loan Agreement.  *See* Motion, Exhibit 5 (Declaration of Timothy D. Kaliban [hereinafter, the "Kaliban Declaration"]), ¶¶ 18-21, 23-24 (Dkt.#18-3, pp. 4-5).  It is also undisputed that neither the electronic nor written correspondence from GreenSky to Plaintiff containing the Loan Agreement was returned as undelivered.  *Id.*, ¶ 22, 25-27 (Dkt.#18-3, pp. 5-6).

4

Significantly, Plaintiff asserts that she received a letter from GreenSky stating that GreenSky had sent a payment for $8,871.50 directly to Oklahoma Windows "on or around November 26, 2021 to November 29, 2021." Response, Exhibit A (Declaration of Susan Parisi [hereinafter, the "Parisi Declaration"]), ¶ 40. GreenSky's records show that Plaintiff's Shopping Pass was not used and that GreenSky did not release any sums under the Loan Agreement until November 29, 2021. *See* Motion, Exhibit 5 (Kaliban Declaration), ¶¶ 28-30 & Exhibit 4. In any event, the allegations in the Parisi Declaration show that Plaintiff did, in fact, receive mail from GreenSky regarding the transaction before the Shopping Pass was used, which indicates Plaintiff would have received the copy of the Loan Agreement that had been mailed on November 23, 2021 prior to the release of any funds on November 29.

Plaintiff was not required to sign the Loan Agreement or the arbitration provision for the arbitration provision to be valid and enforceable under the Federal Arbitration Act. *See Seawright v. American General Financial Services, Inc*. 507 F.3d 967, 978 (6th Cir. 2007). In fact, Plaintiff was not required to have even reviewed and specifically approved the arbitration provision for arbitration to be enforceable. *See Wilmore v. Charter Communications LLC,* No. 3:21-cv-01271 (JAM), 2023 WL 2503306, at *5 (D. Conn. Mar. 14, 2023); *Hulwick v. CBOCS East, Inc.,* No. 1:17-CV-468-TLS, 2018 WL 2933684, at *4 (N.D. Ind. Jun. 11, 2018).

In her Response, Plaintiff admits she applied for financing from GreenSky, and indicates she would have borrowed money through the GreenSky program if the financing terms had been different. Response, Exhibit A, Parisi Declaration, ¶¶ 7-10. In other words,

5

Plaintiff does not state there was no basis at all for any financing transaction with GreenSky in connection with her purchase of windows from Oklahoma Windows. Instead, Plaintiff's complaint with the terms of the final Loan Agreement relates to the *financing terms,* which Plaintiff alleges did not reflect her original agreement. Regardless of the financing terms, any loan agreement through the GreenSky program would have the same arbitration agreement contained in the final Loan Agreement, as all GreenSky loan agreements contain the same arbitration agreement. Thus, the alleged change in the financing terms to which Plaintiff allegedly agreed would not have affected the existence or terms of the arbitration agreement.

If Plaintiff insists on maintaining class action claims that require her to be a "debtor," then the terms of any such relationship would be defined in the Loan Agreement. Plaintiff has not provided any other agreement between her and GreenSky with terms that differ from the Loan Agreement. Because the Loan Agreement contains the arbitration provision, GreenSky is entitled to arbitration of the claims asserted in this case that require Plaintiff to qualify as a "debtor," such as the Consumer Disclosure Requirements. On the other hand, to the extent Plaintiff's claims are based on allegations she was not a debtor, then she is not a member of the class of "debtors" she purports to represent. This would preclude her from maintaining her class action claims in this case. *See Schlesinger,* 418 U.S. at 216; *Rector v. City of Denver,* 348 F.3d 935, 949.

Plaintiff cannot have her cake and eat it, too. Either she is a "debtor" with claims under the Consumer Disclosure Requirements, or she is not. Plaintiff should not be able to maintain she is a "debtor" when she believes it helps her class action claims under the

Consumer Disclosure Requirements, while asserting she is not a "debtor" when she believes it would help her claim that she is not subject to the arbitration provisions in the Loan Agreement.  If she is a "debtor," then her claims are subject to arbitration under the Loan Agreement.  If she is not a "debtor," then her class action claims must fail.

## III.
## GREENSKY OBJECTS TO THE CONSENT ORDER ATTACHED AS EXHIBIT B TO THE RESPONSE

In her Response, Plaintiff has attached as Exhibit B a 2021 Consent Order in a previous administrative proceeding before the United States Consumer Financial Protection Bureau (the "Consent Order") to attempt to establish the factual bases of her claims and those of the purported class she seeks to represent in this case.  For the reasons set forth in GreenSky's Objection to Use of Consent Order, filed on September 7, 2023 (Docket No. 43) and GreenSky's Reply to Plaintiff's Response in Opposition to Defendant GreenSky, LLC's Objection to Use of Consent Order, filed on October 30, 2023 (Docket No. 54), both of which are in the Court's file and are fully incorporated by reference herein, GreenSky objects to Plaintiff's proposed use of the Consent Order because such Consent Order has nothing to do with Plaintiff's class action claims based on the Consumer Disclosure Requirements.  *See Gribben v. United Parcel Serv., Inc.,* 528 F.3d 1166, 1172 (9th Cir. 2008); *Kramas v. Sec. Gas & Oil Inc.,* 672 F.2d 766, 772 (9th Cir. 1982); *Option Res. Grp. v. Chambers Dev. Co.,* 967 F. Supp. 846, 850 (W.D. Pa. 1996).  GreenSky also objects to the Consent Order because it constitutes evidence of compromise or offers to compromise claims under Federal Rule of Evidence 408.  *See* FED. R. EVID. 408; *Kramas v. Sec. Gas & Oil Inc.,* 672 F.2d 766, 772 (9th Cir. 1982); *see also Bowers v. Nat'l*

7

A501

*Collegiate Athletic Ass'n*, 563 F. Supp. 2d 508, 535–37 (D.N.J. 2008); *Mendez v. Bank of Am. Home Loans Servicing, LP*, 840 F. Supp. 2d 639, 658–59 (E.D.N.Y. 2012); *Option Res. Grp.,* 967 F. Supp. at 850.

### IV.
### <u>CONCLUSION</u>

WHEREFORE, GreenSky respectfully requests that this Court grant its Motion to Dismiss pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure and dismiss all of Plaintiff's claims against GreenSky in this case so such claims can be decided in arbitration.  GreenSky also requests any further relief of any nature to which it may be justly entitled.

A502

Respectfully submitted,

Dated: November 7, 2023

*s/ Kyle R. Prince*
Derrick T. DeWitt, OBA #18044
Kyle R. Prince, OBA #33040
DeWITT PARUOLO & MEEK
P.O. Box 138800
Oklahoma City, OK 73113
T: (405) 705-3600
F: (405) 705-2573
ddewitt@46legal.com
kprince@46legal.com

-and-

Sean W. Fleming
*Admitted Pro Hac Vice*
Texas State Bar No. 24027250
MACDONALD DEVIN MADDEN
KENEFICK & HARRIS, P.C.
12770 Coit Road, Suite 1100
Dallas, Texas 75251
T: (214) 744-3300
F: (214) 747-0942
SFleming@MacdonaldDevin.com
**Attorneys for Defendant GreenSky, LLC,
incorrectly identified as BMO Harris Bank,
NA d/b/a GreenSky, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of November, 2023, I electronically transmitted

this document to the Clerk of Court using the ECF System for filing and transmittal of a

Notice of Electronic Filing to the following ECF registrants:


M. Kathi Rawls, OBA #18814
Minal Gahlot, OBA #22145
kathi@rawlsgahlot.com
minal@rawlsgahlot.com
-and-
Janet R. Varnell, FBN #0071072
jvarnell@vandwlaw.com
***Attorneys for Plaintiffs***

Shelia D. Sayne, OBA #31213
shelia.sayne@outlook.com
***Attorney for Defendant***
***Oklahoma Windows and Doors, LLC d/b/a***
***Renewal by Anderson of Oklahoma***


                                        *s/ Kyle R. Prince*

10

A504

## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **SUSAN PARISI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. CIV-23-115-R** |
| | ) | |
| **OKLAHOMA WINDOWS AND** | ) | |
| **DOORS, LLC, d/b/a RENEWAL BY** | ) | |
| **ANDERSEN OF OKLAHOMA; and** | ) | |
| **BMO HARRIS BANK, NA, d/b/a** | ) | |
| **GREENSKY, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>ORDER</u>

Before the Court is Defendant GreenSky, LLC's Motion to Compel Arbitration [Doc. 17] and Motion to Dismiss All Claims Pursuant to Federal Rule of Civil Procedure 12(b)(3) [Doc. 46]. Both motions are fully briefed and at issue [Docs. 39, 42, 56, 65]. The Court addresses both Motions with this Order given their considerable overlap. Both Motions are DENIED for the reasons below.

### I.     BACKGROUND

This case stems from a purported loan agreement to finance the installation of new windows in Plaintiff's home. The chronology of facts proves to be crucial to the Court's determination, so it must be discussed with some particularity. Factual matter is cited from

affidavits provided by each party, allegations in the Complaint, and factual matter in parties' exhibits.[1]

### A. GreenSky and Renewal by Andersen's Business Model

GreenSky, LLC works with merchants to provide consumer loans to customers who need to finance their purchases. Doc. 36: Compl. ¶¶ 43-44. Renewal by Andersen of Oklahoma is one of those merchants, and it advertises to potential customers the ability to finance the cost of replacing windows. *Id.* ¶¶ 44, 59. Customers deal directly with Andersen to initiate their window project; they provide personal information to an Andersen representative via the representative's iPad to apply for a loan from GreenSky. *Id.* ¶¶ 43-48. This information enables GreenSky to make a rapid financing decision on the customer's loan application. *Id.* ¶ 47; Doc. 18-3: Kaliban Decl. ¶¶ 12-13.

Once approved for a loan, GreenSky activates a Shopping Pass, which functions like a credit card, for the applicant's account. Compl. ¶ 51. The Shopping Pass account number is used by the Borrower or Merchant to initiate a transaction with GreenSky and allows loaned funds to be disbursed directly to the Merchant for the planned work. *Id.* ¶¶ 52-53. Merchants may use the Shopping Pass number to apply directly to GreenSky for disbursement of funds to themselves, relying on the previous authorization of the Borrower/Customer to begin a project. *Id.* ¶¶ 52-53, 58; Kaliban Decl. ¶ 29. The terms of

---

[1] The court may look to "evidence outside of the complaint such as . . . affidavits" in considering a motion to dismiss based upon improper venue. *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1260 (10th Cir. 2012). Likewise, analyzing a motion to compel arbitration is akin to summary judgment practice, meaning this Court can examine the record to determine whether a genuine dispute of fact regarding the existence of an agreement to arbitrate exists. *See Bellman v. i3 Carbon, LLC*, 563 F. App'x 608, 612 (10th Cir. 2014).

GreenSky's Loan Agreement state that any use of the Shopping Pass constitutes acceptance of the Loan Agreement by the Borrower/Customer. Kaliban Decl. ¶ 29. The terms also direct Borrowers to immediately notify GreenSky regarding unauthorized activity on the account, require that any unauthorized transactions be reported to GreenSky within sixty days, and ensure Borrowers that "[y]ou will have no Loan unless you authorize a transaction[.]" Doc. 39-3 at 6.

**B. The Initial Meeting and Loan Application on November 23, 2021**

Susan Parisi received communications from Andersen advertising the ability to upgrade her home's windows with a loan requiring zero money down, zero interest for two years, and zero payments for twenty-four months ("Zero-Interest Loan"). Doc. 39-1: Parisi Decl. ¶¶ 4, 7. Parisi met with Russell Kelley, a representative from Andersen, at her home on November 23, 2021. *Id.* ¶ 4. They decided to replace nine windows in Parisi's home. Compl. ¶¶ 63-64. However, Parisi informed Kelley she was beginning treatment for cancer soon, and she would need the Zero-Interest Loan option due to the costs and time her treatment would entail. *Id.* ¶ 62.

Kelley confirmed that GreenSky offered a Zero-Interest Loan that would enable Parisi to purchase the windows. *Id.* ¶ 61; Parisi Decl. ¶ 7. Kelley stated that Parisi would need to provide information to GreenSky via his iPad and a phone call so that GreenSky could review her creditworthiness. Parisi Decl. ¶¶ 8-14. Parisi electronically signed where she was instructed to on the iPad to authorize the loan application. *Id.* ¶¶ 15-18. In doing so, Parisi only ever intended to apply for the Zero-Interest Loan. *Id.* ¶ 21. Thirty minutes later, GreenSky called Kelley and informed Parisi via speakerphone that she had been

A507

approved for the two-year loan program with GreenSky. Kaliban Decl. ¶ 17; Parisi Decl.

¶¶ 22-26. Kelley showed Parisi his iPad to evidence she had been approved for the Zero-

Interest Loan, but neither the loan's financial terms nor contract were visible or capable of

being reviewed. Compl. ¶ 65; Parisi Decl. ¶ 28. Before he left her home, Kelley assured

Parisi a contract would be mailed to her. Compl. ¶ 66; Parisi Decl. ¶ 29.

It is uncontroverted that a contract was sent to Parisi on November 23. GreenSky

states a contract was mailed to Parisi via the United States Postal Service that day (which

happened to be the Tuesday before the Thanksgiving holiday). Kaliban Decl. ¶¶ 18-22.

GreenSky also states they emailed a copy of the same Loan Agreement to an email address

Parisi had provided. Kaliban Decl. ¶¶ 23-27.[2] Additionally, Kelley sent her an email that

day containing a contract and financing terms between Andersen and Parisi. Parisi Decl.

¶ 31.

However, Parisi was evidently unaware these contracts were sent to her. She states

she never saw either email because they ended up in her spam folder.[3] Parisi Decl. ¶¶ 31-

32. The only emailed contract Parisi states she received in her Spam folder was the one

from Kelley;[4] the financial terms in that contract were labeled Loan Plan 3541 and reflected

---

[2] Parties are reminded of this Court's Local Rule LCvR7.1(n) regarding exhibits, attachments, and appendices. Both parties erred by duplicating and mislabeling exhibits. For instance, Mr. Kaliban's declaration, itself Exhibit 3 to Document 18, included reference to four additional exhibits within the declaration. The Court would appreciate greater clarity in the parties' use of exhibits and attachments.

[3] Parisi only checked her spam folder at the request of her counsel well over a year after the events discussed herein. Parisi Decl. ¶ 32. Presumably, both emailed contracts were in her spam folder, though she only makes mention of the email from Kelley.

[4] Inexplicably, both parties produce only the supposed attachments to the emails they allegedly sent or received. Plaintiff produced the agreement attached to the alleged email from Kelley, but

the terms of the Zero-Interest Loan. *Id.* ¶ 33. That contract had Parisi's electronic signature affixed to pages she had neither seen nor had described to her by Kelley.[5] *Id.* ¶¶ 33-35. As for the mailed contract, Parisi claims she received it the following week—after her supposed acceptance had already occurred. *Id.* ¶ 42.

### C.  Minimal Communication between November 23 and November 29

A few days following their initial meeting, Parisi received a call from Kelley informing her that she had, in fact, not qualified for the Zero-Interest Loan. Parisi Decl. ¶ 39. He told her that he would find out what happened and follow up with her, but Parisi never heard from him again. Compl. ¶¶ 71-72.

### D.  The Disputed Acceptance of the Loan Agreement on November 29

Sometime before noon on November 29, 2021 (the Monday following Thanksgiving), the Shopping Pass associated with Parisi's account was charged in the amount of $8,871.50.[6] Parisi Decl. ¶ 40; Kaliban Decl. ¶ 28. GreenSky claims, by virtue of this transaction, Parisi accepted the terms of the Loan Agreement as they stood on that day. Kaliban Decl. ¶ 29. Because of the use of the Shopping Pass, GreenSky claims Parisi accepted the terms of a different loan, not the Zero-Interest Loan Parisi had thought she had obtained. *Id.*; Parisi Decl. ¶ 43; Doc. 39-3 at 6.

---

she produces no record of the email itself. Likewise, Defendant produces the Loan Agreement it supposedly attached in an email to Parisi on November 23, but it fails to produce a record of the email itself.

[5] Parisi believes her signature is forged in two spots on this document. *Id.* ¶¶ 36-38.

[6] The Court notes the holiday because it reduces the amount of business and postal days between Parisi's initial meeting with Kelley and her alleged acceptance. Parisi's email initially disputing the charge [Doc. 27-8] was sent midday, indicating the transaction was processed Monday morning.

The loan Parisi is allegedly bound to is markedly different than the loan Parisi sought. Loan Plan 7541 ("High-Interest Loan") [7] requires payments beginning in six months, charges an annual percentage rate of 24.99%, and projects a total cost of $37,717.08 over the life of the $17,744 loan.[8] Doc. 39-3; Doc. 18-3 at 12. The Loan Agreement states, "THIS IS A DIFFERENT PLAN THAN REQUESTED." Doc. 39-3 at 6. The terms also state "FOR PROTECTION AGAINST UNAUTHORIZED PURCHASES, IDENTIFICATION WILL BE REQUIRED FOR ALL PURCHASES." *Id.*

Parisi received three communications from GreenSky or Kelley regarding the loan for which she was approved. First, the physical copy of the Loan Agreement mailed to Parisi on November 23 reflected the terms of the High-Interest Loan. *Id.* However, Parisi states she did not receive the contract in the mail until sometime after November 29. Parisi Decl. ¶ 42. Second, the alleged email GreenSky sent on November 23 included the same High-Interest Loan Agreement attached. Kaliban Decl. ¶ 23. Parisi did not review this copy of the Loan Agreement, as it presumably went to Parisi's spam folder. Parisi Decl. ¶¶ 31-32. Third, Kelley also sent an email to Parisi on November 23; however, it reflected the terms of the Zero-Interest Loan. *Id.* ¶¶ 31-33. This email sat unopened in Parisi's spam folder, too. *Id.* Consequently, the first time Parisi reviewed a Loan Agreement was after

---

[7] GreenSky labels the Loan Agreements with numerals (Loan Plan 3541 and Loan Plan 7541), but this Court refers to them as the Zero-Interest Loan and the High-Interest Loan, respectively, to aid readers.

[8] This is assuming minimum payments are made as projected by the Truth in Lending Disclosure. The total cost of the Zero-Interest Loan would presumably be lower given the much longer two-year promotional period.

A510

November 29—the date of her alleged acceptance—when she received the physical copy in the mail. *Id.* ¶ 42.

Parisi was notified of the Shopping Pass transaction and promptly reached out to GreenSky's customer service email that same day, November 29, stating she was never informed the $8,871.50 charge was going to take place. Doc. 56-1 at 41; Doc. 27-8. Parisi exchanged several emails with GreenSky over the ensuing days disputing and objecting to the transaction she had allegedly authorized. Doc. 56-1 at 43-44; Parisi Decl. ¶ 44. Amidst the communication back and forth, a GreenSky representative stated the transaction occurred because "[t]he merchant charges a percentage upfront on the loan." Doc. 27-11.

Little evidence exists regarding communication between Andersen and Parisi after November 23. Parisi states she last heard from Kelley when he called to inform her she had not qualified for the Zero-Interest Loan and he would find out why. Compl. ¶¶ 71-72. There is no evidence Kelley informed Parisi of the terms of the High-Interest Loan during that phone call. *Id.* Likewise, there is no evidence Parisi provided authorization for Andersen to proceed with the window project in either the phone call or at any time following November 23. *Id.*

### E. Aftermath

Over Parisi's objections, GreenSky proceeded to consider Parisi a willing party to the Loan Agreement. Kaliban Decl. ¶ 30; Parisi Decl. ¶ 45. GreenSky billed her and assessed late fees in accordance with the High-Interest Loan. *Id.* The fees and charges continued until the loan was cancelled in October of 2022 near the time this lawsuit commenced. Parisi Decl. ¶¶ 45, 47. Parisi's credit reports still reflect a balance of more

than $8,000 due to GreenSky. *Id.* ¶ 48. Parisi never had any windows installed in her home. *Id.* ¶ 45.

In this action, Parisi, on behalf of herself and a putative class, claims both Andersen and GreenSky violated provisions of the Oklahoma Consumer Credit Code. GreenSky argues the action has been brought in the wrong venue and seeks to enforce an arbitration provision in the High-Interest Loan agreement.

## F. Timeline

For clarity's sake, the Court reproduces key events below in chronological order:

- *Nov. 23* — Parisi meets with Kelley at home and applies for the Zero-Interest Loan.

- *Nov. 23* — Parisi is approved for a loan by GreenSky. Parisi believes she is approved for the two-year, Zero-Interest Loan when Kelley leaves her home that day.

- *Nov. 23* — Kelley emails Parisi a copy of the electronically-signed agreement between Andersen and Parisi. The document refers to the financial terms of the Zero-Interest Loan. Parisi is unaware of the email.

- *Nov. 23* — GreenSky both mails and emails a copy of the High-Interest Loan to Parisi. Parisi is unaware of the email; the physical mail begins transit.

- *Nov. 24-28* — At some point in this date range, Kelley calls to inform Parisi she has not been approved for the Zero-Interest Loan, but he will find out what happened and get back to her.

- *Nov. 29* — Parisi's Shopping Pass is charged for $8,871.50. GreenSky claims this transaction constituted acceptance of the High-Interest Loan.

- *Nov. 29* — Parisi emails GreenSky to dispute the Shopping Pass charge.

- *Following Nov. 30* — Parisi receives the mailed copy of the High-Interest Loan.

## II.    LEGAL STANDARD

When considering a motion to dismiss due to improper venue, a court must draw all reasonable inferences in favor of the non-moving party and resolve all factual conflicts in favor of the non-movant. *Rolico Aviation Ltd. V. Mansfield Heliflight, Inc.*, 07-1075, 2008 WL 640440 at *1 (W.D. Okla. Mar. 5, 2008) (citing 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1352 (3d ed. 2007)). Plaintiffs may rely on well-pleaded facts found in the complaint, and if controverted by defendant's facts, the court is to give greater weight to plaintiff's facts. *Ben-Trei Overseas, L.L.C. v. Gerdau Ameristeel US, Inc.*, 09-CV-153, 2010 WL 582205 at *3 (N.D. Okla. Feb. 10, 2010) (citing *Pierce v. Shorty Small's of Branson*, 137 F.3d 1190, 1192 (10th Cir. 1998)).

When considering a motion to compel arbitration, a court must first determine if there was an agreement and then determine if the agreement provides the moving entity with the right to compel arbitration. *Caclovic v. J.C. Penney Corp.*, 884 F.3d 1051, 1057 (10th Cir. 2018). Courts apply state-law principles governing the formation of contracts to determine if an agreement to arbitrate exists. *Jacks v. CMH Homes, Inc.*, 856 F.3d 1301, 1304 (10th Cir. 2017). The party moving to compel arbitration bears the burden to show the arbitration clause applies. *Id.* If parties dispute the existence of an agreement, the nonmovant should receive the "benefit of all reasonable doubts and inferences that may arise" *Id.* (internal quotation omitted). The process is akin to summary judgment practice. *Id.* "[T]he party moving to compel arbitration bears the initial burden of presenting evidence sufficient to demonstrate the existence of an enforceable agreement[.]" *Bellman*

at 612.  If a genuine dispute of material fact prevents determining whether the agreement is enforceable, a district court should proceed to a jury trial, if the nonmoving party so requests, to determine the facts and whether the parties agreed to arbitrate. *Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 977 (10th Cir. 2014).

## III.   DISCUSSION

Plaintiff and Defendant never entered into a valid Loan Agreement because there was no mutual assent as to the material terms of the loan. As a matter of law, the parties did not contract. Accordingly, no agreement between the parties to arbitrate the issues within the case can be said to exist, and Defendant's motion to compel arbitration is DENIED. Consequently, venue in this Court is proper, and Defendant's motion to dismiss is DENIED.

Oklahoma contract law governs the formation of this agreement and dictates the conclusion Plaintiff and Defendant never entered into the Loan Agreement. The existence of an agreement to arbitrate is a matter of contract between the parties. *Avedeon Engineering, Inc. v. Seatex*, 126 F.3d 1279, 1283 (10th Cir. 1997). In Oklahoma, an enforceable agreement requires a "meeting of the minds on all essential terms of the contract." *South Central Industries v. Kerrtas Marketing, LLC*, 21-802, 2022 WL 1518935 at *2 (W.D. Okla. Feb. 7, 2022) (quoting *Young v. Chappell*, 239 P.3d 476, 479 (Okla. Civ. App. 2010)). "[T]he consent of the parties must be mutual, and consent is not mutual unless the parties agree on the same thing at the same time." *Smalley v. Bond*, 218 P. 513, 515 (Okla. 1923). For the arbitration clause in the High-Interest Loan to be enforceable, Parisi and GreenSky must have agreed to all the same essential terms at the same time.

10

GreenSky can only show acceptance of the High-Interest Loan in one of two ways: the Shopping Pass transaction was (1) initiated by Parisi or (2) initiated by Andersen with her valid consent.[9] GreenSky fails to provide sufficient evidence on both fronts. GreenSky's evidence tends to show the transaction *occurred* on that day, but it does not indicate whether the transaction was *authorized* by Parisi.

First, GreenSky has provided no evidence that Parisi herself initiated the Shopping Pass transaction. Greensky's only evidence relating to the November 29 transaction is a conclusory declaration that Parisi used the Shopping Pass and authorized Andersen to charge her account for $8,871.50. Kaliban Decl. ¶ 28. Kaliban's statement is supported only by an unidentified transaction ledger showing a charge of that amount processed on that date. *Id.* at 22-23.[10] The only indication the transaction is related to Parisi is that it is attributed to her Shopping Pass number and her name appears as the invoiced account. The absence of additional evidence identifying Parisi is notable, considering the terms of GreenSky's loan agreement state identification is required for all purchases. Doc. 39-3 at 6. Therefore, had GreenSky followed its policies, it would presumably have verified and recorded the identity of the transaction's initiator. Instead, GreenSky produces only the transaction ledger.

In fact, the record indicates Andersen initiated the transaction. The only evidence regarding who initiated the transaction is found in a later email between Parisi and

---

[9] GreenSky does not suggest Parisi accepted their offer in any other way, such as by signing the Loan Agreement sent to her via mail and email.

[10] The transaction ledger appears in the ECF system as pages 22-23 of Doc. 18-3. It appears to have been intended as a separate exhibit.

GreenSky customer service. A GreenSky representative stated the transaction occurred because "[t]he merchant charges a percentage upfront on the loan." Doc. 27-11. Further, the GreenSky representative acknowledged Parisi had initially rejected payment and once again asked if Parisi authorized the transaction after describing how the charge occurred. *Id.* Parisi restated that she did not authorize the transaction. Doc. 27-13. The evidence shows that the Shopping Pass charge occurred on November 29, the charge was initiated by Andersen, and the charge was promptly and consistently disputed by Parisi. Thus, the evidence is insufficient to show Parisi initiated the transaction which allegedly bound her to the High-Interest Loan.

Second, the evidence indicates only that Parisi may have consented to her window project with Andersen under the terms of the Zero-Interest Loan, not the High-Interest Loan.[11] When Kelley, the representative from Andersen, left Parisi's home on November 23, 2021, Parisi believed she had been approved for the two-year, no-interest, no-payment loan. Parisi Decl. ¶¶ 7, 28. Parisi only ever intended to apply for that loan because the two-year grace period was appealing considering her upcoming chemotherapy expenses; she communicated this to Kelley. Parisi Decl. ¶ 21; Compl. ¶ 62. Moreover, the agreement Kelley emailed to Parisi referred to the Zero-Interest Loan. Parisi Decl. ¶ 33. At the close of business on November 23, both Parisi and Andersen appeared to believe the window project would be financed with the aid of Parisi's Zero-Interest Loan. Thus, any

---

[11] Greensky's motion attempts to enforce the arbitration provision in the High-Interest Loan agreement. Thus, determining whether Parisi effectively accepted the Zero-Interest Loan is unnecessary. Consequently, any dispute of fact regarding such acceptance is immaterial.

authorization Parisi gave Andersen on November 23 to proceed with the project by charging Parisi's Shopping Pass was premised upon *this initial set of loan terms*. GreenSky provides no evidence this ever changed.

Because the High-Interest Loan was different in material respects from the Zero-Interest Loan that Parisi had applied for, it constituted an entirely new offer that needed acceptance. "In order that an offer and acceptance may result in a binding contract the acceptance must be . . . identical with the terms of the offer. It must in every respect meet and correspond with the offer[.]" *Anderson v. Garrison*, 402 P.2d 873, 877 (Okla. 1965). GreenSky's Loan Agreement explicitly states, "THIS IS A DIFFERENT PLAN THAN REQUESTED." Doc. 39-3 at 6. A different plan is a different offer. Parisi's apparent consent to the Zero-Interest Loan's terms is not simply transposed to the High-Interest Loan offer. GreenSky provides no evidence that Parisi communicated with Andersen to consent to the High-Interest Loan's terms. Even assuming Andersen had authority to accept the first offer on Parisi's behalf, that authority did not extend to any subsequent offers GreenSky made.

In a last-ditch effort, Defendant attempts to draw the Court's attention to cases in which GreenSky successfully compelled arbitration, but the cases cited are factually distinct from Parisi's. In *Terlizzi v. Altitude Marketing, Inc.*, the borrowers were compelled to arbitrate claims against GreenSky because they had electronically signed an Installment Loan Agreement that was sent to them. 2018 WL 2196090 at *5 (D. Colo. May 14, 2018). Like Parisi, the Terlizzis were surprised by the actual terms of the loan as compared to what had been promised by a sales representative. *Id.* After initially trying to cancel the

13

transaction, they were persuaded and "recommitted to the transaction[.]" *Id.* Parisi neither committed nor recommitted to a transaction with GreenSky in the same way the Terlizzis did. In *Alfortish v. GreenSky, LLC*, the plaintiffs were compelled to arbitrate claims because they admitted to signing and making payments pursuant to the loan agreement. 16-15084, 2017 WL 699830 at *4 (E.D. La. Feb. 22, 2017). The cases GreenSky cites depict plaintiffs who actively engaged and transacted with GreenSky and later tried to evade the arbitration clause. Conversely, Parisi cannot be shown to have ever entered into an agreement with GreenSky, let alone have made payments pursuant to an agreement.[12]

Quite simply, Plaintiff and Defendant never had the requisite meeting of the minds to form a contract. Plaintiff provided any authorization to proceed only under the loan terms she knew on November 23. On November 29, Defendant sought to bind her to an entirely different set of terms of which she was unaware based upon a third party's actions.[13] There is no factual dispute as to whether Plaintiff authorized Andersen to proceed before November 29 under a different set of loan terms than those presented to her on November 23. Defendant offers only an unidentified transaction ledger to support its conclusion Parisi accepted these new terms via a Shopping Pass transaction. The evidence presented by

---

[12] Parisi's case is more akin to *Ferguson v. GreenSky, Inc.* wherein the formation of an agreement between the plaintiff and GreenSky was in dispute. 22-15780, 2023 WL 4462126 (9th Cir. July 11, 2023). On appeal, the Ninth Circuit found the parties had not entered into an agreement to arbitrate all claims as a matter of California law. *Ferguson* at *2 ("Because the parties did not form an agreement under the applicable statutory requirements, there is no basis upon which to compel arbitration.").

[13] While certain terms, such as the arbitration clauses, in the two offers may have been identical, the financial terms were different. Plaintiff and Defendant never agreed on all essential terms of an offer, so this arbitration clause was never agreed upon.

14

GreenSky goes only to the existence of the transaction, not Parisi's authorization of it. That is not sufficient to prove a contract between the parties existed.

Accordingly, no summary trial of factual matters is necessary. GreenSky does not carry its burden to present sufficient evidence the November 29 transaction was authorized by Parisi. The conclusory and self-serving affidavit from Mr. Kaliban, supported only by the transaction ledger, is not sufficient evidence. *See Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991). As a matter of law, the parties did not agree to the High-Interest Loan and, thus, did not agree to arbitrate any disputes. The Defendant's motion to compel arbitration is DENIED.

Defendant's motion to dismiss the case based on improper venue is also DENIED. Defendant's sole argument that the Western District of Oklahoma is an improper venue relies on its assertion an arbitrator's conference room is the proper venue. The Court rejects that argument.[14]

## IV.    CONCLUSION

Defendant's Motion to Compel Arbitration [Doc. 17] and Motion to Dismiss [Doc. 46] are hereby DENIED for the reasons set forth above.

---

[14] The Court does not address the appropriateness of the Consent Order. Defendant has filed a Motion objecting to its use in the case, and the Court will address the matter separately. The Court did not use the Consent Order as a resource in determining its ruling on the instant Motions. Additionally, Defendant's arguments regarding the appropriateness of class certification that comprise the bulk of its Reply Brief [Doc. 65] are premature. The Court will address class certification at a later date when parties may fully brief the issue.

A519

**IT IS SO ORDERED** this 1ˢᵗ day of December 2023.

DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE

A520