No. 23-6218 *and* No. 24-6043

IN THE

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

SUSAN PARISI,

*Plaintiff-Appellee*,

v.

GREENSKY, LLC
(incorrectly identified as BMO Harris Bank, NA, d/b/a Greensky, LLC),

*and*

OKLAHOMA WINDOWS AND DOORS LLC,
d/b/a Renewal by Andersen of Oklahoma.

*Defendant-Appellants*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
The Honorable David L. Russell
D.C. Case No. 5:23-CV-00115-R

**APPELLANTS' JOINT APPENDIX VOLUME III OF III, PAGES 521 TO 701**

Diane J. Zelmer, Esq.
BERENSON LLP
4495 Military Trail,Suite 203
Jupiter, Florida 33458
(561) 429-4496

*Attorneys for Appellant Oklahoma
Windows and Doors, LLC*

Barry Goheen
PIERSON FERDINAND LLP
100 Mount Paran Ridge
Atlanta, Georgia 30327
(404) 703-3093

Derrick T. DeWitt
Kyle R. Prince
DeWITT PARUOLO & MEEK
P.O. Box 138800
Oklahoma City, Oklahoma 73113
(405) 705-3600

*Attorneys for Appellant GreenSky, LLC*

# **TABLE OF CONTENTS**

| ECF # | Document | Date | Page |
|---|---|---|---|

### **VOLUME I**

| ECF # | Document | Date | Page |
|---|---|---|---|
| | Docket Sheet No. 5:23-cv-00115-R from the United States District Court for the Western District of Oklahoma | | A001 |
| 17 | GreenSky's Motion to Compel Arbitration as to All Claims Asserted by Plaintiff and to Dismiss or Stay Claims Pending Arbitration | April 28, 2023 | A013 |
| 18 | GreenSky's Brief in Support of Motion to Compel Arbitration as to All Claims Asserted by Plaintiff and to Dismiss or Stay Claims Pending Arbitration | April 28, 2023 | A016 |
| | Exhibit 1, Plaintiff's Amended Petition and Motion to Certify Class Action | | A042 |
| | Exhibit 2, Loan Agreement | | A068 |
| | Exhibit 3, Declaration of Timothy Kaliban | | A080 |
| | Exhibit 3-1, Loan Application | | A087 |
| | Exhibit 3-2, Loan Decision | | A088 |
| | Exhibit 3-3, Loan Agreement | | A089 |
| | Exhibit 3-4, Loan Account | | A101 |
| 36 | Amended Complaint and Motion to Certify a Class Action | August 21, 2023 | A103 |
| | Exhibit 1, Redacted 12/07/21 letter | | A123 |
| | Exhibit 2, 12/10/21 Email | | A126 |
| | Exhibit 3, 12/14/21 Email | | A127 |
| | Exhibit 4, 12/17/21 Email | | A128 |

i

| | Exhibit 5, Redacted 12/27/21 Letter | | A129 |
|---|---|---|---|
| | Exhibit 6, Redacted 10/2/22 Past Due Notice | | A130 |
| 39 | Parisi's Response in Opposition to GreenSky's Motion to Compel Arbitration as to All Claims Asserted by Plaintiff and to Dismiss or Stay Claims Pending Arbitration | August 24, 2023 | A132 |
| | Exhibit 1, Declaration of Susan Parisi | | A157 |
| | Exhibit 1-1, Renewal by Anderson Agreement | | A164 |
| | Exhibit 1-2, 11/29/21 Email | | A195 |
| | Exhibit 2, CFPB Consent Order | | A197 |
| | Exhibit 3, Plan 7541 Loan Information | | A255 |
| 42 | GreenSky's Reply in Support of Motion to Compel Arbitration as to All Claims Asserted by Plaintiff and to Dismiss or Stay Claims Pending Arbitration | September 7, 2023 | A272 |
| 46 | GreenSky's Motion to Dismiss All Claims Pursuant to Fed. R. Civ. P. 12(b)(3) | September 25, 2023 | A284 |

**VOLUME II**

| 47 | GreenSky's Brief in Support of Motion to Dismiss All Claims Pursuant to Fed. R. Civ. P. 12(b)(3) | September 25, 2023 | A287 |
|---|---|---|---|
| | Exhibit 1, GreenSky's Motion to Compel Arbitration | | A297 |
| | Exhibit 2, Plaintiff's Amended Petition and Motion to Certify Class Action | | A323 |
| | Exhibit 3, GreenSky Shopping Pass | | A343 |
| | Exhibit 4, Loan Agreement | | A344 |

|     | Exhibit 5, Declaration of Timothy D. Kaliban | | A350 |
|-----|-----|-----|-----|
|     | Exhibit 5-1, Loan Application | | A357 |
|     | Exhibit 5-2, Loan Decision | | A358 |
|     | Exhibit 5-3, Loan Agreement | | A359 |
|     | Exhibit 5-4, Loan Account | | A371 |
| 56 | Parisi's Response in Opposition to GreenSky's Motion to Dismiss All Claims Pursuant to Fed. R. Civ. P. 12(b)(3) | October 31, 2023 | A373 |
|     | Exhibit 1, Declaration of Susan Parisi | | A393 |
|     | Exhibit 1-1, Renewal by Anderson Agreement | | A401 |
|     | Exhibit 1-2, 11/29/21 Email | | A432 |
|     | Exhibit 1-3, Emails, various dates | | A434 |
|     | Exhibit 2, CFPB Consent Order | | A437 |
| 65 | GreenSky's Reply Brief in Support of Motion to Dismiss All Claims Pursuant to Fed. R. Civ. P. 12(b)(3) | November 7, 2023 | A495 |
| 66 | Order denying GreenSky's Motion to Dismiss and denying GreenSky's Motion to Compel | December 1, 2023 | A505 |

## **VOLUME III**

| 68 | Oklahoma Windows' Motion to Dismiss the Amended Class Action Complaint (or Stay) and Compel Arbitration | December 7, 2023 | A521 |
|-----|-----|-----|-----|
| 69 | Oklahoma Windows' Memorandum of Law in Support of Motion to Dismiss the Amended Class Action Complaint (or Stay) and Compel Arbitration | December 7, 2023 | A523 |

|   |   |   |   |
|---|---|---|---|
|   | Exhibit 1, Declaration of Jon Erickson |   | A548 |
|   | Exhibit 1-1, Renewal by Anderson Agreement |   | A552 |
|   | Exhibit 1-2, 11/23/21 Email |   | A583 |
| 70 | GreenSky's Notice of Joinder, joining Oklahoma Windows' Motion to Dismiss the Amended Class Action Complaint (or Stay) and Compel Arbitration | December 28, 2023 | A585 |
| 71 | Parisi's Response in Opposition to Oklahoma Windows' Motion to Dismiss the Amended Class Action Complaint (or Stay) and Compel Arbitration | December 28, 2023 | A589 |
|   | Exhibit 1, Declaration of Susan Parisi |   | A622 |
|   | Exhibit 1-1, 11/29/21 Email |   | A632 |
|   | Exhibit 1-2, 11/29/21 Emails |   | A634 |
|   | Exhibit 1-3, Emails, various dates |   | A637 |
|   | Exhibit 1-4, 11/23/21 Emails |   | A640 |
| 72 | GreenSky's Motion to Reconsider Order (Doc. 66) and Brief in Support | December 29, 2023 | A647 |
| 73 | GreenSky's Notice of Appeal | December 29, 2023 | A655 |
| 76 | Parisi's Response in Opposition to GreenSky's Notice of Joinder | January 10, 2024 | A658 |
| 79 | GreenSky's Reply in Support of its Notice of Joinder | January 17, 2024 | A666 |
| 81 | Parisi's Opposition to GreenSky's Motion to Reconsider Order | January 19, 2024 | A673 |
| 82 | Order denying Oklahoma Windows' Motion to Compel Arbitration | February 14, 2024 | A685 |

| 83 | Order denying GreenSky's Motion for Reconsideration | February 14, 2024 | A696 |
| 86 | Oklahoma Windows' Notice of Appeal | March 14, 2024 | A699 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

SUSAN PARISI,

     Plaintiff,

vs.

CASE NO. CIV-23-cv-115-R

(Removed from the District Court of Oklahoma County, State of Oklahoma, Case No. CJ-2022-5727)

OKLAHOMA WINDOWS AND DOORS, LLC d/b/a RENEWAL BY ANDERSON OF OKLAHOMA AND BMO HARRIS BANK, NA d/b/a GREENSKY, LLC,

     Defendants.

_____/

---

### DEFENDANT, OKLAHOMA WINDOWS AND DOORS, LLC

### d/b/a RENEWAL BY ANDERSON OF OKLAHOMA'S MOTION TO DISMISS THE

### AMENDED CLASS ACTION COMPLAINT (OR STAY)

### AND COMPEL ARBITRATION

---

Defendant, OKLAHOMA WINDOWS AND DOORS, LLC d/b/a RENEWAL BY ANDERSON OF OKLAHOMA ("OKLAHOMA WINDOWS" or the "Defendant"), by and through their undersigned counsel, hereby file this Motion to Dismiss the Amended Class Action Complaint [Doc. 36] (or Stay) and Compel Arbitration ("Motion"). The grounds, reasoning and authority for this Motion are set forth in the Memorandum of Law in support thereof, which is being filed simultaneously herewith.

Dated:  December 7, 2023   Respectfully submitted,

       /s/ Diane J. Zelmer_____
      Diane J. Zelmer, Esq. (pro hac vice)
      FL Bar No. 27251
      BERENSON LLP
      4495 Military Trail, Suite 203
      Jupiter, Florida 33458
      Telephone: 561-429-4496
      Email: djz@berensonllp.com
      *Attorney for Defendant, OKLAHOMA WINDOWS AND DOORS, LLC*

      Sheila D. Sayne, Esq., OBA # 31213
      Sayne Law PLLC
      P.O. Box 33309
      Tulsa, Oklahoma 74153-3309
      Telephone: 918-740-3013
      sheila.sayne@outlook.com
      *Attorney for Defendant, OKLAHOMA WINDOWS AND DOORS, LLC*

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was filed and served electronically using CM/ECF, which is served upon all parties of record on the list for this case on this 7th day of December, 2023.

      Respectfully submitted,

      /s/ Diane J. Zelmer
      Diane J. Zelmer, Esq., Fla. Bar 27251

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

SUSAN PARISI,

     Plaintiff,

vs.

OKLAHOMA WINDOWS AND DOORS,
LLC d/b/a RENEWAL BY ANDERSON OF
OKLAHOMA AND BMO HARRIS
BANK, NA d/b/a GREENSKY, LLC,

     Defendants.

_____/

CASE NO. CIV-23-cv-115-R

(Removed from the District Court of
Oklahoma County, State of
Oklahoma, Case No. CJ-2022-5727)

_____

## DEFENDANT, OKLAHOMA WINDOWS AND DOORS, LLC

## d/b/a RENEWAL BY ANDERSON OF OKLAHOMA'S MEMORANDUM OF LAW IN

## SUPPORT OF ITS MOTION TO DISMISS THE AMENDED CLASS ACTION

## COMPLAINT (OR STAY)  AND COMPEL ARBITRATION

_____

Dated:  December 7, 2023       Respectfully submitted,

| | |
|---|---|
| /s/ Diane J. Zelmer<br>Diane J. Zelmer, Esq. (pro hac vice)<br>FL Bar No. 27251<br>BERENSON LLP<br>4495 Military Trail, Suite 203<br>Jupiter, Florida 33458<br>Telephone: 561-429-4496<br>Email: djz@berensonllp.com<br>*Attorney for Defendant, OKLAHOMA WINDOWS AND DOORS, LLC* | Sheila D. Sayne, Esq.<br>OBA # 31213<br>Sayne Law PLLC<br>P.O. Box 33309<br>Tulsa, Oklahoma 74153-3309<br>Telephone: 918-740-3013<br>sheila.sayne@outlook.com<br>*Attorney for Defendant, OKLAHOMA WINDOWS AND DOORS, LLC* |



# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... iii

A.  THE AGREEMENT ............................................................................ 1

B.  LEGAL STANDARD ........................................................................... 3

C.  SUMMARY OF ARGUMENT ............................................................... 4

D.  ARGUMENT .................................................................................... 5

  1.  The Parties Have Expressly Delegated The Determination Of Arbitrability To The Arbitrator. ....................................................................................... 5

  2.  The Federal Arbitration Act Governs This Dispute And Strongly Favors Arbitration. .............................................................................................. 7

  3.  The Written Arbitration Provision is Enforceable. ...................................... 10

  4.  The Class Waiver Provisions Are Enforceable, and Not Substantively Unconscionable. ...................................................................................... 13

  5.  The Plaintiff's Claim Falls Within the Scope of the Arbitration Provision. .............. 14

  6.  OKLAHOMA WINDOWS Has Not Waived Its Right to Arbitrate. ........................ 16

  7.  The Court Should Dismiss or Stay of All Proceedings. ................................. 16

E.  REQUEST FOR EXTENSION TO FILE MOTION TO DISMISS ON OTHER GROUNDS ............ 17

F.  CONCLUSION ................................................................................ 18

CERTIFICATE OF SERVICE ................................................................. 19

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265 (1995) ................................. 9

*Allis Chalmers Mfg. Co. v. Byers*, 88 P.2d 368 (Okla. 1939) ...................................... 11

*Am. Exp. Co. v. Italian Colors Rest.,* 570 U.S. 228 (2013) ..................................... 3, 15

*Am. Home Assur. Co. v. Vecco Concrete Const. Co. of Virginia*, 629 F.2d 961 (4th Cir. 1980)………… ..................................................................................... 7, 10

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................. 4

*ARW Exploration v. Aguirre*, 45 F.3d 1455, 1462 (10th Cir. 1995) ............................... 4

*AT&T Tech., Inc. v. Comm. Workers of America*, 475 U.S. 643 (1986) ....................... 14

*Avedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279 (10th Cir.1997) ....................................... 4

*Bayron-Paz v. Wells Fargo Bank, N.A.*, No, 22 Civ. 6122 (DLC), 2023 WL 4399041 (S.D.N.Y. July 7, 2023)............................................................................................. 12

*Belnap v. Iasis Healthcare*, 844 F.3d 1272 (10th Cir. 2017) ........................................ 6

*Bernhardt v. Polygraphic Co.*, 350 U.S. 198 (1956) ..................................................... 7

*Brown v. Coleman Co., Inc.*, 220 F.3d 1180 (10th Cir.2000) ......................................... 4

*Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2006) ................................. 9

*Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359 (11th Cir. 2005) ...................... 11

*Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 809 F.3d 746 (3d Cir. 2016) ................ 6

*Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52 (2003) ..................................................... 9

*Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612 (2018) ......................................................... 8

*Fancher v. Westwind Enterprises, Ltd.*, 2018 WL 11411336 (W.D. Ok Aug. 8, 2018).............. 16

*First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995) ................................... 10

*Franco v. State ex el. Bd. of Regents of the Univ. of Okla.*, 2020 OK CIV APP 64, ¶ 32, 482 P.3d
1, 9 (Okla. Civ. App. 2020) ................................................ 11

*Freeman v. Prudential Sec., Inc.*, 1993 OK CIV APP 65, ¶ 9, 856 P.2d 592, 594 ...................... 8

*Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840 (2nd Cir. 1987) ................................... 11

*Hamer v. Neighborhood Hous. Servs. of Chi.*, 138 S. Ct. 13 (2017)................................... 16

*Hancock v. American Tel. and Tel. Co., Inc.*, 2011 WL 3626785 (W.D. Okla. 2011)................ 14

*Johnson v. Lynn Hickey Dodge Inc.*, 1998 WL 826829 (10th Cir. 1998) ................................... 11

*Jones v. Sallie Mae, Inc.*, 2013 WL 6283483 (M.D. Fla. Dec. 4, 2013) ............................. 12, 13

*Lojewski v. Grp. Solar USA, LLC*, No. 22 CIV. 10816 (PAE), 2023 WL 5301423 (S.D.N.Y. Aug.
17, 2023) ................................................ 12

*Long v. DeGeer*, 753 P.2d 1327, 1328 (Okl.1988) ................................................ 8

*Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52 (1995) ................................... 9. 14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)................................... 4

*Mayfield v. Fid. State Bank of Cleveland*, 121 Okla. 179 (1926) ................................... 11

*Mey v. DIRECTV, LLC*, 971 F.3d 284 (4th Cir. 2020) ........................................... 14, 15

*MicroStrategy, Inc. v. Lauricia,* 268 F.3d 244 (4th Cir. 2001)................................... 16

*Mitsubishi Motors v. Soler Chrysler-Plymouth*, 473 U.S. 614 (1985) ................................... 9

*Morris v. Airbnb, Inc.*, 2020 WL 5823542 (W.D. Okla. 2020) ................................... 13

*Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1 (1983)........................ 3, 8, 15

*Muriithi v. Shuttle Exp., Inc.,* 712 F.3d 173 (4th Cir. 2013)........................................... 14

*Nichols Ford, Ltd. v. Garza*, No. 02-20-00191-CV, 2021 WL 3931916 (Tex. App. Sept. 2, 2021)
................................................................................ 12

*Noohi v. Toll Bros., Inc.*, 708 F.3d 599 (4th Cir. 2013) ................................................................ 17

*Oil, Chem., & Atomic Workers Int'l Union, Local 2–124 v. American Oil Co.*, 528 F.2d 252 (10th
　　Cir. 1976) .......................................................................................................................... 3

*Perry v. Thomas*, 482 U.S. 483 (1987) ................................................................................ 9

*Peterson v. Shearson/American Express, Inc.,* 849 F.2d 464 (10th Cir. 1988) ............................ 3

*Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671 (5th Cir. 2012) ......... 7

*Preston v. Ferrer*, 552 U.S. 346 (2008) .............................................................................. 9

*Sanchez v. Nitro-Lift Techs., L.L.*C., 762 F.3d 1139 (10th Cir. 2014) ........................................ 15

*Schooley v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 867 F. Supp. 989, aff'd, 107 F.3d 21
　　(10th Cir. 1997) ................................................................................................................ 11

*SmartText v. Interland, Inc.*, 296 F.Supp.2d 1257 (D. Kan. 2003) ............................................ 3

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.,* 559 U.S. 662 (2010) ........................................ 3

*Terminix Intern. Co., LP v. Palmer Ranch Ltd. Partnership*, 432 F.3d 1327 (11th Cir. 2005) ...... 7

*The Redemptorists v. Coulthard Servs., Inc.*, 145 Md. App. 116 (2002) ...................................... 17

*Towe, Hester & Erwin, Inc. v. Kansas City Fire & Marine Ins. Co.*, 1997 OK CIV APP 58, ¶ 24,
　　947 P.2d 594, 599 ............................................................................................................ 8

*United States v. Gonzales*, 520 U.S. 1 (1997) .................................................................... 15

*Vaden v. Discover Bank*, 556 U.S. 49 (2009) ...................................................................... 3

*Voss v. City of Oklahoma City*, 1980 OK 148, ¶ 8, 618 P.2d 925, 928 ........................................ 8

*Walther v. Sovereign Bank,* 386 Md. 412 (2005) .................................................................. 14

*Willco Enterprises, LLC v. Woodruff*, 2010 OK CIV APP 18, ¶ 13, 231 P.3d 767, 772 ............... 8

*Williams v. Imhoff*, 203 F.3d 758 (10th Cir. 2000) .............................................................. 16

**BERENSON**
Counsel to the Remodeling and Home Improvement Industry

A527

**Statutes**

12 O.S. § 1857 .................................................................................................. 7, 11

12 O.S. Supp.2006 § 1857(A) ................................................................................ 8

27 WILLISTON ON CONTRACTS § 70:114 (4th ed. Nov. 2021 update) ................................ 11

9 U.S.C. § 1 ........................................................................................................ 9

9 U.S.C. § 2 ........................................................................................ 8, 9, 10, 11

9 U.S.C. § 3 ...................................................................................................... 16

9 U.S.C. § 4 ........................................................................................................ 4

**Other Authorities**

Webster's Third New International Dictionary 97 (1976) ............................................. 15

Defendant, OKLAHOMA WINDOWS AND DOORS, LLC d/b/a RENEWAL BY ANDERSON OF OKLAHOMA ("OKLAHOMA WINDOWS" or the "Defendant"), by and through their undersigned counsel, hereby files this Memorandum of Law in Support of its Motion to Dismiss the Amended Class Action Complaint [Doc. 36] (or Stay) and Compel Arbitration ("Motion"), and states as follows:

## A.    THE AGREEMENT

1.     On November 23, 2021, Plaintiff, SUSAN PARISI ("PARISI") (the "Plaintiff") entered into a contract with OKLAHOMA WINDOWS for the purchase of four (4) windows to be installed at 1613 N. Markwell Avenue, Oklahoma City, OK  73127, in exchange for the sum of $17,743.  A copy of the PARISI CONTRACT is attached to the Declaration of Jon Erickson as **Exhibit "1.1"** (hereinafter "Contract").

2.     PARISI received a copy of the Contract via e-mail, the same day that she signed the Contract.  A copy of the email is attached as **Exhibit "1.2."**

3.     The Contract contained a three day right to cancel the Contract, through and including November 26, 2023.  **Ex. 1.1, p. 4.**

4.     It is clear from PARISI's own declaration that she was using this very same email address, and thus, had received the Contract [Docs. 27-8 to 27-16].

5.     The Contract contains the following mediation, arbitration and class waiver language:

> **Informal Dispute Resolution and Mediation: Before submitting a claim to mediation and arbitration as described below, the Buyer agrees to present the Contractor with written notice of any construction defects and allow the Contractor within thirty (30) days (1) to inspect any construction defects and (2) present to the Buyer a written response which may include Contractor's offer to repair defects or to compensate Buyer for such defects. Before submitting a claim to mediation and arbitration as described below, the**



Contractor agrees to present the Buyer with written notice regarding any payment disputes and similarly allow the Buyer to respond in writing within thirty (30) days.

If that process does not resolve the dispute, the complaining party must submit all claims to mediation within 10 days following notice of the claim to the other party. The mediation shall take place at offices of the American Arbitration Association (AAA) in the state where the work is to be performed; if there is no such office, the mediation will take place at a location designated by the mediator within the state where the work is to be performed. Each party will identify a person with decision-making authority who shall attend the mediation. The mediation will be nonbinding and conducted by the AAA in accordance with its then-current Construction Industry Mediation Procedures. The parties shall equally share the cost of the mediation. The parties agree that any action or claim or request for an injunction shall not be subject to mediation.

Arbitration: Buyer and Contractor agree that any dispute between them, or any of their respective affiliates, officers, directors, employees, agents or owners arising under or in connection with this Agreement, or the products and services to be provided by Contractor, that has been not resolved through mediation, will be determined by binding arbitration administered by the AAA pursuant to its then-current Construction Industry Fast Track Procedures. The arbitration shall take place at offices of the AAA in the state where the work is to be performed; if there is no such office, the arbitration will take place at a location designated by the arbitrator within the state where the work is to be performed. The arbitration shall be heard by one (1) arbitrator who has at least ten (10) years of experience in the construction industry.  The arbitrator must follow the law of the state where the work is being performed and not disregard the terms of this Agreement.
The arbitration must be conducted on an individual basis. Neither of the parties nor the arbitrator will have any authority or power to proceed with any claim as a class action or otherwise to join or consolidate any claim with any other claims or any other proceeding involving third parties.  In the event a court determines that this limitation on joinder or class action claims is unenforceable, then this entire commitment to arbitrate will become null and void and the parties must submit all claims to the jurisdiction of the courts. The parties agree that any action or claim or request for an injunction shall not be subject to arbitration.

(Ex. 1.1, Terms and Conditions of Sale, p. 8-9)(hereafter "Mandatory Arbitration Clause").

6.    OKLAHOMA WINDOWS purchases some of the products and supplies used to manufacture and/or install its windows and doors from various interstate sources, including from the following:



Ritz Safety, LLC (lead safe work practices "LSWP" materials)
255 Crescentville Rd
Cincinnati, OH 45246

Caliber Supply (Silco caulk)
1710 N Higley Rd Ste 103
Mesa, AZ 85205

Bayworld (bay/bow supplier)
395 Reed St.
Mansfield, OH 44903

Renewal by Andersen (window units, coil and trim)
9900 Jamaica Ave S
Cottage Grove, MN 55016

**Ex. 1, ¶ 6**.

## B. LEGAL STANDARD

There is a liberal federal policy favoring arbitration agreements. *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24-25 (1983); *Peterson v. Shearson/American Express, Inc.,* 849 F.2d 464, 465 (10th Cir. 1988); *see also Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.,* 559 U.S. 662 (2010); *Vaden v. Discover Bank*, 556 U.S. 49, 58 (2009). Indeed, the public policy favoring arbitration agreements is understandable, as arbitration agreements are generally a less expensive and more expeditious means of settling litigation and relieving docket congestion.  Any doubts concerning the scope of arbitration issues should be resolved in favor of arbitration. *Oil, Chem., & Atomic Workers Int'l Union, Local 2–124 v. American Oil Co.*, 528 F.2d 252, 254 (10th Cir. 1976); *see also Moses H. Cone Mem'l Hosp.,* 460 U.S. at 24–25.  Accordingly, "'[c]ourts must 'rigorously enforce' arbitration agreements.'" *Am. Exp. Co. v. Italian Colors Rest.,* 570 U.S. 228, 233, 133 S. Ct. 2304, 2309, 186 L. Ed. 2d 417 (2013).

In the context of a motion to compel arbitration, this standard of review requires the moving party to present evidence sufficient to demonstrate an enforceable arbitration agreement. *SmartText v. Interland, Inc.*, 296 F.Supp.2d 1257, 1263 (D. Kan. 2003). Once the moving party has made such a showing, the burden shifts to the party opposing arbitration to demonstrate a

genuine issue of material fact as to the making of the arbitration agreement. *Id.; Avedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1283 (10th Cir.1997). In deciding whether the non-movant has identified a genuine issue of material fact for trial, "the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (citations omitted).

The FAA provides that "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4. An arbitration clause containing broad language creates a general presumption in favor of arbitrability. *Brown v. Coleman Co., Inc.*, 220 F.3d 1180, 1184 (10th Cir.2000); *ARW Exploration v. Aguirre*, 45 F.3d 1455. 1462 (10th Cir. 1995).

### C.    SUMMARY OF ARGUMENT

Plaintiff signed and entered into a Contract with OKLAHOMA WINDOWS that contains a very strong arbitration clause, and includes class waiver language. The parties expressly agreed that the Construction Industry Fast Track Procedures of the American Arbitration Association procedures apply, which provides the arbitrator with the power to rule on its own jurisdiction and determine arbitrability.

There is a liberal Federal policy favoring arbitration under the Federal Arbitration Act ("FAA"), which governs the enforceability of the parties' arbitration agreement. Here, there can

be no dispute that the transaction involves interstate commerce as OKLAHOMA WINDOWS purchases the products used to manufacture the windows, from various interstate sources.

The arbitration clause is enforceable because the Plaintiff signed the Contract, and under Oklahoma law, is bound by its execution even if she did not read or understand its terms.  Here, the Plaintiff received the Contract via email, and had a right to cancel within three (3) days; thus, she had ample time to review and determine whether she wanted to be bound by the arbitration provision.

Further, the alleged claims fall within the broad scope of the arbitration agreement because the parties agreed to arbitrate "***any dispute between them, or any of their respective affiliates, officers, directors, employees, agents or owners arising under or in connection with this Agreement, or the products and services to be provided by Contractor***."  Clearly, the Plaintiff's allegations concerning whether or not she received proper financial disclosures arise in connection with the Contract; Plaintiffs cannot escape binding arbitration.

Accordingly, OKLAHOMA WINDOWS requests the Court to grant its motion to dismiss or stay and compel arbitration.

## D.   <u>ARGUMENT</u>

### 1.   <u>The Parties Have Expressly Delegated The Determination Of Arbitrability To The Arbitrator.</u>

Under the express, unambiguous terms of the Mandatory Arbitration Clause contained in the parties' underlying agreement, the parties have agreed that, should any dispute between them arise, an arbitrator shall decide whether the dispute is arbitrable, and resolve any questions concerning the scope and validity of the arbitration provisions.

Here, the parties expressly agreed that "***any dispute between them, or any of their respective affiliates, officers, directors, employees, agents or owners arising under or in***

*connection with this Agreement, or the products and services to be provided by Contractor"*

shall be subject to binding arbitration to be determined by one arbitrator, in accordance with and

*pursuant to the then prevailing Construction Industry Fast Track Procedures of the American*

*Arbitration Association* ("AAA")."   **Exhibit 1.1** at Mandatory Arbitration Clause (e.s.)  Under

Rule 9(a),(b) of the AAA's Construction Industry Arbitration Rules and Mediation Procedures

("AAA Rules"):

> (a) The arbitrator *shall* have the power to rule on his or her own jurisdiction,
> including any objections with respect to the existence, scope, or validity of the
> arbitration agreement.

> (b) The arbitrator *shall* have the power to determine the existence or validity of a
> contract of which an arbitration clause forms a part.  Such an arbitration clause
> shall be treated as an agreement independent of the other terms of the contract.
> A decision by the arbitrator that the contract is null and void shall not for that
> reason alone render invalid the arbitration clause.

R-9. Jurisdiction, AAA Construction Industry Arbitration Rules and Mediation Procedures,

available   at   https://www.adr.org/sites/default/files/ConstructionRules_Web_0.pdf   (emphasis

added).

It is well settled, as a matter of both Federal and State law, that when an agreement

incorporates the rules of the AAA, the parties "clearly and unmistakably" agree that an arbitrator

should decide questions of arbitrability.  *See, Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1282

(10th Cir. 2017) (arbitration governed in accordance with rules of JAMS clearly and unmistakably

intended for arbitrator to decide issue of arbitrability).  Courts have consistently reasoned that the

AAA's rules delegate the authority to decide questions of arbitrability to the arbitrator, because

those rules grant the arbitrator plenary authority to rule on such threshold issues. *See, Chesapeake*

*Appalachia, LLC v. Scout Petroleum, LLC*, 809 F.3d 746, 763–64 (3d Cir. 2016) ("It appears that

'virtually every circuit to have considered the issue has determined that incorporation of the

[AAA] arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability.'" (citations excluded)); *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co*., 687 F.3d 671, 675 (5th Cir. 2012) ("[E]xpress adoption of [the AAA] rules presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." (citations excluded)); *Terminix Intern. Co., LP v. Palmer Ranch Ltd. Partnership*, 432 F.3d 1327, 1332 (11th Cir. 2005) (holding that in agreeing to an arbitration clause stating that arbitration shall be conducted "in accordance with the Commercial Arbitration Rules then in force of the American Arbitration Association . . . the parties clearly and unmistakably agreed that the arbitrator should decide whether the arbitration clause is valid." (citations excluded)).  *See also*, 12 O.S. § 1857 ("[a]n arbitrator shall decide whether a condition precedent to arbitrability has been fulfilled and whether a contract containing a valid agreement to arbitrate is enforceable").

Accordingly, the Court should grant OKLAHOMA WINDOWS' motion without deciding the issue of arbitrability and dismiss the complaint without prejudice, allowing Plaintiff to refile their complaint against it only in the highly unlikely event that an arbitrator, duly appointed in accordance with the Construction Industry Arbitration Rules of AAA, determines that this dispute is not subject to arbitration, or alternatively stay the action against OKLAHOMA WINDOWS.

## 2. <u>The Federal Arbitration Act Governs This Dispute And Strongly Favors Arbitration.</u>

Before the Federal Arbitration Act becomes applicable to the instant case, two findings must be made: (1) there was an agreement in writing providing for arbitration and (2) the contract evidences a transaction involving interstate commerce. *Am. Home Assur. Co. v. Vecco Concrete Const. Co. of Virginia*, 629 F.2d 961, 963 (4th Cir. 1980) (citing *Bernhardt v. Polygraphic Co*., 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956)).

Under the plain language of the FAA, federal courts must treat arbitration agreements as "valid, irrevocable, and enforceable." 9 U.S.C. § 2. As the Supreme Court affirmed, the FAA "establishes a liberal federal policy favoring arbitration agreements."[1] *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (internal quotation omitted) (quoting *Moses H. Cone Memorial Hospital*, 460 U.S. at 24 (1983)). Here, as in *Epic Sys. Corp.*, "Congress has instructed that arbitration agreements like [the one] before us must be enforced as written." 138 S. Ct. at 1632. The FAA represents not only a generous federal policy favoring arbitration agreements, but also gives rise to a federal common law of arbitrability that preempts state law:

> [T]he Federal Arbitration Act . . . establishes a national policy favoring arbitration when the parties contract for that mode of dispute resolution. The [statute], which rests on Congress' authority under the Commerce Clause, supplies not simply a procedural framework applicable in federal courts; it also calls for the application, in state as well as federal courts, of federal substantive law regarding arbitration[.]
> * * *
> Section 2 [of the FAA] declares a national policy favoring arbitration of claims that parties contract to settle in that manner[.] That national policy . . . applies in state

---

[1] The same strong public policy applies even if the arbitration agreement were governed under state law:

> Oklahoma law reflects this State's strong public policy in favor of arbitration. *See* 12 O.S. Supp.2006 § 1857(A); *see also Towe, Hester & Erwin, Inc. v. Kansas City Fire & Marine Ins. Co.*, 1997 OK CIV APP 58, ¶ 24, 947 P.2d 594, 599. Section 1857(A) of the New Act declares arbitration agreements "valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for the revocation of a contract." This provision reveals "a clear legislative intent that any disputes arising from the interpretation or application" of such agreements "shall have an immediate and speedy resolution by required arbitration." *Voss v. City of Oklahoma City*, 1980 OK 148, ¶ 8, 618 P.2d 925, 928; *see Bruner v. Timberlane Manor Ltd. P'ship*, 2006 OK 90, ¶ 23, 155 P.3d 16, 25 (recognizing § 1857(A) "is a clear expression of Oklahoma's policy favoring arbitration agreements.").

*Willco Enterprises, LLC v. Woodruff*, 2010 OK CIV APP 18, ¶ 13, 231 P.3d 767, 772. Indeed, arbitration agreements are generally favored in Oklahoma. *Freeman v. Prudential Sec., Inc.*, 1993 OK CIV APP 65, ¶ 9, 856 P.2d 592, 594 (quoting *Long v. DeGeer*, 753 P.2d 1327, 1328 (Okl.1988)(agreements of parties to bind themselves to mandatory arbitration are favored. Our Supreme Court recognized that courts "generally look with favor upon arbitration provisions as a shortcut to substantial justice with a minimum of court interference.").

as well as federal courts and forecloses state legislative attempts to undercut the enforceability of arbitration agreements[.]

* * *

*The FAA's displacement of conflicting state law is now well-established [and] has been repeatedly reaffirmed . . . . A prime objective of an agreement to arbitrate is to achieve streamlined proceedings and expeditious results.*

*Preston v. Ferrer*, 552 U.S. 346, 349, 353, 357 (2008) (emphasis added); *see also, Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443-44 (2006); *Mastrobuono v. Shearson Lehman Hutton*, 514 U.S. 52, 56 (1995); *Mitsubishi Motors v. Soler Chrysler-Plymouth*, 473 U.S. 614, 626 (1985).  Here, there is a valid written agreement to arbitrate between OKLAHOMA WINDOWS and the Plaintiff.  **Exhibit 1.1**.

The FAA applies to every agreement that is part of a transaction "involving [interstate] commerce." 9 U.S.C. § 2; *see also* 9 U.S.C. § 1 (defining "commerce" as "mean[ing] commerce among the several States[.]").  The Supreme Court has interpreted the phrase "involving commerce" broadly, as signaling an intent to exercise Congress' commerce power to the fullest extent of the Commerce Clause.  *See, e.g., Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003); *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265 (1995); *Perry v. Thomas*, 482 U.S. 483, 490 (1987).  The term "involving commerce" requires "only 'that the transaction' in fact 'involv[e] interstate commerce, even if the parties did not contemplate an interstate commerce connection." *Dobson*, 513 U.S. at 281.

Here, there can be no genuine dispute that this matter involves interstate commerce sufficient to trigger the FAA's application.  The windows, which involve the purchase of materials and payment of taxes, necessarily involve interstate commerce.  Indeed, some of the products used to manufacture and/or install the windows and doors are obtained from various interstate sources. An example of some of OKLAHOMA WINDOWS' suppliers and their out of state locations are as follows:

Ritz Safety, LLC (lead safe work practices "LSWP" materials)
255 Crescentville Rd
Cincinnati, OH 45246

Caliber Supply (Silco caulk)
1710 N Higley Rd Ste 103
Mesa, AZ 85205

Bayworld (bay/bow supplier)
395 Reed St.
Mansfield, OH 44903

Renewal by Andersen (window units, coil and trim)
9900 Jamaica Ave S
Cottage Grove, MN 55016

(**Exhibit 1**, Decl. J. Erickson, at ⁋ 6). *Dobson*, 513 U.S. at 282 (holding that transaction involved interstate commerce when material used by plaintiff came from outside the state); *Am. Home Assur. Co. v. Vecco Concrete Const. Co. of Virginia*, 629 F.2d 961, 963 (4th Cir. 1980) (holding that transaction involved interstate commerce when there were orders for products and equipment shipped to Virginia from Maryland, Alabama, Utah, Missouri and California). Moreover, the entire dispute involves disputes that Plaintiff had regarding financing obtained from Greensky, which is based in Georgia while Plaintiff lives in Oklahoma. [Doc. 18, p. 10, n. 4]. Therefore, this case involves interstate commerce, and the FAA governs.

### 3.   The Written Arbitration Provision is Enforceable.

In determining whether a valid arbitration agreement exists, federal courts "apply ordinary state law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (citations excluded). Section § 2 of the FAA provides:

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid,

irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.[2]

It is well-settled under Oklahoma law that a party who signs a contract is presumed to have read and understand its terms and will be bound by its execution. *Mayfield v. Fid. State Bank of Cleveland*, 121 Okla. 179, 249 (1926)(a person signing an instrument is presumed to know its contents, and if he fails to read it, cannot escape liability even if false representations were made as to its contents); *Franco v. State ex el. Bd. of Regents of the Univ. of Okla.*, 2020 OK CIV APP 64, ¶ 32, 482 P.3d 1, 9 (Okla. Civ. App. 2020); *see also Allis Chalmers Mfg. Co. v. Byers*, 88 P.2d 368, 371 (Okla. 1939); *Johnson v. Lynn Hickey Dodge Inc.*, 1998 WL 826829, at *2 (10th Cir. 1998); *Schooley v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 867 F. Supp. 989, aff'd, 107 F.3d 21 (10th Cir. 1997); 27 WILLISTON ON CONTRACTS § 70:114 (4th ed. Nov. 2021 update) ("One who signs or accepts a written contract, in the absence of fraud or other wrongful act on the part of another contracting party, is conclusively presumed to know its contents and to assent to them.")

Here, the fact that Plaintiff signed the Contract with OKLAHOMA WINDOWS which was emailed to her on the same date that she signed it, is more than sufficient evidence to conclude the existence of an arbitration agreement and enforce it. *See also*, *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1369 (11th Cir. 2005) ("[T]he plain language of [9 U.S.C.] § 2 requires that the arbitration provision be 'written.' It does not, however, require that the agreement to arbitrate be signed by either party; nor does any other provision of the FAA"); *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 845-46 (2nd Cir. 1987) ("Under general contract principles a party is

---

[2] This is nearly identical language to that found in the OUAA which provides that an "agreement contained in a record to submit to arbitration any existing or subsequent controversy arising between the parties to the agreement is valid, enforceable, and irrevocable except upon grounds that at law or in equity for the revocation of a contract." 12 O.S. § 1857.

bound by the provisions of a contract that he signs, unless he can show special circumstances that would relieve him of such an obligation" and a court must "focus not on whether there was subjective agreement as to each clause in the contract, but on whether there was an objective agreement with respect to the entire contract" (citations excluded)).

Plaintiff's allegation that she signed the agreement on an electronic tablet will not render the arbitration agreement unenforceable, especially where, as here, she had an opportunity to engage with the representative to ask about the Contract, but did not do so. *Lojewski v. Grp. Solar USA, LLC*, No. 22 CIV. 10816 (PAE), 2023 WL 5301423, at *9 (S.D.N.Y. Aug. 17, 2023). There is no indication that Plaintiff requested or attempted to review the terms, and OKLAHOMA WINDOWS refused. *Id.* Indeed, Plaintiff's interactions with the representative on the date of the sale is sufficient to show she chose to sign the Contract without reading it. *Bayron-Paz v. Wells Fargo Bank, N.A.*, No, 22 Civ. 6122 (DLC), 2023 WL 4399041, at *4 (S.D.N.Y. July 7, 2023) (compelling arbitration where plaintiff alleged salesperson obtained signature on agreement through iPad and did not explain agreement terms, as plaintiff "knew that the transaction would be governed by a written agreement ... but chose to sign the iPad twice without requesting that its contents be displayed to him"). Courts have cautioned that consumers need to carefully review a contract before signing. *Nichols Ford, Ltd. v. Garza*, No. 02-20-00191-CV, 2021 WL 3931916, at *5 (Tex. App. Sept. 2, 2021) (enforcing arbitration clause even when they signed the contract in piecemeal without most of each page being visible). Moreover, any allegation by Plaintiff that she did not receive a copy of the Contract does not render the agreement invalid. *See Jones v. Sallie Mae, Inc.*, 2013 WL 6283483, *5 (M.D. Fla. Dec. 4, 2013)(failure to recall receipt, without more, is not sufficient to create a jury issue [on arbitration].)

Indeed, the Plaintiff acknowledged and admitted that she signed "something on his electronic tablet" and that the representative told her that she would receive a copy of the Contract. [Doc. 27.5, p. 2, ¶ 6].   Plaintiff signed the Contract that stated "Buyer(s) hereby acknowledges that Buyer(s) 1) has read this Agreement, understands the terms of this Agreement, and has received a completed, signed, and dated copy of this Agreement . . ." and her signature is included under the arbitration provisions which indicates "[b]y signing below, Buyer and Contractor hereby agree to the Terms and Conditions of the Sale of this Agreement." **Exhibit 1.1, p. 2, 9.**  *See Jones v. Sallie Mae, Inc*., 2013 WL 6283483, *5 (M.D. Fla. Dec. 4, 2013) ("Plaintiff's signature on the Loan Application [acknowledging receipt of Promissory Note containing arbitration provision] is evidence that he received the Promissory Note and read it.).   Furthermore, the Contract was emailed to her on the date that she signed the Contract on November 23, 2021 to an email address that the Plaintiff acknowledges that she has used.  **Ex. 1.2**; [Docs. 27-8 to 27-16].  The Contract that was emailed to Plaintiff clearly contained a notice of a right to cancel within three (3) business days following execution of the agreement, and thus, Plaintiff had ample time to read the terms and conditions, and understand the implications of being bound by arbitration.  (**Exhibit 1.1,** at p.4).  Accordingly, the arbitration clause in the Agreement is enforceable.

### 4.   The Class Waiver Provisions Are Enforceable, and Not Substantively Unconscionable.

Oklahoma Courts have found that class waivers are valid and enforceable.[3]  *See Morris v. Airbnb, Inc*., 2020 WL 5823542, *4 (W.D. Okla. 2020) (ruling that Defendant's Motion to Compel

---

[3] The arbitration language in the contract that specifically and expressly prohibits filing claims on behalf of a class, as follows:

The arbitration must be conducted on an individual basis. Neither of the parties nor the arbitrator will have any authority or power to proceed with any claim as a class action or otherwise to join or consolidate any claim with any other claims or any other proceeding involving third parties.

Arbitration is granted where the arbitration clause contained a class action waiver); see *also Hancock v. American Tel. and Tel. Co., Inc*., 2011 WL 3626785, *10 (W.D. Okla. 2011) (enforcing arbitration clauses that contained class action waivers and granting a motion to compel arbitration with dismissal of certain claims).  Indeed, "[n]umerous courts, both federal and state, have rigorously enforced no-class-action provisions in arbitration agreements and found them to be valid provisions of such agreements and not unconscionable." *Walther v. Sovereign Bank,* 386 Md. 412, 436 (2005) (citations excluded); *see also, Epic Sys. Corp.*, 138 S. Ct. at 1624 (upholding Arbitration Act and agreement for individualized arbitration procedures, and refusing to outlaw class waivers even where NLRA and FLSA statutes allowed for class or collective action).  As such, class wavier provisions are not substantively unconscionable. *Muriithi v. Shuttle Exp., Inc.,* 712 F.3d 173, 180 (4th Cir. 2013)(doctrine of unconscionability may not invalidate otherwise valid arbitration agreement to eliminate a term barring classwide procedures); *Walther*, 386 Md. at 438 (no-class-action provision is not "so one-sided or oppressive to petitioners as to render the arbitration agreement at issue unconscionable.").   For the foregoing reasons, the arbitration clause containing the class waiver language is enforceable and not substantively unconscionable.

### 5.   The Plaintiff's Claim Falls Within the Scope of the Arbitration Provision.

Once the Court determines that the parties have entered into an arbitration agreement, an order to arbitrate should not be denied unless it may be said with assurance that the arbitration clause does not cover the dispute. *AT&T Tech., Inc. v. Comm. Workers of America*, 475 U.S. 643, 650 (1986).  "'Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'"  *Mey v. DIRECTV, LLC*, 971 F.3d 284, 292 (4th Cir. 2020) (citation excluded); *Mastrobuono v. Shearson Lehman Hutton, Inc*., 514 U.S. at 62 (when a court interprets such

---

**(Ex. 1.1, p. 9).**



provisions in an agreement covered by the FAA, "due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration." (citation excluded)); *see also*, *Moses H. Cone Mem'l Hosp.,* 460 U.S. at 24-25. Accordingly, "'[c]ourts must 'rigorously enforce' arbitration agreements.'" *Am. Exp. Co. v. Italian Colors Rest.,* 570 U.S. 228, 233 (2013).

Where an arbitration clause is broad, there is a presumption of arbitrability and only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail. *AT&T Tech.,* 475 U.S. at 650. Broad arbitration clauses providing that any dispute "arising out of or related to" the underlying contract are capable of expansive reach. *Mey v. DIRECTV, LLC*, 971 F.3d 284, 292 (4th Cir. 2020); *Sanchez v. Nitro-Lift Techs., L.L.C.*, 762 F.3d 1139, 1147 (10th Cir. 2014)(citations omitted)(an arbitration clause applying to disputes "arising under" or "in connection with" the agreement constitutes a broad arbitration clause).

The Contract requires arbitration for "***any*** dispute between them" "***arising under or in connection with*** this Agreement" (**Exhibit 1.1, pp. 8-9**) (e.s.). *United States v. Gonzales*, 520 U.S. 1, 5, (1997) ("[T]he word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" (quoting Webster's Third New International Dictionary 97 (1976)). Accordingly, the arbitration clause is broad and covers the claims raised here in this action. All claims involve the same set of facts and allegations relating to the windows that OKLAHOMA WINDOWS agreed to supply to the Plaintiff pursuant to the parties' Contract, and specifically whether or not the proper financial disclosures were made. Thus, the Plaintiff's claims fall within the scope of the Mandatory Arbitration Provision and this matter is due to be compelled to arbitration.

**6.   OKLAHOMA WINDOWS Has Not Waived Its Right to Arbitrate.**

OKLAHOMA WINDOWS has clearly not waived the right to arbitration.  Waiver is the voluntary and intentional relinquishment of a known right.  *Hamer v. Neighborhood Hous. Servs. of Chi.*, 138 S. Ct. 13, 17 n.1 (2017) (citations omitted).  Any party arguing waiver of the right to arbitration "bears the heavy burden of proving waiver." *MicroStrategy, Inc. v. Lauricia,* 268 F.3d 244, 250 (4th Cir. 2001) (citation excluded).

Here, OKLAHOMA WINDOWS has **not** waived their right to arbitration or acted in any manner inconsistent with arbitration, but rather and immediately proceeded with filing the instant Motion.  Indeed, rather than filing a motion to dismiss on the merits of this action, in an abundance of caution, OKLAHOMA WINDOWS is requesting the Court to rule on OKLAHOMA WINDOWS' Motion first as it is OKLAHOMA WINDOWS' position that all such issues should be decided by an arbitrator.  As such, OKLAHOMA WINDOWS has not acted inconsistent with its right to arbitration, and this dispute should be compelled to arbitration.

**7.   The Court Should Dismiss or Stay of All Proceedings.**

Not only should the Court compel the arbitration of Plaintiff's claims against OKLAHOMA WINDOWS, the Court has the discretion to either dismiss or stay all other proceedings in this matter.  At a minimum, the FAA requires a stay of the action because the issues are referable to arbitration.  *See* 9 U.S.C. § 3 (if any issue referable to arbitration is brought to court, "the court in which suit is pending … shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement"); *See also, Fancher v. Westwind Enterprises, Ltd*., 2018 WL 11411336, *2 (W.D. Ok Aug. 8, 2018) (citing *Williams v. Imhoff*, 203 F.3d 758, 764 (10th Cir. 2000) ("Under the FAA, a court must stay

proceedings if satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding.")(quotation marks and citation omitted).

Here, all of Plaintiff's claims against the OKLAHOMA WINDOWS fall within the scope of the Mandatory Arbitration Provision in their Agreement. Therefore, in addition to granting their Motion to Compel Arbitration, OKLAHOMA WINDOWS requests this Court to dismiss or stay all proceedings against it pending completion of the arbitral process.[4]  Even where certain claims are arbitrable, and others are not, litigation of these claims must be stayed pending resolution of the arbitrable issue upon which they depend.  *See, The Redemptorists v. Coulthard Servs., Inc*., 145 Md. App. 116, 154 (2002) (staying fraud claims that are not arbitrable pending the resolution on the arbitrable issue upon which they depend).

### E.    REQUEST FOR EXTENSION TO FILE MOTION TO DISMISS ON OTHER GROUNDS

In an abundance of caution, in the event the Court denies OKLAHOMA WINDOWS' motion to dismiss or stay and compel arbitration, Defendant requests the Court to extend the date in which Defendant may file a motion to dismiss the Complaint on other grounds.[5]  Defendant has intentionally not requested the Court to rule on the merits of any matter in an effort to avoid any argument as to whether or not Defendant waived their rights to arbitration by participating in litigation in this matter.

---

[4] Under § 16(a)(1)(A), a party may appeal the denial of a motion to stay federal proceedings pending arbitration; at least to the extent that an appeal concerns the denial of a motion to stay, the fact that the motion also seeks dismissal does not affect its appealability.  *Noohi v. Toll Bros., Inc.*, 708 F.3d 599, 604 (4th Cir. 2013)

[5] For example, OKLAHOMA WINDOWS contends that the action is barred (a) for failure of plaintiff to file an action against OKLAHOMA WINDOWS within the one year statute of limitations, (b) because OKLAHOMA WINDOWS does not extend any credit and is not a lender, and thus, OKLAHOMA WINDOWS is not a proper Defendant, (c) Plaintiff was issued a full refund, and thus, has no damages, and (d) Plaintiff failed to comply with conditions precedent to bringing this action, including complying with mediation requirements under the Contract.

**F.     CONCLUSION**

For the above good cause, OKLAHOMA WINDOWS respectfully requests the Court enter

an order staying or dismissing this action and compelling arbitration, and order any other relief

this Court deems just and proper.

WHEREFORE, Defendant, OKLAHOMA WINDOWS requests this Court grant its

Motion to Dismiss the Amended Class Action Complaint (or Stay) and to Compel Arbitration, and

for such other and further relief as is just and proper.

Dated:  December 7, 2023                    Respectfully submitted,

                                            /s/ Diane J. Zelmer_____
                                            Diane J. Zelmer, Esq. (pro hac vice)
                                            FL Bar No. 27251
                                            BERENSON LLP
                                            4495 Military Trail, Suite 203
                                            Jupiter, Florida 33458
                                            Telephone: 561-429-4496
                                            Email: djz@berensonllp.com
                                            *Attorney for Defendant, OKLAHOMA WINDOWS AND DOORS, LLC*

                                            Sheila D. Sayne, Esq., OBA # 31213
                                            Sayne Law PLLC
                                            P.O. Box 33309
                                            Tulsa, Oklahoma 74153-3309
                                            Telephone: 918-740-3013
                                            sheila.sayne@outlook.com
                                            *Attorney for Defendant, OKLAHOMA WINDOWS AND DOORS, LLC*

**<u>CERTIFICATE OF SERVICE</u>**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was filed and served

electronically using CM/ECF, which is served upon all parties of record on the list for this case on

this 7th day of December, 2023.

Respectfully submitted,

/s/ Diane J. Zelmer
Diane J. Zelmer, Esq., Fla. Bar 27251

Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

SUSAN PARISI,

    Plaintiff,

vs.

    CASE NO. CIV-23-cv-115-R

    (Removed from the District
    Court of Oklahoma County,
    State of Oklahoma, Case No.
    CJ-2022-5727)

OKLAHOMA WINDOWS AND DOORS,
LLC d/b/a RENEWAL BY ANDERSON OF
OKLAHOMA AND BMO HARRIS
BANK, NA d/b/a GREENSKY, LLC,

    Defendants.

_____/

---

### DECLARATION OF JON ERICKSON

### IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS (OR STAY) AND

### COMPEL ARBITRATION WITH INCORPORATED MEMORANDUM OF LAW

---

JON ERICKSON declares, pursuant to 28 U.S. Code § 1746, as follows:

1. My name is JON ERICKSON, and I am the corporate Chief Operating Officer of ESLER COMPANIES LLC which wholly owns OKLAHOMA WINDOWS AND DOORS, LLC d/b/a RENEWAL BY ANDERSON OF OKLAHOMA ("OKLAHOMA WINDOWS"). I am familiar with the corporate records and vendors of the company, and have personal knowledge of the facts set forth herein or incorporated by reference.

2. I have reviewed the records of the OKLAHOMA WINDOWS, and on November 23, 2021, Plaintiff, SUSAN PARISI ("PARISI"), entered into a contract with OKLAHOMA WINDOWS for the purchase of five (5) windows to be installed at 1613 N. Markwell Avenue, Oklahoma City, OK 73127, in exchange for the sum of $17,743. A copy of the Contract is attached as **Exhibit "1.1."**

3. PARISI received a copy of the Contract via e-mail, the same day that she signed the Contract. A copy of the email is attached as **Exhibit "1.2."**



4. The Contract contained a three day right to cancel the Contract. **Ex. 1.1, p. 4.**

5. The Contract also contains the following mediation, arbitration and class waiver language:

> **Informal Dispute Resolution and Mediation: Before submitting a claim to mediation and arbitration as described below, the Buyer agrees to present the Contractor with written notice of any construction defects and allow the Contractor within thirty (30) days (1) to inspect any construction defects and (2) present to the Buyer a written response which may include Contractor's offer to repair defects or to compensate Buyer for such defects. Before submitting a claim to mediation and arbitration as described below, the Contractor agrees to present the Buyer with written notice regarding any payment disputes and similarly allow the Buyer to respond in writing within thirty (30) days.**
>
> **If that process does not resolve the dispute, the complaining party must submit all claims to mediation within 10 days following notice of the claim to the other party. The mediation shall take place at offices of the American Arbitration Association (AAA) in the state where the work is to be performed; if there is no such office, the mediation will take place at a location designated by the mediator within the state where the work is to be performed. Each party will identify a person with decision-making authority who shall attend the mediation. The mediation will be nonbinding and conducted by the AAA in accordance with its then-current Construction Industry Mediation Procedures. The parties shall equally share the cost of the mediation. The parties agree that any action or claim or request for an injunction shall not be subject to mediation.**
>
> **Arbitration: Buyer and Contractor agree that any dispute between them, or any of their respective affiliates, officers, directors, employees, agents or owners arising under or in connection with this Agreement, or the products and services to be provided by Contractor, that has been not resolved through mediation, will be determined by binding arbitration administered by the AAA pursuant to its then-current Construction Industry Fast Track Procedures. The arbitration shall take place at offices of the AAA in the state where the work is to be performed; if there is no such office, the arbitration will take place at a location designated by the arbitrator within the state where the work is to be performed. The arbitration shall be heard by one (1) arbitrator who has at least ten (10) years of experience in the construction industry. The arbitrator must follow the law of the state where the work is being performed and not disregard the terms of this Agreement.**

**The arbitration must be conducted on an individual basis. Neither of the parties nor the arbitrator will have any authority or power to proceed with any claim as a class action or otherwise to join or consolidate any claim with any other claims or any other proceeding involving third parties. In the event a court determines that this limitation on joinder or class action claims is unenforceable, then this entire commitment to arbitrate will become null and void and the parties must submit all claims to the jurisdiction of the courts. The parties agree that any action or claim or request for an injunction shall not be subject to arbitration.**

**Ex. 1.1, Terms and Conditions of Sale, p. 8-9.**

    6. OKLAHOMA WINDOWS purchases some of the products and supplies used to manufacture and/or install its windows and doors from various interstate sources, including from the following:

<div align="center">

Ritz Safety, LLC (lead safe work practices "LSWP" materials)
255 Crescentville Rd
Cincinnati, OH 45246

Caliber Supply (Silco caulk)
1710 N Higley Rd Ste 103
Mesa, AZ 85205

Bayworld (bay/bow supplier)
395 Reed St.
Mansfield, OH 44903

Renewal by Andersen (window units, coil and trim)
9900 Jamaica Ave S
Cottage Grove, MN 55016

</div>

I state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: December 7, 2023

_____
JON ERICKSON



BERENSON
4495 MILITARY TRAIL, SUITE 203, JUPITER, FL 33458

Exhibit 1.1



Renewal by Andersen of Oklahoma
Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 I Oklahoma City, OK 73149
Phone: 405-608-5000 I Fax: 405-562-7880 I oksales@renewaloklahoma.com

Susan Farisi

H:
C:

# Thank you for your order

Please find, enclosed for your convenience, the contents of your agreement with Oklahoma Windows and Doors LLC d/b/a Renewal by Andersen of Oklahoma

*Table of Contents*

Agreement Document and Payment Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Itemized Order Receipt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Notice of Cancellation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

Greensky Form Oct 2021.pdf . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

Terms and Conditions of Sale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

Sales Cost Savings Program (SCSP) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Lead-Safe Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

What to Expect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Disclosure Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Limited Warranty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Lead Safe Work Practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Release Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

Price Presentation Discounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

A553



## Agreement Document and Payment Terms

**dba: Renewal by Andersen of Oklahoma**
Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 l Oklahoma City, OK 73149
Phone: 405-608-5000 l Fax: 405-562-7880 l oksales@renewaloklahoma.com



Susan Parisi

H:
C:

---

**Susan Parisi**
_____
Buyer(s) Name

███████████████████
Buyer(s) Street Address

**sparisi21@yahoo.com**
_____
Primary Email

**11/23/21**
_____
Contract Date

████████████
Primary Telephone Number

_____
Secondary Email

████████████
Secondary Telephone Number

---

Buyer(s) hereby jointly and severally agrees to purchase the products and/or services of Oklahoma Windows and Doors LLC d/b/a Renewal by Andersen of Oklahoma("Contractor"), in accordance with the terms and conditions described in this Agreement Document and Payment Terms, any documents listed in the Table of Contents, and any other document attached to this Agreement Document, the terms of which are all agreed to by the parties and incorporated herein by reference (collectively, this "Agreement"). Buyer(s) hereby agrees to sign a completion certificate after Contractor has completed all work under this Agreement.

---

| | | |
|---|---|---|
| Total Job Amount: | **$17,743** | By signing this Agreement, you acknowledge that the Balance Due, and the Amount Financed must be made by personal check, bank check, credit card, or cash. |
| Deposit Received: | **$0** | |
| Balance Due: | **$17,743** | Estimated Start: |
| Amount Financed: | **$17,743** | **3-5 months** |
| Method of Payment: | **Financing** | |

Estimated Completion:
**1-2 days**

We schedule installations based on the date of the signed contract and secondarily on the date in which we complete the technical measurements. The installation date that we are providing at this time is only an estimate. We will communicate an official date and time at a later date. Rain and extreme weather are the most common causes for delay.

Notes: **Dates are subject to change due to back orders**

---

Buyer(s) agrees and understands that this Agreement constitutes the entire understandings between the parties and that there are no verbal understandings changing or modifying any of the terms of this Agreement. No alterations to or deviations from this Agreement will be valid without the signed, written consent of both the Buyer(s) and Contractor. Buyer(s) hereby acknowledges that Buyer(s) 1) has read this Agreement, understands the terms of this Agreement, and has received a completed, signed, and dated copy of this Agreement, including the two attached Notices of Cancellation, on the date first written above and 2) was orally informed of Buyer's right to cancel this Agreement.

NOTICE TO BUYER: Do not sign this contract if blank. You are entitled to a copy of the contract at the time you sign.

**YOU, THE BUYER, MAY CANCEL THIS TRANSACTION AT ANY TIME NOT LATER THAN MIDNIGHT OF 11/26/2021 OR THE THIRD BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION, WHICHEVER DATE IS LATER. SEE THE ATTACHED NOTICE OF CANCELLATION FORM FOR AN EXPLANATION OF THIS RIGHT.**

---

_~~~~~~~~~~~~~~~~~~~_
Signature of Sales Person
**Russell Kelley**
Print Name of Sales Person

_Susan Parisi_
Signature
**Susan Parisi**
Print Name

_____
Signature

_____
Print Name

---



# Itemized Order Receipt



**dba: Renewal by Andersen of Oklahoma**

Legal Name: Oklahoma Windows and Doors LLC

9201 Polaris Drive Suite 200 l Oklahoma City, OK 73149

Phone: 405-608-5000 l Fax: 405-562-7880 l oksales@renewaloklahoma.com

**Susan Parisi**

H:

C:

| ID#: | ROOM: | SIZE: | DETAILS: |
|------|-------|-------|----------|
|  |  | 0 W<br>0 H | **Misc:** Misc, Processing Fee, <Enter Description Here> |
| **107** | dining | 95 W<br>30 H |  |
| **108** | dining upper | 95 W<br>64 H | **Window:** Picture, Insert Frame, Exterior Dark Bronze, Interior Dark Bronze, **Glass:** All Sash: High Performance SmartSun Glass, No Pattern, Tempered Glass, **Grille Style:** No Grille, **Misc:** None |
| **109** | office lower | 59 W<br>30 H | **Window:** Gliding, Double, 1:1, Active / Passive, Base Frame, Exterior Dark Bronze, Interior Dark Bronze, **Glass:** All Sash: High Performance SmartSun Glass, No Pattern, **Hardware:** Dark Bronze, **Screen:** Fiberglass, Full Screen, **Grille Style:** No Grille, **Misc:** None |
| **110** | office upper | 59 W<br>40 H<br>30 L | **Specialty:** Equal Leg Arch, Base Frame, Exterior Dark Bronze, Interior Dark Bronze, **Glass:** All Sash: High Performance SmartSun Glass, No Pattern, **Grille Style:** No Grille, **Misc:** None |
| **111** | guest room | 35 W<br>59 H | **Window:** Gliding, Double, 1:1, Active / Passive, Base Frame, Exterior Dark Bronze, Interior Dark Bronze, **Glass:** All Sash: High Performance SmartSun Glass, No Pattern, **Hardware:** Dark Bronze, **Screen:** Fiberglass, Full Screen, **Grille Style:** No Grille, **Misc:** None |

**WINDOWS: 4**   **PATIO DOORS: 0**   **SPECIALTY: 1**   **MISC: 1**        TOTAL **$17,743**



*Renewal by Andersen is committed to our customers' safety by complying with the rules and lead-safe work practices specified by the EPA.*

A555



# Notice of Cancellation

**dba: Renewal by Andersen of Oklahoma**

Legal Name: Oklahoma Windows and Doors LLC

9201 Polaris Drive Suite 200 | Oklahoma City, OK 73149

Phone: 405-608-5000 | Fax: 405-562-7880 | oksales@renewaloklahoma.com

**Susan Parisi**

H:
C:

---

**You, the buyer(s) may cancel this transaction at any time prior to midnight on 11/26/2021
or the third business day after the date of this transaction, whichever date is later.**

---

NOTICE OF CANCELLATION

Date of Transaction: 11/23/21. You may cancel this transaction, without any penalty or obligation, before midnight on 11/26/2021 or the third business day after the date of this transaction, whichever date is later. If you cancel, any property traded in, any payments made by you under the Contract or Sale, and any negotiable instrument executed by you will be returned within 10 business days following receipt by the Seller of your cancellation notice, and any security interest arising out of the transaction will be canceled. If you cancel, you must make available to the Seller at your residence, in substantially as good condition as when received, any goods delivered to you under this Contract or Sale; or you may, if you wish, comply with the instructions of the Seller regarding the return shipment of the goods at the Sellers expense and risk. If you do make the goods available to the Seller and the Seller does not pick them up within 20 days of the date of your Notice of Cancellation, you may retain or dispose of the goods without any further obligation. If you fail to make the goods available to the Seller, or if you agree to return the goods to the Seller and fail to do so, then you remain liable for performance of all obligations under the Contract. To cancel this transaction, mail or deliver a signed and dated copy of this cancellation notice or any other written notice, or send a telegram, to:

dba: Renewal by Andersen of Oklahoma

Legal Name: Oklahoma Windows and Doors LLC

9201 Polaris Drive Suite 200

Oklahoma City, OK 73149

Phone: 405-608-5000

Fax: 405-562-7880

Email: oksales@renewaloklahoma.com

NOT LATER THAN MIDNIGHT OF 11/26/2021
OR THE THIRD BUSINESS DAY AFTER THE DATE
OF THIS TRANSACTION, WHICHEVER DATE IS LATER.

I HEREBY CANCEL THIS TRANSACTION

_____     _____
Buyer Signature                Date

NOTICE OF CANCELLATION

Date of Transaction: 11/23/21. You may cancel this transaction, without any penalty or obligation, before midnight on 11/26/2021 or the third business day after the date of this transaction, whichever date is later. If you cancel, any property traded in, any payments made by you under the Contract or Sale, and any negotiable instrument executed by you will be returned within 10 business days following receipt by the Seller of your cancellation notice, and any security interest arising out of the transaction will be canceled. If you cancel, you must make available to the Seller at your residence, in substantially as good condition as when received, any goods delivered to you under this Contract or Sale; or you may, if you wish, comply with the instructions of the Seller regarding the return shipment of the goods at the Sellers expense and risk. If you do make the goods available to the Seller and the Seller does not pick them up within 20 days of the date of your Notice of Cancellation, you may retain or dispose of the goods without any further obligation. If you fail to make the goods available to the Seller, or if you agree to return the goods to the Seller and fail to do so, then you remain liable for performance of all obligations under the Contract. To cancel this transaction, mail or deliver a signed and dated copy of this cancellation notice or any other written notice, or send a telegram, to:

dba: Renewal by Andersen of Oklahoma

Legal Name: Oklahoma Windows and Doors LLC

9201 Polaris Drive Suite 200

Oklahoma City, OK 73149

Phone: 405-608-5000

Fax: 405-562-7880

Email: oksales@renewaloklahoma.com

NOT LATER THAN MIDNIGHT OF 11/26/2021
OR THE THIRD BUSINESS DAY AFTER THE DATE
OF THIS TRANSACTION, WHICHEVER DATE IS LATER.

I HEREBY CANCEL THIS TRANSACTION

_____     _____
Buyer Signature                Date

---

 

## GreenSky Financing Form

SOLD TO: Susan Parisi                                 DATE: 11/23/2021

CARD HOLDER'S NAME: Susan Parisi         APPLICATION ID: ▮▮▮▮▮▮▮▮

Job Address: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮        LAST 4 SSN: ▮▮▮

PO Box _____

PLAN #:  3541 - 24 month promotional period. Interest waived if balance paid off before promotional period ends.

Simply visit myloan.greenskycredit.com, enter your Application ID and Access number to download loan agreements.

1.   Total Project Amount      $ 17,743

2.   Deposit (if applicable)   $ 0

3.   Total Greensky Finance Amount   $ 17,743.00

4.   Greensky financed at order (50%)   $ 8,871.50

5.   Greensky financed at completion (50%)   $ 8,871.50

**Name as it appears on card:** Susan Parisi

RbA Rep. Signature: _____        Date: 11/23/2021

Customer Signature: _____        Date: 11/23/2021

A557



## HOA Authorization & Contact Form

Homeowner Name: Susan Parisi

Project Consultant: Russell Kelley

Measure Date: 11/23/21

# of units: 5

**IS THIS PROJECT LIKE FOR LIKE**
YES: ✔   NO: ☐

**PROCEED WITH ORDER**
YES: ✔   NO: ☐

**Check only one and sign please**

✔ NO HOA EXISTS for my project. Please proceed with placing my order.

Homeowner Signature: *Susan Parisi*

Date:_____

---

If project is LIKE FOR LIKE we recommend the following:

☐ I WILL OBTAIN MY OWN HOA APPROVAL. I accept all responsibility for my order. Please proceed with placing my order.

Homeowner Signature:_____   Date:_____

---

☐ Authorization Release for HOA Assistance:   I the undersigned, hereby authorize Renewal by Andersen to act on my behalf in all manners relating to HOA REQUESTS, including signing documents relating to these matters. Any and all acts carried out by Renewal by Andersen on my behalf shall have the same effect as acts of my own. This authorization is valid until further notice.
WHEN OPTING FOR ASSISTANCE, PROVIDE CURRENT CONTACT INFORMATION:
You may be contacted if your HOA is one that will not work with us, or has special requirements that are not within our means.

➢ Sub Division HOA (complete name ):_____

➢ Property Management Co:_____

➢ Contact Name (Manager):_____

➢ Telephone:_____

➢ HOA Management Co. Manager's E-mail:_____

**Home Owners Responsibility:** Renewal by Andersen will submit your request; notify RbA when you hear from your HOA with the decision. Your replacements will be ordered at this time. *(Note: Some HOA's will only communicate with the Home Owner.)*

---

Partial Replacement ☐    Entire Home Replacement ☐

**Reps to initial:** *Color same:* ☐   *Style same:* ☐   *Grid pattern same:* ☐

Notes to HOA for changes needed.

Please explain all changes not like for like. Please provide a brief description for each side of the home (front, back, left, right). Description for each side of the home to include if L4L, if not L4L what unit # is changing.

Homeowners Signature:_____   Date: 11/23/21

A558



**Terms and Conditions of Sale**

dba: Renewal by Andersen of Oklahoma
Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 | Oklahoma City, OK 73149
Phone: 405-608-5000 | Fax: 405-562-7880 | oksales@renewaloklahoma.com

**Susan Parisi**

H:
C:

"I," "my," and "me" means each person who signs this Agreement as a Buyer. "Contractor" means Oklahoma Windows and Doors, LLC d/ b/a Renewal by Andersen of Oklahoma. "We" and "'us" mean both the Buyer, or Buyers if more than one, and the Contractor. Oklahoma Windows and Doors, LLC, LLC d/b/a Renewal by Andersen of Oklahoma is an authorized and independent dealer of Renewal by Andersen LLC ("RbA") products. You are entering into a contract with Oklahoma Windows and Doors, LLC, d/b/a Renewal by Andersen of Oklahoma.

Warranties/Intended Use: I understand that in connection with my purchase, RbA is providing me with a written Limited Warranty a copy of which has been furnished to me or is available to me online at www.renewalbyandersen.com and is incorporated by reference. Contractor is providing me with an Extended Limited Lifetime Labor Warranty. I understand that I should carefully read RbA's Limited Warranty and the Contractor's Extended Limited Lifetime Labor Warranty for complete details of my warranty coverages. I understand that neither warranty will be effective or enforced while a balance due remains on this Agreement.

Contractor's Promises: Contractor promises to perform all work in a professional manner and within industry standards. Contractor will remove and transport away from the premises any debris and waste materials that are generated by Contractor. Contractor will obtain all building permits for the work to be performed under this Agreement. Contractor will maintain worker's compensation insurance and liability insurance during the term of this Agreement in amounts not less than those required by applicable law.

My Promises: I promise to Contractor that (a) I will provide Contractor with reasonable access to my property and the area in which the work is to be performed, including access to electrical outlets; (b) I will be responsible for preparation, moving, and reinstalling of any materials, personal property, motor vehicles, or equipment as may be needed for Contractor to perform its work; (c) the walls and surfaces near and upon which the work is to be performed are sound and suitable for the work being performed; (d) when the work is substantially complete, I will pay Contractor the balance due on the Total Job Amount. I understand that "substantially complete" means the work has been materially finished and is functional as intended; (e) in the event that I disagree with Contractor that the work is substantially complete, I agree that I will not withhold more than 10% of the Agreement price; (f) if taxes and/ or permitting fees are necessary to complete the work, I will pay them unless the law requires Contractor to pay them; and (g) Contractor may place an advertising sign of reasonable size in my yard during the installation.

Deposit, Second and Final Payments: Unless otherwise specified in this Agreement, a Deposit of 33% of the Total Job Amount identified on front of this Agreement is required to be made by you upon your acceptance of this Agreement. The second payment is due at the start of installation and final payment is due at the substantial completion of the installation. The checks are made payable to Renewal by Andersen of Oklahoma. You may hand the check to the installer who will then bring the check into the office. If you have financed your project, the instructions provided by the finance institution must be followed. All amounts quoted, exclude all present and future federal, state and local excise, sales/use, privilege, personal property, gross receipts, and similar taxes and charges payable with respect to the products and services under this Agreement.

Measurements: I understand that all dimensions referred to in this Agreement are considered estimated measurements and used only for the purpose of arriving at the Total Job Amount in this Agreement. I understand that the actual measurements will be determined during a follow up visit by a qualified measurement technician employed by Contractor. I understand that if Contractor must make changes to the estimated measurements, I agree to sign an addendum to this Agreement.

_____

Signature of Sales Person

**Russell Kelley**

Print Name of Sales Person

*Susan Parisi*

_____

Signature

**Susan Parisi**

Print Name

_____

Signature

_____

Print Name

A559



## Terms and Conditions of Sale

dba: Renewal by Andersen of Oklahoma
Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 | Oklahoma City, OK 73149
Phone: 405-608-5000 | Fax: 405-562-7880 | oksales@renewaloklahoma.com



Susan Parisi

H:
C:

**Late Cancellation:** I understand that I have three business days to cancel this Agreement, as described in the Notice of Cancellation. I understand that if I want to cancel this Agreement after those three business days, Contractor does not have to allow me to do so. I understand that if Contractor does permit me cancel after those three business days, however, I will have to pay to Contractor a late cancellation fee equal to 25% of the Total Job Amount to compensate Contractor for its labor, administrative, and material costs.

**Delay/Unknown Conditions:** I understand that if Contractor determines that it cannot perform the work according to Contractor's normal professional standards, then Contractor can cancel this Agreement, notify me in writing of the cancellation, and return to me all deposits I have paid. I understand that some of the things that could cause Contractor to cancel this Agreement would be incorrect pricing, unforeseen structural defects, or unknown pre-existing conditions to my property. I understand that Contractor is not responsible for structural or other defects in my home , and that Contractor's products do not cure those types of problems. I also understand that the work could be delayed by events that Contractor does not control, and that is acceptable to me. Some of the things that could cause the work to be delayed would be acts of God, pandemics, labor strikes, inclement weather, material shortages, my inability to qualify for or obtain financing, delays by local government authorities in issuing or otherwise approving inspections, permitting, or other required authorizations for the work.  In  no event will Contractor be liable for any damage, consequential or otherwise, arising from  delayed performance.

**Late Payment/Default:** I agree that if I do not pay Contractor all or any portion of the money owed when it is due, I will pay a late fee of 1.5% of the amount owed for each month the money is owed and not paid. I also agree that if I default on my promises under this Agreement, and Contractor hires an attorney to enforce this Agreement, to the extent permitted by law, I will pay Contractor its reasonable legal fees and related costs or expenses. I agree and understand that in the event that I do not pay Contractor all or any portion of the money owed when it is due, Contractor may have a claim against me, which may be enforced against my home in accordance with the applicable lien laws. I also understand that if I finance the work with Contractor or a third party, my separately provided financing documents may include a security interest in my home. I understand that I should read those documents closely.

**Informal Dispute Resolution and Mediation:** Before submitting a claim to mediation and arbitration as described below, the Buyer agrees to present the Contractor with written notice of any construction defects and allow the Contractor within thirty (30) days (1) to inspect any construction defects and (2) present to the Buyer a written response which may include Contractor's offer to repair defects or to compensate Buyer for such defects. Before submitting a claim to mediation and arbitration as described below, the Contractor agrees to present the Buyer with written notice regarding any payment disputes and similarly allow the Buyer to respond in writing within thirty (30) days.

If that process does not resolve the dispute, the complaining party must submit all claims to mediation within 10 days following notice of the claim to the other party. The mediation shall take place at offices of the American Arbitration Association (AAA) in the state where the work is to be performed; if there is no such office, the mediation will take place at a location designated by the mediator within the state where the work is to be performed.  Each party will identify a person with decision-making authority who shall attend the mediation. The mediation will be nonbinding and conducted by the AAA in accordance with its then-current Construction Industry Mediation Procedures. The parties shall equally share the cost of the mediation. The parties agree that any action or claim or request for an injunction shall not be subject to mediation.

**Arbitration:** Buyer and Contractor agree that any dispute between them, or any of their respective affiliates, officers, directors, employees, agents or owners arising under or in connection with this Agreement, or the products and services to be provided by Contractor, that has been not resolved through mediation, will be determined by binding arbitration administered by the AAA pursuant to its then-current

| | | |
|---|---|---|
| _(signature)_ | _Susan Parisi_ | |
| Signature of Sales Person | Signature | Signature |
| **Russell Kelley** | **Susan Parisi** | |
| Print Name of Sales Person | Print Name | Print Name |

A560



# Terms and Conditions of Sale

**dba: Renewal by Andersen of Oklahoma**
Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 I Oklahoma City, OK 73149
Phone: 405-608-5000 I Fax: 405-562-7880 I oksales@renewaloklahoma.com

**Susan Parisi**

H:
C:

Construction Industry Fast Track Procedures. The arbitration shall take place at offices of the AAA in the state where the work is to be performed; if there is no such office, the arbitration will take place at a location designated by the arbitrator within the state where the work is to be performed. The arbitration shall be heard by one (1) arbitrator who has at least ten (10) years of experience in the construction industry. The arbitrator must follow the law of the state where the work is being performed and not disregard the terms of this Agreement.

The arbitration must be conducted on an individual basis. Neither of the parties nor the arbitrator will have any authority or power to proceed with any claim as a class action or otherwise to join or consolidate any claim with any other claims or any other proceeding involving third parties. In the event a court determines that this limitation on joinder or class action claims is unenforceable, then this entire commitment to arbitrate will become null and void and the parties must submit all claims to the jurisdiction of the courts. The parties agree that any action or claim or request for an injunction shall not be subject to arbitration.

A judgment may be entered upon the arbitration award by any state or federal court in the state where the Buyer resides. The decision of the arbitrator will be final and binding on all parties to the dispute. However, the arbitrator may not under any circumstances stay the effectiveness of any award, assess punitive, multiple or exemplary damages, or make any award which extends, modifies or suspends any lawful term of this Agreement.

Interpretation of this Agreement: I agree that this Agreement will be interpreted and enforced under the laws of the state where the work is to be performed. If any part of this Agreement is determined to be invalid or illegal, then I agree that the rest of this Agreement will still be valid and enforceable. We both understand that this Agreement and any attachments hereto, make up the entire understanding between us about the work of Contractor. There are no oral or other written agreements, promises, statements, or representations on which either of us is relying. We both agree that any change to this Agreement must be in writing and signed by both of us. The paragraph headings contained in this Agreement are for convenience only and will not affect the meaning or interpretation of this Agreement.

Condensation and Environmental Conditions: Condensation, which can form on or within walls, siding, tiles, or other surfaces results from pre-existing conditions in a home and internal or external temperatures. Reducing the humidity in a home will often remedy any condensation problems. I agree that Contractor is not responsible for condensation or existing or developing spore or mold growth, which can be the result of condensation.

By signing below, Buyer and Contractor hereby agree to the Terms and Conditions of Sale of this Agreement.

| | | |
|---|---|---|
| Signature of Sales Person | Signature | Signature |
| **Russell Kelley** | **Susan Parisi** | |
| Print Name of Sales Person | Print Name | Print Name |

A561



## Sales Cost Savings Program (SCSP)

**dba: Renewal by Andersen of Oklahoma**
Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 l Oklahoma City, OK 73149
Phone: 405-608-5000 l Fax: 405-562-7880 l oksales@renewaloklahoma.com

**Susan Parisi**



H:
C:

To: All Sales Personnel

Date: 1/1/2020

From: Matthew Esler, Manager, Renewal by Andersen of Oklahoma

Re: Sales Cost Savings Program (SCSP)

At Renewal by Andersen of Oklahoma, we are always looking for ways to increase value, and we've found a way to lower costs to our customers. The majority of customers that we see love Renewal by Andersen products and are comfortable enough to award us the project on the initial visit. For a variety of reasons, some customers feel they need time to think it over for a day or two before placing the order. This requires a second visit.

We are happy to visit our customers as many times at it takes to earn their business.

However, when the consumer makes a buying decision on the first visit, the sales cost of additional visits is saved and we are happy to pass that savings on to our customers.

Please keep in mind, the savings are only realized during the initial visit.

Best Regards,
Matthew Esler

Manager
Renewal by Andersen of Oklahoma

| | | |
|---|---|---|
| Signature of Sales Person | Signature | Signature |
| **Russell Kelley** | **Susan Parisi** | |
| Print Name of Sales Person | Print Name | Print Name |

UPDATED : 11/23/21          Page 10 / 30

A562



**Lead-Safe Form**

**dba: Renewal by Andersen of Oklahoma**
Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 l Oklahoma City, OK 73149
Phone: 405-608-5000 l Fax: 405-562-7880 l oksales@renewaloklahoma.com

**Susan Parisi**

H:
C:

Lead Safe Work Pamphlet Receipt and Lead Testing Permission Form

**Pamphlet Receipt**

I have received a copy of the EPA The Lead Safe Certified Guide to Renovate Right informing me of the potential risks of lead hazard exposure from renovation activity to be performed in my home.  I received this pamphlet before the work began.

**Permission to Test**

I  confirm  that if  my home was built before  1978, I understand and give permission to have my home tested for lead paint at time the Installation Manager comes to my home to take final measurements.  I  understand  that  the  if  the  test  does  show  the  presence  of  lead paint, the firm performing the renovation  will be required to use the lead-safe  work practices  required by  EPA's  Lead-Based  Paint Renovation,  Repair,  and  Painting  Rule.  I  also  understand  that there is no added charge to me for using these lead safe work practices.

By signing below, Buyer and Contractor hereby agree to the terms and conditions above.

| _Signature of Sales Person_ | _Susan Parisi_ | |
| --- | --- | --- |
| Signature of Sales Person | Signature | Signature |
| **Russell Kelley** | **Susan Parisi** | |
| Print Name of Sales Person | Print Name | Print Name |

A563



**dba: Renewal by Andersen of Oklahoma**
Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 l Oklahoma City, OK 73149
Phone: 405-608-5000 l Fax: 405-562-7880 l oksales@renewaloklahoma.com

**Susan Parisi**

H:
C:

## OPENING YOUR HOME FOR SITE INSPECTION
You are required to be present during your Site Inspection  in order to open your home and review your contract specifications the Installation Manager  we assign to the project. The Installation Manager will measure the opening for each purchased unit and determine the amount of time required for your installation.

## PRE-INSTALLATION
Once your window and/or door units have a scheduled arrival date from the RbA manufacturing facility, we will confirm the tentative installation date with you. Please keep in mind that this installation date may need to change. Variables, such as rain and extreme weather are the most common reasons for a change in installation date. We appreciate your understanding and flexibility in advance. We will give you a reminder call or text message one day prior to the scheduled installation date.

## INSTALLATION DAY
The installation crew will arrive at your home after picking up all the required installation materials from our warehouse. Due to variables in travel distance and possible morning traffic, arrival times will vary, but typically the crew will arrive between 8am and10am unless you are scheduled for an afternoon installation. At the end of the project the lead installer will perform a final walk-through and issue any applicable final documentation.

## POSSIBLE GLASS LOSS
Buyer has been made aware of the possible glass loss  that is inherent with the installation of replacement windows.

## PAINTING AND STAINING
Any painting, staining, or wallpapering which may be needed is not included in this agreement unless specifically noted.

## FURNITURE AND DECORATIONS
We ask that you remove any furniture that may block access to the windows or door openings.  We ask that you remove the pictures from the walls being worked on and any decorations that are in the work area before work begins.  This will greatly reduce the likelihood of any accidental damage to personal property.

## WINDOW COVERINGS
Please remove all blinds, shades or shutters before we arrive.  We also assume no liability for any new blinds or shutters; that includes fit, measuring and installation.  All of these processes should be handled by a professional window treatment company.

## AIR CONDITIONING UNITS
Buyer is responsible for the removal and re-installation of any AC units and brackets.

## ALARM SYSTEMS
Buyer is responsible for the removal and reinstallation of existing alarm systems. PLEASE CONTACT YOUR ALARM SYSTEM PROVIDER FOR DETAILS.

| | | |
|---|---|---|
| Signature of Sales Person | Signature | Signature |
| **Russell Kelley** | **Susan Parisi** | |
| Print Name of Sales Person | Print Name | Print Name |

A564



## What to Expect

**dba: Renewal by Andersen of Oklahoma**

Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 l Oklahoma City, OK 73149
Phone: 405-608-5000 l Fax: 405-562-7880 l oksales@renewaloklahoma.com

Susan Parisi

H:
C:

PETS

Because not all pets react favorably to the excitement of the construction process, we ask that you keep all of your pets confined during the time we are working on your home.  This should keep them from becoming stressed, accidentally escaping or possible injury.

WHAT IS INCLUDED

Contractor will insulate, caulk and seal the windows we install with our 3-point system to prevent water and air infiltration.

Contractor will clean up all job debris including the old windows and vacuum on a nightly basis.

The RbA Limited Warranty and the Extended Limited Lifetime Labor Warranty will be in effect upon completion of the project and payment in full.

Building Permit: The fee for any and all required building permits is to be paid by the customer to Contractor). Contractor will secure any and all required building permits. After installation is complete, you are required close out the building permit with the issuing municipality.

<br>

_(signature)_
_____
Signature of Sales Person
**Russell Kelley**
_____
Print Name of Sales Person

_Susan Parisi (signature)_
_____
Signature
**Susan Parisi**
_____
Print Name

_____
Signature
_____
Print Name



# Disclosure Statement

**dba: Renewal by Andersen of Oklahoma**
Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 l Oklahoma City, OK 73149
Phone: 405-608-5000 l Fax: 405-562-7880 l oksales@renewaloklahoma.com

**Susan Parisi**

H:
C:

KNOW YOUR RIGHTS AND RESPONSIBILITIES UNDER THE LAW. You are about to enter into a transaction to build a new home or remodel existing property. State law requires your contractor to provide you with this brief overview of some of your rights, responsibilities, and risks in this transaction.

CONVEYANCE TO CONTRACTOR PROHIBITED. Your contractor may not require you to convey your real property to your contractor as a condition to the agreement for the construction of improvements on your property.

KNOW YOUR CONTRACTOR. Before you enter into your agreement for the construction of improvements to your real property, make sure that you have investigated your contractor. Obtain and verify references from other people who have used the contractor for the type and size of construction project on your property.

GET IT IN WRITING. Make sure that you have a written agreement with your contractor that includes: (1) a description of the work the contractor is to preform; (2) the required or estimated time for completion of the work; (3) the cost of the work or how the cost will be determined; and (4) the procedure and method of payment, including provisions for statutory retainage and conditions for final payment. If your contractor made a promise, warranty, or representation to you concerning the work the contractor is to perform, make sure that promise, warranty, or representation is specified in the written agreement. An oral promise that is not included in the agreement may not be enforceable under state law.

READ BEFORE YOU SIGN. Do not sign any document before you have read and understood it. NEVER SIGN A DOCUMENT THAT INCLUDEDS AN UNTRUE STATEMENT. Take your time in reviewing documents. If you borrow money from a lender to pay for the improvements, you are entitled to have the loan closing documents furnished to you for review at least one business day before the closing. Do not waive this requirement unless a bona fide emergency or another good cause exists, and make sure you understand the documents before you sign them. If you fail to comply with the terms of the documents, you could lose your property. You are entitled to have your own attorney review any documents. If you have any question about the meaning of a document, consult an attorney.

GET A LIST OF SUBCONTRACTORS AND SUPPLIERS. Before construction commences, your contractor is required to provide you with a list of the subcontractors and suppliers the contractor intends to use on your project. Your contractor is required to supply updated information on any subcontractors and suppliers added after the list was provided.

MONITOR THE WORK. Lenders and governmental authorities may inspect the work in progress from time to time for their own purposes. These inspections are not intended as quality control inspections. Quality control is a matter for you and your contractor. To ensure that your home is being constructed in accordance with your wished and specifications, you should inspect the work yourself or have your own independent inspector review the work in progress.

MONITOR PAYMENTS. If you use a lender, your lender is required to provide you with a periodic statement showing the money disbursed by the lender form the proceeds of your loan. Your contractor is also required to furnish you with a statement at least once each month of money disbursed to subcontractors and suppliers for this project. Review these statements and make sure that the money is being properly disbursed.

CLAIMS BY SUBCONTRACTORS AND SUPPLIERS. Under state law, if a subcontractor or supplier who furnishes labor or materials

| | | |
|---|---|---|
| _(signature)_ | _Susan Parisi_ | |
| Signature of Sales Person | Signature | Signature |
| **Russell Kelley** | **Susan Parisi** | |
| Print Name of Sales Person | Print Name | Print Name |



# Disclosure Statement

**dba: Renewal by Andersen of Oklahoma**

Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 I Oklahoma City, OK 73149
Phone: 405-608-5000 I Fax: 405-562-7880 I oksales@renewaloklahoma.com

**Susan Parisi**



H:
C:

for the construction of improvements on your property is not paid, you may become liable and your property may be subject to a lien for the unpaid amount, even if you have not contracted directly with the subcontractor or supplier. To avoid liability, you should take the following actions:

(1) If you receive a written notice from a subcontractor or supplier, you should withhold payment from your contractor for the amount of the claim stated in the notice until the dispute between your contractor and the subcontractor or supplier is resolved. If your lender is disbursing money directly to your contractor, you should immediately provide a copy of the notice to your lender and instruct the lender to withhold payment in the amount of the claim stated in the notice. If you continue to pay the contractor after receiving the written notice without withholding the amount of the claim, you may be liable and your property may be subject to a lien for the amount you failed to withhold.

(2) During construction and for 30 days after final completion, termination, or abandonment of the contract by the contractor, you should withhold or cause your lender to withhold 10 percent of the amount of payments made for the work performed by your contractor. This is sometimes referred to as "statutory retainage." If you fail to withhold the 10 percent for at least 30 days after final completion, termination, or abandonment of the contract by the contractor and if a valid claim in timely made by a claimant, you may be personally liable and your property may be subject to a lien up to the amount that you failed to withhold.

If the claim is not paid within a certain time period, the claimant is required to file a mechanic's lien affidavit in the real property records in the county where the property is located. A mechanic's lien affidavit is not a lien on your property, but the filing of the affidavit could result in a court imposing lien on your property if the clamant is successful in litigation to enforce the lien claim.

SOME CLAIMS MAY NOT BE VALID. When you receive a written notice of a claim or when a mechanic's lien affidavit is filed on your property, you should know your legal rights and responsibilities regarding the claim. Not all claims are valid. A notice of a claim by a subcontractor or supplier is required to be sent, and the mechanic's lien affidavit is required to be filed, within strict time periods. The notice and the affidavit must contain certain information. All Claimants may not fully comply with the legal requirements to collect on a claim. If you have paid the contractor in full before receiving a notice of a claim and have fully complied with the law regarding statutory retainage, you may not be liable for that claim. Accordingly, you should consult your attorney when you receive a written notice of a claim to determine the true extent of your liability or potential liability for that claim.

OBTAIN A LIEN RELEASE AND A BILLS-PAID AFFIDAVIT. When you receive a notice of a claim, do not release withheld funds without obtaining a signed and notarized release of lien and claim from the claimant. You can also reduce the risk of having a claim filed by a subcontractor or supplier by requiring as a condition of each payment made by you or your lender that your contractor furnish you with an affidavit stating that all bills have been paid. Under state law, on final completion of the work and before final payment, the contractor is required to furnish you with an affidavit stating that all bills have been paid. If the contractor discloses any unpaid bill in the affidavit, you should withhold payment in the amount of the unpaid bill until you receive a waiver of lien or release from that subcontractor or supplier.

OBTAIN TITLE INSURANCE PROTECTION. You may be able to obtain a title insurance policy to insure that the title to your property and the existing improvements on your property are free from liens claimed by subcontractors and suppliers. If your policy is issued before the improvements are completed and covers the value of the improvements to be completed, you should obtain, on the completion of the improvements and as a condition of your final payment, a "completion of improvements" policy endorsement. This endorsement will

| | | |
|---|---|---|
| _(signature)_ | _Susan Parisi (signature)_ | |
| Signature of Sales Person | Signature | Signature |
| **Russell Kelley** | **Susan Parisi** | |
| Print Name of Sales Person | Print Name | Print Name |



# Disclosure Statement

**dba: Renewal by Andersen of Oklahoma**

Legal Name: Oklahoma Windows and Doors LLC

9201 Polaris Drive Suite 200 l Oklahoma City, OK 73149

Phone: 405-608-5000 l Fax: 405-562-7880 l oksales@renewaloklahoma.com

**Susan Parisi**

H:

C:

protect your property from liens claimed by subcontractors and suppliers that may arise from the date the original title policy is issued to the date of the endorsement.

| Signature of Sales Person | Signature | Signature |
|---|---|---|
| **Russell Kelley** | **Susan Parisi** | |
| Print Name of Sales Person | Print Name | Print Name |

A568

## Renewal by Andersen® Products and Installation Transferable Limited Warranty

UNITS INSTALLED AFTER MAY 1, 2016

*Your Renewal by Andersen® products are warranted under a fully transferable limited warranty covering parts, labor and original installation services.*

### Transferable Limited Warranty on Glass

The glass in Renewal by Andersen® factory glazed windows (including high-performance Low-E4® glass, high-performance Low-E4® Sun glass, high-performance Low-E4® SmartSun™ glass, high-performance SmartSun glass with HeatLock™ technology, patterned glass [including obscure, fern, reed and cascade designs]), Finelight™ grilles, divided light grilles and tempered versions of these glass options is warranted to be free from defects in manufacturing, materials and workmanship for twenty (20) years from the original installation date. It is also warranted not to develop, under normal conditions, any material change in appearance resulting from manufacturing defects or as a result of premature failure of the glass or organic seal for twenty (20) years from the original installation date. This limited warranty on glass does not apply to special order glazings, art glass, insulated art glass, impact-resistant glass or glass that is not factory installed by Renewal by Andersen.

In the event a glass failure occurs as a result of a defect in manufacturing, materials or workmanship within the limited warranty period, Renewal by Andersen, at its option, will: [1] provide and install the appropriate replacement glass product or [2] provide a factory-authorized repair to the existing glass. Such replacement or repair is warranted for the remainder of the original limited warranty period.

### Transferable Limited Warranty on Fibrex® Material Components

The Fibrex® material components of your Renewal by Andersen windows (including frame, sash, and exterior grilles) are warranted not to flake, rust, blister, peel, crack, pit or corrode and be free from defects in manufacturing, materials and workmanship for a period of twenty (20) years from the original installation date.

In the event a Fibrex material component fails as a result of a defect in manufacturing, materials or workmanship within the limited warranty period, Renewal by Andersen, at its option, will: [1] provide and install the appropriate replacement parts or [2] provide a factory-authorized repair to the existing product. Such replacement or repair is warranted for the remainder of the original limited warranty period.

### Transferable Limited Warranty on Components Other Than Glass

The non-glass portions of your Renewal by Andersen windows (including non-electric operators, locks, lifts, balance systems, hinges, handles, insect screens, weatherstripping, sash and frame members) are warranted to be free from defects in manufacturing, materials and workmanship for a period of ten (10) years from the original installation date.

In the event a component other than glass fails as a result of a defect in manufacturing, materials or workmanship within the limited warranty period, Renewal by Andersen, at its option, will: [1] provide and install the appropriate replacement parts or [2] provide a factory-authorized repair to the existing product. Such replacement or repair is warranted for the remainder of the original limited warranty period.

### Transferable Limited Warranty on Exterior Color Finish

The color finish on the Fibrex® material exterior components (frame, sash, window sills and grilles) on Renewal by Andersen windows is warranted to be free from manufacturing defects resulting in color fade greater than 5 delta-e* measured in accordance with ASTM D2244 for a period of ten (10) years from the original installation date.

What is not covered by this exterior color finish warranty: weatherstripping, accessories and hardware, including insect screen frames, handles, trim sets and lock components, exterior trim profiles and exterior aluminum coil stock.

In the event there is a defect covered by this limited warranty for exterior color finish within the limited warranty period, Renewal by Andersen, at its option, will: [1] refinish the product – labor is included (the finish will be applied with standard commercial refinishing techniques and may not be the same finish as originally applied to the product) or [2] repair or replace the product. Such replacement parts or repairs are warranted for the remainder of the original limited warranty period.

### Transferable Limited Warranty on Installation

Installation of your Renewal by Andersen windows or other Andersen window and/or door products by an authorized Renewal by Andersen contractor is warranted for a period of two (2) years from the date of original installation. During this period, should your Renewal by Andersen window or door fail to perform according to our specifications due to improper original installation, we will bring the workmanship up to our professional standards, at no cost to you.

This limited warranty on installation does not extend to labor/services performed by anyone other than the original authorized installer or other authorized Renewal by Andersen contractor, nor to the installation or repair of any finishing or other materials that have been applied to or adjacent to the product after the initial installation.

### No Other Warranties or Representations

THIS LIMITED WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. ALL WARRANTIES ARE LIMITED TO THE APPLICABLE STATUTE OF LIMITATIONS, BUT IN NO CASE WILL EXTEND BEYOND THE LIMITED WARRANTY PERIODS SPECIFIED ABOVE. RENEWAL BY ANDERSEN EXCLUDES AND WILL NOT BE LIABLE FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES, WHETHER ARISING OUT OF CONTRACT, TORT OR OTHERWISE. THE REMEDY OF REPAIR OR REPLACEMENT OF THE ACTUAL PURCHASE PRICE OF THE PRODUCT PROVIDED BY THIS LIMITED WARRANTY IS THE EXCLUSIVE REMEDY WITH RESPECT TO ANY AND ALL LOSS OR DAMAGE.

### Applicable Law

This Limited Warranty is only applicable in the U.S.A. (i.e. the fifty states and the District of Columbia) and Canada. This Limited Warranty gives you specific legal rights, and you may have other rights which vary from state to state or province. Some states do not allow the exclusion or limitation of incidental or consequential damages or limitation of the duration of an implied warranty, so the above limitations or exclusions may not apply to you. If any specific term of this Limited Warranty is prohibited by any applicable law, it shall be null and void, but the remainder of this Limited Warranty shall remain in full force and effect.

A569

*Technical measurement of color fade.

*What is Not covered by this Limited Warranty*

**Specific Additional Exclusions**

In addition to any other limitations or exclusions in this Limited Warranty, Renewal by Andersen shall have no obligation for product failure, damage or costs due to or related to the following:

- Product modifications or glass shading devices (e.g. glass tinting, security systems, improper painting or staining, insulated coverings, etc.)

- Failure due to the application of non Renewal by Andersen hardware (e.g. locksets, trim sets, hinges, panic hardware, closers, etc.)

- Water infiltration other than as a result of a defect in manufacturing, materials or workmanship

- Failure as a result of settling or structural failure of the structure in which the products are installed

- Condensation, other than as a result of a defect in manufacturing, materials or workmanship

- Improper maintenance, such as use of brick wash, razor blades, sealants, sanding or improper washing

- Failing to properly seal and maintain the exposed wood portions and veneer of a product in accordance to Renewal by Andersen painting or staining guidelines

- Fading of furniture, flooring, window coverings or other surrounding materials

- Chemicals or airborne pollutants, such as salt or acid rain

- Accidents

- Acts of God

- Normal wear and tear

Additional items excluded from this limited warranty:

- Products not manufactured by Renewal by Andersen

- Installation services by other than authorized Renewal by Andersen installers

- Removal of Renewal by Andersen windows from the structure in which it was originally installed by anyone other than an authorized Renewal by Andersen installer

- The performance of the low-maintenance exterior glass coating on products with high-performance Low-E4® glass – performance will vary depending on environmental conditions

- Slight glass curvature, minor scratches or other imperfections in the glass that do not impair structural integrity or significantly obscure normal vision

- Rattling of grille bars within an air space

- Insects passing through or around the insect screen

- Tarnish or corrosion to hardware finishes

- Special glazings – contact us concerning the limited warranty on special glazings

- Art glass and decorative insulated art glass, impact-resistant glass

- Renewal by Andersen Series 2 windows and patio doors, Andersen® A-Series windows and doors, 400 Series and 200 Series windows and doors, 400 Series windows with Stormwatch® protection and impact-resistant glass, 100 Series windows and doors, storm doors, E-Series windows and doors, Silver Line® windows and doors, American Craftsman® windows and doors and Weiland® windows and doors have their own limited warranties and are not covered by this Limited Warranty – for information on warranty coverage for these products, please refer to the specific limited warranties for these products – they are available at andersenwindows.com

**Warranty Claim Procedure**

To make a claim under this Limited Warranty, contact the nearest Renewal by Andersen® showroom, our Warranty Service Line at 800-441-1109 or visit our website at renewalbyandersen.com. We will contact you to investigate your claim within approximately two weeks after notification and arrange for appropriate action. Warranty services may be provided by Renewal by Andersen and/or an authorized Renewal by Andersen service provider.

You can help us serve you faster by providing the following important information:

- The serial number of the affected product (e.g., located on a label affixed to the top or side of the window frame)

- Description of the product concerns

- Documentation of the purchase date, if available

- Your name, address (with zip code) where product is installed and telephone numbers

**Non-Warranty Repair**

You will be responsible for all costs related to any repair that is not covered by this Limited Warranty or which is outside of the limited warranty period. When warranty coverage is unclear, Renewal by Andersen may charge an inspection fee for any on-site product inspections. If the inspector determines the Renewal by Andersen product has a defect covered by this Limited Warranty, the inspection fee will be waived.



WINDOW   REPLACEMENT   an Andersen Company

"Renewal by Andersen" and other marks where denoted are trademarks of Andersen Corporation.
© 2016 Andersen Corporation. All rights reserved. Revised April 4, 2016. RBA10909

A570

RENEWALBYANDERSEN.COM



# THE LEAD-SAFE CERTIFIED GUIDE TO
# RENOVATE
# RIGHT

**WARNING**
LEAD WORK AR...
POISON
NO SMOKING
OR EATING

CAUTION   CAUTION   CAUTION   CAUTION   CAUTION   C   CA

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**EPA**

1-800-424-LEAD (5323)
epa.gov/getleadsafe
EPA-740-K-10-001
Revised September 2011

Important lead hazard information for
families, child care providers and schools.

**EPA**   LEAD-SAFE CERTIFIED FIRM

This document may be purchased through the **U.S. Government Printing Office** online at
bookstore.gpo.gov or by phone (toll-free): **1-866-512-1800**.

A571

# IT'S THE LAW!

Federal law requires contractors that disturb painted surfaces in homes, child care facilities and schools built before 1978 to be certified and follow specific work practices to prevent lead contamination. Always ask to see your contractor's certification.

Federal law requires that individuals receive certain information before renovating more than six square feet of painted surfaces in a room for interior projects or more than twenty square feet of painted surfaces for exterior projects or window replacement or demolition in housing, child care facilities and schools built before 1978.

• Homeowners and tenants: renovators must give you this pamphlet before starting work.

• Child care facilities, including preschools and kindergarten classrooms, and the families of children under six years of age that attend those facilities: renovators must provide a copy of this pamphlet to child care facilities and general renovation information to families whose children attend those facilities.

A572

# WHO SHOULD READ THIS PAMPHLET?

## This pamphlet is for you if you:

• Reside in a home built before 1978.

• Own or operate a child care facility, including preschools and kindergarten classrooms, built before 1978, or

• Have a child under six years of age who attends a child care facility built before 1978.

## You will learn:

• Basic facts about lead and your health.

• How to choose a contractor, if you are a property owner.

• What tenants, and parents/guardians of a child in a child care facility or school should consider.

• How to prepare for the renovation or repair job.

• What to look for during the job and after the job is done.

• Where to get more information about lead.

## This pamphlet is not for:

• **Abatement projects.** Abatement is a set of activities aimed specifically at eliminating lead or lead hazards. EPA has regulations for certification and training of abatement professionals. If your goal is to eliminate lead or lead hazards, contact the National Lead Information Center at **1-800-424-LEAD (5323)** for more information.

• **"Do-it-yourself"** projects. If you plan to do renovation work yourself, this document is a good start, but you will need more information to complete the work safely. Call the National Lead Information Center at **1-800-424-LEAD (5323)** and ask for more information on how to work safely in a home with lead-based paint.

• **Contractor education.** Contractors who want information about working safely with lead should contact the National Lead Information Center at **1-800-424-LEAD (5323)** for information about courses and resources on lead-safe work practices.





A573   1

## RENOVATING, REPAIRING, OR PAINTING?



- Is your home, your building, or the child care facility or school your children attend being renovated, repaired, or painted?

- Was your home, your building, or the child care facility or school where your children under six years of age attend built before 1978?

If the answer to these questions is YES, there are a few important things you need to know about lead-based paint.

This pamphlet provides basic facts about lead and information about lead safety when work is being done in your home, your building or the child care facility or school your children attend.

### The Facts About Lead

- Lead can affect children's brains and developing nervous systems, causing reduced IQ, learning disabilities, and behavioral problems. Lead is also harmful to adults.

- Lead in dust is the most common way people are exposed to lead. People can also get lead in their bodies from lead in soil or paint chips. Lead dust is often invisible.

- Lead-based paint was used in more than 38 million homes until it was banned for residential use in 1978.

- Projects that disturb painted surfaces can create dust and endanger you and your family. Don't let this happen to you. Follow the practices described in this pamphlet to protect you and your family.

## LEAD AND YOUR HEALTH

### Lead is especially dangerous to children under six years of age.

Lead can affect children's brains and developing nervous systems, causing:

- Reduced IQ and learning disabilities.
- Behavior problems.



**Even children who appear healthy can have dangerous levels of lead in their bodies.**

Lead is also harmful to adults. In adults, low levels of lead can pose many dangers, including:

- High blood pressure and hypertension.
- Pregnant women exposed to lead can transfer lead to their fetuses. Lead gets into the body when it is swallowed or inhaled.
- People, especially children, can swallow lead dust as they eat, play, and do other normal hand-to-mouth activities.
- People may also breathe in lead dust or fumes if they disturb lead-based paint. People who sand, scrape, burn, brush, blast or otherwise disturb lead-based paint risk unsafe exposure to lead.

### What should I do if I am concerned about my family's exposure to lead?

- A blood test is the only way to find out if you or a family member already has lead poisoning. Call your doctor or local health department to arrange for a blood test.
- Call your local health department for advice on reducing and eliminating exposures to lead inside and outside your home, child care facility or school.
- Always use lead-safe work practices when renovation or repair will disturb painted surfaces.

For more information about the health effects of exposure to lead, visit the EPA lead website at epa.gov/lead/pubs/leadinfo or call **1-800-424-LEAD (5323)**.

### There are other things you can do to protect your family every day.

- Regularly clean floors, window sills, and other surfaces.
- Wash children's hands, bottles, pacifiers, and toys often.
- Make sure children eat a healthy, nutritious diet consistent with the USDA's dietary guidelines, that helps protect children from the effects of lead.
- Wipe off shoes before entering the house.

A574

## WHERE DOES THE LEAD COME FROM?

### Dust is the main problem.

The most common way to get lead in the body is from dust. Lead dust comes from deteriorating lead-based paint and lead-contaminated soil that gets tracked into your home. This dust may accumulate to unsafe levels. Then, normal hand to-mouth activities, like playing and eating (especially in young children), move that dust from surfaces like floors and window sills into the body.

### Home renovation creates dust.

Common renovation activities like sanding, cutting, and demolition can create hazardous lead dust and chips.

### Proper work practices protect you from the dust.

The key to protecting yourself and your family during a renovation, repair or painting job is to use lead-safe work practices such as containing dust inside the work area, using dust-minimizing work methods, and conducting a careful cleanup, as described in this pamphlet.

### Other sources of lead.

Remember, lead can also come from outside soil, your water, or household items (such as lead-glazed pottery and lead crystal). Contact the National Lead Information Center at **1-800-424-LEAD (5323)** for more information on these sources.



## CHECKING YOUR HOME FOR LEAD-BASED PAINT

Percentage of Homes Likely to Contain Lead



### Older homes, child care facilities, and schools are more likely to contain lead-based paint.

Homes may be single-family homes or apartments. They may be private, government-assisted, or public housing. Schools are preschools and kindergarten classrooms. They may be urban, suburban, or rural.

### You have the following options:

**You may decide to assume your home, child care facility, or school contains lead.** Especially in older homes and buildings, you may simply want to assume lead-based paint is present and follow the lead-safe work practices described in this brochure during the renovation, repair, or painting job.

**You can hire a certified professional to check for lead-based paint.** These professionals are certified risk assessors or inspectors, and can determine if your home has lead or lead hazards.

• A certified inspector or risk assessor can conduct an inspection telling you whether your home, or a portion of your home, has lead-based paint and where it is located. This will tell you the areas in your home where lead-safe work practices are needed.

• A certified risk assessor can conduct a risk assessment telling you if your home currently has any lead hazards from lead in paint, dust, or soil. The risk assessor can also tell you what actions to take to address any hazards.

• For help finding a certified risk assessor or inspector, call the National Lead Information Center at **1-800-424-LEAD (5323)**.

You may also have a certified renovator test the surfaces or components being disturbed for lead by using a lead test kit or by taking paint chip samples and sending them to an EPA-recognized testing laboratory. Test kits must be EPA-recognized and are available at hardware stores. They include detailed instructions for their use.

# FOR PROPERTY OWNERS

# FOR TENANTS AND FAMILIES OF CHILDREN UNDER SIX YEARS OF AGE IN CHILD CARE FACILITIES AND SCHOOLS

**You have the ultimate responsibility for the safety of your family, tenants, or children in your care.**

This means properly preparing for the renovation and keeping persons out of the work area (see p. 8). It also means ensuring the contractor uses lead-safe work practices.

Federal law requires that contractors performing renovation, repair and painting projects that disturb painted surfaces in homes, child care facilities, and schools built before 1978 be certified and follow specific work practices to prevent lead contamination.

**Make sure your contractor is certified, and can explain clearly the details of the job and how the contractor will minimize lead hazards during the work.**

• You can verify that a contractor is certified by checking EPA's website at epa.gov/getleadsafe or by calling the National Lead Information Center at **1-800-424-LEAD (5323)**. You can also ask to see a copy of the contractor's firm certification.

• Ask if the contractor is trained to perform lead-safe work practices and to see a copy of their training certificate.

• Ask them what lead-safe methods they will use to set up and perform the job in your home, child care facility or school.

• Ask for references from at least three recent jobs involving homes built before 1978, and speak to each personally.

**Always make sure the contract is clear about how the work will be set up, performed, and cleaned.**

• Share the results of any previous lead tests with the contractor.

• You should specify in the contract that they follow the work practices described on pages 9 and 10 of this brochure.

• The contract should specify which parts of your home are part of the work area and specify which lead-safe work practices will be used in those areas. Remember, your contractor should confine dust and debris to the work area and should minimize spreading that dust to other areas of the home.

• The contract should also specify that the contractor will clean the work area, verify that it was cleaned adequately, and re-clean it if necessary.

## If you think a worker is not doing what he is supposed to do or is doing something that is unsafe, you should:

• Direct the contractor to comply with regulatory and contract requirements.

• Call your local health or building department, or

• Call EPA's hotline **1-800-424-LEAD (5323)**.

If your property receives housing assistance from HUD (or a state or local agency that uses HUD funds), you must follow the requirements of HUD's Lead-Safe Housing Rule and the ones described in this pamphlet.

**You play an important role ensuring the ultimate safety of your family.**



This means properly preparing for the renovation and staying out of the work area (see p. 8).

Federal law requires that contractors performing renovation, repair and painting projects that disturb painted surfaces in homes built before 1978 and in child care facilities and schools built before 1978, that a child under six years of age visits regularly, to be certified and follow specific work practices to prevent lead contamination.

The law requires anyone hired to renovate, repair, or do painting preparation work on a property built before 1978 to follow the steps described on pages 9 and 10 unless the area where the work will be done contains no lead-based paint.

## If you think a worker is not doing what he is supposed to do or is doing something that is unsafe, you should:

• Contact your landlord.

• Call your local health or building department, or

• Call EPA's hotline **1-800-424-LEAD (5323)**.

If you are concerned about lead hazards left behind after the job is over, you can check the work yourself (see page 10).



A576

# PREPARING FOR A RENOVATION

**The work areas should not be accessible to occupants while the work occurs.**

The rooms or areas where work is being done may need to be blocked off or sealed with plastic sheeting to contain any dust that is generated. Therefore, the contained area may not be available to you until the work in that room or area is complete, cleaned thoroughly, and the containment has been removed. Because you may not have access to some areas during the renovation, you should plan accordingly.

## You may need:

• Alternative bedroom, bathroom, and kitchen arrangements if work is occurring in those areas of your home.

• A safe place for pets because they too can be poisoned by lead and can track lead dust into other areas of the home.

• A separate pathway for the contractor from the work area to the outside in order to bring materials in and out of the home. Ideally, it should not be through the same entrance that your family uses.

• A place to store your furniture. All furniture and belongings may have to be moved from the work area while the work is being done. Items that can't be moved, such as cabinets, should be wrapped in plastic.

• To turn off forced-air heating and air conditioning systems while the work is being done. This prevents dust from spreading through vents from the work area to the rest of your home. Consider how this may affect your living arrangements.

**You may even want to move out of your home temporarily while all or part of the work is being done.**

**Child care facilities and schools may want to consider alternative accommodations for children and access to necessary facilities.**



# DURING THE WORK

Federal law requires contractors that are hired to perform renovation, repair and painting projects in homes, child care facilities, and schools built before 1978 that disturb painted surfaces to be certified and follow specific work practices to prevent lead contamination.

The work practices the contractor must follow include these three simple procedures, described below:

**1. Contain the work area.** The area must be contained so that dust and debris do not escape from that area. Warning signs must be put up and plastic or other impermeable material and tape must be used as appropriate to:

  • Cover the floors and any furniture that cannot be moved.

  • Seal off doors and heating and cooling system vents.

  • For exterior renovations, cover the ground and, in some instances, erect vertical containment or equivalent extra precautions in containing the work area.

These work practices will help prevent dust or debris from getting outside the work area.

**2. Avoid renovation methods that generate large amounts of lead-contaminated dust.** Some methods generate so much lead-contaminated dust that their use is prohibited. They are:



  • Open flame burning or torching.

  • Sanding, grinding, planing, needle gunning, or blasting with power tools and equipment not equipped with a shroud and HEPA vacuum attachment.

  • Using a heat gun at temperatures greater than 1100°F.

There is no way to eliminate dust, but some renovation methods make less dust than others. Contractors may choose to use various methods to minimize dust generation, including using water to mist areas before sanding or scraping; scoring paint before separating components; and prying and pulling apart components instead of breaking them.

**3. Clean up thoroughly.** The work area should be cleaned up daily to keep it as clean as possible. When all the work is done, the area must be cleaned up using special cleaning methods before taking down any plastic that isolates the work area from the rest of the home. The special cleaning methods should include:

  • Using a HEPA vacuum to clean up dust and debris on all surfaces, followed by

  • Wet wiping and wet mopping with plenty of rinse water.

When the final cleaning is done, look around. There should be no dust, paint chips, or debris in the work area. If you see any dust, paint chips, or debris, the area must be re-cleaned.

# FOR PROPERTY OWNERS: AFTER THE WORK IS DONE

When all the work is finished, you will want to know if your home, child care facility, or school where children under six attend has been cleaned up properly.

## EPA Requires Cleaning Verification.

In addition to using allowable work practices and working in a lead-safe manner, EPA's RRP rule requires contractors to follow a specific cleaning protocol. The protocol requires the contractor to use disposable cleaning cloths to wipe the floor and other surfaces of the work area and compare these cloths to an EPA-provided cleaning verification card to determine if the work area was adequately cleaned. EPA research has shown that following the use of lead-safe work practices with the cleaning verification protocol will effectively reduce lead-dust hazards.

## Lead-Dust Testing.

EPA believes that if you use a certified and trained renovation contractor who follows the LRRP rule by using lead-safe work practices and the cleaning protocol after the job is finished, lead-dust hazards will be effectively reduced. If, however, you are interested in having lead-dust testing done at the completion of your job, outlined below is some helpful information.

### What is a lead-dust test?
• Lead-dust tests are wipe samples sent to a laboratory for analysis. You will get a report specifying the levels of lead found after your specific job.

### How and when should I ask my contractor about lead-dust testing?
• Contractors are not required by EPA to conduct lead-dust testing. However, if you want testing, EPA recommends testing be conducted by a lead professional.  To locate a lead professional who will perform an evaluation near you, visit EPA's website at epa.gov/lead/pubs/locate or contact the National Lead Information Center at **1-800-424-LEAD (5323).**

• If you decide that you want lead-dust testing, it is a good idea to specify in your contract, before the start of the job, that a lead-dust test is to be done for your job and who will do the testing, as well as whether re-cleaning will be required based on the results of the test.

• You may do the testing yourself. If you choose to do the testing, some EPA-recognized lead laboratories will send you a kit that allows you to collect samples and send them back to the laboratory for analysis.  Contact the National Lead Information Center for lists of EPA-recognized testing laboratories.



# FOR ADDITIONAL INFORMATION

You may need additional information on how to protect yourself and your children while a job is going on in your home, your building, or child care facility.

The National Lead Information Center at **1-800-424-LEAD (5323)** or epa.gov/lead/nlic can tell you how to contact your state, local, and/or tribal programs or get general information about lead poisoning prevention.

• State and tribal lead poisoning prevention or environmental protection programs can provide information about lead regulations and potential sources of financial aid for reducing lead hazards. If your state or local government has requirements more stringent than those described in this pamphlet, you must follow those requirements.



• Local building code officials can tell you the regulations that apply to the renovation work that you are planning.

• State, county, and local health departments can provide information about local programs, including assistance for lead-poisoned children and advice on ways to get your home checked for lead.

The National Lead Information Center can also provide a variety of resource materials, including the following guides to lead-safe work practices. Many of these materials are also available at epa.gov/lead/pubs/brochure



• Steps to Lead Safe Renovation, Repair and Painting.

• Protect Your Family from Lead in Your Home

• Lead in Your Home: A Parent's Reference Guide

For the hearing impaired, call the Federal Information Relay Service at 1-800-877-8339 to access any of the phone numbers in this brochure.

# EPA CONTACTS

## EPA Regional Offices

EPA addresses residential lead hazards through several different regulations. EPA requires training and certification for conducting abatement and renovations, education about hazards associated with renovations, disclosure about known lead paint and lead hazards in housing, and sets lead-paint hazard standards.

Your Regional EPA Office can provide further information regarding lead safety and lead protection programs at epa.gov/lead.

**Region 1**
(Connecticut, Massachusetts, Maine, New Hampshire, Rhode Island, Vermont)
Regional Lead Contact
U.S. EPA Region 1
Suite 1100
One Congress Street
Boston, MA 02114-2023
(888) 372-7341

**Region 2**
(New Jersey, New York, Puerto Rico, Virgin Islands)
Regional Lead Contact
U.S. EPA Region 2
2890 Woodbridge Avenue
Building 205, Mail Stop 225
Edison, NJ 08837-3679
(732) 321-6671

**Region 3**
(Delaware, Maryland, Pennsylvania, Virginia, Washington, DC, West Virginia)
Regional Lead Contact
U.S. EPA Region 3
1650 Arch Street
Philadelphia, PA
19103-2029
(215) 814-5000

**Region 4**
(Alabama, Florida, Georgia, Kentucky, Mississippi, North Carolina, South Carolina, Tennessee)
Regional Lead Contact
U.S. EPA Region 4
61 Forsyth Street, SW
Atlanta, GA 30303-8960
(404) 562-9900

**Region 5**
(Illinois, Indiana, Michigan, Minnesota, Ohio, Wisconsin)
Regional Lead Contact
U.S. EPA Region 5
77 West Jackson Boulevard
Chicago, IL 60604-3507
(312) 886-6003

**Region 6**
(Arkansas, Louisiana, New Mexico, Oklahoma, Texas)
Regional Lead Contact
U.S. EPA Region 6
1445 Ross Avenue,
12th Floor
Dallas, TX 75202-2733
(214) 665-7577

**Region 7**
(Iowa, Kansas, Missouri, Nebraska)
Regional Lead Contact
U.S. EPA Region 7
901 N. 5th Street
Kansas City, KS 66101
(913) 551-7003

**Region 8**
(Colorado, Montana, North Dakota, South Dakota, Utah, Wyoming)
Regional Lead Contact
U.S. EPA Region 8
1595 Wynkoop Street
Denver, CO 80202
(303) 312-6312

**Region 9**
(Arizona, California, Hawaii, Nevada)
Regional Lead Contact
U.S. Region 9
75 Hawthorne Street
San Francisco, CA 94105
(415) 947-8021

**Region 10**
(Alaska, Idaho, Oregon, Washington)
Regional Lead Contact
U.S. EPA Region 10
1200 Sixth Avenue
Seattle, WA 98101-1128
(206) 553-1200

# OTHER FEDERAL AGENCIES

## CPSC

The Consumer Product Safety Commission (CPSC) protects the public from the unreasonable risk of injury or death from 15,000 types of consumer products under the agency's jurisdiction. CPSC warns the public and private sectors to reduce exposure to lead and increase consumer awareness. Contact CPSC for further information regarding regulations and consumer product safety.

**CPSC**
4330 East West Highway
Bethesda, MD 20814
Hotline 1-(800) 638-2772
cpsc.gov

## CDC Childhood Lead Poisoning Prevention Branch

The Centers for Disease Control and Prevention (CDC) assists state and local childhood lead poisoning prevention programs to provide a scientific basis for policy decisions, and to ensure that health issues are addressed in decisions about housing and the environment. Contact CDC Childhood Lead Poisoning Prevention Program for additional materials and links on the topic of lead.

**CDC Childhood Lead Poisoning Prevention Branch**
4770 Buford Highway, MS F-40
Atlanta, GA 30341
(770) 488-3300
cdc.gov/nceh/lead

## HUD Office of Healthy Homes and Lead Hazard Control

The Department of Housing and Urban Development (HUD) provides funds to state and local governments to develop cost-effective ways to reduce lead-based paint hazards in America's privately-owned low-income housing. In addition, the office enforces the rule on disclosure of known lead paint and lead hazards in housing, and HUD's lead safety regulations in HUD-assisted housing, provides public outreach and technical assistance, and conducts technical studies to help protect children and their families from health and safety hazards in the home. Contact the HUD Office of Healthy Homes and Lead Hazard Control for information on lead regulations, outreach efforts, and lead hazard control research and outreach grant programs.

**U.S. Department of Housing and Urban Development**
Office of Healthy Homes and Lead Hazard Control
451 Seventh Street, SW, Room 8236
Washington, DC 20410-3000
HUD's Lead Regulations Hotline
(202) 402-7698
hud.gov/offices/lead/

A579

## SAMPLE PRE-RENOVATION FORM

This sample form may be used by renovation firms to document compliance with the Federal pre-renovation education and renovation, repair, and painting regulations.

### Occupant Confirmation

Pamphlet Receipt

❏ I have received a copy of the lead hazard information pamphlet informing me of the potential risk of the lead hazard exposure from renovation activity to be performed in my dwelling unit. I received this pamphlet before the work began.

_____

Printed Name of Owner-occupant

_____ | _____

Signature of Owner-occupant          Signature Date

### Renovator's Self Certification Option (for tenant-occupied dwellings only)

Instructions to Renovator: If the lead hazard information pamphlet was delivered but a tenant signature was not obtainable, you may check the appropriate box below.

❏ **Declined** – I certify that I have made a good faith effort to deliver the lead hazard information pamphlet to the rental dwelling unit listed below at the date and time indicated and that the occupant declined to sign the confirmation of receipt. I further certify that I have left a copy of the pamphlet at the unit with the occupant.

❏ **Unavailable for signature** – I certify that I have made a good faith effort to deliver the lead hazard information pamphlet to the rental dwelling unit listed below and that the occupant was unavailable to sign the confirmation of receipt. I further certify that I have left a copy of the pamphlet at the unit by sliding it under the door or by (fill in how pamphlet was left).

_____ | _____

Printed Name of Person Certifying Delivery      Attempted Delivery Date

_____

Signature of Person Certifying Lead Pamphlet Delivery

_____

_____

Unit Address

### Note Regarding Mailing Option

— As an alternative to delivery in person, you may mail the lead hazard information pamphlet to the owner and/or tenant. Pamphlet must be mailed at least seven days before renovation. Mailing must be documented by a certificate of mailing from the post office.

A580



**Release Agreement**

dba: Renewal by Andersen of Oklahoma

Legal Name: Oklahoma Windows and Doors LLC

9201 Polaris Drive Suite 200 | Oklahoma City, OK 73149

Phone: 405-608-5000 | Fax: 405-562-7880 | oksales@renewaloklahoma.com

Susan Parisi



H:

C:

I UNDERSTAND that my name, my company name, voice, picture, likeness, biographical materials, photo images of my home and/or person, and statements and/or opinions made by me, in whole or in part, edited or unedited, in any and all media (hereinafter "Information"), without limitation for any and all purposes (including but not limited to incorporating the material into commercials, advertisements, promotions, coupons, in-store displays, on-line programs, free standing inserts and/or publicity or other materials of Renewal by Andersen's products or services).  I agree that Renewal by Andersen LLC will have the right to attribute this Information to me and that the Information is accurate to the best of my knowledge.  No benefit has been given or promised to me in consideration of expressing my beliefs about Renewal by Andersen® products.

I hereby consent to the use of the Information to Renewal by Andersen LLC, their successors and assigns, for use without restriction as to frequency, scope or duration of usage.

In connection herewith, I hereby release and agree to hold harmless Renewal by Andersen LLC, its successors and assigns, each of them from any and all claims of any kind which I, my heirs, executors or assigns, may have on account of such use including what might be deemed to be misrepresentations of me, my character or my person due to distortion, optical illusion or faulty reproduction which may occur in the finished product.

I hereby agree to waive any compensation rights and/or benefits other than the publicity my business will receive from this advertisement for my participation in this project.

Renewal by Andersen LLC, its successors and assigns, shall be the absolute owner of any and all advertising materials (and all rights therein, including the copyright) produced pursuant to this Agreement.

No promise or representation which is not expressed herein has been made to me, and I have read this release, understand it and am signing it voluntarily.

**Buyer(s)**

*Susan Parisi*

Signature

**Susan Parisi**

Print Name

Address

City / State / Zip

Signature

Print Name

Address

City / State / Zip

**Witness**

Signature

**Russell Kelley**

Print Name

**11/23/21**

Date

A581



# Price Presentation Discounts



**dba: Renewal by Andersen of Oklahoma**
Legal Name: Oklahoma Windows and Doors LLC
9201 Polaris Drive Suite 200 l Oklahoma City, OK 73149
Phone: 405-608-5000 l Fax: 405-562-7880 l oksales@renewaloklahoma.com

**Susan Parisi**

H:
C:

| PROJECT PRICE BEFORE DISCOUNTS | $23,344 |
|---|---|

**INDIVIDUAL SAVINGS BASED ON 5 UNITS**

**Advertised Offer**                                          Savings:

    20% Off Project                              **$4,668**

**Sales Cost Savings Program (5%)**                           Savings:
                                                             **$933**

| TOTAL PRICE: $17,743 | |



**$5,601**
SAVINGS

Exhibit 1.2

**From:** Russell Kelley <rkelley@renewaloklahoma.com>
**Sent:** Tuesday, November 23, 2021 11:20 PM
**To:** sparisi21@yahoo.com <sparisi21@yahoo.com>
**Cc:** OKSales <oksales@renewaloklahoma.com>
**Subject:** Agreement Confirmation for Susan Parisi

Thank you for your business. It has been a privilege to assist you with your replacement project. If there is anything else I can do for you, or if you are in need of any future service, please do not hesitate to contact me or the company using the contact information listed in the attached agreement.

Thanks again for your purchase.  I'm confident that you will love your new products for years to come.

Russell Kelley
(405)859-7472

If you are unable to view a PDF please use the link below:
https://get.adobe.com/reader/

Sent from my iPad



ParisiSusan_20
21-11-23.pdf

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

(1) SUSAN PARISI,                          )
                                           )
      Plaintiff,                      )
                                           )
v.                                         )       Case No. CIV-23-115-R
                                           )
(1) C CASHION WINDOWS, LLC d/b/a)
RENEWAL BY ANDERSON OF          )
OKLAHOMA, and (2) BMO HARRIS    )
BANK, NA d/b/a GREENSKY, LLC,   )
                                           )
      Defendants.                     )

**DEFENDANT GREENSKY, LLC'S NOTICE OF JOINDER IN
DEFENDANT OKLAHOMA WINDOWS AND DOORS, LLC d/b/a RENEWAL
BY ANDERSON OF OKLAHOMA'S MOTION TO DISMISS THE AMENDED
<u>CLASS ACTION COMPLAINT (OR STAY) AND COMPEL ARBITRATION</u>**

Defendant GreenSky, LLC, incorrectly identified as BMO Harris Bank, NA d/b/a

GreenSky, LLC ("GreenSky") and, subject to and without waiving its motion to compel

arbitration, joins the Motion to Dismiss the Amended Class Action Complaint (or Stay)

and Compel Arbitration [Dkt.#68] and Memorandum of Law in Support [Dkt.#69] filed by

co-defendant Oklahoma Windows and Doors, LLC d/b/a Renewal by Anderson of

Oklahoma ("Oklahoma Windows"), and shows:

1.      Plaintiff Susan Parisi has filed a putative class action against GreenSky and

purports to assert claims against GreenSky under the Oklahoma Consumer Credit Code,

with respect to Parisi's GreenSky application for a loan from third parties to purchase

windows for her residence.  (Dkt.#36).  Parisi added Oklahoma Windows, the merchant

with whom she contracted to purchase windows, as a Defendant.  (Dkt.#36).

<div align="center">1</div>

<div align="right">A585</div>

2.      GreenSky previously moved under Rule 12 to dismiss or to stay Parisi's claims pending contractual arbitration; this Court denied such motion.  (Dkt.#17, 18; Dkt.#66).  The time for GreenSky to move for reconsideration or appeal such ruling has not yet passed.

3.      Oklahoma Windows has also moved to dismiss or to stay Parisi's claims pending contractual arbitration.  (Dkt.#68, 69).  The time for Parisi to respond to such motion has not yet passed.

4.      GreenSky hereby provides notice that it joins the arbitration motion and adopts the arguments and evidence cited by Oklahoma Windows.  (Dkt.#68, 69).  *See, e.g., Ferrell v. Cypress Envtl. Mgmt.-TIR, LLC*, No. 20-5092, 2021 WL 5576677, at *1 (10th Cir. Nov. 30, 2021) (second defendant joined first defendant's motion to compel arbitration); *AerSale, Inc. v. City of Roswell, New Mexico*, No. 222CV00218MISDLM, 2023 WL 7165107, at *5 (D.N.M. Oct. 31, 2023) (noting joinder in co-defendant's Rule 12(b) motion).

Respectfully submitted,

Dated: December 28, 2023

*s/ Kyle R. Prince*
Derrick T. DeWitt, OBA #18044
Kyle R. Prince, OBA #33040
DeWITT PARUOLO & MEEK
P.O. Box 138800
Oklahoma City, OK 73113
T: (405) 705-3600
F: (405) 705-2573
ddewitt@46legal.com
kprince@46legal.com

-and-

Sean W. Fleming
*Admitted Pro Hac Vice*
Texas State Bar No. 24027250
MACDONALD DEVIN MADDEN
KENEFICK & HARRIS, P.C.
12770 Coit Road, Suite 1100
Dallas, Texas 75251
T: (214) 744-3300
F: (214) 747-0942
SFleming@MacdonaldDevin.com
***Attorneys for Defendant GreenSky, LLC,
incorrectly identified as BMO Harris Bank,
NA d/b/a GreenSky, LLC***

3

A587

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 28th day of December, 2023, I electronically transmitted

this document to the Clerk of Court using the ECF System for filing and transmittal of a

Notice of Electronic Filing to the following ECF registrants:


M. Kathi Rawls, OBA #18814
Minal Gahlot, OBA #22145
kathi@rawlsgahlot.com
minal@rawlsgahlot.com

    -and-

Janet R. Varnell, FBN #0071072
jvarnell@vandwlaw.com
*Attorneys for Plaintiffs*

Shelia D. Sayne, OBA #31213
shelia.sayne@outlook.com

Diane J. Zelmer
*Admitted Pro Hac Vice*
Florida Bar No.: 27251
djz@berensonllp.com
*Attorneys for Defendant*
*Oklahoma Windows and Doors, LLC d/b/a*
*Renewal by Anderson of Oklahoma*


                                            *s/ Kyle R. Prince*

A588

## IN THE UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF OKLAHOMA

**SUSAN PARISI,**

                      **Plaintiff,**

**v.**

**OKLAHOMA WINDOWS AND
DOORS, LLC d/b/a RENEWAL BY
ANDERSON OF OKLAHOMA, and
BMO HARRIS BANK, NA d/b/a
GREENSKY, LLC,**

                    **Defendants.**

**Case No.: 5:23-cv-00115-R**

---

### PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT OKLAHOMA WINDOWS AND DOORS, LLC d/b/a RENEWAL BY ANDERSON OF OKLAHOMA'S MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT (OR STAY) AND COMPEL ARBITRATION

**VARNELL & WARWICK, P.A.**

Janet R. Varnell, FBN: 0071072
400 N. Ashley Drive, Suite 1900
Tampa, FL 33602
Telephone: (352) 753-8600
jvarnell@vandwlaw.com

**RAWLS GAHLOT, PLLC**

M. Kathi Rawls, OBA #18814
Minal Gahlot, OBA # 22145
2404 S. Broadway
Moore, Ok 73160
Phone: 405-912-3225
kathi@rawlsgahlot.com
minal@rawlsgahlot.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................i

TABLE OF AUTHORITIES ........................................................................iii

I.      BACKGROUND AND DISPUTED FACTS ........................................ 1

        A.      Parisi Agreed to a Credit Check as Part of an Application for a Zero
                Interest Loan............................................................................. 1

        B.      Parisi Never Saw the Zero Interest Loan Before Litigation
                Commenced; It Contained Forged Signatures ............................. 5

        C.      No Meeting of the Minds .............................................................. 6

        D.      The Zero Interest Loan Terms Nullify Arbitration ....................... 9

II.     STANDARD OF REVIEW............................................................... 9

III.    ARGUMENT ................................................................................. 11

        A.      There is No Presumption in Favor of Arbitration ...................... 11

        B.      There Was No Mutual Consent ................................................. 14

        C.      The Zero Interest Loan is Unenforceable and Illusory Because There
                Was No Consideration................................................................ 16

        D.      Anderson Failed to Comply with Federal and Oklahoma Electronic
                Signature Laws ......................................................................... 18

        E.      Two Zero Interest Loan Provisions Render Any Commitment to
                Arbitrate Null and Void............................................................. 21

        F.      Disputed Issues of Fact May Be Resolved After Discovery and a
                Trial ........................................................................................ 22

        G.      If The Court Finds That Arbitration Is Warranted (It Is Not), The Case
                Should Be Stayed, Not Dismissed.............................................. 24

        H.      Two Zero Interest Loan Provisions Render Any Commitment to
                Arbitrate Null and Void............................................................. 21

IV.     SUMMARY TRIAL ON MAKING OF AGREEMENT TO ARBITRATE......... 24

V.      CONCLUSION ....................................................................................... 25

CERTIFICATE OF SERVICE............................................................................. 26

A591

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**                                                                                                          **<u>Page</u>**

*Adair Bus Sales, Inc. v. Blue Bird Corp.*,
    25 F.3d 953 (10th Cir. 1994) ...................................................................24

*AT&T Techs.*,
    475 U.S. at 648, 106 S.Ct. 1415 (1986) ..................................................12

*Avedon Engineering Inc v. Seatex*,
    126 F 3d 1279 (10th Cir. 1997) ........................................................11, 22

*Barnes v. Helfenbein*,
    548 P.2d 1014 (Okla. 1976) ...................................................................21

*Beck v. Reynolds*,
    903 P.2d 317 (Okla. 1995) .....................................................................14

*Bellman v. i3Carbon, LLC*,
    563 Fed. App'x. 608 (10th Cir. 2014) ....................................................10

*Ben-Trei Overseas, L.L.C. v. Gerdau Ameristeel US, Inc.*,
    2010 WL 582205 (N.D. Okla. 2010).......................................................10

*Bilbrey v. Cingular Wireless, LLC*,
    164 P. 3d 131 (Okla. 2007) ....................................................................21

*Caclovic v. J.C. Penney Corp.*,
    884 F.3d 1051 (10th Cir. 2018)...............................................................10

*Dumais v. Am. Golf Corp.*,
    299 F.3d 1216 (10th Cir.2002)................................................................12

*Fancher v. Westwind Enterprises, Ltd.,*
    2018 WL 11411336 (W.D. Okla. 2018)..................................................23

*First Options of Chicago, Inc. v. Kaplan*,
    514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) ........................10

*Hancock v. Am. Tel. & Tel. Co.*,
    701 F.3d 1248 (10th Cir. 2012)...............................................................10

*Hardin v. First Cash Fin. Servs., Inc.*,
　　465 F.3d 470 (10th Cir. 2006)...................................................................11, 22

*Hartzell v. Choctaw Lumber Co. of Delaware et al.*,
　　163 Okl. 240, 22 P.2d 387 (1933) ........................................................ 15

*Hill v. Ricoh Ams. Corp.,*
　　603 F. 3d 766 (10th Cir. 2010) ........................................................24

*Homestead Golf Club, Inc. v. Pride Stables*,
　　224 F. 3d 1195 (10th Cir. 2000)........................................................ 16

*Howard v. Ferrellgas Partners, L.*P.,
　　748 F. 3d 975 (10th Cir. 2014)................................................11, 12, 22

*Jacks v. CMH Homes, Inc.*,
　　856 F.3d 1301 (10th Cir. 2017) ........................................................ 12, 16

*Maddox v. Northern Natural Gas Co.*,
　　259 F. Spp. 781 (W.D. Okla. 1966) ........................................................ 15

*Morgan v. Sundance, Inc.*, ⸻ U.S. ⸻,
　　142 S. Ct. 1708, 212 L.Ed.2d 753 (2022) ............................................ 11

*Nabob Oil Co. v. Bay State Oil and Gas Co.*,
　　208 Okl. 296, 255 P.2d 513 (1953) ............................................ 13, 15

*Okla. Oncology & Hematology P.C. v. U.S. Oncology, Inc.*,
　　160 P.3d 936 (Okla. 2007) ................................................................ 11

*Oklahoma Gas and Elec. Co. v. Toshiba Int'l Corp.*,
　　2016 WL 3659941 (W.D. Okla. 2016)................................................ 14

*Pan-Am Tobacco Corp. v. Dep't of Corr.*,
　　471 So. 2d 4 (Fla. 1984) ................................................................ 18

*Pierce v. Shorty Small's of Branson*,
　　137 F.3d 1190 (10th Cir. 1998)................................................................ 10

*Powers Restaurants, Inc. v. Garrison*,
　　465 P.2d 761 (Okla.1970) ................................................................ 17

*Quazilbash v. Wells Fargo & Company*,
  2010 WL 1643778 (N.D. Ok. 2010) .................................................................. 23

*Ragan v. Howard*,
  841 F. 3d 1134 (10th Cir. 2016) ...................................................................... 11

*Redwine Resources, Inc. v. Predator Technologies, L.L.C.*,
  171 P.3d 330 (Okla. Civ. App. 2007) .............................................................. 15

*Riley Mfg. Co. v. Anchor Glass Container Corp.*,
  157 F.3d 775 (10th Cir. 1998) ......................................................................... 12

*Rolico Aviation Ltd. V. Mansfield Heliflight, Inc.*
  2008 WL 640440 (W.D. Okla. 2008) ................................................................. 9

*South Central Industries v. Kerrtas Marketing, LLC*,
  2022 WL 1518935 (W.D. Okla. 2022) ............................................................. 16

*Spahr v. Secco*,
  330 F.3d 1266 (10th Cir.2003) ........................................................................ 12

*Sutton v. David Stanley Chevrolet, Inc.*,
  475 P. 3d 847 (Okla. 2020) ............................................................................. 16

*Thompson v. Bar-S Foods Co*,
  174 P. 3d 567 (Okla. 2007) ............................................................................. 17

*Volt Info. Sciences Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ.*,
  489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989) ................................. 12

*Walker v. BuildDirect.com Techs., Inc.*,
  733 F.3d 1001 (10th Cir. 2013) ....................................................................... 12

*Williams v. Imhoff*,
  203 F.3d 758 (10th Cir. 2000) ......................................................................... 24

*Wright v. Fenstermacher*,
  270 P. 2d 625 (Okla. 1954) ............................................................................. 17

## **Statutes and Regulations**

9 U.S.C. § 2 ...................................................................................................... 16

9 U.S.C. § 3 ...................................................................................................... 23, 24

9 U.S.C. § 4 ............................................................................................... 11, 22, 23

12 Oklahoma Statutes Annotated §2023B.2 ..................................................... 22

12 Oklahoma Statutes Annotated §2023B.3 ..................................................... 22

12A O.S. § 15-101 *et. seq.* .................................................................................. 19

12A O.S. §15-102(10) ......................................................................................... 19

12A O.S. §15-105(b) ........................................................................................... 19

15 Okla. Stat. § 2 ................................................................................................. 14

15 O.S.2001 § 2.As ............................................................................................. 17

15 Okla. Stat. § 66 ............................................................................................... 14

15 Okla. Stat. § 71 ............................................................................................... 15

15 O.S.2001 § 106 ............................................................................................... 17

15 U.S.C. §7001(c)(1) .................................................................................... 18, 19

15 U.S.C. §7006(5) ........................................................................................ 18, 20

## **Other**

5B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1352
    (3d ed. 2007)................................................................................................ 10

RESTATEMENT (SECOND) OF CONTRACTS § 2 cmt. e (1981) ............................... 17

A595

Plaintiff, Lt. Col. Susan Parisi (Ret.) ("Parisi") responds in opposition to Defendant Oklahoma Windows and Doors, LLC d/b/a Renewal By Anderson of Oklahoma's ("Anderson") Motion to Dismiss the Amended Class Action Complaint (Or Stay) and Compel Arbitration (the "Motion"). [ECF Doc. No. 68].  No arbitration agreement exists because no agreement between Anderson and Parisi exists.  The Motion is due to be denied.

## I.     BACKGROUND AND DISPUTED FACTS

Anderson completely ignores this Court's Order finding that Parisi never entered into a valid loan agreement (the "High Interest Agreement") with Defendant Greensky, LLC ("GreenSky"). *See* Order Denying GreenSky Motion to Compel Arbitration and Motion to Dismiss (hereafter, "Order"). [ECF Doc. No. 66].  Because Anderson now attempts to enforce terms in the original loan ("Zero-Interest Loan"), the Court must consider whether Parisi "effectively accepted" that loan. *See id*, p. 12, n. 11.  She did not. And she could not.  Having never agreed or assented to the Zero-Interest Loan for which she was never even approved, Parisi did not agree to the arbitration clause within it.

### A.     <u>Parisi Agreed to a Credit Check as Part of an Application for a Zero Interest Loan</u>

In its Motion, Anderson argues in conclusory fashion that Parisi is bound to arbitrate because she "entered into a contract" with Anderson for the purchase of windows to be installed at her home in exchange for the sum of $17,743.[1]  Motion, ¶1.  The sole basis for

---

[1] Anderson submits a Declaration of Jon Erickson ("Erickson") in Support of its Motion. ECF Doc. No. 69-1.  Erickson, apparently the Chief Operating Officer of Anderson's parent company, Esler Companies LLC, declares that he has personal knowledge of the facts set forth in the declaration. *Id*., ¶1. But rather than facts based on personal knowledge,

Anderson's conclusory statement is that, according to Anderson, Parisi signed the Zero Interest Loan. Motion, p. 17.  But Parisi did not sign the Zero Interest Loan, but rather signed – on an iPad - what the Anderson sales representative told her was a credit check to apply for the Zero-Interest Loan. *See* Exhibit 1, Declaration of Susan Parisi, hereafter, Parisi Decl., ¶10. This occurred when an Anderson representative, Russel Kelly ("Kelly"), came to Parisi's home on November 23, 2021, and told her that she could purchase windows with zero money down, zero interest financing for two years, and zero payments for 24 months after installation. Complaint, ¶61; Parisi Decl., ¶¶4, 7. Parisi had informed Kelly that she was recently diagnosed with cancer and would need the 24-month no payment option due to her health issues. Complaint, ¶62; Parisi Decl., ¶6.

Kelly presented Parisi with his iPad, and asked for her signature to authorize a credit check for the Zero Interest Loan. Parisi Decl., ¶¶8-10.  Parisi was never informed that her signature would be used to agree to the terms of the loan for which she was applying without any further review of those terms. Parisi Dec., ¶13.  Parisi was not informed that her signature could be used to disburse lender financing funds to Anderson. *Id.*  Parisi was never provided with any means to learn that she was agreeing to arbitrate any disputes, nor that she was waiving her right to pursue claims in a class action. Parisi Dec., ¶20.

---

the declaration primarily asserts legal conclusions (*e.g.*, Parisi entered into a contract for the purchase of five windows. *Id.*, ¶2; Parisi received a copy of the Contract via email the same day that she signed the Contract. *Id.*, ¶3), or sets forth purported provisions from the Zero Interest Loan. *Id.*, ¶¶4, 5. Thus, only two paragraphs (¶¶1 and 6) of the six- paragraph declaration could possibly be within Erickson's personal knowledge.

Parisi signed the iPad one time. Parisi Decl., ¶15. Kelly told Parisi he needed some additional signatures for her loan application and thereafter presented his iPad screen to Parisi, swiping through it several times, with only a box for a checkmark and a blank signature line appearing on the screen and visible to Parisi. Parisi Decl., ¶¶16-18. Each time Parisi was directed to check a box on each screen, her signature would become affixed to a signature line on the screen. *Id*. Parisi was not informed of her right to review any page's contents, nor provided with any opportunity to review a paper copy of the document she signed. Parisi Dec., ¶¶12, 19. Kelly never asked Parisi to provide consent to conduct transactions by electronic means. Parisi Dec., ¶12. Parisi was not provided with any disclosures regarding how her electronic signature would be utilized and she never provided consent for her electronic signature's use other than for a credit check. Parisi Decl, ¶¶11, 13.

Shortly after she signed Kelly's iPad, Kelly called a Greensky representative, who informed Parisi that she would be calling her back to let her know if she was approved for a loan. Parisi Decl., ¶¶22, 23. Within thirty minutes, the Greensky representative called back and told Parisi she was approved for a two-year loan program, but did not provide details. Parisi Decl., ¶¶25, 26. That same day, at 4:17 p.m., Greensky emailed Parisi, stating: "It's time to activate your loan!" Parisi Decl. ¶51. Three minutes later, at 4:20 p.m., Greensky again emailed Parisi stating, "It's time to activate your loan!" *Id*. At 4:22 p.m., Greensky emailed Parisi a third time, stating, "Congratulations on Activating Your Loan!", even though Parisi had not activated it. *Id*. The email further indicated that Parisi would need to register on the GreenSky Customer Portal to "review and save/print your loan

3

documents". *Id*. Parisi did not register on the GreenSky Customer Portal and was not provided access to a copy of the loan document. *Id*. Within a few days of their initial meeting, Kelley called Parisi and told her that he did not know what happened or why she had not been approved for the loan he had discussed with her (and that it had never happened before), but Parisi did not qualify for the Zero-Interest Loan. Complaint, ¶71; Parisi Decl., ¶39.  In fact, on the same day Kelly met with Parisi and he affixed her signature to the Zero Interest Loan pages without her review, GreenSky both emailed and mailed Parisi a new offer, the High Interest Agreement. Order, p. 4, 6 (citing Kaliban Decl., ¶¶18-22, 23).[2]  GreenSky told Parisi it had removed its original offer. Parisi Dec., ¶45.

On or around November 26 to November 29, 2021, Parisi received a letter from GreenSky, informing her that it had sent a payment on her account to Anderson for $8,871.50 for her windows installation.  Parisi Decl., ¶40.  Parisi received an email from GreenSky on November 29, 2021 informing her that "[a]s a courtesy alert, a charge of $8,871.50 from Renewal by Andersen of Oklahoma" had been made on her loan. Parisi Decl., ¶41.  On November 29, 2021, Parisi emailed GreenSky rejecting authorization of the charge. Parisi Decl., ¶42.  Also on November 29, 2021, GreenSky acknowledged that Parisi had rejected the charge. *Id*. When Parisi received the mailed copy of the High Interest

---

[2] Parisi has not found a copy of the High Interest Agreement in her email. After this lawsuit was filed, Parisi located in her archived emails, two emails from GreenSky sent on November 23, 2021, with the subject line, "Time to Activate Your Loan!" and one email with the subject line, "Congratulations on Activating Your Loan!"  Parisi Decl., ¶51. It appears that only by clicking on a link in those emails and "activating" the loan would Parisi have been able to view the High Interest Agreement.

A599

Agreement, Parisi refused to sign it, and objected to any release of funds to Anderson. Parisi Decl., ¶45. To date, no windows have ever been installed at Parisi's home. Complaint, ¶75; Parisi Decl., ¶47. In October of 2022, GreenSky informed Parisi that it had "cancelled" its loan contract. Parisi Decl., ¶49.

**B.** **Parisi Never Saw the Zero Interest Loan Before Litigation Commenced; It Contained Forged Signatures**

Despite telling Parisi he would send her a copy of the contract, Parisi never received anything in the mail from Kelly.  Parisi Decl., ¶¶29, 30.  Kelly had emailed a copy of the contract, but it went to Parisi's "spam" junk email folder in her email.  Parisi Decl., ¶31. Parisi only discovered the email after this lawsuit was filed.  Parisi Decl., ¶32.  When Parisi reviewed the emailed contract after litigation began, she observed that several of her electronic signatures had been affixed without her authorization to pages which she had never previously seen, and which Mr. Kelly had never described to her. Parisi Decl., ¶34. Two of the signatures within the contract were not even Parisi's electronic signature, and upon information and belief, those signatures were forged. Parisi Decl., ¶36. The first forged signature is located on Page 5 of the document, identified as the "Greensky Financing Form". Parisi Decl., ¶37.  The signature on the page is not Parisi's. Parisi Decl., ¶¶36, 37. The second forged signature is located on Page 6 of the document and is identified as the HOA authorization and Contact Form. Parisi Decl., ¶¶36, 38. The page contains a checked box for "NO HOA EXISTS for my project," followed by "Please proceed with placing my order." *Id*.  The document also included a separate checked "Yes" box below a

legend, "PROCEED WITH ORDER."  *Id*.  Parisi did not check either box checked on the

document and the signature on the page is not Parisi's. *Id*.

    **C.**    **No Meeting of the Minds**

    The first page of the Zero Interest Loan to which Anderson attempts to bind Parisi

includes the following:

> Buyer hereby jointly and severally agrees to purchase the products and/or
> services of Oklahoma Windows and Doors LLC d/b/a/ Renewal by Anderson
> of Oklahoma ("Contractor") in accordance with the terms and conditions
> described in this Agreement Document and Payment Terms, any documents
> listed in the Table of Contents, and any other document attached to this
> Agreement Document, the terms of which are all agreed to by the parties and
> incorporated herein by reference (collectively, this "Agreement").

Parisi Decl., ¶33; ECF Doc. No. 69-1.

    The Contract terms below that paragraph include the Total Job Amount of $17,743,

Amount Financed of $17,743, and Method of Payment as "Financing." *Id*.  A GreenSky

Financing Form is included in the Table of Contents, is attached to the Zero Interest Loan,

and is part of the Zero Interest Loan. *Id*.  As previously noted, upon information and belief,

Parisi's signature on this form is forged. Parisi Decl., ¶36. The GreenSky Financing Form

lists "Plan #3541 – 24-month promotional period. Interest waived if balance paid off before

promotional period ends." Parisi Decl., ¶33, ECF Doc. No. 69-1.  The form includes on

line No. 3, "Total Greensky Finance Amount" with the amount of $17,743. *Id*.  The form

also includes on line No. 4, "Greensky financed at order (50%)" with the amount of

$8,871.50.  *Id*.  Parisi did not see this form during her meeting with Kelly, nor sign the

form.  Parisi Decl., ¶¶17, 19, 37.

GreenSky did not approve Parisi for Plan #3541 identified on the GreenSky Financing Form. Parisi Decl., ¶45. Instead, on the same day Parisi met with Kelly, GreenSky sent a different contract to Parisi for signature, the High Interest Agreement. Order, p. 4 (citing Kaliban Decl., ¶¶18-22). According to GreenSky, it also emailed Parisi a copy of the High Interest Agreement. Order, p. 6 (citing Kaliban Decl., ¶23).[3] On or around November 29, 2021, Parisi received a copy of the High Interest Agreement in the mail. Parisi Decl., ¶42. Parisi never signed that agreement. Parisi Decl., ¶45. In written communication, dated November 29, 2021, the same day as the alleged use of a GreenSky Shopping Pass assigned to her (which operated like a credit card to pay a 50% deposit to Anderson), Parisi stated that that she was never informed about the Shopping Pass use:

> OK, I was never informed/told that an $8,000 + dollar charge was going to take place! I chose the two-year nothing down, no interest, no payment option. And I was informed the clock started ticking when the windows were installed. So what else is going to be done without my knowledge? This little trick makes me think twice about proceeding. Someone best be ta[l]king to me about this. I am under treatment for bone marrow cancer and I don't need any more surprises! It is not right [to find] this out after the fact.

Parisi Decl., ¶42.

Also on November 29, 2021, a GreenSky representative sent Parisi an email acknowledging that she rejected the charge of $8,871.50 from Anderson and said Anderson would be in touch with her directly:

> Thank you for your response rejecting the charge of $8,871.50 from Renewal by Andersen of Ok on your loan ending in 2561. Renewal by Andersen of Ok will be in touch with you directly.

---

[3] *See* n. 2, *supra*, p. 4.

*Id.*

Nevertheless, on December 1, 2021, a GreenSky representative told Parisi that there was a payment transaction for $8,871.50 because the "merchant charges a percentage upfront on the loan" account. Parisi Dec. *Id*.  Parisi responded:

> Well it certainly would help to know this information up front which I wasn't told that there would be a "payment transaction" for $8,871.50 which I am NOT comfortable with. I was told there would NOT be a payment, NO interest, and etc. for two years. . . I am NOT authorizing any payment at this time to Renewal by Anderson.

Parisi Decl., ¶¶45, 46.

On December 1, 2021, a GreenSky representative responded, stating that the charge to Parisi's account was "part of the loan process":

> The account will be charged because it is part of the loan process but based on your loan plan, we will not bill you until the job is completed or purchase window expiration date 05/26/22.  So the account is being charged but you are not going to be billed just yet.

*Id*.

On December 2, 2021, the GreenSky representative followed up:

> After explaining the loan process, do you authorize this transaction? If you have any questions, please give me a call.

*Id*.

On December 10, 2021, Parisi responded that she unequivocally did not authorize the use of the Shopping Pass:

> You did NOT explain any loan process to me and I do NOT authorize any transaction which I have already stated. I do NOT do well with lies. I have many questions related to this situation. I was told I qualified for a 24 month, NO money down, No Interest, and NO payment situation to begin 24 months after installation, now I am being told I did NOT qualify for that and you have removed that original offer. Well this is to inform you again that I am

8

> NOT doing business with you or Renewal by Anderson and IF you sent them
> money without my consent that is ON you NOT me. I did NOT authorize
> anything. I will provide you the name of my attorney and they will deal with
> this. This is a very sketchy situation you have set up with Renewal by
> Anderson. I suggest this gets straightened out quickly.

*Id*.

### D.  The Zero Interest Loan Terms Nullify Arbitration

The Zero Interest Loan itself contains two provisions that nullify any purported

arbitration agreement:

First, the Zero Interest Loan provides:

> Neither of the parties nor the arbitrator will have any authority or power to
> proceed with any claim as a class action or otherwise to join or consolidate
> any claim with any other claims or any other proceeding involving third
> parties. In the event a court determines that this limitation on joinder or class
> action claims is unenforceable, then this entire commitment to arbitrate will
> become null and void and the parties must submit all claims to the
> jurisdiction of the courts.

Parisi Decl., ¶33, ECF Doc. No. 69-1.

The Zero Interest Loan also provides:

> The parties agree that any action or claim or request for an injunction shall
> not be subject to arbitration.

*Id*.

## II.  STANDARD OF REVIEW

When considering a motion to dismiss due to improper venue, a court must draw all

reasonable inferences in favor of the non-moving party and resolve all factual conflicts in

favor of the non-movant. *Rolico Aviation Ltd. V. Mansfield Heliflight, Inc*., 07-1075, 2008

WL 640440 at *1 (W.D. Okla. Mar. 5, 2008) (citing 5B Charles Alan Wright & Arthur R.

Miller, Federal Practice & Procedure § 1352 (3d ed. 2007)). Plaintiffs may rely on well-pleaded facts found in the complaint, and if controverted by defendant's facts, the court is to give greater weight to plaintiff's facts. *Ben-Trei Overseas, L.L.C. v. Gerdau Ameristeel US, Inc.*, 2010 WL 582205 at *3 (N.D. Okla. Feb. 10, 2010) (citing *Pierce v. Shorty Small's of Branson*, 137 F.3d 1190, 1192 (10th Cir. 1998)).

When considering a motion to compel arbitration, a court must first determine if there was an agreement and then determine if the agreement provides the moving entity with the right to compel arbitration. *Caclovic v. J.C. Penney Corp.*, 884 F.3d 1051, 1057 (10th Cir. 2018); *see also, First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995) ("[A]rbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration."). The Tenth Circuit has held that the party moving to compel arbitration bears the initial burden of presenting evidence sufficient to demonstrate the existence of an enforceable agreement; if it does so, the burden shifts to the nonmoving party to raise a genuine dispute of material fact regarding the existence of an agreement. *Bellman v. i3Carbon, LLC*, 563 Fed. App'x. 608, 612 (10th Cir. 2014). In bearing that burden, the facts that Parisi alleges in her Complaint must be taken as true. *Id.* In addition, the Court must draw "all reasonable inferences and resolve all factual conflicts" in Parisi's favor. *Id.* (quoting *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1261 (10th Cir. 2012).

Under the Federal Arbitration Act ("FAA"), if there is a need to resolve material factual disputes as to the formation of an agreement to arbitrate, the court must proceed to

a summary trial. *See* 9 U.S.C. § 4. ("If the making of the arbitration agreement ... be in issue, the court shall proceed summarily to the trial thereof."). The 10th Circuit agrees that "when factual disputes may determine whether the parties agreed to arbitrate, the way to resolve them ... is by proceeding summarily to trial." *Howard v. Ferrellgas Partners, L.*P., 748 F. 3d 975, 984 (10th Cir. 2014). "When parties dispute the making of an agreement to arbitrate, a jury trial on the existence of the agreement is warranted unless there are no genuine issues of material fact regarding the parties' agreement." *Hardin v. First Cash Fin. Servs., Inc.*, 465 F.3d 470, 475 (10th Cir. 2006) (quoting *Avedon Engineering Inc v. Seatex*, 126 F 3d at 1279, 1283 (10ᵗʰ Cir. 1997).  However, a court can determine that there are no material issues of fact in dispute and decide there is no arbitration agreement as a matter of law. *See Ragan v. Howard*, 841 F. 3d 1134, 1139 (10th Cir. 2016) (When parties do not dispute the material facts surrounding an arbitration provision, then a district court, while viewing the facts most favorable to the non-moving party, can decide as a matter of law whether the parties actually agreed to arbitrate.)

## III.   ARGUMENT

### A.   <u>There is No Presumption in Favor of Arbitration</u>

Courts will not impose arbitration upon parties where they have not agreed to arbitrate. *See Morgan v. Sundance, Inc.*, ⸺ U.S. ⸺, 142 S. Ct. 1708, 1713, 212 L.Ed.2d 753 (2022) ("The federal policy is about treating arbitration contracts like all others, not about fostering arbitration."); *See also, Okla. Oncology & Hematology P.C. v. U.S. Oncology, Inc.*, 160 P.3d 936 at 12 ¶ 22 (Okla. 2007) (citing *Volt Info. Sciences Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ.*, 489 U.S. 468, 479, 109 S.Ct. 1248, 103 L.Ed.2d

488 (1989) (arbitration is a matter of consent, not coercion)). Any presumption in favor of arbitration "disappears when the parties dispute the existence of a valid arbitration agreement." *Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1220 (10th Cir.2002); *Riley Mfg. Co. v. Anchor Glass Container Corp.*, 157 F.3d 775, 779 (10th Cir. 1998) ("[W]hen the dispute is whether there is a valid and enforceable arbitration agreement in the first place, the presumption of arbitrability falls away."); *Howard v. Ferrellgas Partners, L.P.*, 748 F. 3d at 977 ("[B]efore the [FAA]'s heavy hand in favor of arbitration swings into play, the parties themselves must agree to have their disputes arbitrated."). Parisi disputes the existence of a valid enforceable agreement.

"[T]o determine whether a party has agreed to arbitrate a dispute," a court applies "ordinary state-law principles that govern the formation of contracts." *Walker v. BuildDirect.com Techs., Inc.*, 733 F.3d 1001, 1004 (10th Cir. 2013). *Spahr v. Secco*, 330 F.3d 1266, 1269 (10th Cir.2003) (quoting *AT&T Techs.*, 475 U.S. at 648, 106 S.Ct. 1415 (1986)) (internal quotation marks omitted) ("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."). Agreement or mutual assent is essential to a contract. *Jacks v. CMH Homes, Inc.*, 856 F.3d 1301, 1304 (10th Cir. 2017) ("In present-day Oklahoma, a contract is defined by statute as "an agreement to do or not to do a certain thing." Okla. Stat. Ann. tit. 15, § 1. In short, without an agreement, there is no contract.").

Anderson argues that Parisi "expressly agreed" to arbitrate her dispute. [ECF Doc. No. 69, p. 10.] According to Anderson, Parisi is bound by execution of the Zero Interest Loan even if she did not read or understand its terms. *Id.*, p. 11. The problem for Anderson

is that Parisi did not even know she was agreeing to *enter into a contract* when Kelly presented her with his iPad for her to provide an electronic signature. That is quite a different thing than entering into an agreement but not reading its terms.  Kelly told Parisi he needed her signature to check her credit worthiness. Then he told her he needed additional signatures for her loan application. Thereafter, her electronic signature was affixed to several pages of a contract without her knowledge.  Anderson argues that "the fact that Plaintiff signed" the Zero Interest Loan, "which was emailed to her on the same date she signed it, is more than sufficient evidence to conclude the existence of an arbitration agreement and enforce it." Motion, p. 17.  But Anderson fails to cite to one Oklahoma state or federal case holding that a consumer who is told she is signing an iPad electronically for a credit check is bound to a contract she has not previously seen.

Parisi did not see or agree to the Zero Interest Loan terms, and in fact, GreenSky never offered those terms to Parisi.  On the same day Kelly emailed the Zero Interest Loan to Parisi's spam folder, GreenSky sent Parisi a different offer, which in itself constituted a rejection of the Zero Interest Loan. *Nabob Oil Co. v. Bay State Oil and Gas Co*., 208 Okl. 296, 255 P.2d 513 (1953) (making a new proposal constitutes a rejection of the original offer.) In fact, as mentioned by Parisi in her communication to GreenSky, GreenSky told her it had removed its original offer. Parisi Decl., ¶45.

Anderson argues that because Parisi admitted that she signed "something on [Kelly's] electronic tablet" and Kelly told her that she would receive a copy of a contract, that means that there is valid agreement. Motion, p. 19. It does not. First, Parisi's declaration that Anderson quotes explains that she never received a copy of any contract:

> On November 23, 2021, a home evaluation to replace my windows was completed by Mr. Kelly. I was not informed that there would be a down payment of $8,871.50 and I did not authorize a payment of $8,871.50 for the work. I did not receive a copy of a contract but Mr. **Kelly had me sign something on his electronic tablet. He told me he would send a copy of the contract** but I have never received one.

[ECF Doc. No. 27-5, p.2, ¶6] (emphasis added).

Kelly promised to send a contract. But because the contract was emailed, Parisi never received it when it went to her junk/spam email folder. Parisi never saw any of the pages to which her electronic signature was affixed, and in fact, some of the places her signature appears to be affixed that contain material terms, are, upon information and belief, forgeries. Parisi may have understood that a contract would be sent to her based on her credit application, but that cannot be the same as understanding there would be no opportunity to review its terms before she agreed to proceed. If she had an opportunity to review what Kelly sent, she would have likely noticed that two of the most important pages, including the financing terms and a notice to proceed with the windows order, appeared to include forged signatures. But she did not see these or any of the Zero Interest Loan pages. Without her agreement to – or even knowledge of - the terms offered, no contract was formed. *Oklahoma Gas and Elec. Co. v. Toshiba Int'l Corp.*, 2016 WL 3659941, at *4 (W.D. Okla. July 1, 2016) (citing *Beck v. Reynolds*, 903 P.2d 317, 319 (Okla. 1995) (citing 15 Okla. Stat. § 2)).

## B.   There Was No Mutual Consent

Consent is mutual if all parties agree on the same thing in the same sense. *Id*. (citing *Beck, supra*; 15 Okla. Stat. § 66.) To achieve mutual consent, there must be an offer by one

party and an acceptance of that offer by the other party. *Id*. (citing *Redwine Resources, Inc. v. Predator Technologies, L.L.C*., 171 P.3d 330, 334 (Okla. Civ. App. 2007)). An acceptance "must be absolute and unqualified," or else it operates as a new proposal or counter-offer. *Id*. (quoting 15 Okla. Stat. § 71.). "In order that an offer and acceptance may result in a binding contract, the acceptance must be absolute, unconditional, and identical with the terms of the offer, and must in every respect meet and correspond with the offer; and any qualification of or departure from those terms invalidates and rejects the offer." *Maddox v. Northern Natural Gas Co*., 259 F. Spp. 781, 783 (W.D. Okla. 1966) (citing *Hartzell v. Choctaw Lumber Co. of Delaware et al*., 163 Okl. 240, 22 P.2d 387 (1933) (binding contract requires acceptance to be absolute, unconditional, and identical with terms of offer and must in every respect meet and correspond with offer; any qualification of or departure from those terms invalidates offer); *Nabob Oil Co. v. Bay State Oil and Gas Co*., 208 Okl. 296, 255 P.2d 513 (1953) (where new proposals are made, the making of which in itself constitutes a rejection of the original offer.)).

Here, Parisi never viewed, let alone agreed to essential terms. Her acceptance could not be absolute, unconditional, and identical with the terms of the offer because 1) the offer's terms were unknown to her; and 2) the financing terms for which Parisi applied were never offered to her.  Parisi was told she was signing Kelly's iPad to authorize her credit being checked for a loan application.  She never saw the pages to which her signature was being affixed, and never received a paper copy of what was being signed. Whether Kelly intentionally misled Parisi or not, Parisi did not know she was being obligated to a contract that included an arbitration clause or a waiver of class action. *See Sutton v. David*

*Stanley Chevrolet, Inc.*, 475 P. 3d 847, 857 (Okla. 2020) (affirming denial of motion to compel arbitration and finding that representations of finance manager, who held car purchase agreement in one hand while pointing to signature lines with the other hand, created false impression and caused plaintiff to unknowingly give up right to jury trial).

It is undisputed that Parisi was not approved for a Zero Interest Loan, but instead only approved for a different plan (the High Interest Agreement) that required payments within six months. In other words, the Zero Interest Loan sent to Parisi's spam folder did not represent the terms of an actual offer being made to Parisi for her purchase of windows. The parties did not agree on the same thing in the same sense. There was no meeting of the minds. If there is no meeting of the minds, there is no contract. *Jacks v. CMH Homes, Inc.,* 856 F.3d at 1304. Parisi and Anderson were not in agreement on the most essential terms because Parisi was never even approved for the Zero Interest Loan. *South Central Industries v. Kerrtas Marketing, LLC*, 2022 WL 1518935, *2 (W.D. Okla. February 7, 2022) (an enforceable contract requires "a meeting of the minds on all the essential terms of the contract.") (cleaned up); *see also, Homestead Golf Club, Inc. v. Pride Stables*, 224 F. 3d 1195, 1200 (10th Cir. 2000) (contract unenforceable because "[i]mportant material terms such as the funding date, interest rate, and payment schedule" had not been agreed upon).

### C.   The Zero Interest Loan is Unenforceable and Illusory Because There Was No Consideration

The Zero Interest Loan is invalid under basic state law contract principles. 9 U.S.C. § 2 (requiring arbitration of contracts involving commerce, "save upon such grounds as

16

A611

exist at law or in equity for the revocation of any contract."). An essential element of a contract is sufficient consideration. 15 O.S.2001 § 2.  As a general rule, consideration exists as long as there is a benefit to the promisor or a detriment to the promisee. *See Powers Restaurants, Inc. v. Garrison*, 465 P.2d 761, 763 (Okla.1970) (To be enforceable, a contract must be supported by valid consideration); *See also* 15 O.S.2001 § 106 (defining consideration). Here, the Zero Interest Loan offered to Parisi was entirely illusory.  Even if she had intended to enter into a contract – and at the time she provided her electronic signature, she did not – Parisi received no benefit as the promisor. *See Thompson v. Bar-S Foods Co*, 174 P. 3d 567, 574-75 (Okla. 2007) (finding employment contract containing arbitration clause unenforceable for lack of consideration.) If the agreement were held to be enforceable, Parisi would be required to arbitrate her claim and waive her right to a class action trial in exchange for a loan that did not exist – no Zero Interest Loan was ever actually offered to her.  In fact, even if Anderson could argue somehow that the Zero Interest Loan *was* offered to Parisi (which would create a disputed material fact), it was certainly withdrawn without notice when GreenSky offered its High Interest Loan, making any contract for the Zero Interest Loan illusory. RESTATEMENT (SECOND) OF CONTRACTS § 2 cmt. e (1981) (Even if a present intention is manifested, the reservation of an option to change that intention means that there can be no promisee who is justified in an expectation of performance.); *see also, Wright v. Fenstermacher*, 270 P. 2d 625, 627 (Okla. 1954) (equitable relief appropriate when that which was undertaken to be performed was so essential a part of the bargain that the failure of it must be considered as destroying or vitiating the entire consideration of the contract). Accordingly, even assuming arguendo

A612

that there ever was a contract between these parties, the grounds exist at law or in equity for the revocation of that contract. As a matter of law, the Zero Interest Loan is an illusory, unenforceable contract, and as such, no agreement to arbitrate exists; *see also Pan-Am Tobacco Corp. v. Dep't of Corr.*, 471 So. 2d 4, 5 (Fla. 1984) ("It is basic hornbook law that a contract which is not mutually enforceable is an illusory contract.").

D.   <u>**Anderson Failed to Comply with Federal and Oklahoma Electronic Signature Laws**</u>

Parisi never assented to the terms of the Zero Interest Loan.  Parisi only provided her electronic signature because she was told it was needed for a check on her creditworthiness as part of an application for a loan. Parisi did not affirmatively consent, as required by law, to having her electronic signature used to agree to loan terms.

The Electronic Signatures in Global and National Commerce Act ("E-Sign Act") requires that where a transaction involves a consumer, like Parisi, the consumer must affirmatively consent to the use of her electronic signature and have not withdrawn her consent. 15 U.S.C. §7001(c)(1)(A). The E-Sign Act defines an electronic signature as follows: "The term 'electronic signature' means an electronic sound, symbol, or process, attached to or logically associated with a contract or other record and executed or adopted by a person with the ***intent*** to sign the record." (emphasis added). 15 U.S.C. §7006(5). Pursuant to the E-Sign Act, prior to consenting, a consumer must be provided with a clear and conspicuous statement, *inter alia*, of (1) any right or option to have the record provided or made available on paper or in non-electronic form; (2) the right to withdraw the consent to have the record provided in electronic form; and (3) whether the consent applies only to

A613

the particular transaction which gave rise to the obligation to provide the electronic signature or to identified categories of records that may be provided or made available during the course of the relationship.  15 U.S.C. §7001(c)(1)(B).

The Uniform Electronic Transactions Act ("UETA") is a model act for adoption by states that encourages the lawful use of electronic documents and records. Oklahoma has adopted its own version of the UETA, the Oklahoma Uniform Electronic Transactions Act ("OUETA"). 12A O.S. § 15-101 *et. seq*. The OUETA includes the same definition of electronic signature as the E-Sign Act: "Electronic signature" means an electronic sound, symbol, or process attached to or logically associated with a record and executed or adopted by a person with the ***intent*** to sign the record. (emphasis added). 12A O.S. §15-102(10). The OUETA requires that electronic signatures are valid "only between parties each of which has agreed to conduct transactions by electronic means." 12A O.S. §15-105(b). Whether the parties agree to conduct a transaction by electronic means is determined from the context and surrounding circumstances, including the parties' conduct." *Id*. ¶ 15-105(b).

Anderson has it backwards when it argues that "[t]here is no indication that Plaintiff requested or attempted to review the [contract] terms, and [Anderson] refused." Motion, p. 18.  Compliance with the E-Sign Act requires Anderson to provide a clear and conspicuous statement to Parisi informing her of her right or option to have the record provided or made available on paper or in non-electronic form; her right to withdraw her consent to have the record provided in electronic form; and whether her consent applies only to the particular transaction which gave rise to the obligation to provide the electronic signature – her credit

check - or to identified categories of records that may be provided or made available during the course of the relationship, such as loan documents. Anderson never asked Parisi to provide her consent to conduct transactions by electronic means. It did not provide Parisi with a clear and conspicuous statement that she had the right to receive a copy of what she signed provided on paper or non-electronic form, the right to withdraw her consent to have the record provided in electronic form, and most importantly, whether her consent applied to the credit check and loan application only or whether there were other identified categories of documents to which her e-signature could be applied, such as the Zero Interest Loan. Parisi had no intent to agree to provide her approval to any specific loan terms that she had yet to review. *See* 15 U.S.C. §7006(5) ("The term 'electronic signature' means an electronic sound, symbol, or process, attached to or logically associated with a contract or other record and executed or adopted by a person with the ***intent*** to sign the record.") (emphasis added). Parisi's only intent when she provided a signature to Anderson was to have her credit checked to see if she was eligible for a zero interest, zero downpayment, zero payments for twenty-four months loan. As such, Parisi disputes that she ever validly assented to the terms of the Zero Interest Loan, let alone to the arbitration provision included in it. Certainly, the same e-signatures used to agree to have credit checked for a loan application without any notice of further potential use cannot be evidence of an agreement to arbitrate disputes between the parties.

A615

**E.** **Two Zero Interest Loan Provisions Render Any Commitment to Arbitrate Null and Void**

The Terms and Conditions included in the Zero Interest Loan include a provision that removes any authority or power of the parties or the arbitrator to proceed with a class action or to join or consolidate any claim with any other proceeding involving third parties. *See* Section I(C), *supra*. According to the terms, if the Court determines that this limitation on class action or joinder is unenforceable, then the entire "commitment to arbitrate" is null and void. *Id.* In this case, Parisi was never informed that she was going to be held to a class action waiver by applying for a loan to finance windows. Nor could she know that an indispensable third party like GreenSky could not be joined in any arbitration proceeding. This makes the arbitration clause unconscionable, first because Parisi never agreed to allow her signature to be used to enter into a contract with Anderson that waived her class action rights, and second, because a third party – Greensky - who is intricately bound up in the dispute cannot be joined. *Bilbrey v. Cingular Wireless, LLC*, 164 P. 3d 131, 136 (Okla. 2007) (quoting *Barnes v. Helfenbein*, 548 P.2d 1014, 1020 (Okla. 1976) ("The basic test of unconscionability of a contract is whether under the circumstances existing at the time of making of the contract, and in light of the general commercial background and commercial needs of a particular case, clauses are so one-sided as to oppress or unfairly surprise one of the parties.").

Further, the Zero Interest Loan terms include a provision excluding any action for an injunction from arbitration. *See* Section I(C), *supra* ("The parties agree that any action or claim or request for an injunction shall not be subject to arbitration"). Parisi has

A616

specifically requested injunctive relief in her lawsuit and thus her claim "shall not be subject to arbitration." *See* Complaint, *e.g.*, ¶¶8, 39 ("This class action seeks injunctive and monetary relief to redress an unlawful and deceptive pattern of wrongdoing followed by Anderson, in concert with its co-defendant, Harris/GreenSky (jointly Defendants), in its credit extension sale of consumer goods and services in the State of Oklahoma"; "The Class Representative requests a certification of a "hybrid" class for monetary damages under 12 Oklahoma Statutes Annotated §2023B.3 and for equitable relief under 12 Oklahoma Statutes Annotated §2023B.2").

Accordingly, even if the Court were to find that Parisi agreed to the Zero Interest Loan terms, and it should not, those terms include provisions that render any "commitment to arbitrate" null and void.

### F.    Disputed Issues of Fact May Be Resolved After Discovery and a Trial

Under the FAA, if there is a need to resolve material factual disputes as to the formation of an agreement to arbitrate, the court must proceed to a summary trial. *See* 9 U.S.C. § 4. ("If the making of the arbitration agreement ... be in issue, the court shall proceed summarily to the trial thereof."). The 10th Circuit agrees that "when factual disputes may determine whether the parties agreed to arbitrate, the way to resolve them ... is by proceeding summarily to trial". *See Howard v. Ferrellgas Partners, L.P.*, 748 F.3d at 984. "When parties dispute the making of an agreement to arbitrate, a jury trial on the existence of the agreement is warranted unless there are no genuine issues of material fact regarding the parties' agreement." *Hardin v. First Cash Fin. Servs., Inc.*, 465 F.3d 470, 475 (10th Cir. 2006) (quoting *Avedon Engineering Inc v. Seatex*, 126 F 3d at 1283.

Anderson cannot meet its burden to show there is an agreement to arbitrate. Parisi denies ever entering into the Zero Interest Loan. The evidence of an agreement attached to Oklahoma's Motion is a contract that Parisi never saw prior to her signature being affixed to it, includes a financing plan that was not offered to Parisi, for which Parisi was never approved, and includes key substantively material pages with forged signatures, including the financing form itself, and the approval for Anderson to proceed with the windows order. Accordingly, this Court can deny Anderson' Motion as a matter of law. *See Quazilbash v. Wells Fargo & Company*, 2010 WL 1643778 *2 (N.D. Ok. 2010) (denying motion to compel arbitration where defendant failed to show that there was an agreement to arbitrate and there was genuine issue of fact whether plaintiff entered into account agreement at issue). However, if the Court does not do so, Parisi has the right to demand a jury trial on the disputed facts regarding the existence of a binding agreement. See 9 U.S.C. § 4:

> If the making of an arbitration agreement or the failure, neglect or refusal to perform the same be an issue, the court shall proceed summarily to the trial thereof ... if the jury find that no agreement in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed.

*Id.*

Because Parisi has provided her Declaration supporting the lack of a valid arbitration agreement, and the record reflects that Parisi never accepted the Zero Interest Loan and never authorized payment to Anderson, a jury trial on the existence of a valid and enforceable agreement is required if the Court does not deny Anderson's Motion.

**G.**    <u>If The Court Finds That Arbitration Is Warranted (It Is Not), The Case Should Be Stayed, Not Dismissed</u>

Although arbitration should not be compelled for the reasons set out above, even if this Court were to require arbitration, the matter should be stayed and not dismissed. 9 U.S.C. § 3. This statutory requirement is followed in the Tenth Circuit. *See Fancher v. Westwind Enterprises, Ltd.,* 2018 WL 11411336, *2 (W.D. Okla. Aug. 8, 2018) (citing *Williams v. Imhoff*, 203 F.3d 758, 764 (10th Cir. 2000) ("Under the FAA, a court must stay proceedings if satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding." (quotation marks and citation omitted); *Adair Bus Sales, Inc. v. Blue Bird Corp.*, 25 F.3d 953, 955 (10th Cir. 1994) (indicating, when a district court dismissed a suit and ordered the parties to arbitrate, that "[t]he proper course ... would have been for the district court to grant [the movant's] motion and stay the action pending arbitration"); *see also, Hill v. Ricoh Ams. Corp.,* 603 F. 3d 766, 771 (10th Cir. 2010) ("Section 3 of the Act, 9 U.S.C. § 3, obliges courts to stay litigation on matters that the parties have agreed to arbitrate").

**IV.**    **SUMMARY TRIAL ON MAKING OF AGREEMENT TO ARBITRATE**

Under the FAA, if the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.  9 U.S.C. § 4.   Parisi, has a right and hereby requests, a jury trial on the making of the agreement if this Court does not simply deny Anderson's Motion as a matter of law. However, given that Parisi has sufficiently met her burden to show that there is no valid

Zero Interest Loan, this Court can certainly decide that there is no arbitration agreement as a matter of law.

## V.    CONCLUSION

With all reasonable inferences and resolving all factual conflicts in Parisi's favor, Parisi has met her burden of proving proper venue because she has submitted evidence that she was never bound to the Zero Interest Loan containing the arbitration agreement. Accordingly, for all the reasons above, Anderson's Motion to Dismiss the Amended Class Action Complaint (or Stay) and Compel Arbitration should be denied.

Respectfully submitted this 28th day of December, 2023.

**Varnell & Warwick, P.A.**

/s/ Janet R. Varnell
Janet R. Varnell, FBN: 0071072
400 N. Ashley Drive, Suite 1900
Tampa, FL  33602
Telephone: (352) 753-8600
jvarnell@vandwlaw.com

**Rawls Gahlot, PLLC**

/s/ M. Kathi Rawls
M. Kathi Rawls, OBA #18814
Minal Gahlot, OBA # 22145
2404 S. Broadway
Moore, Ok 73160
Phone: 405-912-3225
kathi@rawlsgahlot.com
minal@rawlsgahlot.com

***Attorneys For Plaintiff***

A620

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on December 28, 2023, I electronically filed the foregoing with the Clerk of the Court through the CM/ECF System, which will send a notice of electronic filing to all counsel of record.

<div style="margin-left: 50%;">

/s/ Janet R. Varnell
Janet R. Varnell

</div>

A621

Appellate Case: 23-6218   Document: 010111062400   Date Filed: 06/07/2024   Page: 108

# EXHIBIT 1

# Declaration of Susan Parisi

## IN THE UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF OKLAHOMA

SUSAN PARISI,

                  Plaintiff,

v.

OKLAHOMA WINDOWS AND
DOORS, LLC d/b/a RENEWAL BY
ANDERSON OF OKLAHOMA, and
BMO HARRIS BANK, NA d/b/a
GREENSKY, LLC,

                  Defendants.

Case No.: 5:23-cv-00115-R

## DECLARATION OF SUSAN PARISI

1.     My name is Susan Parisi.  I make this declaration based on my personal knowledge.  I am over the age of 18.

2.     I am a citizen of Oklahoma, County of Oklahoma.

3.     I submit this declaration in support of Plaintiff's Opposition to Defendant Oklahoma Windows and Doors LLC d/b/a Renewal by Anderson of Oklahoma's ("Anderson") Motion to Dismiss and Compel Arbitration.

4.     After receiving advertisements sometime in late 2021 from Anderson offering doors and windows upgrades, I met at my home with its agent, Russell Kelley on or about November 23, 2021.

5.     At that time, we discussed the number of windows I needed and how long it would take to install them.

6.      I informed Mr. Kelley that I had just received a medical diagnosis of multiple myeloma cancer and that I would be starting chemotherapy soon.

7.      He confirmed that I was eligible for a loan to purchase the windows as advertised - a loan requiring zero money down, zero interest and zero payments for twenty-four months following the installation of the windows.

8.      Mr. Kelley stated I would need to sign a credit application so that GreenSky LLC ("GreenSky") could review my credit worthiness.

9.      Mr. Kelley came to the kitchen counter in my home and placed an iPad device in front of himself as I stood next to him.

10.     Mr. Kelley informed me that the iPad would be used to secure my signature authorizing a credit review, so I agreed to sign it.

11.     There were no disclosures regarding how the electronic signature would be utilized and no consent was given for its use, other than for the credit review.

12.     I was not informed of a right to review or provided with an opportunity to review a paper copy of the document I signed. I was never asked to provide consent to conduct transactions by electronic means or told that I had the right to withdraw such consent if I had given it.

13.     I was not informed that my signature could be used to agree to the terms of a loan without any further review or that it could be used to disburse lender financing funds to Anderson windows. I was never informed that my signature could be used on anything other than the credit check and the loan application.

14.     Mr. Kelley seemed like a nice honest man so I had no reason to distrust what he told me.

15.     I signed Mr. Kelley's iPad one time on one signature line.

16.     After I signed it, however, Mr. Kelley then "swiped" the iPad in an upward motion and stated, "he needed some additional signatures to secure the zero interest for two years and no payments for two years" loan program.

17.     When he presented each of the subsequent locations for my signatures on additional screens, I was not able to see what I was signing; the only thing visible on the iPad screen other than a signature line was a box I needed to "check" that permitted my original electronic signature to be affixed on the signature line.

18.     I believe I checked a box to affix my signature approximately twelve (12) times.

19.     I was never presented a hard copy of any contract, or contract terms to review prior to my checking the various "check" boxes appearing on the iPad screen.

20.     I was never told I was agreeing to arbitrate any claims or was waiving any rights. Mr. Kelley never explained that a material term of Anderson's loan was a restriction on my right to access the court or be part of a class action should we have a dispute.

21.     I only ever intended to *apply* for a loan requiring zero money down, zero interest for 24 months, and zero payments for 24 months after my windows were installed.

3

A625

22.     Mr. Kelly immediately took the iPad, made a call to someone on his cell phone, and placed that person on speakerphone.

23.     The person on the speakerphone was a woman who identified herself as a representative of GreenSky, proceeded to inquire about my personal identification information, and then informed me that she would be calling me back to let me know if I was approved.

24.     After the call was completed, Mr. Kelley went around the exterior of my home with me, indicating which windows could be installed first, and which could wait until later.

25.     Less than 30 minutes later, Mr. Kelley's cell phone rang and it was the GreenSky representative, so he placed her on speakerphone again.

26.     GreenSky's telephone representative said, "Congratulations!  You have been approved for the 2-year loan program with GreenSky!"

27.     After he hung up, Mr. Kelley stated that another team from Oklahoma Windows would be coming to my home to measure the windows again to confirm his measurements.

28.     I was not given any opportunity to read the contract after learning I was approved.

29.     As he began to leave for his automobile, Mr. Kelley stated that he would send me a copy of the loan contract.

30.     I never received a copy of the contract from Mr. Kelley in the mail.

31.    Unknown to me, Mr. Kelley had emailed a copy of a contract between Anderson and myself that went to my "spam" or "junk" folder in my yahoo email account.

32.    I discovered this fact on or about August 14, 2023, when my attorney asked me to review my yahoo email account.

33.    The contract attached to Mr. Kelley's email shows Loan Plan 3541 with a 24-month promotional period and interest waived if the balance is paid off before the promotional period ends.

34.    Several of my electronic signatures were affixed without my authorization to pages which I had never seen previously, and which Mr. Kelly never described.

35.    Most of the electronic signatures are the same and show that my "checked" box filled in the electronic signatures on contract pages.

36.    Two of the signatures within the contract are not my electronic signature; I believe those signatures were forged by someone other than myself.

37.    The first forged signature is located on Page 5 of the document emailed to me by Mr. Kelley, identified as the "GreenSky Financing Form".

38.    The second forged signature is located on Page 6 of the document emailed to me by Mr. Kelley; identified as the "HOA authorization & Contact Form." That page contains a checked box for "NO HOA EXISTS for my project," followed by "Please proceed with placing my order." I did not check the box. The page also contains two other checked "yes" boxes for the statements, "IS THIS PROJECT

5

A627

LIKE FOR LIKE" and "PROCEED WITH ORDER."  I did not check either of these "yes" boxes.

39.      Within a few days of our initial meeting, Mr. Kelley called me and told me that I did not qualify for the two year no interest no payment loan.  He said that he did not know what happened, and that this had never happened before.

40.      Thereafter, on or around November 26, 2021 to November 29, 2021, I received a letter from GreenSky stating that GreenSky sent a payment for $8,871.50 directly to Anderson.

41.      On November 29, 2021, I received an email from GreenSky informing me that "[a]s a courtesy alert, a charge of $8,871.50 from Renewal by Andersen of Oklahoma" had been made from my loan.  A true and accurate copy of that email is attached hereto as Attachment 1.

42.      On November 29, 2021, I emailed GreenSky at service@Greensky.com to tell them that I had never been notified about this payment of $8,871.50 being made and that I had not authorized it. I explained that I applied for a two year "nothing down, no interest, no payments" loan and was promised nothing would be due until two years after windows were installed at my home. Also on November 29, 2021, GreenSky acknowledged my rejection of the charge.  A true and correct copy of my email and GreenSky's acknowledgment is attached hereto as Composite Attachment 2.

43.      Within a few days, GreenSky mailed me a contract, which was the first I had seen of any contract.

6

A628

44.    GreenSky's Contract stated that it was for a loan called Plan 7541, and stated in capital letters that it was a different plan than I had requested, which required 84 monthly payments that began as soon as the windows were installed but no later than within six months.

45.    GreenSky told me it had removed its original offer because I did not qualify for it.  I refused to sign the GreenSky contract and objected to any release of funds to Anderson.  My emails objecting to any release of funds and GreenSky's responses are attached hereto as Composite Attachment 3.

46.    I never used or authorized use of the GreenSky Shopping Pass and specifically and expressly told GreenSky that I did not authorize its use.

47.    To date, no windows have been installed at my home, but GreenSky continued to bill me for payments and late fees until I filed this lawsuit.

48.    GreenSky ignored my requests for a copy of a signed contract and failed to conduct a written investigation.  GreenSky inexplicably closed my complaint after stating that I failed to "participate" in the investigation.

49.    In October of 2022, GreenSky informed me that it had cancelled the loan contract.

50.    My credit reports still reflect a balance due to BMO Harris/GreenSky of over $8,000.

51.    After this lawsuit was filed, I located three emails from GreenSky in my archived emails all sent within approximately five minutes on November 23, 2021. The first two, sent at 4:17 p.m. and 4:20 p.m., had the subject line, "It's Time to

A629

Activate Your Loan!" and the third, sent at 4:22 p.m., had the subject line, "Congratulations on Activating Your Loan!" The third email indicated that I would need to register on the GreenSky Customer Portal to "review and save/print" the loan. I did not register on the customer portal or activate the loan. Copies of these GreenSky emails are attached hereto as Composite Attachment 4.

A630

FURTHER DECLARENT SAY NOT.

.

Susan Parisi

9

A631

# ATTACHMENT 1

A632

## Renewal by Andersen of Ok - GreenSky Transaction Notification

From:   GreenSky Inc. (outgoing@email.greensky.com)

To:      sparisi21@yahoo.com

Date:    Monday, November 29, 2021 at 10:49 AM CST

Dear Susan,

Thank you for using the GreenSky Loan Program.

As a courtesy alert, a charge of $8,871.50 from Renewal by Andersen of Oklahoma has been made on your loan ending in ██████

If you don't recognize this charge, please click HERE.

If you have any questions, please email us at service@greensky.com.

Thank you for using the GreenSky® Loan Program.

© 2020 GreenSky, LLC

Financing for GreenSky® consumer credit programs is provided by federally insured, federal and state chartered financial institutions without regard to age, race, color, religion, national origin, gender, or familial status.

GreenSky® is a registered trademark of GreenSky, LLC.

GreenSky® P.O. Box 24929, Atlanta, GA 30359

Licenses: NMLS #1416362

A633

# **ATTACHMENT 2**

1/4/22, 11:24 AM
Yahoo Mail - Charge to my account
Case 5:23-cv-00115-R    Document 36-1    Filed 10/28/23    Page 44 of 25
Appellate Case: 23-6218    Document: 010111062400    Date Filed: 06/07/2024    Page: 121

## Charge to my account

From:   Susan Parisi (sparisi21@yahoo.com)

To:     service@greensky.com

Date:   Monday, November 29, 2021, 12:02 PM CST

OK, I was never informed/told that an $8000 + dollar charge was going to take place! 😞 I chose the two-year nothing down, no interest, no payment option. And was informed the clock started ticking when the windows were installed. So what else is going to be done without my knowledge? This little trick makes me think twice about proceeding. Someone best be taking to me about this. I am under treatment for bone marrow cancer and I don't need any more surprises! It is not right defined this out after the fact.
Susan Parisi

Sent from Yahoo Mail for iPhone

A635

12/27/23, 1:17 PM
Case 5:23-cv-00115-R Document 74-1 Filed 12/28/23 Page 1 of 25
Yahoo Mail - Renewal by Andersen of Ok - GreenSky Transaction Notification
Appellate Case: 23-6218    Document: 010111062400    Date Filed: 06/07/2024    Page: 122

## Renewal by Andersen of Ok - GreenSky Transaction Notification

From:  GreenSky Inc. (outgoing@email.greensky.com)

To:    sparisi21@yahoo.com

Date:  Monday, November 29, 2021 at 12:02 PM CST

Dear Susan,

Thank you for your response rejecting the charge of $8,871.50 from Renewal by Andersen of Ok on your loan ending in ███. Renewal by Andersen of Ok will be in touch with you directly.

If you have any questions, please email us at service@greensky.com.

Thank you for using the GreenSky® Loan Program.

© 2020 GreenSky, LLC

Financing for GreenSky® consumer credit programs is provided by federally insured, federal and state chartered financial institutions without regard to age, race, color, religion, national origin, gender, or familial status.

GreenSky® is a registered trademark of GreenSky, LLC.

GreenSky® P.O. Box 24929, Atlanta, GA 30359

Licenses: NMLS #1416362

A636

# ATTACHMENT 3

A637

## Re: GreenSky case 04386281 [ ref:_00Dd0dh5w._5003o1VuXKY:ref ]

From: Customer Solutions (cst@greensky.com)

To: sparisi21@yahoo.com

Date: Thursday, December 2, 2021, 07:57 AM CST

Good Morning Susan,

After explaining the loan process, do you authorize this transaction? If you have any questions, please give me a call.

--------------- Original Message ---------------
**From:** Customer Solutions [cst@greensky.com]
**Sent:** 12/1/2021 5:02 PM
**To:** sparisi21@yahoo.com
**Subject:** Re: GreenSky case 04386281 [ ref:_00Dd0dh5w._5003o1VuXKY:ref ]

The account will be charged because it is part of the loan process but based on your loan plan, we will not bill you until the job is completed or purchase window expiration date-05/26/22. So the account is being charged but you are not going to be billed just yet.

--------------- Original Message ---------------
**From:** Susan Parisi [sparisi21@yahoo.com]
**Sent:** 12/1/2021 4:55 PM
**To:** cst@greensky.com
**Subject:** Re: GreenSky case 04386281 [ ref:_00Dd0dh5w._5003o1VuXKY:ref ]

Well it certainly would help to know this information up front which I wasn't told that there would be a "payment transaction" for $8,871.50 which I am NOT comfortable with. I was told there would NOT be any payment, NO interest, and etc. for two years. Renewal by Anderson wasn't "completely up front about the "FINE" print. I may have to re-think this whole thing. I do NOT have a date of installation, and I want to know do you place a lean on my home? And I am under treatment for a cancer diagnosis with a scheduled Transplant Date of February 2022. I am NOT authorizing any payment at this time to Renewal by Anderson. Respectfully Susan K. Parisi. You may call me or email me back.

On Wednesday, December 1, 2021, 08:21:05 AM CST, Customer Solutions <cst@greensky.com> wrote:

Good Morning,

Hope your day is going well. My name is Erika and I am reaching out to you regarding your GreenSky account. There was a payment transaction for $8871.50, was there any reason why the payment was rejected? The merchant charges a percentage upfront on the loan account. I wanted you to be aware of the loan process. Please let me know if you have any questions.

Thank you,

Erika
Customer Solutions Account Manager
Office: 855-849-0088 Ext. 401

A638

1/4/22, 11:40 AM
Yahoo Mail - Re: GreenSky case 04386281 [ ref:_00Dd0dh5w._5003o1VuXKY:ref ]

Case 5:23-cv-00115-R Document 71-1 Filed 12/28/23 Page 18 of 25
Appellate Case: 23-6218   Document: 010111062400   Date Filed: 06/07/2024   Page: 125

## Re: GreenSky case 04386281 [ ref:_00Dd0dh5w._5003o1VuXKY:ref ]

From: Customer Solutions (cst@greensky.com)

To: sparisi21@yahoo.com

Date: Friday, December 10, 2021, 01:43 PM CST

Hi Susan,

I am sorry and understand your frustration. I have reached out to the merchant about your concern. Our records shows you signed agreeing to the loan terms. Loan plan ▓▓▓▓ you will not be billed until the project is fully completed. Once completed, you will have 24 months with interest waived and required minimum payment due. Please call me if you have further questions.

Thank you

--------------- Original Message ---------------
**From:** Susan Parisi [sparisi21@yahoo.com]
**Sent:** 12/10/2021 1:29 AM
**To:** cst@greensky.com
**Subject:** Re: GreenSky case 04386281 [ ref:_00Dd0dh5w._5003o1VuXKY:ref ]

You did NOT explain any loan process to me and I do NOT authorize any transaction which I have already stated. I do NOT do well with lies. I have many questions related to this situation. I was told I qualified for a 24 month, NO money down, No Interest, and NO payment situation to begin 24 months after installation, now I am being told I did NOT qualify for that and you have removed that original offer. Well this is to inform you again that I am NOT doing business with you or Renewal by Anderson and IF you sent them money without my consent that is ON you NOT me. I did NOT authorize anything.   I will provide you the name of my attorney and they will deal with this. This is a very sketchy situation you have set up with Renewal by Anderson I suggest this gets straightened out quickly.   Susan Parisi

On Thursday, December 2, 2021, 07:57:40 AM CST, Customer Solutions <cst@greensky.com> wrote:

Good Morning Susan,

After explaining the loan process, do you authorize this transaction? If you have any questions, please give me a call.

--------------- Original Message ---------------
**From:** Customer Solutions [cst@greensky.com]
**Sent:** 12/1/2021 5:02 PM
**To:** sparisi21@yahoo.com
**Subject:** Re: GreenSky case 04386281 [ ref:_00Dd0dh5w._5003o1VuXKY:ref ]

The account will be charged because it is part of the loan process but based on your loan plan, we will not bill you until the job is completed or purchase window expiration date-05/26/22. So the account is being charged but you are not going to be billed just yet.

--------------- Original Message ---------------
**From:** Susan Parisi [sparisi21@yahoo.com]

A639

# ATTACHMENT 4

Emails from GreenSky

----- Forwarded Message -----
**From:** GreenSky <noreply@email.greensky.com>
**To:** "sparisi21@yahoo.com" <sparisi21@yahoo.com>
**Sent:** Tuesday, November 23, 2021 at 04:17:27 PM CST
**Subject:** Time to Activate Your Loan!



# It's Time to Activate Your Loan!

**Application ID:** ███████

Susan,

Congratulations on qualifying for a GreenSky℠ Program loan! You are a few short steps away from being able to use your loan to pay for your project.

If you wish to use your GreenSky℠ loan to make a purchase with your merchant, as a next step, you must activate your GreenSky℠ account by completing the following steps:

1. Activate your account by selecting this link or the button below.
2. Enter the last four digits of your Social Security number.
3. Review and save/print your loan agreement.
4. Follow the remaining prompts to complete the activation process.

**Activate Your Loan**

*If you did NOT authorize this account, please contact us at* vhuylfhC juhhqvn|1frp *or* ;990<690 935 *immediately!*

# Upcoming Milestones for Your Loan

1

A641

*For additional details about your loan, review the  document.*

**1**   **Activate Your Account - You are here**

**2**   **Register on the Customer Portal**

**3**   **Transact on Your Account**

**4**   **First Statement Available**

**5**   **Purchase Window Closes**

**6**   **Repay Your Loan**

We appreciate you choosing us for your financing needs.
Regards,
BMO HARRIS BANK N.A.
The GreenSky· Program

Contact us at ;990<69⊕3935 or visit us online at z z z ｊｉｕｈｈｑｖｎ｜ｌｆｒｐ

GreenSky· and GreenSky Patient Solutions· Program are program names for certain consumer credit plans extended by participating lenders to borrowers for the purchase of goods and/or services from participating merchants/providers. Participating lenders are federally insured, equal opportunity lender banks. GreenSky· and GreenSky Patient Solutions· are registered trademarks of GreenSky, LLC. GreenSky Servicing, LLC services the loans on behalf of participating lenders. NMLS #1416362

© 2006 - 2020 GreenSky LLC, a technology company. All Rights Reserved.

A642

----- Forwarded Message -----
**From:** GreenSky <noreply@email.greensky.com>
**To:** "sparisi21@yahoo.com" <sparisi21@yahoo.com>
**Sent:** Tuesday, November 23, 2021 at 04:20:28 PM CST
**Subject:** Time to Activate Your Loan!



# It's Time to Activate Your Loan!

**Application ID:** ▆▆▆▆▆▆

Susan,

Congratulations on qualifying for a GreenSky· Program loan! You are a few short steps away from being able to use your loan to pay for your project.

If you wish to use your GreenSky· loan to make a purchase with your merchant, as a next step, you must activate your GreenSky· account by completing the following steps:

1. Activate your account by selecting this ⟨link⟩ or the button below.
2. Enter the last four digits of your Social Security number.
3. Review and save/print your loan agreement.
4. Follow the remaining prompts to complete the activation process.

> **Activate Your Loan**

*If you did NOT authorize this account, please contact us at* <u>vhuylfhC juhhqvn|lfrp</u> *or* ;990<690⟨935 *immediately!*

---

# Upcoming Milestones for Your Loan

1

***For additional details about your loan, review the*** <u>xsfrp lgj‡p lhvwrqhv</u> **document.**



**①** **Activate Your Account - You are here**

**②** **Register on the Customer Portal**

**③** **Transact on Your Account**

**④** **First Statement Available**

**⑤** **Purchase Window Closes**

**⑥** **Repay Your Loan**

---

We appreciate you choosing us for your financing needs.
Regards,
BMO HARRIS BANK N.A.
The GreenSky· Program

---

Contact us at <u>;990‹69⁄3935</u> or visit us online at <u>z z z lluhhqvn|lfrp</u>

GreenSky· and GreenSky Patient Solutions· Program are program names for certain consumer credit plans
extended by participating lenders to borrowers for the purchase of goods and/or services from participating
merchants/providers. Participating lenders are federally insured, equal opportunity lender banks. GreenSky·
and GreenSky Patient Solutions· are registered trademarks of GreenSky, LLC. GreenSky Servicing, LLC services
the loans on behalf of participating lenders. NMLS #1416362

© 2006 - 2020 GreenSky LLC, a technology company. All Rights Reserved.

A644

----- Forwarded Message -----
**From:** GreenSky Inc. <outgoing@email.greensky.com>
**To:** Susan <sparisi21@yahoo.com>
**Sent:** Tuesday, November 23, 2021 at 04:22:49 PM CST
**Subject:** Congratulations on Activating Your Loan!



# Congratulations on Activating Your Loan!

**Application ID:** ███████

Susan,

You have successfully activated your GreenSky· Program loan. You are now able to use your GreenSky· loan to make purchases with your merchant! You will be notified whenever a purchase is made on your account. This notification will inform you of any action required.

You can learn more about your loan by z dwfk lqj#klv#vkruw#ylghr1

## Register on the Customer Portal

Here's a quick reminder to complete your registration to access the GreenSky· Customer Portal, where you can:
- Review and save/print your loan documents.
- Sign up for AutoPay & Paperless Billing.
- Access your statements.

To register, all you need is your Application ID and your Account Number. Find out where to easily find this information khuh.

1

**Complete Registration**

*If you did NOT authorize this account, please contact us at* vhuylfhC juhhqvn|1frp *or* ;990‹69〔3935 *immediately!*

---

## Upcoming Milestones for Your Loan

*For additional details about your loan, review the* xsfrp lgj‡b ldnvwrghv *document.*

✓  **Activate Your Account**

②  **Register on the Customer Portal - You are Here**

③  Transact on Your Account

④  First Statement Available

⑤  Purchase Window Expires

⑥  Repay Your Loan

---

Regards,
BMO HARRIS BANK N.A.
The GreenSky· Program

---

Contact us at ;990‹69〔3935 or visit us online at z z z ljuhhqvn|1frp

GreenSky· and GreenSky Patient Solutions· Program are program names for certain consumer credit plans extended by participating lenders to borrowers for the purchase of goods and/or services from participating merchants/providers. Participating lenders are federally insured, equal opportunity lender banks. GreenSky· and GreenSky Patient Solutions· are registered trademarks of GreenSky, LLC. GreenSky Servicing, LLC services the loans on behalf of participating lenders. NMLS #1416362

©2006 - 2021 GreenSky LLC, a technology company. All Rights Reserved.

A646

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| (1) SUSAN PARISI, | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. CIV-23-115-R |
| | ) | |
| (1) C CASHION WINDOWS, LLC d/b/a | ) | |
| RENEWAL BY ANDERSON OF | ) | |
| OKLAHOMA, and (2) BMO HARRIS | ) | |
| BANK, NA d/b/a GREENSKY, LLC, | ) | |
| *Defendants*. | ) | |

**DEFENDANT GREENSKY, LLC'S
<u>MOTION TO RECONSIDER ORDER (DOC. 66) AND BRIEF IN SUPPORT</u>**

Pursuant to Federal Rules of Civil Procedure 54 and 59, Defendant GreenSky, LLC,

incorrectly identified as BMO Harris Bank, NA d/b/a GreenSky, LLC ("GreenSky") moves

the Court to reconsider the Court's Order (Doc. 66) denying GreenSky's Motion to Compel

Arbitration (Doc. 17) and Motion to Dismiss All Claims Pursuant to Federal Rule of Civil

Procedure 12(b)(3) (Doc. 46), and shows:

## I.   <u>SUMMARY</u>

Plaintiff Susan Parisi filed a putative class action against GreenSky and purports to

assert claims against GreenSky under the Oklahoma Consumer Credit Code, with respect

to Parisi's GreenSky application for a loan from third parties to purchase windows for her

residence.  (Doc. 36).  GreenSky moved to compel arbitration (Doc. 17, 18) and moved for

under Rule 12 to dismiss or to stay Parisi's claims pending contractual arbitration.  (Doc.

46, 47).  This Court later denied GreenSky's motions.  (Doc. 66).

A647

After GreenSky moved to compel arbitration, Parisi added Oklahoma Windows, the merchant with whom she contracted to purchase windows, as a Defendant. (Doc. 36). Oklahoma Windows has also moved to dismiss or to stay Parisi's claims pending contractual arbitration. (Doc. 68, 69). In support, Oklahoma Windows provided a written Agreement between it and Parisi containing an arbitration provision, which provides that "Buyer and Contractor agree that any dispute...arising under or in connection with this Agreement, or the products and services to be provided by Contractor... will be determined by binding arbitration...." (Doc. 69, p.2) (emphasis added).

Such Agreement was not before the Court at the time GreenSky filed its motions. Accordingly, in addition to the arguments GreenSky previously raised regarding arbitration and dismissal, the Oklahoma Windows arbitration clause covers the claims Parisi has raised against GreenSky, as her claims "arise under or in connection with" the Oklahoma Windows Agreement and/or the products and services Oklahoma Windows was to provide to Parisi. GreenSky has joined Oklahoma Windows's motion, and adopted the arguments and evidence provided. (Doc. 72). For these reasons, reconsideration is appropriate. Further, without waiving GreenSky's right to arbitration, this Court should allow GreenSky to conduct limited discovery from Parisi and Oklahoma Windows regarding the parties' agreements and contract formations, and reconsider on the basis of such narrowly-tailored discovery and the additional evidence filed by Oklahoma Windows.

A648

## II.    ARGUMENTS AND AUTHORITIES

### A.    Legal standards for reconsideration

This Court has discretion to reconsider an interlocutory ruling.  FED. R. CIV. P. 54(b)

("any order or other decision, however designated, that adjudicates fewer than all the

claims or the rights and liabilities of fewer than all the parties does not end the action as to

any of the claims or parties and may be revised at any time before the entry of a judgment");

*see also* FED. R. CIV. P. 59(d)-(e) (motion to alter or amend).   Grounds supporting

reconsideration may include: "(1) an intervening change in the controlling law, (2) new

evidence previously unavailable, and (3) the need to correct clear error or prevent manifest

injustice."  *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000).  This

motion is based on the second and third grounds.

### B.    This Court should reconsider its Order because the arbitration Agreement between Parisi and Oklahoma Windows was not previously part of the record, and the arbitration provision applies to Parisi's claims against GreenSky

Federal policy favors arbitration, as codified in the Federal Arbitration Act.  *Circuit*

*City Stores, Inc. v. Adams*, 532 U.S. 105, 111 (2001); 9 U.S.C. § 4.  The FAA mandates

that district courts "shall" enforce arbitration agreements "in accordance with the terms of

the agreement."  *Id.*; *see Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).

This provision codifies the "liberal federal policy favoring arbitration."  *AT&T Mobility*

*LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal quotation marks omitted).  Further,

under the FAA, a district court should dismiss or stay a suit involving an arbitration clause

under the following circumstances:

> If any suit or proceeding be brought in any of the courts of the United

States upon <u>any issue referable to arbitration under an agreement in writing</u> for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3 (emphasis added).  Additionally, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Reeves v. Enter. Products Partners, LP*, 17 F.4th 1008, 1011 (10th Cir. 2021), *citing Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

As detailed in GreenSky's prior briefing (adopted herein by reference), the transaction at issue involved Parisi's desire to finance the purchase of residential windows to be installed by Oklahoma Windows.  (Doc. 18, pp. 2-4)  Parisi applied for a loan funded by a third-party financer, through the GreenSky® Program.  (Doc. 18-3).  The Loan Agreement contained an arbitration provision; GreenSky has briefed such issues and provided evidence on that issue.  (Doc. 17, 18, 46, 47).  After GreenSky moved to compel arbitration, Parisi added Oklahoma Windows as a Defendant.  (Doc. 36).

A motion to compel arbitration is not limited to a single arbitration provision between one set of parties; courts are required to consider all arbitration agreements that apply to the issues.  In *Ferrell v. Cypress Envtl. Mgmt.-TIR, LLC*, the first defendant moved to compel arbitration based on its contract, and the district court denied relief.  No. 20-5092, 2021 WL 5576677, at *1 (10th Cir. Nov. 30, 2021) (cited as persuasive under Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.).  The second defendant then moved to compel arbitration based on its own separate contract with the plaintiff, and the first defendant

A650

joined that.  *Id.*  Significantly, the second contract's arbitration clause covered "any dispute, controversy or claim arising out of or related to in any way to the parties' employment relationship," and also required any disputes about the enforcement of the arbitration clause had to be decided by the arbiter.  *Id.*  The district court denied this as well.  *Id.* at *2.  The Tenth Circuit reversed, holding it was appropriate for the non-signatory defendant to join the second defendant's motion, and enforceability of the second defendant's arbitration clause had to be decided by the arbiter, not the district court.  *Id.* at *3-4.

Here, Oklahoma Windows has also moved to dismiss or to stay Parisi's claims pending contractual arbitration.  (Doc. 68, 69).  Oklahoma Windows provided a written Agreement between it and Parisi containing an arbitration provision, which provides in relevant part:

> Arbitration: <u>Buyer and Contractor agree that any dispute</u> between them, or any of their respective affiliates, officers, directors, employees, agents or owners <u>arising under or in connection with this Agreement, or the products and services to be provided by Contractor</u>, that has been not resolved through mediation, will be determined by binding arbitration administered by the AA pursuant to its then-current Construction Industry Fast Track Procedures.

(Doc. 69, p.2) (emphasis added).  Accordingly, in addition to the arguments GreenSky previously raised regarding arbitration and dismissal, the Oklahoma Windows arbitration clause covers the claims Parisi has raised against GreenSky, as her claims "arise under or in connection with" the Oklahoma Windows Agreement and/or the products and services Oklahoma Windows was to provide to Parisi.  *Ferrell*, 2021 WL 5576677; *see also Reeves*, 17 F.4th at 1013 (holding plaintiffs were equitably estopped from avoiding arbitration, where one arbitration agreement covered all of plaintiffs' allegations against defendants).

A651

Such arguments could not have been raised in GreenSky's prior briefing, because the Oklahoma Windows Agreement was not before the Court at the time GreenSky filed its motions. *Servants of Paraclete*, 204 F.3d at 1012. For these reasons, this Court should reconsider the Order, and grant GreenSky relief.

**C.    Alternatively, this Court should allow limited discovery on the factual issues raised in its Order and reconsider in order to correct clear error or prevent manifest injustice**

In its Order, this Court noted that it made factual determinations based on the parties' affidavits and evidence. (Doc. 66, pp. 1-8). Relevant to its decision to deny GreenSky's motions, the Court made findings regarding Parisi's awareness of the GreenSky contract terms, and communications between Parisi and Oklahoma Windows regarding the terms of the GreenSky contract. (Doc. 66, pp. 7-8). This Court ultimately held Parisi did not agree to the GreenSky contract, and the included arbitration provisions. (Doc. 66, p.15).

Now that Parisi has added Oklahoma Windows as a party to this litigation, this Court should consider the arguments and evidence Oklahoma Windows supplied regarding communications between the parties, and reconsider in light of such additional evidence. To prevent manifest injustice, this should include the evidence included with Oklahoma Windows's currently pending motion, any reply or additional briefing it files, and limited discovery on these issues. Further, to prevent clear error and manifest injustice, the parties and issues should all be sent to arbitration, to avoid inconsistent results and a waste of judicial resources.

A652

Respectfully submitted,

Dated: December 29, 2023          */s/ Sean W. Fleming*         

Sean W. Fleming
*Admitted Pro Hac Vice*
Texas State Bar No. 24027250
MACDONALD DEVIN MADDEN
KENEFICK & HARRIS, P.C.
12770 Coit Road, Suite 1100
Dallas, Texas 75251
T: (214) 744-3300
F: (214) 747-0942
SFleming@MacdonaldDevin.com

Derrick T. DeWitt, OBA #18044
Kyle R. Prince, OBA #33040
DeWITT PARUOLO & MEEK
P.O. Box 138800
Oklahoma City, OK 73113
T: (405) 705-3600
F: (405) 705-2573
ddewitt@46legal.com
kprince@46legal.com

***Attorneys for Defendant GreenSky, LLC, incorrectly identified as BMO Harris Bank, NA d/b/a GreenSky, LLC***

7

A653

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 29th day of December, 2023, I electronically transmitted

this document to the Clerk of Court using the ECF System for filing and transmittal of a

Notice of Electronic Filing to the following ECF registrants:

    M. Kathi Rawls, OBA #18814
    Minal Gahlot, OBA #22145
    kathi@rawlsgahlot.com
    minal@rawlsgahlot.com

    Janet R. Varnell, FBN #0071072
    jvarnell@vandwlaw.com

    ***Attorneys for Plaintiffs***

                            */s/ Sean W. Fleming*

3004943

A654

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) SUSAN PARISI, | ) | |
|     *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. CIV-23-115-R |
| | ) | |
| (1) C CASHION WINDOWS, LLC d/b/a | ) | |
| RENEWAL BY ANDERSON OF | ) | |
| OKLAHOMA, and (2) BMO HARRIS | ) | |
| BANK, NA d/b/a GREENSKY, LLC, | ) | |
|     *Defendants*. | ) | |

## DEFENDANT GREENSKY, LLC'S
## <u>NOTICE OF APPEAL</u>

Pursuant to Federal Rules of Appellate Procedure 3 and 4(a), and the Federal Arbitration Act, Defendant GreenSky, LLC, incorrectly identified as BMO Harris Bank, NA d/b/a GreenSky, LLC ("GreenSky") hereby appeals to the United States Court of Appeals for the Tenth Circuit from Court's Order (Doc. 66) denying GreenSky's Motion to Compel Arbitration (Doc. 17) and Motion to Dismiss All Claims Pursuant to Federal Rule of Civil Procedure 12(b)(3) (Doc. 46), entered on December 1, 2023. FED. R. APP. P. 3, 4(a); 9 USC § 16; *Ansari v. Qwest Communications Corp*., 414 F.3d 1214 (10th Cir. 2005). Please take note that GreenSky also filed a motion to reconsider such Order, which is pending as of the date of this notice.

1

A655

Respectfully submitted,

Dated: December 29, 2023                  */s/ Sean W. Fleming*

Sean W. Fleming
*Admitted Pro Hac Vice*
Texas State Bar No. 24027250
MACDONALD DEVIN MADDEN
KENEFICK & HARRIS, P.C.
12770 Coit Road, Suite 1100
Dallas, Texas 75251
T: (214) 744-3300
F: (214) 747-0942
SFleming@MacdonaldDevin.com

Derrick T. DeWitt, OBA #18044
Kyle R. Prince, OBA #33040
DeWITT PARUOLO & MEEK
P.O. Box 138800
Oklahoma City, OK 73113
T: (405) 705-3600
F: (405) 705-2573
ddewitt@46legal.com
kprince@46legal.com

***Attorneys for Defendant GreenSky, LLC, incorrectly identified as BMO Harris Bank, NA d/b/a GreenSky, LLC***

A656

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 29th day of December, 2023, I electronically transmitted

this document to the Clerk of Court using the ECF System for filing and transmittal of a

Notice of Electronic Filing to the following ECF registrants:

      M. Kathi Rawls, OBA #18814
      Minal Gahlot, OBA #22145
      kathi@rawlsgahlot.com
      minal@rawlsgahlot.com

      Janet R. Varnell, FBN #0071072
      jvarnell@vandwlaw.com

      ***Attorneys for Plaintiffs***

                                        */s/ Sean W. Fleming*

3004943

A657

## IN THE UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF OKLAHOMA

**SUSAN PARISI,**

                **Plaintiff,**

**v.**

**OKLAHOMA WINDOWS AND
DOORS, LLC d/b/a RENEWAL BY
ANDERSON OF OKLAHOMA, and
BMO HARRIS BANK, NA d/b/a
GREENSKY, LLC,**

                **Defendants.**

**Case No.: 5:23-cv-00115-R**

---

### PLAINTIFF'S RESPONSE IN OPPOSITION TO GREENSKY'S NOTICE
### OF JOINDER IN DEFENDANT OKLAHOMA WINDOWS AND DOORS, LLC
### d/b/a RENEWAL BY ANDERSON OF OKLAHOMA'S MOTION TO DISMISS
### THE AMENDED CLASS ACTION COMPLAINT (OR STAY)
### AND COMPEL ARBITRATION

Defendant BMO Harris Bank, NA, d/b/a GreenSky, LLC ("GreenSky") attempts

yet another bite at the apple with its Notice of Joinder (the "Notice") [ECF Doc. No. 70] in

Defendant Oklahoma Windows and Doors, LLC d/b/a Renewal by Anderson of

Oklahoma's ("Anderson") Motion to Dismiss the Amended Class Action Complaint (or

Stay) and Compel Arbitration ("Anderson Motion). GreenSky's purported Notice is

improper and Plaintiff Susan Parisi ("Parisi"), by and through her undersigned counsel,

asks this Court to deny or strike it.  *See United States v. Nacchio*, 555 F.3d 1234, 1252

(10th Cir. 2009) ("Courts are not disposed to allow litigants to have two or more bites at

the proverbial apple.") (*en banc*).

A658

## BACKGROUND

The facts of this case are set forth by Parisi in other filings and in this Court's Order issued on December 1, 2023. [ECF Doc Nos. 39, 56, 66]. The relevant procedural history is noted here for the Court's convenience. GreenSky first asked this Court to compel arbitration and dismiss or stay Parisi's claims on April 28, 2023. [ECF Doc. No. 18]. After Parisi amended her Complaint to name co-defendant, Anderson, GreenSky again sought to compel arbitration and dismiss or stay Parisi's claims on September 25, 2023. [ECF Doc. Nos. 46, 47]. This Court denied GreenSky's motions to compel arbitration on December 1, 2023. [ECF Doc. No. 66]. In addition to GreenSky's instant Notice, GreenSky has filed a motion for reconsideration of the Court's Order [ECF Doc. No. 72] and a notice of appeal [ECF Doc. No. 73].

## ARGUMENT

### A.   GreenSky's Notice is Prohibited by the Federal Rules of Civil Procedure

Federal Rule of Civil Procedure 12(g)(2) prohibits a party from filing a second Rule 12 motion that raises "a defense or objection that was available to the party but omitted from its earlier motion." Fed. R. Civ. P. 12(g)(2). GreenSky invites error by this Court in its attempt to join the Anderson Motion, which has the effect of GreenSky filing a second Rule 12 motion. This is obviously prohibited under Rule 12(g)(2)'s plain language, and the rule's two exceptions have no application here.[1]  GreenSky previously argued, pursuant to

---

[1] 12(g) provides that: *Except as provided in Rule 12(h)(2) or (3),* a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." FED. R. CIV. P. 12(g)(2) (emphasis added).  These exceptions do not apply here.

Rule 12, that Parisi was obligated to arbitrate her claims against GreenSky. [ECF Doc. Nos. 18, 46, 47]. GreenSky's Notice even expressly states that it "previously moved under Rule 12 to dismiss or stay Parisi's claims pending contractual arbitration." [ECF Doc. No. 70].

Now GreenSky notices joinder on the Anderson Motion, which sets forth the argument by Anderson that Parisi is obligated to arbitrate her claims against Anderson. If GreenSky omitted arguments made in the Anderson Motion regarding GreenSky's right to compel Parisi to arbitrate her claims, those arguments were certainly available to GreenSky when it previously filed its Rule 12 motions to dismiss and compel arbitration. Those omitted arguments, if any, are waived. *See* Fed. R. Civ. P. 12(h) ("A party waives any defense listed in Rule 12(b)(2)-(5) by (A) omitting it from a motion in the circumstances described in Rule 12(g)(2)").

Nevertheless, GreenSky attempts to further delay the progress of this case with this improper Notice. *See Hunt v. Hamm*, 2016 WL 10565462, *2 (D. N.M. May 31, 2016) (holding that Rule 12(g)(2) prohibited a successive Rule 12(b)(6) motion and noting that the 10th circuit would find that Rule 12(g)(2) means what it says). "Rule 12(g)(2) is designed to avoid unnecessary delay at the pleading stage by encouraging 'the presentation of an omnibus pre-answer motion in which the defendant advances every available Rule 12 defense and objection he may have that is assertable by motion.'" *Albers v. Bd. of Cnty. Comm'rs of Jefferson Cnty.*, 771 F.3d 697, 702 (10th Cir. 2014) (quoting Charles Alan Wright & Arthur R. Miller, 5C Federal Practice & Procedure § 1384 (3d ed. 2014)). This

Court should not permit GreenSky to blithely ignore the federal rules of civil procedure while it tries yet again to compel Parisi to arbitrate her claims against GreenSky.[2]

**B.**   **GreenSky's Failure to Explain How the Anderson Motion Arguments Apply to GreenSky Should Waive its Attempt at Joinder of the Anderson Motion**

Even if this Court were to find that GreenSky's Notice was not violative of Rule 12(g)(2) (and it is), GreenSky's Notice fails entirely to explain how the arguments made by Anderson apply to GreenSky. Such "textbook perfunctory" treatment should waive GreenSky's attempts to adopt by reference Anderson's arguments. *See United States v. Ramirez-Rivera*, 800 F.3d 1, 11 n. 1 (1st Cir. 2015), abrogated on other grounds by *United States v. Leoner-Aguirre*, 989 F.3d 310 (1st Cir. 2019) (explaining that adoption by reference of a co-party's brief or motion "cannot occur in a vacuum and the arguments must actually be transferable from the proponent's to the adopter's case. . .where [adopter] offers no explanation as to why arguments pertained to [adopter] such 'textbook perfunctory' treatment waives the [adopter's] attempt to adopt-by-reference [the proponent's] case.") (quoting *U.S. v. Brown*, 669 F. 3d 10, 16 n. 5 (1st Cir. 2012)); *see also, United States v. Straker*, 800 F.3d 570, 594 n.5 (D.C. Cir. 2015) ("adoption by reference is permitted only to the extent we can readily apply the proponent's arguments to the adopter's case.").

---

[2] Actually, this is GreenSky's third attempt to dismiss Parisi's claims and compel arbitration.  Its first Motion to Dismiss [ECF Doc. No. 18] was fully briefed when Parisi amended her complaint to name the proper co-defendant, Oklahoma Windows. GreenSky then made virtually the same arguments in its subsequent Motion to Dismiss (or Stay) and Compel Arbitration [ECF Doc No. 46] and Memorandum in Support [ECF Doc. No. 47] filed against Parisi's Amended Complaint. [ECF Doc No. 36].

**C.**     **The Anderson Motion Arguments are Inapplicable to GreenSky**

Even if GreenSky's attempt at joinder of the Anderson Motion does not violate Fed. R. Civ. P. 12(g)(2) (which it clearly does), and even if GreenSky's bare-boned "textbook perfunctory" Notice does not waive any attempt to adopt by reference Anderson's arguments (it should), GreenSky would be hard-pressed to explain how Anderson's arguments *apply* to GreenSky, given that GreenSky already argued before this Court that an entirely different contract than the contract at issue in the Anderson Motion applied to Parisi's claims.   GreenSky should be estopped from now arguing that the purported contract upon which the Anderson Motion is based is operative. [ECF Doc. Nos. 18, 46, 47].

Moreover, the Anderson Motion that GreenSky seeks to join is based on (1) an illusory contract that was (2) entirely lacking in consideration, (3) the terms of which were never agreed to (or even seen) by Parisi, (4) who did not intend to enter a contract but instead believed her signature was needed for a credit check. *See* Parisi's Response in Opposition to Anderson's Motion to Dismiss and Compel Arbitration [ECF Doc. No. 71]. There was no meeting of the minds.  *See South Central Industries v. Kerrtas Marketing, LLC*, 2022 WL1518935, *2 (W.D. Ok. February 7, 2022) ("[A] meeting of the minds [must be] on all essential terms of the contract.").

Even if, arguendo, the Court finds a contract was formed between Anderson and Parisi, only the parties to the contract can enforce it. *Wells Fargo Bank, N.A. v. Heath*, 280 P. 3d 328, 334 (Okla. 2012) (quoting *Drummond v. Johnson*, 643 P.2d 634, 639 (Okla.1982) ("Contracts are binding only upon those who are parties thereto, and are

enforceable only by the parties to a contract or those in privity with it. . .")).  GreenSky is

not a party, or a third-party beneficiary, to the contract, and as such cannot enforce its

terms.  *See Knudson v. Weeks*, 394 F. Supp. 963, 976 (W.D. Okla. 1975) (Under 15 O.S.

2011 §29 "a third party beneficiary may not recover under a contract unless it is expressly

made for his benefit.").  In other words, GreenSky is a non-signatory to the purported

arbitration agreement and as a non-signatory, cannot compel arbitration.  *See Morgan v.*

*Sundance, Inc.*, 142 S. Ct. 1708, 1713 (2022) (holding that a court must not devise novel

rules to favor arbitration over litigation, and explaining that arbitration agreements are as

enforceable as other contracts, but not more so).

## CONCLUSION

For all the reasons above, GreenSky's Notice of Joinder should be denied or

stricken.

Respectfully submitted this 10th day of January, 2024.

**VARNELL & WARWICK, P.A.**

/s/ Janet R. Varnell_____
Janet R. Varnell, FBN: 0071072
400 N. Ashley Drive, Suite 1900
Tampa, FL  33602
Telephone: (352) 753-8600
jvarnell@vandwlaw.com

**RAWLS GAHLOT, PLLC**

/s/ M. Kathi Rawls
M. Kathi Rawls, OBA #18814
Minal Gahlot, OBA # 22145
2404 S. Broadway
Moore, Ok 73160
Phone: 405-912-3225

A663

kathi@rawlsgahlot.com
minal@rawlsgahlot.com

***Attorneys For Plaintiff***

A664

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on January 10, 2024, I electronically filed the foregoing with the Clerk of the Court through the CM/ECF System, which will send a notice of electronic filing to all counsel of record.

/s/ Janet R. Varnell
Janet R. Varnell

A665

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| (1) SUSAN PARISI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-23-115-R |
| | ) | |
| (1) C CASHION WINDOWS, LLC d/b/a | ) | |
| RENEWAL BY ANDERSON OF | ) | |
| OKLAHOMA, and (2) BMO HARRIS | ) | |
| BANK, NA d/b/a GREENSKY, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT GREENSKY, LLC'S REPLY IN SUPPORT OF ITS NOTICE OF
JOINDER IN DEFENDANT OKLAHOMA WINDOWS AND DOORS, LLC'S
MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT
(OR STAY) AND COMPEL ARBITRATION**

Defendant GreenSky, LLC, incorrectly identified as BMO Harris Bank, NA d/b/a

GreenSky, LLC ("GreenSky"), subject to and without waiving its motion to compel

arbitration, provides additional briefing in support of its joinder in the Motion to Dismiss

the Amended Class Action Complaint (or Stay) and Compel Arbitration [Doc. 68] and

Memorandum of Law in Support [Doc. 69] filed by co-defendant Oklahoma Windows and

Doors, LLC d/b/a Renewal by Anderson of Oklahoma ("Oklahoma Windows"), and

shows:

**I.**
**REPLY ARGUMENT AND AUTHORITIES**

**A.**   **Joinder in other parties' motions is allowed under the procedural rules**

Plaintiff Susan Parisi has objected to GreenSky's notice of joinder in Oklahoma

Windows's motion, and specifically argues Rule 12(g)(2) precludes such joinder.  (Doc.

1

A666

76, pp. 2-3).   Parisi is wrong, because Oklahoma Windows's motion is not a Rule 12 motion.  (Doc. 68).  And—even assuming it were—the rule itself allows supplementation.

Parties may join in a variety of motions filed by other parties.  *Smith v. Smart Buy Homes*, No. CIV-08-89-C, 2008 WL 5122840, at *1 (W.D. Okla. Dec. 4, 2008) ("Since the case was removed, Defendant Southern Energy has filed an Answer, joined in the Motion to Dismiss for Arbitration, and joined Defendant Smart Buy in opposing Plaintiffs' request for remand."); *United States v. Dyer*, No. CR-22-00209-JD, 2023 WL 1998924, at *1 (W.D. Okla. Feb. 12, 2023) (defendant "joins in, adopts, and incorporates on his behalf" discovery motion filed by co-defendant); *Peralta v. Am. Home Assur. Co*., No. 06-CV-02082-REB-MEH, 2007 WL 2786425, at *3 (D. Colo. Sept. 24, 2007) (second defendant joined the motion to stay filed by first defendant).  In a case with similar facts, the Tenth Circuit recognized that a motion to compel arbitration is not limited to a single arbitration provision between one set of parties; courts are required to consider all arbitration agreements that apply to the issues, including by joining another party's motion.

In *Ferrell v. Cypress Envtl. Mgmt.-TIR, LLC*, the first defendant moved to compel arbitration based on its contract, and the district court denied relief.  No. 20-5092, 2021 WL 5576677, at *1 (10th Cir. Nov. 30, 2021) (cited as persuasive under Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.).  The second defendant then moved to compel arbitration based on its own separate contract with the plaintiff, and the first defendant joined that.  *Id*. Significantly, the second contract's arbitration clause covered "any dispute, controversy or claim arising out of or related to in any way to the parties' employment relationship," and also required any disputes about the enforcement of the arbitration clause had to be decided

2

by the arbiter.  *Id*.  The district court denied this as well.  *Id*. at *2.  The Tenth Circuit reversed, holding it was appropriate for the non-signatory defendant to join the second defendant's motion, and enforceability of the second defendant's arbitration clause had to be decided by the arbiter, not the district court.  *Id*. at *3-4; *see also Reeves v. Enter. Products Partners, LP*, 17 F.4th 1008, 1014 (10th Cir. 2021) (holding an arbitration clause addressing "any concern arising" out of the agreement at issue was broad enough to include claims against a non-signatory).  The same analysis applies here.

This Court denied GreenSky's motion to compel arbitration and to dismiss, both of which were based on the contract between GreenSky and Parisi, and the arbitration clause contained therein.  (Doc. 66).  Later, Oklahoma Windows moved to dismiss or to stay Parisi's claims pending contractual arbitration, based on the arbitration provision contained in its contract with Parisi.  (Doc. 68; Doc. 69).  In support, Oklahoma Windows provided a written Agreement between it and Parisi containing an arbitration provision, which provides that "Buyer and Contractor agree that *any dispute...arising under or in connection with* this Agreement, *or the products and services to be provided* by Contractor... will be determined by binding arbitration...."  (Doc. 69, p.2) (emphasis added).

Such Agreement was not before the Court at the time GreenSky filed its motions, as Oklahoma Windows first made an appearance in December 2023, over seven months after GreenSky moved to compel arbitration.  (Doc. 17; Doc. 69).  Therefore, in addition to the arguments GreenSky previously raised regarding arbitration and dismissal, the Oklahoma Windows/Parisi Agreement's arbitration clause covers the claims Parisi has raised against GreenSky, as her claims "arise under or in connection with" the Oklahoma

3

A668

Windows Agreement and/or the products and services Oklahoma Windows was to provide to Parisi.  Accordingly, as in *Ferrell,* GreenSky properly joined Oklahoma Windows's motion, and adopted the arguments and evidence provided.  (Doc. 72).

Further, Rule 12(g) precludes a party from filing a subsequent Rule 12 motion, but only as to "a defense or objection *that was available to the party* but omitted from its earlier motion."  FED. R. APP. P. 12(g)(2) (emphasis added).  Here, GreenSky moved to compel arbitration (Doc. 17) and for dismissal under Rule 12(b)(3) (Doc. 46), based on the arbitration provision contained in its own contract with Parisi.  The Oklahoma Windows/Parisi Agreement was not part of the pleadings in this case at that time, so was not available to GreenSky to argue.  Accordingly, even if Rule 12(g) applies—which GreenSky denies—the exception under Subsection (2) allows joinder.

**B.**    **GreenSky's joinder is consistent with its motion for reconsideration, both of which provided the basis for GreenSky's inclusion in the Oklahoma Windows/Parisi Agreement's arbitration provision**

Parisi complains that GreenSky did not explain its joinder to her satisfaction.  (Doc. 76, p.4).  In its joinder notice, GreenSky cited as persuasive authority the *Ferrell* opinion which, as detailed above, is on point with the facts and procedural posture of this case. Further, in its motion for reconsideration (Doc. 70), filed the day after the joinder notice, GreenSky elaborated on the application of *Ferrell* and related authorities to the Oklahoma Windows/Parisi Agreement and explained why the arbitration clause includes GreenSky. For the reasons stated above, as well as those stated GreenSky's joinder and reconsideration motion, GreenSky has explained the basis for its joinder.

4

**C.**   **The Oklahoma Windows/Parisi Agreement's arbitration provision applies to GreenSky, as Parisi's claims against GreenSky "arise under or in connection with" such Agreement**

Parisi argues that only the parties to a contract may enforce said contract.  (Doc. 76, pp. 5-6).  This is not the law with respect to arbitration agreements.  As detailed above, in *Ferrell*, the Tenth Circuit directly addressed whether a plaintiff was estopped from avoiding arbitration, where his claims against the two defendants (one with an arbitration clause contract) were "inherently inseparable."   *Id.*, *citing Reeves v. Enter. Products Partners, LP*, 17 F.4th 1008, 1014 (10th Cir. 2021) (holding an arbitration clause addressing "any concern arising" out of the agreement at issue was broad enough to include claims against a non-signatory).

Here, Parisi has pled there is "an unlawful and deceptive pattern of wrongdoing followed by Defendant, Andersen [Oklahoma Windows], in concert with its co-defendant, Harris/GreenSky (jointly Defendants), in its credit extension sale of consumer goods and services in the State of Oklahoma."  (Doc. 36, p.2, ¶8).  Parisi further lumps both Defendants together throughout her pleading, accusing both of concerted actions with respect to prospective consumers and herself in particular.   Again, the Oklahoma Windows/Parisi Agreement contains an arbitration provision, which provides that "Buyer and Contractor agree that *any dispute...arising under or in connection with* this Agreement, *or the products and services to be provided* by Contractor... will be determined by binding arbitration...."  (Doc. 69, p.2) (emphasis added).  Consequently, the Agreement applies to Parisi's claims against GreenSky.  *See Wohlford v. Am. Auto Shield, LLC*, No. CIV-22-520-SLP, 2023 WL 1107891, at *1 (W.D. Okla. Jan. 30, 2023), appeal dismissed, No. 23-

6025, 2023 WL 5570138 (10th Cir. Mar. 22, 2023) (holding plaintiffs' claims against non-signatory defendants were "inextricably intertwined" and fell within the broad scope of the arbitration provisions, which included "any legal dispute" related to the vehicle service contract at issue). Accordingly, GreenSky's joinder in Oklahoma Windows's motion to compel arbitration is proper.

Respectfully submitted,

Dated: January 17, 2024

*s/ Kyle R. Prince*
Derrick T. DeWitt, OBA #18044
Kyle R. Prince, OBA #33040
DeWITT PARUOLO & MEEK
P.O. Box 138800
Oklahoma City, OK 73113
T: (405) 705-3600
F: (405) 705-2573
ddewitt@46legal.com
kprince@46legal.com

-and-

Sean W. Fleming
*Admitted Pro Hac Vice*
Texas State Bar No. 24027250
MACDONALD DEVIN MADDEN
KENEFICK & HARRIS, P.C.
12770 Coit Road, Suite 1100
Dallas, Texas 75251
T: (214) 744-3300
F: (214) 747-0942
SFleming@MacDonaldDevin.com
**Attorneys for Defendant GreenSky, LLC,
incorrectly identified as BMO Harris Bank,
NA d/b/a GreenSky, LLC**

6

A671

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 17, 2024, I electronically transmitted this document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

> M. Kathi Rawls, OBA #18814
> Minal Gahlot, OBA #22145
> kathi@rawlsgahlot.com
> minal@rawlsgahlot.com
>
>    -and-
>
> Janet R. Varnell, FBN #0071072
> jvarnell@vandwlaw.com
> **Attorneys for Plaintiffs**
>
> Shelia D. Sayne, OBA #31213
> shelia.sayne@outlook.com
>
> Diane J. Zelmer
> *Admitted Pro Hac Vice*
> Florida Bar No.: 27251
> djz@berensonllp.com
> **Attorneys for Defendant**
> **Oklahoma Windows and Doors, LLC d/b/a**
> **Renewal by Anderson of Oklahoma**

> *s/ Kyle R. Prince*

A672

## IN THE UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF OKLAHOMA

**SUSAN PARISI,**

               **Plaintiff,**

**v.**

**OKLAHOMA WINDOWS AND DOORS, LLC d/b/a RENEWAL BY ANDERSON OF OKLAHOMA, and BMO HARRIS BANK, NA d/b/a GREENSKY, LLC,**

               **Defendants.**

**Case No.: 5:23-cv-00115-R**

## PLAINTIFF'S OPPOSITION TO GREENSKY'S
## MOTION TO RECONSIDER ORDER

Defendant BMO Harris Bank, NA, d/b/a GreenSky, LLC ("GreenSky") just *can't quit* attempting to force Plaintiff Susan Parisi ("Parisi") to arbitrate her claims, despite this Court's well-reasoned Order denying GreenSky's motions to compel arbitration and dismiss all claims (the "Order") [ECF Doc. No. 66]. Now GreenSky, having failed with its successive attempts to compel arbitration [ECF Doc. Nos. 17, 46], raises the same arguments it already previously raised with this instant "Motion to Reconsider Order (Doc. 66) and Brief in Support" ("Motion to Reconsider") [ECF Doc. No. 72]. GreenSky fails to meet the standard necessary for this Court to reconsider its Order, and therefore the Motion to Reconsider should be denied.

## I.      Background Facts and Procedural History

The facts of this case have been set forth by Parisi in other filings and in this Court's Order issued on December 1, 2023. [ECF Doc. Nos. 39, 56, 66]. For the Court's convenience, an abbreviated procedural history is included here. GreenSky first asked this Court to compel arbitration and dismiss or stay Parisi's claims on April 28, 2023. [ECF Doc. No. 18]. After Parisi amended her Complaint to name co-defendant, Oklahoma Windows and Doors LLC d/b/a Renewal by Anderson of Oklahoma ("Anderson"), GreenSky again sought to compel arbitration and dismiss or stay Parisi's claims on September 25, 2023. [ECF Doc. Nos. 46, 47]. This Court denied GreenSky's motions to compel arbitration on December 1, 2023. [ECF Doc. No. 66]. On December 7, 2023, Anderson moved to dismiss Parisi's Amended Complaint and compel arbitration. [ECF Doc. No. 69]. On December 28, 2023, GreenSky filed a purported Notice of Joinder in Anderson's motion to compel arbitration. Parisi filed her Response in Opposition to that Notice of Joinder on January 10, 2023. [ECF Doc. No. 76]. GreenSky has also filed a notice of appeal of this Court's denial of its motions to compel arbitration. [ECF Doc. No. 73].

## II.     Standard of Review

The Federal Rules of Civil Procedure do not recognize a "motion for reconsideration." *Spring Creek Expl. & Prod. Co., LLC v. Hess Bakken Inv., II, LLC*, 887 F.3d 1003, 1024 (10th Cir. 2018). Nevertheless, "a district court always has the inherent power to reconsider its interlocutory rulings" before entry of final judgment. *Id*. (quoting *Warren v. Am. Bankers Ins. of FL*, 507 F.3d 1239, 1243 (10th Cir. 2007). The Tenth Circuit has held that grounds for a motion to reconsider include (1) an intervening change in the

A674

controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice. *Servants of Paraclete v. Does*, 204 F. 3d 1005, 1012 (10th Cir. 2000) (citing *Brumark Corp. v. Samson Resources Corp.*, 57 F.3d 941, 948 (10th Cir.1995). "Thus, a motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law." *Servants of Paraclete*, 204 F. 3d. at 1012.

## III.    Argument

### A.    GreenSky Rehashes Old Arguments and Fails to Demonstrate Clear Error

GreenSky's Motion to Reconsider fails to meet the standard required for reconsideration.  GreenSky concedes there has been no intervening change in the controlling law, but fails to raise any new evidence previously unavailable or demonstrate a need to correct clear error or prevent manifest injustice. *See DiTucci v. First American Title Insurance*, 2023 WL 382923, *5 (10th Cir. Jan. 25, 2023) ("A motion for reconsideration is not appropriate to revisit issues already addressed or advance arguments that could have been raised in prior briefing.") (cleaned up, citations omitted). This Court did not misapprehend the facts, GreenSky's position, or the controlling law.

GreenSky simply revisits its former arguments about the "liberal federal policy favoring arbitration," and even goes so far as to incorporate by reference its prior briefing. *See* Motion to Reconsider, p. 4.  According to GreenSky, this Court should reconsider its Order "because the arbitration Agreement between Parisi and Oklahoma Windows was not previously part of the record, and the arbitration provision applies to Parisi's claims against

GreenSky." *See* Motion to Reconsider, p. 3. Likewise, GreenSky claims that it could not have raised arguments related to its co-Defendant Oklahoma Windows' purported agreement previously because "the Oklahoma Windows Agreement was not before the Court at the time GreenSky filed its motions." Motion to Reconsider, p. 6. These assertions are flat-out wrong. The "Oklahoma Windows Agreement" was part of the record when GreenSky filed its second motion to compel arbitration (*and* when GreenSky filed a reply brief in support of its first motion to compel arbitration).

**B.    GreenSky Could Have Made Arguments Based on the "Oklahoma Windows Agreement" in its Earlier Briefing But Declined to Do So.**

Parisi's Response in Opposition to GreenSky's first Motion to Compel Arbitration was supported by Parisi's declaration, which referred to the "Oklahoma Windows Agreement" in paragraph 33:

> "The contract attached to Mr. Kelley's email shows Loan Plan 3541 with a 24-month promotional period and interest waived if the balance is paid off before the promotional period ends. A true and accurate copy of the Loan Plan 3541 I discovered in my spam email folder is attached hereto as Exhibit 1."

[ECF Doc. No. 39-1, p. 5]

Exhibit 1 to Parisi's Declaration is Loan Plan 3541, the "Oklahoma Windows Agreement" GreenSky claims was not previously part of the record. [ECF Doc. No. 39-1, pp. 9-38]. Likewise, Parisi's Opposition to GreenSky's Second and Redundant Motion to Dismiss includes the "Oklahoma Windows Agreement" as an exhibit to Parisi's Declaration in Support of her Opposition. [ECF Doc. No. 56-1, pp. 6, 10-39]. GreenSky

therefore cannot claim that the "Oklahoma Windows Agreement" was not previously part of the record simply because GreenSky elected to forego arguments grounded upon it.[1]

GreenSky's attempt to repackage its previous arguments to suggest that the "Oklahoma Windows Agreement" – an illusory contract lacking in consideration for which there was no meeting of the minds – is now somehow applicable to GreenSky's cause, should be denied.  Like it did the first two times it moved to dismiss Parisi's claims and compel her to arbitration, GreenSky tries to conflate two distinct "agreements" in its Motion to Reconsider by referring to a Loan Agreement (capitalized but not defined). Motion to Reconsider, p. 4. This is a repeat of GreenSky's previous tactic of pretending that two different purported contracts are one, despite this Court's clear rejection of GreenSky's sleight of hand. [ECF Doc. No. 66], p. 13. ("A different plan is a different offer. Parisi's apparent consent to the Zero-Interest Loan's terms is not simply transposed to the High-Interest Loan offer.")[2]  Likewise, GreenSky repeats its previous argument that

---

[1] In fact, GreenSky refers to Parisi's Response in a footnote in its Reply supporting its first Motion to Dismiss and Compel Arbitration, stating that "[r]egardless of the financing terms, any loan agreement through the GreenSky program would have the same arbitration agreement contained in the *final* Loan Agreement, as all GreenSky loan agreements contain the same arbitration agreement." [ECF Doc. No. 42], p. 7, fn. 4. (emphasis added). However, a comparison between the "Oklahoma Windows Agreement" arbitration provision and the "final Loan Agreement" arbitration provision reveals several differences. Cf., [ECF Doc. No. 39-1], pp. 16-17 with [ECF Doc. No. 47-4], pp. 4-5. GreenSky makes the same argument again in its Reply in Support of its second Motion to Dismiss and Compel Arbitration, this time in the body of its brief rather than in a footnote. [ECF Doc. No. 65], pp. 5-6.

[2] Parisi did not consent to the "Oklahoma Windows Agreement" terms because she never had a chance to review them; when she provided her iPad signature to the Anderson representative, she believed that it was for a credit check and part of the application process for the loan she hoped to, but never did, receive.  [ECF Doc. No. 71-1], pp. 2-3.

Parisi, by simply applying for a loan, made a commitment to arbitrate her claims. *See* Motion to Reconsider, p. 4. She did not. GreenSky then reiterates that it "has briefed such issues and provided evidence on that issue." *Id*. Thus, by GreenSky's own account, it fails to raise new evidence unavailable previously.

### C.   GreenSky's Cited Caselaw Is Inapposite.

GreenSky cites to *Ferrell v. Cypress Envtl. Mgmt.-TIR, LLC*, 2021 WL 5576677, *1 (10th Cir. Nov. 30, 2021) for its untethered theory that "[a] motion to compel arbitration is not limited to a single arbitration provision between one set of parties" and that "courts are required to consider all arbitration agreements that apply to the issues." *Ferrell*, a putative collective action case for unpaid overtime wages under the Fair Labor Standards Act, 29 U.S.C. §216(b), is 1) inapposite, and 2) a decision issued prior to the Supreme Court's opinion in *Morgan v. Sundance*, 596 U.S. 411, 416 (2022).

*Ferrell* involved the claims of an oil and natural gas pipeline inspector who had signed an employment agreement with a sub-subcontractor containing an arbitration agreement. 2021 WL 5576677, *1. The prime contractor moved to compel arbitration based on the employment agreement, but *before* the district court ruled on the prime contractor's motion, the sub-subcontractor intervened and moved to compel arbitration, also based on the employment agreement. *Id*. (emphasis added). The prime contractor then joined the sub-subcontractor's motion. *Id*. The prime and sub-subcontractor argued that Ferrell, the pipeline inspector, should be equitably estopped from avoiding arbitration. *Id.*, *2. The 10th Circuit reversed the district court's denial of the joint motion, holding that a "concerted misconduct estoppel" applied, with its analysis "driven" by Ferrell's attempt

6

"to use his employment contract to his advantage when it suits him and disavow it when it does not." *Id*., *4 ("Ferrell's attempt to avoid the arbitration provision he agreed to in his contract with Cypress through artful pleading is the epitome of a party 'playing fast and loose with the courts.'") (further citations omitted). The 10th circuit concluded that the appropriate course of action "is to require Ferrell to honor the contract he agreed to." *Id*. Of course, Ferrell never disputed that he signed the employment agreement at issue. By contrast, Parisi disputes that she ever agreed to the "Oklahoma Windows Agreement" and her claims are certainly not based on its terms. Thus, equity would not be served by application of an equitable estoppel theory, nor has GreenSky even advanced such a theory (which it could have done in its previous motion to compel arbitration but did not).

GreenSky also cites to the 10th circuit decision *in Reeves v. Enterprise Products Partners, LP*, a putative collective action also in the employment context where the plaintiff admitted he was jointly employed by the signatory and the non-signatory.17 F. 4th 1008, 1015 (10th Cir. 2021). The *Reeves* court held that a non-signatory could compel arbitration because the signatory was attempting to enforce the agreement's benefits while also seeking to avoid its arbitration provisions. *Id*., at 1015.  Unlike the instant action, there was no dispute in *Reeves* that the signatory had agreed to the contract containing the arbitration provision.  *Id*., at 1010.  Moreover, the actual arbitration clause is not quoted in the *Reeves* opinion, so its scope does not appear to have been a factor impacting the court's decision. *See* Part III (D), *supra*.

Importantly, in *Morgan v. Sundance*, *supra*, decided after *Ferrell* and *Reeves*, the Supreme Court clarified that the Federal Arbitration Act's "policy favoring arbitration"

7

A679

does not "authorize federal courts to invent special, arbitration-preferring procedural rules." *Morgan*., 596 U.S. at 418. The policy is "to make arbitration agreements as enforceable as other contracts, but not more so." *Id*. (further citations omitted). Putting a fine point on it, the Supreme Court held that the federal policy is "not about fostering arbitration." *Id*. Accordingly, GreenSky's misguided attempt to read into *Ferrell* and *Reeves* that "a motion to compel arbitration is not limited to a single arbitration provision between one set of parties" or that "courts are required to consider all arbitration agreements that apply to the issues," should not be sustained in light of *Morgan v. Sundance*.

### D. Even if this Court Finds That the "Oklahoma Windows Agreement" is Valid, GreenSky Cannot Enforce Its Arbitration Provision.

Even if arguendo, the Court finds that there was a meeting of the minds between Parisi and Anderson and a contract was formed (it should not), the contract language expressly limits arbitration to any dispute *between Anderson and Parisi* or their respective affiliates, officers, directors, employees, agents, or owners. [ECF Doc. No. 39-1] pp. 16-17. Therefore, the purported agreement itself forecloses GreenSky's argument that the "Oklahoma Windows arbitration clause covers the claims Parisi has raised against GreenSky." Motion to Reconsider, p. 5. GreenSky confuses the fact that the arbitration provision may be broad in the sense that it might apply to claims that "arise under or in connection with" the "Oklahoma Windows Agreement" with the fact that the agreement is expressly limited to disputes that arise "between them," meaning Anderson and Parisi or "any of their respective affiliates, officers, directors, employees, agents, or owners." The

A680

arbitration provision is therefore not broad enough to include GreenSky, which is not an affiliate, officer, director, employee, agent, or owner of Anderson. *See e.g.*, *Fucci v Bowser*, 2023 WL 6391506, *10 (D. Utah Oct. 2, 2023) (citing *Kroma Makeup EU, LLC v. Boldface Licensing + Branding, Inc.*, 845 F.3d 1351, 1356 (11th Cir. 2017) ("If the parties had consented in the arbitration clause to arbitrate any disputes concerning the validity, interpretation, etc., of the contract, instead of consenting to arbitrate only 'disputes arising between them' ... the [nonsignatories] may have been able to use equitable estoppel to require [the plaintiff] to arbitrate the dispute between it and them. But, as the 'between them' language shows, that is not what the parties to the agreement consented to do in the arbitration provision."); *See also, Daphne Auto., LLC v. E. Shore Neurology Clinic, Inc.*, 245 So. 3d 599, 606 (Ala. 2017) (holding that arbitration provision limited to "disputes between them" had a narrow scope that precluded nonsignatories from compelling arbitration).

In *Daphne*, the court explained that arbitration agreements like the one at issue are broad insofar as they apply to "all claims, demands, disputes or controversies of every kind or nature." *Id*., at 606. But the agreements are limited to disputes that arise "between them," *i.e*, the parties. *Id*. Thus, even were the Court to find that Parisi had intentionally entered into the "Oklahoma Windows Agreement" containing the arbitration provision, the provision's scope is not broad enough to encompass GreenSky.

The "Oklahoma Windows Agreement" further expresses its narrow scope with language declaring the arbitration commitment will be null and void if a third party's claims must be joined. *See* ECF Doc. No. 39-1 ("Neither of the parties nor the arbitrator

will have any authority or power to proceed with any claim as a class action or *otherwise to join or consolidate any claim with any other claims or any other proceeding involving third parties*. In the event a court determines that this limitation on joinder or class action claims is unenforceable, then this entire commitment to arbitrate will become null and void and the parties must submit all claims to the jurisdiction of the courts.") Thus, joining Parisi's claims against GreenSky into a dispute between Parisi and Anderson would nullify any purported commitment to arbitrate.

### E.   Limited Discovery on Factual Issues is Unnecessary and Inappropriate

GreenSky has not explained why the "evidence included with Oklahoma Windows's currently pending motion" is a basis for reconsideration of the Court's Order. Motion to Reconsider, p. 6.  Nor has GreenSky explained how the Court's reconsideration of its decision on GreenSky's motions to dismiss and compel arbitration would "prevent manifest injustice." *Id*. GreenSky's plea for limited discovery "to prevent clear error and manifest injustice" simply regurgitates the standard for reconsideration with no attempt to tie the Court's opinion denying GreenSky's motions to the standard. Accordingly, GreenSky has utterly failed to explain the necessity of "limited discovery" on "these issues." *Id*.

Because Anderson's attempt to compel Parisi to arbitration based on an illusory contract entirely lacking in consideration should fail, inconsistent results should not be an issue. Nor would inconsistent results stemming from two different contracts be a reason to allow a nonsignatory to compel arbitration with a party who did not consent to arbitration. "Arbitration under the [FAA] is a matter of consent, not coercion . . ." *Volt Info. Sciences,*

*Inc. v. Board of Trustees,* 489 U.S. 468, 469 (1989). Furthermore, GreenSky's docket

activity in this litigation does not demonstrate a serious concern with the waste of judicial

resources. Motion to Reconsider, p. 6.

**IV.     Conclusion**

For the reasons stated above, this Court should deny GreenSky's Motion to

Reconsider.

Respectfully submitted this 19th day of January, 2024.

**VARNELL & WARWICK, P.A.**

/s/ Janet R. Varnell
Janet R. Varnell, FBN: 0071072
400 N. Ashley Drive, Suite 1900
Tampa, FL  33602
Telephone: (352) 753-8600
jvarnell@vandwlaw.com

**RAWLS GAHLOT, PLLC**

/s/ M. Kathi Rawls
M. Kathi Rawls, OBA #18814
Minal Gahlot, OBA # 22145

2404 S. Broadway
Moore, Ok 73160
Phone: 405-912-3225
kathi@rawlsgahlot.com
minal@rawlsgahlot.com

***Attorneys For Plaintiff***

A683

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on January 19, 2024, I electronically filed the foregoing with the Clerk of the Court through the CM/ECF System, which will send a notice of electronic filing to all counsel of record.

/s/ Janet R. Varnell
Janet R. Varnell

A684

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

SUSAN PARISI,               )
                        )
             Plaintiff,     )
                        )
v.                       )     No. CIV-23-115-R
                        )
OKLAHOMA WINDOWS AND    )
DOORS, LLC, d/b/a RENEWAL BY   )
ANDERSEN OF OKLAHOMA; and    )
BMO HARRIS BANK, NA, d/b/a     )
GREENSKY, LLC,          )
                        )
             Defendants.   )

## <u>ORDER</u>

Before the Court is Defendant Renewal by Andersen of Oklahoma's Motion to Compel Arbitration [Doc. 69]. Plaintiff responded, and the matter at issue [Doc. 71].[1] The Motion to Compel Arbitration is DENIED for the reasons below.

## I.    BACKGROUND

This case stems from a purported agreement to install and finance new windows in Plaintiff's home. The Court described the events of this case at length in a previous Order

---

[1] Additionally, Defendant GreenSky, LLC filed a Notice of Joinder in its co-defendant's Motion [Doc. 70]. Plaintiff opposed joinder, and the issue is fully briefed [Docs. 76, 79]. The Court finds joinder is proper, though fruitless. FED. R. CIV. P. 12(g)(2) does not bar GreenSky's joinder. *See Conrad v. Phone Directories*, 585 F.3d 1376, 1383 n.2 (10th Cir. 2009). As well, GreenSky may join its co-defendant's Motion because the issues are "integrally related" and "substantially interdependent[.]" *See Reeves v. Enter. Prod. Partners, LP*, 17 F.4th 1008, 1015 (10th Cir. 2021); *see also Ferrell v. Cypress Env't Mgmt.-TIR, LLC,* No. 20-5092, 2021 WL 5576677 at *4 (10th Cir. Nov. 30, 2021).

denying co-defendant GreenSky's Motion to Compel Arbitration. *See* Doc. 66.

Consequently, the Court limits its discussion of facts to only those pertinent to this Motion.[2]

*A. The Initial Meeting and Purported Agreement on November 23, 2021*

Susan Parisi received communications from Andersen advertising the ability to upgrade her home's windows with a loan requiring zero money down, zero interest for two years, and zero payments for twenty-four months ("Zero-Interest Loan"). Doc. 71-1: Parisi Decl. at ¶ 4.  Parisi met with Russell Kelley, a representative from Andersen, at her home on November 23, 2021. *Id.*  Parisi wished to replace multiple windows in her home. Doc. 36: Compl. at ¶¶ 63-64. However, Parisi informed Kelley she was beginning treatment for cancer soon, and she would need the Zero-Interest Loan option due to the costs and time her treatment would entail. *Id.* ¶ 62; Parisi Decl. at ¶ 6.

Kelley confirmed that Parisi's project was eligible for the advertised Zero-Interest Loan from GreenSky, a frequent financier of Andersen projects. Parisi Decl. at ¶ 7. He stated Parisi would need to sign a credit application on his iPad so that GreenSky could review her creditworthiness. *Id.* at ¶¶ 8-10. Kelley did not inform Parisi her signature could be used for purposes other than the credit check and loan application. *Id.* at ¶ 13. Parisi signed Kelley's iPad once. *Id.* at ¶ 15. Then, Kelley stated he needed additional signatures to secure the Zero-Interest Loan for Parisi. *Id.* at ¶ 16. Kelley proceeded to swipe through

---

[2] The Court looks to facts discussed in that previous Order. Analyzing a motion to compel arbitration is akin to summary judgment practice, meaning this Court can examine the record as a whole to determine whether a genuine dispute of fact regarding the existence of an agreement to arbitrate exists. Doc. 66 at 2 n.1 (citing *Bellman v. i3 Carbon, LLC*, 563 F. App'x 608, 612 (10th Cir. 2014)).

additional pages on his iPad on which Parisi could see only a signature line and a check box. *Id.* at ¶ 17. As directed, Parisi checked a box to affix her prior signature on approximately twelve of these additional screens. *Id.* at ¶ 18. Kelley did not inform Parisi of any additional contract terms she may have agreed to via her actions on the iPad. *Id.* at ¶¶ 19-20. In fact, Parisi was unaware she was purportedly signing a contract at all; she only ever intended to apply for the Zero-Interest Loan by signing the iPad. *Id.* at ¶ 21.

Thirty minutes later, GreenSky called Kelley and informed Parisi via speakerphone that she had been approved for the two-year loan program with GreenSky. Doc. 18-3: Kaliban Decl. at ¶ 17; Parisi Decl. at ¶¶ 25-26. Kelley showed Parisi his iPad to evidence she had been approved for the Zero-Interest Loan, but the loan's financial terms were not visible. Compl. ¶ 65; Parisi Decl. ¶ 28. Parisi did not sign anything following her supposed approval for the loan. *Id.* at ¶¶ 15, 28. Before leaving Parisi's home, Kelley told her he would send a copy of the loan contract. *Id*. at ¶ 29. He emailed Parisi a copy of the agreement that night. *Id.* at ¶ 31; Doc. 69-1 at 37. However, Parisi did not discover a signed contract was attached to the email for nearly two years because she did not notice it in the Spam folder of her email inbox. Parisi Decl. at ¶ 32.

*B. The Purported Contract between Parisi and Renewal by Andersen*

The contract is a thirty-page document, and Parisi's signature appears fourteen times. Doc. 69-1: Contract at 6-36.[3] Parisi alleges these signatures are affixed, without her

---

[3] Page numbers on the document refer to the ECF pagination. The Court advises Counsel that the document should have been submitted as a separate exhibit from the Erickson affidavit and Kelley email.

A687

authorization, to pages she had neither seen nor had described to her. Parisi Decl. at ¶¶ 34-35. She also alleges multiple signatures in the document are forged. *Id.* at ¶¶ 36-38.

The contract states the Buyer (Parisi) "agrees to purchase the products and/or services . . . in accordance with the terms and conditions described in this Agreement Document and Payment Terms, any documents listed in the Table of Contents, and any other document attached to this Agreement . . . ." Contract at 7. The total price is listed as $17,743. *Id.* The entire balance is financed; Parisi made no initial deposit. *Id.* The Contract includes notice of the right to cancel within three business days of acceptance. *Id.* at 9.

A GreenSky Financing Form is completed and signed on the fifth page of the contract.[4] *Id.* at 10. It states Parisi's Loan Plan is "Plan 3541 - 24 month promotional period. Interest waived if balance paid off before promotional period ends." *Id.* These terms reflect the Zero-Interest Loan for which Parisi applied. Parisi Decl. at ¶¶ 21, 33. However, Kelley called Parisi a few days after their initial meeting and informed her she had, in fact, not qualified for the Zero-Interest Loan. *Id.* at ¶ 39.

The Contract also contains an Arbitration provision which states:

> Buyer and Contractor agree that any dispute between them, or any of their respective affiliates, officers, directors, employees, agents or owners arising under or in connection with this Agreement, or the products and services to be provided by Contractor, that has been not resolved through mediation, will be determined by binding arbitration . . . . The arbitration must be conducted on an individual basis. Neither of the parties nor the arbitrator will have any authority or power to proceed with any claim as a class action or otherwise to join or consolidate any claim with any other claims or any other proceeding involving third parties. In the event a court determines that this limitation on joinder or class action claims is unenforceable, then this entire commitment to arbitrate will become null and void and the parties must

---

[4] Parisi claims her signature on this page and the next are forged. Parisi Decl. at ¶¶ 37-38.

submit all claims to the jurisdiction of the courts. The parties agree that any action or claim or request for an injunction shall not be subject to arbitration.

*Id.* at 13. Andersen seeks to enforce this arbitration clause.

### C. GreenSky's Financing Offer to Parisi

As laid out in greater detail in a prior Order [Doc. 66 at 2-8], GreenSky did not offer Parisi the Zero-Interest Loan. Rather, following the submission of her credit application via Kelley's iPad, GreenSky offered Parisi a loan with starkly different terms. Doc. 66: Order at 6. The Court previously detailed GreenSky's actual offer:

> Loan Plan 7541 ("High-Interest Loan") requires payments beginning in six months, charges an annual percentage rate of 24.99%, and projects a total cost of $37,717.08 over the life of the $17,744 loan. Doc. 39-3; Doc. 18-3 at 12. The Loan Agreement states, "THIS IS A DIFFERENT PLAN THAN REQUESTED." Doc. 39-3 at 6.

*Id.* at 6 (omitting footnotes and citing to documents in the record).

GreenSky emailed Parisi three times within a span of five minutes regarding its loan offer on the afternoon of November 23. Kaliban Decl. at ¶¶ 23-27; Doc. 71-1 at 20-25.[5] The first two prompted Parisi to activate her loan; the third congratulated her on activating the loan. Doc. 71-1 at 20-25. Parisi, however, states she never opened these emails, activated her loan, or saw an emailed copy of the GreenSky offer because these emails went to her Spam folder, too. Parisi Decl. at ¶ 43; Doc. 71 at 4 n.2. GreenSky also mailed Parisi a copy of its loan offer [Doc. 39-3] the same day.[6] Kaliban Decl. at ¶¶ 18-22.

---

[5] Counsel is advised that these emails should have been submitted to the Court as a separate exhibit, not as an attachment to Ms. Parisi's Declaration.

[6] This purported loan agreement, the subject of GreenSky's Motion to Compel Arbitration, is a separate document from the Andersen Contract at the center of this Motion.

A689

However, Parisi did not receive the physical copy until the following week. Parisi Decl. at ¶ 43.

GreenSky alleged Parisi accepted the terms of the High-Interest Loan via a transaction initiated by Andersen. Kaliban Decl. at ¶ 28; Order at 11-12. Accordingly, GreenSky previously attempted to enforce an arbitration provision found in the High-Interest Loan Agreement [Doc. 17, 46]. The Court denied GreenSky's Motion to Compel and substantially identical Motion to Dismiss, finding Parisi had never effectively accepted the offer from GreenSky. Order at 10.

Now, Andersen seeks to enforce the arbitration provision found in its agreement with Parisi and asks the Court to stay or dismiss Plaintiff's action alleging violations of the Oklahoma Consumer Credit Code. GreenSky joins its co-Defendant's motion, and the Plaintiff opposes both the joinder and the Motion.

## II.    LEGAL STANDARD

When considering a motion to compel arbitration, a court must first determine if there was an agreement and then determine if the agreement provides the moving entity with the right to compel arbitration. *Caclovic v. J.C. Penney Corp.*, 884 F.3d 1051, 1057 (10th Cir. 2018). Courts apply state-law principles governing the formation of contracts to determine if an agreement to arbitrate exists. *Jacks v. CMH Homes, Inc.*, 856 F.3d 1301, 1304 (10th Cir. 2017). The party moving to compel arbitration bears the burden to show the arbitration clause applies. *Id.* If parties dispute the existence of an agreement, the nonmovant should receive the "benefit of all reasonable doubts and inferences that may arise" *Id.* (internal quotation omitted). The process is akin to summary judgment practice.

*Id.* "[T]he party moving to compel arbitration bears the initial burden of presenting evidence sufficient to demonstrate the existence of an enforceable agreement[.]" *Bellman* at 612. If a genuine dispute of material fact prevents determining whether the agreement is enforceable, a district court should proceed to a jury trial, if the nonmoving party so requests, to determine the facts and whether the parties agreed to arbitrate. *Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 977 (10th Cir. 2014).

## III.   DISCUSSION

Parisi and Andersen never entered into a valid contract because there was no mutual assent as to the material terms of the agreement. The parties could not assent to the terms of a nonexistent loan offer. As a matter of law, the parties did not contract.[7] Accordingly, no agreement between the parties to arbitrate exists, and Defendant's motion to compel arbitration is DENIED.

Oklahoma contract law governs the formation of this agreement and dictates the conclusion Plaintiff and Defendant never entered into the Andersen Contract. In Oklahoma, an enforceable agreement requires a "meeting of the minds on all essential terms of the contract." *South Central Industries v. Kerrtas Marketing, LLC*, 21-802, 2022 WL 1518935 at *2 (W.D. Okla. Feb. 7, 2022) (quoting *Young v. Chappell*, 239 P.3d 476, 479 (Okla. Civ. App. 2010)). "[T]he consent of the parties must be mutual, and consent is not mutual unless the parties agree on the same thing at the same time." *Smalley v. Bond*, 218 P. 513, 515

---

[7] Plaintiff propounds theories of contract invalidity based upon forgery and violations of electronic signature laws. *See* Doc. 71 at 12-14, 18-21. It is unnecessary for the Court to address these theories because, even assuming Parisi accepted an offer from Andersen, the lack of mutual assent prevents formation of a contract.

A691

(Okla. 1923). For the arbitration clause in the Andersen Contract to be enforceable, Parisi and Andersen must have agreed to all the same essential terms of the contract at the same time.

The payment terms were an essential element to this agreement, as they are in many agreements. *See e.g., Sarber v. Harris*, 368 P.2d 93, 96 (Okla. 1962) ("The amount of the purchase price as well as the terms of payment formed an essential part of the transaction."); *O'Neal v. Harper*, 75 P.2d 879, 881 (Okla. 1937) ("The purchase price was a material part of the contract and it is necessary that there be a meeting of the minds on the amount thereof before a valid contract could exist. It is not enough that [one party] intended to sell . . . and [one party] intended to buy[.]"). In this instance, Parisi only contacted Andersen after seeing the advertised Zero-Interest Loan offer. Doc. 39-1 at ¶¶ 4, 7. Parisi communicated she needed the Loan to proceed with the project. *Id.* at ¶ 6; Doc. 36 at ¶ 62. When Kelley met with Parisi at her home, they dedicated much of their time to Parisi's application for the Loan. In essence, the Zero-Interest Loan was the foundation of the entire transaction. Parisi was not seeking new windows from Andersen at any cost; Parisi was seeking new windows *only with the assistance of the Zero-Interest Loan*. The Loan was indispensable to the transaction, and thus, it was an essential term on which the parties' minds must have met to have formed a contract.

First, the offer was defective in describing the loan's actual financial terms. "An offer must be definite and certain." 17A Am. Jur. 2d Contracts § 46. It "must sufficiently cover the essentials of the proposed transaction." 17A Am. Jur. 2d Contracts § 48. Here, Andersen's contractual offer promised Parisi the Zero-Interest Loan. The contract assured

A692

Parisi she was purchasing Andersen's "products and/or services . . . in accordance with the terms and conditions described in this Agreement Document and Payment Terms[.]" Contract at 7. The fundamental issue is that Parisi had not, in fact, qualified for the Zero-Interest Loan. Instead, GreenSky offered Parisi only the High-Interest Loan. Thus, the Andersen Contract professed to offer something it could not deliver. The offer did not sufficiently cover the essentials of the proposed transaction between Parisi and Andersen because it did not accurately describe the actual payment terms offered to Parisi. It was an invalid offer.

It follows that Parisi's alleged acceptance of the invalid offer has no legal import. "[A]cceptance must be absolute, unconditional, and identical with the terms of the offer, and must in every respect meet and correspond with the offer; and any qualification of or departure from those terms invalidates the offer." *Nabob Oil Co. v. Bay State Oil & Gas Co.*, 255 P.2d 513, 515 (Okla. 1953) (internal quotation marks omitted). Parisi, even assuming she validly signed the contract on Kelley's iPad, was assenting to the Zero-Interest Loan offer. In reality, no such offer existed. Parisi's purported acceptance of the Andersen Contract was therefore ineffective, as it differed from the terms of the actual offer made to her.

Because offer and acceptance were flawed, there cannot have been mutual assent to the contract's terms. "No contract is complete without the mutual assent of the parties to all essential elements of an agreement. The minds of the parties must meet and unite on all essential elements before an effective contract is created." *Mid-Continent Petroleum Corp. v. Russell*, 173 F.2d 620, 622 (10th Cir. 1949) (discussing Oklahoma contract law).

A693

Andersen misstated its offer. Parisi allegedly accepted the unavailable terms of that offer. Thus, the parties' minds did not "meet and unite" on the Zero-Interest Loan, an essential element of the transaction, and no contract was created. *See id.*

Plaintiff also suggests the contract fails for want of consideration. The Court believes the issue is better conceptualized as a lack of mutual assent, but the consideration argument illustrates a failing of the contract too. "Lack of mutuality means lack of consideration; where there is no other consideration for a contract[,] mutual promises must be binding on both parties to constitute consideration." *Adalex Lab'ys v. Krawitz*, 270 P.2d 346, 349-50 (Okla. 1954). The contract is not mutually enforceable. If Andersen seeks to force Parisi to arbitrate her claims, Parisi cannot force Andersen to provide it a Zero-Interest Loan as promised. Andersen cannot perform its promise because Parisi was never actually offered the Zero-Interest Loan. While it can be argued the promise to replace Parisi's windows is a form of consideration, the parties' intended bargain, reflected in the failed agreement, was for Andersen to replace the windows without Parisi being charged for two years. However, this bargain was illusory and never capable of mutual performance. Thus, the contract lacks consideration.

Accordingly, no summary trial of factual matters is necessary. Andersen does not carry its burden to present sufficient evidence the contract it presented the Court is valid. Andersen, in fact, presents little factual evidence at all. It merely presents the Contract and states conclusively that the agreement is enforceable because Parisi signed it. Moreover, even if the contract was not fundamentally deficient, genuine factual disputes regarding the

propriety of Parisi's acceptance and the contract's validity would prevent the Court from compelling arbitration without a jury's involvement.

## IV.    CONCLUSION

Defendant Andersen's Motion to Dismiss and Compel Arbitration [Doc. 68] is DENIED for the reasons set forth above.

**IT IS SO ORDERED** this 14th day of February 2024.

_David L. Russell_

**DAVID L. RUSSELL**
**UNITED STATES DISTRICT JUDGE**

11

A695

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| SUSAN PARISI,           ) | |
|                     ) | |
|           **Plaintiff,**      ) | |
|                     ) | |
| **v.**                    ) | **No. CIV-23-115-R** |
|                     ) | |
| **OKLAHOMA WINDOWS AND**  ) | |
| **DOORS, LLC, d/b/a RENEWAL BY** ) | |
| **ANDERSEN OF OKLAHOMA; and** ) | |
| **BMO HARRIS BANK, NA, d/b/a**  ) | |
| **GREENSKY, LLC,**          ) | |
|                     ) | |
|           **Defendants.**   ) | |

## <u>ORDER</u>

Before the Court is Defendant GreenSky, LLC's Motion for Reconsideration [Doc. 72] of the Court's prior Order [Doc. 66] denying GreenSky's Motion to Compel Arbitration [Doc. 17] and Motion to Dismiss for Improper Venue [Doc. 46]. Plaintiff responded, and the matter at issue [Doc. 81]. The Motion is DENIED.

Previously, the Court denied GreenSky's Motions because it found that Plaintiff and GreenSky did not, as a matter of law, enter into the contract containing the arbitration clause.[1] GreenSky now argues that a later-filed motion to compel arbitration [Doc. 68] by its co-defendant, Renewal by Andersen of Oklahoma, LLC, presents additional information that may alter the Court's decision in its prior Order.

---

[1] The factual basis for this suit has been well-documented in previous Orders [Docs. 66, 82], so the Court does not do so here.

A696

GreenSky's motion is reviewable under FED. R. CIV. P. 54(b) as reconsideration of an interlocutory order. *Price v. Philpot*, 420 F.3d 1158, 1167 n.9 (10th Cir. 2005) (citing Rule 54(b)). The review of an interlocutory order is guided by the same standards as a motion to alter or amend a judgment under FED. R. CIV. P. 59(e). *Carbajal v. Lucio*, 832 F. App'x 557, 569 (10th Cir. 2020). Parties agree the grounds supporting reconsideration are "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice." *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000). The purpose of a motion to reconsider is not "to revisit issues already addressed or advance arguments that could have been raised in prior briefing." *Id.*

In this instance, GreenSky suggests the second and third grounds for reconsideration support its Motion. It concedes there has been no change in the controlling law. However, GreenSky's argument is inherently flawed. The "new evidence" GreenSky points to was, in fact, available. Accordingly, there was no clear error or manifest injustice.

GreenSky suggests the signed agreement between Parisi and Renewal by Andersen was not before the Court when it ruled on GreenSky's Motion. That is false. The purported contract that Andersen submitted as part of its Motion [Doc. 69-1 at p. 6-35] has been part of the record since August 2023. The same document was submitted by Plaintiff in her Response to Greensky's Motion to Compel Arbitration [Doc. 39-1 at p. 9-38] and Response to GreenSky's Motion to Dismiss [Doc. 56-1 at p. 10-39]. Parisi referred to the purported contract in her sworn declaration [Doc. 39-1 at p.5, ¶¶ 33-38]. The Court even referred to the contract in its Order denying GreenSky's Motions [Doc. 66 at 4-5 nn. 4-5]. GreenSky

A697

had opportunities to utilize the agreement to advance its arguments in its respective Reply briefs [Doc. 42, 65]. GreenSky did not do so. Its disregard of the record is no reason for this Court to reconsider its Order.[2]

GreenSky also urges the Court to reconsider its prior Order in light of the arguments Andersen propounds in its Motion to Compel Arbitration. The Court has done so. The Court denied Andersen's motion and finds no reason to depart from its prior Order denying GreenSky's motions.

GreenSky's Motion for Reconsideration is DENIED for the reasons set forth above.

**IT IS SO ORDERED** this 14th day of February 2024.

DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE

---

[2] Counsel for GreenSky is reminded of its obligations under Rule 11 of the Federal Rules of Civil Procedure.

A698

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

SUSAN PARISI,

     Plaintiff,

vs.                                              CASE NO. CIV-23-cv-115-R

(Removed from the District Court of Oklahoma County, State of Oklahoma, Case No. CJ-2022-5727)

OKLAHOMA WINDOWS AND DOORS, LLC d/b/a RENEWAL BY ANDERSON OF OKLAHOMA AND BMO HARRIS BANK, NA d/b/a GREENSKY, LLC,

     Defendants.

_____/
_____

## DEFENDANT, OKLAHOMA WINDOWS AND DOORS, LLC

## d/b/a RENEWAL BY ANDERSON OF OKLAHOMA'S NOTICE OF APPEAL

_____

     Pursuant to Federal Rules of Appellate Procedure 3 and 4(a), and the Federal Arbitration Act, Defendant Oklahoma Windows and Doors, LLC d/b/a Renewal By Anderson of Oklahoma ("RBA") hereby appeals to the United States Court of Appeals for the Tenth Circuit from Court's Order (Doc. 82) denying RBA's Motion to Dismiss the Class Action Complaint (or Stay) and Compel Arbitration and the supporting Memorandum of Law (Doc 68-69), entered on February 14, 2024. FED. R. APP. P. 3, 4(a); 9 USC § 16; *Ansari v. Qwest Communications Corp.*, 414 F.3d 1214 (10th Cir. 2005).

**BERENSON**
*Counsel to the Remodeling and Home Improvement Industry*
*4495 MILITARY TRAIL, SUITE 203, JUPITER, FL  33458*

A699
PAGE 1

Dated: March 14, 2024                    Respectfully submitted,

                       /s/ Diane J. Zelmer

Diane J. Zelmer, Esq. (pro hac vice)
FL Bar No. 27251
BERENSON LLP
4495 Military Trail, Suite 203
Jupiter, Florida 33458
Telephone: 561-429-4496
Email: djz@berensonllp.com
*Attorney for Defendant, OKLAHOMA WINDOWS AND DOORS, LLC*

Sheila D. Sayne, Esq., OBA # 31213
Sayne Law PLLC
P.O. Box 33309
Tulsa, Oklahoma 74153-3309
Telephone: 918-740-3013
sheila.sayne@outlook.com
*Attorney for Defendant, OKLAHOMA WINDOWS AND DOORS, LLC*

A700

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was filed and served

electronically using CM/ECF, which is served upon all parties of record on the list for this case on

this 14th day of March, 2024.

Respectfully submitted,

/s/ Diane J. Zelmer
Diane J. Zelmer, Esq., Fla. Bar 27251